**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**CHATTANOOGA DIVISION**

| | |
|---|---|
| | ) Consolidated Case No |
| IN RE CBL & ASSOCIATES PROPERTIES, INC. SECURITIES LITIGATION | ) No. 1:19-cv-00181-JRG-CHS |
| | ) |
| | ) **JURY TRIAL DEMANDED** |

<u>**CONSOLIDATED CLASS ACTION COMPLAINT**</u>

**THE HAMILTON FIRM**
John W. Chandler, Jr.
2401 Broad Street, Suite 102
Chattanooga, TN 37408
Tel: (423) 634-0871
Fax: (423) 634-0874
jwc@thehamiltonfirm.com

**HOLIFIELD JANICH & FERRERA, PLLC**
Al Holifield
Sarah R. Johnson
11907 Kingston Pike Suite 201
Knoxville, Tennessee 37934
Tel: (865) 566-0115
Fax: (865) 566-0119
aholifield@holifieldlaw.com
sjohnson@holifieldlaw.com

**Co-Liaison Counsel for the Class**

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
Jeffrey S. Abraham (admitted *pro hac vice*)
Michael J. Klein (admitted *pro hac vice*)
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
jabraham@aftlaw.com
mklein@aftlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Michael J. Wernke (admitted *pro hac vice*)
J. Alexander Hood II (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
jalieberman@pomlaw.com
mjwernke@pomlaw.com
ahood@pomlaw.com

**Co-Lead Counsel for the Class**

**[Additional counsel on signature page]**

# Table of Contents

SUMMARY OF THE ACTION ................................................................. 1

JURISDICTION AND VENUE ............................................................... 4

PARTIES .............................................................................................. 5

SUBSTANTIVE ALLEGATIONS ......................................................... 8

    A.    The Company ......................................................................... 8

    B.    The Overcharge Scheme ......................................................... 8

    C.    The Overcharge Scheme Was Not Covered By Insurance ................. 12

    D.    The *Wave* Litigation ............................................................. 13

    E.    The Insurance Coverage Litigation ........................................... 16

    F.    CBL Was Required to Disclose the *Wave* Litigation and the Overcharge
Scheme ............................................................................. 16

    G.    Defendants' Fraudulent Financial Reporting ............................... 19

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ................... 20

THE TRUTH IS REVEALED WITH CBL'S COMPLETE AND TOTAL
CAPITULATION IN THE *WAVE* LITIGATION ........................................ 50

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
WERE MADE WITH SCIENTER ........................................................... 53

PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................................ 55

RELIANCE ....................................................................................... 57

COUNT I:  Violations of Section 10(b) of the Exchange Act  and Rule 10b-5
Promulgated Thereunder  (Against All Defendants) ................................... 58

COUNT II:  Violations of Section 20 of the Exchange Act   (Against Charles B.
Lebovitz and Stephen D. Lebovitz) ...................................................... 62

PRAYER FOR RELIEF ........................................................................ 63

JURY TRIAL DEMANDED ................................................................... 63

Lead Plaintiffs Jay B. Scolnick, Mark Shaner, Charles D. Hoffman, HoffInvestCo, and Lydia Hoffman (collectively referred to herein as "Plaintiffs" or "Lead Plaintiffs") allege the following based upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through their attorneys including a review and analysis of: (a) U. S. Securities and Exchange Commission (the "SEC" or the "Commission") filings made with respect to Defendants CBL & Associates Properties, Inc. ("CBL Associates") and CBL & Associates Limited Partnership (the "CBL Operating" and with CBL Associates, "CBL" or the "Company"); (b) the Company's press releases and statements made by its senior executives to investors; (c) securities analyst reports relating to CBL; (d) publicly available filings made in *Wave Length Hair Salons of Florida, Inc. v. CBL & Associates, Inc.*, Docket No. 2:16-cv-00206 (M.D. Fla.) (the "*Wave* Litigation"); and (e) publicly available filings made in *Catlin Specialty Ins. Co. v. CBL & Assocs. Props.,* No. N16C-07-166 PRW CCLD (Del. Super. Ct.) (the "*Catlin Specialty* Litigation"). Plaintiffs believe that after the documents filed under seal in the *Wave* Litigation are made public and Plaintiffs are afforded a reasonable opportunity for discovery, substantial additional evidentiary support will exist for the allegations set forth in this Complaint.

## SUMMARY OF THE ACTION

1.      CBL Associates is a publicly traded company organized as a real estate investment trust ("REIT") which, through CBL Operating, owns, leases, manages, and operates regional shopping malls primarily in the southeastern and midwestern United States. This action is brought on behalf of all persons who purchased or otherwise acquired the securities of CBL between July 29, 2014 and March 26, 2019, both dates inclusive (the "Class Period"), because Defendants violated the Securities Exchange Act of 1934 (the "Exchange Act") by (a) failing to disclose that CBL Operating was deliberately overcharging small retail tenants for electricity usage thereby

inflating the Company's reported financial results and (b) after being sued for that very same conduct, failing to disclose the existence of the lawsuit and the Company's likely liability for the underlying wrongful conduct.

2.      In 2005, notwithstanding lease terms uniformly providing that tenants would only be charged for their cost and usage electricity, CBL embarked on a scheme to mark up the electricity bills by meaningful amounts intended to be unnoticeable to tenants, pocketing well over $60 million in the period beginning in 2009.  CBL sought to conceal the overbilling scheme by including a lease provision prohibiting tenants from auditing their electric bills.

3.      CBL's scheme was hatched at the 2005 CBL "Leadership Conference" in which a presentation outlining the scheme was provided to CBL management, including Augustus N. Stephas ("Stephas")—the Executive Vice President and Chief Operating Officer ("COO") of the Company from 2010 through 2018 and an employee of the Company since 1978—and Don Sewell ("Sewell")—the current Senior Vice President – Management of CBL and an employee of the Company since 1973.  The scheme continued, unabated, for over a decade.

4.       On March 16, 2016, an aggrieved tenant, after discovering CBL's overbilling when new operators of its shopping mall sent an electricity bill which was less than half the amount previously billed by CBL, filed the *Wave* Litigation in the U.S. District Court for the Middle District of Florida.  The *Wave* Litigation asserted class action claims arising under the Racketeer Influenced and Corrupt Organization Act ("RICO"), seeking to recover the electricity overcharges as well as treble damages and attorneys' fees, as well as claims for violations of state laws.  The RICO claims in the *Wave* Litigation, with claimed damages estimated at $60 million and in excess of $100 million at different times in the litigation, subject to being trebled, depended upon the

plaintiff successfully establishing that CBL acted intentionally, rather than negligently, in overcharging small retail tenants.

5.    However, Defendants failed to inform CBL's investors, as required by the federal securities laws, of either the Company's overcharge scheme or the resulting *Wave* Litigation. Defendants' concealment continued even after, in 2017: the *Wave* Litigation court denied the majority of the defendants' motion to dismiss; and the Delaware court ruled that Catlin Specialty Insurance Company ("Catlin"), CBL's insurer for the *Wave* Litigation, had no obligation to provide insurance coverage with respect to the *Wave* Litigation because CBL's insurance policy did not cover allegations of fraud.   In short, CBL was facing a putative class action, alleging damages of $60 million subject to being trebled under RICO, for a fraud that Defendants knew they had engaged in, and for which they had no insurance coverage.

6.    Defendants knew about the *Wave* Litigation, the likely liability to which CBL was exposed as well as the underlying scheme, as among other things, senior CBL executives were deposed in the *Wave* Litigation; John V. Curry, the Company's Chief Legal Officer and Secretary, had formerly been a partner at Husch Blackwell LLP ("Husch Blackwell") which represented the defendants in the *Wave* Litigation; and CBL admitted that an adverse decision in the *Wave* Litigation could impose what it characterized in a brief filed in the U.S. Court of Appeals for the Eleventh Circuit as a potential "death-knell" for the Company.

7.    Defendants were motivated to conceal the existence of the *Wave* Litigation because of (in addition to the obvious fact that it accurately alleged a massive fraud), among other things: (a) the Company's desire to raise capital through the sale of $400 million in senior notes in December 2016 and an additional $225 million in senior notes on or about August 29, 2017; (b) their desire to increase their compensation, which depended, in large part, on CBL's total

shareholder returns; (c) the Company's desire to avoid adverse publicity among existing and potential tenants; and (d) the Company's conduct being blatantly unlawful under controlling statutes, including Texas Utilities Code § 17.004, Florida Administrative Code Rule 25-6.049(9)(b), and Virginia Code § 56-588.

8.     On March 1, 2019, three years after the *Wave* Litigation was filed, CBL finally disclosed its existence but told investors that any loss related to the *Wave* Litigation was not probable.  Less than four weeks later, on March 26, 2019, CBL disclosed that it agreed to pay $60 million to resolve the claims asserted in the *Wave* Litigation, which settlement papers state represented 100% of estimated damages plus an additional $28 million in attorneys' fees, in addition to other costs, to settle the case.  On this news, CBL's common stock price plummeted $0.47 per share, or 24.61%, to close at $1.44 per share on March 27, 2019, and the prices of its preferred shares and debt plummeted significantly as well, causing Plaintiffs and other Class members significant damages.

## JURISDICTION AND VENUE

9.     The claims asserted in this Complaint arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, giving this Court subject matter jurisdiction over those claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331 (federal question jurisdiction).

10.     This Court has personal jurisdiction over each Defendant named herein because each Defendant is found or is an inhabitant or transacts business in this District as required by Section 27 of the Exchange Act.  In addition, each individual defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

11.     The acts and conduct complained of herein occurred in substantial part in this District making venue proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## PARTIES

13.     Plaintiffs Jay B. Scolnick, Mark Shaner, Charles D. Hoffman, HoffInvestCo, and Lydia Hoffman each purchased CBL securities during the Class Period as reflected in the certifications previously filed with the Court. *See* ECF No. 14-2 and ECF No. 25-3 in 1:19-cv-00149. On September 10, 2019, the Court entered an Order appointing Plaintiffs as the co-lead plaintiffs in this action pursuant to 15 U.S.C. §78u-4(a)(3)(B)(ii). *See* ECF No. 69.

14.     Defendant CBL Associates is incorporated under the laws of the State of Delaware and maintains its principal headquarters located at 2030 Hamilton Place Blvd., Suite 500, CBL Center, Chattanooga, Tennessee. CBL is registered with the SEC pursuant to Section 12(b) of the Exchange Act, 15 U.S.C. §78l(b), and its common stock as well as its Series D and Series E preferred stock trade on the NYSE. CBL is the 100% owner of two qualified REIT subsidiaries, CBL Holdings I, Inc. and CBL Holdings II, Inc.

15.     Defendant CBL Operating is a Delaware limited partnership that holds all of the assets and indebtedness of CBL Associates. At June 30, 2019, CBL Holdings I, Inc., the sole general partner of CBL Operating, owned a 1.0% general partner interest in CBL Operating and CBL Holdings II, Inc. owned an 85.6% limited partner interest. CBL Associates and CBL

Operating share the same management, are operated as a single business, and make joint filings with the SEC.

