# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESEE
## CHATTANOOGA DIVISION

| | |
|---|---|
| IN RE CBL & ASSOCIATES PROPERTIES, INC. SECURITIES LITIGATION | ) <br> ) Consolidated Case No. <br> ) No. 1:19-cv-00181-JRG-CHS <br> ) |

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

SUMMARY OF RELEVANT FACTS ..................................................................................1

    The Company.....................................................................................................................1

    The Overcharge Scheme ...................................................................................................2

    The *Wave* Litigation is Initiated after Discovery of the Overcharge Scheme .....................2

    Defendants Conceal the Scheme and CBL's Exposure in the *Wave* Litigation .................3

    Defendants Belatedly Disclose the Truth ...........................................................................4

ARGUMENT ........................................................................................................................5

    A.    Defendants Had a Duty to Disclose the Wave Litigation ............................5

    B.    Defendants' Statements About CBL's Tenant Reimbursements and Revenue Recognition Were Materially False or Misleading.....................10

    C.    Defendants' Misstatements and Omissions Were Material.......................14

    D.    Plaintiffs Properly Allege a Strong Inference of Scienter .........................15

        1.   Plaintiffs Properly Allege a Strong Inference of Scienter Based upon the Supreme Court's Controlling Decision in *Tellabs*................16

        2.   The Complaint Also Satisfies Multi-Factor Tests Which Courts Often Employ in Helping Determine Whether a Strong Inference of Scienter is Alleged..........................................................18

            i.    Defendants' Actual Knowledge of and Participation in the Overcharge Scheme Establishes A Strong Inference of Scienter ...........................................................................19

            ii.   Defendants' Failure to Disclose Information That They Had a Clear Duty to Disclose Supports an Inference of Scienter ...........................................................................21

            iii.   Other Factors Support A Strong Inference of Scienter......24

        3.   The Complaint Adequately Pleads Corporate Scienter .......................26

    E.    The Complaint Adequately Alleges Loss Causation .................................28

    F.    Defendants Are Each "Makers" of False and Misleading Statements .................................................................................................30

CONCLUSION................................................................................................................. 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AllState Ins. Co. v. Countrywide Fin. Corp.*,
824 F. Supp. 2d 1164 (C.D. Cal. 2011) ....................................................................................28

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009)..........................................................................................................5

*Ashland, Inc. v. Oppenheimer & Co.*,
648 F.3d 461 (6th Cir. 2011) ............................................................................................5, 6

*Axar Master Fund, Ltd. v. Bedford*,
308 F. Supp. 3d 743 (S.D.N.Y. 2018)..................................................................................9

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009)..............................................................................23

*Ballan v. Upjohn Co.*,
814 F. Supp. 1375 (W.D. Mich. 1992) ...............................................................................29

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................................5

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) .........................................................................................11

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) ......................................................................................26

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
56 F. Supp. 3d 549 (S.D.N.Y. 2014)..................................................................................30

*Catalano v. BMW of N. Am., LLC*,
167 F. Supp. 3d 540 (S.D.N.Y. 2016).................................................................................21

*City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) .......................................................................................19, 26

*City of Philadelphia v. Fleming Cos., Inc.*,
264 F.3d 1245 (10th Cir. 2001) .........................................................................................6, 7

*City of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011).................................................................................30

Case 1:19-cv-00181-JRG-CHS    Document 101    Filed 02/06/20    Page 3 of 42
PageID #: 1407

*Cosby v. KPMG, LLP*,
2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018) ........................................................................30

*Crown, Cork & Seal Co. v. Parker*,
462 U.S. 345 (1983) ..........................................................................................................6

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
2019 WL 4600934 (S.D.N.Y. Sep. 22, 2019) ..........................................................................8

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) ...............................................................................................15

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ..........................................................................................................28

*ECA & Local 134 IBEW Jt. Pension Trust of Chi.*,
553 F.3d 187 (2d Cir. 2009) ................................................................................................19

*FindWhat Inv'r Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ...........................................................................................11

*Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*,
964 F. Supp. 2d 875 (N.D. Ohio 2013) ...................................................................................29

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ...............................................................................................18

*Galati v. Commerce Bancorp, Inc.*,
220 F. App'x 97 (3d Cir. 2007) ............................................................................................11

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018) ....................................................................................13

*Garden City Employees' Ret. Sys. v. Psychiatric Solutions, Inc.*,
2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) .................................................................11, 20

*Gibbons v. Udaras na Gaeltachta*,
549 F. Supp. 1094 (S.D.N.Y.1982) ........................................................................................13

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) .......................................................................................... *passim*

*In re Adaptive Broadband Sec. Litig.*,
2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ..............................................................................25

*In re American Bank Note Holographics Sec. Litig.*,
93 F. Supp. 2d 424 (S.D.N.Y. 2000) ......................................................................................24

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ..............................................................................28, 29

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006)..............................................................................13

*In re BioScrip. Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)................................................................................21

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005)..............................................................................27

*In re Carter-Wallace, Inc. Sec. Litig.*,
150 F.3d 153 (2d Cir. 1998)..............................................................................................27

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004)..............................................................................27

*In re Diamond Foods, Inc. Sec. Litig.*,
2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ...........................................................24

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ..............................................20, 26, 29

*In re Envoy Corp. Sec. Litig.*,
133 F. Supp. 2d 647 (M.D. Tenn. 2001)..........................................................................24

*In re Flowers Foods, Inc. Sec. Litig.*,
2018 WL 1558558 (M.D. Ga. Mar. 23, 2018),
reconsideration denied, 2018 WL 2190904 (M.D. Ga. May 10, 2018)...................................16

*In re Ford Motor Co. Sec. Litig.*,
381 F.3d 563 (6th Cir. 2004) ............................................................................................11

*In re Grupo Televisa Sec. Litig.*,
368 F. Supp. 3d 711 (S.D.N.Y. 2019)..............................................................................11

*In re Huffy Corp. Sec. Litig.*,
577 F. Supp. 2d 968 (S.D. Ohio 2008) ............................................................................20

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005)..............................................................................27

*In re KBC Asset Management N.V.*,
572 F. App'x 356 (6th Cir. 2014) ....................................................................................29

*In re Level 3 Communs. Sec. Litig.*,
667 F.3d 1131 (10th Cir. 2012) ........................................................................................19

Case 1:19-cv-00181-JRG-CHS Document 101 Filed 02/06/20 Page 5 of 42
PageID #: 1409

*In re Lions Gate Ent. Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) ...................................................................7, 9

*In re Marsh & McLennan Cos. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)......................................................11, 12, 26

*In re Medicis Pharm. Corp. Sec. Litig.*,
   2010 WL 3154863 (D. Ariz. Aug. 9, 2010)..............................................22, 23, 24

*In re Medicis Pharm. Corp. Sec. Litig.*,
   689 F. Supp. 2d 1192 (D. Ariz. 2009) ...................................................................22

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) .......................................................22, 23, 25

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...............................................................25

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) .........................................................................18, 26

*In re Pfizer, Inc. Sec. Litig.*,
   538 F. Supp. 2d 621 (S.D.N.Y. 2008)...................................................................29

*In re PMA Capital Corp. Sec. Litig.*,
   2005 WL 1806503 (E.D. Pa. July 27, 2005)..........................................................12

*In re Pss World Med.,Inc. Sec. Litig.*,
   250 F. Supp. 2d 1335 (M.D. Fla. 2002).................................................................12

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016)..............................................................11, 12

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).....................................................................................21

*In re Se. Milk Antitrust Litig.*,
   2013 WL 2155379 (E.D. Tenn. May 17, 2013)......................................................17

*In re Secure Computing Corp. Sec. Litig.*,
   184 F. Supp. 2d 980 (N.D. Cal. 2001) ..................................................................23

*In re Snap Sec. Litig.*,
   2018 WL 2972528 (C.D. Cal. June 7, 2018) .......................................................8, 9

*In re Sofamor Danek Grp.*,
   123 F.3d 394 (6th Cir. 1997) ..............................................................................5, 11

*In re Twinlab Corp. Sec. Litig.*,
103 F. Supp. 2d 193 (E.D.N.Y. 2000) ...................................................................25

*In re Virtus Inv. Partners Inc. Sec. Litig.*,
195 F. Supp. 3d 528 (S.D.N.Y. 2016)...................................................................11

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
258 F. Supp. 3d 1037 (N.D. Cal. 2017) ..................................................................8

*Indiana Public Retirement System v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016)..............................................................................8, 22

*J & R Mktg., SEP v. Gen. Motors Corp.*,
549 F.3d 384 (6th Cir. 2008) ................................................................................5

*Janus Capital Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)............................................................................................30

*Kyrstek v. Ruby Tuesday, Inc.*,
2016 WL 1274447 (M.D. Tenn. Mar. 31, 2016) ....................................................18

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011)................................................................................14

*Luczak v. Nat'l Beverage Corp.*,
400 F. Supp. 3d 1318 (S.D. Fla. 2019) ................................................................29

