# EXHIBIT A

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| LEWIS STEIN, Individually and on Behalf of All Others Similarly Situated, *et al.*, | ) ) ) | Case No. 1:19-cv-98 |
| *Plaintiffs*, | ) ) | Judge Travis R. McDonough |
| v. | ) ) | Magistrate Judge Christopher H. Steger |
| U.S. XPRESS ENTERPRISES, INC., *et al.*, | ) ) | |
| *Defendants*. | ) ) | |

---

## MEMORANDUM OPINION

---

Before the Court are motions to dismiss the amended complaint (the "complaint") (Doc. 57), filed by Defendants U.S. Xpress Enterprises, Inc. ("USX"), Eric Fuller, Eric Peterson, Jason Grear, Max Fuller, and Lisa Quinn Pate (collectively, the "USX Defendants"), and Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, Wells Fargo Securities, LLC, Stephens, Inc., WR Securities LLC, and Stifel Nicolaus & Company, Inc. (collectively, the "Underwriters" or "Underwriter Defendants"). (Docs. 72, 73.) For the following reasons, the motions will be **GRANTED IN PART** and **DENIED IN PART**.

1

## I. BACKGROUND

USX is a publicly traded trucking company incorporated in Nevada and headquartered in Chattanooga, Tennessee.[1] (Doc. 57, at 5, 12). Defendant Max Fuller and Patrick Quinn founded USX as a privately held company in 1985. (*Id.* at 16.) USX went public in 1994 with an initial public offering ("IPO") of Class A common stock traded on the NASDAQ stock market. (*Id.*) In June 2007, an entity controlled by Max Fuller and Patrick Quinn commenced a tender offer on all Class A common stock and returned USX to private control. (*Id.* at 16–17.) Fuller and Quinn's entity, New Mountain Lake Acquisition Company ("New Mountain Lake"), later merged into and conducted business as USX. (*Id.* at 17.) The New Mountain Lake acquisition used a leveraged buyout to purchase the shares at a price of $20.10, encumbering USX with significant, high-interest debt. (*Id.* at 5.)

USX maintains a fleet of approximately 6,800 tractors and 16,000 trailers. (*Id.* at 17.) It has two reportable service segments: Truckload and Brokerage. (*Id.*) The Brokerage segment does not use USX's assets and instead brokers shipping contracts to third parties, typically for a commission. (*Id.* at 6, 17.) As of March 31, 2018, the Truckload segment accounted for 87% of USX's revenue and was comprised of an over-the-road ("OTR") division and a dedicated division ("Dedicated"). (*Id.* at 17.) OTR, responsible for 54% of overall revenue, ships freight for a single customer under a short-term contract or one-time spot-market transaction, using one ("solo") or two ("team") drivers on 450- to 1,050-mile routes. (*Id.*) Dedicated, responsible for 33% of overall revenue, ships freight under multi-year contracts designed to ensure that adequate service capacity is available to meet a customer's needs over time. (*Id.*)

---

[1] Unless otherwise specified, facts discussed herein are drawn from the lead plaintiff's amended complaint and assumed true for the purpose of the present motions.

In October 2015, Max Fuller's eldest son, Defendant Eric Fuller, became USX's President and Chief Operating Officer ("COO"), while Defendant Eric Peterson was appointed Chief Financial Officer ("CFO").  (*Id.* at 5.)  A year and a half later, Eric Fuller replaced his father as Chief Executive Officer ("CEO").  (*Id.*)  Under this new leadership, USX pursued what Eric Fuller described as a "turnaround" to improve USX's poor operating ratio[2] and "clos[e] the gap" between its ratio and those of its peers.  (*Id.*)

On June 14, 2018, USX—under the leadership of some of the USX Defendants and with the services of the Underwriters—initiated a second IPO, selling 16,668,000 shares of Class A common stock at $16 per share.  (*Id.* at 5.)  The IPO yielded $245.2 million in net proceeds after underwriting discounts, commissions, and offering expenses.  (*Id.*)  At the time, USX had outstanding debt in the amount of $237.7 million, including: (1) a $26 million loan with 13% interest maturing in November 2020 and owed to Max Fuller, the estate of Patrick Quinn, and former CFO Ray Harlin; (2) an unspecified sum owed to an affiliate of underwriter Wells Fargo Securities, LLC; and (3) $192.5 million drawn from a loan facility with a floating interest rate of LIBOR[3] plus 10.0% to 11.5% and maturing in May 2020.  (*Id.* at 5, 18.)  IPO proceeds paid in full the debt owed to Max Fuller and the related parties, and funded a $7.5 million purchase of real estate that USX had been leasing from Q&F Realty, an entity owned by Patrick Quinn's

---

[2] In this context, "operating ratio" represents total operating cost as a percentage of revenue. (*See* Doc. 75-2, at 8.)  Total operating cost equal to revenue would yield a ratio of 100%, while a percentage below 100% would indicate profit. To improve the operating ratio, then, is to lower it by increasing revenue, decreasing operating costs, or both.

[3] LIBOR stands for London InterBank Offered Rate, a globally accepted benchmark interest rate that is calculated daily based upon the rates major banks charge one another for short-term loans. *See* Congressional Research Service, LIBOR: Frequently Asked Questions (July 16, 2012), https://fas.org/sgp/crs/misc/R42608.pdf.

Case 1:19-cv-01080-TRM-CHS   Document 91   Filed 06/30/20   Page 4 of 84   PageID #: 1496
PageID #: 1552

widow (also Defendant Lisa Quinn Pate's mother), certain Quinn family trusts, Max Fuller, and certain Fuller family trusts. (*Id.* at 18).

According to Plaintiffs, the IPO Offering Documents[4] prepared by Defendants "did not give an accurate picture of USX's then-existing operations, risks facing [USX,] or disclose adverse events necessary to make the statements made therein not materially misleading." (*Id.* at 7.) In particular, the Offering Documents misrepresented or omitted[5] that: (1) USX was not incentivizing or compensating drivers well enough to combat an industry-wide driver shortage; (2) USX was not actually improving its load planning and truck maintenance as part of a "transformation"; (3) USX was unable to grow Dedicated and instead was covering Dedicated contracts with OTR drivers at higher per-mile cost; (4) USX's largest customer (Walmart) had been adversely impacted by route changes associated with a new round of contract bidding; (5) USX's cost-per-mile for drivers and independent contractors exceeded internal expectations; (6) USX's insurance coverage was "not symmetrical" with its "overall credit and earnings profile and leverage"; (6) USX's safety initiatives lagged those of its peers and, combined with a poorly maintained truck fleet, increased exposure to significant liability given the under-insurance

---

[4] The "Offering Documents" were developed in connection with and issued for the 2018 IPO: "USX's June 11, 2018 final Amended Registration Statement on Form S-1/A, which amended the May 7, 2018 Registration Statement on Form S-1; and the June 13, 2018 final Prospectus on Form 424B4." (Doc. 57, at 4 n.1); *see also* 17 C.F.R. § 230.404(a) ("A registration statement shall consist of . . . [among other things] a prospectus containing the information called for by Part I of [the applicable filing] form.").

[5] For brevity, the Court lists only the alleged adverse facts—most of which are summations of facts derived from the statements of "confidential witnesses"—which are meant to show why statements in the Offering Documents and later statements by some USX Defendants post-IPO, or omissions related to the same, were materially misleading. The alleged statements themselves will be replicated during the Court's analysis below.

4

problem; and (7) "the risks USX warned might occur" in generalized, hypothetical terms had in reality "already come to pass" and "were negatively impacting USX's operations." (*Id.* at 7–8.)

Following the IPO, USX and executives Eric Fuller and Eric Peterson made statements[6] related to USX's performance in the second and third quarters of 2018, continuing to attribute better performance to its "transformation," when, in fact, problems with utilization and driver retention were obscured by the cyclical nature of the trucking industry which happened to benefit USX prior to and after the IPO. (*Id.* at 8–9, 49–50.)

Such statements continued to inflate USX's stock price until November 1, 2018, when in a press release and on an earnings call with securities analysts, Defendants disclosed the operational problems discussed above. (*Id.* at 10.) Afterward, "the price of USX's common stock declined from a close of $10.14 per share on November 1, 2018, to a close of $7.10 per share on November 2, 2018," or "approximately 29.98% in a single day, on unusually high trading volume." (*Id.* at 10–11.)

This securities class action followed, asserting claims on behalf of "all persons who purchased or otherwise acquired Class A common stock of USX between June 14, 2018 and November 1, 2018." (*Id.* at 4.) Specifically, Plaintiffs' complaint asserts claims against Defendants for misrepresentations and omissions in violation of the Securities Act of 1933 and Securities Exchange Act of 1934. Defendants have moved to dismiss the claims against them (Docs. 72, 73), and those motions are now ripe for the Court's review.

## II.    STANDARD OF REVIEW

According to Rule 8 of the Federal Rules of Civil Procedure, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

---

[6] For brevity, the Court will replicate these statements in full only as necessary below.

Fed. R. Civ. P. 8(a)(2). The statement need not contain detailed factual allegations, but it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

A defendant may obtain dismissal of a claim that fails to satisfy Rule 8 by filing a motion pursuant to Rule 12(b)(6). On a Rule 12(b)(6) motion, the Court considers not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct." *Id.* at 679. For purposes of this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the veracity of all well-pleaded factual allegations in the complaint. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). This assumption of veracity, however, does not extend to bare assertions of legal conclusions, *Iqbal*, 556 U.S. at 679, nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

After sorting the factual allegations from the legal conclusions, the Court next considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief. *Thurman*, 484 F.3d at 859. This factual matter must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Under Federal Rule of Civil Procedure 9(b), a complaint "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake." This requirement "reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a 'more specific form of notice' is necessary to permit a defendant to draft a responsive pleading." *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007)). Accordingly, Rule 9(b) requires complaints that aver fraud "to allege the time, place, and content of the alleged misrepresentation," as well as "the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (citation and internal quotation marks omitted).

## III. ANALYSIS

Securities "all have one thing in common: their value is based on attributes of the issuing corporation," about which the issuer typically "knows more . . . than the purchaser" in a phenomenon called "information asymmetry." Brent A. Olson, 1 Publicly Traded Corporations Handbook § 4:1 (2019); *cf.* Robert Cooter & Thomas Ulen, LAW & ECONOMICS 41 (6th ed. 2012) ("When sellers know more about a product than do buyers . . . information is said to be distributed asymmetrically in the market. . . . [S]evere asymmetries can disrupt markets so much that a social optimum cannot be achieved by voluntary exchange."). Indeed, when "companies do not supply accurate or complete information about themselves, it is impossible for the public to accurately value their securities." Olson § 4:1. Mindful of this asymmetry and the attendant social cost, Congress has sought to promote the "full and fair disclosure of information material to investors" by enacting myriad securities statutes, authorizing extensive regulation by the

Case 1:19-cv-10098-TRM-JRS-CHS Document 91 Filed 06/30/20 Page 7 of 84 PageID #: 1500
PageID #: 1556

Securities and Exchange Commission ("SEC"), and continuously funding federal enforcement of these statutes and regulations. *Id.*

The statutory and regulatory scheme also relies on private actions to vindicate the goals of federal securities law. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the [SEC]."). Relevant here, Section 11 of the Securities Act of 1933 (the "Securities Act") provides a private cause of action to those who acquire securities in connection with a registration statement for public sale that, upon taking effect, "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund* ("*Omnicare*"), 575 U.S. 175, 178 (2015) ("The linchpin of the [Securities] Act is its registration requirement. . . . [The registration] statement must contain specified information about both the company itself and the security for sale. . . . Beyond those required disclosures, the issuer may include additional representations of either fact or opinion."). Section 15 of the Securities Act provides that "[e]very person who . . . controls any person liable under section[] 77k . . . of this title, shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 77o(a).

Similar in aim but with critical differences, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") proscribes the use of "any manipulative or deceptive device or contrivance" in "connection with the purchase or sale of" securities "in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b); *see also* 17 C.F.R.

§ 240.10b-5 ("Rule 10b-5").[7]   Although § 10(b) does not explicitly provide a private cause of action, the Supreme Court "has found a right of action implied in the words of the statute and its implementing regulation," Rule 10b-5.  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).  Section 20 of the Exchange Act provides that "[e]very person who . . . controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a).

Perceived abuses of class-action lawsuits brought under the Securities Act and Exchange Act, however, precipitated modifications to both statutes in the Private Securities Litigation Reform Act of 1995 (the "Reform Act").  107 Stat. 737 (codified at 15 U.S.C. §§ 77z-1 and 78u-4).  Although securities class actions can protect investors, Congress became concerned that "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and

---

[7] Rule 10b-5 is coterminous with § 10(b), so the Court will refer to them collectively as "§ 10(b)".  *See United States v. O'Hagan*, 521 U.S. 642, 651 (1997) ("Liability under Rule 10b–5 . . . does not extend beyond conduct encompassed by § 10(b)'s prohibition.").  Rule 10b-5 provides in full:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

'manipulation by class action lawyers of the clients whom they purportedly represent'" were running rampant and had "resulted in extortionate settlements, chilled any discussion of issuers' future prospects, and deterred qualified individuals from serving on boards of directors." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (quoting H.R. Rep. No. 104-369, at 31 (1995) (Conf. Rep.)).  Relevant here, the Reform Act "provide[s] a 'safe harbor' for forward-looking statements" and "imposes heightened pleading requirements" for actions brought under § 10(b).  *Id.* at 81–82.

The USX Defendants move to dismiss Plaintiffs' claims, arguing that:  (1) Plaintiffs employ a "puzzle pleading" strategy that is deficient on its face; (2) Plaintiffs have not met the heightened pleading standard required under Rule 9(b); (3) some of the alleged misrepresentations are forward-looking statements protected under the judicially crafted "bespeaks caution" doctrine; (4) some of the alleged misrepresentations under the Exchange Act are forward-looking statements protected by the Reform Act's safe harbor provision; (5) some of the alleged misrepresentations are non-actionable statements of opinion; (6) some of the alleged misrepresentations are mere corporate puffery or optimism; (7) any other misrepresentations lack falsity allegations; (8) none of the alleged omissions related to a duty to disclose or were required to avoid making other representations misleading; (9) Plaintiffs failed to plead scienter as to the Exchange Act claims; and (10) without viable substantive Securities Act or Exchange Act claims, control-person liability claims under both must fail.  The Underwriter Defendants incorporate the USX Defendants' arguments for dismissal by reference and make additional arguments for dismissal of the alleged omissions under the Securities Act.

On a Rule 12(b)(6) motion to dismiss a complaint grounded in the Securities Act and Exchange Act, the Court "may consider the full text of the SEC filings, prospectus, analysts'

reports and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment" under Federal Rule of Civil Procedure 56. *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360–61 (6th Cir. 2001) (quotation omitted).

### A. Puzzle-Pleading Defense

Defendants first argue that the Court should dismiss Plaintiffs' claims under the "puzzle pleading" doctrine because Plaintiffs have alleged misrepresentations without pleading the precise facts that render them untruthful, leaving Defendants and the Court to ascertain "why Plaintiffs contend that any of those statements were misleading." (Doc. 72-1, at 20.)

Courts have dismissed securities class-action complaints for so-called "puzzle pleading" when the plaintiffs "left it up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading." *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1111 (N.D. Cal. 2013) (quotation omitted)[8]; *see also In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 858 (N.D. Tex. 2005) ("The Court will not waste its resources attempting to construe which statements are actionable and why each is actionable."). Courts, however, "need not dismiss [a complaint] simply because it is difficult to understand." *Laborers' Local #231 Pension Fund v. PharMerica Corp.*, No. 3:18-CV-109, 2019 WL 4645583, at *10 n.3 (W.D. Ky. Sept. 24, 2019). Indeed, in *Laborers' Local #231 Pension Fund*, the district court rejected a puzzle-pleading defense to a complaint that "list[ed] the alleged omissions separately from the [p]roxy statements those omissions allegedly make misleading" because the court could "adequately decipher . . .

---

[8] *Primo* also noted that in "the context of securities class action complaints, courts have repeatedly lamented plaintiffs' counsels' tendency to place the burden [ ] on the reader to sort out the [allegedly false] statements and match them with the corresponding adverse facts." *Id.* at 1111–12 (quotation and quotation marks omitted).

11

which alleged omissions generally correspond to which proxy statements." *Id.*; *see also City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, No. 1:10-CV-520, 2011 WL 2650717, at \*7 (W.D. Mich. July 6, 2011) (rejecting puzzle-pleading defense where the plaintiffs "use[d] a single set of reasons to explain why various statements were false").

In this case, although Plaintiffs' complaint is no pinnacle of precision, the Court can adequately connect the alleged misrepresentations to the alleged reasons they are false or misleading such that dismissal under the "puzzle pleading" doctrine is inappropriate. Defendants take issue with Plaintiffs' repeated use of "lengthy block quotes from the public filings, with certain portions emphasized and others not, without providing any explanation as to how these statements were false or misleading." (Doc. 72-1, at 20.) For example, Plaintiffs allege: "The Offering Documents also warned of the risk that '*[a] reduction in or termination of our services by one or more of our major customers*, including our dedicated customers, *could have a material adverse effect on our business*, financial condition and results of operations.'" (Doc. 57, at 37 (emphasis in original).)[9] Viewed in isolation, such an allegation does not even show an attempt to explain why the representation is false or misleading. But Plaintiffs' complaint goes on to allege, in a section dedicated to spelling out adverse facts, that "certain account shipping patterns had already been negatively impacted, including those of USX's largest customer Walmart, adversely impacting utilization as well as driver retention and hiring." (Doc. 57, at 41.)[10] Relatedly, a core strand of the complaint maintains that the Offering Documents warned

---

[9] This approach is replicated in ¶¶ 104–108, 110–113, 115–120, relating to the Offering Documents, and ¶¶ 126–131, 133–137, 140–141, relating to post-IPO statements by Defendants USX, Eric Fuller, and Eric Peterson (collectively, the "Exchange Act Defendants" as appropriate).

