UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| IN RE CBL & ASSOCIATES PROPERTIES, INC. SECURITIES LITIGATION | ) ) | Consolidated Case No. 1:19-CV-00181-JRG-CHS |

# **MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motion to Dismiss the Consolidated Complaint [Doc. 93], Defendants' Memorandum of Law in Support [Doc. 93-1], Plaintiffs' Response [Doc. 101], Defendants' Reply [Doc. 104], Defendants' Supplemental Memorandum [Doc. 141], and Plaintiffs' Response to Defendants' Supplemental Memorandum [Doc. 142]. For the reasons herein, the Court will deny Defendants' motion.

## I. Background

A publicly traded company on the New York Stock Exchange, Defendant CBL & Associates Properties, Inc., ("CBL"), which is incorporated in Delaware and headquartered in Tennessee, owns, develops, and leases regional shopping malls and other commercial properties. [Compl., Doc. 80, ¶¶ 1, 14, 23]. According to Plaintiffs Jay Scolnick, Mark Shaner, Charles Hoffman, Lydia Hoffman, and HoffInvestCo—all of whom purchased CBL's securities between July 29, 2014, and March 26, 2019, which they refer to as the "class period," [*id.* ¶ 1]—CBL resold electricity to its tenants, many of whom were retailers at shopping malls, and required them to pay electricity charges to CBL. [*Id.* ¶¶ 1, 25]. Plaintiffs allege that CBL and its tenants entered into contracts stating that "[t]enant shall not be charged more than the rates it would be charged for the same [electric] services if furnished directly to the Leased Premises by the Local Utility Company." [*Id.* ¶ 26].

Despite this contractual language, CBL engaged in a fraudulent scheme, Plaintiffs allege, to inflate its revenues by unlawfully overcharging its tenants for electricity. [*Id.* ¶ 27]. CBL

allegedly charged its tenants more per kilowatt hour than the local utility company's rate and more kilowatt hours than the tenants actually used. [*Id.* ¶ 28]. Plaintiffs assert that the alleged scheme began in 2005 when CBL's executives—specifically, Defendant Augustus M. Stephas, CBL's former executive vice president and chief executive officer, and Defendant Don Sewell, CBL's senior vice president—greenlighted the scheme after "a presentation outlining the scheme was provided to" them by Valquest Systems, Inc., at a leadership conference.[1] [*Id.* ¶¶ 3, 20–21, 28]. Plaintiffs describe Valquest as "a consulting services firm that purports to specialize in utility redistribution and allocation in multi-tenant multi-use commercial facilities." [*Id.* ¶¶ 20–21, 28].

According to Plaintiffs, CBL, with Valquest's help, "carefully calibrate[d] and track[ed] on a yearly basis . . . the amount of any overcharge to ensure that there was a profit but not so much profit as to arouse suspicion." [*Id.* ¶ 29]. Specifically, Plaintiffs maintain that Valquest prepared monthly "electric income allocation summaries" in which it "tracked the overbilling" and "indicat[ed] in the tracking where an inflated bill was 'good' (acceptably inflated) and where an inflated bill was 'too good' (the level of information could attract scrutiny)." [*Id.* ¶ 30]. Plaintiffs also allege that "CBL's management, including Defendant Sewell," reviewed and responded to Valquest's summaries. [*Id.*]. When CBL's tenants questioned their electric bills, Valquest allegedly provided them with "artificially inflated energy surveys" to substantiate the bills. [*Id.* ¶ 31].

CBL's scheme, Plaintiffs assert, continued through 2016, at which time one of CBL's tenants, Wave Lengths Hair Salon of Florida, Inc., ("Wave Lengths"), allegedly discovered the fraud when a new company unaffiliated with CBL took over one of CBL's properties after CBL

[1] Although Plaintiffs' complaint includes numerous allegations against Valquest, Valquest is not a party to this case.

defaulted on mortgage payments. [*Id.* ¶¶ 4, 35–36]. According to Plaintiffs, the new company performed "an electricity usage evaluation of the entire mall," discovered that CBL had been "substantially overcharging" its tenants for electricity, and reduced Wave Lengths' electric bill from roughly $600 per month to $269 per month. [*Id.* ¶ 36]. Soon afterwards, in March 2016, Wave Lengths filed a class action lawsuit, known as the "*Wave* litigation," against CBL in the United States District Court for the Middle District of Florida. [*Id.* ¶ 4]. Wave Lengths brought claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, and state law, and it sought to recover treble damages for CBL's alleged overcharges, which it estimated as ranging between $60 and $100 million. [*Id.* ¶¶ 4, 41].

In 2017, the United States District Court for the Middle District of Florida denied "the majority of" CBL's motion to dismiss, [*id.* ¶ 5], and in early January 2019, it granted class certification, denied CBL's motion for summary judgment, and scheduled the case for trial in April 2019, [*id.* ¶ 50]. CBL requested permission from the United States Court of Appeals for the Eleventh Circuit to appeal the district court's certification order and, according to Plaintiffs, CBL filed an appellate brief in which it wrote that the certification order was a "death knell" for the company. [*Id.* ¶¶ 6, 51, 181, 183]. CBL was unsuccessful in its bid to appeal the certification order. [*Id.* ¶ 183].

On March 1, 2019, CBL filed its 2018 Form 10-K, an annual filing with the Securities Exchange Commission, and in the Form 10-K, it made the following statements about the *Wave* litigation:

> We believe [the *Wave* litigation] is without merit and are defending ourselves vigorously. . . . We have not recorded an accrual relating to this matter at this time as a loss has not been determined to be probable. Further, we do not have sufficient information to reasonably estimate the amount or range of reasonably possible loss at this time. However, litigation is uncertain and an adverse judgment in this case

> could have a material adverse effect on our financial condition and results of operations. This matter is not covered by insurance.

[*Id.* ¶¶ 177, 180]. Following CBL's release of its 2018 Form 10-K, its common stock's price fell by approximately eight percent. [*Id.* ¶ 182]. On March 15, 2019, CBL agreed to a $90 million settlement. [*Id.* ¶¶ 52, 183]. According to Plaintiffs, CBL disclosed the $90 million settlement on March 26, 2019, and announced it was suspending payment of its dividend. [*Id.* ¶ 183]. On the next day, its stock lost approximately twenty-five percent of its value. [*Id.* ¶ 8].

Now, Plaintiffs Scolnick, Shaner, Charles and Lydia Hoffman, and HoffInvestCo bring suit in this Court, claiming that CBL and certain individual officers of CBL—Defendants Charles B. Lebovitz, CBL's Chairman of the Executive Committee of the Board of Directors; Stephen D. Lebovitz, CBL's Chief Executive Officer and President; Farzana Khaleel, CBL's Executive Vice President, Chief Financial Officer, and Treasurer; A. Larry Chapman, CBL's Director; Mr. Stephas; and Mr. Sewell—violated § 10(b) of the Securities Exchange Act of 1934, as amended by 15 U.S.C. § 78j(b), as well as Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5. [*Id.* ¶¶ 9, 16–21, 197–206]. Specifically, in alleging a violation of § 10(b) and Rule 10b-5, Plaintiffs assert that CBL had an affirmative duty, under generally accepted accounting principles ("GAAP")[2] and Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303,[3] to disclose to investors the alleged fraudulent scheme and the *Wave* litigation, but failed to do so in the standard financial disclosures that it filed with the SEC—namely, in its Form 10-Ks and Form

[2] Plaintiffs allege that "[f]inancial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading." [Compl. ¶ 65].

[3] Item 303 requires companies to describe in their SEC filings "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations" and "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(i)–(ii).

