**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION**

|  |  |  |
|---|---|---|
| IN RE CBL & ASSOCIATES PROPERTIES, INC. SECURITIES LITIGATION | ) ) ) ) | Consolidated Case No. 1:19-CV-181-JRG-CHS |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

II.    STATEMENT OF FACTS ............................................................................... 3

III.   CERTIFICATION IS PROPER UNDER RULE 23(a) ...................................... 5

     A.     The Class Is So Numerous That Joinder of All Members Is Impracticable ........... 5

     B.     Common Questions of Law or Fact Exist for All Class Members ........................ 6

     C.     The Proposed Class Representatives' Claims Are Typical of Those of The Class .................................................................................................... 7

     D.     The Proposed Class Representatives Will Fairly and Adequately Protect the Interests of the Class .................................................................. 7

IV.   CERTIFICATION IS PROPER UNDER RULE 23(b)(3) ................................. 9

     A.     Common Questions of Law and Fact Predominate ............................................. 9

         1.     The Fraud-on-the-Market Presumption Applies to Plaintiffs' Claims ..... 10

             a.     The Market for CBL Common and Preferred Stock Was Efficient........................................................................................ 13

                 i.     CBL's NYSE Listing is Strong Evidence of Market Efficiency ........................................................................ 13

                 ii.     The *Cammer* and *Krogman* Factors Demonstrate Market Efficiency ........................................................................ 14

             b.     The Market for CBL Notes Was Efficient .................................... 19

         2.     Reliance Is Also Presumed Under *Affiliated Ute* ...................................... 21

         3.     Mechanical Tabulations for Individual Class Members Will Not Defeat Predominance........................................................................................ 22

     B.     A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action ................................................................ 22

V.    THE COURT SHOULD APPOINT PLAINTIFFS' CHOICE OF COUNSEL ................. 24

VI.   CONCLUSION ............................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAL High Yield Bond Fund v. Ruttenberg*,
229 F.R.D. 676 (N.D. Ala. 2005)................................................................................................11

*Affiliated Ute Citizens of Utah v. United States*,
92 S. Ct. 1456 (1972).................................................................................................................22

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..................................................................................................................8, 9

*Amgen v. Conn. Ret. Plans and Trust Funds*,
568 U.S. 455 (2013)...............................................................................................................2, 10

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)...............................................................................................................10, 13

*Bovee v. Coopers & Lybrand*,
216 F.R.D. 596 (S.D. Ohio 2003) ................................................................................................2

*Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*,
843 F.3d 1119 (6th Cir. 2016) .....................................................................................................9

*Burgess v. BancorpSouth, Inc.*, No. 14-cv-1564,
2017 U.S. Dist. LEXIS 97953 (M.D. Tenn. Jun. 26, 2017)....................................................5, 6

*Califano v. Yamasaki*,
442 U.S. 682 (1979)......................................................................................................................2

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ........................................................................................ *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) .................................................................................................11

*Cates v. Cooper Tire & Rubber Co.*,
253 F.R.D. 422 (N.D. Ohio 2008) ...............................................................................................7

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
270 F.R.D. 247 (D.S.C. 2010)......................................................................................................7

*City of Goodlettsville v. Priceline.com, Inc.*,
267 F.R.D. 523 (M.D. Tenn. 2010) ..............................................................................................5

iii

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)...................................................................................................................22

*Conn. Ret. Plans & Trust Funds v. Amgen, Inc.*,
2009 U.S. Dist. LEXIS 71653 (C.D. Cal. Aug. 12, 2009)..........................................................7

*Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007)........................................................................................................23

*Cromer Fin. Ltd. v. Berger*,
205 F.R.D. 113 (S.D.N.Y. 2001) ...............................................................................................10

*Daffin v. Ford Motor Co.*,
458 F.3d 549 (6th Cir. 2006) .......................................................................................................5

*Erica P. John Fund, Inc. v. Halliburton Co.*,
*563* U.S. 804, 131 S. Ct. 2179 (2011).......................................................................................10

*Freeman v. Laventhol & Horwath*,
915 F.2d 193 (6th Cir. 1990) .....................................................................................................11

*Garden City Emps. Ret. Sys. v. Psychiatric Sols., Inc.*, No. 09-0882,
2012 U.S. Dist. LEXIS 44445 (M.D. Tenn. Mar. 29, 2012) .......................................................2

*Gen. Tel. Co. of Southwest v. Falcon*,
457 U.S. 147 (1982)......................................................................................................................7

*Gulf Oil Co. v. Bernard*,
452 U.S. 89 (1981)........................................................................................................................2

*In re Accredo Health, Inc., Sec. Litig.*, No. 03-2216,
2006 U.S. Dist. LEXIS 97621 (W.D. Tenn. Mar. 7, 2006) .........................................................2

*In re Am. Med. Sys.*,
75 F.3d 1069 (6th Cir. 1996) ...............................................................................................5, 7, 8

*In re Diamond Foods, Inc., Sec. Litig.*,
295 F.R.D. 240 (N.D. Cal. 2013)...............................................................................................22

*In re Direct Gen. Corp. Sec. Litig.*, No. 05-0077,
2006 U.S. Dist. LEXIS 56128 (M.D. Tenn. Aug. 8, 2006) .............................................2, 7, 11

*In re Enron Corp. Sec., Deriv. and ERISA Litig. ("Enron")*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) .......................................................................................12

*In re JPMorgan Chase & Co. Secs. Litig.*, No. 12 Civ. 03852,
2015 U.S. Dist. LEXIS 132181 (S.D.N.Y. Sept. 29, 2015)..................................................13, 22

iv

*In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig.*, MDL No. 1658 (SRC),
2013 U.S. Dist. LEXIS 13511 (D.N.J. Jan. 30, 2013) ............................................................10

*In re Petrobras Sec. Litig.*,
312 F.R.D. 354 (S.D.N.Y. 2016) .......................................................................................24

*In re SCOR Holding (Switzerland) AG Litig.*,
537 F. Supp.2d at 579 .......................................................................................................24

*In re Vivendi Universal, S.A.*,
242 F.R.D. 76 (S.D.N.Y. 2007) .........................................................................................5

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
722 F.3d 838 (6th Cir. 2013) ........................................................................................6, 22

*In re WorldCom, Inc. Sec. Litig.*,
219 F.R.D. 267 (S.D.N.Y. 2003) .......................................................................................23

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ..........................................................................14, 19, 21

*Levine v. SkyMall, Inc.*, No. Civ. 99-166,
2001 U.S. Dist. LEXIS 24705 (D. Ariz. May 22, 2001) .........................................................15

