# EXHIBIT 8

Case 1:19-cv-00181-JRG-CHS    Document 184-8    Filed 10/28/22    Page 1 of 48
PageID #: 3239

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

-----------------------------------x

IN RE: CBL & ASSOCIATES PROPERTIES,

INC. SECURITIES LITIGATION

Consolidated Case No.

1:19-CV-181-JRG-CHS

-----------------------------------x

CONFIDENTIAL

REMOTE VIDEOTAPED DEPOSITION OF

JAY SCOLNICK

September 29, 2022

10:37 a.m.

Robin K. Ferrill, CCR-B-1936, RPR

Case 1:19-cv-00181-JRG-CHS    Document 184-8    Filed 10/28/22    Page 2 of 48
PageID #: 3240

                    APPEARANCES OF COUNSEL
Attorneys for Plaintiffs
MICHAEL WERNKE, Esquire
     Pomerantz, LLP
     600 Third Avenue
     20th Floor
     New York, New York 10116
     212.661.1100
     mjwernke@pomlaw.com

On behalf of the Plaintiffs
EITAN KIMELMAN, Esquire
     Bronstein, Gewirtz & Grossman, LLC
     60 East 42nd Street
     Suite 4600
     New York, New York 10165
     info@bgandg.com
     212-697-6484

On behalf of the Plaintiffs
D.  SEAMUS KASKELA, Esquire
     Kaskela Law
     18 Campus Boulevard
     Suite 100
     Newtown Square, PA 19073
     484.258.1585
     skaskela@kaskelalaw.com

On behalf of the Defendants
PETER M. STARR, Esquire
MATTHEW B. ROSENTHAL, Esquire
     King & Spalding LLP
     1180 Peachtree Street, N.E.
     Atlanta, Georgia 30309

ALSO  PRESENT:
     Mike Brown, Videographer

Case 1.19-cv-00181-JRG-CHS   Document 184-8   Filed 10/28/22   Page 3 of 48
PageID #: 3241

CONFIDENTIAL

REMOTE VIDEOTAPED DEPOSITION OF

JAY SCOLNICK

September 29, 2022

THE VIDEOGRAPHER:  We are on the record. My name is Mike Brown representing Veritext Legal Solutions.  The date, September the 29th, 2022.  Time on the video monitor is 10:37 a.m. Caption of the case In Re: CBL & Associates Properties, Incorporated Securities Litigation. Name of our witness, Jay Scolnick.

Counsel, please state your name for the record and whom you represent.

MR. STARR:  Peter Starr, King & Spalding, LLP on behalf of the defendants.  And with me is Matt Rosenthal, also King & Spalding and also on behalf of the defendants.

MR. WERNKE:  Michael Wernke, Pomerantz, LLP on behalf of the lead plaintiffs and the class.

MR. KIMELMAN:  Eitan Kimelman on behalf of Bronstein, Gewirtz & Grossman, LLC on behalf of the plaintiff.

MR. KASKELA:  Good morning.  Seamus Kaskela Kaskela Law, LLC for plaintiff.

THE VIDEOGRAPHER:  Court reporter, Robin

800.808.4958                                                          770.343.9696

Ferrill. Will the court reporter please swear in the witness.

JAY SCOLNICK,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

MR. STARR: All right. Before we begin, I'd just like to note for the record that Mr. Wernke called me yesterday to advise that Mr. Scolnick recently identified one and a half to two bankers boxes worth of other documents that were not and had not been produced to defendants. So defendants are going to proceed with Mr. Scolnick's deposition today without access to those documents. But we do so under reservation of rights to take further action and mitigate any prejudice this has caused. And, furthermore, Plaintiff's counsel has stipulated that the defendants may recommence Mr. Scolnick's deposition for an additional three and a half hours of examination time, if necessary, once these documents have been produced and reviewed by defendants.

So we will keep this deposition open in the event that we later need to ask additional

Case 1.19-cv-00181-JRG-CHS    Document 184-8    Filed 10/28/22    Page 5 of 48
PageID #: 3243

Q.   And do you own 100 percent of the ownership interests in each of those companies?

A.   Yes.

Q.   Do you have other employees?

A.   No.

Q.   So none of those four companies have any employees other than you?

A.   No.

Q.   What is Doreen Development Corporation?

A.   Doreen is a company that is hundred percent owned by my mother, Doreen Scolnick.  And I know why you are asking.  They bought some shares of CBL.  So they have had an account at TD Ameritrade that I bought some shares for my mother.  So it's just her own company, shared some extra cash.

Q.   Does Doreen Development Corporation have any business operations?  I mean, what does it do as a company?

A.   It's a partner in some -- I don't know the exact structure, but it's a partner in some investments.

Q.   Is that incorporated?  Is that company incorporated in the laws of any state?

A.   Yes, it's a Colorado corporation.  It's a Corp.

800.808.4958                                                            770.343.9696
Case 1.19-cv-00181-JRG-CHS   Document 184-8   Filed 10/28/22   Page 6 of 48
PageID #: 3244

Q.   Does Doreen have any employees?

A.   No.  No employees.

Q.   You mentioned one lawsuit against one of your companies already.  Have any of your other companies, the four we just discussed ever been named as a defendant in a lawsuit?

A.   Well, to be totally transparent, I never got to a lawsuit, but I got served once by an oil company.  Because in Colorado, oil and housing sometimes work on the same properties.  And they -- you know, they said I was obstructing some of their operations.  So that's all.

