# EXHIBIT 9

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

_____

IN RE: CBL & ASSOCIATES PROPERTIES,

INC. SECURITIES LITIGATION

_____


***CONFIDENTIAL***


VIDEO DEPOSITION OF MARK SHANER

Taken by Remote Video Conference


September 30, 2022

12:10 p.m.


Laura M. MacKay, RPR, CCR-B-1736

Case 1:19-cv-00181-JRG-CHS   Document 184-9   Filed 10/28/22   Page 2 of 43
PageID #: 3288

Page 4

APPEARANCES OF COUNSEL: (Via Zoom)

On behalf of the Plaintiffs:

MICHAEL J. WERNKE, Esq.

Pomerantz, LLP

600 Third Avenue, 20th floor

New York, NY  10016

mjwernke@pomlaw.com

(212) 661-1100

-and-

EITAN KIMELMAN, Esq.

Bronstein Gerwitz & Grossman

60 East 42nd Street, Suite 4600

New York, NY  10165

eitank@bgandg.com

(917) 750-9429

-and-

D. SEAMUS KASKELA

Kaskela Law, LLC

18 Campus Boulevard, Suite 100

Newtown Square, PA  19073

skaskela@kaskelalaw.com

(888) 715-1740

Case 1.19-cv-00181-JRG-CHS    Document 184-9    Filed 10/28/22    Page 3 of 43
PageID #: 3289

APPEARANCES OF COUNSEL: (Con't)

On behalf of the Defendants:

MATT ROSENTHAL, Esq.

PETER STARR, Esq.

King & Spalding LLP

1180 Peachtree Street, NE

Suite 1600

Atlanta, GA  30309

mrosenthal@kslaw.com

pstarr@kslaw.com

(404) 572-2767

Videographer:

MICHAEL BROWN

Case 1.19-cv-00181-JRG-CHS    Document 184-9    Filed 10/28/22    Page 4 of 43
PageID #: 3290

THE VIDEOGRAPHER: We're on the record. My name is Mike Brown representing Veritext Legal Solutions. The date is September the 30th, 2022. The time on the video monitor is 12:10 p.m.

Caption of the case: In Re CBL & Associates Properties, Incorporated, Securities Litigation.

Name of our witness: Mark Shaner.

Counsel, please state your name for the record and whom you represent.

MR. ROSENTHAL: Matt Rosenthal, King & Spalding, LLP, on behalf of the defendants.

And with me is Peter Starr, also King & Spalding, also on behalf of the defendants.

MR. WERNKE: Michael Wernke, Pomerantz, LLP, on behalf of the lead plaintiffs and the class.

MR. KASKELA: Seamus Kaskela, Kaskela Law, LLC, plaintiff.

MR. KIMELMAN: Eitan Kimelman, Bronstein, Gewirtz & Grossman, on behalf of the plaintiff.

THE VIDEOGRAPHER: Our court reporter,

Case 1.19-cv-00181-JRG-CHS Document 184-9 Filed 10/28/22 Page 5 of 43 PageID #: 3291

Laura MacKay.

Would the court reporter please swear in the witness.

MARK SHANER,

having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ROSENTHAL:

Q.  Good morning, Mr. Shaner.  Could you please state your full name and address for the record.

A.  Mark Shaner, 70 South Potomac Street, Aurora, Colorado, 80012.

Q.  And, Mr. Shaner, where are you right now?

A.  I'm in my office, one of my offices.

Q.  Is anyone in the room with you?

A.  No.

Q.  Have you ever been deposed before?

A.  Yes.

Q.  How many times?

A.  Two or three.

Q.  For each of those, what types of lawsuits were those?

A.  My latest was in a divorce proceeding.  The others were quite a ways back.  Probably 20 years ago.

believed its management had committed fraud?

MR. WERNKE: Objection to form.

A. No.

BY MR. ROSENTHAL:

Q. Do you provide investment advice to others?

A. No.

Q. When did you first learn of CBL?

A. I believe I learned through Jay Scolnick.

Q. When was that?

A. I have no idea.

Q. Do you have a ballpark idea?

A. Well, 2006 -- I would just about speculating. Prior to my first purchase.

Q. Prior to your first purchase. When was your first purchase?

A. I don't recall.

Q. Was it before the class period?

A. May have been.

Q. What did Mr. Scolnick say to you when he first alerted you to CBL?

A. We discussed it, and he thought the stock was undervalued.

Q. What do you mean by "undervalued"?

A. The price of the stock should have been greater based on its assets. Based on the company's

800.808.4958                                                    770.343.9696

Case 1.19-cv-00181-JRG-CHS    Document 184-9    Filed 10/28/22    Page 7 of 43
PageID #: 3293

assets.

MR. ROSENTHAL:  Peter, could you put up tab 6, please.

