# EXHIBIT 25

United States District Court
Eastern District of Tennessee

|  | x |  |
|---|---|---|
| IN RE CBL & ASSOCIATES PROPERTIES INC. SECURITIES LITIGATION | : | |
| | : | |
| | : | |
| | : | Consolidated Case No. 1:19-cv-00181-JRG-CHS |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | x | |

**EXPERT REPORT OF TERRENCE HENDERSHOTT, PH.D.**
**October 28, 2022**

# Table of Contents

I.     Qualifications and Compensation ........................................................................... 1

II.    Assignment and Summary of Allegations ............................................................. 2

III.   Summary of Opinions ........................................................................................... 3

IV.    Dr. Cain Fails to Demonstrate that the Senior Notes Traded in an Efficient Market Throughout the Putative Class Period .................................................................. 6

   A.  Market Efficiency from the Perspective of a Financial Economist ............................. 6

   B.  Market Efficiency of the Corporate Bond Markets ....................................................... 9

   C.  Dr. Cain Has No Reliable Basis to Conclude that the Senior Notes Traded in an Efficient Market and Ignores Evidence That Would Be Inconsistent with Market Efficiency Under His Own Approach .......................................................................... 15

       1.  Cause-and-Effect Analysis ................................................................................ 16

       2.  Other *Cammer* and *Krogman* Factors ............................................................. 21

           a)      Average Weekly Trading Volume ................................................... 21

           b)      Analyst Coverage ............................................................................. 26

           c)      Market Makers and Arbitrageurs ................................................... 28

           d)      Bid-Ask Spread ............................................................................... 30

           e)      Autocorrelation ............................................................................... 32

V.     Dr. Cain Fails to Demonstrate How Damages Can Be Calculated on a Class-Wide Basis for any of CBL's Securities ............................................................................. 34

## I.      Qualifications and Compensation

1.      I am a Professor and the Willis H. Booth Chair in Banking and Finance at the Haas School of Business at the University of California Berkeley.  **Appendix A** contains my CV and a list of my deposition and trial testimony over the last four years.

2.      My expertise and research focus on market microstructure, which includes how information is incorporated into security prices and the interaction between trading and prices of various securities and financial instruments.  Specifically, I have conducted research regarding how the prices of stocks, corporate bonds, and other over-the-counter and exchange-traded products incorporate information.  In addition, I have studied high-frequency trading, electronic communications networks and exchange design, regulation of financial markets, management of information systems, and the role of information technology in financial markets.  My research has also focused on market efficiency and related topics in the corporate bond markets, including market liquidity and how market prices discover and incorporate new information.

3.      I have published numerous articles on the structure, design, and regulation of financial markets and how market participants—such as market makers, high-frequency traders, and institutional investors—affect price discovery and the liquidity of different financial markets in leading economics and finance journals, including the *Journal of Finance*, *Journal of Financial Economics*, *Review of Financial Studies*, and *Review of Economic Studies*.  Additionally, I received the New York Stock Exchange Euronext Award from the Western Finance Association and the Nasdaq Award from the Financial Management Association for my research on equity trading and market microstructure.

4.      I teach undergraduate and graduate-level courses on business analytics, information technology strategy, and high-frequency finance at the Haas School of Business.  I have served on the editorial boards of leading finance journals, including the *Journal of Finance*, *Journal of Financial Economics*, and *Journal of Financial Markets*.

5.      In addition to my academic work, I served as the visiting economist at the New York Stock Exchange from 2005 to 2006, as a member of the Nasdaq Economic Advisory Board from 2004 to 2007, and as chair of the Nasdaq Economic Advisory Board in 2007.  I served as a

member of the Commodity Futures Trading Commission's ("CFTC") subcommittee of the Technology Advisory Committee ("TAC") focusing on High-Frequency Trading, and the Financial Industry Regulatory Authority's ("FINRA") market surveillance advisory group. I have also consulted on issues related to market efficiency for a number of financial markets, high-frequency trading firms, and investment firms.

6.     I am being compensated for my time and services on an hourly basis at my regular rate of $1,250 per hour. I was assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter, nor my compensation from Cornerstone Research, is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

## II.     Assignment and Summary of Allegations

7.     I have been retained by Counsel for Defendants to review the Expert Report of Matthew D. Cain, Ph.D., dated August 18, 2022 (the "Cain Report") and to assess the economic arguments put forth by Dr. Cain relating to the securities of CBL & Associates Properties Inc. (together with CBL & Associates Limited Partnership, "CBL" or the "Company"). These securities include CBL's common stock, preferred stock, and debt in the form of notes. Specifically, I have been asked to evaluate whether Dr. Cain's analysis reliably demonstrates that the 5.25% senior note scheduled to mature on December 1, 2023 (the "5.25% Senior Note"), the 4.60% senior note scheduled to mature on October 15, 2024 (the "4.60% Senior Note"), and the 5.95% senior note scheduled to mature on December 15, 2026 (the "5.95% Senior Note," and collectively with the 5.25% Senior Note and the 4.60% Senior Note, the "Senior Notes") traded in an efficient market between July 29, 2014 to March 26, 2019 (the "Putative Class Period"). I have also been asked to evaluate Dr. Cain's opinion that damages in this matter can be calculated on a class-wide basis subject to a common methodology. A list of the documents and data I have considered in forming my opinions is attached hereto as **Appendix B**.

8.     I understand Plaintiffs allege that CBL made misrepresentations during the Putative Class Period by "(a) failing to disclose that CBL [] was deliberately overcharging small retail tenants

for electricity usage thereby inflating the Company's reported financial results and (b) after being sued for that very same conduct, failing to disclose the existence of the lawsuit and the Company's likely liability for the underlying wrongful conduct."[1]

9.      I understand that Plaintiffs are seeking certification of a class defined as "all persons who purchased or otherwise acquired the securities of CBL between July 29, 2014 and March 26, 2019, both dates inclusive."[2]

### III.     Summary of Opinions

10.     Below I provide a summary of my opinions, the bases for which—including detailed explanations of my analyses, reasoning, and support—are outlined in the sections below.

11.     First, as explained further in **Section IV**, the Cain Report does not provide reliable evidence showing that the Senior Notes traded in an efficient market throughout the Putative Class Period.  While Dr. Cain appears to infer market efficiency of the Senior Notes based on characteristics of CBL's common stock, such an inference fails to account adequately for the differences between CBL's common stock and the Senior Notes.  CBL's common stock was traded on the New York Stock Exchange ("NYSE"), whereas the Senior Notes were not, and were instead traded over-the-counter ("OTC").  Accordingly, the market for the Senior Notes was decentralized, more opaque, and less liquid than the market for CBL's common stock.  In sum, Dr. Cain's analyses of the Senior Notes do not sufficiently account for these differences and thus do not demonstrate that they traded in an efficient market throughout the Putative Class Period.

12.     Critically, Dr. Cain's cause-and-effect test, which is the only direct test of market efficiency Dr. Cain performs and is therefore the most important test from the perspective of financial economists, does not even consider any period prior to November 3, 2017, despite the fact that the Putative Class Period dates back more than three years prior to that date (i.e., July 29, 2014).  Accordingly, Dr. Cain provides no direct evidence that prices of the Senior Notes rapidly incorporated new value-relevant information for the first *three years and three months* of the

---

[1] Consolidated Class Action Complaint, *In Re CBL & Associates Properties, Inc. Securities Litigation*, dated November 5, 2019 ("Complaint"), pp. 1–2.

[2] Complaint, p. 1.

Putative Class Period.  By this fact alone, Dr. Cain has failed to demonstrate, from the perspective of financial economics, that the market for the Senior Notes was efficient *throughout* the Putative Class Period.

13.     Further, Dr. Cain's other tests, none of which are direct tests of market efficiency, do not demonstrate that the Senior Notes traded in an efficient market throughout the entire Putative Class Period.  In particular, my analysis demonstrates the following:

a.  **Average Weekly Trading Volume:** Dr. Cain overstates the trading volume of the Senior Notes.  He fails to acknowledge that his measures of trading volume (based on the mean weekly trading volume) are skewed by a small number of days with large volume, and therefore obscure the fact that there were many days during the Putative Class Period when the Senior Notes did not trade at all.  Moreover, contrary to Dr. Cain's claims, the presence of retail trading in the market for the Senior Notes was substantial.  Finally, Dr. Cain fails to acknowledge that trading volume was substantially lower in the early portion of the Putative Class Period—a period that Dr. Cain did not directly test for price response, as noted above.

b.  **Analyst Coverage:** Dr. Cain vastly overstates the level of analyst coverage dedicated to the Senior Notes by conflating common stock equity reports with bond-focused reports.  Indeed, of the supposed 1,959 analyst reports Dr. Cain identified, he does not demonstrate that *any* of these related to or even discussed the Senior Notes.  To the contrary, the source from which Dr. Cain identifies analyst coverage, *Investext*, focuses only on *equity* analyst reports.  Moreover, even Dr. Cain's estimate of equity analyst coverage is inflated by duplicate reports and by industry-wide reports (rather than company-specific reports).  Removing these duplicate and industry-wide reports results in only 377 reports, or less than 20% of Dr. Cain's estimate.

c.  **Market Makers and Arbitrageurs:** Dr. Cain does not present a count of market makers for the Senior Notes.  Instead, he asserts that each unique market participant ID reporting a trade to FINRA constitutes an "independent reporting market

Page 4

maker[].["3] However, an analysis of Dr. Cain's data shows that the vast majority of these market participants seldom traded the Senior Notes. Indeed, less than 10% of the market participants Dr. Cain identified conducted both buy and sell transactions on more than half of weeks during the Putative Class Period.

   d. **Bid-Ask Spread:** Dr. Cain understates the bid-ask spread of the Senior Notes, a measure of trading costs, by only comparing buy and sale transactions within a narrow 15-minute window, which is inconsistent with the typical academic approach to estimating bond bid-ask spreads. Using a one trading day window, which is more consistent with the academic literature, reveals substantially higher bid-ask spreads compared to Dr. Cain's calculations.

   e. **Autocorrelation:** As Dr. Cain explained, autocorrelation of returns is an indication of market inefficiency because it allows investors to predict future returns based on past returns. While Dr. Cain tested for autocorrelation in CBL's common stock and preferred stock returns, he did not conduct a test for autocorrelation in the Senior Notes returns. Conducting such a test following Dr. Cain's methodology reveals that there is indeed autocorrelation in the returns of the Senior Notes, indicating potential market inefficiency.

14. Second, as discussed in **Section V**, Dr. Cain has not demonstrated that his generic damages methodology is capable of calculating damages on a class-wide basis. Specifically, Dr. Cain has not shown how inflation due to alleged overcharging of tenants for electricity usage and over-recognition of revenue can be calculated throughout the Putative Class Period based on CBL's alleged corrective disclosures, which related to the existence of and size of settlement in the *Wave* Litigation. He has also failed to demonstrate that inflation would be "constant" over the Putative Class Period, even though the nature of the information that could have been disclosed and the economic conditions in which CBL's securities were traded all changed throughout the more than four-and-a-half-year period.

---

[3] Expert Report of Matthew D. Cain, dated August 18, 2022 ("Cain Report"), ¶ 120.

**IV. Dr. Cain Fails to Demonstrate that the Senior Notes Traded in an Efficient Market Throughout the Putative Class Period**

15. It is my understanding that Plaintiffs must prove that the market for the Senior Notes was efficient throughout the Putative Class Period.

16. Below I discuss market efficiency from the perspective of financial economists, explain important features of the corporate bond market, and evaluate Dr. Cain's purported tests of market efficiency for the Senior Notes.

**A. Market Efficiency from the Perspective of a Financial Economist**

17. In an efficient market, "prices always 'fully reflect' available information."[4] The prices of securities trading in efficient markets react quickly to new value-relevant information. Thus, if investors execute trades in a security that trades in an efficient market, it can be presumed that the price at which the investors transact fully reflects all publicly available information.

18. Early researchers on market efficiency developed what is referred to as the Efficient Market Hypothesis ("EMH"). Professor Eugene Fama of the University of Chicago, a principal developer of EMH, who was awarded the 2013 Nobel Prize in Economics, stated that "[a]n efficient capital market is a market that is efficient in processing information. The prices of securities observed at any time are based on 'correct' evaluation of all information available at that time. In an efficient market, prices 'fully reflect' available information."[5]

---

[4] Fama, Eugene F. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25 (2): 383–417 at 383.

[5] Fama, Eugene F. (1976), *Foundations of Finance: Portfolio Decisions and Securities Prices*, New York, NY: Basic Books, Inc., p. 133. Financial economists recognize market efficiency in three different forms: weak-form efficiency, semi-strong form efficiency, and strong-form efficiency. *See* Fama, Eugene F. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25 (2): 383–417 at 388. In a weak-form efficient market, investors can use historical information regarding a security's price, volume, and returns to predict future security price movements. A semi-strong form efficient market indicates that historical prices and volume cannot be used to predict future price movements (as in weak-form efficient markets) and also that security prices quickly and fully adjust to reflect new, value-relevant public information. In a strong-form efficient market, security prices reflect not only the public information, as in semi-strong form efficient markets, but also any non-public information possessed by "any investor or groups (*e.g.*, managements of mutual funds) [that] have monopolistic access to any information relevant for the formation of prices." I focus my discussion to the semi-strong form of market efficiency, which I understand is the most relevant to examine in this setting. *See* Fama, Eugene F. (1991), "Efficient Capital Markets: II," *The Journal of Finance* 46 (5): 1575–1617 at 1576.

19.     The underlying rationale for why prices in an efficient market fully reflect all publicly available information is that the presence of competition amongst investors and the ability to trade on public information would quickly eliminate opportunities to profit on such information. Specifically, sophisticated investors can trade by exploiting "mispricing" of a security relative to similar financial instruments on different markets or in different forms, which is called "arbitrage."[6] By searching for and trading on mispricing (e.g., buying securities that are priced too low or selling securities that are priced too high given available public information), arbitrageurs ensure that public information is rapidly and fully reflected in the prices of securities.

20.     Researchers have investigated the question of whether markets are efficient in various financial markets over the past 50 years.  A large and growing body of academic research has documented evidence that even in an active and competitive market, various frictions can result in the price of a security moving in a manner that is inconsistent with market efficiency. Specifically, the arbitrage activities described above are not without cost or risk in the real world. Capital constraints, transaction costs, and other various risks can dramatically affect arbitrageurs' incentives and effectiveness in ensuring that new information is impounded into securities prices in an efficient manner.  As Professor Fama stated in one of his seminal works:

> [T]hough transaction costs, information that is not freely available to all investors, and disagreement among investors about the implications of given information are not necessarily sources of market inefficiency, they are potential sources.  And all three exist to some extent in real world markets.  Measuring their effects on the process of price formation is, of course, the major goal of empirical work in this area.[7]

21.     The existence of such frictions is commonly referred to as the "limits to arbitrage," and academic literature has examined and discussed such constraints.[8]  Empirical studies have investigated market frictions that impede prices from reflecting value-relevant information and

---

[6] *See* Hull, John C. (2002), *Options, Futures & Other Derivatives*, 5th Edition, Upper Saddle River, NJ: Prentice Hall, p. 700.

[7] Fama, Eugene F. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25 (2): 383–417 at 388.

[8] *See*, for example, Shleifer, Andrei, and Robert W. Vishny (1997), "The Limits of Arbitrage," *The Journal of Finance* 52 (1): 35–55.  *See also*, Mitchell, Mark, et al. (2002), "Limited Arbitrage in Equity Markets," *The Journal of Finance* 57 (2): 551–584.

have documented departures from efficiency for a wide variety of securities at various times. Examples of such frictions include, among others, funding constraints,[9] constraints on trading (*e.g.*, short selling constraints),[10] constraints on investor attention,[11] and frictions and costs due to the processing of information.[12]

22.     Indeed, there is well-documented evidence that even securities that are well covered, listed on exchanges, and traded in relatively liquid markets may not always be informationally efficient depending on how, when, and where the value relevant information is made available to investors.  For instance, in an efficient market, a security's price should incorporate public information fully, and therefore stale information should not affect it.  Yet, there is evidence that markets do sometimes react to republication of stale news.[13]  There is also evidence that security prices can fail to fully and quickly reflect information from earnings announcements.[14]  Other examples of security prices exhibiting behavior inconsistent with market efficiency involve the violation of "the law of one price:" [15] *i.e.*, in an efficient market, if two securities have the same

---

[9] *See*, for example, Shleifer, Andrei, and Robert W. Vishny (1997), "The Limits of Arbitrage," *The Journal of Finance* 52 (1): 35–55.

[10] *See*, for example, D'Avolio, Gene (2002), "The Market for Borrowing Stock," *Journal of Financial Economics* 66 (2): 271–306; Stambaugh, Robert F., et al. (2012), "The Short of It: Investor Sentiment and Anomalies," *Journal of Financial Economics* 104 (2): 288–302.

[11] Hirshleifer et al. (2009) show that a stock incorporates new earnings-related information more slowly if there are contemporaneous earnings announcements made by other firms on the same day.  *See* Hirshleifer, David, et al. (2009), "Driven to Distraction: Extraneous Events and Underreaction to Earnings News," *The Journal of Finance* 64 (5): 2289–2325.

[12] In this context, Professors Grossman and Stiglitz state that "because information is costly, prices cannot perfectly reflect the information which is available, since if it did, those who spent resources to obtain it would receive no compensation."  *See* Grossman, Sanford J., and Joseph E. Stiglitz (1980), "On the Impossibility of Informationally Efficient Markets," *The American Economic Review* 70 (3): 393–408 at 405.  *See also*, Cohen, Lauren, and Dong Lou (2012), "Complicated Firms," *Journal of Financial Economics* 104 (2): 383–400.

[13] *See* Tetlock, Paul C. (2011), "All the News That's Fit to Reprint: Do Investors React to Stale Information?" *The Review of Financial Studies* 24 (5): 1481–1512.  Researchers have also found that publication in a major newspaper of news previously discussed in specialized publications can have a large effect on the stock price, which is inconsistent with EMH.  *See* Huberman, Gur, and Tomer Regev (2001), "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance* 56 (1): 387–396.

[14] *See*, for example, Bernard, Victor L., and Jacob K. Thomas (1989), "Post-Earnings Announcement Drift: Delayed Price Response or Risk Premium?" *Journal of Accounting Research* 27: 1–36; Defond, Mark L., and Jieying Zhang (2014), "The Timeliness of the Bond Market Reaction to Bad Earnings News," *Contemporary Accounting Research* 31 (3): 911–936.

[15] Professors Lamont and Thaler document examples of large capitalization stocks violating the law of one price. *See*, for example, Lamont, Owen A., and Richard H. Thaler (2003), "Can the Market Add and Subtract?  Mispricing

underlying cash flows, they must have the same price as otherwise market participants (*e.g.*, arbitragers) would take advantage of this price divergence, causing the prices to quickly converge.