16.     Defendant Charles B. Lebovitz is, and has been at all times relevant to this Complaint, Chairman of the Executive Committee of the Board of Directors of CBL (the "Board"). Charles B. Lebovitz was one of the founders of the Company, its name derives from the initials of his name, and he beneficially owns approximately 10% of CBL Associates' outstanding common stock.  Mr. Lebovitz earned a base salary of $675,000 in 2016 and $681,750 in 2017 and 2018 and earned the following cash incentive bonuses from the Company: $270,000 in 2016, $308,700 in 2017 and $325,080 in 2018.   In addition, Mr. Lebovitz was awarded the long-term incentive payments assigned the following values by the Company: $876,147 in 2016, $1,070,986 in 2017 and $1,044,001 in 2018. Mr. Charles Lebovitz also received non-equity incentive plan compensation of $592,875 in 2016 and $482,541 in 2018.

17.     Defendant Stephen D. Lebovitz is, and has been at all times relevant to this Complaint, the Chief Executive Officer ("CEO") and President of the Company, a member of the Board and a member of the Executive Committee of the Board. Stephen D. Lebovitz is also the son of defendant Charles B. Lebovitz.  Stephen D. Lebovitz earned a base salary of $700,000 in 2016 and $707,000 in 2017 and 2018 and earned the following cash incentive bonuses from the Company: $241,500 in 2016, $277,830 in 2017 and $292,572 in 2018.  In addition, Stephen D. Lebovitz was awarded the long-term incentive payments assigned the following values by the Company: $1,046,715 in 2016, $1,259,260 in 2017 and $1,471,139 in 2018.  Stephen D. Lebovitz also received non-equity incentive plan compensation of $806,969 in 2016 and $675,557 in 2018.

18.     Defendant Farzana Khaleel ("Khaleel") is, and at the times relevant to this Complaint served as, the Company's Executive Vice President – Chief Financial Officer and

Treasurer. Khaleel earned a base salary of $528,989 in 2016 and $534,279 in 2017 and 2018 and earned the following cash incentive bonuses from the Company: $120,000 in 2016, $119,700 in 2017 and $131,387 in 2018. In addition, Khaeel earned the following cash incentive bonuses from the Company: $351,679 in 2016, $428,399 in 2017 and $417,600 in 2018. Khaeel also received non-equity incentive plan compensation of $237,150 in 2016 and $193,016 in 2018.

19. Defendant A. Larry Chapman ("Chapman") has been a director of CBL since 2013. Chapman is Chairman of CBL's Audit Committee, which monitors the Company's SEC disclosure compliance and related reporting risks and exercised certain oversight responsibilities.

20. Defendant Augustus N. Stephas served as Executive Vice President and Chief Operating Officer of the Company from 2010 until December 31, 2018. Mr. Stephas served as Chief Operating Officer – Senior Vice President of the Company from February 2007 through January 1, 2010. Previously, Mr. Stephas served as Senior Vice President – Accounting and Controller of the Company, having held those positions since January 1997. Mr. Stephas joined CBL's predecessor in July 1978 as Controller and was promoted to Vice President in 1984. Stephas' compensation was based on the Individual Performance Objectives set forth in proxy statements filed with the SEC that included "oversight of leasing and management as well as billings, collection, legal and other internal operations" and "expense containment and oversight of general and administrative costs."

21. Defendant Don Sewell serves as Senior Vice President – Management of the Company. He was promoted to that position in February 2018, having previously served CBL as Vice President – Mall Management since February 2000 and in various prior property management positions with the Company since 1973. In his current position, Mr. Sewell oversees the

management and operational duties for CBL's portfolio of enclosed regional malls. Mr. Sewell is identified in CBL's Form DEF 14A SEC filings as a "senior officer of the Company."

## SUBSTANTIVE ALLEGATIONS

### A. The Company

22.     CBL was organized on July 13, 1993, as a Delaware corporation, to acquire substantially all of the real estate properties owned by CBL & Associates, Inc., which had been formed by Defendant Charles B. Lebovitz and other related parties in 1978.  On November 3, 1993, CBL completed an initial public offering through which it became a publicly traded company.

23.     CBL is a self-administered, fully integrated REIT which owns, develops, acquires, leases, manages, and operates regional shopping malls, open-air and mixed-use centers, outlet centers, associated centers, community centers and office properties. The Company's properties are located in 26 states but are primarily in the southeastern and midwestern United States. The Company conducts substantially all its business through CBL Operating.

24.     The majority of CBL's revenues are derived from mall properties. CBL Associates and CBL Operating derive their revenue primarily from leases with retail tenants which generally includes fixed minimum rents, percentage rents based on tenants' sales volumes and reimbursements from tenants for expenditures related to real estate taxes, insurance, common area maintenance ("CAM") and other recoverable operating expenses, as well as certain capital expenditures.

### B. The Overcharge Scheme

25.     CBL Operating used uniform and standard lease agreements for many tenants at the shopping centers it owned in order to require that the tenants pay to CBL (through CBL

Operating or other wholly-owned, single-purpose entities) a proportionate share of the electricity charges for its shopping centers.

26.     CBL, acting through CBL Operating, represented to its tenants through the language used in lease agreements that the tenants would only be charged the amount that the shopping center was charged by the local utility provider to supply the tenant with electricity, by providing that: "Tenant shall not be charged more than the rates it would be charged for the same [electric] services if furnished directly to the Leased Premises by the Local Utility Company . . . ." A rider to the lease provides for the calculation of electricity charges and again provides that the rate "shall not exceed the rate (including taxes) which Tenant as the operator of a separately metered and billable facility would otherwise pay . . . had Tenant purchased such electricity directly from the Local Utility Company."

27.     Notwithstanding these contractual obligations and representations, beginning in 2005, Defendants commenced a scheme to inflate CBL's tenant reimbursements and revenues by unlawfully overcharging the Company's small retail tenants for electricity (the "Overcharge Scheme").

28.     Specifically, in 2005, at a CBL "Leadership Conference," Phil Catagnus, the President of Valquest Systems, Inc. ("Valquest") — a consulting services firm that purports to specialize in utility redistribution and allocation in multi-tenant multi-use commercial facilities — presented a PowerPoint to CBL executives (including Defendants Sewell and Stephas) that laid out how CBL could profit from the resale of electricity to the tenants at the malls CBL operated. Valquest's presentation set forth a scheme to do so by (a) charging tenants more per kilowatt hour than the true rate, and (b) charging tenants for more kilowatt hours ("kWh") than the tenants

actually consumed.  CBL and Valquest agreed to track the fraud using electric income allocation summaries, an example of which was included in the PowerPoint presentation.

29.     CBL and Valquest also agreed, as explained in a PowerPoint presentation, that to avoid scrutiny of the Overcharge Scheme they would carefully calibrate and track on a yearly basis by mall the amount of any overcharge to ensure that there was a profit but not so much profit as to arouse suspicion.

30.     Valquest prepared electric income allocation summaries each month for each mall that it sent to Sewell at CBL. These summaries tracked the overbilling, indicating in the tracking where an inflated bill was "good" (acceptably inflated) and where an inflated bill was "too good" (the level of inflation could attract scrutiny).  CBL's management, including Defendant Sewell, participated in and responded to that correspondence.

31.     Valquest would provide tenants that questioned their bills with artificially inflated energy surveys that were used to project energy costs or to substantiate the energy costs that either CBL or CBL & Associates Management, Inc. ("CBL Management"), the wholly-owned subsidiary of CBL Associates, billed.

32.     CBL (through Jennifer Cope, its Rule 30(b)(6) designee in the *Wave* Litigation) testified that those surveys included, at the bottom, what the electric charge was supposed to be based on Valquest's calculations (with the inflated figures).  Mr. Catagnus, the head of Valquest, testified that the goal was to have a calculation that was "plus five percent on the consumption." However, in practice, it often went up to 10 percent, 15 percent, 20 percent, and even 30 percent.

33.     CBL acknowledged in its Rule 30(b)(6) testimony in the *Wave* Litigation that those charges were worked through to the electric income allocation summaries and ultimately to the amounts CBL collected from tenants. As described in a contemporaneous "e-mail back and forth

between two CBL employees" during the summary judgment hearing in the *Wave* Litigation, "[o]ne CBL employee says, I don't like these exaggerated utility bills. The response: No, it's not fair to the customer. Sounds like it's a profit center big time."

34.     The Valquest PowerPoint also stated that CBL needed to have a standard lease to undertake the fraud.  Specifically, in an effort to conceal its wrongful and illegal conduct, CBL caused related entities to insert an audit waiver provision in lease agreements requiring tenants to waive any right to audit CBL's invoices and records to determine whether they actually were being charged the correct amount for electricity.

35.     One such retail tenant of CBL affected by this scheme was Wave Lengths Hair Salon of Florida, Inc. doing business as Salon Adrian ("Wave Lengths") which, in June 2006, entered a ten-year lease for retail space at a shopping mall located in Fort Meyers, Florida known as Gulf Coast Town Center ("GCTC").  Wave Lengths was concerned about the high cost of electricity for which it was being charged at GCTC and sought to decrease those charges by upgrading to energy efficient appliances and lighting.  In 2009, after making those upgrades, Wave Lengths complained about its electricity costs and in response thereto, CBL paid Valquest which provided Wave Lengths with an energy survey that inflated Wave Lengths' electricity costs in order to substantiate CBL's overcharges.

36.     In early 2016, the CBL subsidiary which owned GCTC defaulted on its $190.8 million mortgage loan, the lender took possession of GCTC, fired CBL Management, and hired a new management company unaffiliated with CBL to operate GCTC. The new operator performed an electricity usage evaluation of the entire mall and discovered that CBL had been substantially overcharging the tenants for electricity.  The new operator informed Wave Lengths that its energy

charge, which had previously averaging over $600 per month would be reduced to $269 per month – revealing *a 123% mark-up of Wave Lengths' actual electrical usage charges*.

37. In total, CBL charged its tenants for more than 190 million kWh of electricity that they never consumed, reaping tens of millions of dollars in illicit revenues from its unlawful scheme. Indeed, just between January 1, 2011 (six years into the scheme) and April 23, 2019, CBL reaped approximately $60 million in illicit revenues from its unlawful scheme.

### C.     The Overcharge Scheme Was Not Covered By Insurance

38. CBL held an insurance policy issued by Catlin. Catlin issued a Contractor's Protective, Professional, and Pollution Liability Insurance Policy, with a policy period from December 31, 2015 to December 31, 2016 (the "Catlin Policy" or the "Policy"). The Limit of Liability stated in the Policy is $10,000,000 per Claim and $10,000,000 in the aggregate, with a Self-Insured Retention of $250,000 per Claim applicable to Coverage B – Professional Liability. The Retroactive Date for Coverage B – Professional Liability is October 23, 2003, with respect to the first $5,000,000 of the per Claim and aggregate liability limits, and the Retroactive Date for Coverage B – Professional Liability is February 21, 2008, with respect to the $5,000,000 of the per Claim and aggregate liability limits that exceed the initial $5,000,000 per Claim and aggregate liability limits.

39. The Insuring Agreement for Coverage B – Professional Liability of the Policy states that Catlin would provide coverage only for a "Claim for an actual or alleged negligent act, error or omission." Similarly, the Insuring Agreement for Coverage B – Professional Liability of the Policy also states that Catlin would provide coverage only for a "Claim for an actual or alleged negligent act, error or omission in the rendering of Professional Services." Defendants' overbilling scheme did not constitute a "negligent act, error or omission."