*Luna v. Marvell Tech. Grp. Ltd.*,
2016 WL 5930655 (N.D. Cal. Oct. 12, 2016)....................................................9, 10

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016)......................................................14, 15, 21

*Menaldi v. Och-Ziff Capital Mgmt. Grp., LLC*,
277 F. Supp. 3d 500 (S.D.N.Y. 2017)....................................................................8

*Muzinich & Co. v. Raytheon Co.*,
2002 U.S. Dist. LEXIS 26962 (D. ID. Apr. 30, 2002) ...........................................27

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys.*,
2016 WL 4098584 (M.D. Tenn. June 16, 2016)....................................................29

*North Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
929 F. Supp. 2d 740 (M.D. Tenn. 2013)...............................................................24

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)....................................................................11, 19, 20

Case 1:19-cv-00181-JRG-CHS   Document 101   Filed 02/06/20   Page 7 of 42
PageID #: 1411

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    830 F.3d 376 (6th Cir. 2016) ...................................................................................28, 29

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) .................................................................................... *passim*

*Pa. Pub. Sch. Emp'ees. Ret. Sys. v. Bank Of America Corp.*,
    874 F. Supp 2d. 341 (S.D.N.Y. 2012)........................................................................7

*Palazzolo v. Fiat Chrysler Autos. N.V.*,
    WL 6389573 (E.D. Mich. Dec. 14, 2017) ...............................................................15

*Palladin Partners v. Gaon*,
    2006 WL 2460650 (D.N.J. Aug. 22, 2006) .............................................................25

*Patel v. Parnes*,
    253 F.R.D. 531 (C.D. Cal. 2008) ............................................................................25

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) ..............................................................................25

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) .............................................................................22, 24

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018)..............................................................12

*Schuh v. HCA Holdings, Inc.*,
    947 F. Supp. 2d 882 (M.D. Tenn. 2013)...................................................................5

*SEC v. RPM Int'l, Inc.*,
    282 F. Supp. 3d 1 (D.D.C. 2017) ....................................................................8, 9, 14

*SEC v. U.S. Environmental, Inc.*,
    82 F. Supp. 2d 237 (S.D.N.Y. 2000).......................................................................13

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)........................................................................................5

*Teamsters Local 445 Freight Div. v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)....................................................................................27

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................................15, 25

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ........................................................30

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
  2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) ...................................................................19, 29

*Zaluski v. United Am. Healthcare Corp.*,
  527 F.3d 564 (6th Cir. 2008) ............................................................................................11

*Zwick Partners, LP v. Quorum Health Corp.*,
  2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018)...............................................................28, 30

## Rules

Fed. R. Civ. P. 9(b) ....................................................................................................................13

## Regulations

17 C.F.R. §210.4-01(a)(1)............................................................................................................7

17 C.F.R. §229.103 ......................................................................................................................6

17 C.F.R. §240.10b-5...............................................................................................................5, 10

## INTRODUCTION

CBL & Associates Properties, Inc. ("CBL" or the "Company") engaged in a multi-year nationwide scheme of uniformly overcharging retail tenants for electricity (the "Overcharge Scheme" or "Scheme"). Defendants also actively concealed from public investors the existence of the Overcharge Scheme and its impact on CBL's publicly reported financial results. Then, after a tenant discovered the Overcharge Scheme and initiated a class action lawsuit (the "*Wave* Litigation") challenging CBL's conduct, Defendants concealed from investors both the existence of the *Wave* Litigation and the Company's likely liability in that lawsuit from having engaged in the willful wrongful conduct underlying the Overcharge Scheme.

Defendants seek an escape hatch from liability by advancing a grab bag of arguments primarily contending that they had no duty to disclose the facts at issue because they were not material and that Plaintiffs' claims are not alleged with the particularity required by governing pleading standards. Those arguments, however, ignore controlling principles of law as well as the relevant facts of the *Wave* Litigation, in which CBL agreed to pay $90 million, or more than 100% of claimed damages, to settle claims even as CBL was in critically poor financial shape. Therefore, as detailed below, Defendants' motion to dismiss should be denied.

## SUMMARY OF RELEVANT FACTS

### The Company

CBL is a publicly traded real estate investment trust ("REIT"), subject to the disclosure requirements of the Securities Exchange Act of 1934 (the "Exchange Act"). *See* Plaintiffs' Consolidated Class Action Complaint (the "Complaint"), ECF No. 80 at ¶14 (hereafter cited as "¶_"). CBL owns and operates shopping malls in 26 states and reports its financial results in filings with the Securities and Exchange Commission ("SEC"). *E.g.,* ¶¶15, 23, 56, 72, 100, 203.

### The Overcharge Scheme

CBL's lease agreements uniformly provide, consistent with state laws forbidding CBL from making a profit on utility charges, that the tenants could only be charged "the rates [they] would be charged for the same [electric] services if furnished directly … by the Local Utility Company[.]" ¶26. *See also* ¶25. Nonetheless CBL charged tenants (i) for kilowatt hours ("kWh") they never consumed, and (ii) more per kWh than the rate paid by CBL. ¶28.

Specifically, the Overcharge Scheme was hatched by Defendants Augustus Stephas ("Stephas") (CBL's Chief Operating Officer) and Don Sewell ("Sewell") (CBL's Senior Vice President – Management) at CBL's 2005 annual "Leadership Conference." ¶¶20, 21, 28. A presentation detailed the Scheme. ¶¶28, 29. To avoid discovery, CBL: (i) carefully calibrated and tracked overcharges to avoid arousing suspicion; and (ii) inserted a provision into lease agreements requiring tenants to waive any right to conduct an independent audit of electricity charges. ¶¶29, 32, 34. Any tenant questioning their electricity bills was provided with artificially inflated surveys used to project energy costs, rather than providing the actual utility electricity bill. ¶31. Summaries detailing the overbilling for each mall each month were sent to Sewell. ¶30.

As demonstrated from contemporaneous emails, the impropriety of the Overcharge Scheme was widely known within CBL. ¶33. One CBL employee wrote "I don't like these exaggerated utility bills." To which the other employee stated, "No, it's not fair to the customer. Sounds like it's a profit center big time." ¶33. The *Wave* Court later found the evidence now sealed shows that "CBL knew what they were doing was wrong and potentially illegal." ¶186.

### The *Wave* Litigation Is Initiated after Discovery of the Overcharge Scheme

In early 2016, CBL defaulted on its mortgage loan for a Florida shopping mall after which a new management company took control. The plaintiff in the *Wave* Litigation, which had previously complained about its electricity bills, saw its bills drop by 123%. ¶36. On March 16,

2

2016, the plaintiff initiated the *Wave* Litigation asserting claims, on behalf of a nationwide class, arising out of the Overcharge Scheme, including claims arising under the Racketeer Influenced Corrupt Organizations Act ("RICO") and state laws. ¶¶41, 42, 46.

On July 20, 2016, CBL's insurance carrier filed a declaratory judgment action to disclaim coverage because the Scheme involved willful illegal conduct and dishonest acts. ¶¶39, 40, 54. On November 25, 2016, CBL failed in its effort to strike the class action allegations and on April 11, 2017, largely failed in its effort to obtain dismissal of the *Wave* Litigation. ¶¶47, 48. On September 20, 2017 CBL's insurance carrier successfully disclaimed coverage. ¶55.

The *Wave* Litigation involved a massive undertaking with CBL producing more than *1.8 million pages* of discovery, more than seventy third party subpoenas, twelve fact depositions as well as depositions of the class representative and the plaintiff's experts. ¶49. On January 22, 2019, CBL filed a petition for permission to appeal the class certification order in which it argued that the class certification order created a "death knell" for the Company and acknowledging that the *Wave* Litigation was a "bet the company" case. ¶51.

**Defendants Conceal the Scheme and CBL's Exposure in the *Wave* Litigation**

CBL stated in SEC filings made between July 29, 2014, and March 26, 2019 (the "Class Period"), that "[w]e receive reimbursements from tenants for … operating expenses *as provided in the lease agreements*" (¶¶71, 76, 81, 99, 130, 154, 159, 165, 171, 177),[1] that the "[t]enant reimbursements are recognized when *earned* in *accordance with tenant lease agreement*" (¶¶159, 165, 171), or that the "[t]enant reimbursements are recognized as revenue in the period the related operating expenses *are incurred*." ¶¶71, 76, 81, 99, 130, 154, 177. In each of these filings, Defendants Steven Lebovitz (CEO) and Farzana Khaleel (CFO) also represented that

---

[1] Emphasis is added in quotations, and citations are omitted herein, without further indication.

3

CBL's financial statements were prepared in accordance with GAAP. ¶¶16, 17, 72, 77, 82, 85, 89, 94, 100, 105, 106, 111, 115, 122, 131, 138, 143, 149, 154, 159, 165, 171, 178.