[10] Plaintiffs allege the same list of adverse facts in relation to the Offering Documents and the post-IPO statements. (*See* Doc. 57, at 40–42, 44–45.)

12

of theoretical "risks" without disclosing that such risks "had already come to pass and were negatively impacting USX's operations." (*Id.* at 8.) To be unduly puzzled by these pleadings, then, would require an intentional disregard of context and structure. *See* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). Dismissing the complaint over its formatting would be drastic and unwarranted. Accordingly, the Court will **DENY** Defendants' motion to dismiss under the puzzle-pleading doctrine.

### B. Heightened Pleading Standards

Defendants next argue that the Court should dismiss Plaintiffs' claims because they fail to meet the heightened pleading standards for fraud claims under Rule 9(b) of the Federal Rules of Civil Procedure. (*See* Doc. 72-1, at 13.) In addition to the pleading requirements set forth in Rule 8 of the Federal Rules of Civil Procedure, when a claim sounds in fraud, the plaintiff must also "state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), and "detail[] the who, what, when, where, and how of the alleged fraud." *Bondali v. YumA Brands, Inc.*, 620 F. App'x 483, 489 (6th Cir. 2015) (quotation and quotation marks omitted). Additionally, for certain Exchange Act claims, the Reform Act sets forth an additional heightened pleading standard:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
>
> > (A) made an untrue statement of a material fact; or
> >
> > (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

13

15 U.S.C. § 78u-4(b)(1). Moreover, if such claims require "proof that the defendant acted with a particular state of mind [alternatively, "scienter"], the complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A); *see also Tellabs*, 551 U.S. at 324 (holding that the "inference of scienter [must be] more than merely 'reasonable' or 'permissible,'" i.e., "a reasonable person would deem the inference . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged").

The parties agree that the heightened pleading standards of Rule 9(b) and the Reform Act apply to the Exchange Act claims. (*See* Doc. 85, at 15 (contrasting pleading standards for Securities Act and Exchange Act claims).) Defendants argue that Rule 9(b) also applies to the Securities Act claims because they sound in fraud, notwithstanding that the complaint disclaims any such basis: "Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence and/or strict liability." (Doc. 57, at 63, 64 (same disclaimer for Securities Act §§ 11 and 15).)

Although fraud is not a requisite in a claim under § 11 of the Securities Act, when "§ 11 claims . . . sound in fraud, Rule 9(b) must apply." *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.* ("*Omnicare I*"), 583 F.3d 935, 948 (6th Cir. 2009) (citing cases from the Courts of Appeals for the First, Eleventh, Third, Second, Fifth, Ninth, and Seventh Circuits, and one contrary Eighth Circuit decision). "A blanket disavowal in the complaint that [Securities Act] claims do not allege fraud . . . is insufficient to rescue them from the requirements of Rule 9(b)." *Local 295/Local 851 IBT Emp'r Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.* ("*Local 295*"), 731 F. Supp. 2d 689, 709 (S.D. Ohio

14

2010).[11]  Instead, courts conduct "an examination of the factual allegations that support [the plaintiffs' §] 11 claims" to determine whether the claims sound in fraud.  *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160 (3rd Cir. 2004) (applying Rule 9(b) to § 11 claims when "a core theory of fraud permeate[d]" entire complaint because alleged "knowing and intentional" misrepresentations served as the "linchpin" of the action).  And if "a complaint employs the exact same factual allegations to allege violations of [§] 11 as . . . to allege fraudulent conduct under [§] 10(b) of the Exchange Act, [the court] can assume that it sounds in fraud."  *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009).

Nevertheless, Defendants expend more effort arguing that Rule 9(b) applies to all of Plaintiffs' claims than explaining why its heightened pleading standard makes any difference to their motions.  Instead, they focus on whether Plaintiffs have alleged actionable misstatements and omissions, which even Rule 8 standards would require the Court to analyze.  To the extent that Defendants do apply Rule 9(b), they seek blanket dismissal by essentially rehashing the puzzle-pleading argument rejected above and the falsity argument that will be addressed below.[12]  Faced with similar circumstances, the court in *Local 295* denied outright dismissal

---

[11] Plaintiffs cite a few cases in support of the proposition that such disclaimers bar application of Rule 9(b) to Securities Act claims.  The much greater weight of the case law, however, suggests that such disclaimers alone will not suffice.  Indeed, a vacated Sixth Circuit opinion suggests that the Court is not free to conclude otherwise.  *See Ind. State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.* ("*Omnicare II* "), 719 F.3d 498, 502 (6th Cir. 2013) (applying Rule 9(b) to Securities Act § 11 claims over the plaintiffs' opposition "base[d] . . . primarily on a [one-sentence] disclaimer" of fraud in the complaint), *vacated and remanded on other grounds*, 575 U.S. 175.

[12] (*See* Doc. 72-1, at 20 ("The Complaint . . . includes a section identifying the allegedly 'false and misleading' statements, but it remains unclear why Plaintiffs contend that any of those statements were misleading. . . .  Indeed, Plaintiffs repeatedly include lengthy block quotes from the public filings, with certain portions emphasized and others not, without providing any explanation as to how these statements were false or misleading. . . . [This warrants Rule 8

15

under Rule 9(b) in favor of analyzing whether particular alleged misstatements or omissions were actionable.  731 F. Supp. 2d at 710 (explaining that the Rule 9(b) argument referenced the briefing section about whether "the complaint fail[ed] to plead any actionable misstatements or omissions . . . [but that section was] not framed in the context of Rule 9(b)" beyond the "general assertion" of Rule 9(b) noncompliance which did not "specify how and why the complaint lack[ed] the requisite specificity").

Even if blanket dismissal is inappropriate, however, Plaintiffs' § 11 claims still sound in fraud, meaning that Rule 9(b) supplies the operative analytical framework for the forthcoming analysis.  The Securities Act claims rest on the same factual background, provided in Section V (¶¶ 44–101) of the complaint, as the Exchange Act claims.  (*Compare* Doc. 57, at 63 (for purposes of Securities Act § 11, "Plaintiffs incorporate . . . ¶¶ 33–55, 57–100") *with id.* at 65 (for purposes of Exchange Act § 10(b), "Plaintiffs incorporate . . . ¶¶ 44–186").)[13]  And, indeed, the gravamen of the complaint is that Defendants knew of serious operational problems within USX but exploited a market-cycle upswing—which resulted in temporary profitability against a history of net losses—to attribute new-found success to a "transformation."  The so-called transformation justified an inflated IPO price, which generated enough proceeds to retire an over-leverage problem Defendants had caused to further enrich Defendants and related parties.  Far from negligence or strict liability, the complaint's fulcrum is that Defendants intentionally

---

dismissal and] certainly warrants dismissal under the heightened pleading standards of Rule 9(b) and the Reform Act."); Doc. 90, at 10 n.3 ("The underlying pleading deficiency [per Rule 9(b)] is most evident in the Complaint's puzzle-pleading structure.").)

[13] The exclusion of ¶¶ 56 and 101 does not alter this conclusion.  The complaint abounds with factual allegations that suggest fraud.

concealed or misconstrued known operational problems for personal gain.  That is a fraud theory, and Rule 9(b) must govern Plaintiffs' § 11 claims.[14]

### C. Section 11 Claims under the Securities Act

Defendants move to dismiss Plaintiffs' § 11 claims, which allege the presence of material misstatements or omissions in the Offering Documents.  (*See* Doc. 57, at 63–64); *see also* 15 U.S.C. § 77k(a)(1)–(a)(3), (a)(5) (allowing suit against every person "who signed the registration statement," "who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing," and "who . . . is named in the registration statement as being or about to become a director, person performing similar functions, or partner," as well as "every underwriter with respect to such security").

Section 11 states, in pertinent part:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue [persons or entities specified in § 77k(a)(1)–(5).]

---

[14] Though some courts have applied Rule 9(b) to § 11 claims against certain defendants but not others in the same matter, Plaintiffs argue for no such approach here.  *E.g.*, *In re EveryWare Global, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 869 (S.D. Ohio 2016) ("Plaintiffs . . . urge the Court to apply Rule 8 to their claims against [certain] Defendants, while applying Rule 9(b) only to [others]."), *aff'd sub nom. IBEW Local No. 58 Annuity Fund v. EveryWare Global, Inc.*, 849 F.3d 325 (6th Cir. 2017).  Indeed, their opposition to Rule 9(b) is predicated on the disclaimer, which does not suffice.  But, even if Plaintiffs did make such an argument, the Court would struggle to conclude that the complaint meaningfully parses the claims against the thirteen separate defendants so as to require different pleading frameworks.  *Cf. In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 273 (3rd Cir. 2006) (the plaintiff "carefully segregated its allegations of negligence [against certain defendants] from its allegations of fraud against those defendants" by pleading the two "wholly apart" and thereby "mak[ing] for a clear conceptual separation . . . between claims sounding in negligence and those sounding in fraud").

17

*Id.* § 77k(a). To state a claim for relief under § 11,

> the plaintiff must allege facts showing that: (1) [they] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under [§] 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

*Local 295*, 731 F. Supp. 2d at 704 (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2nd Cir. 2010)); *see also J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 390 (6th Cir. 2008) (explaining that an omission may be actionable in face of duty to disclose). If a material misstatement or omission can be established, "'[l]iability . . . is virtually absolute, even for innocent misstatements'" because § 11 does not require proof "that the defendant acted with scienter." *Local 295*, 731 F. Supp. 2d at 704 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382–83 (1983)).

"Materiality is an 'inherently fact-specific finding,'" *Litwin v. Blackstone Grp., Inc.*, 634 F.3d 706, 716–17 (2d Cir. 2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988)), that is "satisfied when a plaintiff alleges 'a statement or omission that a reasonable investor would have considered significant in making investment decisions.'" *Id.* at 717 (quotation omitted). Though "it is not necessary to assert that the investor would have acted differently" if faced with an accurate disclosure, there "must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* (internal quotation marks and quotation omitted). But "when a district court is presented with a Rule 12(b)(6) motion, a complaint may not properly be dismissed" for lack of materiality unless the misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (internal quotation marks and quotation omitted).

Certain statements, however, are not actionable under § 11. Alleged misrepresentations may be non-actionable under § 11 if the judicially crafted "bespeaks caution" doctrine applies. "Under that doctrine," misrepresentations are "'immaterial as a matter of law'" where no "'reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.'" *Albert Fadem Tr. v. Am. Elec. Power Co., Inc.*, 334 F. Supp. 2d 985, 1022 (S.D. Ohio 2004) (quoting *Halperin v. eBankerUSA.com, Inc.*, 295 F.3d 352, 357 (2nd Cir. 2002)); *see also In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 690 (M.D. Tenn. 2000) ("The [doctrine] is essentially shorthand for the principle that a statement or omission must be considered in context."). Bespeaks-caution protection, however, is available only when cautionary language relates to "forward-looking, prospective representations." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004) (following other circuits to limit bespeaks-caution doctrine to forward-looking statements). "[M]isrepresentation of present or historical facts cannot be cured by cautionary language"; otherwise, an offeror "could knowingly misrepresent historical facts" while "disclaim[ing] those misrepresented facts with cautionary language" about risk purportedly contingent but actually manifested. *Id.* at 96–97. By the same token, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *see also In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine . . . . provides no protection to someone who warns [a] hiking companion to walk slowly because there might be a ditch ahead when [the speaker] knows with near certainty that the Grand Canyon lies one foot away." (quotation omitted)).

Additionally, statements of opinion—which express "a view, not a certainty," are not "determinate" or "verifiable," and are often flagged with prefatory language like we "think" or

Case Case 1:19-cv-09439-PKC-CRS Document 91 Filed 06/30/21 Page 20 of 85 Page 20 of 85 1512 PageID #: 1568

"believe"—are typically non-actionable under § 11. *Omnicare*, 575 U.S. at 182–84. An opinion statement may be actionable, however, when the opinion "itself constitutes a factual misstatement" or is "rendered misleading by the omission of discrete factual representations." *Id.* at 182. An opinion itself can be a misrepresentation of fact if a speaker says: (1) "I believe X is true" but does not actually believe X is true, perhaps due to known countervailing information[15]; or (2) "I believe X is true because of Y" where Y is not true, because that statement "may be read to affirm not only the speaker's state of mind, as described [in scenario one], but also an underlying fact"—that Y is true. *Id.* at 183–86. With respect to omissions, the "investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry [underlying the opinion] the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194. This is "no small task." *Id.*

"[S]tatements of corporate optimism" or "mere puffery" are also typically not actionable under § 11. *In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-cv-1112, 2019 WL 6168254,

---

[15] The Supreme Court explained that the *Omnicare* plaintiffs could not press this theory of § 11 opinion-statement liability because of a disclaimer in the complaint: "the [plaintiffs] do not contest that [the defendant's] opinion was honestly held. Recall that their complaint explicitly 'exclude[s] and disclaim[s]' any allegation sounding in fraud or deception." *Id.* at 186 (modifications in original). A similar disclaimer seemingly bars Plaintiffs from pursuing such a theory under § 11 here. The reader may find it strange, then, that Plaintiffs' disclaimer could preclude liability for opinions disseminated but not honestly held (for such a claim "sound[s] in fraud or intentional or reckless misconduct," (Doc. 57, at 63)) while apparently failing to disclaim fraud allegations for purposes of Rule 9(b). Distinctions could be made that justify this surprising incongruence, but the Court is seemingly bound to these parameters, whatever their conceptual compatibility.

Case Case-1:19-cv-0980-TRM-CHS-CHS Document 91-1 Filed 06/30/20 Filed 07/10/20 of 8 Page 21 of 85 1513 PageID #: 1569

at \*9 (M.D. Tenn. 2019).[16]  "Courts have consistently found immaterial" a certain species of

"'rosy affirmation commonly heard from corporate managers and numbingly familiar to the

marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so

clearly constituting the opinions of the speaker, that no reasonable investor could find them

important to the total mix of information available.'" *Id.* (quoting *In re Ford Motor Co. Sec.

Litig.*, 381 F.3d 563, 570–71 (6th Cir. 2004)).  Indeed, "[v]ague predictions of positive future

results cannot engender reasonable reliance by investors." *Id.*

Even when Rule 9(b) does not apply to a § 11 claim, the plaintiff "must allege 'that [the]

statement was either false or misleading (in light of omitted information).'" *In re

IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 117 (S.D.N.Y. 2010) (quotation omitted);

*see also In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1257 (N.D. Cal. 2019)

("Even without Rule 9(b) . . . a facially plausible claim for relief under [§] 11 [still requires

pleading of facts sufficient to infer falsity].").  But when "Rule 9(b) . . . applies" to "[§] 11

claims . . . [,] the complaint must [go a step further and] 'set forth *what* is false or misleading

about a statement, and *why* it is false.'" *Rubke*, 551 F.3d at 1161 (emphasis added) (quotation

omitted).

### 1. Alleged Misstatements

Defendants move to dismiss Plaintiffs' § 11 claims, arguing that the alleged

misstatements are protected by the bespeaks-caution doctrine, non-actionable opinions, mere

---

[16] *Envision*'s discussion of puffery actually relates to Exchange Act § 10(b) claims, and, while
the parties do not explicitly identify Sixth Circuit cases applying a corporate-puffery bar to
claims under Securities Act § 11, courts in other circuits plainly have applied a corporate-puffery
bar.  *See, e.g.*, *Rombach*, 355 F.3d at 174 ("[E]xpressions of puffery and corporate optimism do
not give rise to securities violations [under § 11].").

21

corporate puffery, or not pleaded to be false. The Court considers the alleged misrepresentations in the order presented in the complaint, with the understanding that Plaintiffs have used bold typeface to highlight the actionable portion of the statement.

### i. Paragraph 104

Plaintiffs allege that the Offering Documents "emphasize [USX's] 'improved performance' due to '*asset optimization*' under a section entitled 'Our Transformation'" and quote the following:

**Asset Optimization.**

- In 2015, we began to redesign our fleet renewal and maintenance programs with the goal of improving reliability, reducing downtime for all tractors and reducing maintenance costs on the older tractors in our fleet. These initiatives, among others, were intended to improve the quality of our assets by purchasing, maintaining and trading our tractors in a manner designed to optimize life cycle costs.

- In addition, in early 2016 *we began enhancing our asset utilization by analyzing our consolidated Truckload and Brokerage freight demand using optimization software*, allocating the most profitable freight to our Truckload assets and outsourcing the remainder to third-party carriers. With more loads to choose from, we have more options for improving the pricing and miles on our company tractor and trailer assets.

(Doc. 57, at 34–35 (emphasis in original).) Defendants argue that this alleged misrepresentation is an opinion statement and lacks adequate pleading of falsity.

Although a core theory of Plaintiffs' complaint is that USX did not really undergo a "transformation," Plaintiffs provide no facts that show the falsity of the emphasized statement. The adverse facts meant to show this statement was "materially false and/or misleading"— provided in the subsections of ¶ 122—nowhere state that USX did not begin using software in early 2016 or that the software did not begin to enhance its asset utilization. (*See id.* at 40–42.) The closest Plaintiffs come is to allege generally at ¶ 122 that "USX's purported 'transformation'

22

. . . did not improve load planning." (*Id.* at 41.)  But even taken as true and considered in the light most favorable to Plaintiffs, that fact cannot be fairly read to show the falsity of USX's statement (with particularity or otherwise), which went no further than to say that it enhanced load planning by way of new software in early 2016.  Accordingly, this statement is not actionable under § 11.

### ii.    Paragraph 105

Plaintiffs allege that as "part of the 'Transformation' in 2017, USX claimed it would 'Focus on Front-line Tactics' because 'Tactical Execution' is 'critical to [USX's] success,'" and that "[t]he Offering Documents went on to state that 'the early results of our load planning, fleet management and customer service initiatives have begun to be reflected in our operating metrics,' stating in pertinent part":

- *Load Planning Initiative.* **During 2017, we shifted from a load planning strategy based on minimizing empty miles to one that maximizes utilization of our drivers' available hours.** We believe the focus on drivers' hours more effectively utilizes our scarcest resource and improves driver satisfaction. Following this change, miles per seated tractor per week and driver turnover rate both improved.