10-Qs—during the class period. [*Id.* ¶ 63].[4] According to Plaintiffs, CBL concealed the alleged fraudulent scheme and the *Wave* litigation until March 1, 2019, when it filed its 2018 Form 10-K and disclosed the *Wave* litigation. In short, Plaintiffs claim that CBL intentionally misled them by failing to disclose the *Wave* litigation sooner than it did. [*Id.* ¶¶ 109, 112, 120, 126, 134, 181].

In addition to maintaining that CBL made material omissions in violation of § 10(b) and Rule 10b–5, Plaintiffs allege that CBL made material misrepresentations in violation of § 10(b) and Rule 10b–5. First, they allege that CBL made "materially false or misleading" statements about the *Wave* litigation in its 2018 Form 10-K. [*Id.* ¶ 181]. Second, they claim that, during the class period, CBL made material misrepresentations in its Form 10-Ks and Form 10-Qs because it overstated its revenue by including amounts from the alleged fraudulent scheme. [*Id.* ¶¶ 66–67]. Third, they allege that CBL, during the class period, made material misrepresentations in its Form 10-Ks and Form 10-Qs by certifying that it prepared them in compliance with GAAP, which requires revenue to be "earned" and "realizable." [*Id.* ¶¶ 67–182]. Specifically, they assert that CBL's reported revenues were neither earned nor realizable; rather, they were "the result of fraud." [*Id.* ¶ 69]. So CBL, they maintain, "should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount [it] overcharged [its] tenants," instead of "recording revenue generated from the Overcharge Scheme." [*Id.*]. Lastly, Plaintiffs claim that Defendants Charles Lebovitz and Stephen Lebovitz are each liable as "controlling persons" under § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). [Compl. ¶¶ 207–12].

[4] The Securities Exchange Act of 1934 requires issuers of registered securities to file with the SEC "annual reports" and "quarterly reports," "as the [SEC] may prescribe." 15 U.S.C. § 78m(a)(2). An issuer must file annual reports on Form 10-K and quarterly reports on Form 10-Q. 17 C.F.R. §§ 240.13a–13(a), 249.310(a). Form 10-Ks and Form 10-Qs must be certified. *Id.* § 240.13a–14.

Under Federal Rule of Civil Procedure 12(b)(6), CBL and the individual Defendants moved for the dismissal of Plaintiffs' claims, but before the Court could rule on their motion, CBL filed for bankruptcy [Notice of Bankruptcy, Doc. 119], which prompted the Court to stay this case for about a year. CBL recently informed the Court that the bankruptcy court approved a bankruptcy plan that precludes Plaintiffs from pursuing their claims against CBL. [Defs.' Suppl. Mem. at 1–2]. Plaintiffs agree that they now "cannot prosecute violations of federal securities laws against CBL." [Pls.' Resp. Suppl. Mem. at 2]. Plaintiffs' claims against CBL are therefore **DISMISSED with prejudice**. With the dismissal of these claims, the only remaining claims are those against the individual Defendants.

Plaintiffs, however, maintain that the Court must determine whether they have alleged plausible claims against CBL because a violation of § 10(b) and Rule 10b-5 is a prerequisite to liability against the individual Defendants. The Court agrees.[5] *See Merzin v. Provident Fin. Grp., Inc.*, 311 F. Supp. 2d 674, 679 (S.D. Ohio 2004) ("A plaintiff can hold individual defendants liable under a 'controlling persons' theory of liability only if the defendants were 'controlling persons' of an entity that has violated the Securities Act. If the Court concludes that plaintiffs have not stated a claim that the defendant company violated the Securities Act, the Court need not reach the plaintiffs' claim to 'controlling person' recovery." (citing *In re Comshare, Inc. Secs. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999))). Having carefully considered the parties' arguments, the Court is now prepared to rule on the motion to dismiss.

---

[5] The individual Defendants also appear to agree with Plaintiffs because they recognize that Plaintiffs' claim under§ 20(a) is a derivative of their claims under § 10-b. [Defs.' Mem. at 29–30].

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the plaintiff's complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that create a reasonable inference that the defendant is liable for the alleged conduct in the complaint. *Id.*

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the allegations in the complaint as true and construes them in a light most favorable to the plaintiff. *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," however. *Iqbal*, 556 U.S. at 678. A plaintiff's allegations must consist of more than "labels," "conclusions," and "formulaic recitation[s] of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citation omitted); *see Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citation omitted)).

## III. Analysis

Section 10(b) of the Securities Exchange Act of 1934 provides purchasers of securities with a private right of action akin to common-law tort actions for deceit and misrepresentation. *Dura Pharms., Inc., v. Broudo*, 544 U.S. 336, 341 (2005) (citation omitted).[6] It proscribes "(1)

[6] "Though the text of the Securities Exchange Act does not provide for a private cause of action for § 10(b) violations, the Court has found a right of action implied in the words of the statute and its implementing regulation," which is Rule 10b-5. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) (citation omitted).

the 'use or employ[ment] . . . of any . . . deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities and Exchange Commission 'rules and regulations.'" *Id.* (quoting 15 U.S.C. § 78j(b)). Section 10(b) "is implemented through Rule 10b-5," *Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383 (6th Cir. 2016), which states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.[7] Section 20(a) of the Securities Exchange Act of 1934 extends liability to "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

Because securities-fraud claims under § 10b and § 20(a) are cloaked with the specter of fraud, Federal Rule of Civil Procedure 9(b) applies to them. *See Morse v. McWhorter*, 290 F.3d 795, 798 (6th Cir. 2002) (recognizing that § 10b and Rule 10b-5 "prohibit[] fraudulent, material misstatements or omissions in connection with the sale or purchase of a security"); *see also Bondali v. YumA Brands, Inc.*, 620 F. App'x 483, 488 (6th Cir. 2015) ("Because Section

[7] "Plaintiffs assert . . . Rule 10b-5(a), (b) and (c) claims against all Defendants." [Compl. ¶ 198].

10(b) and 20(a) claims sound in fraud, this court must also impose the pleading requirements of Federal Rule of Civil Procedure 9(b) and determine whether the complaint alleges fraud with particularity."); *Frank v. Dana Corp.*, 547 F.3d 564, 569–70 (6th Cir. 2008) ("Securities fraud claims arising under Section 10(b), as with any fraud claim, must satisfy the particularity pleading requirements of Rule 9(b)." (citation omitted)).

Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." To satisfy Rule 9(b), a pleading, at a minimum, must contain allegations of "the time, place and content of the misrepresentations; the defendant's fraudulent intent; the fraudulent scheme; and the injury resulting from the fraud." *Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006) (citations omitted); *see Frank*, 547 F.3d at 570 ("[A]t a minimum, [the] [p]laintiffs must allege the time, place and contents of the misrepresentations upon which they relied." (citation omitted)); *see also Bondali*, 620 F. App'x at 488–89 ("Fraud is alleged with particularity by identifying the statements or omissions alleged to be false or misleading and detailing the 'who, what, when, where, and how' of the alleged fraud." (quoiting *Sanderson v. HCA–The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006))).

Although Rule 9(b) allows a party to plead intent and knowledge in general terms, conclusory assertions as to these states of mind will not suffice "without reference to [a] factual context." *Iqbal*, 556 U.S. at 686. In other words, the pleading requirements under Rule 8(a)(2) are "still operative" and apply to allegations of intent and knowledge. *Id.* (citation omitted); *see also Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 680 (6th Cir. 1988) ("Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two

rules must be read in harmony." (citation omitted)). A party therefore may not simply plead "the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 686.

In addition to hurdling Rule 9(b)'s heightened pleading standard, allegations of false or misleading statements or omissions in a securities-fraud complaint must satisfy the "more '[e]xacting pleading requirements'" of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. 104–67, 109 Stat. 737. *Frank*, 547 F.3d at 570 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). Under the PSLRA, a plaintiff must (1) "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).[8] In short, "[t]he PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 313 (quotation omitted).