*Little Caeser Enters. v. Smith*,
172 F.R.D. 236 (E.D. Mich. 1996) .......................................................................................2

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
967 F.2d 742 (2d Cir. 1992)...............................................................................................22

*Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*,
762 F.3d 1248 (11th Cir. Aug. 6, 2014) ...............................................................................12

*Lumen v. Anderson*,
280 F.R.D. 451 (W.D. Mo. 2012)........................................................................................13

*Plumbers & Pipefitters Nat'l Pension Fund v. Burns*,
967 F. Supp. 1143 (N.D. Ohio 2013)....................................................................................15

*Ross v. Abercrombie & Fitch Co.*,
257 F.R.D. 435 (S.D. Ohio 2009) .........................................................................................6

*Sprague v. Gen. Motors Corp.*,
133 F.3d 388 (6th Cir. 1998) ...........................................................................................6, 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..........................................................................................................23

v

*Top Flite Fin. Inc. v. Bridging Cmtys. Inc.*,
   138 S. Ct. 80 (2017) ..............................................................................................................9

*UFCW Local 1776 v. Eli Lilly and Co.*,
   620 F.3d 121 (2d Cir. 2010)...................................................................................................9

*Utesch v. Lannett Co., Inc.*, No. CV 16-5932,
   2021 U.S. Dist. LEXIS (E.D. Pa. Aug. 12, 2021)................................................................24

*Vinh Nguyen v. Radient Pharm. Corp.*,
   287 F.R.D. 563 (C.D. Cal. 2012) ..........................................................................................15

*Weathers v. Peters Realty Corp.*,
   499 F.2d 1197 (6th Cir. 1974) ................................................................................................5

*Weinberg v. Insituform Techs., Inc.*, No. 93-2742,
   1995 U.S. Dist. LEXIS 5124 (W.D. Tenn. Apr. 10, 1995)......................................................8

*Willis v. Big Lots, Inc.*,
   2017 U.S. Dist. LEXIS 38933 (S.D. Ohio Mar. 17, 2017) ....................................................11

## <u>Statutes</u>

PSLRA .........................................................................................................................................23

Securities Exchange Act of 1934 ..................................................................................................3

## <u>Rules</u>

Fed. R. Civ. P. 23.................................................................................................. *passim*

Lead Plaintiffs Jay B. Scolnick, Mark Shaner, Charles D. Hoffman, HoffInvestCo, and Lydia Hoffman as well as Ronald T. Amsterdam (collectively, "Plaintiffs" or "Proposed Class Representatives"), by their counsel, respectfully submit this memorandum of law in support of their motion for an Order: (i) certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23; (ii) appointing Plaintiffs as Class Representatives; and (iii) appointing Co-Lead Counsel Pomerantz LLP ("Pomerantz") and Abraham, Fruchter & Twersky LLP ("AF&T") as Class Counsel.

## I. INTRODUCTION

Plaintiffs seek certification of the following Class:

All persons and entities who purchased or otherwise acquired CBL & Associates Properties, Inc. ("CBL" or the "Company") common stock and/or CBL's 7.375% Series D Cumulative Redeemable Preferred Stock ("preferred series D") and/or CBL's 6.625% Series E Cumulative Redeemable Preferred Stock ("preferred series E") and/or senior unsecured notes,[1] between July 29, 2014 and March 26, 2019, both dates inclusive (the "Class Period"), excluding Defendants,[2] CBL, current and former officers and directors of CBL, members of the current and former officers and directors' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

This case warrants class action treatment because the questions of law and fact relevant to the merits of this case, including whether statements were materially false or misleading statements, reliance, materiality, scienter, and loss causation are virtually identical for each and every member of the Class. Specifically, Plaintiffs are seeking to prove that they, like other Class members, were

---

[1] The senior unsecured notes are: (1) senior unsecured notes issued by CBL in November 2013, that bear interest at 5.25% and mature on December 1, 2023 ("CBL 5.25% note"); (2) senior unsecured notes issued by CBL in October 2014 that bear interest at 4.60% and mature on October 15, 2024 ("CBL 4.60% note"); and (3) senior unsecured notes issued by CBL Operating in December 2016 and August 2017 that bear interest at 5.95% and mature on December 15, 2026 ("CBL 5.95% note").

[2] "Defendants" refers to Charles B. Lebovitz; Stephen D. Lebovitz; Farzana Khaleel ("Khaleel"); A. Larry Chapman ("Chapman"); Augustus N. Stephas ("Stephas") and Don Sewell ("Sewell").

injured by the same false or misleading statements concerning Defendants' failure to disclose CBL's scheme of uniformly overcharging retail tenants for electricity (the "Overcharge Scheme" or "Scheme"), its impact on the Company's reported financial results and the extent to which the Overcharge Scheme exposed CBL to material liability in a class action lawsuit (the "*Wave Litigation*") challenging that conduct.

The use of class action procedures to adjudicate claims under federal securities law has long been upheld by the Supreme Court, as well as courts throughout the Sixth Circuit. *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979).[3] The Supreme Court has also warned against imposing restrictions on certification of federal securities claims. *See Amgen v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 478 (2013) ("We have no warrant to encumber securities-fraud litigation by adopting an atextual requirement of precertification proof of materiality that Congress [] has not sanctioned"). Therefore, if a court is in doubt as to whether to certify a securities class action, it should err in favor of certification. *See Little Caeser Enters. v. Smith*, 172 F.R.D. 236, 241-42 (E.D. Mich. 1996).

This case readily satisfies all of the requirements of Rule 23. Certification under Rule 23 is appropriate because: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative

---

[3] *See also Garden City Emps. Ret. Sys. v. Psychiatric Sols., Inc.*, No. 09-0882, 2012 U.S. Dist. LEXIS 44445, at \*87 (M.D. Tenn. Mar. 29, 2012) (alteration in original) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 n. 11 (1981)) (finding that class actions "vindicat[e] the rights of individuals who otherwise ought not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost"); *In re Accredo Health, Inc., Sec. Litig.,* No. 03-2216, 2006 U.S. Dist. LEXIS 97621, at \*37 (W.D. Tenn. Mar. 7, 2006), quoting *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 607 (S.D. Ohio 2003) ("[i]t is well-recognized that class actions are a particularly appropriate means for resolving securities fraud actions."); *In re Direct Gen. Corp. Sec. Litig.*, No. 05-0077, 2006 U.S. Dist. LEXIS 56128, at \*21 (M.D. Tenn. Aug. 8, 2006) (agreeing with Plaintiffs "that class actions are particularly appropriate means for resolving securities fraud litigation").

parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Additionally, common issues of law or fact "predominate over any questions affecting only individual members," and a class action is "superior" to other methods of adjudication. Fed. R. Civ. P. 23(b)(3).