Q.   So you were served with a complaint by an oil company?

A.   Yes.

Q.   And what was the -- how was that situation resolved?

A.   I immediately moved -- we moved the dirt out of their way.  So we nev- -- it never went anywhere.  It was quickly resolved.

Q.   And with respect to that lawsuit involving the -- the fence, the one inch of fence over the line, which company was that?

A.   Premier Community Homes.

Q.   You settled that case.  When you settled

those accounts, and the objective was to show all my

losses that I was -- you know, I was involved in.

And I made all those transactions.  So that's why we

presented it.  I made every trade there.  So why not

include it?

Q.   (By Mr. Starr) Do you have any ownership

interest in Doreen Development Corporation?

A.   No, I don't.  Other than it's a hundred

percent owned by my mother.

Q.   Right.  Owned by your mother, but you don't

have any ownership interest in it.  So do you have

authority to take actions on behalf of Doreen

Development Corporation?

MR. WERNKE:  Objection, form.

A.   I had authorization to make all the trades.

Q.   (By Mr. Starr) To make the trades in the

Doreen account?

A.   Right.

MR. STARR:  Do you mind if we take a quick

five, guys?

MR. WERNKE:  Sure.

THE VIDEOGRAPHER:  All right.  Off the

record, 11:41.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  Back on the record.  The

Case 1.19-cv-00181-JRG-CHS    Document 184-8    Filed 10/28/22    Page 8 of 48
PageID #: 3246

capitalize the income and come up with a value for the assets, subtract the liabilities, and what drops out is the value for the common shareholders.  Common appraisal practice.

Q.    And where do you get the information that you need for that analysis?

A.    The -- the 10-Q, 10-Ks.

Q.    Do you ever review equity analyst reports about a company before investing in it?

A.    Not before.  Like I'll -- well, I should say sometimes it will get brought to my attention, but I always verify it, sort of -- forget what the saying is, but yes, I don't always -- I may -- I may read something and then I'll go analyze it.  Or it could be the opposite, I found it and I still -- I might read the reports periodically.  But I rely on my analysis the most.

And I have never bought a stock, ever, without doing my own analysis.  I have never bought it off of an investing report.  I only rely on my final analysis, which is from the 10-K and 10-Qs.

You can see from what I sent, some of my analysis goes back to 2005 and then there was a gap and then I went back and looked at it again.  And I have been following CBL for quite a while, and I --

you could see what I sent you.  And I did a quarterly analysis every quarter.  So that's really where I get all my decision-making process from.

Q.   Yes.  And we will talk about those analyses, quarterly analyses in a moment.  But I guess at a high level, though, what was your approach for analyzing CBL and kind of what -- could you describe what went into your quarterly analyses of CBL?

A.   I told you:  I capitalize the income, subtract the liabilities and then the common stock is what drops out of the value.

Q.   So how do you capitalize the income with a company like CBL with many different properties and with what level of granularity?

A.   You pull the latest quarterly report, which is a 10-Q, and you annualize it.  And then you would capitalize it by what I would consider an ongoing capitalization rate for a different -- the different types of problems.  You can see in one of the pages of my analysis, there was -- like CBL got up to about 14 tabs on an Excel spreadsheet.  But one of the tabs was a -- a matrix that I put together for the different capitalization rates for the different grades of malls.  So and I arranged from like five

800.808.4958                                              770.343.9696
Case 1.19-cv-00181-JRG-CHS   Document 184-8   Filed 10/28/22   Page 10 of 48
PageID #: 3248

and a half all the way up to a 10 percent cap rate.

So, and then the offices, you know, were pretty high cap rate, maybe around 9 percent. So I was, you know, I was pretty conservative. I had -- you know, they had class A, B and C models. So I would analyze -- by using the matrix with the cap rate, I could consolidate all their income together.

So as an aggregate, I would capitalize all that income by the cap rate that fell out through the matrix. And then that would give me the value of all the assets and then you have to subtract the liabilities out of liquidation.

So it was based on a -- sort of a liquidation of the assets because it was the value of the assets after paying off all the liabilities.

Q. So when you said that you were pretty conservative in terms of calculating a cap rate, were there assumptions that you had to rely on to come up with the cap rate, or what do you mean by you were conservative?

A. Well, I used -- they had malls that were -- they rated as A, B and C and then actually they had a fourth, called lender malls that they were sort of under a lender -- I forget what they called it. But basically they had, like, you would send a message to

other groups that they were -- that they were in default.

Q. So heavily mortgaged or something or they were on the cusp of returning to the lender, is that what you mean?

A. Yes. Yes. It wasn't that they were heavily mortgaged. Some of them could have just been free and clear. And -- but what I did was I assigned a cap rate for each quality mall, A, B, C, D. Plus, they had some strip plazas that had a different cap rate. The office buildings had a cap -- a different cap rate. So as much as you can get segmented information, I was assigning different cap rates.

Q. And where did you -- where did you get the cap rates that you -- where were you -- the cap rates that you assigned, where were you getting those from?

A. From sort of industry -- industry -- what do you call it? Publications. Reading: Like I think CBRE had an annual cap rate survey. So there are different industry publications. But some of these cap rates were -- when I say "conservative," you know, I was using some double digit cap rates.

Q. Would you ever dial back those sort of industry cap rates or adjust them according to your own views of a particular category or tier of

properties? Of CBL's properties, that is?

A. Yes, I think if you look at the -- you know, cap rates do get also affected by the, you know, the interest rate, the 10-year key bill. 10-year key bill is sort of -- a 10- or five-year key bill is sort of another factor. So I have adjusted my cap rate from the information I submitted, the cap rate did adjust. I did move the cap rates around based on the market and the information I read in the annual report, you know, about the different malls and, you know, stuff like that, where the rents were going. So yeah, I did -- it wasn't the same cap rate throughout the years.