(Exhibit 4 marked.)

BY MR. ROSENTHAL:

Q.  Mr. Shaner, we're putting up a document that's previously been marked as Exhibit 4.  You should see it in just a moment.

A.  Okay.

MR. STARR:  One second.

A.  I keep going back to my thing.

MR. STARR:  One moment.

A.  Exhibit 4.  It hasn't shown up quite yet.

MR. ROSENTHAL:  It may take a minute.

MR. WERNKE:  It might be higher in the list since it's an earlier number, Mark.  It might be, like, the second one down.

A.  Oh, I got it now.  Okay.  Thank you.

BY MR. ROSENTHAL:

Q.  And you can see the document now?

A.  Yeah.

Q.  I'll represent to you that this is an article published by Seeking Alpha that's publicly available and I downloaded from the Seeking Alpha website on the Internet.

800.808.4958                                                        770.343.9696
Case 1.19-cv-00181-JRG-CHS    Document 184-9    Filed 10/28/22    Page 8 of 43
PageID #: 3294

on the performance of CBL's stock?

A.  I don't know why it sold at that time.

Q.  Did you typically make such drastic reductions in your holdings in a particular company in such a short span of time as you did here?

A.  I'm sure I've done it before if I needed the cash.

Q.  Was this reduction in holdings because you needed to have the cash?

A.  I don't know.  Remember, I said I don't know why this particular one was made at this time. I don't remember.

Q.  Mr. Shaner, after this sale of 30,000 shares in April 2018, you did not retain any CBL securities at that point; correct?

A.  I don't know.

Q.  Could you please flip back to Exhibit 52, which is your other Merrill Lynch account statement we've looked at.

A.  Exhibit 52?

Q.  Yes, please.

A.  Okay.  I'm there.

Q.  Can you please turn to Bates page 148 of this document again.

A.  Okay.

Case 1.19-cv-00181-JRG-CHS    Document 184-9    Filed 10/28/22    Page 9 of 43
PageID #: 3295

Q.   As we saw before, this chart reflects your retirement account assets; right?

A.   Yes.

Q.   And this was for the period of December 2017?

A.   December 1st, 2017, through December 29th, 2017.

Q.   And this particular portion of this document reflects your then-current holdings of CBL common stock; right?

A.   Yes, in this account.

Q.   Do you know if you held CBL common stock in any other account in this time period?

A.   I don't remember.

Q.   Do you see the column titled "Quantity"? It's the third row over.

A.   Yeah, I see that.

Q.   Just above the redaction, there's a row titled "Subtotal"; correct?

A.   Correct.

Q.   So this shows that at this point in time you had 78,000 shares of CBL common stock in this account; right?

A.   Correct.

Q.   Could you now flip back to Exhibit 53,

Case 1:19-cv-00181-JRG-CHS   Document 184-9   Filed 10/28/22   Page 10 of 43
PageID #: 3296

which is the other Merrill Lynch account that we
were just going through.

A.   Exhibit 53.  Got it.

Q.   And could you go to Bates page 242.

A.   Okay.

Q.   And just let me know when you get there.

A.   242.  Okay.  Let's see here.  Moving along.

Q.   It's a bit easier with paper documents,
but...

A.   Yeah.  I'm almost there.  Just -- 241.  I'm
on 242.

Q.   Great.  So we discussed a few minutes ago
that this page reflected a 10,000 share sale --
here.  Let me rephrase that.

This page reflects that you sold 10,000
shares of CBL common stock in January of 2018;
correct?

A.  Yes.

Q.   And at the previous exhibit we looked at,
the total amount of CBL common stock you held in
this account in December 2017, the month prior, was
78,000, which means after the sale of these 10,000
shares, you had 68,000 shares of CBL common stock
remaining in this account; correct?

MR. WERNKE:  Objection to form.

Case 1:19-cv-00181-JRG-CHS   Document 184-9   Filed 10/28/22   Page 11 of 43
PageID #: 3297

Page 87

A.  I don't know.  Is it the same account?  I mean...

BY MR. ROSENTHAL:

Q.  It is the same account.

A.  That would seem accurate.

Q.  If you flip back to Bates page 236 -- or could you please flip back to Bates page 236 and let me know when you get there?

A.  Okay.  I'm there.

Q.  And as we with the document we looked at a moment ago, do you see that there is a "Quantity" column and a "Subtotal" row?

A.  Right.  "Subtotal."

Q.  And the subtotal there for CBL common stock is 68,000; right?

A.  Correct.

Q.  And that's consistent with the math that we just discussed; right?

A.  Yes.

Q.  Now, could you please flip a little bit further towards the front to Bates page 225.

A.  Okay.

Q.  And just let me know when you are there.

A.  I'm there.

Q.  Okay.  Great.

Case 1:19-cv-00181-JRG-CHS    Document 184-9    Filed 10/28/22    Page 12 of 43
PageID #: 3298

Page 88

We looked at this page a moment ago.  This is for February 2018.  And as we discussed, you made a sale of 20,000 shares of CBL common stock on February 21st; right?