### B.      Market Efficiency of the Corporate Bond Markets

23.      CBL's Senior Notes are corporate bonds, which are a type of debt instrument.  The markets for debt securities differ in many ways from the markets for equity securities, and these differences have important implications for any assessment of market efficiency.  Indeed, these differences could make arbitrage activities costlier and impede market efficiency.  Additionally, as compared to the stock market, the evidence from academic studies to date offers less support for a presumption of efficiency for the corporate bond market.  Therefore, a rigorous examination of market efficiency for the Senior Notes is warranted.

24.      Of particular import, while CBL's common stock is traded on the NYSE, the Senior Notes are not traded on any public exchanges and instead are traded in OTC dealer markets that are decentralized, less transparent, and less liquid.[16]  One of the key features of OTC markets is that there is no centralized pricing of securities traded in such markets, such as a central limit order book for equities.  Rather, a variety of trade-specific and counterparty-related factors determine the prices of individually negotiated trades in OTC markets.[17]  Therefore, the corporate

---

in Tech Stock Carve-Outs," *The Journal of Political Economy* 111 (2): 227–268 at 230–231; Lamont, Owen A., and Richard H. Thaler (2003), "Anomalies: The Law of One Price in Financial Markets," *The Journal of Economic Perspectives* 17 (4): 191–202.

[16] Ross, Stephen A., et al. (2003) *Corporate Finance*, 6th Edition, McGraw-Hill, pp. 18, 107.

[17] There is evidence that bond prices are affected by characteristics of the trade, including the urgency and quantity of the trade, and the relationship between the dealers and investors.  For example, Dick-Nielsen and Rossi find that in the OTC bond market impatient investors typically pay higher prices when they buy and receive lower prices when they sell.  *See* Dick-Nielsen, Jens, and Marco Rossi (2019), "The Cost of Immediacy for Corporate Bonds," *The Review of Financial Studies* 32 (1): 1–41.  Similarly, Di Maggio et al. state that "Dealers charge lower spreads to dealers with whom they have the strongest ties and more so during periods of market turmoil."  *See* Di Maggio, Marco, et al. (2017), "The Value of Trading Relations in Turbulent Times," *Journal of Financial Economics* 124 (2): 266–284 at 266.  Acharya and Bisin state that these contractual terms are individually tailored to each transaction.  Specifically, they write "[In OTC markets,] [c]ontractual terms such as prices and collateral that affect a trade can be tailored to mitigate counterparty risk."  *See* Acharya, Viral, and Alberto Bisin (2014), "Counterparty Risk Externality: Centralized Versus Over-The-Counter Markets," *Journal of Economic Theory* 149: 153–182 at 154.  My own research study with Dan Li, Dmitry Livdan, and Norman Schürhoff also finds that the transaction prices insurers receive vary depending on their dealer network size, initially declining with more dealers but increasing once networks exceed 20 dealers.  *See* Hendershott, Terrence, et al. (2020), "Relationship Trading in Over-the-Counter Markets," *The Journal of Finance* 75 (2): 683–734.

bond market is much more opaque than the market for exchange-listed equity instruments, especially before trading takes place ("pre-trade") but also after ("post-trade").[18]  Unlike corporate bonds, exchange-listed equities also generally trade in continuous markets, where trades can be made at any time during the trading day.  In addition, participants can observe bid-ask quotes, which represent firm quotes at which investors can execute their trades, on a continuous basis before they decide to trade.[19]  By contrast, in the OTC corporate bond market, executable bid-ask quotes are not readily observable to market participants (*i.e.*, investors and broker-dealers).[20]  For pre-trade price information, investors in the OTC corporate bond market can contact broker-dealers to request quotes.  Traders can also observe indicative quotes from broker-dealers provided by data vendors such as Bloomberg.[21]  However, these indicative quotes, which are often representative of prior traded prices, can become stale depending on how frequently a particular security trades, and they do not necessarily reflect prices at which dealers are actually willing to purchase or sell a security at that time.[22]

25.     In terms of post-trade transparency, FINRA also collects and disseminates the time of execution, price, yield and volume data for eligible fixed income securities through the Trade

---

[18] Bessembinder, Hendrik, and William Maxwell (2008), "Markets: Transparency and the Corporate Bond Market," *The Journal of Economic Perspectives* 22 (2): 217–234 at 218.

[19] For example, the NYSE is a continuous trading system.  *See*, for example, Amihud, Yakov, and Haim Mendelson (1987), "Trading Mechanisms and Stock Returns: An Empirical Investigation," *The Journal of Finance* 42 (3): 533–553 at 535.  A continuous market is a market that involves the immediate execution of orders upon their reception by market makers and specialists.  Under SEC regulations, brokers are required to execute customer trades at the best available ask price when buying securities, and the best available bid price when selling securities (i.e., execute at the National Best Bid and Offer ("NBBO").  *See* "Regulation NMS," Securities Act Release No. 34-51808, June 9, 2005, p. 160.

[20] Corporate bond transactions may occur in traditional over-the-counter markets, or electronic markets. Electronic trading platforms, such as MarketAxess (formed in April 2000), provide institutional investors with access to multi-dealer competitive pricing.  *See* Hendershott, Terrence, and Ananth Madhavan (2015), "Click or Call? Auction versus Search in the Over-the-Counter Market," *The Journal of Finance* 70 (1): 419–447 at 421, 426.  *See also*, "MarketAxess Investor FAQs," *MarketAxess*, available at https://investor.marketaxess.com/investor-faqs.  Given that the availability of electronic trading may reduce trading costs, it is important to note that electronic trading evolved throughout the Putative Class Period.

[21] I have used data from BondCliQ, a provider that collects indicative quotes from participating dealers, in my own research.  *See* Hendershott, Terrence, et al. (2021), "Quote Competition in Corporate Bonds," *Working Paper*.

[22] Elton and Green (1998) citing Coleman, Fisher, and Ibbotson (1992) state "until about 1979, prices on dealers' quotations sheets were honored until noon the next day for small transactions. After that, quotes were indicative and although bid prices were used for internal purposes, ask prices were arbitrary."  *See* Elton, Edwin J., and T. Clifton Green (1998), "Tax and Liquidity Effects in Pricing Government Bonds," *The Journal of Finance* 53 (5): 1533–1562 at 1537, footnote 2.

Reporting and Compliance Engine ("TRACE") within 15 minutes of the transaction.[23]  However, for infrequently traded securities, the prices observed from TRACE can be stale due to a lack of recent transactions.  Given this relative lack of price transparency, debt markets are considered to be more opaque than equity markets.

26.     Research shows that a lack of transparency in security prices may be an impediment to market efficiency.[24]  Furthermore, infrequent trading exacerbates this opacity.  Because bonds trade OTC and the trading can be infrequent, investors may be poorly informed about the state of the market.  This may lead to different investors paying substantially different prices to different dealers at roughly the same time.[25]

27.     Furthermore, the corporate bond market is a non-centralized dealer market where dealers often have to facilitate transactions by trying to match counterparties, *i.e.*, potential buyers and sellers.  Dealers who act as counterparties on trades can act either as agents or as principals.  A dealer acting as a principal will use its balance sheet to facilitate a trade either by selling a bond it owns or buying a bond for its own account.  In contrast, a dealer trading as an agent will need to locate an investor who wants to be on the other side of the trade, which may take time.  In some cases, multiple dealers act as agents in order to facilitate a trade between a buyer and a seller, making the process of matching even more complicated and opaque.[26]  Research has shown that since the 2008 financial crisis, dealers are more likely to be agents, which means that dealers have to locate one or more counterparties before a trade can take place.[27]

---

[23] Dick-Nielsen, Jens (2009), "Liquidity Biases in TRACE," *The Journal of Fixed Income* 19 (2): 43−55.

[24] Bloomfield, Robert, and Maureen O'Hara (1999), "Market Transparency: Who Wins and Who Loses?" *The Review of Financial Studies* 12 (1): 5–35 at 5.  Using laboratory experiments, Bloomfield and O'Hara (1999) show that "trade disclosure increases the informational efficiency of transaction prices."  In the context of NYSE traded stocks, Boehmer, et al. find some improvement in informational efficiency following the introduction of OpenBook (i.e., a service which improved pre-trade transparency on NYSE).  *See* Boehmer, Ekkehart, et al. (2005), "Lifting the Veil: An Analysis of Pre-Trade Transparency at the NYSE," *The Journal of Finance* 60 (2): 783–815.

[25] *See*, for example, Feldhütter, Peter (2012), "The Same Bond at Different Prices: Identifying Search Frictions and Selling Pressures," *The Review of Financial Studies* 25 (4): 1155–1206 at 1156.  It is instructive that Dr. Feldhütter, a researcher cited by Dr. Cain in his report, finds that investors pay substantially different prices for the same corporate bond at roughly the same time, which is a hallmark of market inefficiency.

[26] Li, Dan, and Schürhoff, Norman (2019), "Dealer Networks," *The Journal of Finance* 74 (1): 91–144 at 91−92.

[27] Bessembinder, Hendrik, et al. (2018), "Capital commitment and illiquidity in corporate bonds," *The Journal of Finance* 73 (4): 1615–1661 at 1636.

28.     The decentralized structure described above also impacts liquidity in the bond market, which is another important factor when assessing market efficiency.  Liquidity typically refers to the extent to which a particular asset can be bought or sold quickly on the market without having a significant effect on its price.[28]  Liquidity is important for informational efficiency because it allows investors to trade on new value-relevant information quickly, without incurring high transaction costs and without the act of trading causing price distortion.[29]  Liquidity can often be measured by trading volumes (*i.e.*, all things being equal, higher trading volumes indicates higher liquidity) and bid-ask spreads (*i.e.*, all things being equal, lower bid-ask spreads indicate lower transaction costs and higher liquidity).  Implicit costs of trading, such as the amount of time it takes to find a counterparty and the ability to execute large trades without adversely affecting the price, are also indicators of liquidity.[30]  If a market is illiquid, *i.e.*, the security is thinly traded and investors need to both incur substantial transaction costs and experience a long search time before finding a counterparty, it is much less likely that the security's price at a given time fully and rapidly incorporates all value-relevant public information.

29.     Liquidity is different in markets for different instruments.  The corporate bond market tends to have less active trading and lower liquidity than the market for exchange-listed equities.  For example, large-capitalization U.S. stocks trade, on average, 1.8 times *per second*.[31]  In comparison, corporate bonds trade much more infrequently, and studies have found that the median corporate bond does not trade on a majority of trading days.[32]

---

[28] "Liquidity is generally described as the ability to trade large quantities quickly at low cost with little price impact. This description highlights four dimensions to liquidity, namely, trading quantity, trading speed, trading cost, and price impact."  *See* Liu, Weimin (2006), "A Liquidity-Augmented Capital Asset Pricing Model," *Journal of Financial Economics* 82 (3): 631–671 at 631.

[29] Chordia, Tarun, et al. (2008), "Liquidity and Market Efficiency," *Journal of Financial Economics* 87 (2): 249–268 at 267.  The authors state "[i]n sum, this evidence is consistent with greater liquidity engendering a higher degree of informational efficiency."

[30] As stated in a literature survey, "[l]arger bid-ask spreads and transactions costs are indicative of course, but a larger sense of liquidity really matters: how much is for sale at the bid-ask points ('depth'), and most of all how large will the 'price impact' of a trade be."  *See* Cochrane, John H. (2004), "Asset Pricing: Liquidity, Trading, and Asset Prices," *NBER Reporter* (Winter): 1–12 at 5.

[31] Brogaard, Jonathan, et al. (2018), "High Frequency Trading and Extreme Price Movements," *Journal of Financial Economics* 128 (2): 253–265 at 255.

[32] Dick-Nielsen et al. (2012) find that, after excluding retail-sized trades (i.e., trades below $100,000 in volume), the median corporate bond did not trade on 60.7% of days between 2005Q1 and 2009Q2.  *See* Dick-Nielsen, Jens, et al.

30.     Indeed, illiquidity in corporate bonds is substantial, significantly greater than what can be explained by bid-ask spreads.[33]  For example, Ellul et al. (2011) document that corporate bonds are subject to regulatory-induced fire sales due to relatively low liquidity in the bond market, exhibiting significant price declines when downgraded to non-investment grade.[34]  Furthermore, Bessembinder et al. (2018) find that dealer capital commitment decreased during the 2007 to 2009 financial crisis and the corporate bond market continued to evolve away from the commitment of bank-affiliated dealer capital to absorb customer imbalances afterwards, which may point to more difficult trading conditions and lower liquidity.[35]

31.     Academic studies also find that corporate bond returns exhibit momentum and subsequent long-term reversals, which are both indicia of market inefficiency.  Momentum refers to a situation in which future returns occur in the same direction as current returns, while reversal refers to a change in the direction between current and future returns.  As Dr. Cain explained in his report, investors can take advantage of momentum by "purchas[ing] (sell[ing] or short sell[ing]) stock when returns are positive (negative) in order to generate profits as the returns continue over subsequent trading days" and exploit reversal by "sell[ing] or short sell[ing] (purchas[ing]) stock when returns are positive (negative) in order to capture profits when the returns reverse."[36]  For example, Jostova et al. (2013) document significant momentum in corporate bonds with both transaction and dealer-quote data.[37]  Li and Galvani (2018) develop a corporate bond momentum strategy based on trading volume and show that it yields large and persistent unconditional profits.[38]  Bali et al. (2021) show that contrarian strategies based on long-

(2012), "Corporate Bond Liquidity before and after the Onset of the Subprime Crisis," *Journal of Financial Economics* 103: 471–492 at 474–475, Table 2.

[33] Bao, Jack, et al. (2011), "The Illiquidity of Corporate Bonds," *The Journal of Finance* 66 (3): 911–946.

[34] Ellul, Andrew, et al. (2011), "Regulatory Pressure and Fire Sales in the Corporate Bond Market," *Journal of Financial Economics* 101 (3): 596–620.

[35] Bessembinder, Hendrik, et al. (2018), "Capital Commitment and Illiquidity in Corporate Bonds," *The Journal of Finance* 73 (4): 1615–1661.

[36] Cain Report, ¶ 69.

[37] Jostova, Gergana, et al. (2013), "Momentum in Corporate Bond Returns," *The Review of Financial Studies* 26 (7): 1649–1693.

[38] Li, Lifang, and Valentina Galvani (2018), "Market States, Sentiment, and Momentum in the Corporate Bond Market," *Journal of Banking and Finance* 89: 249–265.

term returns are statistically and economically profitable in the corporate bond market.[39]  These profitable trading strategies based on momentum and long-term reversals would, as Dr. Cain stated, "imply market inefficiency because publicly available information about prior [] price movements would not be fully reflected in current [] prices."[40]

32.     Finally, corporate bond prices are generally less sensitive to company-specific news than equity prices.  Bondholders are creditors of the company, whose payout is capped at the promised coupons and principal payments.  On the other hand, equity holders are partial owners of the company.  There is no guaranteed payout to equity holders but also no limit to potential upsides if the company performs extremely well.  When the company incurs losses, equity holders are generally the first in line to absorb losses and provide a capital cushion that protects bondholders and other debtholders.  If the company cannot make the promised payments on its debt, assets of the company are generally used to first pay off bondholders and other debtholders, while equity holders have the residual claims of the remaining assets.  Given the differing payout structures of bonds and equity, corporate bond prices are typically less sensitive to news about the company in an efficient market relative to equity prices.  As Dr. Cain stated in his report, "[b]ond prices are not as responsive to a company's earnings announcements as equity products tend to be."[41]  Dr. Cain further testified in deposition, "the actual valuation impact [of earnings announcement information] for a company is going to be somewhat different for different securities."[42]

33.     In summary, Dr. Cain fails to adequately consider any of the contextual factors discussed above in his assessment of the Senior Notes, including that bond markets are decentralized, more opaque, and less liquid than is generally true in equity markets.

---

[39] Bali, Turan, et al. (2021), "Long-Term Reversals in the Corporate Bond Market," *Journal of Financial Economics* 139 (2): 656–677.

[40] Cain Report, ¶ 69.

[41] Cain Report, ¶ 117.

[42] Deposition of Matthew D. Cain, October 4, 2022 ("Cain Deposition"), 180:4-181:21.

C.   **Dr. Cain Has No Reliable Basis to Conclude that the Senior Notes Traded in an Efficient Market and Ignores Evidence That Would Be Inconsistent with Market Efficiency Under His Own Approach**

34.   According to the Cain Report, in order to evaluate market efficiency for the Senior Notes, Dr. Cain assessed the Senior Notes relative to five factors set forth in the *Cammer* decision[43] (trading volume, analyst coverage, market makers and arbitrageurs, SEC Form S-3 eligibility, and cause-and-effect analysis) and three factors set forth in the *Krogman* decision[44] (market capitalization, bid-ask spread, and public float).[45]  However, as detailed below, Dr. Cain's analyses of the *Cammer* and *Krogman* factors do not provide reliable evidence that the Senior Notes traded in an efficient market throughout the Putative Class Period.

35.   First, Dr. Cain has not demonstrated that the market for the Senior Notes was efficient throughout the entirety of the Putative Class Period.  For his most critical test—the cause-and-effect analysis—Dr. Cain only tested less than one-third of the Putative Class Period and has not even attempted to examine market efficiency for the remaining two-thirds of the Putative Class Period.  While his other analyses purport to test the entirety of the Putative Class Period, they rely on statistics that obscure the many changes to the nature of the Senior Notes, the nature of the information available to the market, and the economic conditions under which the Senior Notes traded throughout the more than four-and-a-half-year Putative Class Period.  Indeed, Dr. Cain conceded during his deposition that it is possible for a security to trade in an *efficient* market at one point in time but an *inefficient* market at another point in time.[46]

36.   Second, even for the portion of the Putative Class Period Dr. Cain purports to test, he has failed to demonstrate through his analyses of the *Cammer* and *Krogman* factors that the market for the Senior Notes was efficient.  Dr. Cain's findings of market efficiency are based on flawed analyses and use thresholds of efficiency that are not tailored to corporate bonds.

---

[43] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) at 1286.

[44] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

[45] Cain Report, ¶ 126.

[46] "Q. Is it possible for the market of a security to be efficient at one point in time but not another point in time? A. Yes, I do think that's possible." *See* Cain Deposition, 124:14–19.

37.     I discuss Dr. Cain's analyses below in detail, starting with his cause-and-effect analysis, which is the only direct test of market efficiency Dr. Cain undertakes, and then other of the *Cammer* and *Krogman* factors.