40.     The Policy also contained a "Dishonest Acts" exclusion, barring coverage for damages or claims that arise, directly or indirectly, out of "[a]ny dishonest, fraudulent, criminal, intentionally or knowingly wrongful, or malicious act, error, or omission, or those of an inherently harmful nature." Thus, Defendants knew by the unambiguous terms of the Policy that any claims or damages arising from the overbilling scheme would not be covered by the Policy.

### D.     The *Wave* Litigation

41.     On March 16, 2016, Wave Lengths filed the *Wave* Litigation as a class action complaint in the U.S. District Court for the Middle District of Florida asserting RICO claims and claims under State law.  On July 6, 2016, Wave Lengths filed its first amended complaint.

42.     The Amended Complaint in the *Wave* Litigation summarized the claims as follows:

> When a landlord rents mall space to small businesses, it must follow state laws and regulations that forbid turning providing utilities into a profit center for secret excess rent. Likewise, when a mall landlord promises a tenant in written contract that it will not mark-up electricity, it must honor that contractual obligation. But CBL & Associates Properties, Inc. ("CBL"), broke these basic rules. ***Through a pernicious shell game of corporate entities, CBL for years executed a fraudulent scheme through a criminal enterprise to overcharge small business tenants for electricity at all of its shopping malls throughout the United States***. (*Wave* Cplt. ¶ 1) (emphasis added).

43.     The *Wave* Complaint further alleged that CBL had engaged in racketeering activity:

> CBL directed and required CBL Management to use standard lease agreements that falsely represented that the tenants at the shopping malls it ultimately owned would be charged the amount that the shopping malls were charged by the local utility providers to supply those tenants with electricity. That is, CBL Partnership, at the direction and behest of CBL, caused CBL Management to represent to the tenants that the tenants would pay the same amount for electricity that the tenants would pay if they were purchasing the electricity directly from the local utility. Despite the contractual obligations and representations, CBL, CBL Partnership, CBL Management, and other unnamed co-conspirators engaged in a racketeering enterprise and conspiracy, breached the lease agreements with tenants, and violated applicable state laws and regulations by inflating the tenants' electric bills. ***Sometimes, the fraudulent and illegal markups exceeded 100% of the tenant's actual electricity usage charges.*** (*Wave* Cplt. ¶ 3) (emphasis added).

Case 1:19-cv-00181-JRG-CHS   Document 80   Filed 11/05/19   Page 15 of 68   PageID #: 995

44.     Moreover, it was alleged that CBL sought to conceal the scheme by prohibiting

tenants from auditing their bills and usage:

> In an effort to conceal its wrongful and illegal conduct, CBL caused CBL
> Management to insert into the lease agreements a clause requiring the tenants at the
> shopping malls, ultimately owned and controlled by CBL through its holding
> companies, to waive their right to audit the shopping malls' electric bills in
> exchange for agreeing that the electricity charges would not be marked-up.
> Whenever tenants raised issues about their electricity costs, CBL caused CBL
> Management to inform the tenants that they had waived their audit rights under the
> lease agreement and instructed CBL Management not to provide the tenants with
> the actual electricity bills from the utilities, which would have revealed the
> undisclosed mark-ups. (*Wave* Cplt. ¶ 4).

45.     In sum, "to justify the marked-up electrical charges[,]" CBL engaged in a

scheme [that] allowed it to take advantage of the tenants by: (a) fraudulently
misrepresenting to them that their electricity charges were not being marked up; (b)
actually having the electrical charges marked-up in contravention of the lease
agreement; and (c) covering up that illegal conduct by using the audit waiver
provision to shield it from scrutiny. CBL knew it was much bigger, and much better
financed than the thousands of small business owners nationwide who rented mall
spaces from it. In exploiting this inequality, CBL used its vast resources and
superior negotiating and bargaining power to actively victimize and defraud tenants
– simply to reap unfair, improper, and illegal profits." (*Wave* Cplt. ¶ 5).

46.     Wave Lengths sought to certify of a nationwide class covering "hundreds of current

and former tenants." (*Wave* Cplt. ¶ 42). The causes of action asserted included: RICO; unjust

enrichment; violations of Florida's Deceptive and Unfair Trade Practices Act; Florida's Civil

Remedies for Criminal Practices Act; and, breach of contract. Plaintiff requested treble damages

for itself and the Class pursuant to RICO. (*Wave* Cplt., pp. 19-35).

47.     On April 11, 2017, the Florida federal court denied this motion almost in its

entirety. In her opinion, Judge Chappell: (a) upheld the treble damages federal RICO claim,

finding the allegations sufficient to infer a criminal conspiracy; and (b) likewise upheld the unjust

enrichment claim for Florida class members, and the Florida deceptive trade practices claim. The

sole claim dismissed was for breach of the implied contractual covenant of good faith and fair dealing.

48.     The Florida' court's decision followed its earlier rejection, through a November 25, 2016 Magistrate Judge's report and recommendation subsequently adopted by the Florida court, of the defendants' effort to strike the class action allegations from the *Wave* Litigation complaint. Nonetheless, a fair reading of the Florida court's decision on the motion to dismiss would lead to the inevitable conclusion that the defendants' conduct was part of a nationwide scheme which was suitable for class action treatment.

49.     CBL produced more than *1.8 million pages* of documents in the *Wave* Litigation. In addition, more than *seventy* third parties were served with subpoenas resulting in more than 200,000 pages of additional documents. During the *Wave* Litigation, class counsel deposed twelve party and non-party witnesses, and CBL deposed the class representative and the class' experts.

50.     On January 7, 2019, the court granted, in part, the Class' Motion to Certify the Class. The court, on January 23, 2019, denied CBL's Motion for Summary Judgment. The parties attended the court's January 9, 2019, pretrial conference and calendar call, and trial was scheduled to begin on April 2, 2019.

51.     On January 22, 2019, CBL filed a petition for permission to appeal the class certification order with the United States Court of Appeals for the Eleventh Circuit. CBL argued that the class certification order created a "death knell" for the Company and that the *Wave* Litigation was a "bet the company" case.

52.     Following the pre-trial conference, mediation efforts accelerated, leading on March 15, 2019, to CBL's complete and total capitulation. The $90 million settlement fund CBL agreed to provide not only provided the class members with 100% of their damages, but also,

extraordinarily, provided plaintiff's lawyers with a payment of $28 million in attorneys' fees, subject to court approval.

### E.   The Insurance Coverage Litigation

53.      Upon the filing of the *Wave* Litigation on March 16, 2016, CBL's insurance carrier, Catlin, promptly informed CBL that the Policy did not provide coverage to the defendants for the claims asserted in the *Wave* Litigation because they were based on alleged intentional, knowingly wrongful and fraudulent conduct by the defendants.

54.      Shortly thereafter, on July 20, 2016, Catlin sued to disclaim coverage for the defendants' fraudulent conduct, filing the *Catlin Specialty* Litigation, a declaratory judgment action in the Delaware Superior Court.

55.      That action was resolved on September 20, 2017 when the court ruled that CBL had no insurance coverage for the massive claims asserted in the *Wave* Litigation.  The *Catlin Specialty* court granted partial judgment on the pleadings to the insurance carrier suing CBL holding that the underlying claims in the *Wave* Litigation sounded in fraud rather than breach of contract because they involved a nationwide scheme to improperly overcharge CBL's smaller retail tenants for electricity payments, which the Delaware court described as a theory of a "pattern of intentional, knowing, wrongful, fraudulent conduct" with "no hint" that the defendants acted negligently.

### F.   CBL Was Required to Disclose the *Wave* Litigation and the Overcharge Scheme

56.      CBL is required to follow the federal securities laws, including the rules and regulations promulgated by the SEC pursuant to the federal securities laws.  During the Class Period, CBL filed Forms 10-Q and 10-K with the SEC. These filings failed to disclose material information required to be disclosed pursuant to controlling SEC rules and regulations.

57. The SEC created specific rules governing the content of disclosures made by public companies in their filings with the SEC. SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

58. Specifically, Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (*i.e.*, Forms 10-Q and 10-K), among other things:

    i. Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

    ii. Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

59. Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

60. Moreover, under SEC Item 303, 17 C.F.R. §229.103 a public company must, in the textual portion of its SEC reports:

Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject. Include the ***name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought.*** (emphasis added).

61.    In addition to the above, CBL's financial statements were required to be presented in accordance with GAAP.  Under 17 C.F.R. §210.4-01(a)(1):

Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles ["GAAP"] ***will be presumed to be misleading or inaccurate***, despite footnote or other disclosures, unless the Commission has otherwise provided. (emphasis added).

62.    GAAP Rule ASC 450 provides guidance regarding the accrual ***and disclosure*** of loss contingencies, which are defined as conditions, situations, or circumstances "involving uncertainty as to possible loss . . . that will ultimately be resolved when one or more future events occur or fail to occur."  ASC ¶ 450-20-20 Glossary.  Under ASC 450-20-50, for a claim that has been asserted, an issuer must ***disclose*** a loss contingency if there is at least ***a reasonable possibility*** that a loss may be incurred, even if the amount cannot be reasonably estimated.  A loss contingency is reasonably possible if the likelihood that it will occur "***is more than remote*** but less than likely." ASC at 450-20-20.   Under ASC 450, loss contingencies must be ***accrued*** when information available before financial statements are issued suggests that a loss contingency is probable and can be reasonably estimated.  ASC ¶ 450-20-25.  Disclosure of reasonably possible losses must include "the nature of the contingency" and an estimate of the loss or range of loss.  ASC ¶ 450-20-50-4.  If a loss cannot be estimated, the entity may state that an "estimate cannot be made." ASC ¶ 450-20-50-4.  Under ASC 450, even threatened (but not yet filed) litigation may qualify as a loss contingency when the potential claimant has manifested awareness of the claim.  *See* ASC ¶ 450-20-50-6.

63.     Here, Defendants violated the affirmative disclosure duties imposed by Regulation S-K, ASC 450 and GAAP, and thus Section 10(b) of the Exchange Act, by failing to disclose, among other things, the following material information in the Company's Forms 10-Q and 10-K filed during the Class Period: (i) that CBL was engaged in the Overcharge Scheme; (ii) the *Wave* Litigation, which was a serious, ongoing class action that exposed the Company to tens if not hundreds of millions of dollars in liability; and (iii) that CBL's Overcharge Scheme subjected it to numerous undisclosed risks, including monetary risks and reputational risks that would adversely affect its current business, as well as its future revenues and growth prospects.

64.     The foregoing concealed material facts were required to be disclosed by Defendants because they were, among other things: (i) material events and uncertainties known to CBL management that would cause CBL's reported financial information not to be necessarily indicative of the Company's future operating results or of future financial condition; (ii) known trends or uncertainties that have had or that Defendants reasonably expected will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations; and (iii) unusual transactions or significant economic changes that were materially affecting the amount of reported operating and net income from CBL's continuing operations.

## G.     **Defendants' Fraudulent Financial Reporting**

65.     The SEC requires that registrants, like CBL, prepare and file financial statements that comply with GAAP. The Financial Accounting Standards Board ("FASB") of the American Institute of Certified Public Accountants ("AICPA") established the Accounting Standards Codification ("ASC") as the sole source of GAAP during the Class Period. Financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading.