However, in truth, CBL was collecting tenant reimbursements for electricity at rates well above the amounts "provided in the lease agreements." *E.g.*, ¶¶71, 76, 81, 99, 130, 154, 159, 165, 171, 177. Moreover, because CBL never provided the electricity necessary to "earn" the inflated tenant reimbursements, its recognition of those reimbursements as revenue improperly inflated its revenue in violation of GAAP and contrary to Defendants' representations. ¶69.

Notwithstanding CBL's disclosure of another class action lawsuit, the Company failed to disclose the existence of the *Wave* Litigation. ¶119. Instead, in each of CBL's SEC filing made with respect to quarterly and yearly financial disclosures, the Company disclosed in boilerplate fashion that they were "currently involved in certain litigation that arises in the ordinary course of business, most of which is expected to be covered by liability insurance" and which "are not expected to have a material adverse effect on our liquidity, results of operations, business or financial condition." ¶¶108, 118, 119, 126, 127, 133, 135, 146, 152, 168 and 174.

CBL also actively prevented details of the Scheme and the *Wave* Litigation from becoming publicly known by causing briefs and discovery material to be filed and remain under seal by, contrary without a document-by-document analysis, designating the documents produced during discovery as "Confidential." ¶186(i); *see also* ECF No. 83.

**Defendants Belatedly Disclose the Truth**

On March 1, 2019 CBL filed its annual report for the fiscal year ended December 31, 2018 on Form 10-K. ¶177. The 2018 10-K finally disclosed the existence of the *Wave* Litigation, admitting that "an adverse judgment in this case ***could have a material adverse effect on our financial condition and results of operations***," and CBL's lack of insurance coverage, in reaction to which the price of CBL common stock dropped $0.16 per share, or nearly 8%. ¶180.

On March 26, 2019, CBL disclosed that it had settled the *Wave* Litigation for $90 million, $30 million higher than the "aggregate damages of $60 million." ¶¶183-84. In reaction to this disclosure, CBL's common stock price plummeted $0.47, a decrease of almost 25%. ¶185.

## ARGUMENT

To state a claim, a request for relief need only be "plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), *i.e.*, "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). In assessing a complaint's sufficiency, the Court must construe it "in the light most favorable to the plaintiff" and "accept all well-pleaded factual allegations as true." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 467 (6th Cir. 2011) (citation omitted).

### A.      Defendants Had a Duty to Disclose the Wave Litigation

In contending that they were not required to disclose the existence of the *Wave* Litigation, Defendants do not contest that Item 103 of SEC Regulation S-K ("Item 103") required disclosure of those facts. Instead, Defendants assert that a Section 10(b) claim cannot be premised on a failure to comply with Item 303. *See* Defs. Memo. at 9.

An "affirmative duty to disclose in Form 10-Qs can serve as the basis for a securities fraud claim under Section 10(b)." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). Discussing Item 303, the Sixth Circuit held that a company "is duty-bound to disclose all material information required to be disclosed by statute." *J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 390 (6th Cir. 2008); *see* also *Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882, 892 (M.D. Tenn. 2013) (securities law violation adequately alleged based on Item 303).[2]

---

[2] Defendants incorrectly assert that the court in *In re Sofamor Danek Grp.*, 123 F.3d 394, 403 (6th Cir. 1997), held that Item 303 does not create a Rule 10b-5 duty to disclose. Def. Br. 9. The

Equally meritless is Defendants' contention that their statements that CBL was not facing any material litigation (¶¶108, 111, 119, 133, 134) were truthful because the *Wave* Litigation was not material until January 7, 2019, when the class was certified. *See* Defs, Memo. at 11-13. That argument is belied by Item 103 requiring a company to describe "any material pending legal proceedings, other than ordinary routine litigation incidental to the business[.]" 17 C.F.R. §229.103. An uninsured class action alleging a nationwide fraud and hundreds of millions of dollars in treble damages is not "incidental" to CBL's business. Instruction 5 to Item 103 states that a pending lawsuit is ***not*** "ordinary routine litigation incidental to the business" if it "involves primarily a claim for damages … [which] exceeds 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis[.]" CBL's assets during the relevant time were slightly more than $100 million. ¶110. Thus, any claim asserting damages in excess of $10 million — a threshold the *Wave* Litigation easily exceeded — was required to be disclosed.

Defendants' attempt to argue the facts as to when class certification became likely in the *Wave* Litigation is blatantly improper on a motion to dismiss. *See, e.g.*, *Ashland, supra*. However, even if it were appropriate, Defendants' ignore that the *Wave* Court had previously denied their motion to strike the class action allegations (¶48) and on the law ignores that where class allegations are made, a putative class certification is assumed to exist. *See, e.g.*, *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) (the filing of a class action tolls the applicable statute of limitations, and permits all members of the putative class to file individual actions in the event that class certification is denied).

*City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245 (10th Cir. 2001), upon which Defendants primarily rely, is not on point because it addressed only the issue of scienter and did

court acknowledged that it was "[p]erhaps so" that Item 303 ***did*** create a duty to disclose but found that the plaintiffs had failed to adequately allege that the defendants had violated Item 303.

not even mention Item 103. Instead, the potential liability represented only between 2.4% and 3.5% of the issuer's assets. *Id.* at 1264. Similarly, in *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 16 (S.D.N.Y. 2016), the other case Defendants cite, the defendants were within the safe harbor of Item 103 for not disclosing pending legal actions.

Defendants also err in contending that a failure to comply with GAAP cannot serve as the basis for a Section 10(b) claim. Defs. Memo. at 9-10, 15. Instead, "SEC regulations dictate that where financial statements are not prepared in compliance with GAAP, they are presumed to be misleading." *Pa. Pub. Sch. Emp'ees. Ret. Sys. v. Bank of America Corp.,* 874 F. Supp 2d. 341, 356 (S.D.N.Y. 2012) (citing 17 C.F.R. §210.4-01(a)(1)).[3]

Here, Defendants acknowledge, as they must, that ASC 450 governs accounting for loss contingencies (Defs. Memo. at 9) and that GAAP provision is pellucid in requiring disclosure of pending or threatened litigation where there is at least a "reasonable possibility" that a loss may be incurred, ***even if the loss cannot be reasonably estimated***. ASC 450-20-50. A loss contingency is "reasonably possible" if the likelihood that it will occur "is ***more than remote but less than likely***." *Id.* ASC 450 also requires that loss contingencies must be ***accrued*** when information available suggests that a loss contingency is "probable" and "can be reasonably estimated." ASC ¶450-20-25. Therefore, the relevant standard is whether the possibility of a loss was "more than remote."

The facts alleged in the Complaint easily meet this standard. Given that CBL senior management crafted and orchestrated the nationwide Overcharge Scheme for years – a fact confirmed by the Florida court certifying the class in the *Wave* Litigation (¶186) – they knew

---

[3] Defendants misleadingly assert that violations of GAAP (*e.g.* ASC 450, Items 103, 303, and FASB Concept No. 5) cannot be the basis of a securities fraud claim. Def. Br. at 9-10, 15. The cases that Defendants cite clearly state that GAAP violations are sufficient to allege a false statement and make the unremarkable observation that a plaintiff must also allege scienter.

upon filing of the *Wave* Litigation, which alleged treble damages and was not covered by insurance, that it was "more than remote," that a loss would be incurred. By 2017, when the *Wave* Court denied CBL's motion to dismiss, a loss was at the very least probable.

*Indiana Public Retirement System v. SAIC, Inc*., 818 F.3d 85 (2d Cir. 2016) ("*SAIC*") is on point. There, the company was held to have a duty to disclose loss contingency even though no complaint had been filed because of an existing government investigation and management being aware of the underlying wrongdoing. Indeed, under similar circumstances courts have held that a company has a duty to disclose a loss contingency ***and accrue a loss*** even before any complaint is filed. *See also SEC v. RPM Int'l, Inc*., 282 F. Supp. 3d 1, 21-22 (D.D.C. 2017) (duty to disclose a DOJ investigation into an overcharge scheme ***and accrue*** a loss because it knew that the DOJ was determining whether to intervene in a federal civil *qui tam* case); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig*., 258 F. Supp. 3d 1037, 1045 (N.D. Cal. 2017) (duty to disclose ***and accrue*** for a loss contingency related to emissions violations after regulators began to question the company's compliance, when no action had been filed). Indeed, courts have required disclosure where a loss is "more likely than not" even when no entity had yet accused the company of wrongdoing if management knew of the illegal scheme. *See, e.g., DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 2019 WL 4600934, at \*9 (S.D.N.Y. Sep. 23, 2019) (duty to disclose the loss contingencies attributed to a bribery scheme even though it had not yet been investigated by any government agency).[4]

---

[4] Disclosure is required even where management was not involved in the underlying wrongdoing if they have reason to believe a credible action will be filed. *E.g. Menaldi v. Och-Ziff Capital Mgmt. Grp., LLC*, 277 F. Supp. 3d 500, 515 (S.D.N.Y. 2017) (duty to disclose a government investigation into possible violations of the Foreign Corrupt Practices Act even though the defendants had no knowledge of actual bribes because the subpoenas from the SEC "had enough details to suggest that the government was on Och-Ziff's trail."). Disclosure is required even for ***individual*** private actions that allege improper conduct. *In re Snap Sec. Litig.*, 2018 WL

Defendants' assertion that that loss contingency disclosures are protected matters of opinion (Defs. Memo. 10-11) also cannot withstand scrutiny because even assuming *arguendo* that an omission could be considered an opinion – which itself is highly doubtful – opinions are actionable where, as here, they omit facts about the basis therefor that, if disclosed, would likely "conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 135 S. Ct. 1318, 1329 (2015). *See also RPM Int'l, Inc.*, 282 F. Supp. 3d at 27-28 ("The Court has already detailed why the complaint fairly alleges that the omissions did not comport with GAAP, and the same facts make RPM's statements that it had arrived at this belief or judgment misleading."); *In re Snap*, 2018 WL 2972528, at *6 n.16 (holding that "to the extent any of the allegedly false or misleading statements [about loss contingencies] could qualify as 'opinion'… the CAC adequately alleges that the S-1 omitted material facts going to the basis of Snap's disclosures").[5]

---

2972528, at *6-7 (C.D. Cal. June 7, 2018) (duty to disclose a wrongful termination lawsuit that the company moved to keep under seal in which a former employee was fired after discovering inaccuracies in how Snap reported daily active users).