- *Fleet Management Initiative.* In October 2017, we initiated a fleet management pilot program on 250 tractors in which our fleet managers emphasize proactive interactions with drivers to anticipate and fix issues such as home time planning and load scheduling. **Inbound driver calls declined and driver turnover decreased**, resulting in more time for our managers to proactively solve problems, **thereby improving our efficiency and utilization. We have seen similar results as we continue to roll out this program to the rest of our fleet**, which we expect to complete during 2018.

- *Customer Service Initiative.* **In January 2018, we redesigned our customer service around regional specialists to drive deeper knowledge of specific markets.** Under this new structure, experts in managing freight flows in and out of their respective regions become key points of contact with customers and arrange load pickup and delivery to meet available service hours for our

23

drivers. ***We believe this service model will contribute to improved equipment utilization, driver satisfaction and network balance.***

(Doc. 57, at 35 (emphasis in original).) Defendants argue that these statements are protected by the bespeaks-caution doctrine, are non-actionable statements of opinion, are non-actionable statements of corporate optimism or puffery, and lack adequate pleading of falsity.

The statement which begins "[w]e believe" is plainly an opinion, and no facts in ¶ 122 enable opinion-statement liability under *Omnicare*. Nor do any facts in ¶ 122 suggest the falsity of any of these alleged misstatements. Indeed, besides the position that USX's operational structure and changes thereto were (to paraphrase) not satisfactorily effective, the alleged adverse facts do nothing to suggest that USX falsely represented that it took these particular actions or that these particular phenomena occurred. Accordingly, these statements are not actionable under § 11.

### iii. Paragraph 106

Plaintiffs allege that "USX credited the 'Transformation' for 'maintaining a relatively steady Adjusted Operating Ratio during the negative freight markets of 2016 and early 2017' and in the first quarter 2018 'meaningful[ly] narrowing [ ] the gap between our Adjusted Operating Ratio and the average Adjusted Operating Ratio of a group of publicly traded truckload companies.'"[17] (Doc. 57, at 35.) Defendants argue that this is a non-actionable statement of opinion and lacks adequate pleading of falsity.

Plaintiffs allege neither that USX's adjusted operating ratio was not relatively steady during the relevant timeframe nor that it failed to improve relative to other trucking companies during the first quarter of 2018. Indeed, they allege that the observed improvement resulted from

---

[17] Unlike the other allegations, this quote contains no emphasis, which the Court takes to mean that the entire statement is alleged to be a misrepresentation.

24

market cyclicality prior to and during the IPO.  As a result, they have not pled falsity as to those statements.  As to whether the operational changes labeled a "transformation" caused those observed outcomes, Plaintiffs omit that the Offering Documents state "[*w*]*e believe* the transformation of business practices described above has been instrumental" to these quantifiable phenomena.  (Doc. 75-5, at 12 (emphasis added).)   While opinion-statement liability might have been predicated on there not actually being a "transformation" (for the opinion statement is predicated on an underlying truth, i.e., that USX made operational changes), Plaintiffs do not plead that there were *no* operational changes at USX, only that those changes were inadequate.  In other words, Plaintiffs allege that the transformation—which is a puffy way of saying that changes occurred—was insufficiently transformative.  But this opinion statement is predicated on the fact that operational changes did occur, and, as seen just above, Plaintiffs themselves identify specific operational changes at USX without pleading that those specific changes did not take place.  Because Plaintiffs do not plead that no changes occurred, there is no assertion that the opinion is predicated on an allegedly false statement of fact.  *Cf. J & R Mktg.*, 549 F.3d at 397 ("In the end, any progress could be called significant given the large [problems] faced, and investors understand that management is generally optimistic.  A representation that progress was 'significant' is the same as a representation that a company's products are 'the best,' which is considered immaterial as a matter of law.").  Accordingly, this statement is not actionable under § 11.

### iv.   Paragraph 107

Plaintiffs allege that "[t]he Offering Documents identified USX's '***competitive strengths***' and emphasize[] a '***complementary mix of services to afford flexibility and stability***' including

Case Case-1v109094801RM-CRHS-CEScumDentUnlenFfiletd6605/30r72led P7/(e0/25 of 8Page2a6eut35 1518
PageID #: 1574

that USX was '***capable of handling meaningfully larger volumes without meaningful additional investment.***'" (Doc. 57, at 35–36 (emphasis in original).) They stated:

> ***Complementary mix of services to afford flexibility and stability throughout economic cycles***
>
> Our service offerings have unique characteristics and are subject to differing market forces, which we believe allows us to respond effectively through economic cycles.
>
> *OTR*
>
> OTR business involves short-term customer contracts without pricing or volume guarantees ***that allow us to benefit from periods of supply and demand imbalance and price volatility. This is the largest part of our business*** and the overall truckload market, which is currently benefiting from strength in pricing and volumes described under "–Truckload Market."
>
> *Dedicated*
>
> ***Dedicated business features committed rates, lanes and volumes under contracts that generally afford us greater revenue predictability over the contract period and help smooth the impact of market cycles.*** Additionally, our dedicated contract service offering generally has higher driver retention rates than our OTR service offering, which we believe is because our professional drivers prefer the more predictable time at home that dedicated routes offer. In addition, ***this increased visibility allows us to commit and invest fleet resources with a more predictable return profile***.

(*Id.* (emphasis in original).) Defendants argue that these statements are non-actionable under the bespeaks-caution doctrine, as statements of opinion, and for failure to plead falsity.

Plaintiffs correctly argue that these statements are not forward-looking and instead relate to then-current facts, precluding bespeaks-caution protection. And they are not statements of opinion; they lack prefatory language, state facts not views, and are verifiable (at least as far as they go). Plaintiffs do not plead, however, that Dedicated does not provide greater revenue predictability and does not smooth market cycles. And they do not plead that Dedicated does not entail increased visibility and (again) more predictability. Indeed, both of these statements describe Dedicated in relation to OTR, and Plaintiffs do not go so far as to say that Dedicated is

26

not more predictable than OTR. It would be rather surprising if they did, for such a position would conflict with Plaintiffs' theory that the greater volatility in OTR presented USX with an unseized opportunity around the time of the IPO precisely because OTR drivers were being redirected to Dedicated accounts, exchanging volatility-driven upside for Dedicated's predictable but smaller margins. (*See* Doc. 57, at 29–30.) In sum, because Plaintiffs do not plead that these statements are false, they are not actionable under § 11.

### v. Paragraph 108

Plaintiffs allege that USX "claimed . . . that additional flexibility could be achieved through Brokerage offloading excess or less profitable loads to third-parties" and that the Offering Documents stated:

*Brokerage*

> Brokerage capacity allows us to aggregate volume and to flex the amount allocated to our own fleet with freight cycles. Typically, ***we allocate more loads to our OTR fleet during slow freight demand to keep our assets productive, and more loads to third-party carriers during higher freight demand to maintain control over customer freight and make a margin on outsourcing the moves***. By retaining control over significantly more freight than we are able to serve with our own assets, and allocating the available loads first to our own tractors, ***we have more choices for optimizing the utilization and pricing of our fleet every day and throughout market cycles***.

(Doc. 57, at 36 (emphasis in original).) Defendants argue that these statements are non-actionable under the bespeaks-caution doctrine, as statements of opinion, and for failure to plead falsity.

Paragraph 122 provides no basis to conclude that the statements at issue are false. Nowhere do Plaintiffs plead that USX does not shift toward OTR during low freight demand and does not outsource to Brokerage during higher freight demand. Nor do they plead that USX did not have more choices by virtue of its brokerage services or that such choices do not contribute

27

to better utilization and pricing (to the extent such subjective assertions could even be verified), notwithstanding the alleged support of Dedicated by OTR.  Whether utilization is satisfactory in the end is an entirely different issue.  Accordingly, these statements are not actionable under § 11.

### vi.    Paragraph 110

Plaintiffs allege that USX "described its truck fleet as a 'modern and well-maintained fleet'" and that the Offering Documents stated:

> Over the past several years, we have developed a disciplined and effective inhouse maintenance program designed to actively manage these assets based on customized timetables for preventive maintenance and replacement of parts.  We believe this approach, coupled with our in-house maintenance facilities and in-house technicians dedicated to fleet maintenance, helps us effectively manage our maintenance cost per mile, ***keeps drivers on the road efficiently*** and creates an attractive asset and record for resale.

(Doc. 57, at 37 (emphasis in original).)  Defendants argue that this statement is non-actionable under the bespeaks-caution doctrine, as a statement of opinion, and for failure to plead falsity.

The emphasized statement is prefaced by opinion language and unverifiable in the sense that keeping drivers on the road "efficiently" is, at least in this context, a vague statement that is not susceptible of objective confirmation.  It is therefore not actionable.

### vii.    Paragraph 111

Plaintiffs allege that "Defendants also described USX's growth strategy to '***capitalize on current favorable truckload environment***,'" and that the Offering Documents stated:

> The truckload market is cyclical and it is currently experiencing increases in volumes and rates, primarily due to tightening driver supply coupled with increasing industrial and retail freight demand.  According to FTR Transportation Intelligence, truckload rates (excluding fuel surcharge) in the first quarter of 2018 were 14.4% higher than rates in the first quarter of 2017.  ***We believe the current truckload market presents us with an opportunity to take advantage of rising rates across all of our service offerings, while continuing to benefit from our***

28

Case Case 1:19-cv-00080-TRM-JRG-CHS Document 91 Filed 06/30/21 Page 29 of 85 PageID #: 1521  Filed 07/10/23 Page 29 of 85 PageID #: 1577

> *operational initiatives.*  We believe our scale, management team and continued roll-out of tactical operational improvements, as well as our mix of over-the-road, dedicated and brokerage services, position us for long-term success in our industry.

(Doc. 57, at 37 (emphasis in original).)  Defendants argue that this statement is non-actionable under the bespeaks-caution doctrine, as a statement of opinion, and for failure to plead falsity.

The emphasized statement is one of opinion.   It is also forward-looking insofar as it pertains to management's improvement plans.  But the Offering Documents clearly warn that "[d]espite the implementation of our operation and tactical strategies, we may be unsuccessful in achieving a reduction in our operating ratio … in the time frames we expect or at all."  (Doc. 72-5, at 32.)  Indeed, "[t]here is no assurance that we will be successful in achieving any of our business strategies" and "[e]ven if we are . . . we still may not achieve our goals," such as to improve the operating ratio.  (*Id.*)  Nor are the warnings merely generic "X will occur unless it does not" warnings, for the Offering Documents explain specifically that USX's "strategies require time, significant management and financial resources[,] and successful implementation," meaning that roadblocks to improvement may arise in a variety of ways.  (*Id.*)  The Offering Documents therefore bespeak caution as to whether operational improvements will yield profitability improvements.  Consequently, a reasonable investor could not be misled by this forward-looking statement.  And, to the extent that the statement is predicated on the present fact that operational changes had yielded some amount of benefit, Plaintiffs do not plead that there were *no* changes with *no* benefits[18] prior to the IPO, only that any changes were not beneficial

---

[18] Plaintiffs do allege that the operational "transformation" was not successful.  (*E.g.*, Doc. 57, at 25 ("USX's transformation was a failure.").)  But this is simply too conclusory to conclude that *every* change USX highlighted in its Offering Documents failed to yield *any* improvement whatsoever.  *Cf. Iqbal*, 556 U.S. at 679 (explaining that "whether a complaint states a plausible claim for relief" requires "well-pleaded facts" from which to infer "more than the mere possibility of misconduct").  In other words, even assuming that the transformation really did

enough—or, more precisely, could not guarantee greater profitability going forward. (*See* Doc. 57, at 24 ("In contrast to what investors had been led to believe, USX was not reaping the benefits of its 'Transformation' (i.e., a sustainable improvement of its operating ratio), but had instead received a short-lived bump in profitability stemming from the early stages of the truckload freight services demand surge.").[19]) But this alleged misstatement does not purport to guarantee anything, and is not pleaded to be false to the extent that it implies a then-present fact. Accordingly, this statement is not actionable under § 11.

### viii. Paragraph 112

Plaintiffs allege that Defendants "claimed USX had the flexibility to '*[g]row profitably as appropriate to the market cycle*' when the rising rate market subsides" and that the Offering Documents stated:

- Continue to leverage our service mix to manage through all market cycles
  - Grow our revenue base prudently with a focus on dedicated contract service and brokerage by cross-selling our services with existing customers and pursuing new customer opportunities
  - Maximize profitability for new freight across OTR and brokerage operations by selectively allocating freight to company assets
  - Seek favorable dedicated service contracts and brokerage freight to manage

---

"fail," the Court cannot assume that what is true of the whole is true of the parts, especially where the parts have verifiable contents that could be (but are not) alleged to be false. *Cf. Silvester v. Becerra*, 138 S. Ct. 945, 949 (2018) (mem.) (Thomas, J., dissenting) ("By assuming that a conclusion about the whole applies to each of its parts, the [court of appeals] committed the 'fallacy of division.'" (quoting P. Hurley, A Concise Introduction to Logic 170–72 (6th ed. 1997))).

[19] Indeed, Plaintiffs themselves allege that USX made changes, and that some of the changes were harmful. (*See, e.g.*, Doc. 57, at 30 ("USX['s] operational issues in part stemmed from USX's 'Transformation' in which much of senior management was replaced during 2017.")

- *Capitalize on current favorable truckload environment*
  - *Continue to secure rate increases in all of our service offerings*
  - *Strategically expand our fleet based on expected profitability and driver availability, including through our company-sponsored independent contractor lease program (which has grown from zero drivers in the second quarter of 2017 to approximately 485 drivers at March 31, 2018)*
  - *Leverage current market conditions to accelerate timeline for enhancement of network*

(Doc. 57, at 37–38 (emphasis in original).)  Defendants argue that these statements are non-actionable under the bespeaks-caution doctrine, as statements of opinion, as statements of puffery, and for failure to plead falsity.

To "capitalize" on the current environment by "leverag[ing]" conditions to accelerate "enhancement of network" is vague, puffy corporate optimism that defies meaningful verification; a reasonable investor could not conclude that this statement means much if anything, rendering it immaterial as a matter of law and therefore not actionable.  And, even if it contains a verifiable factual statement—which is less than clear—it also does not appear that Plaintiffs pleaded falsity.  The first two sub-bullets are decidedly forward-looking, although they do suggest the truth of certain present facts.  The present facts—that at the time USX was securing rate increases concomitant with the expanding (if cyclically so) market and that it had hired hundreds of independent contractors—are also not pleaded to be false.

To the extent the first sub-bullet point is forward-looking, the Offering Documents bespeak caution.  They warn that the "truckload industry is highly cyclical" and that myriad possibilities, such as economic changes that decrease shipping demand or increase truckload supply, can "exert downward pressure on rates."  (Doc. 72-5, at 21.)  USX's plan to "continue to secure rate increases," then, is explicitly tempered by the sobering reality that trucking is cyclical

31

and sensitive to economic conditions beyond any one company's control.  USX therefore could not guarantee continued rate increases in the larger market or for itself, and warned investors on precisely that point.

As to the second sub-bullet point regarding fleet and driver expansion, the Offering Documents warn "we experience substantial difficulty in attracting and retaining sufficient numbers of qualified drivers, which includes the engagement of independent contractors" in part because the "industry is subject to a shortage of qualified drivers" that can be exacerbated by external economic fluctuations and regulations.  (*Id.* at 30.)  USX further cautioned that "we suffer from a high turnover rate of drivers and our turnover rate is higher than the industry average and compared to our peers."  (*Id.* at 31.)  It noted that this "will create difficulties in maintaining or increasing" driver capacity and "requires [USX] to spend significant resources recruiting a substantial number of drivers" to even "operate existing revenue equipment," thereby "subject[ing] [USX] to a higher degree of risk with respect to driver shortages than our competitors."  (*Id.*)  In sum, it warned that "[i]f we are unable to continue to attract and retain a sufficient number of drivers, we could be forced to . . . continue to adjust our compensation packages or operate with fewer tractors and face difficulty meeting shipper demands, either of which could materially adversely affect our growth and profitability."  (*Id.*)

Plaintiffs argue that these warnings do not trigger bespeaks-caution protection, because USX was already suffering the consequences of the shortage and poor retention, which required it to "cannibalize" OTR drivers by having them drive Dedicated routes, in turn hurting driver compensation and morale and further exacerbating the retention problem.  The cannibalization therefore both directly prevented USX from reaping the benefits of increasing OTR rates and

32

Case Case 1:19-cv-00098-TRM-CHS Document 91 Filed 06/30/21 Page 33 of 85 PageID #: 1525
PageID #: 1581

indirectly worsened the shortage it aimed to circumvent. Indeed, most of the specific adverse

facts that Plaintiffs identified relate directly to this issue:

> [1] USX did not have in place compensation packages sufficient to hire and retain quality truck drivers to meet the demand for its services. Such incentives and/or compensation required additional expenditures that necessarily would negatively impact [USX's] operating ratio. Nor were the incentives USX had in place sufficient;
>
> [2] USX drivers were not among the "best paid in the industry"[20] nor had USX increased driver pay commensurate with the market wages for trucks drivers which slowed the pace of hiring and hindered retention of drivers;
>
> [3] [the operational changes failed to] improve load planning or truck maintenance which harmed trucker morale and worsened USX's poor driver retention rates;
>
> [4] USX was unable to "prioritize[e] growth in dedicated contract services" because a shortage of drivers … was negatively impacting USX's dedicated division, which forced USX to reallocate OTR drivers (at an increased cost) to drive dedicated routes – this was a common practice prior to the IPO which caused underperformance in OTR and continued after the IPO;
>
> [5] certain account shipping patterns [i.e., those of USX's largest account, Walmart] had already been negatively impacted … adversely impacting utilization as well as driver retention and hiring; [and]
>
> [6] USX's cost per mile for driver wages and independent contractors was exceeding [its] internal expectations[.]