In arguing that Plaintiffs' claims require dismissal, CBL homes in on the heightened pleading standards under Rule 9(b) and the PSLRA, pointing out that "[i]n light of these demanding pleading requirements, it is unsurprising that the Sixth Circuit routinely affirms dismissals." [Defs.' Mem. at 8 n.7]. But the Sixth Circuit has also taken the opposite approach, having, on multiple occasions, reversed district courts that have deemed securities-fraud claims unable to withstand scrutiny under Rule 9(b) and the PSLRA. *See, e.g.*, *City of Taylor Gen. Employees Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 807, 816 (6th Cir. 2022); *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 982 (6th Cir. 2018); *Ohio Pub. Employees Ret. Sys.*,

[8] The PSLRA's heightened pleading requirements serve as a "protection[] to discourage frivolous litigation." H.R. Conf. Rep. No. 104–369, at 32 (1995).

830 F.3d at 388; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011). So although Rule 9(b) and the PSLRA act as ramparts against frivolous securities-fraud suits, their strongholds are not impregnable—nor are they meant to be. *See City of Taylor*, 830 F.3d at 388 ("Although the pleading requirements for securities-fraud cases are daunting, they are not insurmountable."). In fact, the Sixth Circuit has acknowledged that, "[i]n general, the federal judiciary has a limited understanding of investor behavior and the actual economic consequences of certain statements" and "must tread lightly at the motion-to-dismiss stage, engaging carefully with the facts of a given case and considering them in their full context." *In re Omnicare, Inc. Secs. Litig.*, 769 F.3d 455, 472 (6th Cir. 2014) (citation omitted). This Court will do just that: tread carefully as it considers whether Plaintiffs' claims satisfy Rule 9(b) and the PSLRA.

### A. Section 10(b) and Rule 10b-5 (Count One)

Again, Plaintiffs' claim in Count One consists of allegations that CBL violated § 10(b) and Rule 10b-5 by making material omissions and misrepresentations in its Form 10-Ks and Form 10-Qs during the class period. To state a claim that CBL made material omissions and misrepresentations in violation of § 10(b) and Rule 10b–5, Plaintiffs must allege facts showing (1) CBL made a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation. *Matrixx Initiatives*, 563 U.S. at 37–38. CBL challenges the sufficiency of Plaintiffs' allegations under the first, second, and sixth elements.

#### 1. Material Misrepresentation or Omission

"A misrepresentation is an affirmative statement that is misleading or false." *In re Omnicare*, 769 F.3d at 470. In pleading a material misrepresentation, Plaintiffs must allege

facts showing that CBL "made a statement that was '*misleading* as to a *material* fact,'" *Matrixx Initiatives*, 563 U.S. at 38 (emphasis in original) (quotation and footnote omitted), though "[i]n lieu of targeting" a "misleading or false statement[], [Plaintiffs] may focus on [an] omission—[CBL's] failure to disclose information when it had a duty to do so." *In re Omnicare*, 769 F.3d at 471. "Regardless of whether a plaintiff chooses to proceed under a misrepresentation theory or one based on an omission, he will have to allege facts that satisfy § 10(b)'s materiality component." *Id.*

"[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988) (footnote omitted). In other words, "would the information, had it been presented accurately, have 'significantly altered the "total mix" of information made available?'" *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005) (quoting *id.* at 231–32). The significance of information is oftentimes a function of whether it is "hard information" or "soft information." *Id.* "Hard information" is "typically historical information or other factual information that is objectively verifiable," whereas "soft information" is "predictions and matters of opinion." *In re Sofamor Danek Grp.*, 123 F.3d 394, 401–02 (6th Cir. 1997) (quotation and citation omitted)); *see In re Ford Motor Co. Secs. Litig.*, 381 F.3d 563, 569 (6th Cir. 2004) (defining "soft information" as "information that is uncertain and not objectively verifiable such as 'predictions, matters of opinion, and asset appraisals'" (quotation omitted)). An alleged misrepresentation concerning soft information is not actionable unless a plaintiff pleads facts showing that the statement at issue was "made with knowledge of its falsity." *In re Omnicare*, 769 F.3d at 470 (quotation omitted).

i. The *Wave* Litigation

CBL characterizes its statements about the *Wave* litigation in the 2018 10-K Form as soft information, [Defs.' Mem. at 10–11]—a characterization that Plaintiffs do not overtly dispute—and argues that Plaintiffs, in alleging that its statements about the *Wave* litigation are materially misleading, "rely solely on conjecture based on subsequent events (namely adverse litigation rulings in January 2019)," [*id.* at 1]. In response, Plaintiffs maintain that their allegations are sufficient to support a reasonable inference that CBL "knew the [*Wave* litigation] had merit" when it issued its 2018 Form 10-K, yet in the 2018 Form 10-K, it stated that it was meritless. [Pls.' Resp. at 9 n.5].

Section 10(b)—in tandem with its implementing regulation, Rule 10b-5—expressly prohibits "any untrue statement of a material fact," 17 C.F.R. § 240.10b–5(b), and although "§ 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information," they do require disclosure "when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading,'" *Matrixx Initiatives*, 563 U.S. at 44–45 (quoting *id.*); *see In re Ford Motor Co.*, 381 F.3d at 569 ("[E]ven with 'soft information,' a defendant may choose silence or speech based on the then-known factual basis, but it cannot choose half-truths." (citation omitted)); *see also Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir. 2009) ("When a company chooses to speak, it must 'provide complete and non-misleading information.'" (quotation omitted)); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) ("[U]nder Rule 10b–5 . . . the lack of an independent duty does not excuse a material lie." (quoting *Ackerman v. Schwartz*, 947 F.2d 841, 848 (7th Cir.1991))), *rev'd on other grounds by Tellabs*, 551 U.S. at 314.

Despite CBL's assertion otherwise, the distinction between hard information and soft information is of little consequence here because Plaintiffs allege facts demonstrating that CBL chose to speak about the *Wave* litigation but did not do so truthfully. *See Helwig*, 251 F.3d at 561 (stating that "[t]he characterization of opinions and projections as 'soft' is beside the point in this case" because "the question here is . . . liability for not having spoken enough"). Plaintiffs plead that CBL, in its 2018 Form 10-K, stated that the *Wave* litigation was "without merit," [Compl. ¶ 180], but when CBL made this statement, the United States District Court for the Middle District of Florida had already ruled that the class plaintiffs' claims were sufficient to withstand summary judgment, [*id.* ¶ 50]. A claim that advances past summary judgment is not meritless; rather, it is a claim for which the evidence is adequate to allow a reasonable jury to return a verdict in the plaintiff's favor. *Anderson*, 477 U.S. at 257.