Accordingly, Plaintiffs request certification of the Class, appointment of Plaintiffs as Class Representatives, and appointment of Pomerantz and AF&T as Class Counsel.

## II. STATEMENT OF FACTS

CBL is a publicly traded real estate investment trust, subject to the disclosure requirements of the Securities Exchange Act of 1934 (the "Exchange Act"). *See* Plaintiffs' Consolidated Class Action Complaint (the "Complaint"), ECF No. 80 at ¶ 14 (hereafter cited as "Compl. ¶_"). CBL owns and operates shopping malls in 26 states. *E.g.,* Compl. ¶¶ 15, 23, 56, 72, 100, 203. CBL's lease agreements uniformly provided that tenants could only be charged "the rates [they] would be charged for the same [electric] services if furnished directly . . . by the Local Utility Company[.]" Compl. ¶ 26, *see also* Compl. ¶ 25. Nevertheless, CBL charged tenants (i) for kilowatt hours ("kWh") tenants never consumed and (ii) more per kWh than the rate paid by CBL. Compl. ¶ 28.

On March 16, 2016, one of CBL's tenants initiated the *Wave* Litigation asserting claims, on behalf of a nationwide class, arising out of the Overcharge Scheme. Compl. ¶¶ 41, 42, 46. On September 20, 2017, CBL's insurance carrier successfully disclaimed coverage because the Scheme involved willful illegal conduct and dishonest acts. Compl. ¶¶ 39, 40, 54 55.

On April 10, 2017, a federal court denied CBL's motion to dismiss the *Wave* Litigation. Compl. ¶ 136. The *Wave* Litigation ultimately involved a massive undertaking with CBL producing more than 1.8 million pages of discovery, more than seventy third party subpoenas, and twelve fact depositions. Compl. ¶ 49. Despite a duty to do so, Defendants never disclosed the

3

Overcharge Scheme or the resulting *Wave* Litigation to investors before settling the case.  Instead, CBL's SEC filings proclaimed "[w]e receive reimbursements from tenants for . . . operating expenses ***as provided in the lease agreements***" (*see, e.g.*, Compl. ¶¶ 71, 81, 99, 154),[4] and that the tenant reimbursements were properly "earned" pursuant to the lease agreements and recognized as revenue in accordance with GAAP.  *See, e.g.,* Compl. ¶¶ 16, 71, 81, 85, 99, 154, 165 159.  And although CBL regularly disclosed other class action lawsuits even when they had been dismissed and posed no risk to CBL, the Company failed to disclose the existence of the *Wave* Litigation. Compl. ¶ 119; *see also* Compl. ¶¶ 108, 119, 127, 133, 146, 168.

On March 1, 2019 CBL filed its annual report for 2018, which finally disclosed the *Wave* Litigation but asserted that it was "without merit" and it was not "probable" that any loss would result. Compl.  ¶ 180. Notably, the Company did so after the United States District Court for the Middle District of Florida had already ruled that the class plaintiffs' claims were sufficient to withstand summary judgment, meaning the claim not only had merit, but the plaintiffs had marshalled adequate evidence "to allow a reasonable jury to return a verdict in the plaintiff's favor."  2022 U.S. Dist. LEXIS 82740 at *21.  Nevertheless, as a result of the disclosure of the *Wave* Litigation, the price of CBL common stock dropped $0.16 per share, or nearly 8%.  Compl. ¶ 182.

On March 26, 2019, CBL disclosed that it had settled the *Wave* Litigation for $90 million, $30 million higher than the "aggregate damages of $60 million."  Compl. ¶¶ 183-84. In reaction to this disclosure, CBL's common stock price plummeted $0.47, a decrease of almost 25%. Compl. ¶ 185.

---

[4] Emphasis is added in quotations, and citations are omitted herein, without further indication.

## III. CERTIFICATION IS PROPER UNDER RULE 23(a)

To obtain class certification under Rule 23(a), a party must establish the following four prerequisites: (1) numerosity; (2) commonality; (3) and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a). The Court must also determine whether the action is maintainable under Fed. R. Civ. P. 23 (b)(1), (2) or (3). *Burgess v. BancorpSouth, Inc.*, No. 14-cv-1564, 2017 U.S. Dist. LEXIS 97953, at *5 (M.D. Tenn. Jun. 26, 2017). The Sixth Circuit has recognized the need for the class certification requirements of Rule 23 to be construed liberally. *Weathers v. Peters Realty Corp.,* 499 F.2d 1197, 1200 (6th Cir. 1974) ("Although the court has broad discretion in determining the application of [Rule 23], the application of these [] requirements should not be so strictly applied that the policies underlying class action would be undermined.")

### A. The Class Is So Numerous That Joinder of All Members Is Impracticable

Rule 23(a)(1) requires that a class be so numerous that joinder of all members would be "impracticable." There is "no strict numerical test" required. *See Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006). The Sixth Circuit has long recognized that "'substantial' numbers satisfy the numerosity requirement." *See In re Am. Med. Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Courts in this circuit have found that as few as forty class members may satisfy numerosity. *See City of Goodlettsville v. Priceline.com, Inc.*, 267 F.R.D. 523, 529 (M.D. Tenn. 2010).

"[I]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007) (collecting cases). CBL is a publicly traded company, whose common stock trade on the New York Stock Exchange ("NYSE"). Declaration of Michael J. Wernke ("Wernke Decl.") Ex. A, Expert Report of Matthew D. Cain, Ph.D., ¶ 21, hereinafter "¶__". During the Class Period, the number of CBL common stock outstanding ranged from 170.3 million shares

5

to 173.5 million shares and the average weekly trading volume was 13.9 million shares. ¶ 31, 61. Although the precise number of Class members cannot be determined at this time, Plaintiffs believe that the number of securities traded and held on the NYSE demonstrate that there are many thousands of members of the proposed Class. Accordingly, the proposed Class here is so numerous that joinder of all members is impracticable, and the numerosity element has been satisfied.