Q. (By Mr. Starr) Yes, well, we'll run back to these analyses of CBL. Let me just broaden our horizons a little bit here and just talk generally about your process for investing when you decide to invest in a company. So we covered SEC filings and analyst reports. Do you review news sources about the company when deciding whether to invest in a new company?

MR. WERNKE: Object to form.

A. I have a Google alert that sometimes comes up with some articles, but not -- not much, then usually it's just something that's, you know, they

spoke with Ms. Reinsmidt over the phone?

A. I would be guessing but maybe half a dozen.

Q. We have discussed that you conducted your own analyses of CBL's financial performance. Could you please explain the various types of analyses that you would conduct on CBL?

A. Well, yes. The -- I would say like 90 percent of my -- 90 percent of my analysis was -- was really -- or 90 percent of my decision-making process, whereas based on that one page called intrinsic value, which derives all of its information from the financial statements, the Qs and the Ks. So that's, you know, it's a -- I have a pretty big spreadsheet, but that is the -- that's the first tab. That's the baby to, you know, what I use for all the -- you know, for just the decision-making process.

Q. Are you using the term "intrinsic value" synonymously with net asset value?

A. Yes.

Q. NAV?

A. Yes. Yes. Yes, I am.

Q. Did CBL itself report its net asset value to investors?

A. No.

Q.   Other analysts and financial commentators calculated CBL's net asset value during the relevant period, right?

A.   They did.  Some, yes.

Q.   Did your --

A.   Yes.  Sorry.

Q.   Sorry.  Go ahead.

A.   Yes, at some --

Q.   No, what you were going to say?

A.   I just saw one on Bank of America.

Q.   Did your calculations of net asset value ever differ from the conclusions reached by other analysts?

A.   I can't remember the difference, but -- I can't remember the differences.

Q.   So were there differences?

A.   I believe so.

Q.   Did you perform your own analysis of CBL's debt obligations?

A.   I took the debt at face value on my analysis.

Q.   Did you get the information about CBL's debt allegations from its public financial statements?

A.   Yes.

Q.   Did you rely on your calculation of net asset value to determine whether to buy, sell or hold CBL stock?

A.   A hundred percent.

Q.   That was the primary or the sole factor that you used to make investment decisions about CBL. Is that fair?

A.   Yes.  That's accurate.

Q.   All right.  Mr. Scolnick, I'm going to introduce an exhibit here on Exhibit Share.  This will be the document that's marked as Exhibit 27.

(Defendant's Exhibit 27, Document entitled, Annual Property Return Efficiency, marked for identification.)

Q.   (By Mr. Starr) Please let me know when you can see it.

A.   I'll refresh it.  Okay.  Now I got it. Okay.  Yes, that's my analysis.  Hold on a second. Oh, I got to put that down in this.  Yes, that's --

Q.   This will be Exhibit 27?

A.   Right.

Q.   And what is that document?  Can you please identify it?

A.   It says, Annual Property Return Efficiency.

Q.   This is a document that you created

yourself?

A.   Yes.

Q.   You see the date there on the bottom left-hand corner, it says, Prepared on --

A.   Yes.

Q.   -- April 29, '17?

A.   It does.  Yes.

Q.   Is this part of your quarterly -- one of your quarterly analyses?

A.   Yes.  Yes, and this one actually is each of the annual -- comes from the annual reports or the 10-Ks because it's just the 12 months.  Well, actually, sorry, it's three months.  Three months on the end there because it's the latest three months.

Q.   The most recent three months, is that what that final column shows?

A.   Yes, because it's April.  So that is the latest three months and then it's annualized to be comparative to the other years.  Right.  Uh-huh.

Q.   Did you have any help preparing this document or was this all you?

A.   It's all me.

Q.   And what does Annual Property Return Efficiency measure?

A.   Well, there's a couple things here.

got a good spread.  So, you know, they had plenty of spread.  They had some good old assets that had a good yield.  So the rest of it --

Q.    If I'm understanding you correctly, you calculate the free and clear return excluding any considerations about debt because you were trying to determine what the pure return is and then what the spreadsheet to interest rate would be.  Is that a fair characterization?

A.    Yes.  Right.  So debt could always be refinanced, which they did.  But you can't change your leases and you can't change your income.  So that's -- the free and clear is really important because that's what they would take to their banker to get their mortgages or to refinance.  So that's why it's -- it's important.

Then the FFO is at the bottom and that's -- that is after debt.  So that's a little more.  You could see how I would jump from that all the way, you know, actually, I only had the last four years, yes -- so.

Q.    Just to be clear, what does FFO refer to?

A.    Funds from operation.  And that's after debt.  That's basically -- it's a little bit like EBITDA, earnings before interest, taxes, depreciation

good debt check in case the debt all came due.

Q. All right. You can set that exhibit aside now or at least minimize it.

A. Okay.

MR. STARR: And I will add another document on this Exhibit Share. This one will be marked as Exhibit 28.

(Defendant's Exhibit 28, Document entitled, Weighted Average Cap Rate, 12/31/16, marked for identification.)

THE WITNESS: Okay. Hold on. I've got to refresh. Hold on a second.

Q. (By Mr. Starr) Yes. No worries. Just let us know when you can see it. It will be Exhibit 28.

A. Okay.

Q. And once you get it opened, my first question will be: What is this document?

A. Okay. So earlier I talked to you about the matrix or their cap rate. And this was a -- this was a blender cap rate. And it talked about -- you can see the three different malls there.