A.  Correct.

Q.  So -- and as we just discussed, you held 68,000 shares of CBL common stock at the beginning of February, which would mean at this point you would have 48,000 shares of CBL common stock remaining; right?

A.  I would assume so, yes.

Q.  Could you please flip back to Bates page 218.

A.  Got it.

Q.  And if you look in the "Quantity" column again, it says that at the end of February 2018, you had 48,000 shares of CBL common stock remaining; right?

A.  Yes.

Q.  So that would be consistent with the math that we just discussed; right?

A.  Right.

Q.  And then could you please turn even further towards the front to Bates page 209.  And let me know when you get there.

800.808.4958                                                    770.343.9696
Case 1:19-cv-00181-JRG-CHS   Document 184-9   Filed 10/28/22   Page 13 of 43
PageID #: 3299

A. Got it.

Q. And as we discussed earlier, you sold 18,000 shares of CBL common stock in March 2018, which is reflected in the middle of this page; correct?

A. Correct.

Q. And we just noted that at the end of February, you had 48,000 shares remaining in this account, which means that after the sale of this 18,000 shares, you would only have 30,000 remaining; correct?

A. Correct.

Q. And then if you flip to Bates page 201, a little bit further towards the front, and let me know when you get there.

A. Got you.

Q. And do you see in the "Quantity" row in the "Subtotal," it says that you had 30,000 shares remaining in March 2018; right?

A. Correct.

Q. And that would be consistent with the math that we just went through; right?

A. Correct.

Q. And, finally, could you flip even further towards the front to Bates page 184.

Case 1.19-cv-00181-JRG-CHS    Document 184-9    Filed 10/28/22    Page 14 of 43
PageID #: 3300

A.  To 184?

Q.  Yes.

A.  Okay.  Okay.

Q.  We just looked at this page a moment ago. It's for the period March 30th, 2018, through April 30th, 2018.  And in the middle of this page, this document reflects that you made a sale of 30,000 shares of CBL common stock in April 2018; correct?

A.  Correct.

Q.  And we just noted a moment ago that you had had 30,000 shares remaining in this account; right?

A.  Correct.

Q.  So at this point you did not hold any shares in CBL common stock in this Merrill Lynch account; right?

A.  That would seem to be accurate.

Q.  So you totally exited your investments in CBL at that point; right?

A.  No.  I don't know about that.  In this account, I had no CBL.

Q.  Were there other accounts that held CBL common stock?

A.  Yes.

Q.  Which ones?

Case 1.19-cv-00181-JRG-CHS    Document 184-9    Filed 10/28/22    Page 15 of 43
PageID #: 3301

A.  Charles Schwab, I think.

Q.  As to this Merrill Lynch account, the records you produced indicated that you did not purchase any more CBL common stock before the alleged corrective disclosure occurred on March 26, 2019.  Does that mean you that did not purchase any more shares of CBL common stock in this Merrill Lynch account?

A.  I don't know that.  I could have purchased some after the class period.

Q.  But you didn't purchase anything else during the class period in this Merrill account; right?

A.  To the best of my knowledge.

MR. ROSENTHAL:  Peter, could you please put tab 13 up.

MR. STARR:  Yes.  One moment.

(Exhibit 54 marked.)

MR. STARR:  It's taking a moment here.

Okay.  It should be coming in as Exhibit 54 now.

A.  Exhibit 54.  Got it.

BY MR. ROSENTHAL:

Q.  Do you recognize this document?

A.  It appears to be a statement of my Charles

Case 1:19-cv-00181-JRG-CHS    Document 184-9    Filed 10/28/22    Page 16 of 43
PageID #: 3302

received $4,384.99 when you sold those on September 21st. So that means you had a short-term gain of $300; correct?

A. Yes.

Q. Did this sale close out your holdings in CBL stock in this account at that time?

A. I don't know. The documents need to speak for themselves.

Q. Is it common for you to make an investment in a company and completely exit that investment within a week?

MR. WERNKE: Objection to form.

A. You know, I do whatever I do depending on the situation it's done.

BY MR. ROSENTHAL:

Q. In what situations would you open an investment into a company and close it within a week?

A. If there's -- if I need the money or whatever the events are. I don't recall what the events were at this time.

MR. WERNKE: Matt, we've been going for well over an hour. If you are almost done with this document, can we take a break here soon?