### 1.     Cause-and-Effect Analysis

38.     From the perspective of a financial economist, only *Cammer* Factor No. 5, which assesses whether there is a cause-and-effect relationship between the release of new, value relevant information and a security's price response, directly tests market efficiency.  Indeed, Dr. Cain notes the *Cammer* court's statement that "[o]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price."[47]  Professor Fama also writes that "[t]he cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns."[48]

39.     To assess *Cammer* Factor No. 5 for the Senior Notes, Dr. Cain conducted an event study to purportedly demonstrate "a cause-and-effect relationship between Company disclosures and resulting movements in CBL Senior Notes' prices."[49]  Specifically, Dr. Cain compared the frequencies of statistically significant abnormal returns and volume on trading days with company-specific news (i.e., credit ratings downgrades and earnings releases that occurred within one week of such downgrades), which he calls "News Days," to other trading days "in which relatively little Company-specific information was provided to the market," which he names "Least News Days."[50]  Dr. Cain concludes that the market for the Senior Notes was efficient because a higher proportion of News Days correspond to statistically significant abnormal returns than the Least News Days.  As detailed in this section, however, Dr. Cain's assessment of the Senior Notes' market reactions on these News Days does not provide reliable evidence of market efficiency *throughout* the Putative Class Period, given that he (1) only examined News Days

---

[47] Cain Report, ¶ 45.

[48] Fama, Eugene F. (1991), "Efficient Capital Markets: II," *The Journal of Finance* 46 (5): 1575–1617 at 1607.

[49] Cain Report, ¶ 126.

[50] Cain Report, ¶ 47.

which fall on or after November 3, 2017, (2) did not test if the Senior Notes traded efficiently with respect to the specific type of information alleged to have been misrepresented, and (3) did not test whether new information was quickly and fully incorporated into the prices of the Senior Notes on those News Days.

40.     First, the earliest of Dr. Cain's News Days is not until more than three years and three months into the more than four-and-a-half-year Putative Class Period, on November 3, 3017 when CBL issued its Q3 2017 earnings release.  An event study examining the Senior Notes' market reactions only on News Days on or after November 3, 2017 cannot reliably demonstrate market efficiency for any point before that or, indeed, throughout the full Putative Class Period.

41.     Dr. Cain's failure to perform a direct test of market efficiency prior to November 3, 2017 is particularly important because the environment in which the Senior Notes traded by this late date was not the same as it was earlier in the Putative Class Period.  For example, the performance of CBL's primary holdings, shopping malls, experienced a steady decline in sales over the Putative Class Period.[51]  CBL also had been continually disposing of mall assets throughout the Putative Class Period as major retail tenants such as Sears Holdings Corp., Macy's Inc., and J.C. Penney Co. closed stores, and CBL announced a "sharp cut to its dividend" in November 2017.[52]  Indeed, mirroring the decline in performance of CBL's primary assets, over

---

[51] *See*, for example, "Retail Clouds Darken as Mall Operator CBL Is Downgraded to Junk Status," *The Wall Street Journal*, November 9, 2017, available at https://www.wsj.com/articles/retail-clouds-darken-as-mall-operator-cbl-is-downgraded-to-junk-status-1510272538.

[52] *See*, for example, "CBL & Associates Properties, Inc. Completes The Sale Of Eastgate Crossing In Cincinnati, OH," *CBL & Associates Properties, Inc.*, June 1, 2015, available at https://invest.cblproperties.com/news-views/news-details/2015/CBL--Associates-Properties-Inc--Completes-the-Sale-of-Eastgate-Crossing-in-Cincinnati-OH-06-01-2015/; "CBL Announces Community Center Sale And Recent Financing Activity," *CBL & Associates Properties, Inc.*, July 7, 2015, available at https://invest.cblproperties.com/news-views/news-details/2015/CBL-Announces-Community-Center-Sale-and-Recent-Financing-Activity-07-07-2015/; "CBL & Associates Properties, Inc. Announces Dispositions Of Non-Core Properties," *CBL & Associates Properties, Inc.*, November 16, 2015, available at https://invest.cblproperties.com/news-views/news-details/2015/CBL--Associates-Properties-Inc--Announces-Dispositions-of-Non-Core-Properties-11-16-2015/; "CBL Announces Additional Community Center Disposition Progress," *CBL & Associates Properties, Inc.*, November 30, 2015, available at https://invest.cblproperties.com/news-views/news-details/2015/CBL-Announces-Additional-Community-Center-Disposition-Progress-11-30-2015/; "CBL & Associates Properties, Inc. Completes Sale Of Mayfaire Community Center," *CBL & Associates Properties, Inc.*, December 3, 2015, available at https://invest.cblproperties.com/news-views/news-details/2015/CBL--Associates-Properties-Inc--Completes-Sale-of-Mayfaire-Community-Center-12-03-2015/; "CBL & Associates Properties, Inc. Announces Disposition Of Renaissance Center," *CBL & Associates Properties, Inc.*, December 17, 2015, available at https://invest.cblproperties.com/news-views/news-details/2015/CBL--Associates-Properties-Inc--Announces-Disposition-of-Renaissance-Center-12-17-2015/; "CBL

the course of the Putative Class Period, the Senior Notes were downgraded from investment grade ratings to non-investment grade or "junk" status after CBL's Q3 2017 earnings release on November 3, 2017.[53] Non-investment grade bonds exhibit different trading patterns, liquidity, and informational sensitivity than those of investment grade bonds—largely because they are considered "riskier" with respect to the potential for default.[54] Accordingly, even if Dr. Cain had established that the Senior Notes traded efficiently as non-investment grade instruments, such a finding would not necessarily apply to how they traded when they were investment grade. Thus, Dr. Cain has not performed any direct test of market efficiency for the Senior Notes that could demonstrate they traded efficiently prior to November 3, 2017.

---

Completes Sale Of Majority Interest In Triangle Town Center To DRA Advisors LLC," *CBL & Associates Properties, Inc.*, February 8, 2016, available at https://invest.cblproperties.com/news-views/news-details/2016/CBL-Completes-Sale-of-Majority-Interest-in-Triangle-Town-Center-to-DRA-Advisors-LLC-02-08-2016/; "Sears Warning Slams Mall Stocks," *The Wall Street Journal*, March 22, 2017, available at https://www.wsj.com/articles/sears-warning-slams-mall-stocks-1490203294; "CBL & Associates Properties, Inc. Completes Two Additional Property Dispositions," *CBL & Associates Properties, Inc.*, April 4, 2015, available at https://invest.cblproperties.com/news-views/news-details/2016/CBL--Associates-Properties-Inc--Completes-Two-Additional-Property-Dispositions-04-04-2016/; "Mall Owners See Strength in Smaller Numbers," *The Wall Street Journal*, May 12, 2017, available at https://www.wsj.com/articles/mall-owners-see-strength-in-smaller-numbers-1494619600; "CBL Completes Sale Of Two Regional Malls For $66.5 Million," *CBL & Associates Properties, Inc.*, July 22, 2015, available at https://invest.cblproperties.com/news-views/news-details/2016/CBL-Completes-Sale-of-Two-Regional-Malls-for-66-5-Million-07-22-2016/; "CBL & Associates Properties, Inc. Completes Sale Of Community Center," *CBL & Associates Properties, Inc.*, September 1, 2016, available at https://invest.cblproperties.com/news-views/news-details/2016/CBL--Associates-Properties-Inc--Completes-Sale-of-Community-Center-09-01-2016/; "CBL & Associates Properties, Inc. Closes Three Mall Sale," *CBL & Associates Properties, Inc.*, December 19, 2016, available at https://invest.cblproperties.com/news-views/news-details/2016/CBL--Associates-Properties-Inc--Closes-Three-Mall-Sale-12-19-2016/; "CBL & Associates Properties Announces The Sale Of The Outlet Shoppes At Oklahoma City," *CBL & Associates Properties, Inc.*, May 1, 2017, available at https://invest.cblproperties.com/news-views/news-details/2017/CBL--Associates-Properties-Announces-the-Sale-of-the-Outlet-Shoppes-at-Oklahoma-City-05-01-2017/; "CBL & Associates Properties Completes The Sale Of Two Malls For $53.5 Million," *CBL & Associates Properties, Inc.*, May 11, 2017, available at https://invest.cblproperties.com/news-views/news-details/2017/CBL--Associates-Properties-Completes-the-Sale-of-Two-Malls-for-53-5-Million-05-11-2017/; "Retail Clouds Darken as Mall Operator CBL Is Downgraded to Junk Status," *The Wall Street Journal*, November 9, 2017, available at https://www.wsj.com/articles/retail-clouds-darken-as-mall-operator-cbl-is-downgraded-to-junk-status-1510272538.

[53] *See*, for example, "Fitch Downgrades CBL to 'BB+'; Outlook Negative," *Fitch Ratings*, November 9, 2017, available at https://www.fitchratings.com/research/non-bank-financial-institutions/fitch-downgrades-cbl-to-bb-outlook-negative-09-11-2017.

[54] *See*, for example, Hotchkiss, Edith, and Gergana Jostova (2017), "Determinants of Corporate Bond Trading: A Comprehensive Analysis," *Quarterly Journal of Finance* 7 (2): 1750003 at 1750003-1; Hendershott, Terrence, et al. (2020), "Short Selling and Price Discovery in Corporate Bonds," *Journal of Financial and Quantitative Analysis* 55 (1): 77–115 at 89.

42.	Second, Dr. Cain's analysis of the market reactions on the News Days does not provide reliable evidence as to whether any alleged misrepresentations would have been incorporated into the price of the Senior Notes throughout the Putative Class Period. As noted, Dr. Cain's News Days overlapped with dates on which the Senior Notes experienced credit rating downgrades— which is one of the more important events that can occur in the life cycle of a corporate bond. The academic literature has shown that prices can react differently to different types of information, depending on how and where this information is made available. It also appears that investors may pay more attention to information that is easier to process.[55] For example, there is evidence that markets react to information that is more conspicuous but may not react quickly and fully to information that is less conspicuous.[56] A well-cited example in finance literature involves a biotech company EntreMed that experienced a 330% increase in its stock price after the *New York Times* mentioned the company in a front-page article in relation to a breakthrough in cancer research, after the relevant information had been published in a scientific journal, *Nature*, months earlier.[57] This demonstrates that the information released earlier that was less conspicuous and accessible only to specialists was not fully and rapidly incorporated into the stock price.[58] As such, analyzing market reactions to credit rating changes, which are highly important to corporate bonds and which Dr. Cain exclusively focuses on here, does not necessarily provide evidence on whether the markets would have efficiently incorporated the allegedly misrepresented

---

[55] *See*, for example, Aboody, David (1996), "Recognition versus Disclosure in the Oil and Gas Industry." *Journal of Accounting Research* 34: 21–32. *See also,* Sloan., Richard G. (1996), "Do Stock Prices Fully Reflect Information in Accruals and Cash Flows About Future Earnings?" *The Accounting Review* 71 (3): 289–315.

[56] *See*, for example, Huberman, Gur, and Tom Regev (2001), "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance* 56 (1): 387–396. As one study surveying the literature puts it, "[s]alient news carries greater weight in market prices." *See* Daniel, Kent, et al. (2002), "Investor Psychology in Capital Markets: Evidence and Policy Implications," *Journal of Monetary Economics* 49 (1): 139–209 at 169. *See also*, Gilbert, Thomas, et al. (2012), "Investor Inattention and the Market Impact of Summary Statistics," *Management Science* 58 (2): 336–350.

[57] *See*, for example, Huberman, Gur, and Tom Regev (2001), "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance* 56 (1): 387–396 at 387, 391.

[58] Hong, Harrison, and Jeremy Stein (2007), "Disagreement and the Stock Market," *Journal of Economic Perspectives* 21 (2): 109–128 at 116–118.

information, which relates to a lawsuit filed against CBL and CBL's reported revenues from tenant reimbursements.[59]

43.      Third, even for the period that Dr. Cain directly examined, a more careful analysis suggests there is evidence consistent with an *inefficient* market, including momentum and reversals following Dr. Cain's News Days.  As demonstrated in **Exhibit 1**, I analyzed the cumulative abnormal returns in two trading windows following Dr. Cain's News Days (denoted $t = 0$): (1) the two trading days immediately following each of Dr. Cain's News Days (denoted $t = 1$ to $t = 2$),[60]and (2) the cumulative abnormal returns in the subsequent trading week (i.e., from the third to the seventh trading day immediately following Dr. Cain's News Days (denoted $t = 3$ to $t = 7$)).  I found that many News Days are followed by statistically significant cumulative abnormal returns in the subsequent trading windows, meaning that prices either continued to fall or sharply reversed.  Both of these patterns are inconsistent with efficient markets quickly and fully incorporating new public information into prices.  Illustratively adopting Dr. Cain's test for statistical differences,[61] I can conclude that the frequent occurrences of trading windows exhibiting momentum or reversals cannot be explained by chance for each of the Senior Notes at the 95% level and collectively for all three Senior Notes at the 99% level for both trading windows.

44.      In summary, Dr. Cain has not even attempted to establish, from the perspective of a financial economist, that any of the notes traded efficiently prior to November 3, 2017, and his analyses from November 3, 2017 through the end of the Putative Class Period does not reliably demonstrate that the market of the Senior Notes consistently incorporated public, value-relevant information, including the information at issue in this case.

---

[59] During his deposition, Dr. Cain acknowledged that he has not conducted any analysis of price impact around the alleged misstatements.  *See* Cain Deposition, 224:2–10.

[60] During his deposition, Dr. Cain stated that the full value of public information could be incorporated as quickly as within minutes, and typically no longer than three trading days in his experience.  *See* Cain Deposition, 92:2–22.  I also find statistically significant cumulative abnormal returns in the subsequent five trading days immediately following each of Dr. Cain's News Days.

[61] *See*, for example, Cain Report, Exhibits 7d–7f.

## 2. Other *Cammer* and *Krogman* Factors

45.     Unlike *Cammer* Factor No. 5, *Cammer* Factors Nos. 1–4 and the *Krogman* Factors are not direct tests of market efficiency.  Instead, these factors look for structural features that indicate whether market conditions are conducive to new information being quickly and fully incorporated into security prices.  Nonetheless, if certain of these structural features are absent, that could indicate the presence of frictions that may impede market efficiency.  As I demonstrate below, Dr. Cain's analyses of these factors are flawed.  He ignores evidence that certain of these indicative factors weigh against his conclusion that the Senior Notes traded in an efficient market throughout the Putative Class Period.

### a) Average Weekly Trading Volume

46.     *Cammer* Factor No. 1 is the average weekly trading volume, which is one of the key elements for liquidity.  While not a direct test of efficiency, in that a market being liquid does not necessarily mean that the market is efficient, active trading and liquidity are important to ensure that information gets impounded in prices fully and rapidly.  However, low liquidity can take other forms, such as high transaction costs or delays in executing trades in the desired quantity, that could also present impediments to market efficiency.  Thus, even if Dr. Cain had performed a reliable analysis of the trading volume of the Senior Notes, such an analysis alone would not demonstrate, from the perspective of financial economists, that the Senior Notes traded efficiently.

47.     But Dr. Cain has not performed a reliable analysis of the average weekly trading volume of the Senior Notes for several reasons.  First, Dr. Cain does not provide a clear and reliable benchmark for what level of trading volume would be consistent with bond market efficiency, let alone any scientific basis for such a benchmark.  While in his report, Dr. Cain compared the mean weekly turnovers, which he found to average 2.45%, 2.20%, and 4.45% for the 5.25% Senior Note, 4.60% Senior Note, and 5.95% Senior Note, respectively, to the 1% and 2% common stock thresholds established by the *Cammer* court, Dr. Cain does not provide any justification why it is

appropriate to apply the *Cammer* benchmarks developed for common stock to corporate bonds.[62] In fact, Dr. Cain testified in his deposition that "whether or not there is a particular level of volume" is "not particularly relevant for bonds because of the nature of the trading."[63]

48.    Dr. Cain further asserts that "even lower levels of trading volume for the Senior Notes would not be inconsistent with market efficiency" because the *Cammer* court's thresholds include frequent retail trading activity whereas "CBL's Senior Notes were traded by large, sophisticated institutional investors."[64]  However, Dr. Cain does not provide any evidence that retail investors traded the Senior Notes only infrequently.

49.    Indeed, based on my analysis, a great majority of trades in the Senior Notes were small, retail-size trades.  In the finance literature, a standard threshold for classifying institutional and retail trades in the bond market is $100,000 in trade sizes, as retail investors are more likely to trade in sizes smaller than $100,000, whereas institutional investors tend to transact in much larger trade sizes.[65]  I find that 89.4% of the trades in the TRACE data upon which Dr. Cain relies are trades with less than $100,000 in trade sizes.[66]  The mean trade sizes are just around the $100,000 threshold, specifically, $106,097, $112,082, and $100,024 for the 5.25% Senior Note, 4.60% Senior Note, and 5.95% Senior Note, respectively.[67]  These statistics indicate that the presence of retail trading in the market for the Senior Notes was substantial.  Therefore, Dr. Cain provides no reliable basis for his claim that lower thresholds of trading volume would be

---

[62] Cain Report, ¶ 114–115.  During his deposition, Dr. Cain acknowledged that the thresholds established by the *Cammer* court are for common stock and not for corporate bonds.  *See* Cain Deposition, 184:13–17 ("Q. And you mentioned the 1 to 2 percent mentioned by the Cammer court. But that, again, was looking at common stock, not debt. Right? A. That is correct, I believe so.").

[63] Cain Deposition, 188:19–25.

[64] Cain Report, ¶ 115.  Dr. Cain does not provide a benchmark of what level of retail activity would be considered frequent.  During his deposition, Dr. Cain acknowledged that publicly reported holdings for the Senior Notes were less than 50% in some instances.  *See* Cain Deposition, 183:22–184:4.

[65] *See*, for example, Bessembinder, Hendrik, et al. (2009), "Measuring Abnormal Bond Performance," *The Review of Financial Studies* 22 (10): 4219–4258; Dick-Nielsen, Jens, and Marco Rossi (2019), "The Cost of Immediacy for Corporate Bonds," *The Review of Financial Studies* 32 (1): 1–41; Hendershott, Terrence, et al. (2021), "Quote Competition in Corporate Bonds," *Working Paper*.

[66] These trades account for 18.5% in terms of dollar value traded.

[67] The median trade sizes are well below the $100,000 threshold, specifically, $15,577, $17,928, and $18,569 for the 5.25% Senior Note, 4.60% Senior Note, and 5.95% Senior Note, respectively.

appropriate for the Senior Notes.  Furthermore, Dr. Cain does not establish what lower levels, if any, would indicate corporate bond market *inefficiency* to him.[68]

50.     Second, Dr. Cain's analysis of the Senior Notes' trading volume fails to accurately depict the evolving liquidity conditions of the Senior Notes during the Putative Class Period.  Indeed, Dr. Cain's focus on the mean weekly turnover of the Senior Notes, a measure susceptible to the influence of outliers, over more than four-and-a-half years ignores the fact that the Senior Notes traded infrequently and at well below 2% weekly turnover at earlier points in the Putative Class Period.