66.     During the Class Period, Defendants caused CBL's financial statements to be materially false and misleading and falsely represented that CBL's financial statements presented fairly CBL's financial position and results of operations in conformity with GAAP.

67.     By inflating CBL's reported revenue through the Overcharge Scheme, Defendants materially overstated CBL's reported operating income and net income, or materially understated CBL's reported operating loss or net loss, for each quarter and year end during the Class Period.

68.     Under FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, in order for revenue to be recognized in accordance with GAAP, CBL needed to **earn** the revenue and the amount of revenue **earned** must be realizable. Revenue is considered to be **earned** when CBL performs the services it was contracted to perform, and revenue is realizable when CBL is **entitled to collect** and collection is reasonably assured of that revenue.

69.     However, the revenue Defendants caused CBL to generate throughout the Class Period through the Overcharge Scheme was not "**earned**" and CBL was not entitled to collect revenue generated from the Overcharge Scheme. In stark contrast, the revenue generated by the Overcharge Scheme was the result of fraud.  Instead of recording revenue generated from the Overcharge Scheme, CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

70.     On July 29, 2014, CBL issued a release entitled "CBL & Associates Properties Reports Second Quarter 2014 results." In the release, CBL provided its second quarter 2014 ("2Q14") financial results, including the following (in thousands):

| REVENUES: | |
|---|---|
| Tenant reimbursements | $70,774 |
| Total revenues | $256,933 |
| Net income attributable to common shareholders | $26,735 |

71.     On August 11, 2014, CBL filed its quarterly report on Form 10-Q for the three months ended June 30, 2014 with the SEC (the "2014Q2-10Q") repeating the financial results provided in the 2Q14 press release and stating that:

> [w]e receive reimbursements from tenants for real estate taxes, insurance, common area maintenance, and other recoverable operating expenses as provided in the lease agreements. Tenant reimbursements are recognized as revenue in the period the related operating expenses are incurred."

72.     The 2014Q2-10Q also represented that the Company's financial statements had "been prepared in accordance with [GAAP]" and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2014Q2-10Q), which certified that they had reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

73.     The representations in ¶¶70-72 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme.  In addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

74.     On October 29, 2014, CBL issued a release entitled "CBL & Associates Properties Reports Third Quarter 2014 results and Raises Full Year Guidance." In the release, CBL provided its 3Q14 financial results, including the following (in thousands):

| REVENUES: | |
| --- | --- |
| Tenant reimbursements | $71,330 |
| Total revenues | $258,714 |
| Net income attributable to common shareholders | $38,119 |

75.     The 3Q14 press release also stated that "[c]ontributions from rent growth, including increased new and renewal lease spreads, resulted in $3.0 million of growth in minimum rent and a $2.2 million increase in tenant reimbursements compared with the prior-year period."

76.     On November 10, 2014, CBL filed its quarterly report on Form 10-Q for the three months ended September 30, 2014 with the SEC (the "2014Q3-10Q"). The 2014Q3-10Q repeated the financial results provided in the 3Q14 press release. The 2014Q3-10Q also stated that:

> [w]e receive reimbursements from tenants for real estate taxes, insurance, common area maintenance, and other recoverable operating expenses as provided in the lease agreements. Tenant reimbursements are recognized as revenue in the period the related operating expenses are incurred.

77.     The 2014Q3-10Q also represented that the Company's financial statements had "been prepared in accordance with [GAAP]" and contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2014Q3-10Q), which certified that they had reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

78.     The representations in ¶¶74-77 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme. In

addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

79.     On February 3, 2015, CBL issued a release entitled "CBL & Associates Properties Reports Results for Fourth Quarter and Full Year 2014." In the release, CBL provided its 4Q14 financial results, including the following (in thousands):

| REVENUES: | |
| --- | --- |
| Tenant reimbursements | $76,239 |
| Total revenues | $283,849 |
| Net income attributable to common shareholders | $65,333 |

80.     The 4Q14 press release also stated that "[t]op line revenue benefited from a $2.8 million increase in minimum rents and a $1.9 million increase in tenant reimbursements primarily due to contributions from double-digit lease spreads as well as an increase in other rents, including sponsorship and branding income."

81.     On March 2, 2015, CBL filed its annual report on Form 10-K for the year ended December 31, 2014 with the SEC (the "2014 10-K"). The 2014 10-K repeated the Company's financial results provided in the 4Q14 press release. The 2014 10-K also stated that:

> [w]e receive reimbursements from tenants for real estate taxes, insurance, common area maintenance, and other recoverable operating expenses as provided in the lease agreements. Tenant reimbursements are recognized as revenue in the period the related operating expenses are incurred.

82.     The 2014 10-K also represented that the Company's financial statements had "been prepared in accordance with [GAAP]" and contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel, which certified that they had reviewed the Form 10-K and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any

material changes to the Company's internal control over financial reporting. The 2014 10-K was signed by Defendants Charles Lebovitz, Steven Lebovitz, Khaleel and Chapman.

83.     The representations in ¶¶79-82 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme.  In addition, the statements made in the 10-K regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

84.     On April 28, 2015, CBL issued a release entitled "CBL & Associates Properties Reports First Quarter 2015 Results." In the release, CBL provided its 1Q15 financial results, including the following (in thousands):

| REVENUES: | |
|---|---|
| Tenant reimbursements | $72,133 |
| Total revenues | $260,909 |
| Net income attributable to common shareholders | $34,941 |

85.     On May 11, 2015, CBL filed its quarterly report on Form 10-Q for the three months ended March 31, 2015 with the SEC (the "2015Q1-10Q").  The 2015Q1-10Q repeated the financial results provided in the 1Q15 press release and represented that the Company's financial statements had "been prepared in accordance with GAAP."

86.     The 2015Q1-10Q contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2015Q1-10Q), which certified that they had reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material

respects, and disclosed any material changes to the Company's internal control over financial reporting.

87.     The representations in ¶¶84-86 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme. In addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

88.     On July 29, 2015, CBL issued a release entitled "CBL & Associates Properties Reports Second Quarter 2015 Results." In the release, CBL provided its 2Q15 financial results, including the following (in thousands):

REVENUES:

| | |
|---|---|
| Tenant reimbursements | $70,224 |
| Total revenues | $253,843 |
| Net income attributable to common shareholders | $30,672 |

89.     On August 10, 2015, CBL filed its quarterly report on Form 10-Q for the three months ended June 30, 2015 with the SEC (the "2015Q2-10Q"). The 2015Q2-10Q repeated the financial results provided in the 2Q15 press release and represented that the Company's financial statements had "been prepared in accordance with GAAP."

90.     The 2015Q2-10Q contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2015Q2-10Q), which certified that they had reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material

respects, and disclosed any material changes to the Company's internal control over financial reporting.

91.    The representations in ¶¶88-90 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme.   In addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

92.    On October 28, 2015, CBL issued a release entitled "CBL & Associates Properties Reports Third Quarter 2015 Results." In the release, CBL provided its 3Q15 financial results, including the following (in thousands):

| REVENUES: | |
|---|---|
| Tenant reimbursements | $72,461 |
| Total revenues | $262,636 |
| Net income attributable to common shareholders | $26,346 |

93.    The 3Q15 press release also stated that "[t]enant reimbursement increased by $0.8 million, offset by a $1.8 million variance in real estate tax expense and a $0.4 million increase in maintenance and repair expense."

94.    On November 9, 2015, CBL filed its quarterly report on Form 10-Q for the three months ended September 30, 2015 with the SEC (the "2015Q3-10Q").  The 2015Q3-10Q repeated the financial results provided in the 3Q15 press release and represented that the Company's financial statements had "been prepared in accordance with GAAP."

95.    The 2015Q3-10Q contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2015Q3-10Q), which certified that they had

reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

96.     The representations in ¶¶92-95 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme. In addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

97.     On February 3, 2016, CBL issued a release entitled "CBL & Associates Properties Reports Results for Fourth Quarter and Full Year 2015." In the release, CBL provided its 4Q15 financial results, including the following (in thousands):

| REVENUES: | |
|---|---|
| Tenant reimbursements | $73,461 |
| Total revenues | $277,630 |
| Net income (loss) attributable to common shareholders | $(33,480) |

98.     The 4Q15 press release also stated that "[s]ame-center revenues for 2015 grew $1.5 million as compared with 2014. Major items included: . . . a $0.6 million increase in tenant reimbursements and other revenue."

99.     On February 29, 2016, CBL filed its annual report on Form 10-K for the year ended December 31, 2015 with the SEC (the "2015 10-K"). The 2015 10-K repeated the Company's financial results provided in the 4Q15 press release. The 2015 10-K also stated that

[w]e receive reimbursements from tenants for real estate taxes, insurance, common area maintenance, and other recoverable operating expenses as provided in the lease agreements. Tenant reimbursements are recognized as revenue in the period the related operating expenses are incurred.

100.    The 2015 10-K also represented that the Company's financial statements had "been prepared in accordance with [GAAP]" and contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel, which certified that they had reviewed the Form 10-K and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting. The 2015 10-K was signed by Defendants Charles Lebovitz, Steven Lebovitz, Khaleel and Chapman.

101.    The representations in ¶¶97-100 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme. In addition, the statements made in the 10-K regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

102.    On April 27, 2016, CBL issued a release entitled "CBL & Associates Properties Reports Strong First Quarter 2016 Results." In the release, CBL provided its 1Q16 financial results, including the following (in thousands):

| REVENUES: | |
|---|---|
| Tenant reimbursements | $73,366 |
| Total revenues | $263,078 |
| Net income attributable to common shareholders | $28,851 |

103.	The 1Q16 press release also stated that same-center net operating income ("NOI") results for 1Q16 had been positively impacted by "[t]enant reimbursement and other revenues," which had "increased by $1.5 million."

104.	On April 28, 2016, after-market hours, CBL filed its first current report following the commencement of the Overbill Litigation on Form 8-K with the SEC (the "April 2016 8-K"). CBL appended a press release as an exhibit to the April 2016 8-K, announcing CBL's financial and operating results for the quarterly period ended March 31, 2016 (the "1Q 2016 Press Release"). The 1Q 2016 Press Release touted CBL's first quarter results while failing to disclose the Overbill Litigation. Rather, the 1Q 2016 Press Release merely noted, in relevant part:

> [D]uring the first quarter of 2016, the Company recognized $1.7 million of litigation expense as well as a $26.4 million increase in equity in earnings related to the sale of our 50% interest in Triangle Town Center. Additionally, during the first quarter of 2015, the Company recognized a $16.6 million gain on investment related to the sale of marketable securities and received income of $4.7 million, net of related expenses, as a partial settlement of ongoing litigation. Considering the significance and nature of these items, the Company believes it is important to identify their impact on its FFO measures for readers to have a complete understanding of the Company's results of operations. Therefore, the Company has also presented adjusted FFO measures excluding these items from the applicable periods.

Despite CBL's assertion that it "believe[d] it [wa]s important to identify [the] impact" of the items quoted above "on [the Company's] FFO measures for readers to have a complete understanding of the Company's results of operations[,]" the Company failed to mention that it was engaged in ongoing litigation with potentially hundreds of millions of dollars at stake, or that a class of plaintiffs had brought action against the Company for fraudulently inflating their electricity bills.