[5] The cases relied upon by Defendants for their assertion that "CBL was not required to disclose *Wave* until it was 'substantially certain' to result in a material loss" (Def. Br. at 11) are inapposite because none involved the filing of an actual lawsuit, which ASC 450 explicitly requires disclosure of if the chance of loss is "more than remote." The facts in the remainder of the cases cited by Defendants likewise bear no resemblance to the facts here. In *In re Lions Gate Entertainment Corp. Sec. Litig.*, 165 F. Supp. 3d 1 (S.D.N.Y. 2016) (Def. Br. 11-12), there was no duty to disclose under ASC 450 because "the investigation was not pending or threatened litigation" and the ultimate settlement amount of $7.5 million was immaterial. *Id.* at 20-21. *Axar Master Fund, Ltd. v. Bedford,* 308 F. Supp. 3d 743, 758-59 (S.D.N.Y. 2018), involved a regional airline attempting to renegotiate contracts with Delta and United. The court found that there was no duty to disclose the possibility of a loss if negotiations were unsuccessful and a lawsuit were filed because the defendant had already disclosed that the contract renegotiations could have a negative financial impact if not successful. Here, the *Wave* Litigation had already been filed, Defendants' knew the allegations had merit, and the settlement amount of $90 million and the suspension of dividends for two quarters, which caused CBL's stock price to plummet, was clearly material, as Defendants ultimately admitted in SEC filings. *See RPM Int'l, Inc.*, 282 F. Supp. 3d at 21-22 (distinguishing *Lions Gate*). Defendants rely on *Luna v. Marvell Tech. Grp.*

Instead, a reasonable investor would understand Defendants' silence to mean, at the very least, that there was no uninsured class action alleging (correctly) the existence of a nationwide fraudulent Overcharge Scheme and that sought damages in excess of 10% of CBL's current assets. Courts are skeptical that disclosures of loss contingencies constitute opinions, and have found that even if they are opinions they can be false and misleading under *Omnicare*.

### B. Defendants' Statements About CBL's Tenant Reimbursements and Revenue Recognition Were Materially False or Misleading

Defendants contend that the statements made in CBL's SEC filings concerning revenue recognition from tenant leases are not actionable as a matter of law because: (1) the statements are literally true; (2) allegations of GAAP violations standing alone are insufficient to state a §10(b) claim; (3) there is no generalized duty to disclose corporate mismanagement or unlawful behavior; (4) Plaintiffs' allegations of falsity fail to take account of CBL's affirmative defenses to the allegations made in the Wave Litigation; and (5) the amount by which CBL's revenues were overstated is less than 5% and, therefore immaterial as a matter of law. Defs. Memo. 13-20.

It is a fundamental principle of federal securities laws, explicitly expressed in Rule 10b-5, that statements which are literally true can nonetheless be misleading when they "omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they are made, not misleading." 17 C.F.R. §240.10b-5. Accordingly, the law is clear that "once [a company] chooses to speak on a subject, [it is required] to do so fully and fairly: 'Our securities laws therefore, require an actor to provide complete and non-misleading information

---

*Ltd.,* 2016 WL 5930655, at *3-5 (N.D. Cal. Oct. 12, 2016), which actually supports Plaintiffs' position. In *Marvell*, Carnegie Mellon filed a patent infringement action against Marvell on March 6, 2009 and the court entered a judgment against Marvell in May 2014. Marvell promptly disclosed each. The plaintiff alleged that Marvell should have also accrued a loss during the appeal. *Id*. Specifically, Marvell, disclosed the existence of the action in its 10-K filed on April 1, 2009. Ex. 1 at 118.

10

with respect to the subjects on which he undertakes to speak.'" *Garden City Employees' Ret. Sys. v. Psychiatric Solutions, Inc.*, 2011 WL 1335803, at \*48 (M.D. Tenn. Mar. 31, 2011) (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001)).

No special exemption from the federal securities law exists for statements concerning GAAP compliance. Here, CBL's financial statements "put its sources of revenue at issue" and "gave rise to Section 10(b) liability because the company failed to disclose the illegal conduct that generated the revenue." *In re Virtus Inv. Partners Inc. Sec. Litig.,* 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016); *see also In re Grupo Televisa Sec. Litig.,* 368 F. Supp. 3d 711, 721 (S.D.N.Y. 2019) (same). *Cf. In re Ford Motor Co. Sec. Litig*., 381 F.3d 563, 570 (6th Cir. 2004) (claims failed because the "plaintiffs have not alleged the historical inaccuracy of Ford's financial and earnings' statements.").[6] *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir. 2000), the case upon which Defendants rely, stands for the unremarkable proposition that a securities law plaintiff

---

[6] The remaining cases cited by Defendants are inapposite because none of the plaintiffs disputed that the company had actually "earned" and recognized the revenue. Rather, the plaintiff merely alleged that a company had obtained business by an undisclosed or improper means. *See, e.g., In re Sanofi Sec. Litig*., 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) (alleging that sales growth for a product line was boosted by an illegal marketing and kickback scheme: "There is no allegation that Sanofi failed to accurately report any of its financial figures."); *In re Sofamor Danek Grp.*, 123 F.3d at 401 (alleging that a company had improperly promoted its medical devices for a use not approved by the FDA); *Zaluski v. United Am. Healthcare Corp*., 527 F.3d 564, 568 (6th Cir. 2008) (alleging a healthcare company hired a State official as a consultant, violating a contract with a state and jeopardizing future revenues if the state terminated the contract; *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (no duty to disclose that a significant portion of revenue attributed to Internet "clicks" were generated by traffic created by spyware or bots); *In re Marsh & McLennan*, 501 F. Supp. 2d 452, 459 (S.D.N.Y. 2006) (alleging that an insurance broker's revenue included proceeds from clients steered to insurers with whom it had lucrative payoff agreements); *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (statements about earnings were not actionable because of a failure to "acknowledge the long-term unsustainability of its business model."); *Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 99 (3d Cir. 2007) (alleging that the defendant bank officers assisted a public official in getting personal loans for which he was unqualified in exchange for sending business to the bank).

must also allege scienter to make those misleading GAAP statements actionable which, as discussed below, Plaintiffs have done in this Action. *See* pp. 15-27, *infra*.

Defendants' statements of compliance with GAAP were also coupled with statements reporting that tenant reimbursements complied with leases and only recognized as revenue when "earned." (*E.g.* ¶171). Those statements are unquestionably misleading because of the failure to disclose the extra charges collected through the Scheme. *See, e.g., Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *12 (D.N.J. July 27, 2018) ("once Defendants' chose to speak about [pricing] they could not 'omit material facts related to that issue to as to make the disclosure misleading'"); *In re PMA Capital Corp. Sec. Litig*., 2005 WL 1806503, at *6 (E.D. Pa. July 27, 2005) ("Defendants were obligated to speak truthfully when addressing the way in which they priced…"). Statements of revenue are false when cash was received without providing the good or service. *See In re Pss World Med.,Inc. Sec. Litig.*, 250 F. Supp. 2d 1335 (M.D. Fla. 2002) (revenue misrepresented where it was recognized on transactions where products never shipped).

Nor can Defendants absolve themselves of securities law liability because the misrepresentations at issue related to corporate mismanagement or uncharged criminal conduct. *In re Sanofi Sec. Litig*., upon which Defendants rely**,** holds that **"*a duty to disclose uncharged criminal conduct does arise if it is necessary to ensure that a corporation's statements are not misleading*."** 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016). Likewise, *In re Marsh & McLennan Cos. Sec. Litig.,* upon which Defendants rely, held, "corporations are obligated to disclose facts necessary to ensure that their statements are not misleading. *This duty applies to the disclosure of criminal conduct to the same extent it applies to the disclosure of any other material information*." 501 F. Supp. 2d at 469.