(Doc. 57, at 37–38.) Assuming these allegations to be true, Plaintiffs have adequately alleged

that USX's statement that it would expand its fleet in order to capitalize on the then-favorable

trucking environment was materially misleading in the face of particular internal realities. And

these allegations further preclude bespeaks-caution protection, for "[c]autionary words about

future risk cannot insulate from liability the failure to disclose that the risk has transpired," which

is precisely what Plaintiffs plead here. *Rombach*, 355 F.3d at 173. Accordingly, Plaintiffs may

---

[20] This was a verbal statement that predated the IPO. (*See* Doc. 57, at 24.)

pursue a § 11 claim as to the second sub-bullet point on the basis that USX could not take advantage of the favorable market, by expansion or otherwise, because it could not even cover its Dedicated contracts and, in fact, was shifting drivers away from high-margin OTR routes at significant cost to itself.

### ix. Paragraph 113

Plaintiffs allege that Defendants "describe[d] how the Company seeks to '***maintain flexibility through long-term enterprise planning***' by '***prioritizing growth in dedicated contract services***'" and that the Offering Documents stated:

> ***Maintain flexibility through long-term enterprise planning and conservative financial policies***
>
> - Maximize our free cash flow generation by managing expenses, taxes and capital expenditures
>
> - Prioritize growth in dedicated contract services, which offers more predictable revenue streams and greater asset productivity
>
> - Prioritize growth in brokerage, which requires limited capital investment and affords network-balancing freight volumes
>
> - Monitor capital allocation to improve long-term return on invested capital
>
> - Maintain a conservative leverage profile after this offering.

(Doc. 57, at 38 (emphasis in original).) Defendants argue that these statements are non-actionable under the bespeaks-caution doctrine, as statements of opinion, as statements of puffery, and for failure to plead falsity.

These statements are vague, ordinary corporate pufferies that a reasonable investor would not consider material as a matter of law. *Cf. In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) ("Statements such as '[w]e continue to demonstrate the viability of our growth strategy . . . ,' '[w]e continue to enhance our position as a leader in the automotive industry . . . ,' and 'the Company is on target to achieve projected "synergies" and cost savings'

34

Case Case 1:190-cv-190098-0TRM-JRG-CHS Document Document 91  ent File 1605/30/724 ed 07/10/24 of 8 Page 35 etD 85 1527
PageID #: 1583

are the sort of 'vague statements predicting growth' that [can be] dismissed as puffery."

(citations omitted)). They are therefore not actionable.

### x. Paragraph 115

Plaintiffs allege that Defendants "indicated increased contract rates and pricing, which

would be used to counteract increases in driver pay" and that the Offering Documents stated:

> For the quarter ended March 31, 2018, our Truckload revenue, before fuel
> surcharge increased by $34.3 million, or 11.6% compared to the same quarter in
> 2017. ***The primary factors driving the increase in Truckload revenue were a
> 9.0% increase in revenue per loaded mile due to increased contract rates and
> increased pricing in the spot market compared to the same quarter in 2017***,
> combined with a slight increase in average revenue miles per tractor and average
> available tractors, due to a stronger freight environment and our continued focus
> on executing our operating initiatives.

(Doc. 57, at 39 (emphasis in original).) Defendants argue that this statement is non-actionable as

a statement of opinion and for failure to plead falsity.

Plaintiffs neither allege that there was not a 9% increase in revenue per loaded mile

compared to 2017 nor that it did not result from increased contract rates and spot-market pricing.

Indeed, this statement is quite compatible with—and indeed helps explain—market cyclicality

creating fleeting profitability at USX. Plaintiffs, after all, maintain that increased revenue

resulted from external market forces (rather than an internal decrease in operational costs) and in

turn drove the profitability that preceded the IPO. It is easy to understand, therefore, why

Plaintiffs do not allege that revenue did not increase, as would be required to plead the falsity of

this statement. Because there is no plausible allegation of falsity, this statement is not actionable.

### xi. Paragraph 116

Plaintiffs allege that the Offering Documents "contained risk factors that USX claimed

'***could impair [its] ability to improve profitability*** and materially adversely affect our results of

operations 'including [sic] that USX ***may*** have difficulty recruiting and retaining drivers because

35

our competitors offer better compensation or working conditions.'" (Doc. 57, at 39 (emphasis in original).)  Defendants argue that these statements are non-actionable under the bespeaks-caution doctrine, as statements of opinion, and for failure to plead falsity.

This hypothetical cautionary language is cherry-picked from a larger context in which USX's already-extant driver-retention problems are thoroughly disclosed.  (*See* Doc. 72-5, at 30–31 (Offering Documents warning: "we experience substantial difficulty in attracting and retaining sufficient numbers of qualified drivers, which includes the engagement of independent contractors";  the "industry is subject to a shortage of qualified drivers";  "we suffer from a high turnover rate of drivers and our turnover rate is higher than the industry average and compared to our peers;"  USX has "difficulties in maintaining or increasing" driver capacity, requiring it "to spend significant resources recruiting a substantial number of drivers" to even "operate existing revenue equipment," thereby "subject[ing] [USX] to a higher degree of risk with respect to driver shortages than our competitors.").)  Considering the isolated hypotheticals at issue—which are inherently forward-looking—against the totality of the cautionary language shows that a reasonable investor could not be misled as to whether USX was experiencing driver-retention problems at the time of the IPO.  Accordingly, Plaintiffs may not pursue a § 11 claim as to these cautionary statements.

### xii.  Paragraph 117

Plaintiffs allege that while "USX acknowledged the driver shortage in the Offering Documents risk-factors section, it also assured investors "*[w]e have implemented driver pay increases to address this shortage*."  (Doc. 57, at 39 (emphasis in original).)  Defendants argue that this statement is non-actionable under the bespeaks-caution doctrine, as a statement of opinion, and for failure to plead falsity.

Plaintiffs do not allege that USX did not increase pay in response to the driver shortage. (Whether it worked satisfactorily, or how that might be verified in a non-conclusory fashion, is a separate question.) They have therefore failed to plead falsity, meaning this statement is not actionable under § 11.

### xiii. Paragraph 118

Plaintiffs allege that the Offering Documents acknowledged

a higher turnover rate of drivers the industry average [sic] and compared to our peers but claimed that it spent "*significant resources recruiting a substantial number of drivers in order to operate existing revenue equipment*." Further, that USX that [sic] "*employ[ed] driver hiring standards*" implying that it was attracting quality drivers by linking those standards as "further reduc[ing] the pool of available drivers from which we would hire." The Offering Documents also claimed that: "*[i]f we are unable to continue to attract and retain a sufficient number of drivers, we could be forced to, among other things, continue to adjust our compensation packages or operate with fewer tractors and face difficulty meeting shipper demands, either of which could materially adversely affect our growth and profitability*."

(Doc. 57, at 39 (emphasis in original).) Defendants argue that these statements are non-actionable under the bespeaks-caution doctrine, as statements of opinion, and for failure to plead falsity.

The first statement is not alleged to be false, as Plaintiffs do not contend that USX was not expending significant resources on driver recruitment, but merely that the expenditures were not working. The second statement provides that "[w]e also employ driver hiring standards, which could further reduce the pool of available drivers from which we would hire." (Doc. 72-5, at 31.) Plaintiffs do not allege that USX had no hiring standard, only that it was not particularly exacting. Nor do they plead that the non-exacting standard would not screen out some drivers and shrink the candidate pool—for the standard to screen out no one would mean that USX would hire anyone, which Plaintiffs do not plead. *Cf. Bondali*, 620 F. App'x at 490 ("By

37

pointing out the structural weaknesses of [the defendant]'s standards and protocols, all the plaintiffs have done is shown that whether [its] standards and protocols could be described as 'strict' is a question subject to reasonable debate.").

The final statement, however, indicates a then-present fact accompanying a forward-looking projection—that USX at that time had "a sufficient number of drivers" to meet shipper demand.[21]  But Plaintiffs allege that USX actually lacked sufficient drivers to meet then-present Dedicated demand prior to and during the IPO, requiring it to cannibalize the time of OTR drivers at higher cost and lower revenue.  This itself may not be misleading; in a strict sense, USX had enough drivers to fulfill its contractual obligations (or at least, Plaintiffs do not allege otherwise).  But Plaintiffs also allege that growth and profitability were already materially suffering due to the cannibalization.  The Court therefore cannot conclude that this statement—which theorizes that "if" USX could not "continue" to employ enough drivers to meet demand, i.e., merely "could" face shortage-related growth and profitability losses—is not materially misleading as a matter of law.  Even if the forward-looking component of this statement is protected under the bespeaks-caution doctrine, the attendant assertion of present fact is not.  Nor is the statement mere opinion, for "sufficiency" of supply is not so vague and meaningless as to preclude verification.  Indeed, when a supplier says that it has "sufficient" capacity to meet demand, a reasonable investor could take this to mean that it can meet demand without harm to itself.  Plaintiffs allege that this was precisely *not* the case at USX, hence the cannibalization and

---

[21] "[T]he word 'continue' renders [a] statement both a representation of current fact and a forward-looking projection." *Pension Fund Grp. v. Tempur-Pedic Intern., Inc.*, 614 F. App'x 237, 247 (6th Cir. 2015).

Case 1:19-cv-01080-TRM-CHS Document 91 Filed 06/30/20 Page 39 of 85 PageID #: 1531
PageID #: 1587

ripple effects that followed.  Accordingly, Plaintiffs may pursue a § 11 claim to the extent that the OTR cannibalization makes this statement misleading.

### xiv.  Paragraph 119

Plaintiffs allege that the Offering Documents "warned of the risk that *'[a] reduction in or termination of our services by one or more of our major customers*, including our dedicated customers, *could have a material adverse effect on our business*, financial condition and results of operations.'"  (Doc. 57, at 40 (emphasis in original).)  Defendants argue that these statements are non-actionable under the bespeaks-caution doctrine, as statements of opinion, and for failure to plead falsity.

Plaintiffs have not alleged that these statements are false.  While the complaint alleges that "certain account shipping patterns had already been negatively impacted, including those of USX's largest customer Walmart, adversely impacting utilization as well as driver retention and hiring," Plaintiffs do not allege that Walmart had terminated or even reduced its use of USX, in turn materially harming its business. (Doc. 57, at 41.)  Indeed, the complaint alleges elsewhere that during "the end of 2017 or early 2018, Walmart put up for bid all of its distribution centers' dedicated contracts" and that "USX lost a few of its Walmart dedicated contracts, including one in Texas, but won new dedicated business in Virginia and Louisiana."  (*Id.* at 28.)  Plaintiffs elide this factual background by describing the Walmart rebid as negatively impacting USX. And, indeed, it allegedly did because the Texas drivers could not service the new routes, requiring OTR support.  But the complaint does not allege that USX lost business on net, leaving open the possibility that it actually gained business.  In other words, this cautionary language is structured conditionally: "if X, then Y."  Plaintiffs allege that Y had already occurred, i.e., that USX had problems.  But they do not allege that X had already occurred because they do not

39

allege a termination or loss of business.  Thus, the apparently contingent risk—loss or reduction of business—is not alleged to have already manifested, notwithstanding that a similar harm had manifested for other reasons.[22]  Accordingly, these statements are not actionable under § 11.

### xv.   Paragraph 120

Plaintiffs allege that Defendants "described certain risks related to high deductibles on claims exposure, telling investors that they 'may' occur" without disclosing "factors known [to be] increasing such risk" and that the Offering Documents stated:

> ***We retain high deductibles on a significant portion of our claims exposure, which could significantly increase the volatility of, and decrease the amount of, our earnings and materially adversely affect our results of operations.***
>
> We retain high deductibles on a significant portion of our claims exposure and related expenses associated with third-party bodily injury and property damage, employee medical expenses, workers' compensation, physical damage to our equipment and cargo loss.  We retain a deductible of approximately $5.0 million per occurrence for automobile bodily injury and property damage through our captive risk retention group and up to $500,000 per occurrence for workers' compensation claims, both of which can make our insurance and claims expense higher or more volatile than if we maintained lower retentions.  We are also responsible for the first $5.0 million aggregate in the $5.0 million to $10.0 million layer of excess insurance coverage for automobile bodily injury and property damage.  Additionally, with respect to our third-party insurance, reduced capacity in the insurance market for trucking risks can make it more difficult to obtain both primary and excess insurance, can necessitate procuring insurance offshore, and could result in increases in collateral requirements on those primary lines that require securitization.

---

[22] In any case, it may also be that a change in trucking route details for one customer—even a significant customer—is not the kind of omission for which § 11 imposes liability.  *See Local 295*, 731 F. Supp. 2d at 705 ("Imposing liability for some omissions or misstatements would cause management 'simply to bury the shareholders in an avalanche of trivial information that is hardly conducive to informed decisionmaking.'" (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976))).

Case Case 1:19-cv-10900-TBM-JRG-CES Document 91 Filed 06/30/20 Filed 07/10/20 of 8 Page 41 of 85 1533 PageID #: 1589

(Doc. 57, at 40 (emphasis in original).)  Defendants argue that these statements are non-actionable under the bespeaks-caution doctrine, as statements of opinion, and for failure to plead falsity.

These statements are not pleaded to be false.  Plaintiffs allege that "USX's insurance coverage was not symmetrical with [its] overall credit and earnings profile and leverage" and that its "driver safety initiatives were inadequate and lagged behind its peers resulting in riskier drivers and a poorly maintained fleet and, as a result, increased the Company's exposure to liability claims."  (Doc. 57, at 38–39.)  But this cautionary language admits that USX had significant claims exposure (and concomitant insurance-claim-related volatility) and then explains the specifics of USX's insurance.  Plaintiffs do not claim that these descriptions or numbers were inaccurate.  Instead, they only cast them as poor business decisions that resulted in significant financial exposure to two accidents in the third quarter of 2018.  (*See* Doc. 57, at 31–33 (alleging that "USX's business deficiencies . . . made its self-insurance scheme far riskier than described" but not at any point explaining how any particular description was misleading).)  Whatever the prudence of USX's insurance scheme, Plaintiffs have not pleaded that USX falsely represented its coverage.  Accordingly, these statements are not actionable under § 11.

### 2.  Alleged Omissions by Half-Truth

In addition to the foregoing alleged misrepresentations, Plaintiffs allege that Defendants misled investors by omitting certain information from the Offering Documents.  Section 11 may impose liability when the defendant "omitt[ed] information it was required to include in the registration statement."  *J & R Mktg.*, 549 F.3d at 390 (citing 15 U.S.C. § 77k(a)).  There "are two accepted methods of determining whether a duty exists for the offeror to disclose certain information in the context of a public offering:"  (1) "an offeror is duty-bound to disclose all

41

material information required to be disclosed by statute," and (2) "an offeror has a duty to disclose any additional information required to make another statement, whether required or voluntarily made, not misleading." *Id.* (citations omitted). The Court refers to claims under the second possibility as "half-truth" claims. *Cf. Ontario Teachers' Pension Plan Board v. Teva Pharma. Indus. Ltd.*, 432 F. Supp. 3d. 131, 157 (D. Conn. 2019) ("Half-truths, 'statements that are misleading by omission', are actionable in securities law." (citation omitted)).

The same facts alleged to show the falsity of the Offering Documents statements are alleged to be actionable omissions by half-truth. (*See* Doc. 57, at 40–42 (detailing adverse facts that Defendants "failed to disclose").) In that sense, the alleged misrepresentations and alleged omissions are often complementary sides of the same coin. Plaintiffs do not appear to allege in their complaint or cite in their brief any statutory duties to disclose these adverse facts, though they do separately allege omission of known negative trends under Item 303 of SEC Regulation S-K, which will be taken up below. (*See id.* at 42 ("The Offering Documents were also materially untrue and misleading because they failed to meet the requirements of Item 303 of Regulation S-K. 17 C.F.R. §229.303(a)(3)(ii). Item 303 requires the disclosure of known trends that have had or are reasonably expected to have a material impact on a company's business.").) The Court will address each alleged half-truth omission in turn.

Plaintiffs first allege that the Offering Documents omitted that "USX did not have in place compensation packages sufficient to hire and retain quality truck drivers to meet the demand for its services. Such incentives and/or compensation required additional expenditures that necessarily would negatively impact the Company's operating ratio. Nor were the incentives USX had in place sufficient." (*Id.* at 41.) The Court concluded above that certain statements in the Offering Documents, which implicate then-present facts about driver retention

and the harm that USX was suffering from the OTR cannibalization, are actionable.  It cannot be said, however, that USX failed to disclose its driver retention struggles.  (*See* Doc. 72-5, at 30–31 (Offering Documents warning: "we experience substantial difficulty in attracting and retaining sufficient numbers of qualified drivers, which includes the engagement of independent contractors";  the "industry is subject to a shortage of qualified drivers";  "we suffer from a high turnover rate of drivers and our turnover rate is higher than the industry average and compared to our peers;"  USX has "difficulties in maintaining or increasing" driver capacity, requiring it "to spend significant resources recruiting a substantial number of drivers" to even "operate existing revenue equipment," thereby "subject[ing] [USX] to a higher degree of risk with respect to driver shortages than our competitors";  "[i]f we are unable to continue to attract and retain a sufficient number of drivers, we could be forced to … continue to adjust our compensation packages or operate with fewer tractors and face difficulty meeting shipper demands, either of which could materially adversely affect our growth and profitability.").)  To conclude that USX failed to disclose its driver-retention problems and concomitant expenditures, then, would require the reader to ignore outright the plain language of the Offering Documents.  *See EveryWare*, 175 F. Supp. 3d at 873 (dismissing Securities Act claim where SEC filing actually disclosed the relevant information).   This alleged omission is not actionable.

Plaintiffs next allege that the Offering Documents omitted that "USX drivers were not among the 'best paid in the industry' nor had USX increased driver pay commensurate with the market wages for truck drivers which slowed the pace of hiring and hindered the retention of drivers."  (Doc. 57, at 41.)  Plaintiffs concede that the "best paid in the industry" statement was made verbally by Eric Fuller on February 13, 2018.  (Doc. 85, at 19 n.9.)  As discussed above, however, USX disclosed in unambiguous terms the seriousness of its driver-retention problems

43

and explicitly cautioned that USX may face challenges "because our competitors offer better compensation or working conditions." (Doc. 72-5, at 33.) Nor can a statement outside the registration statement give rise to liability under § 11.[23] This alleged omission is not actionable.