Based on Plaintiffs' allegation that a federal district judge found the evidence sufficient to enable a reasonable jury to deliver a verdict for the class plaintiffs, CBL's statement that the *Wave* litigation was without merit is at best a half-truth and at worst intentionally misleading. In addition, CBL's alleged characterization of the *Wave* litigation as a possible death knell—a characterization that it made in relative temporal proximity to the issuance of its 2018 Form 10-K, *see* [Compl. ¶¶ 50, 51, 180]; *see generally In re Omnicare*, 769 F.3d at 472 (underscoring "the importance of context to materiality determinations" (citation omitted))—further supports Plaintiffs' claim that CBL made a material misrepresentation in its 2018 Form 10-K when it downplayed the *Wave* litigation as meritless, *see In re Omnicare*, 769 F.3d at 478 (declaring that information "in conflict with [the defendant's] statements in the Form 10–K submissions" would "change an investor's mind about whether to buy or sell stock in [the defendant]"). At the very least, Plaintiffs' allegations support a reasonable inference that the information in the

2018 Form 10-K, "had it been presented accurately" or completely, would have "significantly altered the 'total mix' of information made available" to investors. *City of Monroe*, 399 F.3d at 669 (internal quotation marks omitted) (quoting *Basic*, 485 U.S. at 231–32). Their allegations, as they pertain to the *Wave* litigation, are therefore sufficient to support the materiality element of their claim under § 10(b) and Rule 10b–5.[9]

CBL, however, also challenges Plaintiffs' allegation that it had an affirmative duty under GAAP and Item 303 to disclose the *Wave* litigation to investors in its Form 10-Ks and Form 10-Qs. "Before liability for non-disclosure can attach," or in other words, before the non-disclosure of information is actionable under § 10(b) and Rule 10b-5, "the defendant must have violated an affirmative duty of disclosure." *In re Sofamor*, 123 F.3d at 400 (citing *Basic*, 485 U.S. at 239 n.17). Citing the Sixth Circuit's decision in *Zaluski v. United American Healthcare Corp.*, 527 F.3d 564 (6th Cir. 2008), CBL maintains that "failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." [Def.'s Mem. at 9 (quoting *id.* at 576)]. Similarly, CBL cites *In re Sofamor*, in which the Sixth Circuit acknowledged that "several" courts have "held that there is no private right of action under Item 303" and rejected the argument that the plaintiffs could, in "the absence of a separate cause of action," pursue their claim that the defendant had a duty of disclosure under Item 303. [*Id.* (quoting *In re Sofamor*, 123 F.3d at 402–03)]. In response, however, Plaintiffs cite cases in which courts have recognized that a party's noncompliance with

[9] CBL also argues, in a footnote in its brief, that its statements about the *Wave* litigation are not material because they "were a matter of public record as of March 2016, when the lawsuit was filed, and were covered by the press thereafter." [Defs.' Mem. at 13 n.10]. But Plaintiffs allege that CBL "prevent[ed] public access" to the *Wave* litigation because it fought to keep the case under seal through October 2019, [Compl. at 1, ¶ 186(i)]; *see* [Pls.' Resp. at 4 ("CBL also actively prevented details of the Scheme and the *Wave* Litigation from becoming publicly known by causing briefs and discovery material to be filed and remain under seal by . . . designating the documents produced during discovery as 'Confidential.'"), and the Court must accept this allegation as true, *Mixon*, 193 F.3d at 400. And as for CBL's argument that the press has covered the *Wave* litigation, the Court declines to venture outside the four corners of Plaintiffs' complaint to consider this argument. *See In re Unumprovident Corp. Secs. Litig.*, 396 F. Supp. 2d 858, 873 (E.D. Tenn. 2005) (stating that a court must confine itself to a review of the allegations that are within a complaint's four corners, not looking beyond them).

GAAP can create liability under § 10(b), [Pls.' Resp. at 7], and it contends that CBL misinterprets the Sixth Circuit's holding in *In re Sofamor* because the Sixth Circuit stated that "it was '[p]erhaps so' that Item 303 ***did*** create a duty to disclose," [*id.* at 6 n.2 (quoting *In re Sofamor*, 123 F.3d at 403)].

In reviewing *Zaluski* and *In re Sofamor*, the Court is not of the conviction that either of these cases categorically precludes courts from holding that GAAP and Item 303 create a duty of disclosure. The Sixth Circuit declined to find that a duty existed under GAAP and Item 303 only after first determining that the plaintiffs had failed to sufficiently plead their underlying claims under § 10(b). *Zaluski*, 527 F.3d at 576–77; *In re Sofamor*, 123 F.3d at 402–03. This Court is therefore loath to engage in an overly expansive reading of *Zaluski* or *In re Sofamor*. It can reasonably read each case as supporting only the contention that a claim under GAAP or Item 303 cannot survive as a stand-alone claim without an adequately pleaded § 10(b) claim as an antecedent.

As the Sixth Circuit acknowledged in *Zaluski*, "the GAAP claim is pleaded as a subset of the 10b–5 claim," *Zaluski*, 527 F.3d at 576 n.1, and here in this case, Plaintiffs' allegations under GAAP and Item 303 likewise read as a subset of their § 10(b) claim, *see* [Compl. ¶ 197 (incorporating allegations under GAAP and Item 303 into Count One, in which Plaintiffs raise their alleged violation of § 10(b) and Rule 10b-5)]. Considering that Plaintiffs have sufficiently pleaded CBL's statements about the *Wave* litigation were materially misleading under § 10(b), the Court sees absolutely no reason why they cannot bring their GAAP and Item 303 claims as a subset of their adequately pleaded § 10(b) claim. *See J&R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 390, 392 (6th Cir. 2008) (referring to "the duty of disclosure arising from Item 303" and stating that "an offeror is duty-bound to disclose all material information required to

be disclosed by statute" (citations omitted)); *see also* 15 U.S.C. § 78m(b)(2)(ii), (i) (stating that companies "shall" prepare their "financial statements in conformity with generally accepted accounting principles" and that those statements "shall" disclose "all material correcting adjustments that have been identified by a registered public accounting firm in accordance with generally accepted accounting principles").

The only remaining question is whether Plaintiffs have in fact sufficiently pleaded their claims under GAAP and Item 303. CBL expressly contests the sufficiency of the allegations under GAAP only. [Defs.' Mem. at 9]. Plaintiffs, in framing their claim under the GAAP, state they are asserting a violation of ASC 450, a provision of the GAAP that "governs accounting for loss contingencies." [Pls.' Resp. at 7]. According to Plaintiffs, it requires the disclosure of litigation when the likelihood that a company may incur a loss from the litigation is "more than remote but less than likely," even if the company cannot reasonably estimate the loss's amount. [*Id.*; Compl. ¶ 62]. Plaintiffs state that CBL, under ASC 450, had a duty to disclose the *Wave* litigation when the United States District Court for the Middle District of Florida denied its motion to dismiss in 2017 because, at that point, the risk of liability was greater than remote. [Pls.' Resp. at 7–8]. CBL, on the other hand, maintains that its risk of incurring a loss from the *Wave* litigation was less than remote because it "denied all liability and vigorously litigated the *Wave* case." [Defs.' Mot. at 9–10].

The parties' dispute over ASC 450 is not a difficult one for the Court to resolve. When a federal district court denies a defendant's motion to dismiss, it has come to the conclusion that the plaintiff's claims are plausible, which means "enough fact[s] [exist] to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556 (footnote omitted). The fact that the United States District Court for the Middle District of

Florida had come to this conclusion in 2017 means CBL, for purposes of ASC 450, had a duty to disclose the *Wave* litigation at that point because its possibility of incurring a loss from the litigation had become more than remote. *Cf. City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1265 (10th Cir. 2001) (stating that, for liability to attach for a company's non-disclosure of litigation, "[the company] 'must' have known the [litigation] was meritorious . . . at the time [it] decided not to explicitly disclose the lawsuit[] in its SEC filings and Annual Reports"). And, in this vein, when the Court accepts as true Plaintiffs' allegations that CBL's corporate brass had not only conceived but also knowingly participated in an illegal scheme—which was the very subject of the *Wave* litigation—the risk of liability from the lawsuit was arguably probable if not likely. Yet CBL allegedly did not disclose the *Wave* litigation until 2019. [Compl. ¶¶ 8, 180]. Plaintiffs' allegations therefore easily satisfy ASC 450's standard.

ii. Reported Revenues

Next, CBL raises a threefold argument challenging Plaintiffs' allegation that its reported revenues in its Form 10-Ks and Form 10-Qs are material misrepresentations. First, it contends that Plaintiffs fail to properly allege that the revenue statements are false and misleading. [Defs.' Mem. at 14]. Second, it asserts that Plaintiffs fail to properly allege the fraudulent scheme. [*Id.* at 17]. And third, it argues that its revenue statements are not materially misleading as a matter of law. [*Id.* at 19]. The Court will address these arguments in sequential order.

a. Materially False Revenue Statements

CBL argues that Plaintiffs' allegations that it made material misrepresentations in its financial reports—that is, that it overstated its revenue in its Form 10-Ks and Form 10-Qs by including amounts from the alleged fraudulent scheme—are "not actionable under the federal securities laws." [Defs.' Mem. at 14]. According to CBL, "there is no allegation that [it] did not

actually receive this revenue," and the absence of this allegation is fatal to CBL's claim. [*Id.* at 15–16 (citing *In re Sanofi Secs. Litig.*, 155 F. Supp. 3d 386, 403–04 (S.D.N.Y. 2016))]; *see In re Sanofi*, 155 F. Supp. 3d at 404 ("Courts in this district have held that 'the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability.'" (quotation and citations omitted)).