**B.      Common Questions of Law or Fact Exist for All Class Members**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality does not require that "[t]he claims of the potential class members [] be factually identical." *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 442 (S.D. Ohio 2009). Nor does it preclude class certification where "questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved." *BancorpSouth*, 2017 U.S. Dist. LEXIS 97953, at *7. Indeed, "there need only be one question common to the class," so long as "the answer of that question [is] central to and advance[s] the litigation." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 853 (6th Cir. 2013). Commonality, therefore, is satisfied by "a common issue the resolution of which will advance the litigation." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998)).

Here, common questions of law and fact include: (i) whether Defendants' statements were materially false and misleading; (ii) whether the underlying misrepresentations and omissions were made with scienter; (iii) whether the prices of CBL's securities were artificially inflated during the Class Period; and (iv) whether Defendants' misrepresentations and omissions caused Class members to suffer economic losses. The misstatements were made to the Class as a whole, and injured Class members in the same way. In comparable situations, courts have consistently found the commonality requirement to have been satisfied. *See, e.g., BancorpSouth*, 2017 U.S. Dist. LEXIS 97953, at *8 (finding that "[i]f [Defendants'] misstatements and omissions violated federal

law, they violated federal law as to all potential class members . . . [and] answering those questions will generate common, class-wide answers concerning liability.").

      **C.**      **The Proposed Class Representatives' Claims Are Typical of Those of The Class**

Rule 23(a)(3) requires that the claims of the representative plaintiff be typical of the claims of the class. "The requirement of typicality is not onerous. If there is a strong similarity of legal theories, the requirement is met, even if there are factual distinctions among named and absent class members." *Cates v. Cooper Tire & Rubber Co.*, 253 F.R.D. 422, 429 (N.D. Ohio 2008). "The claims and defenses of a proposed class representative are typical if they arise "from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys.*, 75 F.3d at 1082; *Direct Gen.*, 2006 U.S. Dist. LEXIS 56128, at \*11.[5] Typicality exists where a "sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Gen. Motors Corp.*, 133 F.3d at 399.

Plaintiffs purchased CBL securities during the same period of time as the putative class members purchased or held their shares. Plaintiffs' claims, like those of all other Class members, derive from the same legal theories and the same misrepresentations and omissions. Accordingly, as Plaintiffs' claims are typical of those of the Class, the typicality element here has been satisfied. *See Conn. Ret. Plans & Trust Funds v. Amgen, Inc.*, 2009 U.S. Dist. LEXIS 71653, at \*14-15 (C.D. Cal. Aug. 12, 2009); *Sonoco*, 270 F.R.D. at 251.

      **D.**      **The Proposed Class Representatives Will Fairly and Adequately Protect the Interests of the Class**

---

[5] The Supreme Court has acknowledged that the "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

Rule 23(a)(4) requires that: "(1) the representative must have common interests with unnamed members of the class; and (2) it must appear that the representative will vigorously prosecute the interests of the class through qualified counsel." *In re Am. Med. Sys.*, 75 F.3d at 1083. The first of these two requirements overlaps with the commonality and typicality prerequisites and assures that putative class representatives have interests co-extensive with the interests of the unnamed class members. *See Weinberg v. Insituform Techs., Inc.*, No. 93-2742, 1995 U.S. Dist. LEXIS 5124, at *14-15 (W.D. Tenn. Apr. 10, 1995). The second factor assures that the representatives' incentive to pursue the action aligns with that of the class members, *see In re Am. Med. Sys.*, 75 F.3d, at 1083, or that the class representative does not have any conflict of interests with "the class they seek to represent." *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (citation omitted).

Here, Plaintiffs "possess[es] the same interest and suffer[ed] the same injury as the class members," *id.* at 625-26, and no actual or potential conflicts exist. Since their appointment, Plaintiffs have each taken their roles and obligations to the putative Class seriously and have acted to protect the interests of the Class. Should they be appointed as class representatives, they intend to act in a similar fashion. Through counsel, Plaintiffs have investigated and filed the Amended Complaint, successfully opposed and argued a motion to dismiss and pursued discovery. Plaintiffs have certified that they will continue to oversee further motion practice and are willing to participate in settlement discussions, should they arise. Wernke Decl. Ex. B, Declaration of Jay B. Scolnick ("Scolnick Decl.") ¶¶ 6-8; Ex. C, Declaration of Mark Shaner ("Shaner Decl.") ¶¶ 6-8; Ex. D, Declaration of Charles D. Hoffman on behalf of himself and on Behalf of HoffInvestCo. ("Hoffman Decl.") ¶¶ 6-8 Ex. E, Declaration of Lydia Hoffman ("Lydia Hoffman Decl.") ¶¶ 6-8; Ex. H, Declaration of Ronald T. Amsterdam ("Amsterdam Decl.") ¶¶ 6-8.

Plaintiffs have engaged qualified, experienced and capable attorneys to represent the Class. Proposed Class Counsel, Pomerantz and AF&T, are highly experienced in complex class litigation, especially securities fraud actions, and have the ability and willingness to prosecute this action vigorously. *See* Firm Resume of Pomeranz, attached as Ex. F to the Wernke Decl. and Firm Resume of AF&T, attached as Ex. G to the Wernke Decl. Counsel's vigorous pursuit of the Class's interests is well documented in its advancement of the Class's claims before this Court, including, *inter alia*, in its defeat of the Defendants' motions to dismiss.

## IV. CERTIFICATION IS PROPER UNDER RULE 23(b)(3)

The proposed Class also satisfies Rule 23(b)(3)'s requirements that: (1) common questions of law or fact predominate over individual questions; and (2) class action treatment is superior to other methods of adjudication. *See Amchem*, 521 U.S. at 615.

### A. Common Questions of Law and Fact Predominate

Predominance exists where the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *See UFCW Local 1776 v. Eli Lilly and Co*., 620 F.3d 121, 131 (2d Cir. 2010). "[P]laintiffs seeking class certification 'need not prove that each element of a claim can be established by class-wide proof: What the rule does require is that common questions *predominate* over any questions affecting only individual [class] members.'" *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016), *cert. denied*, *Top Flite Fin. Inc. v. Bridging Cmtys. Inc.*, 138 S. Ct. 80 (2017) (emphasis in original).

### 1. The Fraud-on-the-Market Presumption Applies to Plaintiffs' Claims

Plaintiffs will prove, on a common basis, the elements of their Sections 10(b) and 20(a) claims alleged in the Amended Complaint. "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 563 U.S., at 810.[6] Here, reliance can be established on a common basis under the "fraud-on-the-market" theory. As explained in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988):

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

*Id*. at 241-42.