Q. Yes.

A. That was the A, B, C and then I told you about the fourth mall. That was the lender (inaudible) malls. And then the strip centers were

800.808.4958 Case 1.19-cv-00181-JRG-CHS Document 184-8 Filed 10/28/22 Page 19 of 48 770.343.9696
PageID #: 3257

the associated centers, community centers and then they had some office buildings, I think at which they worked out of one of them. So this was a matrix that would, on the spreadsheet, it would go all the way back to net asset value and then I would capitalize the income at 7.61 percent. That would be my blended cap rate, try to reflect all the different qualities of their malls.

Q. Of the various categories of property that are listed here?

A. Exactly, yes. You know, it ranged from 6.75 up to 11.38. You know, so it's -- that's quite a range for a cap rate. But, you know, they also had -- I'm weighting it by the gross leasable area, the GLA on the far right, 58 million.

Q. And when you say that this -- this matrix would go all the way back to net asset value on your spreadsheet, what do you mean by that? Was it linked or was it input and one an input to the other? Can you explain that a little more?

A. The 7.61 was a link that went back to the first page, net asset value, or (inaudible) so. And that 7.61 cap rate linked. And that's how I got my value for the -- well, all the income was coming out of the 10-K, 10-Qs, and then it would be capitalized.

one aside.

A.   Okay.

Q.   The document that I'm adding now will be marked as Exhibit 29.  It's taking a moment here.  Bear with me.

A.   Okay.

Q.   All right.  You should be able to see it now.

(Defendant's Exhibit 29, Document entitled, CBL & Associates Properties, Inc., 12/31/16, marked for identification.)

A.   Got it.  Okay.

Q.   (By Mr. Starr)  Can you identify this document for the record, Mr. Scolnick?

A.   The document, as Exhibit 29, is labeled CBL -- CBL Properties for December 31, 2016 Debt Obligations and Maturities.

Q.   And did you create this document yourself, Mr. Scolnick?

A.   Yes.

Q.   What does -- what information does it show?

A.   It just shows when their debts are coming due, what they have to renew, you know, it sort of gives you an idea if there's any really big debt that they are going to have to renegotiate.  So it -- just

Case 1:19-cv-00181-JRG-CHS   Document 184-8   Filed 10/28/22   Page 21 of 48
PageID #: 3259

for the record, it shows the expiration dates from 2016 to 2025 of all their various debt obligations.

Q.   How did you compile this information?

A.   From the 10-K.  So it -- it may be similar in the 10-K, I can't remember, but I got it all from the 10-K.

Q.   Did anybody help you prepare this document?

A.   No.

Q.   As you noted, the debt obligations information set forth here dates back to 2016 and then forward to 2025 and even to 2026 and thereafter, right?

A.   Right.  And it was -- it should be noted, it was prepared on 4/29/2017.  So this would -- came from the 10-K on 2016.  So that -- and this would have been the most recent financial information filed with the SEC.

Q.   How did you calculate 2026 and thereafter and what period of time does that cover?

A.   The 2026 and thereafter?

Q.   Yes.

A.   Well, it came from the 10-K.  And they -- they just provide that.  You don't know how far -- you know, you really don't know unless you were privy to some other information, you don't know what the

one, says it was prepared on 11/5/17, right?

A.   Oh, yes, it was.  Yes.

Q.   So this is just essentially an update of the last version of this document that we saw.  Is that fair?

A.   Yes, that's fair, yes.  It would have been prepared within, like, you know, like a few days after the Q came out -- the Q for the 30th would have come out, you know, 60 days after that.  So September, October, October, November, yeah, so it's right after the Q came out.  I remember that was right on top of those Qs.  So what are you going to look at?

Q.   You know what, I think we will just move right on to another document.

A.   Okay.  I'll wait for you to download.

Q.   Yes, and I'm now introducing a document that's been marked as Exhibit 32 to your deposition.

        (Defendant's Exhibit 32, Document entitled,
    Dividend and Interest Coverage Ratio, marked for
    identification.)

Q.   (By Mr. Starr) Please let me know when you can see it.

A.   Yeah.  I'm pulling it up.  Dividend and Interest Coverage Ratio. So this is an Exhibit 32

prepared on 11/5 of 2017. It would have been from the September 30th, 2017 Q. And it's titled, Dividend and Interest Coverage Ratio of CBL & Associates property. So this is --

Q. And this is another analysis that you prepared. Is that correct?

A. Exactly. Yes.

Q. I'll note this has the same prepared on date, 11/5/17. That's the same as the e-mail that we saw two exhibits ago, the e-mail that you sent to Joe D. and Mr. Shaner, correct?

A. Yes, that's true, yes.

Q. What does this document show?

A. Okay. We'll start from the top. So this tells you -- it's sort of like a -- a -- in a normal operating company, you would have what's called an acid test. Not asset, but acid, acid test. And it's sort the test on when everything is said and done with all their interests and everything, can they pay it?

And -- can they pay the interest? And when you -- when you apply for financing, you know, banks typically say you've got to have a certain interest coverage ratio over your free and clear return, which is that 9 percent we were looking at, you know. So

800.808.4958 770.343.9696
Case 1.19-cv-00181-JRG-CHS Document 184-8 Filed 10/28/22 Page 24 of 48
PageID #: 3262

you got to have interest coverage ratio.  That's standard underwriting.  So the interest coverage ratio would have to exceed at least probably 1.3, 1.25.  CBL would be dealing with stuff like this all the time when they are refinancing.