Case 1:19-cv-00181-JRG-CHS   Document 184-9   Filed 10/28/22   Page 17 of 43
PageID #: 3303

MR. ROSENTHAL:  Yeah, I can take a break in just a couple of minutes.  If I can just wrap up one line of questioning.

If that's all right with you, Mr. Shaner.

MR. WERNKE:  If we would just -- once you finish this document, can we just take a short break?  We've been going for almost an hour and a half.

MR. ROSENTHAL:  Yeah, of course.

BY MR. ROSENTHAL:

Q.  When you invested in CBL stock during the class period, did you have long-term interest in the investment?

MR. WERNKE:  Objection to form.

A.  I don't know.

MR. ROSENTHAL:  I'm good to take a break now.

THE VIDEOGRAPHER:  Off the record, 2:49.

(Recess 2:49-3:08 p.m.)

THE VIDEOGRAPHER:  Back on the record. The time, 3:08.

BY MR. ROSENTHAL:

Q.  Mr. Shaner, we were just discussing your Charles Schwab account; right?

A.  Yes.

Q.  Do you still have that exhibit in front of you?

A.  No.

Q.  Could you please pull it back up.  I believe it was Exhibit 54.

A.  I have it.

Q.  Do you have it open?

A.  Correct.

Q.  Could you please flip to Bates page 141 of this document.

A.  Okay.

Q.  Do you see in the very top row of that document there is a row reflecting a purchase you made of 1,000 shares of CBL common stock on November 2, 2018?

A.  Yes.

Q.  And then if you go back one page to Bates page 140, do you see that the bottom row of that page indicates that you made another purchase of 2,000 shares of CBL common stock on November 14th, 2018; right?

A.  Correct.

Q.  And that purchase as at $2.97 per share; right?

page 139, at the top, when it shows your holdings, it shows that the quantity is 3,700 shares; right?

A. Right.

Q. Which would indicate that our math is correct?

A. Correct.

Q. Mr. Shaner, we just discussed that as of April 13th, 2018, you had no holdings in CBL securities remaining in your Merrill Lynch account; right?

A. That's my understanding.

Q. So these 3,700 shares in your Charles Schwab account were the only shares that you held on the date of the alleged correct disclosure on March 26, 2019; correct?

A. That's my understanding. I haven't reviewed all of the records, but I think that's correct.

Q. So that means that those 3,700 shares are the only shares for which you can claim damages in this case; right?

A. Talk to my attorneys.

Q. The complaint you filed allegations that CBL stock price declined when the truth about its fraud was revealed; right?

Case 1.19-cv-00181-JRG-CHS    Document 184-9    Filed 10/28/22    Page 20 of 43
PageID #: 3306

Page 101

A.   Or it should have been revealed.

Q.   And you allege that CBL stock price declined in March 2019, right?  At the end of the class period?

A.   I believe so, yes.

Q.   And the complaint allegations that the decline in CBL stock price coincided with certain corrective disclosures in March 2019; right?

A.   The complaint will speak for itself.

Q.   My question is, for all the other shares you sold before the date of these corrective disclosures the ones that you sold back in 2018, those losses aren't due to the revelation made in March 2019; right?

MR. WERNKE:  Objection to form.

A.   There's a continuing fraud.  So those losses, in my view, are covered under this lawsuit.

BY MR. ROSENTHAL:

Q.   So do you believe that the price of CBL stock was declining during the class period due to this alleged fraud?

MR. WERNKE:  Objection to form.

A.   Yes.

BY MR. ROSENTHAL:

Q.   Why?

800.808.4958                                                        770.343.9696

Case 1:19-cv-00181-JRG-CHS   Document 184-9   Filed 10/28/22   Page 21 of 43
PageID #: 3307

A.  People had knowledge, other than me, of a fraudulent scheme.

Q.  Mr. Shaner, could you please turn back to Exhibit 26, which is the PSLRA certification that you filed.  It's the paper-copy exhibit that you have?

A.  Yeah, I've got it right in front of me.

Q.  And could you turn to page 9 again, which is your list of purchases and sales?

A.  Uh-huh.

Q.  So if you look at this, your first class period sale was in November 2017; right?

A.  Yeah, but as you properly noted, there are probably some inadvertent errors on this, that maybe there were some sales before that.  I think this simply has to be revised to reflect the statements that you received from Merrill Lynch and Charles Schwab.  I noted there's a few inadvertent errors.

Q.  But, in general, you can see that you made numerous purchases in 2016 and 2017, and then you switched and basically started making numerous sales starting in early 2018 with no further purchases except for the three purchases in your Charles Schwab account we've just discussed; right?

A.  Well, the revised certification will

800.808.4958                                                  770.343.9696
Case 1:19-cv-00181-JRG-CHS    Document 184-9    Filed 10/28/22    Page 22 of 43
PageID #: 3308

document exactly what I did.