51.     **Exhibits 2.A–2.C** show that weekly turnover for the Senior Notes varied substantially throughout the Putative Class Period, with large spikes in weekly turnover that skew Dr. Cain's findings.  From a statistical perspective, when data is skewed by outliers, the median is more instructive than mean when assessing the typical value.[69]

52.     A review of the median weekly turnover of the Senior Notes, as opposed to the mean weekly turnover, helps to demonstrate this as the median weekly turnovers during the Putative Class Period were 1.5%, 1.1%, and 3.5% for the 5.25% Senior Note, 4.60% Senior Note, and 5.95% Senior Note, respectively, driven by a substantial number of weeks with low or no trading volume.  As shown in **Exhibits 3.A–3.C**, there were 142, 152, and 37 weeks which had a weekly turnover less than 2% (approximately 58.2%, 65.0%, and 30.6% of all possible trading weeks) during the Putative Class Period for each of the Senior Notes.  When compared with a 1% threshold, 101, 112, and 13 weeks had a weekly turnover less than 1% (approximately 41.4%, 47.9%, and 10.7% of all possible trading weeks), respectively.  Furthermore, for the 5.25% Senior Note and the 4.60% Senior Note, there were 8 and 12 weeks of the Putative Class Period during which these Senior Notes *did not trade at all*.  For comparison, trading in CBL's common stock is significantly less variable than trading in the Senior Notes.  The mean and median weekly

---

[68] Dr. Cain pointed to the involvement of "large, sophisticated institutional investors" in the corporate bond market in his report and deposition as the reason that lower levels of trading volume would not be inconsistent with market efficiency.  However, Dr. Cain does not conduct any analysis to support this claim.  *See* Cain Report, ¶ 115; Cain Deposition, 183:14–184:12.

[69] *See* Greene, William H. (2008), *Econometric Analysis*, 6th Edition, Upper Saddle River, NJ: Prentice Hall, p. 989 ("[] the median corresponds more closely than the mean to the middle of the distribution.  It is unaffected by extreme values.").

turnover for CBL's common stock is much more similar in magnitude (8.1% and 6.6%, respectively).

53.     Additionally, these periods of high and low trading volume were not evenly distributed across the Putative Class Period.  As summarized in **Exhibits 3.A–3.C**, prior to the filing of the *Wave* Litigation complaint (a period of 85 weeks from July 29, 2014 to March 15, 2016), the mean weekly turnovers of the 5.25% Senior Note and the 4.60% Senior Note were 1.0% and 1.0% and the median weekly turnovers were merely 0.4% and 0.1%.  During this period, there were only 12 and 8 weeks that had a mean weekly turnover greater than 2% (approximately 14.1% and 10.5% of possible trading weeks), while 8 and 11 weeks (approximately 9.4% and 14.5% of possible trading weeks) had no trading at all for the 5.25% Senior Note and the 4.60% Senior Note, respectively.  Thus, prior to the filing of the *Wave* Litigation, weekly turnovers for the 5.25% Senior Note and the 4.60% Senior Note were substantially below the 2% common stock threshold in *Cammer*.

54.     In fact, from the start of the Putative Class Period through March 15, 2016, the 5.25% Senior Note and the 4.60% Senior Note did not trade at all on 51.4% and 66.3% of trading days.[70] In other words, prior to the filing of the *Wave* Litigation, the 5.25% Senior Note and 4.60% Senior Note had no trading activity in over half of the possible trading days.  Moreover, as noted above, much of the trading activity in the Senior Notes was driven by small trades.  For example, by filtering out retail-sized trades ($100,000 in trade sizes),[71] I find that the 5.25% Senior Note and the 4.60% Senior Note did not have any trades above $100,000 on 64.4% and 80.4% of trading days during this period.  In other words, prior to the filing of the *Wave* Litigation, there were potentially no institutional trading at all on approximately three out of five trading days for the 5.25% Senior Note.  Institutional trading in the 4.60% Senior Note was even less frequent, as approximately four out of five trading days potentially had no institutional trading at all.

---

[70] *See* **Exhibits 3.A–3.B**.

[71] *See*, for example, Bessembinder, Hendrik, et al. (2009), "Measuring Abnormal Bond Performance," *The Review of Financial Studies* 22 (10): 4219–4258; Dick-Nielsen, Jens, and Marco Rossi (2019), "The Cost of Immediacy for Corporate Bonds," *The Review of Financial Studies* 32 (1): 1–41; Hendershott, Terrence, et al. (2021), "Quote Competition in Corporate Bonds," *Working Paper*.

55. Third, Dr. Cain's calculation of trading volume includes redundant trade reports that inflate his volume estimates. For example, the TRACE data upon which Dr. Cain relies contain agency chain transactions, where a dealer intermediates between two principals as an agent by transferring the bond from one principal to the other while not assuming any price risk. An agency chain transaction may generate multiple trade reports as each participant would file a trade report for the same transaction. TRACE data also include prearranged trades, which are riskless trades for a dealer as two prearranged transactions offset each other.

56. I follow the recommendations in Asquith et al. (2019) and Schultz (2017) to remove redundant trade reports from agency chain transactions and prearranged trades.[72] As shown in **Exhibits 3.A–3.C,** when that approach is adopted, I find that adjusted mean weekly turnovers are 2.1%, 2.0%, and 4.0% for the 5.25% Senior Note, 4.60% Senior Note, and 5.95% Senior Note during the Putative Class Period, respectively (i.e., 14.3%, 9.1%, and 10.1% lower than Dr. Cain's estimates, respectively). Meanwhile, the adjusted median weekly turnovers are 1.3%, 1.0%, and 3.2% for the 5.25% Senior Note, 4.60% Senior Note, and 5.95% Senior Note during the Putative Class Period, respectively. Prior to the filing of the *Wave* Litigation, adjusted mean and median weekly turnovers are 1.0% and 0.4% for the 5.25% Senior Note, and 1.0% and 0.1% for the 4.60% Senior Note.

57. Finally, Dr. Cain's analysis of mean weekly trading volume for the Senior Notes is not consistent with the methodology he claims to adopt. In his report, Dr. Cain states that he "analyzed trades which were marked as a sell order from a dealer to a customer."[73] However, Dr. Cain's analysis in fact only excludes buy orders from market participants other than a customer. Therefore, Dr. Cain's analysis also includes buy orders where a dealer purchases from a customer, sell orders from a dealer to another dealer, sell orders from a dealer to an agent, sell orders from a dealer to an ATS firm, and sell orders from an ATS firm to various participants. After excluding these trades, trading volumes for trades which were marked as a sell order from a dealer to a customer only account for 32.4%, 32.3%, and 33.5% of the volumes that Dr. Cain used to draw

---

[72] Asquith, Paul, et al. (2019), "The Effects of Mandatory Transparency in Financial Market Design: Evidence from the Corporate Bond Market," *Working Paper*; Schultz, Paul (2017), "Inventory Management by Corporate Bond Dealers," *Working Paper*. **Appendix C** describes the procedures I have taken in detail.

[73] Cain Report, ¶ 113.

conclusions regarding *Cammer* Factor No. 1 for the 5.25%, 4.60%, and 5.95% Senior Notes and tabulated in his report exhibits.[74]

### b) Analyst Coverage

58.     Dr. Cain also considers *Cammer* Factor No. 2, analyst coverage.  He opines that "CBL was covered by 1,959 analyst reports which were issued by 26 different firms over the Class Period."[75]  However, Dr. Cain's assessment of analyst coverage for the Senior Notes is flawed because (1) none of the reports Dr. Cain included actually covered the Senior Notes specifically, (2) Dr. Cain overstates even the analyst coverage related to the common stock, and (3) Dr. Cain does not provide a clear and reliable benchmark for what level of analyst coverage would be consistent with bond market efficiency.

59.     First, while Dr. Cain asserts that CBL had wide analyst coverage, his basis for this conclusion is the *Investext* database, which focuses only on equity analyst reports.[76]  Indeed, as Dr. Cain testified in his deposition, none of the reports included in his tally came from any of the three major credit rating agencies (Fitch, Moody's, and S&P).[77]  To the extent that the *Investext* reports on which Dr. Cain relies focus on CBL specifically, rather than its industry generally, the reports in the database are *equity* analyst reports focusing on CBL's *common stock*.  During his deposition, Dr. Cain admitted that he had not reviewed each analyst report included in Exhibit 3 of his report and, instead, he reviewed only a random sample and could not provide *any* examples of analyst reports that are specific to CBL's Senior Notes.[78]

---

[74] Cain Report, ¶ 114, Exhibits 2d–2f.

[75] Cain Report, ¶ 116.

[76] Cain Report, Exhibit 3.  Dr. Cain stated that he "obtained analyst reports covering CBL from Investext and Factiva" but did not identify any analyst report from Factiva in his report.  *See also*, Cain Report, n. 25.

[77] Cain Deposition, 189:13–20 ("Q. And does that particular database include reports from fixed income or credit agency analysts? A. You mean like Moody's or S&P? Q. Yes. A. Or Fitch? I do not think that those are included in Investext.").  In his report, Dr. Cain also appears to agree that "many of these reports focus on CBL's Common Stock."  *See* Cain Report, ¶116.

[78] Cain Deposition, 81:7–82:6; 164:12–22 ("Q. So sitting here today, do you have any specific recollection that you reviewed an analyst report specific to the preferred stock of CBL? A. I don't recall one way or another whether any of the analyst reports talked exclusively about the preferred stock. So, or talked exclusively about the debt. Or exclusively about the common stock. Off the top of my head.").  Based on a review of the title of each of the 1,453

60.     Furthermore, Dr. Cain significantly overstates even equity analyst coverage by including in his count duplicative reports and reports that are not related to CBL.  In his report and deposition, Dr. Cain admitted that there are only 1,453 analyst reports after removing duplicates from the 1,959 reports he uses to measure analyst coverage.[79]  However, within these 1,453 unique reports, Dr. Cain also includes industry and topical reports in his measure of analyst coverage.  Such industry and topical reports provide only broad market updates (e.g., relating to the REIT industry generally) and do not provide any news or information specific to CBL.[80]  Some of these reports, in Dr. Cain's words, "provide much more general or generic information that's generated somewhat algorithmically."[81]  As shown in **Exhibit 4**, after removing duplicate reports, industry reports, and topical reports, there are only 377 unique *equity* reports authored by 19 unique firms, comprising less than 20% of the supposed 1,959 reports Dr. Cain identified.

61.     Dr. Cain also includes in his estimate of analyst coverage equity reports from firms that were not actively following CBL.  For example, 6 out of the 26 firms in Exhibit 3 of the Cain Report issued only one report during the more than four-and-a-half-year Putative Class Period, and half of the firms issued fewer than one report per quarter on average.[82]  It is not clear how Dr.

---

unique reports Dr. Cain identified, none of the titles mentions the Senior Notes.  Only seven reports mention corporate bonds generally in their titles.  One of them, issued by Wells Fargo and titled "CBL: Unsecured Bond Issuance Pulled" is related to a potential CBL note offering that did not materialize.  The other six reports were issued by JPMorgan Econ & FI and titled "USD High Grade Coverage and Rating Report : A summary of credit analyst recommendations on USD HG bond issuers."  I reviewed one of these JPMorgan Econ & FI reports, dated February 25, 2019, and this report did not directly discuss any of the Senior Notes.  Instead, the report focused exclusively on investment-grade corporate bonds (i.e., "high grade" bonds).  Each of the six JPMorgan Econ & FI reports was issued after the Senior Notes were downgraded to non-investment grade.  *See* "Investment-grade Bond (or High-grade Bond)," *Investor.gov*, available at https://www.investor.gov/introduction-investing/investing-basics/glossary/investment-grade-bond-or-high-grade-bond.

[79] Cain Report, ¶ 34; Cain Deposition, 72:11–13.

[80] During his deposition, Dr. Cain acknowledged that some firms that issued general industry reports may not meaningfully improve the information environment of CBL.  *See* Cain Deposition, 78:20–79:3 ("[T]here may be firms that are issuing general industry reports, and there could be variation in the extent to which those industry reports are providing real-time coverage of CBL and the extent to which they improve the information environment around CBL.").

[81] Cain Deposition, 70:13–17.  For example, during his deposition, Dr. Cain was asked to review a KeyBanc research report that is included in his analyst coverage measure and conceded that the report does not contain any analysis or new information specific to CBL.  *See* Cain Deposition, 83:18–23.

[82] Cain Report, Exhibit 3.  Dr. Cain acknowledged in his deposition that the firms that issued a small number of reports during the Putative Class Period are not meaningfully contributing to the assessment of analyst coverage.  *See* Cain Deposition, 73:11–17 ("Q. And again, feel free to skim the document. But there is not any further analysis of CBL in this; is there? A. I don't see any that's unique only to CBL.").  *See also*, Deposition Exhibit 59.

Cain can conclude that these analysts "followed and reported on a company's stock" or "conduct[ed] thorough and detailed research on CBL and its industry" when they issued such infrequent reports during the Putative Class Period.[83]

62.      Finally, Dr. Cain does not provide a clear and reliable benchmark for what level of analyst coverage would be consistent with bond market efficiency, let alone any scientific basis for such a benchmark.  Dr. Cain cites only to literature related to common stock analyst coverage (Lee and So (2017)) and fails to note that Lee and So (2017) use different data sources and analyst coverage measures from those Dr. Cain uses.[84]  Specifically, Lee and So (2017) use *Institutional Brokers Estimates System* (*IBES*) as their data source rather than *Investext*.[85]  Further, Lee and So (2017) measure the number of analyst covering a firm as the number of analysts who issued earnings forecasts for the firm.[86]  Dr. Cain conceded during his deposition that he had not verified which of the analyst reports in his Exhibit 3, if any, contain earnings forecasts.[87]

### c)      Market Makers and Arbitrageurs

63.      *Cammer* Factor No. 3 was described by the *Cammer* Court as "the existence of market makers and arbitrageurs."[88]  In contrast to CBL's common stock, Dr. Cain does not have any data on which firms, if any, served as market makers for the Senior Notes.[89]  Instead, Dr. Cain counts

---

[83] Cain Report, ¶¶ 32, 34.

[84] Lee, Charles M. C., and Eric C. So (2017), "Uncovering Expected Returns: Information in Analyst Coverage Proxies," *Journal of Financial Economics* 124 (2): 331–348.

[85] Lee, Charles M. C., and Eric C. So (2017), "Uncovering Expected Returns: Information in Analyst Coverage Proxies," *Journal of Financial Economics* 124 (2): 331–348 at 334.

[86] Lee, Charles M. C., and Eric C. So (2017), "Uncovering Expected Returns: Information in Analyst Coverage Proxies," *Journal of Financial Economics* 124 (2): 331–348 at 335.

[87] Cain Deposition, 86:22–87:2.

[88] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) at 1286.

[89] A market maker is "[a] trader who is willing to quote both bid and offer prices for an asset."  *See* Hull, John C. (2002), *Options, Futures & Other Derivatives*, 5th Edition, Upper Saddle River, NJ: Prentice Hall, p. 709.  In equity markets, "market makers" refers to a firm that stands ready to buy and sell a particular stock on a regular and continuous basis at a publicly quoted price.  *See*, for example, "Fast Answers: Market Maker," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/fast-answers/answersmktmakerhtm.html.  In an over-the-counter bond market, a market maker is a dealer who both sells to and also buys from customers or other dealers and is compensated by means of price differentials for the service of providing liquidity and facilitating trades.

each unique market participant ID as an "independent reporting market maker[]"[90] and claims that there is a "large number of market makers that actively traded the CBL Senior Notes."[91]  During his deposition, however, Dr. Cain admitted that his measure of market makers could include "[brokers that] may not have done a publicly reported trade" and is "irrespective of the volume of any trade."[92]  Dr. Cain further acknowledged that the frequency distribution of market making activity is important and some of his so-called unique brokers "would not necessarily be considered a market maker."[93]  Despite these admissions, Dr. Cain provides no evidence on which brokers, if any, served as market makers for the Senior Notes, let alone actively traded the Senior Notes.

64.     In the absence of data on market makers, Dr. Cain mischaracterizes brokers who traded the Senior Notes as market makers.  Specifically, Dr. Cain uses the numbers of unique "Report Side M[arket] P[articipant] ID[s]" in his FINRA dataset for each Senior Note as his measure of "independent reporting market makers."[94]  However, the majority of these market participants executed fewer than one trade per month on average during the Putative Class Period, undermining Dr. Cain's assertion that they are market makers, and, in fact, certain brokers have multiple participant IDs, meaning they cannot be unique market makers.[95]

65.     As demonstrated in **Exhibits 5.A–5.C**, when limited to include only market participants who reported at least one buy and sell transaction within the same week for more than half of the Putative Class Period, there were only 7, 1, and 22 participants (2.3%, 0.4%, and 7.4% of Dr. Cain's measure of market makers) who traded actively for over 50% of the possible trading weeks for the 5.25%, 4.60%, and 5.95% Senior Notes, respectively.

66.     Finally, Dr. Cain does not address *Cammer* Factor No. 3's reference to arbitrageurs. Trading and competition among arbitrageurs are critical to ensure market efficiency because, as

---

[90] Cain Report, ¶ 120.

[91] Cain Report, ¶ 123.

[92] Cain Deposition, 195:5–16.

[93] Cain Deposition, 192:16–20.

[94] Cain Report, ¶ 120, Appendix C.

[95] For example, multiple MPIDs ("WCHV," "WELX," "WEMM," "WFES," and "WFPB") belong to the executing broker Wells Fargo Securities, LLC with the clearing broker code "0250."  *See* "NSCC MPID Directory," *DTCC*, available at https://www.dtcc.com/-/media/Files/Downloads/client-center/NSCC/NSCC-MPID-Directory.xls.

noted by the *Cammer* court, "these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[96]

### d) Bid-Ask Spread

67.　One of the *Krogman* factors Dr. Cain assesses is the bid-ask spread, which is the difference between the asking price at which a dealer is willing to sell and the bid price at which a dealer is willing to buy the Senior Notes.  While not a direct test of market efficiency, bid-ask spreads are a measure of trading costs, which are, in turn, important indicators of market liquidity.  Professor Fama, in his seminal paper on market efficiency, discusses the role that transaction costs may play as a "potential source" of inefficiency.[97]  While wide bid-ask spreads may indicate that a lack of liquidity hinders market efficiency, narrow spreads do not provide affirmative evidence that the securities in question actually trade in efficient markets.[98]  As discussed above, executable bid-ask quotes are not readily observable to market participants in the OTC corporate bond market.  Therefore, financial economists develop different techniques for estimating bid-ask spreads for corporate bonds.

68.　In his report, Dr. Cain arbitrarily calculates bid-ask spreads for the Senior Notes as the price differences between certain purchases and sales within a narrow window of 15 minutes.[99]  Given the low frequency of corporate bond trading, this method necessarily cherry-picks days with greater liquidity when there are corresponding customer purchases and sales occurring in a short window.

---

[96] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) at 1287.

[97] "But though transaction costs, information that is not freely available to all investors, and disagreement among investors about the implications of given information are not necessarily sources of market inefficiency, they are potential sources. And all three exist to some extent in real world markets."  *See* Fama, Eugene (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25 (2): 383–417 at 388.