105.	On May 10, 2016, CBL filed with the SEC its report for the fiscal quarter ended March 31, 2016 (the "2016Q1-10Q"). The 2016Q1-10Q repeated the financial results provided in the 1Q 2016 Press Release and represented that the Company's financial statements had "been prepared in accordance with GAAP."

106.    The 2016Q1-10Q also represented that the Company's financial statements had "been prepared in accordance with [GAAP]" and contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2016Q1-10Q), which certified that they had reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

107.    The representations in ¶¶102-106 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme.  In addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

108.    The 2016Q1-10Q, under a heading titled "**ITEM 1: Legal Proceedings**" (on page 59) made the following disclosure:

> We are currently involved in certain litigation that arises in the ordinary course of business, most of which is expected to be covered by liability insurance. Based on current expectations, such matters, both individually and in the aggregate, are not expected to have a material adverse effect on our liquidity, results of operations, business or financial condition.

109.    The statements made in the 2016Q1-10Q regarding legal proceedings were materially false or misleading because they failed to disclose the existence of the *Wave* Litigation despite being required to do so by Item 103 of Regulation S-K, incorporated by the SEC into the disclosure requirements for Forms 10-Q including that of the 2016Q1-10Q. Item 103 required CBL to "[d]escribe briefly any material pending legal proceedings, other than ordinary routine litigation

incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject." 17 C.F.R. §229.103.

110.    Instruction 5 to Regulation S-K Item 103 specifically states that a pending lawsuit is **not** considered "ordinary routine litigation incidental to the business" if it "involves primarily a claim for damages, or involves potential monetary sanctions . . . [which] exceeds 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis[.]" CBL's current assets are measured by its cash plus its accounts receivable and during the times relevant to this Complaint amounted to slightly more than $100 million, making any claim potentially involving in excess of $10 million, a threshold which the *Wave* Litigation easily exceeded, extraordinary and not routine or incidental.

111.    The 2016Q1-10Q represented (on pages 16 and 33) that its unaudited condensed consolidated financial statements were prepared in accordance with GAAP and under a subheading to the Company's consolidated financial statements titled "**Note 12 – Contingencies**" (on page 33) made the following disclosure concerning litigation contingencies:

> The Company is currently involved in certain litigation that arises in the ordinary course of business, most of which is expected to be covered by liability insurance. Management makes assumptions and estimates concerning the likelihood and amount of any potential loss relating to these matters using the latest information available. The Company records a liability for litigation if an unfavorable outcome is probable and the amount of loss or range of loss can be reasonably estimated. If an unfavorable outcome is probable and a reasonable estimate of the loss is a range, the Company accrues the best estimate within the range. If no amount within the range is a better estimate than any other amount, the Company accrues the minimum amount within the range. If an unfavorable outcome is probable but the amount of the loss cannot be reasonably estimated, the Company discloses the nature of the litigation and indicates that an estimate of the loss or range of loss cannot be made. If an unfavorable outcome is reasonably possible and the estimated loss is material, the Company discloses the nature and estimate of the possible loss of the litigation. The Company does not disclose information with respect to litigation where an unfavorable outcome is considered to be remote or where the estimated loss would not be material. Based on current expectations, such matters, both individually and in the aggregate, are not expected to have a material adverse

effect on the liquidity, results of operations, business or financial condition of the Company.

112.     The statements made in the 2016Q1-10Q regarding contingencies were materially false or misleading because it failed to disclose the existence of the *Wave* Litigation as required despite purporting to have been prepared in accordance with GAAP as the Accounting Standards Codification ("ASC") which are part of GAAP require in ASC 270-15-50-6 that:

> Contingencies and other uncertainties that could be expected to affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports. Such disclosures shall be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial. The significance of a contingency or uncertainty should be judged in relation to annual financial statements…

113.     On July 28, 2016, CBL issued a release entitled "CBL & Associates Properties Reports Outstanding Second Quarter 2016 Results and Increases Full-Year Guidance." In the release, CBL provided its 2Q16 financial results, including the following (in thousands):

| REVENUES: | |
| --- | --- |
| Tenant reimbursements | $70,096 |
| Total revenues | $254,965 |
| Net income attributable to common shareholders | $51,696 |

114.     The 2Q16 press release also stated that same-center NOI results for 2Q16 had been positively impacted by "[t]enant reimbursement and other revenues," which had "increased by $0.9 million."

115.     On August 9, 2016, CBL filed with the SEC its report for the fiscal quarter ended June 30, 2016 (the "2016Q2-10Q"). The 2016Q2-10Q repeated the financial results provided in the 2Q16 press release and represented that the Company's financial statements had "been prepared in accordance with GAAP."

116.     The 2016Q2-10Q contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2016Q2-10Q), which certified that they had

reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

117.     The representations in ¶¶113-116 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme.  In addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

118.     The 2016Q2-10Q included the same statement with respect to **ITEM 1: Legal Proceedings**" (on page 65) as the 2016Q1-10Q and was materially false or misleading for the same reasons as the 2016Q1-10Q as alleged above in paragraph 109.

119.     The 2016Q2-10Q disclosed the existence of a putative class action in the United States District Court for the Eastern District of Tennessee on behalf of persons who purchased CBL common stock between August 8, 2013 and May 24, 2016, and a putative shareholder derivative action alleging breaches of fiduciary duties.  The 2016Q2-10Q also made a disclosure (on page 38) with respect to litigation contingencies which differed from the one made in the 2016Q1-10Q by, among other things, omitting language from the prior disclosure stating that "[t]he Company does not disclose information with respect to litigation where an unfavorable outcome is considered to be remote or where the estimated loss would not be material."  Instead, the 2016Q2-10Q stated that:

The Company is currently involved in certain litigation that arises in the ordinary course of business, most of which is expected to be covered by liability insurance. Management makes assumptions and estimates concerning the likelihood and amount of any potential loss relating to these matters using the latest information available. The Company records a liability for litigation if an unfavorable outcome is probable and the amount of loss or range of loss can be reasonably estimated. If an unfavorable outcome is probable and a reasonable estimate of the loss is a range, the Company accrues the best estimate within the range. If no amount within the range is a better estimate than any other amount, the Company accrues the minimum amount within the range. If an unfavorable outcome is probable but the amount of the loss cannot be reasonably estimated, the Company discloses the nature of the litigation and indicates that an estimate of the loss or range of loss cannot be made. If an unfavorable outcome is reasonably possible and the estimated loss is material, the Company discloses the nature and estimate of the possible loss of the litigation. Based on current expectations, such matters, both individually and in the aggregate, are not expected to have a material adverse effect on the liquidity, results of operations, business or financial condition of the Company.

120.     The statements made in the 2016Q2-10Q litigation contingency section of the Company's financial statements were materially false or misleading for the same reasons as alleged above in paragraph 112 with respect to the 2016Q1-10Q.

121.     On October 27, 2016, CBL issued a release entitled "CBL & Associates Properties Reports Outstanding Third Quarter 2016 Results." In the release, CBL provided its 3Q16 financial results, including the following (in thousands):

| REVENUES: | |
|---|---|
| Tenant reimbursements | $69,489 |
| Total revenues | $251,721 |
| Net income (loss) attributable to common shareholders | $(10,164) |

122.     On November 8, 2016, CBL filed with the SEC its report for the fiscal quarter ended September 30, 2016 (the "2016Q3-10Q"). The 2016Q3-10Q repeated the financial results provided in the 3Q16 press release and represented that the Company's financial statements had "been prepared in accordance with GAAP."

123.     The 2016Q3-10Q contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2016Q3-10Q), which certified that they had

reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

124.    The representations in ¶¶121-123 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme. In addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

125.    The 2016Q3-10Q included the same statement with respect to **ITEM 1: Legal Proceedings**" (on page 66) as the 2016Q1-10Q and was materially false or misleading for the same reasons as the 2016Q1-10Q as alleged above in paragraph 109.

126.    The 2016Q3-10Q also contained the same statements as those contained in the 2016Q2-10Q concerning legal contingencies and is materially false or misleading for the same reasons as set forth in paragraphs 112 and 120 with respect to the 2016Q2-10Q and 2016Q1-10Q.

127.    On December 8, 2016, CBL filed a Form 424B5 prospectus supplement (the "2016 424B5") with the SEC relating to the offering of $400,000,000 5.950% Senior Notes Due 2026 (the "2026 Notes") which was made pursuant to, and was part of, a Form S-3 Registration Statement, filed with the SEC on July 2, 2015. The Form 424B5 (on page iii) incorporated by reference CBL's prior filings made with the SEC including the 2016Q1-10Q, 2016Q2-10Q and the 2016Q3-10Q. As a result, the 2016 Form 424B5 was materially false or misleading for the

same reasons as alleged above in paragraphs 109, 112, 113, 120 and 122 with respect to the 2016Q1-10Q, 2016Q2-10Q and the 2016Q3-10Q.

128.    The 2016 Form 424B5 was also materially false or misleading because it failed to make the disclosure required by Item 11 of Form S-3 (17 C.F.R. §239.13) to "[d]escribe any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to security holders and which have not been [previously reported.]" The filing of the *Wave* Litigation was such an event but was not disclosed in the Form 424B5.

129.    On February 1, 2017, CBL issued a release entitled CBL & Associates Properties Reports Results for Fourth Quarter and Full-Year 2016." In the release, CBL provided its 4Q16 financial results, including the following (in thousands):

| REVENUES: | |
|---|---|
| Tenant reimbursements | $67,487 |
| Total revenues | $258,493 |
| Net income attributable to common shareholders | $57,607 |

130.    On March 1, 2017, CBL filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K repeated the Company's financial results provided in the 4Q16 press release. The 2016 10-K also stated that:

> [w]e receive reimbursements from tenants for real estate taxes, insurance, common area maintenance, and other recoverable operating expenses as provided in the lease agreements. Tenant reimbursements are recognized as revenue in the period the related operating expenses are incurred.

131.    The 2016 10-K also represented that the Company's financial statements had "been prepared in accordance with [GAAP]" and contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel, which certified that they had reviewed the Form 10-K and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any

material changes to the Company's internal control over financial reporting. The 2014 10-K was signed by Defendants Charles Lebovitz, Steven Lebovitz, Khaleel and Chapman.

132.    The representations in ¶¶129-131 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme.  In addition, the statements made in the 10-K regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

133.    The 2016 10-K stated (on pages 45-46) under a heading titled "**ITEM 3. LEGAL PROCEEDINGS**" the following:

> We are currently involved in certain litigation that arises in the ordinary course of business, most of which is expected to be covered by liability insurance. Based on current expectations, such matters, both individually and in the aggregate, are not expected to have a material adverse effect on our liquidity, results of operations, business or financial condition.

134.    The 2016 10-K Item 3 Legal Proceedings was materially false or misleading because it failed to disclose the existence of the *Wave* Litigation.  Instead, 2016 10-K Item 3 discussed in detail putative securities fraud class action complaints which had been filed on May 27, 2016, and June 9, 2016, in the U.S. District Court for the Eastern District of Tennessee and had been subsequently voluntarily dismissed on December 21, 2016, and January 4, 2017.  The 2016 10-K also discussed a shareholder derivative lawsuit filed in Chancery Court for Hamilton County, Tennessee which had also been voluntarily dismissed.