12

Defendants incorrectly argue that Plaintiffs have failed to plead the Overcharge Scheme with particularity because they have not identified the precise amounts that every tenant was overcharged monthly. Def. Br. at 18-19. Rule 9(b) was designed to prevent "strike suits," which this Action clearly is not. Citing to CBL's lease agreements as well as documents and testimony produced in the *Wave* Litigation, the Complaint identifies the "who" (CBL's management, including Stephas and Sewell), "what" (overcharging for electricity), "when" (beginning at CBL's 2005 "Leadership Conference"), "where" (in electricity allocation summaries), and "how" (through uniform tenant agreements and false allocation summaries). ¶¶26, 28-37. This is more than sufficient at the pleading stage. *See SEC v. U.S. Environmental, Inc*., 82 F. Supp. 2d 237, 240 (S.D.N.Y. 2000) (particularity satisfied where complaint provided examples of improper behavior and alleging more broadly the larger scheme, and rejecting as "unreasonable" defendants' argument that a plaintiff must please "every manipulative [transaction]"); *Galestan v. OneMain Holdings, Inc*., 348 F. Supp. 3d 282, 302 (S.D.N.Y. 2018) (particularity satisfied where complaint identified meetings where the relevant issues were discussed and reports that contained the relevant information, and rejecting defendants' argument that plaintiffs must "quantify the scope, magnitude, or duration of the [] problems"); *Gibbons v. Udaras na Gaeltachta*, 549 F. Supp. 1094, 1124 (S.D.N.Y.1982) ("Rule 9(b) is not a vehicle by which potentially meritorious claims are to be driven out of court because the plaintiff has failed to allege facts that he can only obtain through taking discovery that he has thus far been denied.").

Defendants misunderstand the law by incorrectly arguing that no securities law violation exists unless Plaintiffs allege that the Overcharge Scheme was illegal. Defs' Br. 18-19. A Plaintiff need allege underlying illegal practices in connection with a Section 10(b) claim only if the alleged misleading statements are false ***solely*** because of illegality. *See In re AXIS Capital*

*Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (requiring adequate antitrust allegations because claims were "entirely dependent" on antitrust violation); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) (same). Here, Defendants' statements concerning (i) CBL's tenant reimbursements being in accordance with the leases, (ii) financial results, and (iii) GAAP compliance, are false and misleading regardless of whether the Overcharge Scheme violated of RICO or any other law. The Complaint adequately pleads the falsity of Defendants' statements with particularity–who, what, when, where, and how.

### C.     Defendants' Misstatements and Omissions Were Material

Defendants argue that disclosure of the *Wave* Litigation was not required because it was not material until after the class was certified. Def. Br. 11-13. Defendants are in error because materiality is a "mixed question of law and fact" and a complaint may not be dismissed on materiality unless the statements "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance[.]" *Helwig*, 251 F.3d at 563; *see also Litwin v. Blackstone Grp.*, *L.P.*, 634 F.3d 706, 718 (2d Cir. 2011) ("Where the principal issue is materiality, an inherently fact-specific finding, the burden on plaintiffs to state a claim is even lower.").

Here, the *Wave* Litigation alleged a nationwide fraud by CBL's management, sought treble damages of over one hundred million dollars, which was higher than CBL's current assets at the time (¶110), higher than CBL's $26.735 million in net income in the first quarter of the Class Period (¶70), and the disclosure of the *Wave* Litigation caused CBL's stock price to plummet. This easily meets the pleading standard for materiality. *RPM Int'l*, 282 F. Supp. 3d at 24 (failure to disclose a government investigation into an overcharge scheme was material even though there was no stock price decline because the alleged overcharge "'equaled approximately 30% of RPM's net income for the first quarter.'"). Indeed, CBL subsequently admitted that the

*Wave* Litigation, was a "bet the company" case that "could have a material adverse effect on our financial condition and results of operations." ¶¶51, 180. *See Menaldi,* 164 F. Supp. 3d at 584 ("Given Och-Ziff's explicit acknowledgment that the Investigation 'could have material effect' on its business … Plaintiffs have plausibly pleaded that, in its earlier SEC filings … Och-Ziff … 'did not speak in an accurate and complete manner'").

Defendants' misrepresentations about tenant reimbursements and revenue recognition were material for the same reasons—they concealed fraud conducted by "senior officers" that inflated CBL's revenue by approximately $60 million over the course of 8 years or $7.5 million per year. ¶37. CBL's Net income (loss) for 2016, 2017 and 2018, was respectively, $172.88 million, $120.94 million, and $(99.23 million). ECF No. 93-2, at 73 of 116. This amounts to approximately 11.5% of net income, which is presumptively material. *See, e.g.*, *Palazzolo v. Fiat Chrysler Autos. N.V.*, WL 6389573, at *7 (E.D. Mich. Dec. 14, 2017) (recognizing 5% as a rule of thumb for assessing quantitative materiality).

### D.  Plaintiffs Properly Allege a Strong Inference of Scienter

The Supreme Court established a three-part test to determine the sufficiency of a plaintiff's scienter allegations. *First*, the court must "accept all factual allegations in the complaint as true." *Second*, the court "must consider the complaint in its entirety" to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Third*, the court "must take into account plausible opposing inferences" and decide whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 979 (6th Cir. 2018) (quoting *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 at 322-24 (2007)). If the inferences for and against scienter are in "equipoise," the complaint survives. *Tellabs*, 551 U.S. at 331.

### 1. Plaintiffs Properly Allege a Strong Inference of Scienter Based upon the Supreme Court's Controlling Decision in *Tellabs*

Defendants do not, nor could they reasonably, deny knowing about, yet failing to disclose, the *Wave* Litigation and CBL's exposure to liability or the overcharging for electricity. *E.g.,* ¶¶3, 28, 186(a). Instead, Defendants assert only that they "sincerely believed" the *Wave* Litigation was not meritorious or that it would not have a material impact on the Company's financial condition. *See* Defs. Memo. at 24-26. This argument fails for multiple reasons.

*First,* under governing SEC disclosure requirements, Defendants unquestionably had a duty to disclose the existence of the *Wave* Litigation regardless of their subjective opinion on the likely outcome of the case. *See* Point A, *supra.* Defendants' effort to couch their failure to disclose as expressing an opinion, a purportedly sincerely held, does not change matters. *Omnicare,* upon which Defendants rely, holds that a statement of opinion is actionable where, as here, Defendants failed to disclose an ***existing fact*** inconsistent with that opinion, *i.e.,* the pendency of, and key proceedings in, the *Wave* Litigation. 135 S. Ct. at 188-89. *Omnicare* explained that investors expect "not just that the issuer believes the opinion (however irrationally), ***but that it fairly aligns with the information in the issuer's possession at the time.***" *Id. at* 188–89. Here, the *Wave* Litigation was precisely such an existing fact rather than a forward-looking statement for the obvious reason that Defendants never made any statement, forward-looking or otherwise, about the *Wave* Litigation. Tellingly, every case upon which Defendants rely (*see* Defs. Memo. at 25 n.23) involves a company actually disclosing the loss contingency or litigation at issue with the only dispute being whether they had misrepresented the outcome of that specific event.[7]

---

[7] *See, e.g.*, *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *8 (M.D. Ga. Mar. 23, 2018), reconsideration denied, 2018 WL 2190904 (M.D. Ga. May 10, 2018) ("where Plaintiff

This does not mean that "*every* fact known to an issuer supports its opinion statement" (*i.e.* CBL may have had affirmative defenses). In context, which is what *Omnicare* held matters, CBL repeatedly stated that litigations against it were immaterial to its financial condition despite voluminous discovery in the *Wave* Litigation, while keeping the record in the *Wave* Litigation sealed. The information in Defendants' possession at the time – which caused the *Wave* Litigation to settle for 100% of damages – was presumably damning, when "[w]eighing the amount, form and certainty of the relief offered" by CBL to resolve the *Wave* Litigation. *See In re Se. Milk Antitrust Litig.*, 2013 WL 2155379, at \*4 (E.D. Tenn. May 17, 2013).

*Second*, Defendants' argument ignores the first *Tellabs* rule by failing to accept all well-pleaded allegations of the Complaint as true and, instead, seeking to relitigate the *Wave* Litigation based upon select excerpts from the record in that case (Defs. Memo. at 3-4, 18) while acting to prevent Plaintiffs both in this Court and the Court in Florida from viewing the record in the *Wave* Litigation. ¶186(i). *See also* ECF Nos. 83-85, 87-90.

*Third*, even before the ruling on class certification, CBL appears to have lost every significant ruling in and related to the *Wave* Litigation including the motion to strike class action allegations, the motion to dismiss and the declaratory judgment action with the insurance carrier. ¶¶5, 47, 48, 55. In other words, any "sincerely held belief" boiled down to a hope and a prayer that the *Wave* Court would not certify a class, or would otherwise find for CBL in a litigation that it later admitted was a "bet the company" case that could be its "death-knell." ¶6.