Plaintiffs allege that the Offering Documents omitted that "USX's purported 'transformation' and 'driver-centric' initiatives did not improve load planning or truck maintenance which harmed trucker morale and worsened USX's poor driver retention rates." (Doc. 57, at 41.) As discussed above, however, the Offering Documents disclosed that USX's strategies were incomplete, that some of the projections stemmed from a pilot program involving 250 tractors (out of 5,500—that is, less than 5%), and that the effective rollout and attendant success of its plans were far from certain. (*See* Doc. 72-5, at 11, 17, 32.) This alleged omission is not actionable.

---

[23] Plaintiffs resist this conclusion by citing to a Sixth Circuit case for the proposition that "[a] duty to affirmatively disclose 'may arise when there is insider trading, a statute requiring disclosure,' or, as relevant in this case, 'an inaccurate, incomplete[,] or misleading prior disclosure.'" *In re Omnicare, Inc. Sec. Litig.* ("*Omnicare III* "), 769 F.3d 455, 471 (6th Cir. 2014) (internal quotation marks and citation omitted). *Omnicare III*, however, is a § 10(b) case that discussed this duty in the context of correcting prior SEC-required disclosures upon receipt of new information. While the parties (and the Court, for that matter) have discussed § 11 and § 10(b) cases somewhat interchangeably, at least where the issues or doctrines are analogous, § 11 limits itself to registration statements. While alleged omissions necessarily implicate external facts, current § 11 doctrine only creates a duty to avoid half-truths when the half-truths themselves are found in the registration statement. In that sense, the duty is anchored firmly to the registration statement. The Court declines to create a third category of duty to disclose under § 11—which apparently would encompass prior, non-registration-statement verbal declarations—especially considering Plaintiffs have cited no § 11 precedent for such a holding. *See also J & R Mktg.*, 549 F.3d at 390 (describing duties to disclose as arising only from statutes and half-truths). Section 11 clearly requires offerors to speak the whole truth in a registration statement. It clearly does not require them to seek and destroy every prior misstatement.

As for the § 10(b) context, the Court does not read *Omnicare III* to create a free-ranging duty to correct prior misstatements; instead, *Omnicare III* explicated a duty to correct inaccurate SEC filings upon receipt of new information. That is a far cry from the facts alleged in this case.

44

Plaintiffs also allege that the Offering Documents omitted that "USX was unable to 'prior[i]tiz[e] growth in dedicated contract services' because a shortage of drivers for trucks was negatively impacting USX's dedicated division, which forced USX to reallocate OTR drivers (at an increased cost) to drive dedicated routes—this was a common practice prior to the IPO which caused underperformance in OTR and continued after the IPO." (Doc. 57, at 41.) The Court concluded above that certain statements were actionable under § 11 because the Offering Documents did not disclose the cannibalization of OTR drivers by the Dedicated division. By the same token, those statements may be half-truths to the extent that profitability problems were already manifesting in the form of the omitted OTR cannibalization, especially against a backdrop of rising OTR rates. At the least, the Court cannot say as a matter of law that USX's asserted plans for growth and related cautionary statements—made without disclosing the OTR cannibalization—would mislead no reasonable investor.

The Underwriter Defendants rightly point out that this allegation is inconsistent to the extent that directing OTR drivers to Dedicated routes amounts to prioritizing Dedicated over OTR. (*See* Doc. 73-1, at 15.) But that does not preclude recovery as a matter of law for failure to disclose the cannibalization. Nor is this a matter of mere corporate mismanagement. (*See id.*) USX predicated its IPO on improving its operating ratio. Like many businesses, and especially trucking businesses, USX's revenue is highly sensitive to market conditions and therefore beyond its control in many respects. USX could, however, improve its operating ratio by decreasing costs. The Offering Documents indicate repeatedly that load-planning and fleet-management optimization were to serve as primary cost-reduction drivers. Accordingly, the OTR cannibalization could sensibly be viewed as in direct conflict with USX's stated plan, notwithstanding that the stated plan is rather vague. This is why Plaintiffs allege—and not

45

unreasonably so—that USX materially failed to state the whole truth by not disclosing the cannibalization.  This alleged omission is therefore actionable.

Plaintiffs next allege that the Offering Documents omitted that "certain account shipping patterns had already been negatively impacted, including those of USX's largest customer Walmart, adversely impacting utilization as well as driver retention and hiring."  (Doc. 57, at 41.)  As discussed above, Walmart stopped using USX's services in Texas but added routes in Virginia and Louisiana.   But it is unclear whence a duty to disclose this particular, customer-specific route information would arise.  In other words, Plaintiffs have not identified a particular half-truth that would require USX to disclose the loss of some Walmart routes and gain of others. This alleged omission is therefore not actionable.

Plaintiffs allege that the Offering Documents omitted that "USX's cost per mile for driver wages and independent contractors was exceeding the Company's internal expectations."  (Doc. 57, at 41.)  This conclusory assertion, whatever it may mean, is supported by no particularly pleaded facts.  Plaintiffs do not plead what the actual expectations were, what reality manifested, the attendant margin, or (perhaps most importantly) why the margin matters.  Without particularized allegations, this alleged omission is not actionable.

Plaintiffs allege that the Offering Documents omitted that "USX's insurance coverage was not symmetrical with USX's overall credit and earnings profile and leverage."  (*Id.*)  It is far from obvious what "symmetrical" means in this context or how one might verify insurance symmetry, or lack thereof.  In any case, the Offering Documents disclosed in detail the specifics of USX's insurance coverage and cautioned that its high exposure could yield significant volatility.  (*See* Doc. 72-5, at 33 (explaining, "[w]e retain high deductibles on a significant portion of our claims exposure, which could significantly increase the volatility of, and decrease

46

the amount of, our earnings").)  Plaintiffs allege that such volatility manifested in the third quarter of 2018.  That may be true, but USX disclosed its significant exposure to liability.  This alleged omission is therefore not actionable.

Plaintiffs next allege that the Offering Documents omitted that "the risks USX warned might occur had already come to pass and were negatively impacting USX's operations."  (Doc. 57, at 41.)  This is highly conclusory, and surely does not mean what it says—for Plaintiffs do not allege that every risk discussed in the Offering Documents came to pass.  In other words, this pleading itself is far too vague to support omission liability.  Particularized omissions in this vein could be actionable, however, and the analysis above relies in part upon this overarching allegation about USX's approach to the Offering Documents.  But, because it is so vague and conclusory, this alleged omission itself is not actionable.

Plaintiffs allege that the Offering Documents omitted that "USX's driver safety initiatives were inadequate and lagged behind its peers resulting in riskier drivers and a poorly maintained fleet and, as a result, increased the Company's exposure to liability claims."  (*Id.*)  It is not at all obvious what Plaintiffs mean by the conclusory and subjective term "inadequate," making it difficult to identify any basis for a duty to disclose that alleged fact.  Similarly, as to whether USX's drivers are "riskier" and its fleet is "poorly maintained," the Court cannot identify either sufficiently meaningful factual underpinnings for these allegations or concomitant statements in the Offering Documents upon which to predicate a half-truth claim.  Indeed, Plaintiffs allege a variety of poor managerial choices throughout USX's business, including as to driver safety and truck management.  (*See* Doc. 57, at 31–33.)  Perhaps USX was in fact mismanaged, but repackaging a variety of individual problems as part of an overarching, broadly worded, and

47

unverifiable "omission" cannot support § 11 liability in the absence of half-truths about the particular facts at issue.  This alleged omission is therefore not actionable.

### 3.    Alleged Omission of Known Adverse Trends Under Item 303

Item 303 of Regulation S-K requires, in pertinent part, that Securities Act registrants:

> [d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii); *see also J & R Mktg.*, 549 F.3d at 392 (explaining that, unlike § 11 itself, "the duty of disclosure arising from Item 303 does require knowledge").  "According to the SEC's interpretive release regarding Item 303, the Regulation imposes a disclosure duty 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'"  *Panther Partners Inc. v. Ikanos Comms. Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (citation omitted).

Plaintiffs allege:

> The adverse trends known to the Securities Act Defendants, but omitted from the Offering Documents, included: (i) USX had prior to the IPO, been unable to hire and retain sufficient numbers of drivers to meet its customers' demands; (ii) in the time prior to the IPO, USX's compensation paid to its drivers was not rising fast enough to keep up with prevailing rates for drivers, impacting hiring and retention; (iii) prior to the IPO, OTR drivers were reallocated to support the dedicated division, negatively impacting profitability; and (iv) USX's lax driver safety practices and hiring had increased the Company's exposure to liability claims.

(Doc. 57, at 42.)  For the reasons discussed above, *supra* Section III(C)(1)(xv)(2), the Court concludes that the factual underpinnings for alleged trends (i) and (ii) were disclosed in the

Offering Documents, precluding any claim for failure to disclose under Item 303.  Also as discussed above, the factual underpinnings for alleged trend (iv) are too conclusory and not susceptible of meaningful verification, precluding any claim for failure to disclose under Item 303.[24]  Finally, the Court concludes that the failure to disclose the cannibalization of OTR drivers underpinning alleged trend (iii) is not actionable, because Plaintiffs have not pleaded a specific factual basis for "actual knowledge" of this trend as required by Item 303.  To be sure, Plaintiffs allege throughout the complaint that the Securities Act Defendants should have known about this trend, but, as explained in the scienter analysis below, they do not plead any specific facts relating to their knowledge at the time of the IPO.  *See J & R Mktg.*, 549 F.3d at 392 (explaining that Item 303 requires actual knowledge).

### D.  Section 15 Claims under the Securities Act

Plaintiffs bring "control person" claims under § 15, predicated on the substantive § 11 violations, against the USX Defendants.  (Doc. 57, at 64–65); *see also* 15 U.S.C. § 77o(a); *Local 295*, 731 F. Supp. 2d at 714–15 (stating that § 15 claim requires "(1) a primary securities law violation; (2) power to control the specific transaction or activity upon which the primary violation is predicated; and (3) actual participation (i.e., exercise of control) in the operations of the primary violator in general").  Defendants seek dismissal of these claims solely on the basis that the underlying § 11 claims should be dismissed.  (*See* Doc. 72-1, at 42 ("Because Plaintiffs

---

[24] Plaintiffs argue that whether the correct information was actually available to investors elsewhere is a "truth on the market" defense.  That is not what Defendants argue; they argue that this information was disclosed in the registration statement itself.  That is why these allegedly undisclosed trends are non-actionable, not because the information was available somewhere outside the relevant SEC filing.

49

have failed to state viable Section 11 . . . claims, their claims for 'control person' liability under Section 15 of the Securities Act . . . likewise fail.").

The Court has concluded that not all of the § 11 claims should be dismissed. Accordingly, Defendants have identified no sound basis on which to dismiss the § 15 claims.

### E.  Claims under Section 10(b) of the Exchange Act and Rule 10b-5

Defendants USX, Eric Fuller, and Eric Peterson move to dismiss Plaintiffs' claims against them under § 10(b) of the Exchange Act and Rule 10b-5 (collectively, "§ 10(b)").  They argue that Plaintiffs have not alleged any actionable misrepresentations or omissions and have not "state[d] with particularity facts giving rise to a strong inference that the defendant acted with the required" scienter.  15 U.S.C. § 78u-4(b)(2)(A).

To state a claim under § 10(b), a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Omnicare III*, 769 F.3d at 469 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011)).  "In the securities-fraud context, scienter includes a 'knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness.'"  *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (quoting *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008), *abrogated on other grounds by Matrixx*, 563 U.S. 27 (2011)).  "Recklessness is . . . highly unreasonable conduct which is an extreme departure from the standards of ordinary care," and is "more akin to conscious disregard" than negligence.  *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004)); *see also Doshi*, 823 F.3d at 1032 ("Before drawing an inference of recklessness, courts typically require 'multiple, obvious red flags,' . . .

demonstrating an 'egregious refusal to see the obvious, or to investigate the doubtful.'" (quoting *PR Diamonds*, 364 F.3d at 686–87, 695)).

Like § 11 of the Securities Act, however, certain kinds of statements are not actionable under § 10(b). Again, the bespeaks-caution doctrine may protect forward-looking statements accompanied by meaningful cautionary language. *Cf. In re Champion Enters., Inc. Sec. Litig.*, 144 F. Supp. 2d 848, 862 (E.D. Mich. 2001) ("[T]he Reform Act's safe harbor provision also incorporates the judicially created bespeaks caution doctrine."). Statements of opinion are non-actionable. *See In re Lehman Brothers Sec. & ERISA Litig.*, 131 F. Supp. 3d 241, 251–52 (S.D.N.Y. 2015) (applying *Omnicare* opinion-liability framework to § 10(b) claims). The same is true for statements of corporate optimism and mere puffery. *Envision Healthcare*, No. 3:17-cv-1112, 2019 WL 6168254, at *9 (applying puffery doctrine in § 10(b) context). And falsity must be pleaded with particularity under Rule 9(b). *See also* 15 U.S.C. § 78u-4(b)(1) (complaints alleging § 10(b) violations "shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading").

Additionally, similar to the bespeaks-caution doctrine, the Reform Act provides a limited safe harbor for certain forward-looking statements, which include:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)[.]

15 U.S.C. § 78u-5(i)(1).  These kinds of forward-looking statements

> are actionable as securities fraud only if (1) a reasonable investor would find the statement material, (2) the defendant failed to identify its statement as forward looking or provide "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," and (3) the defendant made the statement "with actual knowledge . . . that [it] was false or misleading."

*Pension Fund Grp. v. Tempur-Pedic Intern., Inc.*, 614 F. App'x 237, 242 (6th Cir. 2015)

(quoting 15 U.S.C. § 78u-5(c)(1)).

### 1. Alleged Mistatements and Omissions under Exchange Act Section 10(b) and Rule 10b-5

Plaintiffs allege that the statements and omissions in the Offering Documents, on which

Securities Act § 11 liability is predicated, also give rise to Exchange Act § 10(b) claims.  They

further allege that a handful of post-IPO statements by the Exchange Act Defendants are

actionable under § 10(b).  The Court first addresses whether the statements and omissions

themselves are actionable, then whether Plaintiffs have adequately alleged scienter.  Because a

strong inference of scienter, *see* 15 U.S.C. § 78u-4(b)(2)(A), has not been pleaded as to any

actionable statements, Plaintiffs' § 10(b) claims will be dismissed.

### i. Alleged Statements

The alleged statements and omissions in the Offering Documents are subject to the same

analysis as conducted above with respect to § 11, though the Reform Act safe harbor also

applies.  *See, e.g.*, *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 574 (S.D.N.Y. 2012)

("As determined in the § 11 analysis, Plaintiffs have sufficiently pled the falsity of the statements

for a § 10(b) claim.")  Therefore, the outcome of a § 10(b) analysis would be the same as for the

§ 11 analysis already performed.  *Cf. id.* (proceeding to scienter analysis under § 10(b) despite

analyzing actionability only under § 11).  Accordingly, the only statements in the Offering

52

Documents potentially actionable under § 10(b) are those that survived § 11 scrutiny above. The post-IPO statements, however, were not analyzed above and require a separate analysis.

### a. Paragraph 126

Plaintiffs allege that the Exchange Act Defendants, in an August 2, 2018 press release incorporated into a SEC Form 8-K, "falsely highlight[ed] the success of USX's 'transformation':

> Over the last three years we have implemented a complete overhaul of the Company's strategy and operations that we expect will improve execution and profitability. ***To achieve our goal, we changed the Company's culture and recruited the expertise necessary to drive our transformation. We also implemented several strategic initiatives focused on improving driver retention, increasing our asset utilization, creating synergies for our customers within our different service offerings and driving a culture of cost management. The early success of our initiatives can clearly be seen in our second quarter results*** where we delivered our best Adjusted Operating Ratio since 1998.

(Doc. 57, at 42–43 (emphasis in original).) Defendants argue that these statements are non-actionable under the Reform Act safe harbor, as statements of opinion, and for failure to plead falsity.

These statements are non-actionable as opinions and for failure to plead falsity. They are thoroughly vague and unverifiable, and they plainly reflect the opinions of the speaker. To the extent they are predicated on facts, those facts (e.g., "[w]e also implemented several strategic initiatives focused on improving driver retention" (Doc. 57, at 42–43)) are not pleaded to be false. Here, as throughout their complaint, Plaintiffs allege that USX's changes did not work well enough (e.g., did not improve driver retention satisfactorily), not that there were no changes. This oblique and insufficient approach to "falsity" derives in no small part from Plaintiffs' failure to plead particularized adverse facts and the subdued statements at issue. In sum, these statements are non-actionable.

### b. Paragraph 127

Plaintiffs next allege that the Exchange Act Defendants "falsely assured investors that USX saw no adverse factors that would negatively impact current trends and that the Company maintained its focus on retaining and hiring drivers, allowing USX to offset any driver supply challenges that they had known of prior to the IPO":

> Overall, we remain optimistic as we continue to execute our strategy and market conditions remain strong. [1] ***Of note, we experienced improving rates and volumes through the second quarter and expect no catalyst over the near term that would negatively impact current trends.*** That said, we continue to see an erosion of professional driver availability. As a result, [2] ***we are continuing to focus on our driver centric initiatives to both retain the professional drivers who have chosen to partner with us and to attract new professional drivers to our team.*** We believe this focus allowed us to offset the difficult conditions, which have created a significant professional driver supply challenge for the broader industry as we [3] ***slightly increased our tractor count during the second quarter of 2018 through an 11% reduction in our driver turnover percentage.*** The environment in the third quarter of 2018 remains strong from a rate and volume perspective and we are currently anticipating rates to further increase on a sequential basis as [4] ***we continue to implement contract rate increases in both our over the road and dedicated divisions.***

(Doc. 57, at 43 (emphasis in original).) Defendants argue that these statements are non-actionable under the Reform Act safe harbor, as statements of opinion, and for failure to plead falsity.