CBL likens this case to *In re Sofamor*, noting that in that case the Sixth Circuit rejected a claim that a company's failure to disclose the "illegal promotion" of its products rendered its reported revenues "incomplete and misleading." [Defs.' Mem. at 16 (quoting *In re Sofamor*, 123 F.3d at 400)]. In jettisoning the plaintiffs' claim, the Sixth Circuit stated that "[i]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *In re Sofamor*, 123 F.3d at 401 n.3 (citations omitted); *see In re Sanofi*, 155 F. Supp. 3d at 404 ("Absent an allegation that [the defendant] reported income that it did not actually receive or sales growth that did not actually occur, this Court agrees that 'a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data.'" (quoting *id.*)). So in CBL's view, "[b]ecause [its financial statements] are not alleged to have been false when made, Plaintiffs are left with a claim for fraudulent nondisclosure of the alleged Overcharge Scheme." [Defs.' Mem. at 17].[10]

In response, Plaintiffs maintain that "[i]t is a fundamental principle of federal securities laws, explicitly expressed in Rule 10b-5, that statements which are literally true can nonetheless be misleading when they 'omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they are made, not misleading.'" [Pls.' Resp. at

---

[10] "For the same reasons," CBL argues that Plaintiffs' allegations regarding GAAP—that is, Plaintiffs' allegations that CBL made material misrepresentations in its Form 10-Ks and Form 10-Qs by certifying that it prepared them in compliance with GAAP—are also defective. [Defs.' Mem. at 16 n.11].

10 (quoting 17 C.F.R. § 240.10b-5)]. In this vein, Plaintiffs argue that once a company chooses to speak on a subject, it must do so fully and fairly, [*id.*], and they cite case law countering CBL's argument, *see In re Virtus Inv. Partners, Inc. Secs. Litig.*, 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016) (noting that, in a previous case, the court had concluded that a "company's statements put its source of revenue at issue" and "gave rise to Section 10(b) liability because the company failed to disclose the illegal conduct that generated the revenue").

Although CBL's arguments are shrewd, they do not warrant the dismissal of Plaintiffs' claims. Relying on *In re Sofamor*, CBL contends that that "[t]he legality of a business practice" is soft information and "does not have to be disclosed unless it is 'virtually as certain as hard facts,'" [Defs.' Mem. at 17 (quoting *In re Sofamor*, 123 F.3d at 402)]—a contention that is, generally, not without merit, *see Ind. State Dist. Council*, 583 F.3d at 945 ("Defendants argue that . . . companies have no duty to opine about the legality of their own actions. As a *general* matter, that is true. Such information is considered 'soft' and, therefore, disclosure is not required." (emphasis added) (citing *In re Sofamor*, 123 F.3d at 401–02))); *but see Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 719 F.3d 498, 505 (6th Cir. 2013) (stating that a duty of disclosure does not exist unless the complaint contains "a clear allegation that the defendants knew of the scheme and its illegal nature at the time they stated the belief that the company was in compliance with the law" (quoting *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 831 (8th Cir. 2003)), *rev'd on other grounds by Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).

But the fact that a company ordinarily has no duty to opine about the legality of its business practices does not mean, when it does report information about matters relevant to its business practices, that it may knowingly make materially false statements only later to dismiss

them as soft information. *See Helwig*, 251 F.3d at 561 ("[U]nder Rule 10b–5 . . . the lack of an independent duty does not excuse a material lie." (quotation omitted)); *In re Sanofi*, 155 F. Supp. 3d at 403 ("Courts in this district regularly hold that the securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct. Many of the same courts have held, however, that a duty to disclose uncharged criminal conduct does arise if it is necessary to ensure that a corporation's statements are not misleading." (citations omitted)). After all, even when a misrepresentation involves soft information, it will still be actionable if the complaint contains an allegation that it was "made with knowledge of its falsity." *In re Omnicare*, 769 F.3d at 470 (quotation omitted). That allegation, importantly, was absent in *In re Sofamor*, *see In re Sofamor*, 123 F.3d at 401 ("[T]he complaint alleges, 'defendants disavowed any knowledge of wrongful promotion of pedicle screws'" when it reported its revenue. (footnote omitted)), but it is not absent in the complaint here against CBL, *see* [Compl. ¶¶ 67, 199].

At least one district court in this circuit, the United States District Court for the Eastern District of Michigan, recognized in a published opinion that "[a] statement regarding financial performance, *even when accurate*, is still misleading under the securities laws if the speaker attributes the performance to the wrong source." *Chamberlain v. Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 708–09 (E.D. Mich. 2010) (emphasis added) (quoting *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 389 (D. Del. 2010))). A speaker attributes its performance to the wrong source when it reports growth and revenue that came not from its business practices but from a fraudulent scheme. *Id.* In this case, Plaintiffs plead adequate facts showing that CBL's Form 10-Ks and Form 10-Qs contain material misrepresentations because CBL's reported revenues are partly attributable to the wrong source, i.e., a fraudulent scheme

rather than its legitimate business practices. [Compl. ¶¶ 73, 78, 83, 87, 91, 96, 101, 107, 117, 124, 132, 140, 145, 151, 156, 161, 167, 173, 179].

These alleged facts are sufficient to support a claim under § 10(b) and Rule 10b-5, even if CBL's Form 10-Ks and Form 10-Qs are historically accurate. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("[N]ot every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." (citations omitted)). The Court is simply unwilling to hold that a reasonable investor in CBL would have placed no importance on the information that CBL allegedly withheld from its financial statements—i.e., that it was artificially inflating its revenue with proceeds from an unlawful scheme—or that this information would not "have 'significantly altered the "total mix" of information made available'" to those investors. *City of Monroe*, 399 F.3d at 669 (quotation omitted); *see Helwig*, 251 F.3d at 563 ("At this stage in the proceedings, 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are *so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.*" (emphasis in original) (quotation omitted)).

b. The Fraudulent Scheme

Next, CBL contends that Plaintiffs' allegations of the fraudulent scheme fail to satisfy the "exacting standards required by Rule 9(b) and the PSLRA." [Defs.' Mem. at 18]. Specifically, CBL argues:

> Plaintiffs omit important facts, including (i) which tenants at (ii) which malls were overcharged, (iii) the specific amounts by which they were overcharged, and (iv) who at CBL imposed such charges. *See U.S. ex rel. Mooney v. Americare, Inc.*, 2013 WL 1346022, at *4 (E.D.N.Y. Apr. 3, 2013) (plaintiff 'fails to plead the "who,

> what, when, where and how" of the fraudulent referral scheme' because it 'does not provide patient names, claim numbers, dates of services, claim amounts, or reimbursement amounts, if any.').