To invoke the fraud-on-the market-presumption, "plaintiffs must demonstrate that [1] the alleged misrepresentations were publicly known, [2] that the stock traded in an efficient market, and [3] that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed." *Erica P. John Fund, Inc. v. Halliburton Co., 563* U.S. 804, 811 (2011).

---

[6] Aside from reliance and damages (as to which individual issues do not defeat predominance), courts routinely find that the other elements can be proved with common evidence. *See In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig*., MDL No. 1658 (SRC), 2013 U.S. Dist. LEXIS 13511, at *63 (D.N.J. Jan. 30, 2013) ("Defendants' liability will depend on the same evidence relating to the materiality of the misstatements and omissions at issue and Defendants' state of mind in making such statements or failing to disclose certain information . . . In addition . . . loss causation for the putative class is also capable of proof through common evidence. Each class member's claim for relief is based on the same corrective disclosures"); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 127 (S.D.N.Y. 2001) ("With one exception, [reliance] there is no dispute that each element necessary to establish liability . . . is common to the class . . . The proof for the claims of misrepresentation or omission, materiality, and [Defendant's] scienter are all based on a common nucleus of facts and a common course of conduct"). Because merits determinations are to be eschewed, the Supreme Court has recently confirmed that neither materiality nor loss causation has to be proved at the class certification stage to trigger *Basic*'s presumption of reliance. *See Amgen*, 568 U.S. at 466-68 (materiality); *Halliburton*, 563 U.S. at 811-12 (loss causation).

Here, all three elements have been established.

The seminal decision *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 (D.N.J. 1989), set forth certain factors, *i.e.*, the "*Cammer* factors," as an aid to determine whether the market for any stock is open and efficient: whether (1) there "existed an average weekly trading volume during the class period in excess of a certain number of shares," to wit, 1% for a "substantial presumption" of efficiency, 2% turnover for a "strong presumption," *Id*. at 1293; (2) "a significant number of securities analysts followed and reported on [the] company's stock during the class period;" (3) the company's stock "had numerous market makers;" (4) "the Company was entitled to file an S-3 Registration Statement in connection with public offerings"; and (5) "empirical facts show[ ] a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id*. at 1284-87.

Courts within the Sixth Circuit analyze market efficiency by applying the criteria identified in *Cammer*. *See, e.g., Willis v. Big Lots, Inc.*, 2017 U.S. Dist. LEXIS 38933, at *10 (S.D. Ohio Mar. 17, 2017) ("the Cammer factors [] reflect the legal standard for market efficiency and have been considered by the Sixth Circuit in such determinations.") citing *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990); *Laventhol & Horwath*, 915 F.2d at 199; *In re Direct Gen. Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 56128, at *19-20 (M.D. Tenn. Aug. 8, 2006) (applying the five *Cammer* factors).

The *Cammer* factors, however, are not an exclusive list, and a plaintiff "is not required to show the existence of each of these factors" to establish market efficiency. *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 683 (N.D. Ala. 2005) (citations omitted). "The vast majority of courts have used the *Cammer* factors as 'an analytical tool rather than as a checklist.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015)

(citing *Cammer*, 711 F. Supp. at 1287) (collecting cases).  And while the *Cammer* "cause and effect factor" generally has been an important consideration in determining whether market efficiency exists, in the wake of *Halliburton II* courts have recognized that a finding of market efficiency does not "always require[] proof that the alleged misrepresentations had an immediate effect on the stock price."  *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1256 (11th Cir. Aug. 6, 2014).

"While commentators and courts have recognized that the *Cammer*[] factors were developed to measure the efficiency of stock markets and do not fit the bond markets well, they  . . . have tried applying them where possible to bond markets to determine efficiency."  *In re Enron Corp. Sec., Deriv. and ERISA Litig.,* 529 F. Supp. 2d 644, 747-48 (S.D. Tex. 2006).  Bond investors typically focus on the creditworthiness of the issuer and its likelihood of default.  Accordingly, "factors affecting debt securities must . . . be examined with a view to their distinctive nature and to the kinds of news that would move their market price in contrast to the kind of information that might affect the more volatile stock market, as well as the manner in which that movement would occur."  *Id.* at 749.  Of course, "[g]iven the policy behind the federal securities laws of protecting securities investors from fraud . . . it [is] unreasonable that merely because bonds are not marketed in the same manner or as efficiently as stocks on national exchanges, one must conclude that the bond market is inefficient and thus defrauded bond investors should not have a right to use the fraud-on-the-market theory to permit them to pursue class action litigation."  *Id*.  "[T]he issue is not whether the market for equity is more efficient than the market for debt securities, but whether the market for debt securities is adequately informationally efficient (whether the price reflects all publicly available information) to trigger the fraud-on-the-market presumption of reliance."  *Id*. at 768.

### a. The Market for CBL Common and Preferred Stock Was Efficient

#### i. CBL's NYSE Listing is Strong Evidence of Market Efficiency

Throughout the Class Period, CBL's common stock and preferred stock was traded in the NYSE. ¶¶ 21, 39, 83. Congress, the Supreme Court, and the seminal *Cammer* decision all recognize that such well-developed markets are generally efficient in reflecting publicly-available information in the prices of their listed securities. In *Basic*, the Supreme Court noted that in "drafting [the 1934] Act, Congress expressly relied on the premise that securities markets are affected by information…[and] [r]ecent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information." 485 U.S. at 246; *see also Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) ("Basic itself recognized the NYSE as an efficient market"). Similarly, *Cammer* quoted with approval treatise commentary that "there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System." 711 F. Supp. at 1292.

Accordingly, consistent with *Cammer* and *Basic*, "[m]ost courts to consider the issue have concluded that a stock's listing on the New York Stock Exchange is a strong indication that the market for the stock is efficient." *See, e.g., In re JPMorgan Chase & Co. Secs. Litig.*, No. 12 Civ. 03852, 2015 U.S. Dist. LEXIS 132181, *22 (S.D.N.Y. Sept. 29, 2015). The fact that CBL's common and preferred stocks traded in such a well-developed market leads to a strong presumption of market efficiency. ¶ 21, 83.

### ii. The *Cammer* and *Krogman* Factors Demonstrate Market Efficiency

Dr. Cain analyzed CBL's common and preferred stocks using the *Cammer* and *Krogman* factors[7] and concluded that the markets for each were efficient during the Class Period. ¶¶ 28-143. Courts have found that certain established factors used in determining the market efficiency for common stock are also applicable to preferred stock. *See In Re Teva Securities Litigation*, No. 3:17-cv-00558 (SRU).[8]

**Weekly Trading Volume:** Under *Cammer*, turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is efficient; 1% would justify a substantial presumption. ¶¶ 28-29. During the Class Period, the average weekly trading volume of CBL common stock on the NYSE was 8.11%. ¶ 30. Similarly, the average weekly trading volume of CBL preferred series D and series E was 1.68% and 1.97%, respectively. ¶ 82. This level of trading volume provides strong support for market efficiency. ¶¶ 30, 82.