So looking at this, which is based on the 10-Q, which is based on the net operating income, which is the 626,236,000, that income, you know, subtracting out their debt showed a good coverage ratio.  And then you always got to pay the preferred shareholders, so, you know, just to make sure, like, especially since I was buying those preferred shares for my mother, I wanted to make sure they could afford to pay those.  So those, they had one and a half times coverage, which is then based on the Q income.

And then, you know, you want to make sure that the dividends they are paying was not coming out of capital.  You never want to buy a stock where the dividend is coming out of the capital, which is sort of like, you know, coming out of your -- you know, basically your board and to -- to pay the dividend.  That would be a real no-no.  So this tells you like, can they afford to pay the dividend?  Well, evidently from what they disclosed, they had two times the

income to pay the dividend.  So they had 1.64 to pay out the 80 cents.  So you can see the ratio was 48 percent or, hence, two for one.  So they had plenty of money to pay the dividend that I was buying for the common stock.  They had plenty of money to pay my mother the one and a half times coverage.  And they had plenty of interest to pay the debt holders, which is going to be the first lien holder, which is 2.9.

So it looked like, you know, on this date, they could pay everybody.  And that's why it was sort of another litmus test that the stock looked really cheap because the value was good and they could pay everybody.  So everything --

Q.   So is it fair to say this -- you described it as an acid test.  Is it fair to say this is sort of another gut check that would confirm your net asset value calculation, just another way to check the health of the company and make sure you were on solid ground?

A.   Exactly.  Yep.

Q.   And the coverage that you are measuring here, if I understand you correctly, is interest on the debt, dividend on the preferred and dividend on the common.  Is that -- are those the three --

A.   Yes.

per-square-foot basis.

So another sort of tangible. If it was $400 a foot, you would be a little -- you'd be a little suspect if you are paying $400 a foot. How were they getting the value? You know, maybe they have inflated rents or something. So this told you that, you know, it mall sort of reconciled, you know, to buy all their malls for 214, you know, it showed that it was pretty good value and then this other --

Q. You compare that 214 to some standard or average in the industry? Did you have that sort of comparison?

A. Just, you know, just sort of what I do have, some malls would sell for 3-, $400. So just an idea like that was pretty cheap. Just gave me more of a relative value. It wasn't going to make or -- it wasn't going to make my decision because the mall could be -- you know, could -- they had a lot of rural malls. So the mall could only be worth lower than the industry or some of the ones I would -- you know, that I would read about. But like I said, 95 percent of my decision was based on the intrinsic value, or the net asset value based on the -- you know, the income statements. These were just ways to --

Q.   In that top line, Discounts to Net Asset Value, so you took -- I want to make sure I'm understanding this.  So you would take your calculation of net asset value and then compare the then prevailing common stock price to net asset value to figure out --

A.   Right.

Q.   -- to figure out whether the stock, I guess, is trading at a discount to the company's actual net asset value.  Is that the analysis?

A.   Yes.  Right.  So if I thought it was worth 15 and it's selling for like 10, so 10 on 15 is, you know, 67 percent.  That type of thing.  So if I thought it was good value, 63 percent, as a discount, this is actually a discount.  So.

Q.   Right.

A.   I guess it's even the opposite, it's like 37 percent to its net asset value, yes.

Q.   Right.  So you think the stock is only trying at 37 percent of what the true net asset value was.  That's what this number would show?

A.   Right.  So that's why I went all in because I thought, you know, it was extremely cheap.

Q.   And then the next line down says, Price of assets based on stock price of the historical costs.

Case 1.19-cv-00181-JRG-CHS   Document 184-8   Filed 10/28/22   Page 28 of 48
PageID #: 3266

didn't know he was with any private equity firm, but he -- he tried to set up a meeting through LinkedIn with -- with some private equity firm.  I can't remember the name, so -- but when I met him, I didn't -- I think he was with a private -- I mean, he told me what he did, but he didn't seem like, you know, maybe he was just out, trying to get leads.  I'm not sure what he did, you know, like if he was maybe -- maybe he was with Traditions when he was up in North Dakota, but I don't really know.

Q.   So let's take a look at the third page of this document.  And in the third page, there -- there's a bottom e-mail is a July 27, 2017 e-mail from Seinfeld to you.  He is posing a question to you about CBL's share price, right?

A.   Yes.  So that's the company he made the pitch to, Corvex, yeah.  Right.

Q.   So in that bottom e-mail, though, he's asking you about the share price and you respond by saying, There are 44 million shares shorted, so they will have to cover eventually.  Do you see that?

A.   Yes, I thought there might be a short squeeze.

Q.   So were you -- you were tracking the short interests in the CBL at this point?

A.   Yes.  That -- this stuff that I gave you, it was one of the tabs.  So I was tracking --

Q.   Do you usually -- sorry.  Go ahead.

A.   Oh, yes, do I usually track short positions?

Q.   I was going to ask do you usually track short interests in the companies you invest in?

A.   Let me just -- no.  Well, I mean, I don't that often, but I'm trying to think where I got that information from.

I -- I don't notice that many shorts on other companies.  So I -- it's not usually a big factor, but I'm trying to remember where I got the -- I can't remember now, but there was like a source I had to, you know, to track the amount of shares shorted.  So anyway, sometimes it's a good indicator because if you think the stock is worth something, it could be a short squeeze and then the stock has to jump right back up.  So I believed in the statements and thought the shorts were naive, but now.

Q.   So the next e-mail up -- now we are in November 2017, right?  Mr. Seinfeld e-mails you November 6th, 2017 and he's asking you whether you still think there's real estate value in CBL?