Q.  You can admit, though, in general you switched from purely buying CBL securities to almost purely selling CBL securities; is that right?

MR. WERNKE:  Objection to form.

A.  I mean, the facts will speak for themselves and the trades speak for themselves, whatever they were or whatever they are.

BY MR. ROSENTHAL:

Q.  Well, as the documents produced indicated, it shows that you were purchasing numerous large quantities -- sorry.  Withdrawn.

The documents indicate that you almost exclusively purchased CBL stock at the beginning of the class period and then, starting in 2018, almost exclusively sold CBL securities.  Those documents indicate that there is a drastic shift in your strategy with CBL.  I'm asking was there any particular reason for this shift?

A.  Not that I'm aware of.

Q.  No reason at all?

A.  As I said before, I may have needed the money.

Q.  At the time you may have needed the money, would you have done the same in other holdings you

Page 104

had in other companies, or was it limited to CBL securities?

MR. WERNKE: Objection to form.

A. CBL was my main holding at that time.

BY MR. ROSENTHAL:

Q. Was there a reason why CBL was your primary holding at that time?

A. Based on my -- based on the published documents, I thought it was a good investment. I was wrong.

Q. So a moment ago you -- you stated that the continuing fraud that defendants were allegedly perpetrating had resulted in certain losses throughout the class period; right?

MR. WERNKE: Objection to form.

A. Please restate the question.

BY MR. ROSENTHAL:

Q. A moment ago you testified that the declines in stock price that happened during the class period were due to the "continuing fraud"; right?

MR. WERNKE: Objection to form.

A. Yes, primarily. There may be other factors.

BY MR. ROSENTHAL:

Case 1.19-cv-00181-JRG-CHS   Document 184-9   Filed 10/28/22   Page 24 of 43
PageID #: 3310

Q.   How did that fraud cause those price declines?

MR. WERNKE:  Objection to form.

BY MR. ROSENTHAL:

Q.   Prior to the March 2019 corrective disclosures?

MR. WERNKE:  Objection to form.

A.   Because obviously people had other -- some people, as I said before, not me, knew the fraud long before I did.

BY MR. ROSENTHAL:

Q.   Who knew?

A.   The Alpha guy, obviously.

Q.   Who is the Alpha guy?

A.   The Wave guy.  I mean the Wave plaintiffs, the Wave attorneys, the numerous tenants that were affected by the Wave litigation.  They all knew it well before I did.  I didn't learn of it till March, 2019.

Q.   And those individuals knowing about this alleged fraud resulted in the stock price decline prior to the corrective disclosure date?

MR. WERNKE:  Objection to form.

A.   It was a factor.

BY MR. ROSENTHAL:

Case 1.19-cv-00181-JRG-CHS   Document 184-9   Filed 10/28/22   Page 25 of 43
PageID #: 3311

Page 106

Q.   Are you suggesting that declines in CBL stock right before March 2019 were the result of the market knowing about the fraud?

MR. WERNKE:  Objection to form.

A.   Some people knew about the fraud.  Whether the market knew about the fraud, I don't know.  I didn't know about the fraud until March 2019.

BY MR. ROSENTHAL:

Q.   Mr. Shaner, who is Ronald Amsterdam?

A.   Personally?  No.

Q.   Who is Ronald Amsterdam?

A.   Pardon me?

Q.   Who is Ronald Amsterdam?

A.   I'm sorry.  I didn't hear.

Q.   Who is Ronald Amsterdam?

A.   He's seeking to be a class representative with us.

Q.   When was the first time you heard the name Ronald Amsterdam?

A.   About a month ago.

Q.   Have you ever spoken with him?

A.   No.

Q.   What is his role in this case?

A.   He's representing some of the -- some of the securities of the bondholders of CBL.

800.808.4958                                                    770.343.9696

Q.  How did Mr. Amsterdam become involved in this case?

MR. WERNKE:  Objection to form.

A.  I believe it came through my attorneys. That was my knowledge of Mr. Amsterdam's involvement.

MR. WERNKE:  Sorry.  I just want to make sure -- I'm getting a note on my system saying:  "Low system resources may affect your audio quality."  I just want to make sure everyone can hear me okay.

MR. ROSENTHAL:  I can hear you great.

MR. WERNKE:  Okay.  Thanks.

THE WITNESS:  Thank you.

MR. STARR:  Sorry, Matt.  Which document?

MR. ROSENTHAL:  Tab 14, please.

MR. STARR:  It's going to be one moment, Mr. Shaner.

Document is being introduced as Exhibit 55.

(Exhibit 55 marked.)