[98] Bloomfield, Robert, et al. (2009), "How Noise Trading Affects Markets: An Experimental Analysis," *The Review of Financial Studies* 22 (6): 2275–2302; Sarr, Abdourahmane, and Tonny Lybek (2002), "Measuring Liquidity in Financial Markets," *IMF Working Paper*, WP/02/232: 1–64 at 41.

[99] Cain Report, ¶ 136.

Case 1:19-cv-00181-JRG-CHS   Document 184-25   Filed 10/28/22   Page 33 of 67
PageID #: 3529

69.　　Dr. Cain cites two research papers that supposedly use "similar techniques" for estimating bid-ask spreads.[100]  However, both studies adopt longer windows than Dr. Cain's narrow 15-minute interval.  For example, Feldhütter and Poulsen (2018) track a round-trip intermediation chain as a bond travels from a selling investor through the network of dealers until the bond ends in the inventory of a buying investor.[101]  They estimate bid-ask spreads as the sales price the "tail" dealer receives from the investor minus the purchase price the "head" dealer pays to the investor divided by the mid-price of the two.[102]  The authors find that, depending on bond maturity and rating, it takes dealers on average between 5.7 and 9.4 days to complete a chain,[103] which is significantly longer than Dr. Cain's 15-minute window.  The Federal Reserve Staff Report cited by Dr. Cain also uses a different interval and methodology to calculate bid-ask spreads.  They estimate bid-ask spreads as the price differences between trade-size weighted-average dealer ask prices and trade-size weighted average dealer bid prices for the same bond on the same trading day, which is also longer than Dr. Cain's 15-minute window.[104]

70.　　Furthermore, Dr. Cain's focus on dealer-to-dealer bid-ask spreads, as shown in Exhibit 9b of his report, misleadingly implies that bid-ask spreads for the Senior Notes were narrow.[105] However, dealer-to-dealer bid-ask spreads are not a relevant measure of investor trading costs. As discussed in the literature, interdealer trades are conducted primarily to unwind inventory and manage dealer inventory levels.[106]  Dealer-to-customer bid-ask spreads, which are much larger than interdealer bid-ask spreads, represent the trading costs customers would incur when transacting with dealers.

---

[100] Cain Report, ¶ 136.

[101] Feldhütter, Peter, and Thomas K. Poulsen (2018), "What Determines Bid-Ask Spreads in Over-the-Counter Markets?" *Working Paper*: 1–47 at 6.

[102] Feldhütter, Peter, and Thomas K. Poulsen (2018), "What Determines Bid-Ask Spreads in Over-the-Counter Markets?" *Working Paper*: 1–47 at 6.

[103] Feldhütter, Peter, and Thomas K. Poulsen (2018), "What Determines Bid-Ask Spreads in Over-the-Counter Markets?" *Working Paper*: 1–47 at 14.

[104] "Staff Report on Corporate Bond Market Liquidity," *Federal Reserve Staff Report*, 2014, available at https://www.federalreserve.gov/foia/files/bond-market-liquidity-report-2014q1.pdf, p. 6.

[105] Cain Report, ¶ 137, Exhibit 9b.

[106] *See*, for example, Schultz, Paul (2017), "Inventory Management by Corporate Bond Dealers," *Working Paper*.

71.     I estimate an alternative bid-ask spread measure by following Dr. Cain's methodology but extending the 15-minute window to a full trading day.  As shown in **Exhibit 6**, this alternative method results in substantially larger bid-ask spreads than Dr. Cain's arbitrary bid-ask spread calculations.  Specifically, volume-weighted average (median) bid-ask spreads estimated as price differences between corresponding trades during the same trading day instead of within 15 minutes are 16.5% (21.5%), 13.5% (18.7%), and 6.2% (13.8%) larger for customer-based bid-ask spreads for the 5.25% Senior Note, 4.60% Senior Note, and the 5.95% Senior Note, respectively.

72.     Finally, Dr. Cain does not provide a clear and reliable benchmark for what level of bid-ask spreads would be consistent with bond market efficiency, let alone any scientific basis for a benchmark.  In his report, Dr. Cain cites Mola et al. (2013) (the "MRK Study") as a benchmark for the bid-ask spreads of the Senior Notes.[107]  However, during his deposition, Dr. Cain admitted that the MRK Study only presents bid-ask spreads for common stock and does not provide benchmarks for corporate bonds.[108]  Ultimately, Dr. Cain testified that there is no typical bid-ask spread for corporate bonds and "[bid-ask spread] really fluctuates from case-to-case, from bond-to-bond."[109]

### e)     Autocorrelation

73.     Dr. Cain tests for autocorrelation in CBL's common stock and preferred stock returns but conducts no such analysis for the Senior Notes returns.[110]  Autocorrelation is a statistical property of the series of security returns wherein future returns can be systematically predicted with a reasonable degree of statistical certainty based on current returns.[111]  As Dr. Cain stated, the

---

[107] Cain Report, ¶ 64.  *See also*, Mola, Simona, et al. (2013), "Is There Life after the Complete Loss of Analyst Coverage?" *The Accounting Review* 88 (2): 667–705.

[108] Cain Deposition, 200:20–24.

[109] Cain Deposition, 202:2–7.

[110] During his deposition, Dr. Cain admitted that he did not examine autocorrelation for the Senior Notes returns. Cain Deposition, 211:11–15 ("Q. Does your report address whether or not the CBL notes exhibited any degree of [auto]correlation? A. I don't believe that that's something that I looked at on the notes.").

[111] *See* Greene, William H. (2008), *Econometric Analysis*, 6th Edition, Upper Saddle River, NJ: Prentice Hall, p. 148 ("Autocorrelation is usually found in time-series data. Economic time series often display a 'memory' in that variation around the regression function is not independent from one period to the next.").

presence of autocorrelation would indicate market inefficiency "because publicly available information about prior stock price movements would not be fully reflected in current stock prices."[112] Consistent with this notion, Dr. Cain tested for autocorrelation in CBL's common stock and its preferred stock returns, and concluded that the absence of autocorrelation supported a finding of market efficiency with respect to those stocks: "[t]he lack of a consistent and persistent autocorrelation pattern over time would thus not present an arbitrage opportunity for investors."[113] However, Dr. Cain did not examine autocorrelation for the Senior Notes returns.

74. Following Dr. Cain's methodology for testing autocorrelation in CBL's common stock and preferred stock returns, I also examine returns on the Senior Notes for autocorrelation. To do so, I conduct a regression analysis on the Senior Notes' daily returns to evaluate whether the abnormal return on a given day can predict the abnormal return for the same Senior Note on the following trading day.

75. My results, as presented in **Exhibits 7.A–7.C**, demonstrate autocorrelation for periods in each of the Senior Notes. Specifically, the autocorrelation coefficient over the Putative Class Period is negative and statistically significant at the 99% level for the 5.25% Senior Note and 4.60% Senior Note, and negative and statistically significant at the 90% level for the 5.95% Senior Note. The results suggest that the daily abnormal returns of the Senior Notes exhibit reversal patterns, where positive (negative) abnormal returns are followed by negative (positive) abnormal returns on the next trading day. The autocorrelation coefficients are also economically significant. The -0.24 and -0.25 coefficients for the 5.25% Senior Note and 4.60% Senior Note over the Putative Class Period indicate generally that a quarter of the abnormal returns on a given day would be reversed on the next trading day.

76. Moreover, as **Exhibits 7.A–7.C** demonstrate, the quarterly autocorrelation coefficients are generally negative throughout the Putative Class Period.[114] This consistent predictability in

---

[112] Cain Report, ¶ 69.

[113] Cain Report, ¶ 103.

[114] There are certain quarters with positive quarterly autocorrelation coefficients but none of those coefficients are statistically significant. I also note that for the 5.25% Senior Note and 4.60% Senior Note, several quarters earlier in the Putative Class Period contain multiple trading days with no trading at all, which substantially reduce the sample size of each quarter and therefore limit statistical power. Indeed, as abnormal returns require data from two consecutive trading days to compute, several quarters contain only single-digit abnormal returns in the quarterly

the Senior Notes' returns throughout the Putative Class Period could possibly, as Dr. Cain states, "present an arbitrage opportunity for investors."[115] Just as Dr. Cain interprets the lack of autocorrelation as support for market efficiency for common and preferred stocks, the presence of autocorrelation in the Senior Note returns would indicate market *inefficiency*.

## V. Dr. Cain Fails to Demonstrate How Damages Can Be Calculated on a Class-Wide Basis for any of CBL's Securities

77. I understand that while Plaintiffs are not required to analyze loss causation or calculate per-share damages at the class certification stage, I understand they are required to put forth a methodology for calculating damages on a class-wide basis and in a manner consistent with Plaintiffs' theory of liability. Dr. Cain's generic method to calculate per-share damages based on the "artificial inflation in the prices of CBL securities at the time of purchase minus the artificial inflation in the prices of CBL securities at the time of sale" does not accomplish this.[116] In particular, Dr. Cain has not demonstrated how any decline in CBL's securities prices corresponding with the alleged corrective disclosures, which disclosed the existence of and settlement amount in the *Wave* Litigation, could reliably be used to estimate inflation over the Putative Class Period. For example, Plaintiffs and Dr. Cain have not asserted that CBL could or should have disclosed the ultimate amount of *Wave* Litigation settlement at an earlier point in the Putative Class Period and yet Dr. Cain proposes to use the market reaction to the settlement amount to backcast inflation to earlier points in the period. Similarly, while Plaintiffs have alleged CBL systematically over-recognized revenue throughout the Putative Class Period, CBL's alleged corrective disclosures did not disclose any alleged over-recognition of revenue. Dr. Cain has not articulated how these alleged corrective disclosures could be used to measure the price effect, if any, on CBL's securities related to alleged misrepresentations concerning over-recognition of revenue. Moreover, even assuming, counterfactually, that CBL had disclosed

---

sample, and the 4.60% Senior Note had zero abnormal return in Q3 2015 in Dr. Cain's sample. Despite the small sample sizes, the autocorrelation coefficients for quarters earlier in the Putative Class Period are also generally negative.

[115] Cain Report, ¶ 71.

[116] Cain Report, ¶144.

over-recognition of revenue at the end of the Putative Class Period (when cumulative revenue overstatement would have been highest) it is not clear how any price reaction to this disclosure could be used to estimate price inflation at earlier points in the class period (when cumulative revenue overstatement would have been lower). Similarly, Dr. Cain has not shown that the economic conditions in which the CBL securities traded were constant across the Putative Class Period so as to assume a constant inflation band. Indeed, as discussed above, market conditions for shopping malls, CBL's financial performance, and its credit ratings all degraded over the course of the Putative Class Period. Negative, value-relevant information concerning CBL may have a different effect on its securities prices if disclosed when the Company was relatively weaker than it would have had earlier in the Putative Class Period. This is particularly the case for the Senior Notes, which had been downgraded below investment-grade by the time of the alleged corrective disclosures.

Executed this 28th of October, 2022

_Terrence J. Hendershott_

_____

Terrence Hendershott, PH.D.

**Exhibit 1**

# Momentum/Reversals Following Dr. Cain's News Days[1]
## CBL Senior Notes
### 7/29/14 – 3/26/19

**CBL 5.25% Senior Note**

| Date[2] | Abnormal Return on Dr. Cain's News Days (t = 0)[3] | Cumulative Abnormal Returns from t = 1 to t = 2 | | | | Cumulative Abnormal Returns from t = 3 to t = 7 | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | CAR[4] | T-Statistic[5] | P-Value | Sig[6] | CAR[4] | T-Statistic[5] | P-Value | Sig[6] |
| 11/3/17 | -2.76% | -0.56% | -0.66 | 0.512 | | NA | NA | NA | |
| 11/9/17 | 0.24% | -0.09% | -0.10 | 0.917 | | -1.40% | -1.19 | 0.236 | |
| 2/9/18 | -2.69% | -0.70% | -0.81 | 0.419 | | NA | NA | NA | |
| 2/15/18 | -1.33% | -1.82% | -2.14 | 0.033 | ** | -1.08% | -0.92 | 0.360 | |
| 8/2/18 | -0.46% | NA | NA | NA | | -2.42% | -2.06 | 0.039 | ** |
| 8/3/18 | -0.23% | -1.34% | -1.56 | 0.119 | | -2.52% | -2.15 | 0.031 | ** |
| 12/20/18 | -2.03% | -2.21% | -2.60 | 0.010 | *** | 1.74% | 1.46 | 0.145 | |
| 2/8/19 | -0.04% | NA | NA | NA | | -0.59% | -0.50 | 0.619 | |
| 2/11/19 | -0.07% | -0.02% | -0.02 | 0.983 | | -0.94% | -0.80 | 0.426 | |
| 2/22/19 | 0.30% | -1.08% | -1.26 | 0.208 | | -2.26% | -1.93 | 0.054 | * |
| **Dr. Cain's Test for Two Sample Proportions** | | | 2.33 | 0.020 | ** | | 2.10 | 0.035 | ** |

**CBL 4.60% Senior Note**

| Date[2] | Abnormal Return on Dr. Cain's News Days (t = 0)[3] | Cumulative Abnormal Returns from t = 1 to t = 2 | | | | Cumulative Abnormal Returns from t = 3 to t = 7 | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | CAR[4] | T-Statistic[5] | P-Value | Sig[6] | CAR[4] | T-Statistic[5] | P-Value | Sig[6] |
| 11/3/17 | -2.54% | -2.69% | -3.18 | 0.002 | *** | NA | NA | NA | |
| 11/9/17 | 0.64% | 0.17% | 0.20 | 0.841 | | -0.57% | -0.47 | 0.640 | |
| 2/9/18 | -2.31% | -0.04% | -0.05 | 0.963 | | NA | NA | NA | |
| 2/15/18 | -0.02% | -2.56% | -3.02 | 0.003 | *** | 0.70% | 0.57 | 0.570 | |
| 8/2/18 | -2.70% | NA | NA | NA | | -3.31% | -2.76 | 0.006 | *** |
| 8/3/18 | 0.96% | -2.32% | -2.73 | 0.006 | *** | -2.60% | -2.15 | 0.032 | ** |
| 12/20/18 | -2.17% | -1.69% | -1.99 | 0.047 | ** | 1.69% | 1.37 | 0.171 | |
| 2/8/19 | 1.59% | NA | NA | NA | | 1.00% | 0.82 | 0.415 | |
| 2/11/19 | -1.23% | -0.85% | -0.99 | 0.321 | | -0.09% | -0.07 | 0.943 | |
| 2/22/19 | 1.45% | -1.36% | -1.59 | 0.112 | | -2.98% | -2.48 | 0.013 | ** |
| **Dr. Cain's Test for Two Sample Proportions** | | | 5.59 | 0.000 | *** | | 4.43 | 0.000 | *** |

**CBL 5.95% Senior Note**

| Date[2] | Abnormal Return on Dr. Cain's News Days (t = 0)[3] | Cumulative Abnormal Returns from t = 1 to t = 2 | | | | Cumulative Abnormal Returns from t = 3 to t = 7 | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | CAR[4] | T-Statistic[5] | P-Value | Sig[6] | CAR[4] | T-Statistic[5] | P-Value | Sig[6] |
| 11/3/17 | -3.98% | -1.90% | -2.66 | 0.008 | *** | NA | NA | NA | |
| 11/9/17 | 0.24% | -0.10% | -0.14 | 0.885 | | -0.20% | -0.21 | 0.837 | |
| 2/9/18 | -1.91% | -0.28% | -0.39 | 0.700 | | NA | NA | NA | |
| 2/15/18 | -2.16% | -0.45% | -0.63 | 0.531 | | -0.65% | -0.69 | 0.490 | |
| 8/2/18 | -1.28% | NA | NA | NA | | -4.59% | -4.96 | 0.000 | *** |
| 8/3/18 | -0.39% | -0.41% | -0.57 | 0.566 | | -4.38% | -4.72 | 0.000 | *** |
| 12/20/18 | -2.94% | -1.41% | -1.97 | 0.050 | ** | 2.59% | 2.70 | 0.007 | *** |
| 2/8/19 | -0.14% | NA | NA | NA | | -0.71% | -0.75 | 0.455 | |
| 2/11/19 | 0.00% | -0.01% | -0.02 | 0.985 | | -1.18% | -1.25 | 0.210 | |
| 2/22/19 | 0.05% | -0.75% | -1.04 | 0.300 | | -5.14% | -5.57 | 0.000 | *** |
| **Dr. Cain's Test for Two Sample Proportions** | | | 2.57 | 0.010 | ** | | 4.90 | 0.000 | *** |

**All CBL Senior Notes**

| | Cumulative Abnormal Returns from t = 1 to t = 2 | | | Cumulative Abnormal Returns from t = 3 to t = 7 | | |
|---|---|---|---|---|---|---|
| | Z-Statistic | P-Value | Sig[6] | Z-Statistic | P-Value | Sig[6] |
| **Dr. Cain's Test for Two Sample Proportions** | 5.99 | 0.000 | *** | 6.63 | 0.000 | *** |

    Short-term momentum. CAR is significant and has the same direction (negative/positive) as the Abnormal Return.

    Short-term reversal. CAR is significant and has a different direction (negative/positive) than the Abnormal Return.

Source: Cain Report and Production, dated 8/18/2022

Note:
[1] Dr. Cain defines News Days as trading days containing credit ratings downgrades and earnings releases that occurred within one week of such downgrades.
[2] 11/9/17 is the fourth trading day following 11/3/17. 2/15/18 is the fourth trading day following 2/9/18. 8/3/18 is the first trading day following 8/2/18. 2/11/19 is the first trading day following 2/8/19. For trading windows containing one Dr. Cain's News Days, I do not calculate Cumulative Abnormal Returns.
[3] "t" represents trading days.
[4] Cumulative abnormal return ("CAR") is defined as the sum of the differences between the predicted logarithmic return on a Senior Note based on Dr. Cain's event study model and the actual logarithmic return in the trading days following Dr. Cain's News Days.
[5] For Dr. Cain's Test for Two Sample Proportions, the Z-Statistic is displayed.
[6] *** indicates statistical significance at the 99% confidence level. ** indicates statistical significance at the 95% confidence level. * indicates statistical significance at the 90% confidence level.

# Exhibit 2.A
## CBL 5.25% Senior Note Weekly Turnover
### 7/29/14 – 3/26/19



As a Percentage
of Notional Value

Filing of *Wave* Litigation:
3/16/16

**Putative Class Period:  7/29/14 – 3/26/19**

% Weeks with Turnover <2%:  58.2%

% Weeks with Turnover <1%:  41.4%

% Weeks with Turnover of 0%:  3.3%

**← Pre-*Wave* Period:  7/29/14 – 3/15/16 →**

% Weeks with Turnover <2%:  85.9%

% Weeks with Turnover <1%:  74.1%

% Weeks with Turnover of 0%:  9.4%

Source:  Cain Report and Production, dated 8/18/2022

Note:  Trading Weeks are defined in seven calendar day increments beginning on the start of the Putative Class Period or the respective issuance date of each Senior
Note, whichever is later.