135.    The 2016 10-K in a portion of the Company's consolidated financial statements (on pages 136-37) titled "**NOTE 14. CONTINGENCIES**" under a sub-heading titled "*Litigation*"

made the following disclosure before summarizing the putative securities fraud class action and shareholder derivative lawsuit discussed above:

> The Company is currently involved in certain litigation that arises in the ordinary course of business, most of which is expected to be covered by liability insurance. Management makes assumptions and estimates concerning the likelihood and amount of any potential loss relating to these matters using the latest information available. The Company records a liability for litigation if an unfavorable outcome is probable and the amount of loss or range of loss can be reasonably estimated. If an unfavorable outcome is probable and a reasonable estimate of the loss is a range, the Company accrues the best estimate within the range. If no amount within the range is a better estimate than any other amount, the Company accrues the minimum amount within the range. If an unfavorable outcome is probable but the amount of the loss cannot be reasonably estimated, the Company discloses the nature of the litigation and indicates that an estimate of the loss or range of loss cannot be made. ***If an unfavorable outcome is reasonably possible and the estimated loss is material, the Company discloses the nature and estimate of the possible loss of the litigation***. Based on current expectations, such matters, both individually and in the aggregate, are not expected to have a material adverse effect on the liquidity, results of operations, business or financial condition of the Company. (emphasis added).

136.    The statements regarding contingencies made in the 2016 10-K were materially false or misleading because they failed to disclose the existence of the *Wave* Litigation in which the plaintiff had—unlike the securities fraud class actions and shareholder derivative lawsuit—declined to voluntarily dismiss its claims and had already defeated CBL's efforts to strike the class action allegations contained in the complaint filed in the *Wave* Litigation. Instead, on April 10, 2017, the Florida court had largely denied CBL's motion to dismiss the *Wave* Litigation which when combined with other related developments including the Florida Court's rejecting of CBL's efforts to strike the class action allegations.

137.    On May 3, 2017, CBL issued a release entitled "CBL & Associates Properties Reports Results for First Quarter 2017." In the release, CBL provided its 1Q17 financial results, including the following (in thousands):

| REVENUES: | |
|---|---|
| Tenant reimbursements | $67,291 |
| Total revenues | $238,013 |
| Net income attributable to common shareholders | $22,892 |

138.     On May 10, 2017, CBL filed with the SEC its report for the fiscal quarter ended March 31, 2017 (the "2017Q1-10Q"). The 2017Q1-10Q repeated the financial results provided in the 1Q17 press release and represented that the Company's financial statements had "been prepared in accordance with GAAP."

139.     The 2017Q1-10Q contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2017Q1-10Q), which certified that they had reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

140.     The representations in ¶¶137-139 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme.  In addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

141.     The 2017Q1-10Q (on pages 15, 31, and 55) made the same statement with respect to legal proceedings and contingencies as the 2016Q2-10Q and is materially false or misleading for the same reasons as alleged above in paragraphs 118 and 120 with respect to the 2016Q2-10Q.

142.     On August 3, 2017, CBL issued a release entitled "CBL & Associates Properties Reports Results for Second Quarter 2017." In the release, CBL provided its 2Q17 financial results, including the following (in thousands):

| REVENUES: | |
|---|---|
| Tenant reimbursements | $62,231 |
| Total revenues | $229,233 |
| Net income attributable to common shareholders | $30,173 |

143.     On August 9, 2017, CBL filed with the SEC its report for the fiscal quarter ended June 30, 2017 (the "2017Q2-10Q"). The 2017Q2-10Q repeated the financial results provided in the 2Q17 press release and represented that the Company's financial statements had "been prepared in accordance with GAAP."

144.     The 2017Q2-10Q contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2017Q2-10Q), which certified that they had reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

145.     The representations in ¶¶142-144 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme. In addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

146.    The 2017Q2-10Q made the same statements with respect to legal proceedings and contingencies as the 2016Q2-10Q and is materially false or misleading for the same reasons as alleged above in paragraphs 118 and 120 with respect to the 2016Q2-10Q.

147.    On August 29, 2017, CBL filed a Form 424B5 prospectus supplement (the "2017 424B5") with the SEC pursuant to, and was part of, a Form S-3 Registration Statement, filed with the SEC on July 2, 2015 relating to the offering of $225,000,000 of 2026 Senior Notes of CBL Operating. The 2017 424B5 (on page iii) incorporated by reference the 2016 10-K, 2017Q1-10Q and 2017Q2-10Q and, as a result, was materially false or misleading for the same reasons as alleged above in paragraphs 132, 134, 136, 140 and 145 with respect to the 2016 10-K, 2017Q1-10Q and 2017Q2-10Q.

148.    On November 2, 2017, CBL issued a release entitled "CBL Properties Reports Results for Third Quarter 2017." In the release, CBL provided its 3Q17 financial results, including the following (in thousands):

| REVENUES: | |
| --- | --- |
| Tenant reimbursements | $63,055 |
| Total revenues | $224,650 |
| Net income (loss) attributable to common shareholders | $(2,258) |

149.    On November 8, 2017, CBL filed with the SEC its report for the fiscal quarter ended September 30, 2017 (the "2017Q3-10Q").  The 2017Q3-10Q repeated the financial results provided in the 3Q17 press release and represented that the Company's financial statements had "been prepared in accordance with GAAP."

150.    The 2017Q3-10Q contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2017Q3-10Q), which certified that they had reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material

respects, and disclosed any material changes to the Company's internal control over financial reporting.

151.    The representations in ¶¶148-150 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme.  In addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

152.    The 2017Q3-10Q (on pages 16, 37, and 63) made the same statements with respect to legal proceedings and contingencies as the 2016Q2-10Q and is materially false or misleading for the same reasons as alleged above in paragraphs 118 and 120 respect to the 2016Q2-10Q.

153.    On February 8, 2018, CBL issued a release entitled "CBL Properties Reports Results for Fourth Quarter and Full-Year 2017." In the release, CBL provided its 4Q17 financial results, including the following (in thousands):

| REVENUES: | |
|---|---|
| Tenant reimbursements | $61,975 |
| Total revenues | $235,356 |
| Net income attributable to common shareholders | $25,241 |

154.    On March 1, 2018, CBL filed with the SEC its annual report for the fiscal year ended December 31, 2017 on Form 10-K (the "2017 10-K").  The 2017 10-K repeated the Company's financial results provided in the 4Q17 press release and represented that the Company's financial statements had "been prepared in accordance with GAAP." The 2017 10-K also stated that:

[w]e receive reimbursements from tenants for real estate taxes, insurance, [common area maintenance], and other recoverable operating expenses as provided in the lease agreements. Tenant reimbursements are recognized as revenue in the period the related operating expenses are incurred.

155.    The 2017 10-K contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel, which certified that they had reviewed the Form 10-K and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting. The 2014 10-K was signed by Defendants Charles Lebovitz, Steven Lebovitz, Khaleel and Chapman.

156.    The representations in ¶¶153-155 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme.  In addition, the statements made in the 10-K regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

157.    The 2017 10-K (on pages 45, 75, and 144) made substantially the same statements with respect to legal proceedings under Item 3 and Contingencies under Note 14 as the 2016 10-K but excluded the discussion of the dismissed putative securities fraud class action complaints and shareholder derivative lawsuit. The 2017 10-K is materially false or misleading for the same reasons as set forth in paragraphs 134, 136 and 151 with respect to the 2016 10-K and the 2017Q3-10Q.

158.    On April 26, 2018, CBL issued a release entitled "CBL Properties Reports Results for First Quarter 2018." In the release, CBL provided its 1Q18 financial results, including the following (in thousands):

| REVENUES: | |
| --- | --- |
| Tenant reimbursements | $60,613 |
| Total revenues | $220,200 |
| Net income attributable to common shareholders | $(10,320) |

159.    On May 10, 2018, CBL filed with the SEC its report for the fiscal quarter ended March 31, 2018 (the "2018Q1-10Q"). The 2018Q1-10Q repeated the financial results provided in the 1Q18 press release and represented that the Company's financial statements had "been prepared in accordance with GAAP." The 2018Q1-10Q also stated that the:

> Company receives reimbursements from tenants for real estate taxes, insurance, [common area maintenance] and other recoverable operating expenses as provided in the lease agreements. Tenant reimbursements are recognized when earned in accordance with the tenant lease agreements.

160.    The 2018Q1-10Q contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2018Q1-10Q), which certified that they had reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

161.    The representations in ¶¶158-160 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme. In addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper

revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

162. The 2018Q1-10Q (on pages 14, 28 and 51) made the same statements with respect to legal proceedings and contingencies as the 2016Q2-10Q and is materially false or misleading for the same reasons as set forth in paragraph 152 with respect to the 2016Q3-10Q.

163. The 2018Q1-10Q was also materially false or misleading because it disclosed (on page 35) that the Company's general and administrative expenses increased primarily due to increases in legal fees and a decrease in capitalized overhead related to development projects while failing to disclose that the increased legal fees paid by CBL were, in large part if not entirely, related to undisclosed *Wave* Litigation.

164. On August 1, 2018, CBL issued a release entitled "CBL Properties Reports Results for Second Quarter 2018." In the release, CBL provided its 2Q18 financial results, including the following (in thousands):

| REVENUES: | |
|---|---|
| Tenant reimbursements | $56,614 |
| Total revenues | $214,598 |
| Net income attributable to common shareholders | $(35,020) |

165. On August 9, 2018, CBL filed with the SEC its report for the fiscal quarter ended June 30, 2018 (the "2018Q2-10Q"). The 2018Q2-10Q repeated the financial results provided in the 2Q18 press release and represented that the Company's financial statements had "been prepared in accordance with GAAP." The 2018Q2-10Q also stated that the

> Company receives reimbursements from tenants for real estate taxes, insurance, [common area maintenance] and other recoverable operating expenses as provided in the lease agreements. Tenant reimbursements are recognized when earned in accordance with the tenant lease agreements.

166. The 2018Q2-10Q contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2018Q2-10Q), which certified that they had

reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

167. The representations in ¶¶164-166 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme. In addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

168. The 2018Q2-10Q (on pages 14, 31-32 and 59) made the same statements with respect to legal proceedings and contingencies as the 2016Q2-10Q and is materially false or misleading for the same reasons as set forth in as set forth in paragraph 152 with respect to the 2016Q3-10Q.

169. The 2018Q2-10Q (on page 40) also stated that increased legal costs offset decreases to general and administrative expenses. The 2018Q2-10Q omitted that the increased legal costs paid by CBL were, in large part if not entirely, related to undisclosed *Wave* Litigation.

170. On October 29, 2018, CBL issued a release entitled "CBL Properties Reports Results for Third Quarter 2018 and Declares Common and Preferred Stock Dividends." In the release, CBL provided its 3Q18 financial results, including the following (in thousands):

| REVENUES: | |
| --- | --- |
| Tenant reimbursements | $55,375 |
| Total revenues | $206,878 |
| Net income attributable to common shareholders | $(12,590) |

171.     On November 9, 2018, CBL filed with the SEC its report for the fiscal quarter ended September 30, 2018 (the "2018Q3-10Q"). The 2018Q3-10Q repeated the financial results provided in the 3Q18 press release and represented that the Company's financial statements had "been prepared in accordance with GAAP." The 2018Q3-10Q also stated that the:

> Company receives reimbursements from tenants for real estate taxes, insurance, [common area maintenance] and other recoverable operating expenses as provided in the lease agreements. Tenant reimbursements are recognized when earned in accordance with tenant lease agreements.