*Fourth,* Defendants' assertions are belied by CBL's 2016 10-K filed on March 1, 2017, in which CBL disclosed two other class actions that had been voluntarily dismissed and in which

has sufficiently alleged Defendants' knowledge that an aspect of the company was at risk, the Court 'cannot conclude' that Defendants' subsequent assertions that relevant lawsuits are without merit 'are not actionable as a matter of law.'") (citation omitted).

"[CBL] made no payment or entered into any agreement as part of this matter, and as such, we now consider this matter closed." Ex. 2 at 45-46. Disclosing two other class actions that posed zero chance of loss while concealing the massive risk from the *Wave* Litigation demonstrates Defendants' scienter. "Common sense dictates that disclosing the good while withholding the bad, especially when the bad is so readily known, suggests deliberate concealment." *Kyrstek v. Ruby Tuesday, Inc.*, 2016 WL 1274447, at *9 (M.D. Tenn. Mar. 31, 2016).

*Fifth*, any "sincerely held belief" as to the *Wave* Litigation cannot justify Defendants' misrepresentations regarding tenant reimbursements being collected in accordance with the lease agreements and recorded only when "earned" as required by GAAP. *See* Point B, *supra*.

> **2.     The Complaint Also Satisfies Multi-Factor Tests Which Courts Often Employ in Helping Determine Whether a Strong Inference of Scienter Is Alleged**

Defendants seek to distract from their unquestioned knowledge of the undisclosed facts relating to the Overcharge Scheme and *Wave* Litigation by highlighting the multi-factor test articulated by the Sixth Circuit. *See* Defs. Memo. at 21 (quoting *Helwig*, 251 F.3d at 552). That decision, however, came prior to *Tellabs* requiring a holistic view of a complaint's scienter allegations which was subsequently confirmed by a Supreme Court decision "address[ing] the allegations collectively ... [without] pars[ing] out the allegations for individual analysis." *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) (citation omitted).

Sixth Circuit authorities still refer to the *Helwig* factors. *See, e.g., In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 473 (6th Cir. 2014). However, *Frank* makes clear the factors themselves are a helpful guide rather than outcome determinative because, as Defendants

acknowledge, the "*Helwig* factors are non-exhaustive[.]" Defs. Memo. at 21.[8] These factors, in any event, align with those identified by other circuits. *See, e.g., ECA & Local 134 IBEW Jt. Pension Trust of Chi.*, 553 F.3d 187, 199 (2d Cir. 2009) (a strong inference of scienter exists where a complaint alleges that the defendants: (1) "engaged in deliberately illegal behavior"; (2) "knew facts or had access to information suggesting that their public statements were not accurate"; or (3) "failed to check information they had a duty to monitor").

### i. Defendants' Actual Knowledge of and Participation in the Overcharge Scheme Establishes a Strong Inference of Scienter

Defendants Stephas and Sewell, as "senior officers" of CBL, concocted, implemented and participated in the Overcharge Scheme. ¶¶20, 21, 28-37. It is indisputable that they knew that tenants were overcharged for electricity by amounts improperly included as revenue when filing and reviewing CBL's SEC filings that repeatedly assured investors that (i) the amount of tenant reimbursements for electricity was collected in accordance with the lease agreements, (ii) it was recognized as revenue when "earned" and (iii) it was recognized in accordance with GAAP. "[O]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *In re Level 3 Communs. Sec. Litig.*, 667 F.3d 1131, 1344 n.13 (10th Cir. 2012) (citation omitted); *see also Novak v. Kasaks*, 216 F.3d

---

[8] The absence of a *Helwig* factor cannot be used to demonstrate the failure to properly allege a strong inference of scienter as the Sixth Circuit has held that a strong inference of scienter was alleged with as few as two factors. *See City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 684-86 (6th Cir. 2005) (four *Helwig* factors led to strong inference of scienter); *Wilkof v. Caraco Pharm. Labs., Ltd.*, 2010 WL 4184465, at \*5 (E.D. Mich. Oct. 21, 2010)(determining the "temporal proximity" factor was of particular significance and not analyzing any other factors); *In re Hayes Lemmerz Int'l, Inc.*, 271 F. Supp. 2d 1007 at 1014-1017 (scienter pled based on two *Helwig* factors).

300, 308 (2d Cir. 2000) (a plaintiff can allege a strong inference of scienter by demonstrating defendants' "knowledge of facts or access to information contradicting their public statements").

Indeed, Stephas' position when the Overcharge Scheme was instigated was "Senior Vice President – Accounting and Controller" of CBL. Thus, he was specifically involved in the improper revenue recognition. Stephas' and Sewell's participation in the creation of the Scheme as well as Sewell's review of the inflated electricity summaries (which CBL's 30(b)(6) representative confirmed were used to charge tenants) also establish scienter under *Helwig's* second factor. *Helwig*, 251 F.3d at 552 (identifying "divergence between internal reports and external statements on the same subject" as a factor demonstrating scienter).[9]

The same facts also support an inference of scienter under *Helwig*'s sixth and seventh factors. *Helwig*, 251 F.3d at 552 ("(6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication"). Moreover, since Sewell and Stephas knew that the Overcharge Scheme was improper and illegal, it substantively falls under the umbrella *Helwig*'s fourth factor, which infers scienter where the underlying conduct is improper. *Id.* ("(4) evidence of bribery by a top company official").

Defendants concede that they were aware of the *Wave* Litigation when it was filed. Indeed, a key aspect of the Board of Directors' (which included Charles Lebovitz, Stephen

---

[9] *See also In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968 (S.D. Ohio 2008) (scienter adequately alleged where the defendant had access to information contradicting the public statements); *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at \*23 (M.D. Tenn. Nov. 19, 2019) ("The facts pleaded indicate these defendants disregarded current factual information indicating that the contracts were not performing as expected and that they nevertheless made statements affirming projected revenue and assuring investors that the contracts were performing 'pretty similar to our overall EmCare margins.'"); *Garden City Employees' Ret. Sys.*, 2011 WL 1335803, at \*51-59 (scienter adequately alleged where (i) internal reports contradicted statements in SEC filings; (ii) the company concealed illegal activity; and (iii) the financials were incorrectly reported).

Lebovitz and Chapman) responsibilities involved monitoring of "existing and potential legal claims against [CBL]." ¶186(c). They each, as well as Khaleel, signed CBL's SEC filings representing that they were aware of litigations against CBL. Because Defendants knew of the *Wave* Litigation, and their fellow "senior officers" Sewell and Stephas undeniably knew the allegations were true, there is a strong inference of scienter when Defendants failed to acknowledge the case's existence as required under Items 103, 303 or ASC 450.

### ii. Defendants' Failure to Disclose Information That They Had a Clear Duty to Disclose Supports an Inference of Scienter

Further supporting scienter, Defendants concealed the existence of the Overcharge Scheme and *Wave* Litigation until March 1, 2019. ¶180. By that time, CBL's motion to dismiss had been denied, its insurer had disclaimed coverage, 1.8 million pages of documents were produced, and class certification had been granted. ¶¶5, 47, 48, 55. Nonetheless, despite being less than a month away from settling the *Wave* Litigation for $90 million, Defendants rather amazingly stated that CBL had not accrued any liability because they did not believe any liability was probable. ¶180. Nevertheless, Defendants not only failed to disclose the *Wave* Litigation but went (and continue to go) to great lengths to keep every material docket entry under seal and away from public knowledge. ¶186(i). These facts support scienter under the third, fifth, and sixth *Helwig* factors. *Helwig*, 251 F.3d at 552; *see also Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 560 n.14 (S.D.N.Y. 2016) ("plaintiffs adequately pleaded scienter by alleging that the defendants … made a conscious decision to withhold material information").[10]

---

[10] Courts have held that silence under similar circumstances supports a strong inference of scienter. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76-77 (2d Cir. 2001) ("allegations as to what defendants knew on a daily, weekly and monthly basis," which formed basis of an Item 303 S-K violation, supported an inference of scienter.); *Menaldi*, 164 F. Supp. 3d at 585 (scienter adequately pled where defendants knew about SEC-DOJ investigation but failed to disclose its potential impact until after misconduct was exposed); *In re BioScrip. Inc. Sec. Litig.*, 95 F. Supp.

As to CBL's improper recording of revenue, while an allegation of a GAAP violation does not establish scienter *per se*, additional allegations that support a strong inference of scienter "include (1) the magnitude, obviousness, and reasonableness of the violation; (2) the omission in public statements of material facts related to the GAAP violation; (3) the defendant's potential motive or reason for using the accounting methods it did; and (4) other statements or conduct indicating that the defendant intentionally or recklessly misapplied GAAP." *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *4 (D. Ariz. Aug. 9, 2010) ("*Medicis II*") citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004)).