The third and fourth statements are not pleaded to be false. Plaintiffs do not allege that USX did not see an 11% turnover improvement or that USX was not implementing contract rate increases. The second statement is vague and opinionated, but to the extent it implicates a fact—that USX implemented driver-centric initiatives—that fact is not pleaded to false. It is pleaded only to have been ineffective. These statements are therefore non-actionable.

The first statement must be divided in two. First, "we experienced improving rates and volumes through the second quarter" is not itself pleaded to be false. Quite the opposite,

54

Case Case-1:19-cv-09080-TRM-CHS-CHS Document 91 ment File 1606/30/7ed 07/10/24 of 8Page 55 of 85 1547 PageID #: 1603

Plaintiffs maintain that USX did experience better rates and volumes (concomitant with the trucking industry's cyclicality) prior to the IPO. The second statement, which uses the word "expect," is quintessentially forward-looking and posits that that trend—improving rates and volumes—will continue. *Cf. Slayton v. Am. Express Co.*, 603 F.3d 758, 659 (2d Cir. 2010) (agreeing with SEC's position that phrases like "we expect" are forward-looking). But it is directly followed by the statement: "That said, we continue to see an erosion of professional driver availability." (Doc. 57, at 43.) The follow-up statement is clearly cautionary and puts a reasonable investor on notice that improved rates and volumes may not manifest because of a continuing (that is, both present and forward-going) problem with driver availability. It is therefore non-actionable.

### c. Paragraph 128

Plaintiffs also allege that the August 2, 2018, Form 8-K "misleadingly downplayed the adverse impact that the shift of OTR drivers to dedicated had on USX, when in reality, the shift of OTR assets to dedicated was a pervasive and long-standing problem":

> Despite the challenging market for drivers, utilization increased through the successful execution of numerous operational initiatives gaining traction through the quarter. ***This strong utilization was impacted by the over the road division's support of dedicated accounts during the quarter***, which negatively impacted over the road utilization by approximately 150 basis points. While supporting the dedicated accounts with the Company's over the road fleet negatively affected our utilization in the second quarter, ***management believes that when these accounts are operationally established, U.S. Xpress will be able to recognize this increase in over the road utilization.***

(Doc. 57, at 43 (emphasis in original).) Defendants argue that these statements are non-actionable under the Reform Act safe harbor, as statements of opinion, and for failure to plead falsity.

55

The second statement is an opinion and non-actionable. The first statement is not pleaded to be false. Indeed, it says precisely what Plaintiffs allege throughout the complaint: that allocating OTR drivers to Dedicated accounts harms utilization. How this statement—which also disclosed the actual extent of the impact (i.e., a 150-basis-point (1.5%) negative effect)— "misleadingly downplayed" the problem is anybody's guess. No particularized facts are provided to indicate what this statement should have said to avoid downplaying a problem for which an objective metric was provided.

### d. Paragraph 129

Plaintiffs next allege that the August 2, 2018, Form 8-K "also falsely downplayed issues with 'certain' accounts' shipping patterns and 'mix changes' by not disclosing that the issue involved a major customer and implying that rate increases, which were previously implemented in July 2018, had resolved those issues":

> The reduction in our utilization was primarily the result of ***certain accounts' shipping patterns that performed differently than expected*** which affected utilization, driver hiring, and retention, and due in part to mix changes in the portfolio. As a result of negotiations related to these accounts that were underperforming from a utilization standpoint, rate increases have been implemented that were effective as of the end of July 2018.

(Doc. 57, at 44 (emphasis in original).) Defendants argue that this statement is non-actionable as a statement of opinion and for failure to plead falsity.

It is not at all clear how this statement "falsely downplays" anything; presumably, Plaintiffs mean that USX should have disclosed that Walmart no longer used USX in Texas but began using it in Virginia and Louisiana. But, as previously discussed, USX disclosed a utilization reduction of 150 basis points (1.5%). How the Exchange Act Defendants could simultaneously give an exact figure representing the overall utilization impact of the rebid and

56

yet obscure its negative effects is unclear.  In other words, Plaintiffs do not plead particular facts showing how this statement is false, thereby rendering it non-actionable.

### e.   Paragraph 130

Plaintiffs allege that the Exchange Act Defendants falsely

> claimed that the brokerage unit allowed the Company to meet its customers' capacity requirements:  "***[t]he brokerage segment continues to provide additional selectivity for the Company's assets to optimize yield while at the same time offering more capacity solutions to our customers.***"  In fact, the use of the OTR drivers had been required to cover dedicated customers adversely impacting the Company.

(Doc. 57, at 44 (emphasis in original).)  Defendants argue that this statement is non-actionable as a statement of opinion and for failure to plead falsity.

This alleged misstatement is quite vague; how one would analyze whether Brokerage actually provides "additional selectivity" and "more capacity solutions," the Court cannot divine. Moreover, Plaintiffs do not plead that Brokerage does not do these things and do not explain how OTR's support of Dedicated renders this statement false.  At most, Plaintiffs plead that Brokerage was insufficient to avoid OTR's support of Dedicated.  But this alleged misstatement does not claim otherwise by any stretch of the imagination.  This statement is therefore not pleaded to be false and is therefore non-actionable.

### f.   Paragraph 131

Plaintiffs allege that, on an August 2, 2018, earnings call with securities analysts, Defendant Eric Fuller, "[w]hen asked if USX could handle wage boosts if necessary, . . . indicated that OTR drivers already received a significant wage boost and that dedicated could pass on the rate changes to its customers":

> Sure.  Yes, Ravi, I think, obviously, and I know we have talked about this, is the way we look at driver wages is in two buckets.  ***You have dedicated, which we***

57

*believe we can be made whole for any increases that we have to give our drivers in the dedicated segment* and on over the road is obviously where you have a little bit more exposure.

If you look at our over the road drivers, again, they have received a 15% increase in their weekly take-home this year versus last year.  So we think that's a significant increase and we think that we can continue to, at least over the near term, we can stay fairly disciplined in our having to increase wages.

(Doc. 57, at 44 (emphasis in original).)  Defendants argue that this statement is non-actionable under the Reform Act safe harbor, as a statement of opinion, and for failure to plead falsity.

This statement is plainly an opinion, and Plaintiffs do not plead that USX could not recoup wage increases in Dedicated.  This statement is therefore non-actionable.

### g.   Paragraph 133

Plaintiffs allege that Defendant Eric Fuller "further assured investors . . . that the issue regarding shipping patterns had been addressed and would soon be behind the Company by noting that rate increases had already been incorporated into the dedicated fleet's numbers and that there were active negotiations to recapture the lost margin":

I think we still have a little bit of ways to go and *there's still some negotiations with a few different customers* on some changes in how they are operating.  And so those negotiations are still happening, *but the 3.5% went into our dedicated rate per mile and that is already effective in our numbers on a go-forward basis.*

(Doc. 57, at 45 (emphasis in original).)  Defendants argue that these statements are non-actionable under the Reform Act safe harbor, as statements of opinion, and for failure to plead falsity.

Plaintiffs do not plead that USX was not negotiating with its Dedicated customers or that the 3.5% increase had not been incorporated into USX's figures.  And, in fact, Plaintiffs excised from their complaint the part of Defendant Eric Fuller's response indicating that the negotiations

58

and updated figures may *not* mean that USX would be able to recapture its lost margin going forward:

> Q (Ken Hoexter with Merrill Lynch): . . . is that rate increase of the 3.5% sequential, would that get your margins back to where it would have before these contract adjustments[?]
>
> A (Eric Fuller): *Not necessarily.* I think we still have a little bit of ways to go . . . .

(Doc. 72-9, at 9. (emphasis added).) These statements are non-actionable.

### h. Paragraph 134

Plaintiffs next allege that a defendant[25] "misled investors on the conference call, describing the 11% improvement in driver retention as an 'improvement in the overall driver retention percentage.'" (Doc. 57, at 45.) Defendants argue that this statement is non-actionable as a statement of opinion and for failure to plead falsity.

Plaintiffs do not plead that USX did not see an 11% retention improvement in the second quarter of 2018. This statement is therefore not pleaded to be false. The Court also observes that Plaintiffs excised the portion of Defendant Eric Fuller's statement that cautioned that this retention improvement did not mean that USX had overcome the negative effects of the driver shortage. (*See* Doc. 72-9, at 12 ("So that's improvement in the overall driver retention percentage. . . . [U]nfortunately I can tell you all things have not been constant from a hiring perspective. We've seen a lot of pressure in our driver recruiting initiatives.").)

### i. Paragraph 135

Plaintiffs allege that Defendant Eric Fuller "also emphasized that the driver-centric initiatives were enhancing driver take-home pay, thus implying driver hiring and retention and

---

[25] It appears that Plaintiffs meant Defendant Eric Fuller. (*See* Doc. 72-9, at 12 (answer by Eric Fuller containing this statement).)

59

the operating ratios were also increasing.  'Obviously, *the load planning initiative is around driving improvements in our utilization and that utilization is leading to drivers taking home more pay*.'"  (Doc. 57, at 45 (emphasis in original).)  Defendants argue that this statement is non-actionable under the Reform Act safe harbor, as a statement of opinion, and for failure to plead falsity.

The context from which this statement was drawn renders Plaintiffs' construal of the statement untenable.  The Exchange Act Defendants repeatedly explained that USX's retention and pay were negatively impacted by the industry-wide driver shortage and even cautioned that the driver shortage obscured the real effects of their initiatives:  "But with the recruiting difficulties, then it makes it a little bit more difficult to recognize the type of impact [our initiatives are having]."  (Doc. 72-9, at 12–13.)  The statement itself is not pleaded to be false—Plaintiffs do not plead that USX underwent no operational changes—and even assuming that something "impl[ied]" is actionable under § 10(b), the Court need not analyze the falsity of an implication that is explicitly and contemporaneously rejected by the Exchange Act Defendants, for no reasonable investor would draw such an implication.

### j.  Paragraph 136

Plaintiffs allege that "Form 10-Q filed with the SEC on August 9, 2018 and signed by Defendant Eric Peterson also echoed the false statements seen in the press release issued a week earlier.  For example":

> We continue to see an erosion of professional driver availability.  As a result, we are continuing to focus on our driver centric initiatives to both retain the professional drivers who have chosen to partner with us and attract new professional drivers to our team.  *We believe this focus allowed us to offset the difficult conditions* which have created a significant professional driver supply challenge for the broader industry.  *We slightly increased our tractor count during the second quarter of 2018 and had an 11% reduction in our driver*

> > *turnover percentage*, which we expect will continue to improve.  We will continue to focus on implementing and executing our initiatives that we expect will continue to drive sustainable improved performance over time.

(Doc. 57, at 45–46 (emphasis in original).)  Defendants argue that these statements are non-actionable under Reform Act safe harbor, as statements of opinion, and for failure to plead falsity.

The first statement is one of opinion and is non-actionable.  Additionally, Plaintiffs do not plead that USX did not experience a slight tractor increase and an 11% reduction in driver turnover during the second quarter of 2018.  The second statement is therefore not pleaded to be false and is non-actionable.

### k.  Paragraph 137

Plaintiffs allege that USX's August 9, 2018 Form 10-Q

> also referenced the Offering Documents indicating "***[t]here have been no material changes from the risk factors disclosed in the Prospectus***" and directed investors to the Offering Documents for the "Risk Factors" that "could cause future events and actual results to differ materially."  As such, the false and misleading risks that the Offering Documents warned could happen in ¶¶116-120 were fully incorporated into the USX's 2Q Form 10-Q and reaffirmed on August 9, 2018.  These warnings were materially false and misleading because the risks that the Exchange Act Defendants warned could materially impact USX's business had already come to pass and continued to negatively impact USX's business.

(Doc. 57, at 46 (emphasis in original).)  Defendants argue that this statement is non-actionable under the Reform Act safe harbor, as a statement of opinion, and for failure to plead falsity.

Plaintiffs allege that the relevant portions of the Offering Documents were misleading at the time of the IPO and do not allege any particular changes between June 2018 and August 2018 that would make this Form 10-Q statement misleading above and beyond the extent to which the Offering Documents themselves may have been misleading.  (*See generally* Doc. 57.)

Case 1:19-cv-00098-TRM-CHS Document 91 Filed 06/30/20 Page 62 of 85 PageID #: 1554
PageID #: 1610

Accordingly, the Court incorporates its analysis of these statements from above and concludes that this statement is actionable only to the extent that the incorporated statements referenced in ¶ 118 are actionable.

### l.   Paragraph 140

Plaintiffs allege that on "September 13, 2018 USX presented at the Morgan Stanley Laguna conference.  Defendants Eric Peterson and Eric Fuller participated in the conference. When asked if USX was contemplating additional pay raises for its drivers, Eric Fuller highlighted all the pay raises USX had purportedly already given to their drivers":

> So you've really got to look at it in a lot of different buckets.  We've got dedicated. And on the dedicated side, which makes up half of our trucks and half of our drivers, *we're constantly giving increases in conjunction with the customer.*  So we would go back to the customer and get – kind of get, make a decision with the customer in that certain location to give increases.  So I would take half of that truck count and say I'm going to give made-whole on any kind of increases on a dollar-for-dollar basis in that bucket.  *On over the road, we have given – the drivers have received about a 15% increase on a year-over-year basis. We've given about a 9% increase. And that utilization increase has led to the rest of it.*  We're constantly looking at pay.  Right now, I don't have any plans in the near term to increase pay.  But I mean, very competitive environment, and I would tell you that sometimes in this environment, things can change pretty quickly.  So it's something that we keep an eye on.  But at this junction, I'm not planning on raising pay in the near term.

(Doc. 57, at 47 (emphasis in original).)  Defendants argue that these statements are non-actionable under the Reform Act safe harbor, as statements of opinion, and for failure to plead falsity.

Here, as throughout their complaint, Plaintiffs do not allege that USX did not give Dedicated pay increases in conjunction with the customer or that OTR drivers did not receive a 15% increase year-over-year (driven in part by utilization and in part by actual raises).  Instead, they allege that the pay was not high enough.  They may be right.  But the Court cannot

62

transmute the generalized view that USX had not raised wages sufficiently into a falsification of these statements, which have particular content that could be verifiably false (though Plaintiffs do not so allege).  These statements are therefore not pleaded to be false and are not actionable.

### m.  Paragraph 141

Plaintiffs allege that, "[l]ater that week, on September 18, 2018, Eric Fuller gave an interview on Bloomberg TV confirming that [the] dedicated [division] was not seeing difficulty passing driver pay raise costs on to its customers":

> ***We are finding the ability to pass along any kind of increases to our customers.*** And for the most part, our customers are aware of the driver situation and are concerned enough about being able to find capacity that ***they are understanding for the most part on any type of increases that we are asking for, from a pay standpoint.***

(Doc. 57, at 47 (emphasis original to the complaint).)  Defendants argue that these statements are non-actionable as statements of opinion and for failure to plead falsity.

The reasoning just given in relation to ¶ 140 applies with equal force here.  These statements are non-actionable for failure to plead falsity.

### ii.  Scienter

The Reform Act requires a complaint alleging § 10(b) violations to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  In other words, the complaint must allege facts from which a strong inference of intent to deceive, manipulate, or defraud, or of recklessness, may be drawn.  *See Doshi*, 823 F.3d at 1032.  The United States Supreme Court has explained that a "strong inference" is "more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations," such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one

Case 1:19-cv-00098-TRM-CHS  Document 91  Filed 06/30/21  Page 64 of 85  PageID #: 1556
PageID #: 1612

could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The inquiry is "inherently comparative" because the "strength of an inference cannot be decided in a vacuum." *Id.* at 323. And it must explore "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original). Finally, with respect to statements about "'soft information,' which 'includes predictions and matters of opinion,'" the plaintiff must additionally "allege particular facts demonstrating that defendants had *actual knowledge* that their statements . . . were false or misleading at the time they were made." *Omnicare III*, 769 F.3d at 470–71 (emphasis added) (quoting *Murphy v. Sofamor Danek Grp., Inc. (In re Sofamore Danek Grp., Inc.)*, 123 F.3d 394, 401 (6th Cir. 1997)).[26]

---

[26] *Omnicare III* "recognize[d] that . . . different rules apply when the misrepresentation or omission concerns hard, as opposed to soft, information." *Id.* at 470. "'[H]ard information'— 'typically historical information or other factual information that is objectively verifiable' … is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading." *Id.* (quoting *Murphy*, 123 F.3d at 401). Soft information, on the other hand, also requires actual knowledge as described above and a concomitant subjective inquiry. Prior to *Omnicare III*, courts in the Sixth Circuit often conducted that inquiry under the otherwise-objective first element of securities fraud, thereby "conflating" whether a misrepresentation is actionable and the second securities fraud element, scienter. *Id.* This "muddled the analytical framework," prompting *Omnicare III* to clarify that a misrepresentative statement concerning soft information can support a securities fraud claim only if the defendant had actual knowledge of its false or misleading nature, and that this subjective inquiry is properly regarded as a question of scienter. *Id.* at 470–71. Thus, the "additional requirement" of actual knowledge effectively "rais[es] the bar for alleging scienter" when an alleged misrepresentation concerns soft information. *Id.* at 471. The parties give this differentiation rather little treatment, but it appears that Plaintiffs do not allege particularly hard misrepresentations—such as falsifying numerical figures or stating outright falsehoods—but instead focus on "soft" statements that are predictive, riddled with opinion, and generally not susceptible of meaningful verification. This suggests that Plaintiffs must plead specific facts showing that the Exchange Act Defendants actually knew that their statements were false or misleading.