[*Id.* at 19]. According to CBL, Plaintiffs, in their complaint, have merely "copied-and-pasted" conclusory allegations from the *Wave* litigation, and CBL insists that "[a] court 'cannot assume the truth of . . . mere allegations' made in a different action, without assurance that these 'facts' have been 'independently verified.'" [*Id.* at 18 (internal quotation and quotation omitted)]. CBL asserts that the allegations pertaining to the *Wave* litigation are "unproven," "uncontested" and "do not amount to 'facts.'" [*Id.* (quotation omitted)].

But in conflict with this assertion, CBL appears to overlook the fact that, earlier on its motion to dismiss, it calls on the Court to take judicial notice of the "filings made in . . . the '*Wave* litigation,'" acknowledging that Plaintiffs "base[] many of [their] allegations on those filings" and that "this Court can consider them on this motion to dismiss." [*Id.* at 3 n.1]. "[I]t is well-settled that '[f]ederal courts may take judicial notice of proceedings in other courts of record,'" *Lyons v. Stovall*, 188 F.3d 327, 332 n.3 (6th Cir. 1999) (quotation omitted), and having reviewed the record in the *Wave* litigation, in which the parties completed discovery, the Court believes that CBL is already in possession of the information it claims is missing from Plaintiffs' complaint.[11] But even if CBL is without this information, a motion for a more definite statement would surely suffice. *See Hardy v. First Am. Bank*, 774 F. Supp. 1078, 1083 (M.D. Tenn. 1991) ("Many of plaintiffs' fraud allegations do not indicate the time or place of the alleged frauds as federal courts require under [R]ule 9(b) in securities-fraud litigation. Although plaintiffs[']

[11] Attorney Gregory C. Cook, who is counsel to CBL and the individual Defendants, was also counsel to CBL in the *Wave* litigation.

claims are not so vague as to warrant dismissal, the Court orders a more definite statement of the securities fraud claims[.]").

c. Not Materially Misleading as a Matter of Law

CBL also argues that its revenue statements are not materially misleading as a matter of law, citing the SEC's "internal guidance regarding the determination of materiality in Staff Accounting Bulletin (SAB) No. 99," which, according to CBL, courts recognize as persuasive authority. [Defs.' Mem. at 19]; *see Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 163 (2d Cir. 2000) (stating that SAB 99 is persuasive guidance for assessing the materiality of an alleged misrepresentation). According to CBL, SAB 99 provides that a "deviation of less than [5%] with respect to a particular item on the registrant's financial statements is unlikely to be material." [*Id.* at 19–20 (alteration in original)]. Relying on SAB 99, CBL maintains that the amount it allegedly generated from the fraudulent scheme—$60 million—is not material because it equates to only .75% of its total revenue from 2011 to 2018. [*Id.* at 20]. In arriving at this figure, CBL directs the Court to two documents attached to its motion to dismiss—its 2016 Form 10-K and 2018 Form 10-K [Doc. 93-2], which the Court has license to consider because Plaintiffs refer to both of them in their complaint. *In re Unumprovident Corp. Secs. Litig.*, 396 F. Supp. 2d 858, 873 (E.D. Tenn. 2005). Plaintiffs, however, urge the Court, when conducting its calculation under SAB 99, to rely not on CBL's total revenue but its net revenue, which they say yields a deviation of 11.5%. [Pls.' Resp. at 15].

Of the parties' respective methods of calculation, the Court is more inclined to follow CBL's, considering that Plaintiffs allege that CBL misrepresented its total revenue, which is a superset of its net revenue. But the much more germane issue is whether the Sixth Circuit has endorsed SAB 99. CBL cites no precedent in which the Sixth Circuit, or any district court in this

circuit, has adhered to SAB 99 as persuasive authority, and based on this Court's research, the Sixth Circuit appears to disapprove of the dismissal-by-numbers approach that CBL invites the Court to embrace. *See Helwig*, 251 F.3d at 563 ("Materiality is about marketplace effects, not just mathematics."); *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717–18 (2d Cir. 2011) ("*Qualitative* factors may cause misstatements of quantitatively small amounts to be material[.]" (emphasis added) (quoting SAB 99, 64 Fed. Reg. 45150-01, 45152 (Aug. 19, 1999)). In fact, CBL, in quoting SAB 99 in its brief, has omitted vitally important language from it—language that is decidedly relevant to any analysis under SAB 99—and that omitted language states: "But quantifying, in percentage terms, the magnitude of a misstatement . . . cannot appropriately be used as a substitute for a full analysis of all relevant considerations." SAB 99, 64 Fed. Reg. at 45151. Based on this language, CBL's reliance on SAB 99 as an independent basis for the dismissal of Plaintiffs' claims is inappropriate—if not disingenuous in the manner that CBL has presented it to the Court. In sum, Plaintiffs have sufficiently pleaded a material misrepresentation or omission under § 10(b) and Rule 10b-5, and the Court must now turn its attention to the element of scienter, which CBL claims that Plaintiffs have failed to plead with the requisite specificity.

2. Scienter

"In the securities-fraud context, scienter includes a 'knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness.'" *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (quotation omitted). "Recklessness" means "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Frank*, 646 F.3d at 959 (quotation omitted). The Supreme Court has fashioned a three-part test for determining whether a plaintiff's allegations of scienter are sufficient. *Tellabs*, 551 U.S. at 322–24. First, the Court

must "accept all factual allegations in the complaint as true." *Id.* at 322. Second, the Court, considering the complaint in its entirety, must ascertain "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 323. And third, the Court, while "tak[ing] into account plausible opposing inferences," must determine whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324 (footnote omitted).

The Court's analysis, however, does not end with this three-part test; the Court must consider this test "with reference to" nine other "non-exhaustive factors," known as the *Helwig* factors, which are:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Dougherty*, 905 F.3d at 979 (quotation omitted). In assessing whether allegations are sufficient to attribute scienter—which is, of course, a subjective inquiry—to a corporation rather than an individual defendant, the Court may consider the following state of minds:

a. The individual agent who uttered or issued the misrepresentation;

b. Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance;

c. Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance[.]

*In re Omnicare*, 769 F.3d at 466 (quotation omitted). Because Plaintiffs sufficiently allege that "CBL's management," specifically Mr. Sewell, conceived the fraudulent scheme, participated in it by reviewing and approving falsified "electric income allocation summaries" designed to snooker tenants—and investors—into believing the overcharges were genuine, and "controlled the content of the statements made by CBL," [Compl. ¶¶ 29–31, 203], his alleged knowledge of the scheme imputes to CBL, *Doshi*, 823 F.3d at 1041; *In re Omnicare*, 769 F.3d at 483. The Court must now holistically apply the *Helwig* factors, "to analyze whether all the facts alleged give rise to a strong inference that [CBL] acted with the necessary scienter." *Doshi*, 823 F.3d at 1041 (citations omitted).

Although Plaintiffs contend that their allegations meet two thirds of the *Helwig* factors, [Pls.' Resp. at 20–21], that contention is overly optimistic. By the Court's tally, the allegations only implicate four of the factors—factor two, factor four, factor five, and factor six—but the fact that only a minority of the factors apply to the case does not necessarily preclude the Court from determining that Plaintiffs have adequately pleaded scienter.[12] The Court need not conclude that Plaintiffs have satisfied every one of these factors, only those that are relevant to the case. *See Dougherty*, 905 F.3d at 981–82 (determining that the plaintiff had successfully pleaded scienter after considering only three of the factors and noting that "[n]one of the other *Helwig* factors apply in this case").