**Analyst Coverage:** Analyst coverage on a security implies that information about the company is rapidly reflected in the security price. *Cammer*, 711 F. Supp. at 1286. During the Class Period, at least 1,959 reports on CBL were issued by analysts at 26 separate firms. ¶ 34. Financial information was further disseminated to investors *via* media coverage. ¶ 36. There were

---

[7] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

[8] Whether market participants are investors in CBL common stock or CBL preferred stock, they generally will have access to the same information from the same sources (*e.g.*, analysts, media, Company filings, etc.). ¶ 81. Therefore, to the extent that CBL common stock share price reflects publicly available information regarding CBL, and the share price rapidly adjusts to account for new, economically material and unanticipated information, prices for CBL preferred stock would also reflect the same publicly available information regarding CBL. *Id.* Should it be found that CBL common stock traded in an efficient market during the Class Period, then that finding supports the conclusion that CBL preferred stock also traded in an efficient market. *Id.*

over 1,636 news articles pertaining to the Company during the Class Period.  *Id.*  Moreover, CBL produced numerous filings containing Company information which were immediately disseminated to the public through the SEC's online database, EDGAR.  *Id.*  This volume of analyst and news coverage supports an inference that its securities traded in efficient markets.  *See Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 967 F. Supp. 1143, 1162 (N.D. Ohio 2013) (15 analysts during 18-month class period showed efficient market); *Levine v. SkyMall, Inc.*, No. Civ. 99-166, 2001 U.S. Dist. LEXIS 24705, at \*14-19 (D. Ariz. May 22, 2001) (second *Cammer* factor satisfied where only four analyst firms followed the Company).

**Market Makers and Arbitrageurs:**  The number of market-makers is not germane to CBL stock because its stock traded on the NYSE during the Class Period.  ¶¶ 37-41.  This type of large, national exchange reports volume, prices, bid-ask spreads, and other trading details which ensure that it remains well-developed, liquid, and efficient.  ¶ 40.  Courts view large, established stock exchanges with designated market makers (such as the NYSE) as being informationally efficient.  *Id; see also Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 573 (C.D. Cal. 2012) (finding that the existence of a designated market maker satisfies *Cammer* Factor 3).

**S-3 Eligibility:** A Company's eligibility to file a short-form registration statement, *i.e.,* Form S-3, supports a finding of market efficiency because a company that makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer. *Cammer*, 711 F. Supp. at 1285; ¶¶ 42-43.  Not only was CBL eligible for to S-3 registration, CBL filed two SEC form S-3ASR's during the Class Period. ¶ 44.

**CBL's Market Capitalization:**  CBL's market capitalization averaged $1.8 billion over the Class Period far exceeding that of other securities operating in efficient markets.  ¶¶ 60-61.  Similarly, during the Class Period, CBL's preferred series D market capitalization averaged

15

$410.34 million.  *¶ 94.*  CBL's preferred series E market capitalization averaged $151.91 million. ¶ 95.  CBL's sizeable market capitalization throughout the Class Period is further evidence of the efficiency of the market for CBL common and preferred stock.  ¶¶ 60-61, 94-95.

**Bid-Ask Spread:** The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid).  *¶ 62.*  A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade.  *Id.*  CBL's common stock spread fluctuated between 0.04% and 3.49% from July 2014 through March 2019, and averaged 0.25% over the Class Period. ¶ 63. Similarly, for CBL's preferred series D, the spread fluctuated between 0.09% and 0.68% from July 2014 through March 2019, and averaged 0.27% over the Class Period.  ¶ 97.  CBL's preferred series E spread fluctuated between 0.17% and 1.28% between July 2014 and March 2019 and averaged 0.59% over the Class Period. ¶ 98.  CBL's narrow bid-ask spread for its common and preferred stock supports the conclusion that they traded in an efficient market during the Class Period. ¶ 99.

**Public Float:** The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders.  ¶ 65.  Approximately 98.12% of CBL's common shares were held by institutions and other outside investors. ¶ 66. Similarly, all of CBL's preferred stock appears to have been held by outside investors.  ¶ 100.  This large degree of public float for CBL's stock supports the conclusion that it traded in an efficient market during the Class Period.  *Id.*

**Institutional Ownership:** Institutional investors who have significant resources to allocate to investing decisions can improve market efficiency by digesting new public information and making investment decisions quickly impounded into stock prices.  ¶¶ 40, 67.  On average, 800

16

institutions held CBL stock at some point during the Class Period. ¶¶ 40 n.27, 68. Similarly, institutional ownership as a percentage of shares outstanding for CBL preferred series D ranged from 31.44% to 46.11% and the preferred stock was held by 56 institutions during the Class Period. ¶ 85. Likewise, institutional ownership as a percentage of shares outstanding for CBL preferred series E ranged from 17.24% to 36.11% and the preferred stock was held by 37 institutions during the Class Period. *Id.* The significant institutional ownership base for CBL stock supports the conclusion that the stocks traded in efficient markets during the Class Period. *Id.*

**Autocorrelation:** Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns. ¶ 69. If statistically significant autocorrelation in stock returns persists, it implies market inefficiency. *Id.* The autocorrelation coefficient over the full Class Period for CBL common stock was not statistically significant. ¶ 71. The autocorrelation coefficients for series D and E, were also not statistically significant. ¶¶ 101-103. This finding supports the conclusion that CBL's stocks traded in efficient markets.