A.   Right.

Q.   Were there any websites dedicated to financial moves that you followed to learn more information about CBL, such as Seeking Alpha?  Did you ever read Seeking Alpha articles about CBL?

A.   You know, I did a little bit, but not -- I didn't put a lot of credence into it because I just -- I didn't think anyone -- like, you could see how much analysis I did, I didn't think anybody there was giving any -- they were just blowing out opinions.  I never -- I never -- I never followed Seeking Alpha as the way to make a decision.

Q.   Did you ever use Yahoo Finance to get information about CBL?

A.   What finance?

Q.   Yahoo Finance?

A.   No.  No.  I told you, I was an investor.  I think I -- I was a subscriber to The Intelligent REIT Investor.  That was about it.  But no one did any real in-depth analysis.

Q.   Not as in-depth as your analysis.  Is that right?

A.   Not even like, just lightly.  Other than a few analyst reports, yes.  Yes, nothing.

Q.   Mr. Scolnick, do you still have that -- that Exhibit 26, I believe it was, the certification

Exhibit 41 on Exhibit Share, there are three transactions relating to this March 2017 put option.

A.   Forty-one?  You want me to stay on 41?

Q.   I want you to go -- yes, keep the certification handy, but look back on the screen at Exhibit 41 at the transactions we were just reviewing, the March 2017 put options.

A.   Right.

Q.   Do you see there are three transactions there?  There's two 20-unit sales and then one 40-unit purchase?

A.   Oh, I did see that before.  Hold on.  You have -- this is on 40 -- tab Exhibit 41, right?

Q.   Exhibit 41, yes.

A.   Uh-huh.  Yes, yes, yeah.  I found it.  It's near the bottom where all the options were, yes.

Q.   Right.  And it's those first three transactions there for the March 2017 put, right?

A.   Yes, so they cancel each other out.

Q.   So that -- that third transaction, the purchase of 40 units is not reflected on the certification, correct?  If you refer back to Exhibit 26.

MR. WERNKE:  Object to the form.

A.   Yes, I would have to defer that to my

800.808.4958                                                          770.343.9696
Case 1:19-cv-00181-JRG-CHS   Document 184-8   Filed 10/28/22   Page 32 of 48
PageID #: 3270

attorney. I didn't prepare the -- I didn't prepare the document that you are referring to.

Q. (By Mr. Starr) Okay. So just looking at the certification, though, do you see there are two -- there are only two transactions relating to that March 2017 put, right? There's a one sale 20 units and then another sale of 20 units. Do you see that?

A. Yes, I see the 20 on the screen. I see the two 20s on the certification.

Q. But there is no 40 on the certification, correct?

A. I think you are right. But I didn't prepare it.

Q. Okay. Are you aware of any other transactions that were omitted from that chart in the certification?

A. I'm not.

MR. WERNKE: Object to the form.

Q. (By Mr. Starr) Let's go -- let's go back to Exhibit 41 for a moment. Sorry, the exhibit on the screen.

A. Okay.

Q. And please scroll up a page to the page that's numbered 510, so it's the fourth page of the

Case 1:19-cv-00181-JRG-CHS    Document 184-8    Filed 10/28/22    Page 33 of 48
PageID #: 3271

can't answer that.

Q. Let's take a look at another exhibit together.

(Defendant's Exhibit 42, Document entitled, Sheryl Scolnick Purchases of CBL In Her Sep IRA 2016, marked for identification.)

A. Okay.

Q. (By Mr. Starr) So I'm now adding to Exhibit Share a document that's marked as Exhibit 42.

A. Okay.

Q. Let me know when you can see it, please.

A. Okay. I got it, Peter.

Q. All right. Could you please identify this document for the record?

A. Okay. This is a list of CBL purchases bought under my wife's account, Sheryl Scolnick. It's Exhibit 42, and it's in her SEP IRA. It's labeled SEP IRA 2016. And it looks like I must have prepared this.

Q. That was going to be my next question. This document was not issued by a financial institution, was it?

A. Well, just looking at it, it looks like -- although it says end of file, I -- I'm not 100 percent sure, like, I don't know why -- I don't

think I was asked to put this together.  So maybe someone in Michael's office put it together.  I don't know.

Q.    How is the --

A.    Yes, I --

Q.    How is the information in this document compiled?

A.    Well, the first question is do I recognize it.  I don't recognize this -- I don't recognize it.  So I -- usually you ask:  Do you recognize this document?  I don't recognize it.

Q.    Well, this is a document that you produced, right?  You see your name in the bottom right-hand corner?

A.    No.  Well, that's -- that's not my footer.  I didn't put that footer in there.

Q.    Did your counsel put that in there, I mean --

A.    Yeah, it could be sort of like one of these.  Yes, it must have been put together by the person that put all those exhibits together on your -- that you attached to the certification.  So I didn't put this together.

Q.    Is Ms. Scolnick's IRA account held at a financial institution?

Case 1:19-cv-00181-JRG-CHS   Document 184-8   Filed 10/28/22   Page 35 of 48
PageID #: 3273

A. Yes, I think this might be held at Schwab.

Q. Are there any records from Schwab or whichever financial institution it's held at that would confirm that these transactions, in fact, occurred?

A. Well, they probably have statements there. I -- I can't remember where this information is from.

Q. Did you not search the records of -- did you not search for records of transactions in Ms. Scolnick's IRA account?

A. I must have because somebody prepared this. And that's probably the only -- that's probably the place where all those -- that Interactive is -- I think, is -- is before she got the Schwab account. So anyway, I -- I guess it depends on the -- this is -- actually, these dates are -- maybe she had both. One was an IRA account and I guess one was a cash account. That makes sense.