A.  55.  Got it.

BY MR. ROSENTHAL:

Q.  Do you recognize this document?

800.808.4958                                                          770.343.9696
Case 1.19-cv-00181-JRG-CHS   Document 184-9   Filed 10/28/22   Page 27 of 43
PageID #: 3313

A.   I think I do.  I think this is one of the exhibits that was attached to Mr. Scolnick's certification.

Q.   And your certification as well; correct?

A.   Well, this was specific to him, yeah.  Well, yes.

Q.   I guess the first couple of pages relate to Mr. Scolnick, but if you turn to -- I guess, actually, turn -- could you please turn to page 4.  You will see at the bottom it has an internal pagination that says "page 4 of 5."

A.   "Page 4 of 5"?  Okay.

Q.   Are you there?

A.   Yes.

Q.   Thank you.

If you look maybe a third of the way down, maybe half, you will see that it starts listing some information regarding your holdings in CBL common stock; right?

A.   Regarding my holdings?

Q.   Yeah.

A.   Yes.  Yes, I do, yeah.

(Overspeaking.)

Q.   So this chart contains information relating to numerous of your transactions in CBL securities

Page 110

MR. WERNKE:  Objection to form.

A.  I sold many of my shares, yes, during the class -- during the class period.

BY MR. ROSENTHAL:

Q.  Could you go to page 5 of 5 of this document, please.

A.  Uh-huh.

Q.  Do you see the column that's fourth from the right that's titled "Shares Retained"?

A.  Yes.

Q.  And you see that it lists 3,700 stocks -- if you look all the way to the left, it's a bolded line showing that that's -- it indicates that that's the total number of shares they retained at the end of the class period; right?

A.  Correct.  That's what it says.

Q.  And that's consistent with the math we just did, where we saw that you had closed out your Merrill Lynch account and you retained 3,700 shares in your Charles Schwab account; right?

A.  Correct.

Q.  So this would indicate that you only owned those 3,700 shares in March 2019; right?

A.  Correct.

Q.  Could you flip back to page 4 of this

Case 1:19-cv-00181-JRG-CHS   Document 184-9   Filed 10/28/22   Page 29 of 43
PageID #: 3315

document.  It's the page just before that.

And do you see the second of your transactions that is listed is that you made a purchase on November 2, 2018, of 1,000 shares of CBL common stock at $2.88 per share?

Do you see that?

A.  Yes.

Q.  And the column next to that indicates that you spent 2,880 total for that transaction; right?

A.  Yes.

Q.  And then the next row reflects the purchase you made on 11/14/2018 of 2,000 shares of CBL common stock at $2.97 per share.

Do you see that?

A.  It's a bit hard to read.

Yes, I do see that.

Q.  And that -- the next column indicates that you spent $5,940 for that transaction; right?

A.  Correct.

Q.  And then the trade just below that is from December 31st, 2018, and it shows that you purchased 700 shares of CBL common stock at $1.94; right?

A.  Correct.

Q.  And the next you column indicates that you spent $1,358 on that investment; right?

Case 1:19-cv-00181-JRG-CHS   Document 184-9   Filed 10/28/22   Page 30 of 43
PageID #: 3316

Page 112

A.  Correct.

Q.  And the timing of that seems to indicate that those are the three purchases that we had just discussed from your Charles Schwab account.  Would you agree with that?

A.  It seems that the dates match up, correct.

Q.  And that the 1,000, 2,000, 700 would add up to 3700.  So it seems likely that that would be those shares in your Charles Schwab account; right?

A.  Correct.

Q.  Now, I'll represent to you that if you add up the total spent on those three trades, you spent $10,178 on those trades.  Is that fair?

A.  If your math is right, that's fair.

Q.  I mean, you can ballpark it; right?  I mean, it's --

A.  Yeah.

Q.  It's about 3,000, about 6,000, about -- so it's a little over what?  10,000 or 11,000, give or take; right?

A.  Right.

Q.  Could you go back to page 5, which is the next page.  And let me know when you get there.

A.  I'm there.

Q.  Do you see the farthest to the right rows

Case 1:19-cv-00181-JRG-CHS    Document 184-9    Filed 10/28/22    Page 31 of 43
PageID #: 3317

CBL securities at the time the alleged corrective disclosures; right?

A. You will have to ask Mr. Scolnick. I don't know.

Q. You see this representation that this document is making, though? It says that he retained 114,562 --

A. I see the number.

Q. And do you see that in the "Loss" columns next to that, it lists losses of 784,442 or 775,990, depending on the exact method of calculation. Do you see that?

A. I see those numbers.

Q. Can you explain to me how your calculation of losses resulted in a number north of 500,000 for 3,700 shares while Mr. Scolnick's results in a loss of 700,000 for over 100,000 in shares?

MR. WERNKE: Objection to form.

A. I reject your premise. Speak with my attorneys.

BY MR. ROSENTHAL:

Q. Mr. Shaner, did you purchase any CBL securities after March 26, 2019?

A. I don't know.

Q. Would you have considered purchasing any

shares of CBL securities after March 26, 2019?