# Exhibit 2.B
# CBL 4.60% Senior Note Weekly Turnover
## 10/1/14 – 3/26/19



As a Percentage of Notional Value

Filing of *Wave* Litigation: 3/16/16

**Putative Class Period: 10/1/14 – 3/26/19**

% Weeks with Turnover <2%: 65.0%

% Weeks with Turnover <1%: 47.9%

% Weeks with Turnover of 0%: 5.1%

**◄ Pre-*Wave* Period: 10/1/14 – 3/15/16 ►**

% Weeks with Turnover <2%: 89.5%

% Weeks with Turnover <1%: 80.3%

% Weeks with Turnover of 0%: 14.5%

Source: Cain Report and Production, dated 8/18/2022

Note: Trading Weeks are defined in seven calendar day increments beginning on the start of the Putative Class Period or the respective issuance date of each Senior Note, whichever is later.

Case 1:19-cv-00181-JRG-CHS   Document 184-25   Filed 10/28/22   Page 41 of 67
PageID #: 3537

# Exhibit 2.C
## CBL 5.95% Senior Note Weekly Turnover[1]
### 12/6/16 – 3/26/19

As a Percentage
of Notional Value

Putative Class Period: 12/6/16 – 3/26/19

% Weeks with Turnover <2%: 30.6%

% Weeks with Turnover <1%: 10.7%

% Weeks with Turnover of 0%: 0.0%



Source: Cain Report and Production, dated 8/18/2022

Note:

[1] The CBL 5.95% Senior Note was issued on 12/6/16, after the filing of *Wave* Litigation. Trading Weeks are defined in seven calendar day increments beginning on the start of the Putative Class Period or the respective issuance date of each Senior Note, whichever is later.

# Exhibit 3.A
# Turnover Statistics[1]
# CBL 5.25% Senior Note

| | Pre–*Wave* Period Unadjusted (7/29/14 – 3/15/16) | Pre–*Wave* Period Adjusted[2] (7/29/14 – 3/15/16) | Putative Class Period Unadjusted (7/29/14 – 3/26/19) | Putative Class Period Adjusted[2] (7/29/14 – 3/26/19) |
|---|---|---|---|---|
| Mean Weekly Turnover | 1.0% | 1.0% | 2.5% | 2.1% |
| Median Weekly Turnover | 0.4% | 0.4% | 1.5% | 1.3% |
| Number of Weeks with Weekly Turnover Over 2% | 12 | 12 | 102 | 89 |
| Number of Weeks with Weekly Turnover Under 2% | 73 | 73 | 142 | 155 |
| Number of Weeks with Weekly Turnover Under 1% | 63 | 64 | 101 | 109 |
| Number of Weeks with No Trading | 8 | 8 | 8 | 8 |
| Number of Days with No Trading | 209 | 211 | 225 | 227 |
| Number of Days with No Trading as a Percentage of All Trading Days | 51.4% | 51.8% | 19.3% | 19.5% |

Source: Cain Report and Production, dated 8/18/2022

Note:
[1] Trading Weeks are defined in seven calendar day increments beginning on the start of the Putative Class Period or the respective issuance date of each Senior Note, whichever is later.
[2] Certain redundant trade reports related to agency chain transactions are removed following the methodology described in Asquith et al. (2019). Certain redundant trade reports related to prearranged trades are removed following the methodology described in Schultz (2017). **Appendix C** describes the procedures I have taken in detail.

# Exhibit 3.B
# Turnover Statistics[1]
# CBL 4.60% Senior Note

| | Pre–*Wave* Period Unadjusted (10/1/14 – 3/15/16) | Pre–*Wave* Period Adjusted[2] (10/1/14 – 3/15/16) | Putative Class Period Unadjusted (10/1/14 – 3/26/19) | Putative Class Period Adjusted[2] (10/1/14 – 3/26/19) |
|---|---|---|---|---|
| Mean Weekly Turnover | 1.0% | 1.0% | 2.2% | 2.0% |
| Median Weekly Turnover | 0.1% | 0.1% | 1.1% | 1.0% |
| Number of Weeks with Weekly Turnover Over 2% | 8 | 8 | 82 | 72 |
| Number of Weeks with Weekly Turnover Under 2% | 68 | 68 | 152 | 162 |
| Number of Weeks with Weekly Turnover Under 1% | 61 | 61 | 112 | 119 |
| Number of Weeks with No Trading | 11 | 11 | 12 | 12 |
| Number of Days with No Trading | 240 | 240 | 298 | 298 |
| Number of Days with No Trading as a Percentage of All Trading Days | 66.3% | 66.3% | 26.6% | 26.6% |

Source: Cain Report and Production, dated 8/18/2022

Note:
[1] Trading Weeks are defined in seven calendar day increments beginning on the start of the Putative Class Period or the respective issuance date of each Senior Note, whichever is later.
[2] Certain redundant trade reports related to agency chain transactions are removed following the methodology described in Asquith et al. (2019). Certain redundant trade reports related to prearranged trades are removed following the methodology described in Schultz (2017). **Appendix C** describes the procedures I have taken in detail.

# Exhibit 3.C
# Turnover Statistics[1]
# CBL 5.95% Senior Note[2]

| | Putative Class Period Unadjusted (12/6/16 – 3/26/19) | Putative Class Period Adjusted[3] (12/6/16 – 3/26/19) |
|---|---|---|
| Mean Weekly Turnover | 4.8% | 4.0% |
| Median Weekly Turnover | 3.5% | 3.2% |
| Number of Weeks with Weekly Turnover Over 2% | 84 | 79 |
| Number of Weeks with Weekly Turnover Under 2% | 37 | 42 |
| Number of Weeks with Weekly Turnover Under 1% | 13 | 18 |
| Number of Weeks with No Trading | 0 | 0 |
| Number of Days with No Trading | 1 | 1 |
| Number of Days with No Trading as a Percentage of All Trading Days | 0.2% | 0.2% |

Source: Cain Report and Production, dated 8/18/2022

Note:
[1] Trading Weeks are defined in seven calendar day increments beginning on the start of the Putative Class Period or the respective issuance date of each Senior Note, whichever is later.
[2] The CBL 5.95% Senior Note was issued on 12/6/16, after the filing of *Wave* Litigation.
[3] Certain redundant trade reports related to agency chain transactions are removed following the methodology described in Asquith et al. (2019). Certain redundant trade reports related to prearranged trades are removed following the methodology described in Schultz (2017). **Appendix C** describes the procedures I have taken in detail.

# Exhibit 4
# Number of Analyst Reports
7/29/14 – 3/26/19

| | Reports Issued During the Putative Class Period | | |
|---|---|---|---|
| Firm Name | As Presented in Cain Report | CBL-Specific, Excluding Duplicates | Reports Dr. Cain Demonstrates Focused on the Senior Notes[1] |
| Wells Fargo Securities, LLC | 718 | 63 | 0 |
| KeyBanc Capital Markets Inc. | 514 | 87 | 0 |
| BTIG | 185 | 34 | 0 |
| Cowen and Company | 174 | 14 | 0 |
| JPMorgan | 73 | 29 | 0 |
| RBC Capital Markets | 53 | 23 | 0 |
| Hilliard Lyons | 36 | 20 | 0 |
| Wright Reports | 32 | 6 | 0 |
| Thomson Reuters StreetEvents | 30 | 30 | 0 |
| Sadif Analytics Prime | 26 | 13 | 0 |
| BuySellSignals Research | 24 | 24 | 0 |
| ValuEngine, Inc. | 23 | 8 | 0 |
| Oppenheimer & Co., Inc. | 17 | 0 | 0 |
| Validea | 15 | 6 | 0 |
| Boenning & Scattergood, Inc | 12 | 12 | 0 |
| JPMorgan Econ & FI | 6 | 0 | 0 |
| MarketLine (a Datamonitor Company) | 6 | 2 | 0 |
| MarketLine | 4 | 3 | 0 |
| EVERCORE ISI | 3 | 0 | 0 |
| Evercore Partners | 2 | 1 | 0 |
| Alliance Advisors | 1 | 0 | 0 |
| Cantor Fitzgerald | 1 | 0 | 0 |
| New Constructs, LLC | 1 | 0 | 0 |
| Sadif Analytics | 1 | 0 | 0 |
| Timetric | 1 | 1 | 0 |
| World Market Intelligence | 1 | 1 | 0 |
| Total | 1,959 | 377 | 0 |
| As a Percentage of Number of Analyst Reports Presented in Cain Report | 100.0% | 19.2% | 0.0% |

Source: *Investext*; Cain Report and Production, dated 8/18/2022

Note:

[1] Based on a review of the title of each of the 1,453 unique reports Dr. Cain identified, none of the titles mentions the Senior Notes. Only seven reports mention corporate bonds generally in their titles. One of them, issued by Wells Fargo and titled "CBL: Unsecured Bond Issuance Pulled" is related to a potential CBL note offering that did not materialize. The other six reports were issued by JPMorgan Econ & FI and titled "USD High Grade Coverage and Rating Report : A summary of credit analyst recommendations on USD HG bond issuers." I reviewed one of these JPMorgan Econ & FI reports, dated February 25, 2019, and this report did not directly discuss any of the Senior Notes. Instead, the report focused exclusively on investment-grade corporate bonds (i.e., "high grade" bonds). Each of the six JPMorgan Econ & FI reports was issued after the Senior Notes were downgraded to non-investment grade. *See* "Investment-grade Bond (or High-grade Bond)," Investor.gov, available at https://www.investor.gov/introduction-investing/investing-basics/glossary/investment-grade-bond-or-high-grade-bond.

# Exhibit 5.A
# Market Participant Count that Reported at Least One Buy and One Sell Transaction in the Same Week by Percentage of Possible Trading Weeks
# CBL 5.25% Senior Note



Only 2.3% of market participants reported at least one buy and one sell transaction in the same week for more than half of possible trading weeks

Percentage of Possible Trading Weeks with at Least One Buy and One Sell Transaction [1]

Source: Cain Report and Production, dated 8/18/2022

Note:

[1] Trading Weeks are defined in seven calendar day increments beginning on the start of the Putative Class Period or the respective issuance date of each Senior Note, whichever is later.

# Exhibit 5.B
# Market Participant Count that Reported at Least One Buy and One Sell Transaction in the Same Week by Percentage of Possible Trading Weeks
# CBL 4.60% Senior Note



Only 0.4% of market participants reported at least one buy and one sell transaction in the same week for more than half of possible trading weeks

Source: Cain Report and Production, dated 8/18/2022

Note:

[1] Trading Weeks are defined in seven calendar day increments beginning on the start of the Putative Class Period or the respective issuance date of each Senior Note, whichever is later.

# Exhibit 5.C
# Market Participant Count that Reported at Least One Buy and One Sell Transaction in the Same Week by Percentage of Possible Trading Weeks
# CBL 5.95% Senior Note



Source: Cain Report and Production, dated 8/18/2022

Note:

 [1]  Trading Weeks are defined in seven calendar day increments beginning on the start of the Putative Class Period or the respective issuance date of each Senior Note, whichever is later.

# Exhibit 6
# CBL Senior Note Bid-Ask Spreads
# Over the Putative Class Period[1]
## 7/29/14 – 3/26/19

| Note | Customer-Based Bid-Ask Spreads[2] | | |
| --- | --- | --- | --- |
| | Volume-Weighted Average % | Median % | Daily Observations |
| CBL 5.25% Senior Note | 1.41% | 1.30% | 586 |
| CBL 4.60% Senior Note | 1.68% | 1.59% | 426 |
| CBL 5.95% Senior Note | 1.38% | 1.32% | 512 |

Source: Cain Report and Production, dated 8/18/2022

Note:

[1] Bid-Ask Spreads are calculated separately for buy and sale transactions, which are then averaged together. Bid-Ask Spreads for buy transactions are calculated by subtracting from the price of each buy transaction within a trading day the volume-weighted average price of all sale transactions that occurred at lower prices than the buy transaction within that trading day. Bid-Ask Spreads for sale transactions are calculated by subtracting from the price of each sell transaction within a trading day the volume-weighted average price of all buy transactions that occurred at higher prices than the sell transaction within that trading day. Bid-Ask Spreads are estimated as the average percentage difference between buy and sale prices.

[2] I focus on customer-based bid-ask spreads. As discussed in the literature, interdealer trades are conducted primarily to unwind inventory and manage dealer inventory levels. *See*, for example, Schultz, Paul (2017), "Inventory Management by Corporate Bond Dealers," *Working Paper*. Dealer-to-customer bid-ask spreads, which are much larger than interdealer bid-ask spreads, represent the trading costs customers would incur when transacting with dealers.

# Exhibit 7.A
# CBL 5.25% Senior Note
# Test for Autocorrelation During the Putative Class Period[1]
## 7/29/14 – 3/26/19

| Quarter | Coefficient on Previous Trading Day's Abnormal Return[2] | T-Statistic | P-Value | Significance Level[3] | Trading Days In Autocorrelation Regression |
|---|---|---|---|---|---|
| Q3 2014 | -0.74 | -1.20 | 0.441 | | 3 |
| Q4 2014 | -0.10 | -0.23 | 0.825 | | 7 |
| Q1 2015 | -0.45 | -1.72 | 0.109 | | 15 |
| Q2 2015 | -0.54 | -2.69 | 0.015 | ** | 19 |
| Q3 2015 | -0.12 | -0.19 | 0.856 | | 6 |
| Q4 2015 | -0.17 | -0.71 | 0.486 | | 17 |
| Q1 2016 | -0.27 | -1.10 | 0.287 | | 18 |
| Q2 2016 | -0.33 | -2.45 | 0.017 | ** | 59 |
| Q3 2016 | -0.16 | -1.19 | 0.238 | | 49 |
| Q4 2016 | -0.59 | -4.30 | 0.000 | *** | 58 |
| Q1 2017 | -0.37 | -4.15 | 0.000 | *** | 52 |
| Q2 2017 | -0.41 | -3.61 | 0.001 | *** | 63 |
| Q3 2017 | -0.44 | -3.63 | 0.001 | *** | 63 |
| Q4 2017 | -0.23 | -1.90 | 0.062 | * | 62 |
| Q1 2018 | 0.15 | 1.15 | 0.255 | | 61 |
| Q2 2018 | -0.36 | -3.01 | 0.004 | *** | 64 |
| Q3 2018 | -0.34 | -2.85 | 0.006 | *** | 63 |
| Q4 2018 | 0.04 | 0.28 | 0.781 | | 59 |
| Q1 2019 | -0.16 | -1.59 | 0.118 | | 58 |
| **Putative Class Period** | **-0.24** | **-6.94** | **0.000** | **\*\*\*** | **796** |

Source: Cain Report and Production, dated 8/18/2022

Note:
[1] For the purposes of this analysis, I use the abnormal returns calculated by Dr. Cain in his event study. I regress each trading day's abnormal return, as calculated by Dr. Cain, against the abnormal return on the closest prior trading day for which Dr. Cain calculates an abnormal return.
[2] "Previous Day" refers to the most recent trading day on which an abnormal return was calculated by Dr. Cain.
[3] *** indicates statistical significance at the 99% confidence level. ** indicates statistical significance at the 95% confidence level. * indicates statistical significance at the 90% confidence level.

# Exhibit 7.B
# CBL 4.60% Senior Note
# Test for Autocorrelation During the Putative Class Period[1]
## 10/1/14 – 3/26/19

| Quarter | Coefficient on Previous Trading Day's Abnormal Return[2] | T-Statistic | P-Value | Significance Level[3] | Trading Days In Autocorrelation Regression |
|---|---|---|---|---|---|
| Q4 2014 | -0.19 | -0.36 | 0.735 | | 7 |
| Q1 2015 | 0.28 | 0.65 | 0.547 | | 7 |
| Q2 2015 | -0.23 | -0.50 | 0.644 | | 6 |
| Q3 2015[4] | NA | NA | NA | | 0 |
| Q4 2015 | -0.20 | -0.50 | 0.632 | | 8 |
| Q1 2016 | 0.37 | 0.94 | 0.385 | | 8 |
| Q2 2016 | -0.22 | -1.53 | 0.133 | | 49 |
| Q3 2016 | -0.21 | -1.03 | 0.314 | | 26 |
| Q4 2016 | -0.46 | -3.93 | 0.000 | *** | 48 |
| Q1 2017 | -0.42 | -3.63 | 0.001 | *** | 62 |
| Q2 2017 | -0.37 | -3.07 | 0.003 | *** | 61 |
| Q3 2017 | -0.46 | -4.02 | 0.000 | *** | 61 |
| Q4 2017 | 0.10 | 0.78 | 0.440 | | 62 |
| Q1 2018 | -0.31 | -2.55 | 0.014 | ** | 61 |
| Q2 2018 | -0.37 | -3.07 | 0.003 | *** | 62 |
| Q3 2018 | -0.30 | -2.40 | 0.020 | ** | 60 |
| Q4 2018 | -0.10 | -0.67 | 0.507 | | 47 |
| Q1 2019 | -0.31 | -2.34 | 0.023 | ** | 54 |
| **Putative Class Period** | **-0.25** | **-6.86** | **0.000** | **\*\*\*** | **689** |

Source:  Cain Report and Production, dated 8/18/2022

Note:
[1]  For the purposes of this analysis, I use the abnormal returns calculated by Dr. Cain in his event study. I regress each trading day's abnormal return, as calculated by Dr. Cain, against the abnormal return on the closest prior trading day for which Dr. Cain calculates an abnormal return.
[2]  "Previous Day" refers to the most recent trading day on which an abnormal return was calculated by Dr. Cain.
[3]  *** indicates statistical significance at the 99% confidence level.  ** indicates statistical significance at the 95% confidence level.  * indicates statistical significance at the 90% confidence level.
[4]  In the Bloomberg data utilized by Cain, no two consecutive trading days in Q3 2015 have price data for CBL 4.60% Senior Notes.  Thus, Cain does not calculate any returns for this quarter.