172.     The 2018Q3-10Q contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel (who also signed the 2018Q3-10Q), which certified that they had reviewed the Form 10-Q and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting.

173.     The representations in ¶¶170-172 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme. In addition, the statements made in the 10-Q regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

174.     The 2018Q3-10Q (on pages 14, 33 and 61) made the same statements with respect to legal proceedings and contingencies as the 2016Q2-10Q (with a paragraph break inserted in the

discussion of contingencies) and is materially false or misleading for the same reasons as set forth in paragraph 152 with respect to the 2017Q3-10Q.

175.     The 2018Q3-10Q (on page 40) also stated that general and administrative expenses increased during the three months ended September 30, primarily due to expense related to the retirement of the Company's Chief Operating Officer and increased legal expenses, and that "[a]s a percentage of revenues, general and administrative expenses excluding the one-time retirement expense were 7.0% for the three months ended September 30, 2018 compared to 6.0% for the three months ended September 30, 2017." The 2018Q3-10Q omitted that the increased legal expenses paid by CBL were, in large part if not entirely, related to undisclosed *Wave* Litigation.

176.     On February 7, 2019, CBL issued a release entitled "CBL & Associates Properties Reports Results for Fourth Quarter and Full-Year 2018." In the release, CBL provided its 4Q18 financial results, including the following (in thousands):

| REVENUES: | |
| --- | --- |
| Tenant reimbursements | $44,712 |
| Total revenues | $216,881 |
| Net income attributable to common shareholders | $(67,027) |

### THE TRUTH BEGINS TO EMERGE AS DEFENDANTS CONTINUE TO MISLEAD INVESTORS

177.     On March 1, 2019, as markets closed for the day, CBL filed with the SEC its annual report for the fiscal year ended December 31, 2018 on Form 10-K (the "2018 10-K"). The 2018 10-K repeated the Company's financial results provided in the 4Q18 press release. The 2018 10-K also stated that:

> [w]e receive reimbursements from tenants for real estate taxes, insurance, [common area maintenance], and other recoverable operating expenses as provided in the lease agreements. Tenant reimbursements are recognized as revenue in the period the related operating expenses are incurred.

178.     The 2014 10-K also represented that the Company's financial statements had "been prepared in accordance with [GAAP]" and contained Sarbanes-Oxley certifications signed by Defendants Steven Lebovitz and Khaleel, which certified that they had reviewed the Form 10-K and it contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CBL, was accurate in all material respects, and disclosed any material changes to the Company's internal control over financial reporting. The 2014 10-K was signed by Defendants Charles Lebovitz, Steven Lebovitz, Khaleel and Chapman.

179.     The representations in ¶¶176-178 were materially false and misleading because the Company's tenant reimbursements, total revenues and net income attributable to common shareholders was overstated because they included amounts from the Overcharge Scheme.  In addition, the statements made in the 10-K regarding compliance with GAAP were materially false or misleading because CBL should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants overcharged CBL tenants directly caused by Defendants' Overcharge Scheme.

180.     The 2018 10-K (on page 47) under a heading titled "**ITEM 3. LEGAL PROCEEDINGS**" and (on page 138) under a heading titled "**NOTE 15. CONTINGENCIES**" disclosed that:

> On March 16, 2016, Wave Lengths Hair Salons of Florida, Inc. d/b/a Salon Adrian filed a putative class action in the United States District Court for the Middle District of Florida (the "Court") for unspecified monetary damages as well as costs and attorneys' fees, based on allegations that the Company and certain affiliated entities overcharged tenants at bulk metered malls for electricity. On January 7, 2019, the Court partially granted the plaintiff's motion for class certification of a nationwide RICO class and a Florida RICO and FDUTPA class. *We believe this lawsuit is without merit and are defending ourselves vigorously*. On January 22, 2019, we filed a petition seeking interlocutory review of the Court's class certification order; that petition is still pending as of the date of this report. On January 23, 2019, the Court set this matter for the trial term starting on April 1, 2019. *We have not recorded an accrual relating to this matter at this time as a*

*loss has not been determined to be probable. Further, we do not have sufficient information to reasonably estimate the amount or range of reasonably possible loss at this time*. However, litigation is uncertain and an adverse judgment in this case could have a material adverse effect on our financial condition and results of operations. This matter is not covered by insurance.

181.    The statement made in the 2018 10-K was materially false or misleading because the Company had been previously involved in settlement negotiations mediated by JAMS that had failed to resolve the case, knew or could reasonably estimate based upon ongoing discussions with the plaintiffs in the *Wave* Litigation the amount of money necessary to resolve the case and could not afford to try the case because a loss on the merits would serve as a "death-knell" for the Company as it had previously disclosed in a brief filed with the U.S. Court of Appeals for the Eleventh Circuit.

182.    As a result of Defendants' partial yet misleading disclosure regarding the *Wave* Litigation, the price of CBL common stock dropped $0.16 per share, or nearly 8%, on volume of approximately 4.5 million shares. However, because Defendants had failed to disclose the truth about their scheme to systematically overcharge tenants for electricity and the likely impact of the *Wave* Litigation, the price of CBL securities remained artificially inflated.

## THE TRUTH IS REVEALED WITH CBL'S COMPLETE AND TOTAL CAPITULATION IN THE *WAVE* LITIGATION

183.    On March 26, 2019, after markets closed, CBL filed with the SEC a Form 8-K Current Report disclosing that:

On March 20, 2019, the board of directors of CBL & Associates Properties, Inc. ("we" or the "Company") approved the structure of a settlement in the class action lawsuit filed on March 16, 2016 in the United States District Court for the Middle District of Florida (the "Court") by Wave Lengths Hair Salons of Florida, Inc. d/b/a Salon Adrian. As previously disclosed, plaintiff's motion for class certification of a nationwide RICO class and a Florida RICO and FDUTPA (Florida Deceptive and Unfair Trade Practices Act) class was partially granted by the Court on January 7, 2019. In its action, plaintiff sought unspecified monetary damages as well as costs and attorneys' fees, based on allegations that we and certain affiliated entities overcharged tenants at bulk metered malls for electricity.

Our petition seeking to appeal the Court's class certification order was denied by the United States Court of Appeals for the Eleventh Circuit on March 4, 2019. On March 11, 2019, the Court set the trial date for April 2, 2019. On March 15, 2019, following mediation proceedings, a proposed structure of a settlement was approved by representatives of the parties.

Under the terms of the proposed settlement, we have denied all allegations of wrongdoing and have asserted that our actions have at all times been lawful and proper.

Under the terms of the proposed settlement, we are to set aside a common fund with a monetary and non-monetary value of $90 million (the "Common Fund") to be disbursed to class members in accordance with a formula to be agreed upon by the parties that is based upon aggregate damages of $60 million. Class members will be comprised of past and current tenants at certain of our shopping centers that we own or formerly owned during the class period, which will extend from January 1, 2011 through the date of Court preliminary approval. Class members who are past tenants and make a claim will receive payment of their claims in cash. Class members who are current tenants will receive monthly credits against rents and future charges over the next five years. Any amounts under the settlement allocated to tenants with outstanding amounts payable to the Company, including tenants which have declared bankruptcy or declare bankruptcy over the relevant period, will first be deducted from the amounts owed to the Company. All attorney's fees and associated costs to be paid to Class Counsel (which is expected to total a maximum of $28.0 million) and class administration costs (which are expected to not exceed $150,000), will be funded by the Common Fund, but must be approved by the court.

Under the terms of the proposed settlement, we will not pay any dividends to holders of our common shares payable in the third and fourth quarters of 2019. The settlement does not restrict our ability to declare dividends payable in 2020 or in subsequent years.

Under the terms of the proposed settlement, once we have made all required payments and credits, we will have no further payment obligation to the class members. We and our affiliates will receive a general release from the class members for all claims as of the date of final approval by the Court that relate to or arise out of any charges for electricity of any kind, including but not limited to claims that relate to or arise out of the allegations made in the action.

Under the terms of the proposed settlement, the parties will jointly move to stay pending litigation. During such time, counsel for the parties shall work cooperatively to draft final settlement documents with a goal to finalize the settlement agreement and file a motion for preliminary approval by the Court no later than May 29. The settlement is subject to a number of conditions, including Court approval.

As noted above, we have denied all allegations of wrongdoing and have asserted that our actions have at all times been lawful and proper. However, given the class certification, the accelerated trial schedule, the inherent risk of any trial and the potential cost of an adverse resolution of the litigation, we believe that the settlement is in the Company's best interest and in the best interests of our stockholders.

On March 26, 2019, we issued a press release related to this matter which is attached as Exhibit 99.1.

184. Exhibit 99.1 to the Company's March 26, 2019, Current Report stated, in part:

CBL PROPERTIES ANNOUNCES PROPOSED SETTLEMENT OF CLASS ACTION LAWSUIT

CHATTANOOGA, Tenn. (March 26, 2019) - CBL Properties (NYSE: CBL) today announced that it has approved the structure of a settlement of a class action lawsuit as outlined below.

**Background**

On March 16, 2016, Wave Lengths Hair Salons of Florida, Inc. d/b/a Salon Adrian filed a putative class action in the United States Court for the Middle District of Florida seeking unspecified monetary damages, as well as costs and attorneys' fees, based on allegations that CBL and certain affiliated entities overcharged tenants at bulk metered malls for electricity.

In recent months, the pace of the case accelerated to a considerable degree. On January 7, 2019, the Court partially granted the plaintiff's motion for class certification of a nationwide RICO class and a Florida RICO and FDUTPA class. On January 22, 2019, CBL filed a petition with the United States Court of Appeals for the Eleventh Circuit seeking permission to appeal the Court's class certification order, and on March 4, 2019, that petition was denied. On March 11, 2019, the Court set the trial date for April 2, 2019. On March 15, 2019, following mediation proceedings, a proposed structure of a settlement was approved by representatives of the parties.

CBL denies all allegations of wrongdoing and asserts that its actions have at all times been lawful and proper. However, given the class certification, the accelerated trial schedule, the inherent risk of any trial, and the potential cost of an adverse resolution of the litigation, the Company believes that mediation was the prudent path. Furthermore, it maintains that the proposed settlement is in CBL's best interest and in the best interests of its shareholders.

**Proposed Settlement Structure**

Details of the proposed settlement structure and anticipated accounting impact are available on CBL's Form 8-K filed with the SEC today.

As part of the proposed settlement, CBL will suspend payment of its common dividend for two quarters: the quarter ended June 30, 2019 (payable in third quarter 2019), and the quarter ended September 30, 2019 (payable in fourth quarter 2019). The suspension of the dividend for two quarters will preserve approximately $26.0 million in cash at the current quarterly dividend rate. Based on the current projection of taxable income for 2019, which includes the impact of the settlement, CBL believes it will satisfy all required REIT distributions for the 2019 taxable year. The proposed settlement does not restrictCBL's payment of common dividends thereafter. CBL anticipates resuming a quarterly distribution with its dividend payable in January 2020 (subject to Board approval) in an amount to be determined at that time based on updated taxable income projections for 2020. CBL's common dividend previously declared on February 25, 2019, and payable on April 16, 2019, will be paid as declared.