Here, all four factors support an inference of scienter. *First*, revenue recognition is the most basic of all accounting provisions. FASB Con. No. 5 ¶83(b) clearly states revenue cannot be recognized until "delivery has occurred or services have been rendered." *See also id.* ¶¶84(a), (b), and (d) (revenue cannot be recognized until the seller has substantially accomplished what it must do pursuant to the terms of the arrangement). Nevertheless, CBL recognized revenue for electricity that was never provided. The Sixth Circuit has stated that "an inference of knowledge or recklessness may be drawn from allegations of accounting violations that are so simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant." *PR Diamonds,* 364 F.3d at 684; *see also id.* at 688 (scienter not alleged for a GAAP violation that was "relatively arcane in nature and scope."); *In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1204 (D. Ariz. 2009) ("where the accounting rule is extremely clear, and the violation is very obvious, this can give rise to a strong inference of scienter."); *In*

3d 711, 733 (S.D.N.Y. 2015) (scienter adequately pled as to statement of legal compliance where defendant knew about government investigation and CID describing misconduct); *SAIC*, 818 F.3d at 96 (allegations defendant knew the risks of civil and criminal liability "support[ed] the inference that [the defendant] acted with at least a reckless disregard of a known or obvious duty to disclose when … it omitted this material information … in violation of FAS 5 and Item 303").

22

*re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 637-38 (E.D. Va. 2000) (if the GAAP rules "alleged to have [been] violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard").

*Second*, Defendants proffer no competing interpretation of GAAP suggesting an innocent basis for their accounting. The inference of scienter is stronger where the accounting is not "subject to competing interpretations that are reasonable." *Medicis II,* 2010 WL 3154863, at *5.

*Third*, Defendants' reason for using the obviously improper accounting is clearly to avoid disclosing that the funds were illicit gains from the improper and illegal Overcharge Scheme. *See In re Secure Computing Corp. Sec. Litig*., 184 F. Supp. 2d 980, 988 (N.D. Cal. 2001) (finding strong inference of scienter where accounting scheme involved "deliberately warehousing the still-unfinished hardware … and treating it as delivered for accounting purposes in contravention of GAAP"); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185 (S.D. Cal. 2009) (finding strong inference of scienter where it was alleged defendants "fail[ed] to comply with the most basic accounting rules governing revenue recognition" through "channel stuffing).

*Fourth*, the magnitude, significance and pervasiveness of CBL's accounting violations are indicative of scienter. For the three years from 2016 through 2018, CBL's net income totaled $79,081,000. The alleged estimated damages from the Overcharge Scheme in the *Wave* Litigation for those years was approximately $22.5 million or over 25% of reported net income, serving as a sufficient basis for a strong inference of scienter.[11] *See, e.g., In re MicroStrategy,* 115 F. Supp. 2d at 652 (scienter pleaded where alleged accounting violations caused a company

---

[11] The total amount of revenue and earnings attributable to the scheme over approximately eight years was $60 million (¶37) or $7.5 million a year making the total for three years $22.5 million.

to report aggregate net income of $18.9 million over 3 years).[12] In contrast to *Medicis II* (where the restatement had varying positive *and* negative effects and an immaterial impact on financial statements in the aggregate (2010 WL 3154863, at *6-7, 9)), here CBL's improper accounting consistently and exclusively was to the benefit of CBL and the other defendants. *E.g.* ¶186(f).

Indeed, courts have found scienter is plausible under less egregious circumstances. *E.g. In re Diamond Foods, Inc. Sec. Litig.*, 2012 WL 6000923, at *7 (N.D. Cal. Nov. 30, 2012) (scienter alleged where GAAP required the costs should have been recorded in the same year as the associated revenue but the defendants postponed the costs while the corresponding revenues were immediately recognized); *Medicis II*, 2010 WL 3154863, at *6-7 (scienter alleged where GAAP required sales of products with a right of exchange to be excluded from revenue but the defendants included the sales in revenue, finding that the violated rule "was relatively straightforward [and] obvious" and that the allegations gave rise to an inference of scienter).

### iii.     Other Factors Support a Strong Inference of Scienter

"[H]igh-level executives can be presumed to be aware of matters central to their business's operation." *North Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc*., 929 F. Supp. 2d 740, 789 (M.D. Tenn. 2013) ("*Fushi*") quoting *PR Diamonds*, 364 F.3d at 688. "A company's chief executive officer who regularly participates in meetings, signs SEC filings and participates in earnings announcements can be sufficiently involved so as to raise strong inference of scienter." *Fushi*, 929 F. Supp. 2d at 789 citing *In re Envoy Corp. Sec. Litig*., 133 F. Supp. 2d 647, 663-64 (M.D. Tenn. 2001) (scienter adequately alleged against CFO for accounting fraud because as CFO he was "the supervisor over all

---

[12] *See also In re American Bank Note Holographics Sec. Litig.,* 93 F. Supp. 2d 424, 444-47 (S.D.N.Y. 2000) (finding that plaintiffs adequately alleged scienter against CEO and CFO, based on the degree to which they were false, length of time that they were false, and the CEO and CFO's access to information by virtue of their positions).

financial departments"). Specifically, "where accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company," as the tenant reimbursements (accounting for a third of CBL's revenue) unquestionably were here, "'knowledge of the accounting improprieties may be imputed to the company's officers and directors who are involved in the day-to-day operations of the company.'" *Palladin Partners v. Gaon*, 2006 WL 2460650, at *12 (D.N.J. Aug. 22, 2006) (citation and alterations omitted).[13]

Defendants' self-evident motive to conceal the impropriety of the Scheme and the resulting *Wave* Litigation also supports an inference of scienter. Moreover, the incentive compensation of C. Lebovitz, S. Lebovitz and Khaleel was based on total shareholder return, which would have been negatively affected by the disclosure of the *Wave* Litigation, and it was critical for CBL to show strong financial results so they could secure $625 million of funding through bonds issued in December 2016 and August 2017. ¶¶16-18, 186(e), (f). *See, e.g. MicroStrategy*, 115 F. Supp. 2d at 648 (desire to raise capital through public offerings probative of scienter); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) (desire to raise capital through public offerings sufficient allegation of motive); *In re New Century*, 588 F. Supp. 2d 1206, 1232 (C.D. Cal. 2008) ("A motive to defraud based on compensation incentives such as bonuses and dividends also may strengthen an inference of scienter….").

---

[13] Defendants assert that their purported lack of insider sales during the Class Period negates scienter. Def. Br. at 22. That is wrong. *See Tellabs*, 551 U.S. at 325 (the absence of insider trading should not cause scienter allegations to fail); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th Cir. 2003) ("We will not, as defendants request, infer from the fact that they did not sell their Novell stock that they lacked motive to defraud investors."); *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *16 (N.D. Cal. Apr. 2, 2002) ("when Plaintiffs relied on the misstated revenues and purchased stock at inflated prices, the fact that Defendants did not sell their own stock matters little"). Further, the Court should not take judicial notice of SEC filings for the truth of Defendants' asserted stock transactions where Plaintiffs have not made any insider trading allegations. *Patel v. Parnes*, 253 F.R.D. 531, 545-46 (C.D. Cal. 2008).

### 3. The Complaint Adequately Pleads Corporate Scienter

The Sixth Circuit has adopted a "middle ground" to pleading corporate scienter. *Omnicare*, 769 F.3d at 476. A corporation's state of mind is assessed by reference to the state of mind of, *inter alia*, "any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 493 (6th Cir. 2015) citing *Omnicare*, 769 F.3d at 476); *Envision*, 2019 WL 6168254, at *21 (same).

The Sixth Circuit has confirmed that it is appropriate to allow "the knowledge of a ***corporate officer*** to be imputed to the corporation… ***even though the complaint failed to link the [officer] to the issuance of the statements***." *Omnicare, Inc.*, 769 F.3d at 474 (discussing *Bridgestone*, 399 F.3d at 688-690  (CEO's knowledge could be attributed to the company, even though the complaint did not plead that he "played any role in drafting, reviewing, or approving the … representation or the … annual reports, … [or] that he was, as a matter of practice, or by job description, typically involved in the creation of such documents.").[14] "While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants." *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d at 481.

Here, Defendants Stephas and Sewell, both identified as "senior officers" by CBL, concocted, implemented and participated in the Overcharge Scheme. Courts routinely impute knowledge of such individuals to companies. *E.g. Yum! Brands*, 620 F. App'x at 493 (explaining that "senior officers fall[] within the third *Omnicare* category); *Omnicare, Inc.*, 769 F.3d at 483 (finding that the knowledge of the company's Vice President of Internal Audit can be imputed to

---

[14] The Sixth Circuit's *Omnicare* decision confirmed that "the result of [*City of Monroe*] would not change under [*Omnicare*'s] clarification of the standard." *Omnicare*, 769 F.3d at 476.

the company but that the complaint failed to adequately allege his scienter); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (attributing knowledge of a vice president to the corporate defendant); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005) (attributing knowledge of senior management to the corporate defendant).