64

Defendants seek dismissal of the § 10(b) claims under the Reform Act for failure to plead particular facts that yield a strong inference of scienter.  They argue that Plaintiffs have attempted to plead only one of nine factors relevant to analyzing scienter set forth by the Sixth Circuit in *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) (en banc) (the "*Helwig* factors"), *abrogated on other grounds by Tellabs*, 551 U.S. 308 (2007),[27] and that Plaintiffs' other allegations—statements by "confidential witnesses," the core-operations doctrine, the timing of USX's IPO, the receipt of IPO benefits by Defendants Eric Fuller and Eric Peterson, the receipt of IPO benefits by USX, and post-IPO departures by two executives—cannot support a strong inference of scienter.  (*See* Doc. 72-1, at 33–42.)  Plaintiffs argue that the Court should eschew the *Helwig* factors because of *Tellabs*, that in any case they pleaded four out of nine factors, and that the non-*Helwig* allegations support a strong inference of scienter.  (*See* Doc. 85, at 40–55.) The parties mostly fail to differentiate the Exchange Act Defendants from one another for this analysis, so the Court follows suit.[28]

---

[27] "*Helwig* is no longer good law" under *Tellabs* to the extent it "held that 'the "strong inference" requirement means that plaintiffs are entitled only to the most plausible of competing inferences.'"  *Frank*, 646 F.3d at 571 (quoting *Helwig*, 251 F.3d at 553).

[28] The Sixth Circuit has articulated a specific analytical framework for pleading corporate scienter under the Reform Act.  *See Omnicare III*, 769 F.3d at 476 (adopting a "middle ground" corporate scienter approach from scholarly literature to prevent overbroad Sixth Circuit precedent from being construed "at odds with the PSLRA," thus allowing the scienter of real persons to impute to a corporation only under certain conditions).  Though it can scarcely ignore binding law, neither is the Court inclined to apply the *Omnicare III* framework to the Exchange Act claims against USX absent briefing.  But it need not broach this potentially complicated topic, for, as will be seen, Plaintiffs have not pleaded particular facts from which a strong inference of scienter can be drawn as to individuals or otherwise.  In other words, Plaintiffs do not plead facts sufficient to strongly infer a particular individual's state of mind or knowledge, let alone impute it to USX.

Case Case 1:19-cv-00098-TRM-CHS  Document 91  Filed 06/30/21  Page 66 of 85  PageID #: 1558
PageID #: 1614

### a. The *Helwig* Factors

The Sixth Circuit has explained that a scienter analysis requires the Court to "review 'all the allegations holistically,' *Tellabs*, 551 U.S. at 326[,] . . . considering a non-exhaustive list of nine factors":

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Doshi*, 823 F.3d at 1039–40 (quoting *Helwig*, 251 F.3d at 552). Plaintiffs cite a Sixth Circuit opinion explaining that it now "eschew[s] *Helwig*'s checklist approach in favor of *Tellabs*'s and *Matrixx*'s[29] entirely collective assessment." *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 469 (6th Cir. 2011) (citing *Frank*, 646 F.3d at 961); (*see also* (Doc. 85, at 40).) But other Sixth Circuit opinions which post-date *Ashland* have explicitly applied the *Helwig* factors. *See, e.g.*, *Doshi*, 823 F.3d at 1039–43 (applying *Helwig* factors to one corporate and two individual § 10(b) defendants as part of "collective" assessment); *Omnicare III*, 769 F.3d at 473 (applying *Helwig* factors). The Court will therefore consider the *Helwig* factors—whatever their congruence with the *Tellabs*/*Matrixx* framework—but only insofar as they guide, rather than constrain, what must be a holistic analysis. *Cf. Helwig*, 251 F.3d at 552 (explaining, even before

---

[29] Relevant here, *Matrixx* endorsed and then conducted a holistic, checklist-free review of the plaintiffs' allegations to assess scienter under *Tellabs*. *See* 563 U.S. at 49 (recounting and analyzing relevant allegations with expert concision).

Case Case 1:19-cv-09890-TRM-CHS Document 91-16 Filed 06/30/21 Page 67 of 85 PageID #: 1559
PageID #: 1615

*Tellabs*, that the factors are non-exhaustive, "fixed constellations of facts that courts have found probative of securities fraud").

Because the parties appear to agree that the first, fourth, fifth, seventh, and eighth factors are irrelevant here (*see* Doc. 85, at 52 (arguing that "Plaintiffs have alleged four *Helwig* factors" and dismissing as irrelevant the others), the Court will focus its analysis on the second, third, sixth, and ninth factors.

### 1. The Second *Helwig* Factor

The second factor, "divergence between internal reports and external statements on the same subject," does not support an inference of scienter. Although Plaintiffs allege generally that internal information reflected core operational troubles—which the Court will address below—neither the complaint's explicitly designated scienter pleadings (Section VIII.A, ¶¶ 143–53) nor any others allege the existence of particular internal reports with content divergent from external statements by the Exchange Act Defendants. Indeed, while Plaintiffs' brief states that the complaint alleges that "internal USX reporting was at odds with" public representations, (Doc. 85, at 41), the closest any of the cited paragraphs come to identifying particular internal reporting is ¶ 49, which states in part that USX internally "recognized . . . in April 2017 when it was contemplating an IPO [that] its operating ratio lagged behind even its least successful industry peers and needed significant improvement to justify an IPO." (Doc. 57, at 18.) But this does not diverge from public statements, because the Offering Documents not only divulge USX's poor operating ratios from 2014 through the first quarter of 2018, but also compare those ratios with peer companies to contextualize USX's historical struggle. (*See* Doc. 72-5, at 12.)

The other cited paragraphs relate to USX's problems themselves, not reports thereof.[30] The difference is more than superficial, and if not maintained, collapses scienter analysis into falsity analysis. Reports convey information, while internal corporate reports specifically convey information up, down, and across an entity's structure to people who may not otherwise encounter it. Hence, internal reports that contradict public statements can be probative of scienter precisely because they may reveal facts *known* to—not merely extant within the entity—those whose public statements allegedly misled investors. This is not to say that reports must be formal or even written, but if they do not involve a particularized dissemination of information, then this factor's force evaporates. *See Dougherty*, 905 F.3d at 981 (rejecting overly "formalistic definition" of "internal report" and noting that "we [have] viewed the contents of meetings at which senior corporate officers were present as 'internal reports.'").

*Omnicare III* confirms this understanding of the second *Helwig* factor. There, the defendant company provided elderly pharmaceutical care at facilities in nearly every state, which involved extensive billing of claims to governmental health-care programs. 769 F.3d at 461. The plaintiffs alleged that the defendants developed three internal billing audits; the first found "pervasive fraud" because every single audited "facilit[y] submitted false reimbursement claims," the second reviewed other facilities and found that they "also had submitted numerous

---

[30] There is one possible exception: Plaintiffs also discuss the statement of a "confidential witness" that "the longstanding driver turnover issue was so important to USX, that it was internally dubbed a wildly important goal." (Doc. 57, at 25.) Dubbed by whom, to whom, when, in what medium, and with what degree of circulation, the Court is left to wonder. This statement is too vague and conclusory to be credited as a well-pleaded allegation of an internal report. And even if construed as a report, it is not pleaded to be divergent because USX's public-facing statements acknowledge that stabilizing its driver pool was, indeed, an important goal. (*See, e.g.*, Doc. 72-5, at 11 (describing factors "critical to our success" as including the execution of improvements that would decrease driver turnover).)

68

Case Case-1:1900v080TRM-JRHS-CEHScumDenu91erFiled6:05/30/210d 07/10/28 of 8Page:69et0385 1561
PageID #: 1617

claims without the proper documentation" among other illegalities, and the third found that yet more facilities that "did not totally comply" with the law. *Id.* at 461–63. The plaintiffs further alleged that these audits were transmitted to internal audit and compliance committees, and upon information and belief to upper managers sued under § 10(b). *See id.* The defendant company's annual regulatory filings (Form 10–K), however, represented that it "believe[d]" that its "billing practices materially compl[ied] with applicable state and federal requirements" and that it was "in compliance in all material respects with federal, state, and local laws." *Id.* at 464. The Sixth Circuit explained that, accordingly, "a reasonable jury could find a divergence between internal reports (the audits) and external statements (the Form 10–K statements)." *Id.* at 484. But the plaintiffs were not entitled to the full strength of the second factor because there was "a disparity between the levels of generality at which the internal reports and external statements [were] framed." *Id.* The court noted that, "[i]mportantly, in cases where we have found scienter to be sufficiently pleaded, this disparity did not exist" and went on to conclude that the plaintiffs did not plead facts from which a strong inference of scienter could be drawn. *Id.* (citing *City of Monroe Emps. Retirement Sys. v. Bridgestone Corp.* ("*City of Monroe*"), 399 F.3d 651, 684 (6th Cir. 2005)).

The reasoning of *Omnicare III* illuminates why Plaintiffs gain no support from the second *Helwig* factor. Even where the pleadings identified three discrete reports and their contents, and framed them against incompatible external statements, the plaintiffs did not gain the full weight of the factor because of a "disparity" in "levels of generality." *Id.* at 484. Here, it is not even possible to analyze meaningfully whether internal reporting diverged from external statements, or whether any divergence is softened by differing levels of generalization, because the pleading is utterly conclusory. Indeed, Plaintiffs do not identify any particular report or

69

reporting event, let alone its contents, with which to frame the Exchange Act Defendants' external statements against their knowledge. *See also EveryWare*, 175 F. Supp. 3d at 860 (concluding that strong inference of scienter was not supported in part because the plaintiffs did not "identif[y] any 'internal reports, memoranda, or the like and allege[ ] both the contents of those documents and defendants' possession of them at the relevant time'" (quotation omitted)). The second *Helwig* factor therefore does not favor Plaintiffs.

### 2. The Third *Helwig* Factor

The third factor, "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information," minimally favors Plaintiffs. Plaintiffs allege that the Exchange Act Defendants disclosed adverse, non-public information about driver retention, the Walmart rebid, OTR cannibalization, and an under-insurance risk on November 1, 2018, approximately four and a half months after the IPO.[31] But the Sixth Circuit has concluded that where a defendant's allegedly fraudulent statement came "over four months before the [inconsistent] information," the statement and disclosure were "too distant in time to draw an adverse inference." *City of Monroe*, 399 F.3d at 688. Plaintiffs identify a September 18, 2018, statement by Eric Fuller (about six weeks before November 1), and other statements prior to September 18, 2018, but after the IPO, while citing *Dougherty* for the proposition that a six-week gap is probative of scienter. *But see Dougherty*, 905 F.3d at 981 (explaining that a six-week gap "weigh[ed] in Plaintiffs' favor, *albeit minimally*" (emphasis added)). Following *Dougherty*, and mindful that the vast majority of the relevant statements—even assuming they were

---

[31] USX actually discussed the OTR cannibalization in its August 2, 2018 press release and Form 8-K, (*see* Doc. 57, at 43), which was about seven weeks after the IPO and about thirteen weeks, or three months, before the alleged "truth" came out on November 1, 2018.

70

"inconsistent"—occurred more than six weeks prior to November 1, the Court concludes that this factor weighs in Plaintiffs' favor, albeit very minimally.

### 3. The Sixth *Helwig* Factor

The sixth factor, "disregard of the most current factual information before making statements," does not favor Plaintiffs. Courts routinely analyze this factor in tandem with the second. *See, e.g.*, *Dougherty*, 905 F.3d at 981 (analyzing allegations relevant to second factor and noting that "[r]elatedly, [these] allegations also fall under the sixth *Helwig* factor"); *Forman v. Meridian Bioscience, Inc.*, 367 F. Supp. 3d 674, 694 (S.D. Ohio 2019) ("The second and sixth [*Helwig*] factors are related and will be addressed together."). The reasoning set forth above in relation to the second factor, then, strongly suggests that the sixth factor does not favor Plaintiffs. Indeed, to the extent that Plaintiffs allege disregard of current factual information by the Exchange Act Defendants, their pleadings hinge fundamentally on the presumption that high-level executives generally know information about a company's core operations. (*See* Doc. 57, at 49 (alleging in "Scienter" section that misleading statements and omissions "related to the core operations of USX's business").) The core-operations presumption will be discussed below. Beyond that, and for the reasons set forth above, the sixth factor does not weigh in Plaintiffs' favor.

### 4. The Ninth *Helwig* Factor

The ninth factor, "self-interested motivation of defendants in the form of saving their salaries or jobs," favors Plaintiffs to a limited extent. Plaintiffs allege that Eric Fuller and Eric Peterson were motivated by $500,000 bonuses to complete the IPO (for which operational

71

improvements would be necessary to stimulate investor demand), that the Fuller and Quinn[32] families would benefit from the IPO because they were financially entangled with USX via stock, debt, and real estate holdings, and that USX needed to retire a significant over-leverage problem. Thus, the pleadings go, the Exchange Act Defendants were motivated to misrepresent USX's operational reforms in order to ensure that the IPO could be completed and reap the concomitant benefits. Defendants argue that these motivations are quite commonplace, and that commonplace motivations do not support an inference of scienter.

Defendants are right to the extent that "courts distinguish motives common to corporations and executives generally from motives to commit fraud" because "[a]ll corporate managers share a desire for their companies to appear successful." *PR Diamonds*, 364 F.3d at 690.[33] "In this Circuit 'an executive's desire to protect his position within a company or increase his compensation' does not 'comprise a motive for fraud,' *PR Diamonds,* 364 F.3d at 690, nor are allegations that [d]efendants would receive bonuses linked to company performance sufficient for an inference of scienter." *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 786 (M.D. Tenn. 2013) (citation omitted). It is not obvious how a bonus for completing an IPO differs from a bonus linked to company

---

[32] The pleadings do not appear to suggest that any of the Exchange Act Defendants are members of the Quinn family, though Securities Act Defendant Lisa Quinn Pate is. It is therefore difficult for the Court to conclude that Quinn-family motivations are probative as to the Exchange Act Defendants' scienter, except to the limited extent that the Quinn and Fuller families are alleged to have intertwined interests.

[33] This language is a touch difficult to square with the wording of the ninth factor, which hinges on "salaries or jobs," benefits that all or nearly all (perhaps some work for free) upper managers enjoy. In any case, the Court notes that self-interested motivation takes many forms and declines to read *Helwig* or *PR Diamonds* as drawing firm lines around the permissible universe of considerations. Matters of the mind do not transmute with ease into matters of the law.

72

Case Case 1:19-cv-09965-JRM-CHS Document 91 Filed 06/30/20 Page 73 of 85 PageID #: 1565
PageID #: 1621

performance, especially (as Plaintiffs allege) where a successful IPO is intertwined with a

company's ability to perform going forward.  *See, e.g.*, *GSC Partners CDO Fund v. Washington*,

368 F.3d 228, 237 (3d Cir. 2004) ("In every corporate transaction, the corporation and its

officers have a desire to complete the transaction, and officers will usually reap financial benefits

from a successful transaction.").  The Court also observes that Plaintiffs cite no cases involving

disclosed debt retirement or related-party transactions.  Indeed, in a section entitled "Use of

Proceeds", the Offering Documents explicitly state USX's intentions in these respects:

> We expect to use the net proceeds from this offering as follows:
> (a) approximately $269.0 million to repay (i) our existing term loan facility,
> including breakage fees, (ii) borrowings outstanding under our existing revolving
> credit facility and (iii) the 2007 Restated Term Note and (b) approximately
> $23.7 million for general corporate purposes, including, but not limited to, the
> purchase of the Tunnel Hill, Georgia, real estate we historically have leased from
> Q&F Realty, a related party, for $7.5 million.  Additional proceeds, if any, will be
> used to increase cash on our balance sheet.  Our existing $275.0 million term loan
> facility had $192.5 million outstanding at March 31, 2018.  The existing term loan
> facility has a maturity date of May 30, 2020 and bears interest at LIBOR plus an
> applicable margin of 10.0% to 11.5%.  Our existing revolving credit facility had
> $49.1 million in outstanding borrowings and $35.1 million in letters of credit at
> March 31, 2018.  The existing revolving credit facility bears interest dependent on
> the excess availability on the facility at the base rate plus an applicable margin of
> 0.50% to 1.00% or LIBOR plus an applicable margin of 1.50% to 2.00%.
>
> The 2007 Restated Term Note is unsecured, matures in November 2020 and bears
> interest at 13.0% per annum, the rate calculated as if the highest applicable
> margin under our existing term loan facility were in effect, and is held in part by
> certain related parties.  The Tunnel Hill, Georgia, real estate was appraised by an
> independent third-party appraiser at $8.5 million.  See "Certain Relationships and
> Related Party Transactions."

(Doc. 72-5, at 61; *see also id.* at 158 (section entitled "Certain Relationships and Related Party

Transactions" disclosing the exact related-party issues Plaintiffs allege).)  The Court

acknowledges that these disclosures may have been required by federal law, but even so they

diminish the probative value of these facts as to fraudulent intent.  Plaintiffs nowhere allege that

the Exchange Act Defendants failed to disclose USX's plans for its IPO proceeds with respect to debt or related-party transactions.  In sum, the ordinary raising of funds via IPO, ordinary bonuses related to completing an IPO, disclosed related-party transactions, and disclosed debt retirement are scarcely probative of fraudulent intent.  The ninth factor therefore negligibly favors Plaintiffs, if at all.

Taken altogether, Plaintiffs do not enjoy the full weight of even a single *Helwig* factor, though they gain minimal support from the third and ninth factors.  This militates strongly against a finding that Plaintiffs have sufficiently alleged scienter.  *See Doshi*, 823 F.3d at 1041–42 ("Two *Helwig* factors support inferring scienter … Seven factors favor rejecting a scienter inference … [Plaintiff's] allegations therefore fail to create a strong inference that [the corporate defendant] acted with scienter.").

### b.   The Core-Operations Theory

Beyond the *Helwig* factors, Plaintiffs argue that they have adequately alleged scienter because Defendants made "materially false and misleading statements and omissions[ ] related to the core operations of USX's business," specifically to the extent that driver retention and insurance are critical to USX's business.  (Doc. 57, at 49.)  In opposing the motion to dismiss, Plaintiffs rely on these allegations and argue that, under the so-called core-operations doctrine, "'[c]ourts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations as omissions pertain to central, day-to-day operational matters,' and especially where they are '[f]acts critical to a business's core management.'"  (Doc. 85, at 45 (quoting *Garden City Emps.' Retirement Sys. v. Pysch. Sols.*, No. 3:09-00882, 2011 WL 1335803, at *57 (M.D. Tenn. Mar. 31, 2011) (quotation and quotation marks omitted).)  Defendants argue that these allegations are not probative of scienter because "the core operations

74

doctrine is no longer tenable following … the Reform Act" given its "requirement that facts supporting the inference of scienter be 'state[d] with particularity.'" (Doc. 72-1, at 38 (quoting 15 U.S.C. § 78u-4(b)(2)); *see also id.* (arguing that the Court should prevent "Plaintiffs from circumventing the Reform Act's particularized pleading requirements by relying on allegations that could apply to any officer in corporate America")).) They acknowledge that "the Sixth Circuit has not addressed the viability of the doctrine" under the Reform Act but argue that "the courts that have done so suggest that the doctrine did not survive." (*Id.*) Defendants also maintain that "even in those courts that still recognize the core operations doctrine, this doctrine does not provide an independent basis for pleading scienter" and is only supplementary. (*Id.* at 39.)