[12] As to the seventh factor, "disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication," it does not apply because Plaintiffs do not allege that CBL disclosed its accounting information in a way that required a high degree of sophistication. Rather, they allege that CBL withheld information that it had a duty to disclose under GAAP.

i. The Second Factor

Plaintiffs allege that, despite Mr. Sewell's actual knowledge of the fraudulent scheme, CBL failed to report, in its 2018 Form 10-K, that its revenue consisted of overcharges from the fraudulent scheme. [Compl. ¶¶ 30–31, 66–67]. This allegation satisfies the second factor. *See Doshi*, 823 F.3d at 1036, 1041–42 (finding a strong inference of scienter under the second factor when the plaintiff alleged that a company's corporate executive had knowledge of "accounting errors and a theft scheme" but the company failed to disclose the errors or the scheme in its financial statements). Similarly, from Plaintiffs' allegation that Mr. Sewell not only knew of the fraudulent scheme but also participated in it, the Court can easily infer that Mr. Sewell—and by extension, CBL—knew that the *Wave* litigation had merit, yet it told investors in its Form 10-K that the *Wave* litigation was "without merit." [Compl. ¶ 180]. This allegation, too, suffices to satisfy the second factor. *Doshi*, 823 F.3d at 1041–42.

ii. The Fourth Factor

Plaintiffs also allege that Mr. Sewell conspired with Valquest to carry out the fraudulent scheme, and they allege precisely how he participated in and advanced the conspiracy. [Compl. ¶¶ 29–31]. This allegation is sufficiently analogous to the fourth factor's requirements and suffices to satisfy them. *See ECA & Local 134 IBEW Joint Pension Trust of Chi.*, 553 F.3d 187, 199 (2d Cir. 2009) (stating that one circumstance that may give rise to a strong inference of scienter is a defendant's "deliberately illegal behavior" (quotation and citation omitted)).

iii. The Fifth Factor

In addition, Plaintiffs allege that the *Wave* litigation was an "ancillary lawsuit charging fraud" against CBL, *Doshi*, 823 F.3d at 1039; *see* [Compl. ¶ 4], and that CBL "prevent[ed] public access" to the *Wave* litigation because it fought to keep the case sealed through October 2019,

[Compl. ¶ 186(i)]. These allegations are sufficiently analogous to the fifth factor's requirements and suffice to satisfy them. *Cf. City of Monroe*, 399 F.3d at 669 ("The evidence of these secret settlements gets at the same notion as does the *Helwig* factor instructing courts to analyze whether there have been ancillary lawsuits filed charging fraud followed by quick settlement of such suits. The apparent animating idea is that a company engaging in such practices is, all things being equal, more likely than not aware of the improper nature of the practice being alleged, or at least of the perception of the given problem[.]").

iv. The Sixth Factor

The allegations supporting the second factor are equally sufficient to show that, under the sixth factor, CBL disregarded the true facts of the fraudulent scheme and the *Wave* litigation when it issued its 2018 Form 10-K. *See Doshi*, 823 F.3d at 1042 (concluding that the plaintiff's allegations, which were sufficient to satisfy the second element, also satisfied the sixth element because they showed that the company "disregarded [its corporate executive's] knowledge and the attendant risk that . . . rendered [the company's] statements false").

v. Recapitulation of the Factors

In sum, Plaintiffs have pleaded sufficient facts to satisfy all four of the applicable *Helwig* factors, and they have therefore succeeded in alleging facts that, when the Court considers them collectively, give rise to a strong inference of scienter. *Tellabs*, 551 U.S. at 323; *Doshi*, 823 F.3d at 1041 (citations omitted). Although CBL asserts that the more plausible opposing inference is that it incorrectly believed the *Wave* litigation was without merit and would resolve in its favor, [Defs.' Mem. at 25–26], the Court, in light of its analysis up to this point, simply cannot agree that this inference is equally as compelling as the inference of scienter, *see Tellabs*, 551 U.S. at 323–24 (requiring courts to "take into account plausible opposing inferences" and determine

whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged" (footnote omitted)).

3. Loss Causation

Loss causation, which, again is one of the elements of a cause of action under of § 10(b) and Rule 10b–5, "requires 'a causal connection between the material misrepresentation and the loss.'" *Ind. State Dist. Council*, 583 F.3d at 944 (quotation omitted); *see Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997) ("To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries." (citation omitted)). The Sixth Circuit recognizes two theories of loss causation: (1) corrective disclosure and (2) materialization of the risk. *Ohio Pub. Employees Ret. Sys.*, 830 F.3d at 384–85. Under a corrective-disclosure theory, a plaintiff must allege that an economic loss, i.e., a drop in a company's stock price, occurred in reaction to the company's issuance of a corrective disclosure in which it reveals a misstatement or omission. *Id.* at 384. Alternatively, under the materialization-of-the-risk theory, a plaintiff must allege that "negative investor inferences" from a specific event or disclosure "caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement." *Id.* at 384–85 (internal quotation marks and quotation omitted).

CBL contends that Plaintiffs have not adequately pleaded loss causation for two reasons. First, it argues that its disclosure of the *Wave* litigation in its 2018 Form 10-K "could not have caused any stock price decline because this information . . . was already publicly-available and thus could not have a 'corrective' effect." [Defs.' Mem. at 28]. And second, CBL maintains that its disclosure of the *Wave* litigation "could not have revealed any purported fraud because

this information was never concealed in the first place." [*Id.* at 29]. In short, CBL claims that investors already had knowledge of the risks from the *Wave* litigation. In response, Plaintiffs maintain that CBL's first argument fails because it requires the Court to resolve a question of fact at the pleading stage, and Plaintiffs assert that CBL's second argument fails because CBL mischaracterizes their claim as falling under a corrective-disclosure theory when it actually falls under a materialization-of-the-risk theory. [Pls.' Resp. at 28–30].

The Court agrees that the extent to which the market for CBL's stock was, or was not, aware of the true risks associated with the *Wave* litigation is a fact-intensive issue and improper for consideration here at the pleading stage. *See Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1123 (W.D. Mich. 1996) ("[W]hen corporate insiders seek to insulate themselves from liability for allegedly false or misleading representations (or omissions) through a 'truth on the market defense,' the insiders must demonstrate that the truth was transmitted to the public 'with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations.'" (quoting *In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989), *cert. denied,* 496 U.S. 943 (1990))); *Ballan v. Upjohn Co.*, 814 F. Supp. 1375, 1383 (W.D. Mich. 1992) ("[T]he truth-on-the-market theory can only be sustained where the corrective statements are shown to have 'credibly entered the market.' . . . Whether defendants can present sufficient evidence [to this effect] is a matter properly left to the trier of fact. The instant case is still at the early pleading stage." (quoting *In re Apple Computer*, 886 F.2d at 1116)); *see also Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16–cv–2475, 2018 WL 2933406, at *10 (M.D. Tenn. Apr. 19, 2018) ("Defendants also contend that the information upon which their decisions were based, information Plaintiffs allege should have triggered testing, was publicly known. This assertion is a 'truth-on-the-market'

defense. Because this argument is intensely fact-specific, it is not appropriate for the Court to consider it on these Motions to Dismiss. (citation omitted)); *Wilkof v. Caraco Pharms. Labs., Ltd.*, No. 09–12830, 2010 WL 4184465, at *4 (E.D. Mich. Oct. 21, 2010) ("This Court further declines to dismiss this matter based on Defendants' argument that documents such as the FDA Form 483s were public and could be accessed by shareholders. As Plaintiffs correctly note, such a 'truth on the market defense' (where a 'misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market') 'is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint[.]" (quoting *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 167 (2d Cir. 2000))).