**Options Trading:** Academic studies have shown that options written on company stock help to improve market depth and liquidity, investor interest, and overall market efficiency. ¶ 72. CBL's common stock had 388,902 call option contracts and 631,943 put option contracts traded during the Class Period. *Id.* The presence of options trading supports the conclusion that CBL's common stock traded in an efficient market during the Class Period. *Id.*

**Cause and Effect Relationship of Unexpected Material News and Stock price:** This factor examines "empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in stock price." *Cammer*, 711 F. Supp. at 1286-87; ¶ 45. To assess the extent of a "cause and effect relationship" between company disclosures and resulting movements in stock price, Dr. Cain analyzed CBL's quarterly earnings

announcements (the "News Days").  ¶ 46.  These announcements represent a potential opportunity for the public release of new value-relevant Company information.  *Id.*  The mix of unanticipated results, forward guidance, executive statements, analyst interpretations of this information etc. can cause company stock prices to move in an efficient market.  *Id.*  Dr. Cain compared the stock returns and trading volume of CBL's stock on "News Days" versus those metrics on trading days that contained relatively little Company-specific information (the "Least News Trading Days").  ¶ 47.  If CBL's stock prices tend to move more significantly following News Days than on the Least News Trading Days, this would support a conclusion of market efficiency.  *Id.*

In order to study the common stock price movements for CBL on different trading days, Dr. Cain performed an event study to evaluate whether CBL's stock responded to information disclosed on the News Days.  ¶¶ 48-55.  Dr. Cain's event study found that overall, 7 out of 19 CBL News Days (36.84%) caused stock price movements that were statistically significant at the 95% level.  ¶¶ 55-56.  This compares to only 5.39% of the Least News Trading Days with statistically significant stock price movements.  *Id.*  This difference, which itself is statistically significant, provides strong evidence of a cause-and-effect relationship between information and CBL common stock price movements.  *Id.*  This finding establishes a clear cause-and-effect relationship between new Company-specific information and CBL common stock price movements and supports the conclusion that CBL's common stock traded in an efficient market during the Class Period.  *Id.*

With respect to CBL preferred stock, Dr. Cain's event study determined that 5 of 19 CBL earnings announcements (26.32%) caused statistically significant price movements in CBL preferred series D, whereas 4 out of the 19 announcements (21.05%) caused statistically significant price movements for preferred series E.  ¶¶ 89-90.  This compares to only 8.18% and 7.08% of the

Least News Trading Days with statistically significant price movements for preferred Series D and E, respectively. *Id.* These differences, which are themselves statistically significant, provide strong evidence of a cause-and-effect relationship between information and CBL preferred stock price movements. *Id*.

Accordingly, all of the *Cammer* and *Krogman* factors demonstrate that CBL's common and preferred stocks traded on efficient markets during the Class Period.

### b. The Market for CBL Notes Was Efficient

**Weekly Trading Volume:** During the Class Period: (1) CBL's 5.25% senior note had an average weekly turnover of 2.45%; (2) CBL's 4.60% senior note had an average weekly turnover of 2.20%; and (3) CBL's 5.95% senior note had an average weekly turnover of 4.45%. ¶ 114. These volumes are well above *Cammer*'s 2% threshold to justify a strong presumption of market efficiency. ¶¶ 28-29.

**Analyst Coverage:** As aforementioned, during the Class Period, at least 1,959 reports on CBL were issued by analysts at 26 separate firms and over 1,636 news articles were published. ¶¶ 34, 36. These reports contain information relevant to all of CBL's securities, including the notes. ¶ 116. Furthermore, Fitch, Moody's, and S&P all provided continuous and ample coverage of CBL's notes during the Class Period. ¶ 118. This volume of analyst and news coverage supports an inference that its securities traded in efficient markets. *Supra*, 14-15.

**Market Makers:** During the Class Period there were: (1) 299 market makers trading CBL's 5.25% note; (2) 260 market makers trading CBL's 4.60% note; and (3) 299 market makers trading CBL's 5.95% note. ¶ 120. This supports market efficiency. *See Cammer*, 711 F. Supp. at 1283 n.30 (11 market makers justifies substantial presumption of efficiency).

**S-3 Eligibility:** As discussed above, CBL was eligible for S-3 registration.

**Market Capitalization:** CBL's 5.25% note had a market capitalization averaging $430.69 million during the Class Period. ¶ 134. CBL's 4.60% note had a market capitalization averaging $269.18 million. *Id.* CBL's 5.95% note had a market capitalization averaging $494.37 million. *Id.* All three notes' market capitalizations exceeded many bonds that have been deemed to have traded in an efficient market by the courts. *Id.*

**Bid-Ask Spread:** (1) CBL's 5.25% note had an average bid-ask spread of 1.21% and a median bid-ask spread of 1.07% for dealer-to-customer transactions, and an average bid-ask spread of 0.34% and a median bid-ask spread of 0.19% for dealer-to-dealer transactions; (2) CBL's 4.60% note had an average bid-ask spread of 1.48% and a median bid-ask spread of 1.34% for dealer-to-customer transactions, and an average bid-ask spread of 0.31% and a median bid-ask spread of 0.16% for dealer-to-dealer transactions; and (3) CBL's 5.95% note had an average bid-ask spread of 1.30% and a median bid-ask spread of 1.16% for dealer-to-customer transactions, and an average bid-ask spread of 0.21% and a median bid-ask spread of 0.13% for dealer-to-dealer transactions. ¶ 137. The narrow bid-ask spread of CBL's notes supports the conclusion that CBL's notes traded in an efficient market during the Class Period. ¶ 140.

**Public Float:** Dr. Cain found no indication that insiders held any positions in CBL's notes during the Class Period. ¶ 142. Therefore, the public float for CBL's notes is the same as their notional outstanding number. ¶ 143. This large amount of notional outstanding for CBL's notes, $450,000,000 for the 5.25% note, $300,000,000 for the 4.60% note and $400,000,000 for the 5.95% note ($625,000,000 after the additional issuance) supports the conclusion that CBL's notes traded in an efficient market during the Class Period. *Id.*

**Cause and Effect Relationship of Unexpected Material News and Stock price:** Dr. Cain determined that during the Class Period, there were 6 dates when there were disclosures regarding

changes in CBL's credit ratings, which could contain material, unanticipated information relevant to the notes. ¶ 126. Moreover, because credit rating changes are often triggered by the revelation of important value-relevant Company information, for each credit rating change for CBL, Dr. Cain also reviewed and considered any of CBL's earnings releases within one week prior to the ratings change, which were a total of 4. *Id.* Therefore, Dr. Cain identified a total of 10 news announcement dates. *Id.* Dr. Cain's event study analysis showed that 40% of the 10 news announcements caused single-day price movements that were statistically significant at the 95% level for CBL's 5.25% note, whereas 50% of the 10 news announcements caused a single-day price movement that was statistically significant at the 95% level for CBL's 4.60% and 5.95% notes. ¶ 133. This compares to 6.81%, 4.17%, and 6.20% of the Least News Trading Days with statistically significant price movements for CBL's 5.25% note, 4.60% note, and 5.95% note, respectively. *Id.* These differences are themselves statistically significant at 99% level for each of CBL's notes. *Id.* This provides strong evidence of a cause-and-effect relationship between information and CBL's notes price movements, which supports the conclusion that CBL's notes traded in an efficient market throughout the Class Period. *Id.*

Based on his analyses, Dr. Cain concluded that each of CBL's Senior Notes traded on an efficient market during the Class Period, which is supported by the *Cammer* and *Krogman* factors discussed above.