Q. The prior exhibit we were looking at was Exhibit 41, right? That was Ms. Scolnick's cash account at Interactive Brokers? Is that right?

A. Yes, right. Yep.

Q. And I believe you have confirmed that the account statement we saw on Exhibit 41 corresponds to Sheryl Scolnick's account 2 on your certification,

Case 1.19-cv-00181-JRG-CHS Document 184-8 Filed 10/28/22 Page 36 of 48
PageID #: 3274

correct?

A.   Yes, for either one of us, yeah.  At Interactive, just like you said.

Q.   So turning back to Exhibit 42, have you taken any steps to confirm that this information in the document is accurate?

MR. WERNKE:  Objection to form.

Q.   (By Mr. Starr) You may answer.

A.   No.  I -- I haven't.

Q.   If you could turn to the next page of this document -- scroll to it, rather.

A.   Uh-huh.  I'm on it.  It says 2017.

Q.   Correct.  Is that your handwriting there in green?

A.   It looks like it, yes.  I would say that's mine, yes.

Q.   So did you prepare this document?  Looks like it may have been prepared in Excel, doesn't it?

A.   I know.  It does look like it.  I'll be honest with you, it does look like Excel.  And I -- I just don't remember putting it together.

Q.   The title here is, Sheryl Scolnick IRA Purchases of CBL.

A.   Right.

Q.   The last page referred to Ms. Scolnick's

Q.   I'm on the Questrade account.  I'm on the Questrade account statement, page 523.

A.   What date?

Q.   The final two transactions on Page 523. It's like March 20th, 2018 and April 23rd.

A.   Oh, yes, yes.  Yes, I was looking at the settlement.  Yes, I have those two, yes.

Q.   Okay.  Yes, looking back to the certification, though, if you look about halfway down that list of transactions for account 23, do you see that there are several more 2018 transactions listed there on the certification?

A.   Yes.

Q.   So the first two lines up, right?  There's March 20th and April 23rd, 2018.  Do you see those two, the first two in 2018?

A.   Yes, yes.  I see what you are saying.  So the December ones aren't on the statement.  Is that what you're trying to say?

Q.   Correct.

A.   I'm not sure why.

Q.   Do you know whether the certification is wrong or if the statement is wrong?

MR. WERNKE:  Objection to form.

A.   I do not.

there obviously had to be a reason to have a certain cutoff date that maybe changed. I don't know. I can't answer that. But I could -- you know, I could try to provide that information to my attorney, like the actual trade spreadsheet -- not the spreadsheet, but the statements.

Q. The actual records?

A. Well, yes.

Q. We would request production of those if you have them available. And if you could please look back to the certification one more time on account 3. Mr. Scolnick, you don't have to look for them now.

A. Okay. Okay. Okay.

Q. Otherwise, we would have to get all those documents and produce them now. I don't think we need to do that.

A. Okay. Because I can't answer the question, but what was your -- so what was your most --

Q. So back to the certification, the hard-copy document, again, to account 3.

A. Yes.

Q. So beneath those 2018 transactions, you see there are several more purchase transactions in 2019?

A. Yes, I have them circled actually, yes. Uh-huh.

Q.   Those transactions, they are not reflected in Exhibit 45 either, are they?

A.   No.

Q.   The class period that's alleged in your complaint always extended through March 2019, correct?

A.   Yes, March 26th, to be exact.  We can -- I can find out how that -- I mean, it's only certification, so I'm sure I have the records.

Q.   All right.  Let's move on to the document.

A.   The document.  Okay.

Q.   Yes.  Let me just pull it up here.  I haven't got it up yet.  One moment.

A.   Okay.

Q.   All right.  Mr. Scolnick, I've added a document to Exhibit Share that's been marked as Exhibit 46.  Please let me know when you see it.

(Defendant's Exhibit 46, Activity Statement, 1/2/19 - 7/10/19, marked for identification.)

A.   Yes, I got it.

Q.   (By Mr. Starr) Do you recognize this document?

A.   I'm familiar with it.  That's my handwriting on top.

A.    Uh-huh.

Q.    -- you will notice that there are two transactions, first two transactions, August 23rd, 2016, right?

A.    Yes, those match from what your exhibit has.

Q.    And then there are an additional eight transactions in 2016?  Do you see that?

A.    On the certification?

Q.    On the certification, yes.

A.    Yes, yes, eight -- eight others, right.

Q.    And those -- those transactions, 2016, do you see them reflected anywhere on the --

A.    Sorry.  I'll just shut it off.  I silenced it, but -- okay.  Now, do I see the 2016?

Q.    Yes, if you go to -- if you go to --

A.    The last page has three of them.  Those we already discussed.

Q.    If you go to the -- right, the final page of the exhibit is for 2016, right?

A.    Yes, there's only on 12/28, it's a hundred shares.  So the other ones could be somewhere else.

Q.    So there's a discrepancy again here, right?

MR. WERNKE:  Objection to form.

A.    There's another -- they don't completely

match, but there's also -- 2017, yes.  So on your Exhibit 47, I don't see everything that's on the certification.

Q.    (By Mr. Starr) Right.  Do you know why there's a discrepancy between the certification and this Exhibit 47 that shows your account statement for your Roth account?

A.    I don't.  Who prepared Exhibit 47?

Q.    Exhibit 47 has a Bates stamp from you, from your account, so I assume CBL Scolnick.  So that was a document that was produced to Defendants, which is why I'm asking you if you know how to explain this discrepancy.