MR. WERNKE:  Objection to form.

A.  Probably not.

BY MR. ROSENTHAL:

Q.  I want to turn now back to this litigation.
How did you first hear about this litigation?

A.  I believe -- I believe Mr. Scolnick may have told me about it.  I'm not sure.

Q.  Did counsel contact you?

A.  No.  First I contacted Seamus.

Q.  Did you have a prior relationship with Mr. Kaskela?

A.  No.

Q.  What made you reach out to him?

A.  I think I saw something from his firm, and I called.

Q.  Why did you decide to get involved in this litigation?

A.  Because I had been injured.

MR. ROSENTHAL:  Peter, could you put up tab 15, please.

MR. STARR:  Yes.

MR. ROSENTHAL:  In just a moment, a document should be appearing as Exhibit 56.

Page 117

(Exhibit 56 marked.)

A.   56.   Okay.   Got it.

BY MR. ROSENTHAL:

Q.   Do you recognize this document?

A.   Yes.   I signed this document.

Q.   What is it?

A.   It's an engagement letter with the Pomerantz firm.

Q.   It's dated July 16, 2019; right?

A.   Correct.

Q.   At the time you signed this letter, did you have a preexisting relationship with this law firm?

A.   No.

Q.   Had you ever heard of this law firm before?

A.   Seamus might have mentioned it to me in our phone call.

Q.   How did you select Pomerantz as your counsel in this case?

A.   Seamus was representing me, and he suggested that, since Pomerantz was representing Jay, tat it would be a good position or good move to consolidate counsel and move forward with one counsel.

Q.   You have other counsel in this case besides Pomerantz and Mr. Kaskela; right?

Case 1:19-cv-00181-JRG-CHS   Document 184-9   Filed 10/28/22   Page 34 of 43
PageID #: 3320

Page 119

by the court that will not request a fee in excess of 20 percent.

Do you see that?

A. Correct.

Q. In the event that such a situation arises, how will these fees of 20 percent be divided among the various attorneys in this litigation?

A. They have an agreement among themselves where they agree to allocate the 20 percent among the various firms.

Q. Does Mr. Kaskela represent you in this litigation?

A. Pardon me?

Q. Does Mr. Kaskela represent you in this particular litigation?

A. Pomerantz represents me, and Mr. Kaskela is also representing me, correct.

Q. But you don't have an engagement letter with Mr. Kaskela?

A. Mr. Kaskela is paid through the Pomerantz engagement.

Q. Who are the other lead plaintiffs in this case?

A. Jay Scolnick, Charles Hoffman.

Q. Have you ever met Mr. Hoffman?

A.  No.

Q.  Have you ever spoken with him?

A.  No.

Q.  Who is Lydia Hoffman?

A.  That's his wife.

Q.  Do you know if Ms. Hoffman still desires to participate in this case?

A.  I understand, through my attorneys, that Lydia Hoffman will not participate in this case anymore.

Q.  What is Hoffinvestco?

A.  Pardon me?

Q.  What is Hoffinvestco?

A.  I believe that's his investment entity.

Q.  What is the nature of your relationship with Mr. Scolnick?

A.  I am his attorney and friend.

Q.  Would you consider him a business associate?

A.  No, we don't have any -- any common -- we don't have any -- we don't invest in projects together, real estate projects.  I'm his real estate attorney.

Q.  How long have you known Mr. Scolnick?

A.  Over 25 years.

Q.  Are you aware that Mr. Scolnick prepared certain financial analyses regarding CBL?

A.  Yes.

Q.  Did he send those to you?

A.  Some of them, yes.

Q.  Did you review those analyses?

A.  I reviewed them with Mr. Scolnick on the phone.

Q.  Did those inform your decision-making with regard to your investments in CBL securities?

A.  Yes, because we thought the stock was worth more than its stock price.  We thought the stock was undervalued based on what we knew.

Q.  Mr. Shaner, are you aware that the Hoffmans argued to the court that you and Mr. Scolnick's application for lead plaintiff should be denied?

A.  I'm aware of that.

Q.  Do you recall why they believe that you and Mr. Scolnick would not be adequate lead plaintiffs?

A.  You know, if you put the document in front of me, I will refresh my memory, but at first blush, I'm not positive.  I do remember they had an objection.

Q.  Did you or Mr. Scolnick do anything to address the concerns that the Hoffmans raised with

Case 1:19-cv-00181-JRG-CHS   Document 184-9   Filed 10/28/22   Page 37 of 43
PageID #: 3323

Page 127

A.  Not that I can recall.  I could be wrong, but not that I can recall off the top of my head.

Q.  Have you ever had any disagreements with the other lead plaintiffs about litigation decisions in this case?

A.  No.

Q.  How would you resolve such disagreements if they were to arise?

MR. WERNKE:  Objection to form.