# Exhibit 7.C
# CBL 5.95% Senior Note
# Test for Autocorrelation During the Putative Class Period[1]
## 12/6/16 – 3/26/19

| Quarter | Coefficient on Previous Trading Day's Abnormal Return[2] | T-Statistic | P-Value | Significance Level[3] | Trading Days In Autocorrelation Regression |
|---|---|---|---|---|---|
| Q4 2016 | -0.62 | -2.82 | 0.014 | ** | 16 |
| Q1 2017 | -0.28 | -2.33 | 0.023 | ** | 62 |
| Q2 2017 | -0.33 | -2.64 | 0.011 | ** | 63 |
| Q3 2017 | -0.16 | -1.31 | 0.196 | | 63 |
| Q4 2017 | 0.13 | 0.99 | 0.325 | | 62 |
| Q1 2018 | 0.12 | 0.91 | 0.369 | | 61 |
| Q2 2018 | -0.27 | -2.23 | 0.029 | ** | 64 |
| Q3 2018 | -0.07 | -0.52 | 0.608 | | 63 |
| Q4 2018 | -0.06 | -0.42 | 0.677 | | 59 |
| Q1 2019 | 0.00 | 0.02 | 0.983 | | 58 |
| **Putative Class Period** | **-0.08** | **-1.90** | **0.057** | **\*** | **571** |

Source: Cain Report and Production, dated 8/18/2022

Note:
[1] For the purposes of this analysis, I use the abnormal returns calculated by Dr. Cain in his event study. I regress each trading day's abnormal return, as calculated by Dr. Cain, against the abnormal return on the closest prior trading day for which Dr. Cain calculates an abnormal return.
[2] "Previous Day" refers to the most recent trading day on which an abnormal return was calculated by Dr. Cain.
[3] \*\*\* indicates statistical significance at the 99% confidence level.  \*\* indicates statistical significance at the 95% confidence level.  \* indicates statistical significance at the 90% confidence level.

# Appendix A
## Terrence Hendershott
June 2022

Professor
Willis H. Booth Chair in Banking and Finance
Faculty Director, Master of Financial Engineering
Haas School of Business
University of California
Berkeley, CA 94720-1900

phone: (510) 643-0619
fax: (510) 643-1412
hender AT haas.berkeley.edu

## Education

Ph.D., Operations, Information, and Technology, Graduate School of Business, Stanford University, 1999.
B.S., Mathematics and Statistics, Miami University, 1989.

## Publications

- Transparency in Fragmented Markets: Experimental Evidence (with Marvin Wee and Yuanji Wen), *Journal of Financial Markets* 59 (June 2022), 1-20.
- Asset Price Dynamics with Limited Attention (with Albert Menkveld, Remy Praz, and Mark Seasholes), *Review of Financial Studies* 35 (February 2022), 962-1008.
- Does Financial Market Structure Impact the Cost of Raising Capital? (with James Brugler and Carole Comerton-Forde), *Journal of Financial and Quantitative Analysis* 56 (August 2021), 1771-1808.
- FinTech as a Game Changer: Overview of Research Frontiers (with Michael Zhang, Leon Zhao, and Eric Zheng), *Information Systems Research* 32 (March 2021), 1-17.
- Asset Pricing: A Tale of Night and Day (with Dmitry Livdan and Dominik Rösch), *Journal of Financial Economics* 138 (December 2020), 635-662.
- Relationship Trading in OTC Markets (with Dan Li, Dmitry Livdan, and Norman Schürhoff), *Journal of Finance* 75 (April 2020), 683-734.
- Short Selling and Price Discovery in Corporate Bonds (with Roman Kozhan and Vikas Raman), *Journal of Financial and Quantitative Analysis* 54 (January 2020), 77-115.
- Price Discovery without Trading: Evidence from Limit Orders (with Jonathan Brogaard and Ryan Riordan), *Journal of Finance* 75 (August 2019), 1621-1658.
- High Frequency Trading and the 2008 Short Sale Ban (with Jonathan Brogaard and Ryan Riordan), *Journal of Financial Economics* 124 (April 2017), 22-42.
- Are Institutions Informed about News? (with Dmitry Livdan and Norman Schürhoff) *Journal of Financial Economics* 117 (August 2015), 249-287.
- Click or Call? Auction versus Search in the Over-the-Counter Market (with Ananth Madhavan), *Journal of Finance* 70 (February 2015), 419-447.
- Price Pressures (with Albert Menkveld), *Journal of Financial Economics*, 114 (December 2014), 405-423.
- High-Frequency Trading and Price Discovery (with Jonathan Brogaard and Ryan Riordan), *Review of Financial Studies* 27 (August 2014), 2267-2306. Won Michael J. Brennan Best Paper Award for best paper published in *Review of Financial Studies* in 2015.
- Liquidity provision and stock return predictability (with Mark Seasholes), *Journal of Banking & Finance* 45 (August 2014), 140-151.
- How Slow is the NBBO? A Comparison with Direct Exchange Feeds (with Shengwei Ding and John Hanna), *Financial Review* 49 (May 2014), 313-332.
- High-Frequency Trading and the Execution Costs of Institutional Investors (with Jonathan Brogaard, Stefan Hunt, and Carla Ysusi), *Financial Review* 49 (May 2014), 345-369. Won *Financial Review* Outstanding Publication Award for 2014.
- Levelling the Trading Field (with David Easley and Tarun Ramadorai), *Journal of Financial Markets* 17 (January 2014), 65-93.
- The Intended and Collateral Effects of Short-Sale Bans as a Regulatory Tool (with Ethan Namvar and Blake Phillips), *Journal of Investment Management* 11 (2013), 5-13.
- Algorithmic Trading and the Market for Liquidity (with Ryan Riordan), *Journal of Financial and Quantitative Analysis* 48 (August 2013), 1001-1024. Won 2013 Philip Brown Prize.

Case 1:19-cv-00181-JRG-CHS    Document 184-25    Filed 10/28/22    Page 54 of 67
PageID #: 3550

# Appendix A

- Informed Trading and Portfolio Returns (with Alex Boulatov and Dmitry Livdan), *Review of Economic Studies* 80 (January 2013), 35-72.
- Automation, Speed, and Stock Market Quality: The NYSE's Hybrid (with Pam Moulton), *Journal of Financial Markets* 14 (November 2011), 568-604.
- Does Algorithmic Trading Increase Liquidity? (with Charles Jones and Albert Menkveld), *Journal of Finance* 66 (February 2011), 1-33. Won New York Stock Exchange Euronext Award for best paper on equity trading, Western Finance Association (2008). Finalist for the Smith-Breeden Prize for best paper published in the *Journal of Finance*.
- Time Variation in Liquidity: The Role of Market Maker Inventories and Revenues (with Carole Comerton-Forde, Charles Jones, Pam Moulton, and Mark Seasholes), *Journal of Finance* 65 (February 2010), 295-331. Won Nasdaq Award for best paper on market microstructure, Financial Management Association (2007).
- The NFL Should Auction Possession in Overtime Games (with Yeon-Koo Che), *Economists' Voice* 9 (October 2009), http://www.bepress.com/ev/vol6/iss9/art5/.
- A Comparison of Trading and Non-Trading Mechanisms for Price Discovery (with Michael Barclay), *Journal of Empirical Finance* 15 (December 2008), 839-849.
- How to Divide the Possession of a Football? (with Yeon-Koo Che), *Economics Letters* 99 (June 2008), 561-565.
- Order Consolidation, Price Efficiency, and Extreme Liquidity Shocks (with Michael Barclay and Charles Jones), *Journal of Financial and Quantitative Analysis* 43 (March 2008), 93-121.
- Market Maker Inventories and Stock Prices (with Mark Seasholes), *American Economic Review (P&P)* 97 (May 2007), 210-214.
- Automation versus Intermediation: Evidence from Treasuries Going Off the Run (with Michael Barclay and Kenneth Kotz), *Journal of Finance* 61 (October 2006), 2395-2414.
- A Model of Direct and Intermediated Sales (with Jie Zhang), *Journal of Economics & Management Strategy* 15 (Summer 2006), 279-316.
- Island Goes Dark: Transparency, Fragmentation, and Regulation (with Charles Jones), *Review of Financial Studies* 18 (Fall 2005), 743-793.
- Trade-through Prohibitions and Market Quality (with Charles Jones), *Journal of Financial Markets* 8 (February 2005), 1-23.
- Liquidity Externalities and Adverse Selection: Evidence from Trading After Hours (with Michael Barclay), *Journal of Finance* 59 (April 2004), 681-710.
- Competition Among Trading Venues: Information and Trading on Electronic Communications Networks (with Michael Barclay and Tim McCormick), *Journal of Finance* 58 (December 2003), 2637-2666. Won New York Stock Exchange Award for best paper on equity trading, Western Finance Association (2001). Nominated for the Smith-Breeden Prize for best paper published in the *Journal of Finance*.
- Price Discovery and Trading After Hours (with Michael Barclay), *Review of Financial Studies* 16 (Winter 2003), 1041-1073.
- Electronic Trading Systems in Financial Markets, *IEEE-IT Professional* 5 (Jul/Aug 2003), 10-14.
- The Future of Virtual Malls (with Patric Hendershott and Robert Hendershott), *Real Estate Finance* 18 (Spring 2001), 25-32.
- Crossing Networks and Dealer Markets: Competition and Performance (with Haim Mendelson), *Journal of Finance* 55 (October 2000), 2071-2115. Nominated for the Smith-Breeden Prize for best paper published in the *Journal of Finance*.
- Bundling and Optimal Auctions of Multiple Products (with Christopher Avery), *Review of Economic Studies* 67 (July 2000), 483-497.
- Will the Internet Reduce the Demand for Mall Space? (with Patric Hendershott and Robert Hendershott), *Real Estate Finance* 17 (Spring 2000), 41-46.

**Working Papers**
- True Cost of Immediacy (with Dmitry Livdan, Dan Li, and Norman Schürhoff)
- All-to-All Liquidity in Corporate Bonds (with Dmitry Livdan and Norman Schürhoff)

# Appendix A

- Quote Competition in Corporate Bonds (with Dmitry Livdan, Dan Li, Norman Schürhoff, and Kumar Venkataraman)
- Option Auctions (with Saad Khan and Ryan Riordan)
- Stock Exchanges as Platforms for Data and Trading (with Marc Rysman and Rainer Schwabe)
- Order Exposure in High Frequency Markets (with Bidisha Chakrabarty, Samarpan Nawn, and Roberto Pascual)
- Market Predictability and Non-Informational Trading (with Mark Seasholes).

**Books, Reviews, and Chapters**
- Handbook of Economics and Information Systems (Editor), Elsevier, ISBN 0444517715.
- Implementation Shortfall with Transitory Price Effects (with Charles Jones and Albert Menkveld), chapter in High Frequency Trading:  A Survival Guide, Eds. David Easley, Marcos Lopez de Prado, and Maureen O'Hara, Risk Books.
- Book Review of Econometrics of Financial High-Frequency Data, by Nikolaus Hautsch, *Quantitative Finance* (2013).

**Other Publications**
- Call for Papers—Special Issue of Information Systems Research Fintech – Innovating the Financial Industry Through Emerging Information Technologies (with Michael Zhang, Leon Zhao, and Eric Zheng), *Information Systems Research* (December 2017), 885-886.
- Automated Trading, *Encyclopedia of Quantitative Finance*.
- Preface to the Focus Theme Section: 'Financial Market Engineering' (with Dirk Neumann, Robert Schwartz, Bruce Weber, and Christof Weinhardt), *Electronic Markets* 16 (May 2006), 98-100.
- An Economic View of Information Systems (with Krishnan Anand), Introduction to Special Issue on Information Systems and Economics, *Decision Support Systems* 41(May 2006), 683-687.
- Wall St's appeal for new rules is not altruistic, *Financial Times*, comment/op-ed, 7/21/2004, p. 13.
- Should the Outcome of a Coin Flip Mean So Much in NFL Overtime? Bid for the Ball (with Jonathan Berk), *Wall Street Journal Online*, 12/22/2003.

**Honors, Awards, Miscellaneous**
- Faculty Director, Master of Financial Engineering, UC Berkeley (2020-)
- University of California Retirement System Advisory Board (2020-)
- Willis H. Booth Chair in Banking and Finance, Haas School of Business, UC Berkeley (2017-)
- Norwegian Finance Initiative Grant to study the effect of technological and regulatory changes on market structure and transparency across equity and fixed-income markets in the US and Europe (2018-2022)
- Digging into Data Round 4; Digging Into High Frequency Data: Present And Future Risks And Opportunities (2016-2020)
- Market Surveillance Advisory Group, Financial Industry Regulatory Authority (2016-2018, 2021-)
- Cheryl and Christian Valentine Chair, Haas School of Business, UC Berkeley (2012-2017)
- Consultant, Office of the Chief Economist, Commodity Futures Trading Commission (2016-2017)
- Distinguished Visiting Scholar, Securities and Exchange Commission (2015).
- Michael J. Brennan Best Paper Award for best paper published in *Review of Financial Studies* in 2014.
- *Financial Review* Outstanding Publication Award for 2014.
- 2013 Philip Brown Prize.
- High Frequency Trading Subcommittee of the Technology Advisory Committee, Commodity Futures Trading Commission (2012-2013)
- Barbara and Gerson Bakar Faculty Fellow, Haas School of Business, UC Berkeley (2011-2012)
- Consultant, Office of the Chief Economist, Commodity Futures Trading Commission (2009-2011)
- Visiting Scholar, University of Sydney (2010)
- Net Institute Grant (2009)
- Kauffman Foundation Entrepreneurship & Innovation Research Grant (2008-2009)

Case 1:19-cv-00181-JRG-CHS    Document 184-25    Filed 10/28/22    Page 56 of 67 PageID #: 3552

# Appendix A

- New York Stock Exchange Euronext Award for best paper on equity trading, Western Finance Association (2008)
- Visiting Fellow, The Paul Woolley Centre for the Study of Capital Market Dysfunctionality, London School of Economics (2008)
- Nasdaq Award for best paper on market microstructure, Financial Management Association (2007)
- Visiting Professor, Université Paris-Dauphine (2007, 2008, 2009, 2010, 2012, 2013)
- Nasdaq Economic Advisory Board, (2004-7; Chair 2007)
- Visiting Economist, New York Stock Exchange (2005-2006)
- National Science Foundation Grant #0133848, CAREER: Electronic Trading Systems (2002-2006)
- Schwabacher Fellow (outstanding teaching and research), University of California, Berkeley (2005-2006)
- Junior Faculty Research Grant, Committee on Research, University of California, Berkeley (2001, 2003)
- New York Stock Exchange Award for best paper on equity trading, Western Finance Association (2001)
- Simon School Teaching Honor Roll, University of Rochester (2000, 2001)
- Xerox Assistant Professor, University of Rochester (1999-2001)
- Frye Fellowship, Stanford University (1992)
- Chiles Fellowship, Stanford University (1991)

**Teaching Experience**
- High-Frequency Finance (MFE 230X), UC Berkeley.
- Introduction to Business Analytics (UGBA 104), UC, Berkeley.
- Information Technology Strategy (MBA 247B, ENGIN 298A, INFOSYS 290, UGBA 196), UC, Berkeley.
- Operations Management (MBA and EWMBA 204), UC, Berkeley.
- Financial Information Systems (CIS 446/Finance 446), University of Rochester.
- Investment Management and Trading Strategies (Finance 434), Simon School, University of Rochester.

**Professional Service**

Editorial:
- Associate Editor, *Journal of Finance*, 2022-
- Associate Editor, *Journal of Financial Economics*, 2021-
- Associate Editor, *Review of Asset Pricing Studies*, 2021-
- Associate Editor, *Journal of Financial Markets*, 2012-
- Associate Editor, *Management Science*, 2010-2018
- Associate Editor, *Journal of Banking & Finance*, 2015-2016
- Co-Editor, *Journal of Economics and Management Strategy*, 2006-2013
- Associate Editor, *Information Systems Research*, 2004-2005
- Associate Editor, *Decision Support Systems*, 2003-2016
- Advisory Editor, *Handbooks in Information Systems*, Elsevier
- Guest Editor, Special Issue of Information Systems Research Fintech – Innovating the Financial Industry Through Emerging Information Technologies (with Michael Zhang, Leon Zhao, and Eric Zheng), *Information Systems Research*
- Guest Editor, Special Issue on Behavioral Finance and Recent Developments in Capital Markets, *Pacific-Basin Finance Journal*
- Guest Editor, Focus Theme Section: 'Financial Market Engineering', *Electronic Markets*
- Guest Editor, Special Issue on Information Systems and Economics, *Decision Support Systems*

Conferences:
- Western Finance Association, program committee, 2011-
- SAFE Market Microstructure Conference, program committee, 2017-
- International FinTech, InsurTech & Blockchain Forum, program committee, 2018-
- Napa Conference on Financial Markets, program committee, 2009-2017
- European Finance Association, program committee, 2001-2004, 2012-2016
- French Finance Association Paris December Conference, 2013-2019

Case 1:19-cv-00181-JRG-CHS   Document 184-25   Filed 10/28/22   Page 57 of 67 PageID #: 3553

# Appendix A

- Finance Down Under Conference, 2013-2016
- Society for Financial Econometrics and Tinbergen University (Amsterdam) Conference on Measuring and Understanding Asset Price Changes: The Price of Liquidity, and the Liquidity of Price, program committee, 2011
- NYSE-Euronext/Dauphine University, 3rd Workshop on Financial Market Quality, organizer, 2010
- NYSE Euronext & Tinbergen Institute Workshop on Liquidity and Volatility, program committee, 2009
- National Institute of Securities Markets Conference on Structure, Microstructure and Regulation of Securities Markets, Mumbai, India, program committee, 2008
- NYSE-Euronext/Dauphine University, 2nd Workshop on Financial Market Quality, organizer, 2008
- INFORMS Conference on Information Systems and Technology, program committee, 2000-6
- Microstructure of International Financial Markets, Hyderabad, India, program committee, 2006
- FinanceCom (International Workshop on Finance Industry Enterprise, Applications & Services), program committee, 2005-2012

Case 1:19-cv-00181-JRG-CHS    Document 184-25    Filed 10/28/22    Page 58 of 67
PageID #: 3554

# Appendix A

# Prior Testimony

**(Past four years)**

Deposition and Trial Testimony (2017, 2018, 2019), *SEC v. Lek Securities Corp, et al.*, Case No. 17-cv-1789 (U.S. District Court Southern District of New York).

Deposition Testimony (2018), *Axiom Investment Advisors, LLC et al., v. Deutsche Bank AG*, Case No. 1:15-cv-09945 (U.S. District Court Southern District of New York).

Deposition Testimony (2018), *In re The Bank of New York Mellon ADR FX Litigation*, Case No. 16-cv-00212 (U.S. District Court Southern District of New York).

Deposition Testimony (2018), *Carver, et al., v. The Bank of New York Mellon, et al.*, Case No. 15-cv-10180 (U.S. District Court Southern District of New York).

Deposition Testimony (2018, 2019), Covered business method reviews, Patent numbers 6,618,707, 7,246,093, 7,599,875, 7,921,051, 8,386,371, Patent and Trademark Office.

Deposition and Trial Testimony (2019, 2020), *Emily and Malcom Fairbairn v. Fidelity Investments Charitable Gift Fund*, Case No. 3:18-cv-04881 (U.S. District Court Northern District of California).

Deposition and Evidentiary Hearing Testimony (2020, 2021), *In re Global Brokerage, Inc f/k/a FXCM Inc. Securities Litigation*, Case No. 1:17-cv-00916-RA-BCM (U.S. District Court Southern District of New York).

Deposition Testimony (2021), *Budicak, Inc., et al. v. Lansing Trade Group, LLC, et al.*, Case No. 2:19-cv-02449 (U.S. District Court District of Kansas).