185.     On March 27, 2019, CBL's common stock price fell from its closing price of $1.91 the prior day to $1.44, a decrease of almost 25%, on trading volume of approximately 11.7 million shares. CBL Series D preferred shares dropped 7%, or $0.74, on volume of 576,300 shares. CBL Series E preferred shares dropped 4.9%, or $0.46 in, on volume of 53,407 shares. On the same day, the trading price of CBL's senior unsecured notes due 2023 fell by 6.32%, the trading price of CBL's senior unsecured notes due 2024 fell by 6.92%, and the trading price of CBL's senior unsecured notes due 2024 fell by 8.26%.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS WERE MADE WITH SCIENTER

186.     In addition to the facts alleged above, the following facts support a strong inference of Defendants' scienter:

(a)     Defendants intentionally began the Overcharge Scheme in order to defraud CBL's tenants and actively concealed the scheme for over a decade.

(b)     The limited record currently publicly available from the *Wave* Litigation demonstrates knowledge of the underlying scheme of many of the Company's senior executives having been taken including that of that Don Sewell who currently serves as CBL's Senior Vice President – Management of CBL and Stephas, who retired as CBL's EVP – Chief Operating

Officer in September of 2018. For example, the Memorandum and Order granting class certification in the *Wave* Litigation states, in part, that "Plaintiff cites to evidence that Valquest and CBL knew what they were doing was wrong and potentially illegal."

(c)     The Company has publicly stated in proxy statements filed with the SEC on March 28, 2017 (on page 18), March 29, 2018 (on pages 19-20), and March 22, 2019 (on page 18) that a key aspect of the Board's responsibilities involves risk assessment including the monitoring of "existing and potential legal claims against the Company."

(d)     John V. Curry, the Company's Chief Legal Officer and Secretary had formerly been a partner at Husch Blackwell, which represented the defendants in the *Wave* Litigation and he remains employed by the Company despite the failure of CBL's SEC filings to make any disclosures relating to the *Wave* Litigation.

(e)     Defendants' desire to raise capital on favorable terms including through the sale of $400 million in 5.95% unsecured bonds due in 2026 in December 2016 and an additional $225 million in 5.95% unsecured bonds due in 2026 on or about August 29, 2017 as well as through an unsecured revolving credit facility.

(f)     Defendants Charles B. Lebovitz, Stephen Leibovitz, and Farzana Khaleel, incentive compensation for the Long Term Incentive Program ("LTIP") being based in part upon total shareholder return ("TSR") which would have been negatively affected by disclosure of the *Wave* Litigation.

(g)     Defendant Sewell, in 2018, was promoted to CBL's Senior Vice President – Management.  Mr. Sewell joined CBL in October 1973 and was involved in the Company's relationship with Valquest as demonstrated by the summary judgment hearing transcript in the Wave Litigation. Mr. Sewell remains employed by the Company despite the underlying

Overcharge Scheme and the failure of CBL's SEC filings to make any disclosures relating to the *Wave* Litigation.

(h)     The Company's capitulation in the *Wave* Litigation is a rarity in major civil litigation and supports a strong inference that CBL had little or no valid defense to the claims.

(i)     CBL acting to attempt to prevent public access to the documents previously filed under seal in the *Wave* Litigation. Specifically, Defendants have declined to consent to the unsealing of those documents and, instead, on October 11, 2019 filed a brief with the Florida court opposing Lead Plaintiffs' effort to make those documents public.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

187.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") consisting of all those who purchased, or otherwise acquired, any of the following CBL securities between May 10, 2016 and March 27, 2019 (the "Class Period") and were damaged upon the revelation of the alleged corrective disclosures:

- CBL common stock,

- CBL's 7.375% Series D Cumulative Redeemable Preferred Stock,

- CBL's 6.625% Series E Cumulative Redeemable Preferred Stock,

- senior unsecured notes issued by CBL Operating in November 2013 that bear interest at 5.25% and mature on December 1, 2023,

- senior unsecured notes issued by CBL Operating in October 2014 that bear interest at 4.60% and mature on October 15, 2024, and,

- senior unsecured notes issued by CBL Operating in December 2016 and September 2017 that bear interest at 5.95% and mature on December 15, 2026 (and, collectively with the 2023 Notes and 2024 Notes, the "Notes").

188.     Excluded from the Class are the Defendants herein; CBL's officers and directors, at all relevant times; members of their immediate families, and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have, or had, a controlling interest.

189.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CBL equity securities were actively traded on the NYSE and the Notes were also actively traded. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class. The members of the proposed Class may be identified from records maintained by CBL, or its transfer agent, and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

190.     Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct.

191.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel that are competent and experienced in class action and securities litigation.  Lead Plaintiffs have no interest, antagonism, or conflict with the members of the Class.

192.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of CBL;

(c)     whether the Individual Defendants caused CBL to issue false and misleading SEC filings during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings;

(e)     whether the prices of CBL debt and equity securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages, and if so, what is the proper measure of damages.

193.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## RELIANCE

194.    Lead Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

195.    Lead Plaintiffs may rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) CBL securities are traded in an efficient market;

(d) CBL's securities were liquid and traded with moderate-to-heavy volume during the Class Period, and reacted swiftly to news and SEC filings;

(e) CBL's equity securities traded on the NYSE and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of CBL securities; and

(g) Lead Plaintiffs and members of the Class transacted in CBL securities between the time Defendants failed to disclose, or misrepresented material facts, and when the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

196. Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I:

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

### (Against All Defendants)

197. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

198. This count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder. Rule 10b-5(a) makes it unlawful for any person, directly or indirectly to employ any device, scheme, or artifice

to defraud. Rule 10b-5(b) makes it unlawful for any person, directly or indirectly to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. Plaintiffs assert Section 10(b) and Rule 10b-5(a), (b) and (c) claims against all Defendants.

199. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business, which operated as fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Defendants' scheme was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CBL securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase, or otherwise acquire, CBL common stock, preferred stock and debt securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, including the Individual Defendants, took the actions set forth herein.

200. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly, or indirectly, in the preparation and issuance of SEC filings and other statements and documents described above, including statements made to securities analysts,

that were designed to and did influence the market for CBL securities. Such filings, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CBL's finances and business prospects.

201. By virtue of their positions at CBL, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed, or refused to ascertain and disclose, such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew, or recklessly disregarded, that material facts were being misrepresented or omitted as described above.

202. Information showing that Defendants acted knowingly or with reckless disregard for the truth is particularly within Defendants' knowledge and control. As the senior managers or directors of CBL, the Individual Defendants had knowledge of the details of CBL's internal affairs and were aware of the existence and magnitude of the *Wave* Litigation.

203. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants controlled the content of the statements made by CBL. As officers and directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CBL's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of false and misleading reports, releases, and public statements, the market price of CBL securities were artificially inflated throughout the Class

Period. In ignorance of the adverse facts concerning CBL's business and financial condition, which were concealed by Defendants, Lead Plaintiffs and the other members of the Class purchased, or otherwise acquired, CBL common stock, preferred stock, or debt at artificially inflated prices and relied upon the price of the securities, the integrity of the market, and upon statements disseminated by Defendants and were damaged thereby.

204. During the Class Period, CBL securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CBL common stock, preferred stock, or Notes at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired CBL common stock, preferred stock, or debt, or would not have purchased or otherwise acquired such securities at the inflated prices that were paid. At the time of the purchases or acquisitions by Lead Plaintiffs and the Class, the true value of CBL common stock, preferred stock, and notes was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market price of CBL common stock, preferred stock, and notes declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

205. By reason of the conduct alleged herein, Defendants have knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

206. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases

of CBL securities during the Class Period and were harmed upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II:

### Violations of Section 20 of the Exchange Act

### (Against Charles B. Lebovitz and Stephen D. Lebovitz)

207.    Plaintiffs repeats and re-allege each and every allegation contained above as if fully set forth herein.

208.    During the Class Period, the Individual Defendants participated in the operation and management of CBL and conducted and participated, directly and indirectly, in the conduct of CBL's business affairs. Because of their senior positions, they knew the adverse non-public information alleged herein.

209.    As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CBL's financial condition and operations, and to promptly correct any public statements issued by CBL that became materially false or misleading.

210.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that CBL disseminated in the marketplace during the Class Period concerning CBL's financial results and business relationships. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CBL to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of CBL within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged herein that artificially inflated the market price of CBL securities.

211. Each of the Individual Defendants, therefore, acted as a controlling person of CBL. By reason of their senior management positions or directorship positions at CBL, each of the Individual Defendants had the power to direct the actions of the Company and exercised the same power to cause CBL to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of CBL and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

212. By reason of the above conduct, the Individual Defendants are liable, pursuant to Section 20(a) of the Exchange Act, for the violations committed by CBL.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

A. Declaring that the instant action may be maintained as a class action, under Fed. R. Civ. P. 23, and certifying Plaintiffs as Class Representatives;

B. Awarding Plaintiffs and the other members of the Class compensatory damages;

C. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

D. Awarding Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 5, 2019

Respectfully Submitted,

/s/   John W. Chandler, Jr.
John W. Chandler, Jr.
**THE HAMILTON FIRM**
2401 Broad Street, Suite 102
Chattanooga, TN 37408
Tel: (423) 634-0871
Fax: (423) 634-0874
jwc@thehamiltonfirm.com

Al Holifield (BPR# 015494)
Sarah R. Johnson (BPR# 030781)
**HOLIFIELD JANICH &**
**FERRERA, PLLC**
11907 Kingston Pike Suite 201
Knoxville, Tennessee 37934
Tel: (865) 566-0115
Fax: (865) 566-0119
aholifield@holifieldlaw.com
sjohnson@holifieldlaw.com

**Co-Liaison Counsel for the Class**

Jeffrey S. Abraham (admitted *pro hac vice*)
Michael J. Klein (admitted *pro hac vice*)
**ABRAHAM, FRUCHTER &**
**TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
jabraham@aftlaw.com
mklein@aftlaw.com

64

Jeremy A. Lieberman (admitted *pro hac vice*)
Michael J. Wernke (admitted *pro hac vice*)
J. Alexander Hood II (admitted *pro hac vice*)
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
jalieberman@pomlaw.com
mjwernke@pomlaw.com
ahood@pomlaw.com

**Co-Lead Counsel for the Class**

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
peretz@bgandg.com

**Additional Counsel for Jay Scolnick**

**KASKELA LAW LLC**
D. Seamus Kaskela
18 Campus Boulevard, Suite 100
Newtown Square, PA 19073
Tel: (484) 258-1585
skaskela@kaskelalaw.com

**Additional Counsel for Mark Shaner**

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of November, 2019, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system. Notice of this filing was sent by operation of the Court's electronic filing system to all parties indicated in the electronic filing receipt. I hereby certify that I am unaware of any other parties in this cause not using the CM/ECF system.

/s/   John W. Chandler, Jr.
John W. Chandler, Jr.

**THE HAMILTON FIRM**
2401 Broad Street, Suite 102
Chattanooga, TN 37408
Tel: (423) 634-0871
Fax: (423) 634-0874
jwc@thehamiltonfirm.com