Moreover, because the decade-long Scheme required the participation of numerous company employees, "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Teamsters Local 445 Freight Div. v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008) (citation omitted).

Defendants argue that one cannot infer intent to defraud CBL's *investors* from the intent to defraud CBL's *tenants*. Def. Br. at 27. This is absurd. There is no other reasonable inference as to why Sewell and Stephas permitted the issuance of the misstatements and omissions except that they did not want investors (or anyone) to learn about the Scheme. Plaintiffs need not allege that the underlying scheme was concocted specifically to mislead investors but only that Defendants knew that their statements could mislead investors. Courts routinely find scienter where a company's failure to disclose improper business practices rendered statements to investors misleading. *See* p.11, *supra*. *See also In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998) (reversing dismissal of §10(b) claim based on misrepresentations in product advertisements). It is irrelevant whether the false statements were "made for the purpose or object of influencing the decisions of market participants." *Muzinich & Co. v. Raytheon Co.*, 2002 U.S. Dist. LEXIS 26962, at *9 (D. ID. Apr. 30, 2002). Defendants' "fraud could be 'in connection with' the sale of securities even if [they] had no intent to influence investors." *Id.*[15]

---

[15] Defendants' reliance on a footnote from *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004), is misplaced. The plaintiffs alleged that Citigroup provided loans to Enron and WorldCom which those companies used to defraud their own investors and that Citigroup's

## E.     The Complaint Adequately Alleges Loss Causation

To adequately plead loss causation, Plaintiffs are only required to give an "indication of the loss and the casual connection." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The loss causation theory only needs to be "plausible" to survive a motion to dismiss. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 388 (6th Cir. 2016).

Defendants argue that their failure to disclose the *Wave* Litigation did not cause any loss because the information was technically in the public domain. Def. Br. at 28-29. This is referred to as a "truth-on-the-market" defense which "can fairly be characterized as a defense to materiality, reliance, or loss causation, or as a separate affirmative defense. However characterized, it requires a fact-intensive inquiry that is better reserved for summary judgment." *AllState Ins. Co. v. Countrywide Fin. Corp*., 824 F. Supp. 2d 1164, 1185, n.25 (C.D. Cal. 2011). *See Zwick Partners, LP v. Quorum Health Corp.,* 2018 WL 2933406, at \*10 (M.D. Tenn. Apr. 19, 2018) ("not appropriate" to consider "truth-on-the-market" on motion to dismiss).

As the Ninth Circuit explained in the widely-cited *In re Apple Computer Sec. Litig*., to succeed on a truth-on-the-market defense, "any material information which insiders fail to disclose must be transmitted to the public with a degree of ***intensity and credibility*** sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations." 886 F.2d 1109, 1116 (9th Cir. 1989). Here, Defendants assert that despite their representations to the contrary, investors knew that a material loss from the *Wave* Litigation was possible because the docket was publicly available and it was mentioned by two local news websites and a blogger called "The Boy Plunger." Defendants are wrong.

---

financial condition was impacted when those other companies went bankrupt. The court dismissed the claims because the plaintiff failed to identify any false disclosure.

> Even in a fraud on the market case, corporate insiders are not relieved of their duty to disclose material information where that information has received ***only brief mention in a few poorly-circulated or lightly-regarded publications***.

*Ballan v. Upjohn Co.*, 814 F. Supp. 1375, 1382 (W.D. Mich. 1992) quoting *In re Apple*, 886 F.2d at 1116; *see also Wilkof*, 2010 WL 4184465, at \*4 (refusing to dismiss complaint simply because "documents such as the FDA Form 483s were public and could be accessed by shareholders").

Defendants' argument that the market already knew of the *Wave* Litigation is also belied by CBL's stock price declining 8% on unusually high volumes immediately upon its disclosure. ¶¶182, 185. *See Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys.*, 2016 WL 4098584, at \*18 (M.D. Tenn. June 16, 2016) (only new information effects a company's stock price).[16]

Defendants incorrectly argue that the disclosure of the *Wave* class certification and settlement cannot establish loss causation because they did not correct a prior misrepresentation. Def. Br. at 29. Loss causation can be shown through a "corrective disclosure" theory and/or a "materialization of risk theory." *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384-85. Under the materialization of risk theory, the market reacts negatively to the "materialization of the risks" concealed by an alleged fraud. *Id*. Here, class certification and settlement of the *Wave* Litigation were the materialization of the risks from the existence of the *Wave* Litigation, which Defendants failed to disclose. *In re Envision*, 2019 WL 6168254, at \*25 (loss causation sufficient where

---

[16] The cases upon which Defendants rely are inapposite because the relevant information was distributed with the necessary intensity and credibility such that analysts and investors were aware of it. *See In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 633 (S.D.N.Y. 2008) (the information was discussed extensively by various analysts covering the company); *Luczak v. Nat'l Beverage Corp.*, 400 F. Supp. 3d 1318, 1331 (S.D. Fla. 2019) (the alleged corrective disclosure summarized an SEC letter that the plaintiff conceded was known to investors and did not contain corrective information). In *In re KBC Asset Management N.V.*, 572 F. App'x 356 (6th Cir. 2014), the alleged false statements were the company's denial of wrongful conduct in a litigation it disclosed. The court held that the alleged corrective disclosures was unrelated to the alleged false statements. *Id*. at 360. The information relevant to the alleged false statements had, instead, been publicly disclosed and discussed *by the defendants* years earlier. *Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*, 964 F. Supp. 2d 875, 881 (N.D. Ohio 2013).

plaintiff alleged "that high levels of out-of-network revenue were unsustainable and that Envision saw decreased revenue when this risk was realized"); *Cosby v. KPMG, LLP*, 2018 WL 3723712, at \*6-7 (E.D. Tenn. Aug. 2, 2018) (loss causation sufficient where defendants' over-valuation of assets concealed the risk of the company's collapse, which later occurred).

### F.  Defendants Are Each "Makers" of False and Misleading Statements

Defendants argue that C. Lebovitz, Chapman, Stephas and Swell were not "makers" of any statements. Def. Br. at 29 citing *Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 135, 142 (2011). "Janus addressed only whether third parties can be held liable for statements made by their clients … and has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 558 n.56 (S.D.N.Y. 2014) (citation omitted). "After *Janus*, courts have consistently held that corporate officers [such as C. Lebovitz and Chapman] who sign a document on behalf of the corporation 'make' the statements in those documents." *Quorum Health*, 2018 WL 2933406, at \*3. Similarly, management level officers, like Stephas and Sewell, with specific responsibility for mall management and accounting, are routinely found to be "makers" of statements about their area of responsibility. *E.g., Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at \*12 (C.D. Cal. Apr. 12, 2016) (vice president of compliance adequately alleged to be a "maker" of the statements about compliance because "it is reasonable to infer that the statements at issue were initially made by Defendant [] or at least with his advice and consent."); *see also City of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 416-417 (S.D.N.Y. 2011) (finding that two entities and eleven individuals had ultimate authority over same statements).

### CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to dismiss.

30

Dated: February 6, 2020

Respectfully Submitted,

/s/ *Sarah R. Johnson*
Al Holifield (BPR# 015494)
Sarah R. Johnson (BPR# 030781)
**HOLIFIELD JANICH &**
   **FERRERA, PLLC**
11907 Kingston Pike Suite 201
Knoxville, Tennessee 37934
Tel: (865) 566-0115
Fax: (865) 566-0119
aholifield@holifieldlaw.com
sjohnson@holifieldlaw.com

John W. Chandler, Jr.
**THE HAMILTON FIRM**
2401 Broad Street, Suite 102
Chattanooga, TN 37408
Tel: (423) 634-0871
Fax: (423) 634-0874
jwc@thehamiltonfirm.com

**Co-Liaison Counsel for the Class**

Jeffrey S. Abraham (admitted *pro hac vice*)
Michael J. Klein (admitted *pro hac vice*)
**ABRAHAM, FRUCHTER &**
   **TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
jabraham@aftlaw.com
mklein@aftlaw.com

31

Jeremy A. Lieberman (admitted *pro hac vice*)
Michael J. Wernke (admitted *pro hac vice*)
J. Alexander Hood II (admitted *pro hac vice*)
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
jalieberman@pomlaw.com
mjwernke@pomlaw.com
ahood@pomlaw.com

**Co-Lead Counsel for the Class**

**BRONSTEIN, GEWIRTZ &
    GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
peretz@bgandg.com

**Additional Counsel for Jay Scolnick**

**KASKELA LAW LLC**
D. Seamus Kaskela
18 Campus Boulevard, Suite 100
Newtown Square, PA 19073
Tel: (484) 258-1585
skaskela@kaskelalaw.com

**Additional Counsel for Mark Shaner**

32

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing

has been served electronically upon all parties and/or counsel listed through the

Court's ECF system on this February 6, 2020.

**HOLIFIELD JANICH & FERRERA, PLLC**

*/s/ Sarah R. Johnson*
Sarah R. Johnson, Esq.