Plaintiffs cite one Sixth Circuit case[34] (and a few district court opinions) to support the proposition that "courts in the Sixth Circuit regularly credit the core operations theory or similar

---

[34]  Surprisingly, Plaintiffs do not cite the Sixth Circuit's decision in *PR Diamonds* on this point, which explains:

> [F]raudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information. As even the authorities which Plaintiffs cite indicate, the Complaint must allege specific facts or circumstances suggestive of their knowledge. Without more, Plaintiffs fail to meet the PSLRA requirement to state with particularity facts giving rise to a strong inference of scienter. . . . While it is true that high-level executives can be presumed to be aware of matters central to their business's operation, *In re Complete Management, Incorporated Securities Litigation*, 153 F.Supp.2d 314, 325–36 (S.D.N.Y.2001), in this case it cannot be said that the alleged misrepresentations or omissions pertained to central, day-to-day operational matters.

364 F.3d at 688. It appears, then, that the Sixth Circuit has at least acknowledged that the core-operations doctrine is valid, at least to some extent. But the Court does not read "can be presumed" to mean "must be presumed." Instead, the core operations presumption is highly fact-dependent, narrow, and, especially post-*Tellabs*, is but one consideration among many.

inferences of scienter." (Doc. 85, at 46 (citing *Frank*, 646 F.3d at 961–62).) But *Frank* neither

discussed the core-operations doctrine nor presumed anything, and instead analyzed particular

facts showing that the defendants "recklessly disregarded the falsity of their extremely optimistic

statements":

> [The individual defendants] were the top two executives of an auto parts
> manufacturer, and they reported gangbuster earnings during a period of time when
> the entire auto industry was spiraling toward bankruptcy. They filed these
> reports, made positive public statements, and asserted the veracity of their
> financials to government authorities all while one of their key product lines was
> operating at fifty percent of earnings, multiple factories failed to meet their
> budgets, and the price of steel rose seventy-five to 120 percent. It is difficult to
> grasp the thought that [the individual defendants] really had no idea that [the
> company] was on the road to bankruptcy. From the first public statement that [the
> company's] earnings statements might be false, the company fell to its demise in a
> matter of nine months. [The individual defendants] only appear more culpable
> when considering the loan obtained by [the company], which almost surely would
> have been denied if the company's true financial status was publicly reported, and
> the bonuses[35] that [the individual defendants] stood to earn.

646 F.3d at 961–62. Indeed, the problems were so widespread, profound, and numerically

obvious that the defendants could not plausibly claim lack of knowledge when they issued

extraordinarily false earnings and asset numbers. *See id.* at 960 ("[The company] amended its

financial statements to account for a loss of $44 million and eventually had to reduce its tax-

deferred assets by $918 million. The company overstated its net income for the first quarter of

---

[35] The *Frank* defendants allegedly falsified earnings numbers (that is, hard information) both in federal securities filings and in publicly optimistic statements, in part because their bonuses were "directly tied to 'reported' net income and earnings." 646 F.3d at 960. In that sense, the allegations identified "concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged." *Dougherty*, 905 F.3d at 982 (internal quotation marks and quotation omitted). The *Frank* bonuses, then, were extraordinary in the sense that they could be attained only by directly falsifying hard information. These facts are a far cry from the present case.

76

2004 by twelve percent, the second quarter of 2004 by ten percent, the fourth quarter of 2004 by 3.6 percent, the first quarter of 2005 by 12.5 percent, and the second quarter of 2005 by *seventy percent*." (emphasis added)). It is quite apparent, then, that *Frank* does not stand for the proposition that the Court may presume scienter simply because USX's alleged problems—none of which are particularly "hard" falsifications but instead are intertwined with omission of operational details—relate to the "core" of USX's business.

Much of the recent core-operations case law appears to originate in district courts within the Second Circuit. *But see Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018) (explaining and applying Ninth Circuit's version of core-operations doctrine but concluding that the complaint inadequately alleged scienter). The Court of Appeals for the Second Circuit has not settled whether the doctrine survived the Reform Act. *Compare New Orleans Emps. Retirement Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) ("[A]llegations of a company's core operations … can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently."), *with Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) ("[W]e have not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives as a viable theory of scienter."). A majority of district courts appear to have concluded that the doctrine survived, albeit only as a supplementary consideration that may bolster other well-pleaded facts. *See Haw. Structural Ironworkers Pension Trust Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 852 (S.D.N.Y. 2019) ("Many courts in this District have 'expressed doubts as to the [core operations] doctrine's continuing import' after the passage of the PSLRA. . . . [But] this Court agrees . . . that this doctrine continues to be valid in its narrowed [i.e., supplementary] form" (quotation omitted)). Thus, "the importance of an issue to a corporation" may "support[ ] an inference that an executive would be aware" of that issue,

77

although this is not an independent basis for scienter. *See id.* at 853 (concluding that (1) movie theatre company's alleged underinvestment in renovations of theatres it acquired implicated "a significant source of income," which "supports an inference of scienter"; (2) theatre loyalty program was a "significant source of income" and therefore "a core operation" but alleged difficulty did "not . . . support a strong inference of scienter on its own"; and (3) plaintiffs allege "international operation would constitute 23% of its revenues" meaning "[s]easonal trends in these revenues would plausibly affect a significant source of income," supporting conclusion that "such a seasonal trend would affect a core operation, but again, not enough to support a strong inference of scienter").

The Court concludes that a core-operations presumption, even assuming the doctrine survives, provides Plaintiffs no support. The complaint alleges that USX's drivers are central to its business (*see* Doc. 57, at 49), while Plaintiffs' response brief sweeps wider and asserts that the "Court can infer the Exchange Act Defendants were aware of the driver retention issues requiring OTR to support dedicated accounts and its asymmetrical self-insurance program and increased insurance risks due to Defendants' involvement in the day-to-day management of the Company." (Doc. 85, at 45.) The Court need not analyze the insurance component.[36]

The Exchange Act Defendants do not appear to dispute that they were aware of a driver shortage and concomitant retention problem; indeed, overcoming the shortage and reducing turnover was one of their stated goals. But the Court is reticent to presume knowledge beyond this overarching structural problem. However important drivers may be to USX, the Exchange Act Defendants cannot be fairly presumed to know *everything* about USX's drivers. (This is an

---

[36] The Court concluded above that certain statements and omissions in the Offering Documents related to the OTR support problem may be actionable, but not statements related to insurance. *See supra* Section III(C).

78

inherent difficulty with the core-operations doctrine—no matter how important a particular issue, the presumption must dissipate at some level of detail.[37] Surely the Exchange Act Defendants can be presumed to know about an industry-wide driver shortage; surely they cannot be presumed to know each and every driver's safety tendencies, or likelihood of leaving for another job, or health issues.) What, then, of an intermediate detail, such as OTR's support of Dedicated accounts? The complaint discusses this reallocation with little particularity, but to the extent detail is provided, it alleges that "[i]n the summer of 2018, USX shifted 35 OTR drivers to assist dedicated with the Walmart account," and that "at times there were as many as 120 OTR drivers assisting with the new Walmart accounts." (Doc. 57, at 28.) In other words, Plaintiffs allege that thirty-five to 120 OTR drivers provided an unspecified amount of assistance on Dedicated routes—in a company that, "[a]s of March 31, 2018, employed approximately 9,288 employees, of whom approximately 6,900 were drivers" and engaged "approximately 1,239 independent contractors" to drive some routes. (Doc. 72-5, at 107.) Even construed in the light most favorable to Plaintiffs, the Court cannot presume scienter where 120 of USX's apparently 6,900 drivers—or 1.7%—were assisting on the Walmart routes, even if Walmart accounted for around 10% of USX's business. *Cf. Tyler v. Liz Claiborne*, *Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) ("[I]t appears that Macy's business was not sufficiently 'core' to LIZ so that [the core-operations] doctrine would apply. Sales to Macy's represented sixteen percent of LIZ's business

---

[37] *Cf. In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 361 (S.D.N.Y. 2011) ("If knowledge of the alleged subprime characteristics of the [relevant lending] portfolio can be imputed to the Individual Defendants, so too could knowledge of current [loan-to-value] ratios, FICO scores, employee compensation packages, and any number of related operational details. Because such a result would eviscerate the cogent and compelling inference of scienter required by *Tellabs,* the Court declines to find an inference of recklessness based on the subprime lending allegations.").

79

in 2006. But courts have required that the operation in question constitute nearly all of a company's business before finding scienter based on the 'core operations doctrine.'" (citations omitted)). Accordingly, the core-operations doctrine does not support a strong inference of scienter.

### c. The "Confidential Witnesses"

Plaintiffs allege the existence of five "confidential witnesses" ("CWs") and attribute considerable amounts of information—much of which was integral to the falsity and *Helwig* analyses above—to those individuals. The parties dispute whether and to what extent the CWs' allegations should be credited; the Court concludes that sufficient information has been provided to assume the veracity of their factual, particularized statements. *Cf. Ley*, 543 F.3d at 811 ("While we agree that anonymous sources are not altogether irrelevant to the scienter analysis, Plaintiffs' allegations here are too vague and conclusory to be accorded much weight." (citing *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) (finding allegations of confidential witnesses must be discounted and "[u]sually that discount will be steep"))). But the CWs provide essentially no direct information as to what the Exchange Act Defendants might have known and when, and are not alleged to have had any contact with them. Plaintiffs resist this conclusion by pointing to ¶ 71 of the complaint for the proposition that "CWs 1–5 adequately describe the 'who, what[,] when, where, and how' of the alleged fraud." (Doc. 85, at 54 n.26.) That paragraph states, in pertinent part:

> [T]he longstanding driver turnover issue was so important to USX, that it was internally dubbed a wildly important goal. CW1 observed that USX failed to meet its driver turnover goals the majority of the time and regularly discussed the issue in weekly emails sent to office employees starting in approximately April 2017 and during daily operations calls with driver managers and customer service employees.

Case 1:19-cv-01998-TRM-CHS Document 91 Filed 06/30/20 Page 81 of 85 PageID #: 1629

(Doc. 57, at 25.)  These allegations are somewhat particularized but exceedingly limited; they do not even mention the Exchange Act Defendants or what they said, when they said it, and other circumstances.  Accordingly, except to the extent that their factual statements underpinned the *Helwig* analysis above, the CWs provide no additional basis for inferring scienter.

#### d.  Executive Departures

Plaintiffs allege that "[s]everal unusual executive departures" around the time when financial results were disclosed for the third quarter of 2018 support an inference of scienter. (Doc. 57, at 52.)  On October 26, 2018, "USX announced that John W. White, Chief Sales and Marketing Officer, had 'ceased to serve as an employee,' just days before on October 22, 2018." (*Id.*)  On November 2, 2018, "just a day after the announcement of USX's poor 3Q18 results, the Company announced that Lisa Quinn Pate, Chief Administrative Officer and daughter of company co-founder Patrick Quinn, would 'retire' as an employee of the Company"; Plaintiffs acknowledge that she continued serving on the Board of Directors until August 2019 but did not discuss that she actually did not retire as an employee until mid-2019.  (*Id.*; *see also* Doc. 72-12, at 2 (November 2, 2018 press release stating "Lisa Quinn Pate . . . will retire as an employee of the Company in mid-2019.  However, Pate intends to continue her active involvement with the Company as a member of the Board of Directors.").)

The Court is not persuaded that the departure of John W. White, about whom Plaintiffs plead no other facts (*see also* Doc. 72-11, at 2 (announcing separation, no cause given)), and Lisa Quinn Pate, who did not actually separate from USX in November 2018, lends any support to an inference of scienter.  Neither is alleged to have committed any particular malfeasance, they are not defendants as to any § 10(b) claims, Quinn Pate stayed on long after the relevant date, and— aside from the identity of Quinn Pate's father—Plaintiffs scarcely plead any facts as to these

Case Case 1:19-cv-09099-TRM-CHS-CHS Document 91 Filed 06/30/21 Filed 07/10/21 of 85 Page 82 of 85 1574
PageID #: 1630

defendants, let alone their relation to the alleged fraud itself. *See, e.g.*, *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1062–63 (9th Cir. 2014) ("Plaintiffs fail to provide any facts to connect these departures with the problems at issue in this lawsuit. More detrimental to their allegations, however, is that two of the three individuals remained at [the company] in some type of advisory role. Therefore, the most reasonable inference is that these departures were benign."). Indeed, Plaintiffs' citations either do not support their position or else involve factual allegations far beyond what is alleged here. *See Frank*, 646 F.3d at 960–62 (Exchange Act defendant retired on same day company filed for bankruptcy, shortly after revealing egregiously falsified earnings and asset valuations); *Willis v. Big Lots, Inc.*, Case No. 2:12-cv-604, 2016 WL 8199124, at *34 (S.D. Ohio Jan. 21, 2016) (finding one executive departure "noteworthy" because "many allegations of falsity rest on [that particular executive's] mismanagement" and mentioning another because it came "in the wake of [a] DOJ investigation"); *In re Am. Serv. Grp.*, Case No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237, at *159–*60 (M.D. Tenn. Mar. 30, 2009) (finding employee firings significant where internal audit committee investigation allegedly linked them to misreporting of company's financial information). Accordingly, the separation of White and Quinn Pate do not support an inference of scienter.

### e. Holistic Analysis

An overarching analysis of the allegations confirms that Plaintiffs have not pleaded facts that give rise to a strong inference of scienter.[38] While a whole sometimes exceeds the sum of its

---

[38] The Court remains mindful of *Frank*'s warning that "reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees" and so undertakes not to lose the forest. 646 F.3d at 961. The Court observes that in some cases, however, individualized analysis may be necessary to ensure that a barren range of conclusory pleadings is not mistaken for a forest.

82

parts, such is not the case here.  Plaintiffs allege that USX, Eric Fuller, and Eric Peterson predicated an IPO on false statements during a favorable market cycle in order to increase USX's valuation, enrich themselves and related parties, and retire a significant sum of debt.  But to the extent (and it is a very limited extent) that the Exchange Act Defendants' statements are actually pleaded to be false, Plaintiffs allege scarcely any particular facts from which to infer that these Defendants intended to defraud the public or actually knew that their statements were materially false and misleading when made.  And, while Plaintiffs explicitly identify one red flag that they argue shows recklessness, the Walmart rebid (*see* Doc. 85, at 46), this is not enough to overcome the absence of particularized scienter pleadings.  *See Doshi*, 823 F.3d at 1039 ("Before drawing an inference of recklessness, courts typically require 'multiple, obvious red flags,' *PR Diamonds, Inc.*, 364 F.3d at 686–87, demonstrating an 'egregious refusal to see the obvious, or to investigate the doubtful,' *id.* at 695.").  In sum, the allegations in their totality do not give rise a strong inference of scienter.  *Compare Omnicare III*, 769 F.3d at 481, 483–84  (holding as to individual scienter that "the Complaint does not sufficiently tie [president, CEO, and director] Gemunder (or any of the [other] Individual Defendants) to" audits which revealed serious and widespread illegal billing practices, "thus, [the plaintiff] has failed to plead sufficient facts showing that Gemunder or the other Individual Defendants had actual knowledge" of false statements, and "[b]ecause the statements at issue concerned soft information, this lack of knowledge is fatal";  as to corporate scienter, "even though [the Vice President of Internal Audit]'s knowledge of the audit results can be imputed to the corporation, [the plaintiff] fails to plead sufficient facts that would give rise to a strong inference that Omnicare acted to defraud the public" because the "totality" of the facts, and especially the *Helwig* factors, cut against an inference of scienter), *with Frank*, 961 F.3d at 961–62 (holding that the plaintiffs pleaded facts

Case 1:19-cv-00080-TRM-CHS   Document 91   Filed 06/30/21   Page 84 of 85   PageID #: 1576
Case 1:19-cv-00080-TRM-CHS   Document 91   Filed 06/30/21   Page 84 of 85
PageID #: 1632

giving rise to strong inference of recklessness where the individual defendants reported earnings and asset valuations so extremely and thoroughly false that a scienter inference was "at least as plausible as [a] faulty accounting inference," and plaintiffs identified multiple, specific kinds of internal reports, their contrary contents, and their dissemination to the relevant decisionmakers).

### F.  Exchange Act Section 20 Claims

Plaintiffs bring "control person" claims under § 20(a), predicated on the substantive § 10(b) violations, against Defendants USX, Eric Fuller, Max Fuller, and Eric Peterson.  (Doc. 57, at 67–68); *see also* 15 U.S.C. § 78t(a).  Defendants seek dismissal of these claims on the basis that the underlying § 10(b) claims should be dismissed.  (*See* Doc. 72-1, at 42 ("Because Plaintiffs have failed to state viable … Section 10(b) claims, their claims for 'control person' liability under … Section 20(a) of the Exchange Act likewise fail.").

The Court has concluded that the Exchange Act § 10(b) claims should be dismissed for failure to plead facts supporting a strong inference of scienter under the Reform Act. Accordingly, the § 20(a) claims must also be dismissed.

### IV.    CONCLUSION

In sum, and in accordance with the analysis above, the motions to dismiss (Docs. 72, 73) are hereby **GRANTED IN PART** and **DENIED IN PART**.

Plaintiffs' response brief requests, in its final substantive paragraph, leave to file an amended complaint.  A response brief is not the appropriate vehicle for such relief.

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

84