Besides, as the Court already noted, Plaintiffs allege that CBL has "prevent[ed] public access" to the *Wave* litigation by "declin[ing] to consent to the unsealing of . . . documents," [Compl. ¶ 186(i)], and that, at the time they filed their complaint here in this case, "documents filed under seal in the *Wave* Litigation [had not yet been] made public," [*id.* at 1]; *see* [Pls.' Resp. at 4 ("CBL also actively prevented details of the Scheme and the *Wave* Litigation from becoming publicly known by causing briefs and discovery material to be filed and remain under seal by . . . designating the documents produced during discovery as 'Confidential.'"). The Court must accept Plaintiffs' allegations as true, *Mixon*, 193 F.3d at 400, and in doing so, it cannot, at this time, countenance CBL's argument that the *Wave* litigation was fully available for public consumption.

Lastly, as for CBL's second argument as to loss causation—i.e., its argument that its disclosure of the *Wave* litigation "could not have revealed any purported fraud because this information was never concealed in the first place," [Defs.' Mem. at 29]—the Court has already implicitly, if not explicitly, rejected it. *See supra* pt. III.A.1.i (determining that the allegations

are adequate to show that CBL knew that it had participated in a fraudulent scheme at the time it released its 2018 Form 10-K; that it made material misrepresentations in the 2018 Form 10-K about the *Wave* litigation, whose subject matter was that very same fraudulent scheme; and that it had a duty to disclose the *Wave* litigation sooner than it did). So to the extent that CBL argues that Plaintiffs have not alleged loss causation because it never concealed the *Wave* litigation in the first place, that contention is a nonstarter.

By pleading that CBL's management knew of a fraudulent scheme within its corporate ranks, concealed the scheme and the risk it posed to investors, and then became embroiled in litigation when that risk materialized in the form of litigation, Plaintiffs sufficiently allege "the relationship between the risks allegedly concealed and the risks that subsequently materialized." *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 388 (quotation omitted). And by pleading that CBL's dilatory and not-fully-truthful disclosure of the *Wave* litigation drove a freefall in CBL's stock price, Plaintiffs have sufficiently alleged a "close correlation between the alleged revelation or materialization of the risk and the immediate fall in stock price." *Id.* at They have therefore adequately alleged a materialization-of-the-risk theory.

4. The Individual Defendants

In a final volley against Plaintiffs' claims under § 10(b) and Rule 10b-5, the individual Defendants maintain that they cannot be liable because Plaintiffs fail to plead that they made the alleged material misrepresentations in question. [Defs.' Mem. at 29; Defs' Suppl. Mem. at 3]. In pertinent part, Rule 10b-5 does not permit "any person, directly or indirectly . . . *[t]o make* any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(b) (emphasis added). Under Rule 10b-5, the "maker of a statement" is any person "with ultimate authority over the statement, including its content and whether and

how to communicate it." *Janus Capital Grp. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Plaintiffs plainly plead that all the individual Defendants, as corporate officers of CBL with "control and authority," "controlled the content of the statements made by CBL." [Compl. ¶¶ 201, 203]. Plaintiffs then go on to identify the individual Defendants who signed and certified the Form 10-Ks and Form 10-Qs that contained the misrepresentations about CBL's revenue and compliance with GAAP. [Compl. ¶¶ 72, 77, 82, 86, 90, 95, 100, 106, 116, 123, 131, 139, 144, 150, 155, 160, 166, 172].

These allegations are sufficient to demonstrate that the individual Defendants were the makers of the alleged material misrepresentations. *Janus Capital*, 564 U.S. at 142; *see In re Fannie Mae 2008 Secs. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012) (recognizing that, "[i]n the post-*Janus* world," an executive is the maker of a statement when he "signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive" (citations omitted)). While, true, Plaintiffs do not plead that Mr. Stephas or Mr. Sewell, specifically, signed the Form 10-Ks and Form 10-Qs at issue, the Court can reasonably infer that the misstatements in these forms are attributable to them because Plaintiffs plead that the fraudulent scheme was their brainchild—including when, where, and how they devised the scheme, [Compl. ¶ 3]—and that they "controlled the content of the" forms, [*id.* ¶ 203]; *see In re Fannie Mae 2008 Secs. Litig.*, 891 F. Supp. 2d at 473 ("While it is correct that [the individual defendant] did not sign any of the SEC filings at issue, he still may be found to have made a misstatement.").

In passing, though, the Court observes that the complaint, as it applies to the individual Defendants other than Mr. Stephas and Mr. Sewell, lacks the same specific "reference[s] to [a] factual context." *Iqbal*, 556 U.S. at 686. That is, Plaintiffs do not allege with "particularity facts

giving rise to a strong inference" that the individual Defendants other than Mr. Stephas and Mr. Sewell "acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). They do not allege that Mr. Charles Lebovitz, Mr. Stephen Lebovitz, Mr. Khaleel, or Mr. Chapman conceived the fraudulent scheme, participated in it, or—outside of conclusory assertions—had knowledge of it in any way. In the absence of these allegations, these individual Defendants' intent to deceive, manipulate, or defraud is highly dubious under the PSLRA. *See City of Taylor*, 29 F.4th at 815 ("True, he signed [the] reports to regulators and investors. But the complaint does not include allegations showing that he knowingly or deliberately intended to manipulate or was reckless.").

But again, the Court makes these observations only in passing because Mr. Charles Lebovitz, Mr. Stephen Lebovitz, Mr. Khaleel, and Mr. Chapman—who have mustered only a three-sentence argument for the dismissal of the claims against them under § 10(b)—do not expressly contest the sufficiency of the allegations as to their state of mind. Instead, they contest only whether the allegations suffice to demonstrate that they are the makers of the statements at issue, and again, the allegations suffice to that end. *See Janus Capital*, 564 U.S. at 143 ("Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said."). In sum, Plaintiffs' claim under § 10(b) and Rule 10b-5 withstands scrutiny under Rule 12(b)(6), Rule 9, and the PSLRA, as it applies to CBL and the individual Defendants.

**B. Section 20 (Count Two)**

Finally, although the individual Defendants also seek the dismissal of Plaintiffs' claim under § 20(a), they do not attack this claim on the merits. Rather, in a one-sentence argument, they assert that this claim must fail because it is a derivative of Plaintiffs' faulty claim under § 10(b). [Defs.' Mem. at 29–30]. But because Plaintiffs have pleaded a plausible claim under

§ 10(b), the individual Defendants' perfunctory argument for the dismissal of Plaintiffs' claim under § 20(a) is meritless.

Now, in an effort to breathe vitality into this argument, the individual Defendants, in a supplemental brief—in which they represent to the Court that they are "providing notice of subsequent developments" in the bankruptcy proceedings—have significantly expanded on this argument. [Defs.' Suppl. Mem. at 1]. They argue that Plaintiffs' claim is deficient because they have not pleaded "actual participation" and have not pleaded their claim with particularity. [*Id.* at 4]. If the individual Defendants believed that Plaintiffs had not alleged a viable theory of liability or the requisite particularly, they could have, and should have, said so in the first place, but they did not. Instead, they argue these points for the first time in their supplemental brief, which, by rule, does not present parties with an opportunity to supply victuals to a cadaverous argument. *See* E.D. Tenn. L.R. 7.1(d) (stating that, with leave of the Court, a party may file a supplemental brief to "call to the Court's attention developments occurring after a party's final brief is filed"). The Court, therefore, declines to consider the individual Defendants' newfound and belated arguments in their supplemental brief.

## IV. Conclusion

Plaintiffs allege plausible claims under § 10(b) and Rule 10b-5 (Count One) and § 20 (Count Two). Defendants' Motion to Dismiss the Consolidated Complaint [Doc. 93] is therefore **DENIED**. Defendants are **ORDERED** to serve a responsive pleading within twenty-one days of this Order's date. The parties are **ORDERED** to confer and file a joint proposed scheduling order within twenty-one days of this Order's date. The stay of this action is hereby **LIFTED**.

So ordered.

ENTER:

s/J. RONNIE GREER

UNITED STATES DISTRICT JUDGE