### 2. Reliance Is Also Presumed Under *Affiliated Ute*

In *Affiliated Ute Citizens of Utah v. United States*, 92 S. Ct. 1456 (1972), the Supreme Court held that reliance is presumed where "a plaintiff's claim is based on a defendant's failure to disclose material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992). In such circumstances, individual reliance need not be proven. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might

have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 131.

Here, reliance may be presumed under *Affiliated Ute* based on Defendants' omissions of material information including, *inter alia*, CBL's Overcharge Scheme and the existence and materiality of the *Wave* Litigation.

### 3. Mechanical Tabulations for Individual Class Members Will Not Defeat Predominance

Where liability can be proved class-wide, "recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well-nigh universal." *See In re Whirlpool*, 722 F.3d at 861, *quoting Comcast Corp. v. Behrend*, 569 U.S. 27, at 42 (2013). This is especially true for securities class actions, where the process of computing damages after liability is established is "virtually a mechanical task." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 252 (N.D. Cal. 2013). To the extent any evidence is required, an event study like that provided by Dr. Cain (¶¶ 144-150) will suffice. *See, e.g., In re JPMorgan Chase & Co. Secs. Litig.*, 2015 U.S. Dist. LEXIS 132181, at *23-24.

### B. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation. "Together with predominance, the superiority requirement 'ensures that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007). Courts have universally recognized the superiority of class actions in cases alleging securities fraud. *Supra* at 1-2. Courts analyze four factors in determining the superiority of the class action:

A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors weigh in favor of class certification in this case.

The members of the proposed Class have little incentive to pursue individual actions. The costs and expenses of such actions, when weighed against the individual recoveries obtainable, would be prohibitive. *In re WorldCom, Inc. Sec. Litig*., 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail," particularly when many of the putative plaintiffs have suffered economic loss of *de minimus* value). A class action is not only an essential mechanism for investors to redress the injuries they suffered because of defendants' misconduct, it will also facilitate the vindication of the statutory objective of a fair, orderly, trustworthy, and reliable securities market. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 320 n.4, (2007) ("Nothing in the [PSLRA], [] casts doubt on the conclusion 'that private securities litigation is an indispensable tool with which defrauded investors can recover their losses'— a matter crucial to the integrity of domestic capital markets."). Moreover, there are likely thousands of class members. *Supra* Section III.A. "Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources." *In re SCOR Holding (Switzerland) AG Litig*., 537 F. Supp.2d at 579. It would also "risk disparate results among those seeking redress." *Id*. Finally, there is no reason to expect any difficulties in managing this case as a class action. Indeed, class actions of this size and complexity are common.

## V. THE COURT SHOULD APPOINT PLAINTIFFS' CHOICE OF COUNSEL

In addition to satisfying the adequacy prong of Rule 23(a)(4), Pomerantz and AF&T also satisfy the considerations of Rule 23(g) and should be appointed as Class Counsel.[9] Pomerantz and AF&T have been appointed class counsel in hundreds of securities class actions. Courts in this Circuit and around the country have recognized the expertise and ability of Pomerantz and AF&T lawyers to effectively litigate complex securities class actions. *See, e.g., In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 362 (S.D.N.Y. 2016) ("on the basis not only of [Pomerantz's] prior experience but also on the Court's observation of its advocacy over the many months since it was appointed lead counsel, the Court concludes that Pomerantz, the proposed class counsel, is qualified, experienced and able to conduct the litigation"); *Utesch v. Lannett Co., Inc.*, No. CV 16-5932, 2021 U.S. Dist. LEXIS, at *4 (E.D. Pa. Aug. 12, 2021) ("The law firm resumé of [AF&T] illustrates that counsel has substantial experience in litigating securities fraud class actions").

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (i) certify this action as a class action pursuant to Rule 23(a) and 23(b)(3); (ii) appoint the Proposed Class Representatives as Class Representatives; and (iii) appoint Co-Lead Counsel Pomerantz and AF&T as Class Counsel.

---

[9] In appointing class counsel pursuant to Rule 23(g), a court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]" Fed. R. Civ. P. 23(g)(1)(A).

Dated: August 18, 2022

Respectfully Submitted,

/s/ *Sarah R. Johnson*
Al Holifield (BPR# 015494)
Sarah R. Johnson (BPR# 030781)
**HOLIFIELD & JANICH, PLLC**
11907 Kingston Pike Suite 201
Knoxville, Tennessee 37934
Tel: (865) 566-0115
Fax: (865) 566-0119
aholifield@holifieldlaw.com
sjohnson@holifieldlaw.com

John W. Chandler, Jr.
**THE HAMILTON FIRM**
2401 Broad Street, Suite 102 Chattanooga, TN 37408
Tel: (423) 634-0871
Fax: (423) 634-0874
jwc@thehamiltonfirm.com

**Co-Liaison Counsel for Plaintiffs**

Jeffrey S. Abraham (admitted *pro hac vice*) Michael J. Klein (admitted *pro hac vice*) **ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
jabraham@aftlaw.com
mklein@aftlaw.com

25

Jeremy A. Lieberman (admitted *pro hac vice*)
Michael J. Wernke (admitted *pro hac vice*)
Veronica V. Montenegro (admitted *pro hac vice*)
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
jalieberman@pomlaw.com
mjwernke@pomlaw.com
vvmontenegro@pomlaw.com

**Proposed Class Counsel**

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
peretz@bgandg.com

**Additional Counsel for Jay Scolnick**

**KASKELA LAW LLC**
D. Seamus Kaskela
18 Campus Boulevard, Suite 100
Newtown Square, PA 19073
Tel: (484) 258-1585
skaskela@kaskelalaw.com

**Additional Counsel for Mark Shaner**

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18, 2022 I caused the foregoing to be electronically filed with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

*By: Sarah R. Johnson____*
**HOLIFIELD & JANICH, PLLC**
11907 Kingston Pike Suite 201
Knoxville, Tennessee 37934
Tel: (865) 566-0115
Fax: (865) 566-0119
sjohnson@holifieldlaw.com
*Co-Liaison Counsel for Plaintiffs*