A.    I don't.

Q.    Do you know whether all of the trades listed in this account, account 1 on the certification, in fact, occurred?

MR. WERNKE:  Objection to form.

A.    Well, if you look at the sales, you'd have to sell -- especially to Roth, you'd have to sell something -- you would have to have the shares in order to sell.  So we would have to do -- you'd have to like add -- on the certification, you'd have to add those and subtract them and if it ends being zero because we do have a page here that says "no

accounts, any information to that account.  They are just pop-ups from anyone who owns some shares, that type of thing.

Q.   Did you already know Mr. Kimelman at the time you reached out to him?

A.   No, I just -- I think I must have looked at a list and made my best guess and talked to him and interviewed him.  And -- and it was -- it was just a first phone call.

Q.   Why did you decide to get involved in this litigation?

A.   I felt like, you know, I had enough of a loss and that I was knowledgeable enough to help out other shareholders.  We could be successful and get in a class action.  So I sort of felt a little bit like I could help out other people, plus help out myself.  And, you know, I had a very substantial loss.  You know, basically like an expert witness who got damaged.

Q.   And you say you are an expert witness because of your analyses?

MR. WERNKE:  Objection to form.

A.   Just my opinion.

Q.   (By Mr. Starr) All right.  Mr. Scolnick, I'm adding a document on Exhibit Share marked as

A.   Again, I would just be guessing.  Like, I honestly --

Q.   You don't know if it was this year or last year when he first became involved in the litigation?

MR. WERNKE:  Objection to form.  You are badgering him at this point.

A.   It's sort of-- you know, it's -- I don't look at the years, like the calendar years.  But it's just been a long -- this is July 2019.  And there was a lot of preparation, so, you know, there's just a lot of time passed.  So I can't remember exactly when his name came up.

Q.   (By Mr. Starr) Have you ever spoken with Mr. Amsterdam?

A.   I have never.

Q.   Have you ever met him?

A.   No -- well, if I'd met him, I probably would have spoken to him, no.

Q.   Fair enough.

A.   Honestly, I -- I have never met him.

Q.   How did Mr. Amsterdam become involved in this litigation?

MR. WERNKE:  Objection to form.

A.   That would be a question for my attorney, not me.

A. No.

Q. What's the nature of your relationship with Mark Shaner?

A. He's a close friend and my corporate attorney.

Q. He doesn't represent you in this case, though, right?

A. No. He doesn't have that background, so no. Hold on a second.

Q. Do you want to go off the record?

A. Okay. Yes.

MR. STARR: Off the record.

THE VIDEOGRAPHER: Off the record 6:04.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: Back on the record. The time 6:13.

Q. (By Mr. Starr) Mr. Scolnick, did you discuss the substance of your testimony with anyone during the break?

A. No. No, this Zoom call is for, actually.

Q. At the time that you sought the appointment as lead plaintiff, you sought it only on behalf of yourself and Mr. Shaner, right?

A. Yes, for -- to be lead plaintiffs, yes.

Q. You did not initially seek to serve as a

Case 1:19-cv-00181-JRG-CHS Document 184-8 Filed 10/28/22 Page 45 of 48
PageID #: 3283

joint lead plaintiff with the Hoffman group.  Is that right?

A.   Not at that time.  Not at the very beginning.  We didn't even know who the Hoffmans were.

Q.   Have you ever met Mr. Hoffman?

A.   No.

Q.   Have you ever spoken with Mr. Hoffman?

A.   No.  I haven't.

Q.   Are you aware that the Hoffmans argued to the Court that your application for the lead plaintiff should be denied?

A.   I think they did at the very beginning. And then they re- -- I think they -- they pulled it and we all became lead plaintiffs.  That's just my recollection.  So they are lead plaintiffs, so obviously, they were happy with the outcome, for us to all work together.

Q.   Do you know what changed between the time when they were opposing your employment as lead plaintiff and the time you-all decided to join up together?

MR. WERNKE:  Objection to form.

A.   I don't really know what changed their mind. I don't.

A.    Maybe a Tennessee court in Chattanooga.

Q.    Did you participate in the bankruptcy proceeding in any way?

A.    No, I didn't make any claims.

Q.    Did you receive any kind of distribution as a result of the bankruptcy?

A.    No, I did not.

Q.    Do you know whether there have been any settlement discussions in this case?

A.    I don't know if there's any -- I don't know if there were any.

Q.    I understand that you haven't yet completed your production of documents in light of the couple of boxes or box or two of hard-copy documents that you recently identified, right?

A.    Right.  Yes.

Q.    How did you identify this box of relevant documents?

A.    During the deposition prep, I mentioned that I had spent a lot of time analyzing CBL and -- and I was trying to show the -- like, this is how much time I put in.  These are the size of the files. And Michael thought in the -- and I already had sent everything on my hard drive.  So Michael thought in the -- in the absent -- or in the -- to err on

                    C E R T I F I C A T E

STATE OF GEORGIA    )

                    ) ss.:

FULTON COUNTY       )


    I,  Robin Ferrill, Certified Court Reporter

within the State of Georgia, do hereby certify:

          That JAY SCOLNICK, the witness whose

deposition is hereinbefore set forth, was duly sworn

by me and that such deposition is a true record of

the testimony given by such witness.

          I further certify that I am not related to

any of the parties to this action by blood or

marriage; and that I am in no way interested in the

outcome of this matter.

          IN WITNESS WHEREOF, I have hereunto set

my hand this 3rd day of October, 2021.


                    ROBIN K. FERRILL, RPR