A.  We would sit down, discuss the pros and the cons, and we would come to a consensus.

You know, our goal is to represent the class as a whole.  So all of our goals are the same.  So our main focus is to act as a fiduciary for the injured class.  That would be our total focus.

BY MR. ROSENTHAL:

Q.  But as an attorney, you would acknowledge that, for a single goal, there may be differing views of what legal strategy's appropriate for that goal; right?

MR. WERNKE:  Objection to form.

A.  As I said, we would discuss them.  We would go through the pros and cons and come to a consensus.

BY MR. ROSENTHAL:

Page 128

Q.  But there's no set process for dealing with that; right?

MR. WERNKE:  Objection to form.

A.  Well, I rely on my powers of persuasion.

BY MR. ROSENTHAL:

Q.  Mr. Shaner, are you aware that CBL and its affiliated co-debtors filed a Chapter 11 bankruptcy petition after you filed this lawsuit?

A.  Yes.

Q.  Do you know which court administered these bankruptcy proceedings?

A.  I did.  I assume it's Tennessee, but, you know, I'd have to check the filing.

Q.  Did you participate in these bankruptcy proceedings?

A.  No, I did not.

Q.  Did you file a claim in the bankruptcy proceedings?

A.  You would have to check with my attorneys.

Q.  Mr. Shaner, are you aware that the defendants served requests for production of documents on you and the other plaintiffs on June 2, 2022?

A.  I'm sorry.  Say that again.

Q.  Are you aware that the defendants in this

Page 131

A.  Yes.

Q.  What is it?

A.  It's something -- it's an e-mail that I got from Jay Scolnick.

Q.  And at the bottom it appears that Mr. Scolnick forwards you an alert from CBL's investor relations department; right?

A.  Yes.

Q.  Did Mr. Scolnick frequently forward e-mails like this?

MR. WERNKE:  Objection to form.

A.  I don't know frequently.  If one came out, we talked through them and we talked about them. I'm not sure we got more than one or more than three.  I don't know how many I received in printed form.  But I know when there was, we talked through them.

BY MR. ROSENTHAL:

Q.  In the second message from the top, at 9:34 a.m. on December 4th, 2018, you respond to Mr. Scolnick and say:  "Wow.  Good press release.  I just wish the stock would react positively. Regardless of news, it just keeps going down."

Do you see that?

A.  Yeah.

Q. Did you believe that the market was not reacting appropriately to positive news concerning CBL?

A. Well, I thought this was positive news, and the market didn't react positively.

Q. Was the market too bearish on CBL?

A. I can't speak for the market. The market does what it does.

Q. Did you believe that the market was too bearish on CBL?

MR. WERNKE: Objection to form.

A. Based on what I knew, I thought the stock price was lower than it should have been.

BY MR. ROSENTHAL:

Q. Mr. Shaner, this e-mail is from December 2018; right?

A. You're right.

Q. And as we discussed earlier, at this point you had drastically reduced your holdings in CBL securities from -- actually, let me withdraw that.

At this point you had reduced your holdings in CBL securities to about 3,700 shares; right?

A. Yes. Yes.

Q. Or about that. One of those trades might have been December 31st. So it was ballpark a few

Seinfeld is?

A. Who?

Q. I might be butchering the name, but Yehuda Jay Seinfeld?

A. Jay -- say the same again. I'm sorry.

Q. Yehuda, Y-e-h-u-d-a, Jay Seinfeld.

A. At first blush, I don't know the name.

Q. Did you ever have -- actually, withdrawn.

Did you ever believe that CBL should be taken private?

A. Jay and I had some conversations because we thought CBL had so much value that it would be a good takeover by some private company.

Q. What about the value made you think that it would be a good opportunity to take private?

A. Because we always thought the intrinsic value was worth more than the stock price.

MR. ROSENTHAL: Can we go off the record for just one more moment, please?

MR. WERNKE: Sure.

THE VIDEOGRAPHER: Off the record, 4:15.

(Recess 4:15-4:17 p.m.)

THE VIDEOGRAPHER: Back on the record.

The time, 4:17.

BY MR. ROSENTHAL:

CERTIFICATE

STATE OF GEORGIA:
COUNTY OF FULTON:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given upon said proceeding.

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of this action.

I have no relationship of interest in this matter which would disqualify me from maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.

I have no direct contract with any party in this action and my compensation is based solely on the terms of my subcontractor agreement.

Nothing in the arrangements made for this proceeding impacts my absolute commitment to serve all parties as an impartial officer of the court.

_____2022.

_____
LAURA M. MACKAY, CCR-B-1736