Deposition Testimony (2021), *City of Providence v. BATS Global Markets Inc.*, et al., Case No. 2:19-cv-02449 (U.S. District Court Southern District of New York).

Deposition Testimony (2021), *Iowa Public Employees' Retirement System, et al. v. Bank of America Corporation, et al.*, Case No. 1:17-cv-06221-KPF (U.S. District Court Southern District of New York).

# Appendix B

# Documents Considered List

**Academic Articles**

- Aboody, David (1996), "Recognition versus Disclosure in the Oil and Gas Industry." *Journal of Accounting Research* 34: 21–32

- Acharya, Viral, and Alberto Bisin (2014), "Counterparty Risk Externality: Centralized Versus Over-The-Counter Markets," *Journal of Economic Theory* 149: 153–182

- Amihud, Yakov, and Haim Mendelson (1987), "Trading Mechanisms and Stock Returns: An Empirical Investigation," *The Journal of Finance* 42 (3): 533–553

- Asquith, Paul, et al. (2019), "The Effects of Mandatory Transparency in Financial Market Design: Evidence from the Corporate Bond Market," *Working Paper*

- Bali, Turan, et al. (2021), "Long-Term Reversals in the Corporate Bond Market," *Journal of Financial Economics* 139 (2): 656–677

- Bao, Jack, et al. (2011), "The Illiquidity of Corporate Bonds," *The Journal of Finance* 66 (3): 911–946

- Bernard, Victor L., and Jacob K. Thomas (1989), "Post-Earnings Announcement Drift: Delayed Price Response or Risk Premium?" *Journal of Accounting Research* 27: 1–36

- Bessembinder, Hendrik, and William Maxwell (2008), "Markets: Transparency and the Corporate Bond Market," *The Journal of Economic Perspectives* 22 (2): 217–234

- Bessembinder, Hendrik, et al. (2009), "Measuring Abnormal Bond Performance," *The Review of Financial Studies* 22 (10): 4219–4258

- Bessembinder, Hendrik, et al. (2018), "Capital commitment and illiquidity in corporate bonds," *The Journal of Finance* 73 (4): 1615–1661

- Bloomfield, Robert, and Maureen O'Hara (1999), "Market Transparency: Who Wins and Who Loses?" *The Review of Financial Studies* 12 (1): 5–35

- Bloomfield, Robert, et al. (2009), "How Noise Trading Affects Markets: An Experimental Analysis," *The Review of Financial Studies* 22 (6): 2275–2302

- Boehmer, Ekkehart, et al. (2005), "Lifting the Veil: An Analysis of Pre-Trade Transparency at the NYSE," *The Journal of Finance* 60 (2): 783–815

- Brogaard, Jonathan, et al. (2018), "High Frequency Trading and Extreme Price Movements," *Journal of Financial Economics* 128 (2): 253–265

- Chordia, Tarun, et al. (2008), "Liquidity and Market Efficiency," *Journal of Financial Economics* 87 (2): 249–268

Case 1:19-cv-00181-JRG-CHS    Document 184-25    Filed 10/28/22    Page 60 of 67
PageID #: 3556

# Appendix B

- Cochrane, John H. (2004), "Asset Pricing: Liquidity, Trading, and Asset Prices," *NBER Reporter* (Winter): 1–12

- Cohen, Lauren, and Dong Lou (2012), "Complicated Firms," *Journal of Financial Economics* 104 (2): 383–400

- D'Avolio, Gene (2002), "The Market for Borrowing Stock," *Journal of Financial Economics* 66 (2): 271–306

- Daniel, Kent, et al. (2002), "Investor Psychology in Capital Markets: Evidence and Policy Implications," *Journal of Monetary Economics* 49 (1): 139–209

- Defond, Mark L., and Jieying Zhang (2014), "The Timeliness of the Bond Market Reaction to Bad Earnings News," *Contemporary Accounting Research* 31 (3): 911–936

- Di Maggio, Marco, et al. (2017), "The Value of Trading Relations in Turbulent Times," *Journal of Financial Economics* 124 (2): 266–284

- Dick-Nielsen, Jens (2009), "Liquidity Biases in TRACE," *The Journal of Fixed Income* 19 (2): 43–55

- Dick-Nielsen, Jens, and Marco Rossi (2019), "The Cost of Immediacy for Corporate Bonds," *The Review of Financial Studies* 32 (1): 1–41

- Dick-Nielsen, Jens, et al. (2012), "Corporate Bond Liquidity before and after the Onset of the Subprime Crisis," *Journal of Financial Economics* 103: 471–492

- Ellul, Andrew, et al. (2011), "Regulatory Pressure and Fire Sales in the Corporate Bond Market," *Journal of Financial Economics* 101 (3): 596–620

- Elton, Edwin J., and T. Clifton Green (1998), "Tax and Liquidity Effects in Pricing Government Bonds," *The Journal of Finance* 53 (5): 1533–1562

- Fama, Eugene F. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25 (2): 383–417

- Fama, Eugene F. (1991), "Efficient Capital Markets: II," *The Journal of Finance* 46 (5): 1575–1617

- Feldhütter, Peter (2012), "The Same Bond at Different Prices: Identifying Search Frictions and Selling Pressures," *The Review of Financial Studies* 25 (4): 1155–1206

- Feldhütter, Peter, and Thomas K. Poulsen (2018), "What Determines Bid-Ask Spreads in Over-the-Counter Markets?" *Working Paper*: 1–47

- Gilbert, Thomas, et al. (2012), "Investor Inattention and the Market Impact of Summary Statistics," *Management Science* 58 (2): 336–350

- Grossman, Sanford J., and Joseph E. Stiglitz (1980), "On the Impossibility of Informationally Efficient Markets," *The American Economic Review* 70 (3): 393–408

# Appendix B

- Hendershott, Terrence, and Ananth Madhavan (2015), "Click or Call? Auction versus Search in the Over-the-Counter Market," *The Journal of Finance* 70 (1): 419–447

- Hendershott, Terrence, et al. (2020), "Relationship Trading in Over-the-Counter Markets," *The Journal of Finance* 75 (2): 683–734

- Hendershott, Terrence, et al. (2020), "Short Selling and Price Discovery in Corporate Bonds," *Journal of Financial and Quantitative Analysis* 55 (1): 77–115

- Hendershott, Terrence, et al. (2021), "Quote Competition in Corporate Bonds," *Working Paper*

- Hirshleifer, David, et al. (2009), "Driven to Distraction: Extraneous Events and Underreaction to Earnings News," *The Journal of Finance* 64 (5): 2289–2325

- Hong, Harrison, and Jeremy Stein (2007), "Disagreement and the Stock Market," *Journal of Economic Perspectives* 21 (2): 109–128

- Hotchkiss, Edith, and Gergana Jostova (2017), "Determinants of Corporate Bond Trading: A Comprehensive Analysis," *Quarterly Journal of Finance* 7 (2): 1750003

- Huberman, Gur, and Tomer Regev (2001), "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance* 56 (1): 387–396

- Jostova, Gergana, et al. (2013), "Momentum in Corporate Bond Returns," *The Review of Financial Studies* 26 (7): 1649–1693

- Lamont, Owen A., and Richard H. Thaler (2003), "Anomalies: The Law of One Price in Financial Markets," *The Journal of Economic Perspectives* 17 (4): 191–202

- Lamont, Owen A., and Richard H. Thaler (2003), "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs," *The Journal of Political Economy* 111 (2): 227–268

- Lee, Charles M. C., and Eric C. So (2017), "Uncovering Expected Returns: Information in Analyst Coverage Proxies," *Journal of Financial Economics* 124 (2): 331–348

- Li, Dan, and Schürhoff, Norman (2019), "Dealer Networks," *The Journal of Finance* 74 (1): 91–144

- Li, Lifang, and Valentina Galvani (2018), "Market States, Sentiment, and Momentum in the Corporate Bond Market," *Journal of Banking and Finance* 89: 249–265

- Liu, Weimin (2006), "A Liquidity-Augmented Capital Asset Pricing Model," *Journal of Financial Economics* 82 (3): 631–671

- Mitchell, Mark, et al. (2002), "Limited Arbitrage in Equity Markets," *The Journal of Finance* 57 (2): 551–584

# Appendix B

- Mola, Simona, et al. (2013), "Is There Life after the Complete Loss of Analyst Coverage?" *The Accounting Review* 88 (2): 667–705

- Sarr, Abdourahmane, and Tonny Lybek (2002), "Measuring Liquidity in Financial Markets," *IMF Working Paper*, WP/02/232: 1–64

- Schultz, Paul (2017), "Inventory Management by Corporate Bond Dealers," *Working Paper*

- Shleifer, Andrei, and Robert W. Vishny (1997), "The Limits of Arbitrage," *The Journal of Finance* 52 (1): 35–55

- Sloan., Richard G. (1996), "Do Stock Prices Fully Reflect Information in Accruals and Cash Flows About Future Earnings?" *The Accounting Review* 71 (3): 289–315

- Stambaugh, Robert F., et al. (2012), "The Short of It: Investor Sentiment and Anomalies," *Journal of Financial Economics* 104 (2): 288–302

- Tetlock, Paul C. (2011), "All the News That's Fit to Reprint: Do Investors React to Stale Information?" *The Review of Financial Studies* 24 (5): 1481–1512

**Analyst Reports**
- JPMorgan Econ & FI, "USD High Grade Coverage and Rating Report : A summary of credit analyst recommendations on USD HG bond issuers," February 25, 2019.

**Books**
- Fama, Eugene F. (1976), *Foundations of Finance: Portfolio Decisions and Securities Prices*, New York, NY: Basic Books, Inc.

- Greene, William H. (2008), *Econometric Analysis*, 6th Edition, Upper Saddle River, NJ: Prentice Hall

- Hull, John C. (2002), *Options, Futures & Other Derivatives*, 5th Edition, Upper Saddle River, NJ: Prentice Hall

- Ross, Stephen A., et al. (2003) *Corporate Finance*, 6th Edition, McGraw-Hill

**Case Law**
- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)

- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001)

**Data Sources**
- Bloomberg

- FINRA TRACE

- Investext

Case 1:19-cv-00181-JRG-CHS    Document 184-25    Filed 10/28/22    Page 63 of 67
PageID #: 3559

# Appendix B

- SEC Edgar

**Depositions**

- Deposition of Matthew D. Cain, October 4, 2022

**Expert Reports**

- Expert Report of Matthew D. Cain and Production, dated August 18, 2022

**Legal Documents**

- Consolidated Class Action Complaint, In Re CBL & Associates Properties, Inc. Securities Litigation, dated November 5, 2019

- Notice of Motion for Class Certification, In Re CBL & Associates Properties, Inc. Securities Litigation, dated August 18, 2022

**Other Public Materials**

- "CBL & Associates Properties Announces The Sale Of The Outlet Shoppes At Oklahoma City," *CBL & Associates Properties, Inc.*, May 1, 2017, available at https://invest.cblproperties.com/news-views/news-details/2017/CBL--Associates-Properties-Announces-the-Sale-of-the-Outlet-Shoppes-at-Oklahoma-City-05-01-2017/

- "CBL & Associates Properties Completes The Sale Of Two Malls For $53.5 Million," *CBL & Associates Properties, Inc.*, May 11, 2017, available at https://invest.cblproperties.com/news-views/news-details/2017/CBL--Associates-Properties-Completes-the-Sale-of-Two-Malls-for-53-5-Million-05-11-2017/

- "CBL & Associates Properties, Inc. Announces Disposition Of Renaissance Center," *CBL & Associates Properties, Inc.*, December 17, 2015, available at https://invest.cblproperties.com/news-views/news-details/2015/CBL--Associates-Properties-Inc--Announces-Disposition-of-Renaissance-Center-12-17-2015/

- "CBL & Associates Properties, Inc. Announces Dispositions Of Non-Core Properties," *CBL & Associates Properties, Inc.*, November 16, 2015, available at https://invest.cblproperties.com/news-views/news-details/2015/CBL--Associates-Properties-Inc--Announces-Dispositions-of-Non-Core-Properties-11-16-2015/

- "CBL & Associates Properties, Inc. Closes Three Mall Sale," *CBL & Associates Properties, Inc.*, December 19, 2016, available at https://invest.cblproperties.com/news-views/news-details/2016/CBL--Associates-Properties-Inc--Closes-Three-Mall-Sale-12-19-2016/

- "CBL & Associates Properties, Inc. Completes Sale Of Community Center," *CBL & Associates Properties, Inc.*, September 1, 2016, available at https://invest.cblproperties.com/news-views/news-details/2016/CBL--Associates-Properties-Inc--Completes-Sale-of-Community-Center-09-01-2016/

# Appendix B

- "CBL & Associates Properties, Inc. Completes Sale Of Mayfaire Community Center," *CBL & Associates Properties, Inc.*, December 3, 2015, available at https://invest.cblproperties.com/news-views/news-details/2015/CBL--Associates-Properties-Inc--Completes-Sale-of-Mayfaire-Community-Center-12-03-2015/

- "CBL & Associates Properties, Inc. Completes The Sale Of Eastgate Crossing In Cincinnati, OH," *CBL & Associates Properties, Inc.*, June 1, 2015, available at https://invest.cblproperties.com/news-views/news-details/2015/CBL--Associates-Properties-Inc--Completes-the-Sale-of-Eastgate-Crossing-in-Cincinnati-OH-06-01-2015/

- "CBL & Associates Properties, Inc. Completes Two Additional Property Dispositions," *CBL & Associates Properties, Inc.*, April 4, 2015, available at https://invest.cblproperties.com/news-views/news-details/2016/CBL--Associates-Properties-Inc--Completes-Two-Additional-Property-Dispositions-04-04-2016/

- "CBL Announces Additional Community Center Disposition Progress," *CBL & Associates Properties, Inc.*, November 30, 2015, available at https://invest.cblproperties.com/news-views/news-details/2015/CBL-Announces-Additional-Community-Center-Disposition-Progress-11-30-2015/

- "CBL Announces Community Center Sale And Recent Financing Activity," *CBL & Associates Properties, Inc.*, July 7, 2015, available at https://invest.cblproperties.com/news-views/news-details/2015/CBL-Announces-Community-Center-Sale-and-Recent-Financing-Activity-07-07-2015/

- "CBL Completes Sale Of Majority Interest In Triangle Town Center To DRA Advisors LLC," *CBL & Associates Properties, Inc.*, February 8, 2016, available at https://invest.cblproperties.com/news-views/news-details/2016/CBL-Completes-Sale-of-Majority-Interest-in-Triangle-Town-Center-to-DRA-Advisors-LLC-02-08-2016/

- "CBL Completes Sale Of Two Regional Malls For $66.5 Million," *CBL & Associates Properties, Inc.*, July 22, 2015, available at https://invest.cblproperties.com/news-views/news-details/2016/CBL-Completes-Sale-of-Two-Regional-Malls-for-66-5-Million-07-22-2016/

- "Fast Answers: Market Maker," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/fast-answers/answersmktmakerhtm.html

- "Fitch Downgrades CBL to 'BB+'; Outlook Negative," *Fitch Ratings*, November 9, 2017, available at https://www.fitchratings.com/research/non-bank-financial-institutions/fitch-downgrades-cbl-to-bb-outlook-negative-09-11-2017

- "Investment-grade Bond (or High-grade Bond)," *Investor.gov*, available at https://www.investor.gov/introduction-investing/investing-basics/glossary/investment-grade-bond-or-high-grade-bond

# Appendix B

- "Mall Owners See Strength in Smaller Numbers," *The Wall Street Journal*, May 12, 2017, available at https://www.wsj.com/articles/mall-owners-see-strength-in-smaller-numbers-1494619600

- "MarketAxess Investor FAQs," *MarketAxess*, available at https://investor.marketaxess.com/investor-faqs

- "NSCC MPID Directory," *DTCC*, available at https://www.dtcc.com/-/media/Files/Downloads/client-center/NSCC/NSCC-MPID-Directory.xls

- "Regulation NMS," *Securities Act Release No. 34-51808*, June 9, 2005

- "Retail Clouds Darken as Mall Operator CBL Is Downgraded to Junk Status," *The Wall Street Journal*, November 9, 2017, available at https://www.wsj.com/articles/retail-clouds-darken-as-mall-operator-cbl-is-downgraded-to-junk-status-1510272538

- "Sears Warning Slams Mall Stocks," *The Wall Street Journal*, March 22, 2017, available at https://www.wsj.com/articles/sears-warning-slams-mall-stocks-1490203294

- "Staff Report on Corporate Bond Market Liquidity," *Federal Reserve Staff Report*, 2014, available at https://www.federalreserve.gov/foia/files/bond-market-liquidity-report-2014q1.pdf

# Appendix C

# FINRA TRACE Data Cleaning Procedures

1.      In order to clean FINRA TRACE data for analysis, I begin with Dr. Cain's cleaned dataset, which limits trades to secondary market transactions, removes original records that were matched to corrections, cancellations, and reversals, and identifies publicly reported trades.  I then further clean this data following the recommendations in Asquith et al. (2019) to remove certain redundant trade reports, including agency chain transactions and Schultz (2017) to remove certain prearranged trades.[1]

2.      Asquith et al. (2019) recommends removing certain redundant trade reports related to agency chain transactions from FINRA TRACE data.[2]  To do this, I first match sequences of trade reports that are reported with the same volume and price on the same trading day for each Senior Note.  I require that three parties are involved in the trade report sequence, and that one of the counterparties is a customer.  This procedure identifies agency chains where one dealer acts as an agent to facilitate a trade between a principal dealer and a principal customer.  I then consolidate each sequence of three trade reports (dealer to agent, agent to dealer, and agent to customer) into a single trade between the principal dealer and the principal customer.  I conservatively do not remove redundant trade reports associated with more complex agency chains.

3.      Schultz (2017) recommends removing certain redundant trade reports related to prearranged trades.[3]  Consistent with Schulz (2017) I first match pairs of two offsetting trade reports, a buy and a sell, reported by the same dealer with the same volume and price, and execution times within sixty seconds of the other trade report for each Senior Note.  This procedure identifies pairs of trade reports wherein dealers prearrange offsetting transactions so as to avoid inventory risk.[4]  I consolidate each pair of prearranged trade reports into a single trade between the two counterparties.

4.      After implementing these procedures, I then exclude any trade reports Dr. Cain has identified as not having been publicly reported (according to Dr. Cain's Appendix C).[5]

---

[1] Asquith, Paul, et al. (2019), "The Effects of Mandatory Transparency in Financial Market Design: Evidence from the Corporate Bond Market," *Working Paper* ("Asquith et al. (2019)"); Schultz, Paul (2017), "Inventory Management by Corporate Bond Dealers," *Working Paper* ("Schultz (2017)").

[2] *See* Asquith et al. (2019), Online Appendix at 5–7.

[3] *See* Schultz (2017) at 2.

[4] Schultz (2017) at 7.

[5] Cain Report, Appendix C.