**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**CHATTANOOGA DIVISION**

|  |  |  |
|---|---|---|
|  | ) |  |
| IN RE CBL & ASSOCIATES PROPERTIES, | ) | Consolidated Case No. |
| INC. SECURITIES LITIGATION | ) | 1:19-CV-181-JRG-CHS |
|  | ) |  |

**DEFENDANTS' RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

LEGAL STANDARD............................................................................................3

ARGUMENT..........................................................................................................3

I. PLAINTIFFS LACK STANDING TO PURSUE CLAIMS BASED ON THE NOTES.............................................................................................................3

    A. Mr. Amsterdam Is Not a Proper Party. ..................................................4

    B. Mr. Amsterdam Is Unfit to Serve as Class Representative....................5

    C. Without a Noteholder Plaintiff, a Class of Noteholders Cannot Be Certified. ................................................................................................8

II. PLAINTIFFS ARE NEITHER TYPICAL NOR ADEQUATE CLASS REPRESENTATIVES........................................................................................10

    A. Plaintiffs' Claims Are Barred Because They Failed to Submit a Claim in CBL's Bankruptcy. ............................................................................10

    B. Plaintiffs Are an Incohesive Group of Individuals Who Exercise No Control Over This Litigation. ..............................................................13

    C. Plaintiffs Suffer From Individual Issues Including a Lack of Actual Reliance..................................................................................................15

        1. Charles Hoffman Is Atypical and Inadequate.............................16

        2. Jay Scolnick Is Atypical and Inadequate. ...................................18

        3. Mark Shaner Is Atypical and Inadequate.....................................22

III. PLAINTIFFS CANNOT INVOKE A PRESUMPTION OF RELIANCE FOR THE NOTES AND THEREFORE CANNOT SATISFY PREDOMINANCE. ..............26

    A. The *Basic* Presumption Does Not Apply to the Notes...........................26

        1. Plaintiffs Impermissibly Rely on Analyses of CBL's Common Stock in Attempting to Prove Market Efficiency for the Notes.............27

        2. Plaintiffs Fail to Demonstrate the Market for the Notes was Efficient........27

B.        The *Affiliated Ute* Presumption Does Not Apply to Any Securities. ....................33

IV.      PLAINTIFFS HAVE NOT ESTABLISHED THAT DAMAGES CAN BE MEASURED ON A CLASSWIDE BASIS.........................................................................33

CONCLUSION.................................................................................................................................35

Case 1:19-cv-00181-JRG-CHS    Document 199    Filed 11/21/22    Page 3 of 46 PageID #: 3841

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AEP ERISA Litig.*,
 2008 WL 4210352 (S.D. Ohio Sept. 8, 2008) ..........................................................................15

*Affiliated Ute Citizens of Utah v. United States*,
 406 U.S. 128 (1972)............................................................................................................26, 33

*In re AIG Advisor Grp.*,
 2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007) ...........................................................................9

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
 265 F.R.D. 157 (S.D.N.Y. 2010), *vacated in part on other grounds*,
 689 F.3d 229 (2d Cir. 2012)...............................................................................................31, 32

*Ambac Assurance Corp. v. EMC Mortgage Corp.*,
 2010 WL 11595698 (S.D.N.Y. Dec. 16, 2010) ........................................................................9

*Amchem Prod., Inc. v. Windsor*,
 521 U.S. 591 (1997)............................................................................................................10, 25

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
 568 U.S. 455 (2013)................................................................................................................26

*In re BancorpSouth, Inc.*,
 2016 WL 5714755 (6th Cir. Sept. 6, 2016) ..............................................................................3

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)....................................................................................................... *passim*

*Beach v. Healthways, Inc.*,
 2009 WL 3245393 (M.D. Tenn. Oct. 5, 2009) ............................................................10, 11, 16

*Beckman v. Ener1, Inc.*,
 2012 WL 512651 (S.D.N.Y. Feb. 15, 2012)............................................................................13

*Berger v. Compaq Comp. Corp.*,
 257 F.3d 475 (5th Cir. 2001) ..................................................................................................13

*Blank v. Jacobs*,
 2009 WL 3233037 (E.D.N.Y. 2009).......................................................................................21

*Blue Chip Stamps v. Manor Drug Stores*,
 421 U.S. 723 (1975).................................................................................................................8

Case 1:19-cv-00181-JRG-CHS   Document 199   Filed 11/21/22   Page 4 of 46
PageID #: 3842

*Blum v. Yaretsky*,
457 U.S. 991 (1982)...................................................................................................8

*In re BP p.l.c. Sec. Litig.*,
2014 WL 2112823 (S.D. Tex. May 20, 2014),
*aff'd*, 800 F.3d 674 (5th Cir. 2015)....................................................................33, 35

*Cahoo v. Fast Enters. LLC*,
508 F. Supp. 3d 138 (E.D. Mich. 2020)...................................................................21

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ..................................................................... *passim*

*Cavalier Carpets, Inc. v. Caylor*,
746 F.2d 749 (11th Cir. 1984) .................................................................................33

*In re Citigroup Auction Rate Sec. Litig.*,
700 F. Supp. 2d 294 (S.D.N.Y. 2009)........................................................................9

*In re CJ Holding Co.*,
27 F.4th 1105 (5th Cir. 2022) ..................................................................................13

*Clarke v. Baptist Mem'l Healthcare Corp.*,
264 F.R.D. 375 (W.D. Tenn. 2009), *aff'd*, 427 F. App'x 431 (6th Cir. 2011) ........................14

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................................................................................3, 33, 34, 35

*Cosby v. KPMG, LLP*,
2020 WL 3548379 (E.D. Tenn. June 29, 2020)........................................................18

*Cox v. Collins*,
7 F.3d 394 (4th Cir. 1993) .......................................................................................33

*Darvin v. Int'l Harvester Co.*,
610 F. Supp. 255 (S.D.N.Y. 1985) .........................................................................6, 7

*Davidson v. Citizens Gas & Coke Utility*,
238 F.R.D. 225 (S.D. Ind. 2006)................................................................................7

*Direct Mktg. Servs., LLC v. Bluegreen Corp.*,
2005 WL 1594543 (E.D. Tenn. July 6, 2005) ..........................................................14

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
281 F.R.D. 174 (S.D.N.Y. 2012) ...............................................................28, 29, 30

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)........................................................................................23

*Food Lion, LLC v. Dean Foods Co.*,
  312 F.R.D. 472 (E.D. Tenn. 2016)........................................................................................3

*Freeman v. Laventhol & Horwath*,
  915 F.2d 193 (6th Cir. 1990) .........................................................................................28, 33

*GAMCO Investors v. Vivendi*,
  927 F. Supp. 2d 88 (S.D.N.Y. 2013), *aff'd,* 838 F.3d 214 (2d Cir. 2016) ..............................19

*George v. China Auto. Sys., Inc.*,
  2013 WL 3357170 (S.D.N.Y. July 3, 2013) ...............................................................17, 18, 23

*In re Global Brokerage, Inc.*,
  2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021) .................................................................. *passim*

*Grae v. Corr. Corp. of Am.*,
  329 F.R.D. 570 (M.D. Tenn. 2019), *vacated on other grounds*,
  330 F.R.D. 481 (M.D. Tenn. 2019) ......................................................................................33

*Halliburton Co. v. Erica P. John Fund, Inc*.
  573 U.S. 258 (2014).......................................................................................................16, 26

*Hickson Corp. v. Norfolk S. Ry. Co.*,
  260 F.3d 559 (6th Cir. 2001) ...............................................................................................34

*Hoffman v. UBS-AG*,
  591 F. Supp. 2d 522 (S.D.N.Y. 2008).................................................................................3, 9

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
  2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013).....................................................23, 24, 26, 27

*In re Initial Pub. Offering Sec. Litig.*,
  2008 WL 2050781 (S.D.N.Y. May 13, 2008) .........................................................................9

*Kasper v. AAC Holdings, Inc.*,
  2017 WL 3008510 (M.D. Tenn. July 14, 2017) ....................................................................18

*Kline v. Wolf*,
  88 F.R.D. 696 (S.D.N.Y. 1981) ............................................................................................21

*Krieger v. Gast*,
  197 F.R.D. 310 (W.D. Mich. 2000)......................................................................................26

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001).........................................................................................32

*LBS Petroleum, LLC v. Demir*,
  2015 WL 12469064 (S.D. Fla. Oct. 28, 2015).........................................................................9

v

*In re Lehman Bros. Sec. & ERISA Litig.*,
    684 F. Supp. 2d 485 (S.D.N.Y. 2010)..................................................................................9

*Lewis v. Casey*,
    518 U.S. 343 (1996)..............................................................................................................8

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018)................................................................................25

*Local Loan Co. v. Hunt*,
    292 U.S. 234 (1934)............................................................................................................13

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
    722 F. Supp. 2d 1157 (C.D. Cal. 2010) ..............................................................................9

*In re Manown*,
    213 B.R. 411 (Bankr. N.D. Ga. 1997) ...............................................................................13

*In re marchFIRST, Inc.*,
    288 B.R. 526 (Bankr. N.D. Ill. 2002), *aff'd*, 293 B.R. 443 (N.D. Ill. 2003)...........................12

*Medina v. D.C.*,
    643 F.3d 323 (D.C. Cir. 2011) ..........................................................................................34

*Mitchell v. Ky. Dep't of Corrs.*,
    234 F.3d 1269, 2000 WL 1562842 (6th Cir. 2000) .............................................................8

*Morgan v. Crush City Constr., LLC*,
    2022 WL 2752614 (W.D. Wisc. July 14, 2022) ..................................................................7

*Murphy v. Madden*,
    532 B.R. 286 (E.D. Mich. 2015)........................................................................................11

*N.J. Carpenters Health Fund v. Residential Cap., LLC*,
    2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) .....................................................................9

*In re Nortel Networks Corp. ERISA Litig.*,
    2009 WL 3294827 (M.D. Tenn. Sept. 2, 2009)...................................................................8

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)......................................................28, 29, 35

*In re Parmalat Sec. Litig.*,
    2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008).....................................................................8

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
    507 U.S. 380 (1993)...........................................................................................................11

Case 1:19-cv-00181-JRG-CHS   Document 199   Filed 11/21/22   Page 7 of 46
PageID #: 3845

*Porath v. Logitech, Inc.*,
2019 WL 6134936 (N.D. Cal. Nov. 18, 2019) ...............................................................5, 7

*In re Puda Coal Sec. Inc. Litig.*,
2013 WL 5493007 (S.D.N.Y. Oct. 1, 2013) ........................................................................23

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) ..........................................................................................34

*Roane Cnty., Tennessee v. Jacobs Eng'g Grp., Inc.*,
429 F. Supp. 3d 494 (E.D. Tenn. 2019) ...............................................................................8

*Rocco v. Nam Tai Elecs., Inc.*,
245 F.R.D. 131 (S.D.N.Y. 2007) .........................................................................17, 18, 20

*Rolex Emps. Ret. Trust v. Mentor Graphics Corp.*,
136 F.R.D. 658 (D. Or. 1991) ............................................................................................17

*Rosen v. Tenn. Com'r of Finance and Admin.*,
288 F.3d 918 (6th Cir. 2002) ...............................................................................................3

*In re Safeguard Scientifics*,
216 F.R.D. 577 (E.D. Pa. 2003).........................................................................................17

*Shiring v. Tier Techs., Inc.*,
244 F.R.D. 307 (E.D. Va. 2007) ............................................................................5, 14, 15, 25

*In re Smart Techs., Inc. S'holder Litig.*,
295 F.R.D. 50 (S.D.N.Y. 2013) ........................................................................................24

*Sprague v. General Motors Corp.*,
133 F.3d 388 (6th Cir. 1998) .............................................................................................13

*In re Storage Tech. Corp. Sec. Litig.*,
113 F.R.D. 113 (D. Colo. 1986) ........................................................................................21

*Taylor Novelty & Toy, Inc. v. City of Taylor*,
884 F.2d 1393, 1989 WL 108112 (6th Cir. 1989) .............................................................14

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006)................................................................31, 32

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008)..........................................................................................18, 28

*In re Telxon Corp. Sec. Litig.*,
67 F. Supp. 2d 803 (N.D. Ohio 1999)................................................................................14

*Travelers Indem. Co. v. Bailey*,
   557 U.S. 137 (2009)................................................................................................12

*In re Tristar Esperanza Properties, LLC*,
   782 F.3d 492 (9th Cir. 2015) ...................................................................................11

*In re Valence Tech. Sec. Litig.*,
   1996 WL 119468 (N.D. Cal. Mar. 14, 1996)............................................................18

*In re Vivendi Univ., S.A. Sec. Litig.*,
   183 F. Supp. 3d 458 (S.D.N.Y. 2016).......................................................................18

*Wal–Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)....................................................................................................3

*Walters v. Gill Indus., Inc.*,
   2021 WL 5830018 (E.D. Ky. Dec. 8, 2021) ...............................................................5

*Weinberg v. Insituform Techs., Inc.*,
   1995 WL 368002 (W.D. Tenn. Apr. 7, 1995)............................................................22

*Xianglin Shi v. Sina Corp.*,
   2005 WL 1561438 (S.D.N.Y. July 1, 2005) ...............................................................6

*Young v. Nationwide Mut. Ins. Co.*,
   693 F.3d 532 (6th Cir. 2012) ......................................................................................3

**Statutes**

15 U.S.C. § 78u-4 ................................................................................................ *passim*

11 U.S.C. § 510(b) ...........................................................................................1, 11, 34

Fed. R. Civ. P. 23.................................................................................................. *passim*

Fed. R. Civ. P. 17.......................................................................................................14

Fla. Stat. Ann. § 794.011 ............................................................................................5

Fla. Stat. Ann. § 948.01 ..............................................................................................5

# INTRODUCTION

Plaintiffs move to certify a class of purchasers who acquired CBL securities between July 29, 2014 and March 26, 2019. Specifically, Plaintiffs seek to represent purchasers who acquired (i) CBL's common stock, (ii) its Preferred Stock (Series D and E), and (iii) three separate tranches of CBL's senior unsecured notes (the "Notes").[1] None of the Lead Plaintiffs purchased any Notes, however.[2] *See* Dkt. 14-2 (showing Mr. Hoffman purchased only CBL equity securities); Case No. 1:19-cv-00149, Dkt. 25-3 (same for Mr. Shaner and Mr. Scolnick). To address this problem, Plaintiffs attempted to add a new party via their Class Certification Motion, Ronald Amsterdam, but did so without seeking to add him as a party or amending the complaint, causing Defendants to move to strike him from the case. *See* Dkt. 172 *et seq*. For the reasons set forth in that Motion, and below, Mr. Amsterdam is a not a proper party to this case, nor an appropriate class representative, and without him, the case cannot proceed as a class action with respect to the Notes. Setting aside Plaintiffs' inability to represent a class of Noteholders, their Class Certification Motion should be denied for several independent reasons.

*First*, these Plaintiffs' claims are barred because they failed to preserve them in CBL's bankruptcy. Under Section 510(b) of the Bankruptcy Code and the Confirmation Order entered by the Bankruptcy Court, Plaintiffs were required to submit proofs of claim in CBL's bankruptcy, but failed to do so. Accordingly, these Plaintiffs themselves do not even possess the claims that

---

[1] The three Notes at issue are (i) those issued in November 2013 that bear 5.25% interest and mature in December 2023 ("5.25% Notes), (ii) those issued in October 2014 that bear 4.6% interest and mature in October 2024 ("4.6% Notes"), and (iii) those issued in December and August 2017 that bear 5.95% interest and mature in December 2026 ("5.95% Notes").

[2] The Court appointed five Lead Plaintiffs under the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3) ("PSLRA"): Charles Hoffman, Lydia Hoffman, HoffInvestCo, Jay Scolnick, and Mark Shaner. *See* Dkt. 69. Of that group, only three remain—Lydia Hoffman withdrew from the case after refusing to sit for deposition, and HoffInvestCo is not a real legal entity, as explained *infra*.

1

they seek to assert on behalf of the putative class, as required by Rule 23(a)(3) and Rule 23(a)(4).

*Second*, Plaintiffs fail to satisfy Rule 23(a)'s typicality and adequacy requirements because (i) taken collectively, they are a random assortment of individuals who have ceded control of this litigation to their attorneys, and (ii) each Plaintiff individually is subject to unique reliance defenses, and other failings. For example, Mr. Hoffman purchased additional shares of CBL stock *after* the alleged corrective disclosures that, according to Plaintiffs, "revealed" the alleged fraud, and testified that he is not dissuaded from investing in companies that have allegedly engaged in fraud. Similarly, the investment decisions of Mr. Scolnick and Mr. Shaner were driven not by the market price of CBL stock—but by Mr. Scolnick's idiosyncratic calculations of CBL's "intrinsic value," which differed vastly from CBL's actual stock price. Each of these Plaintiffs is also inadequate for other reasons, ranging from discovery violations to questions of credibility.

*Third,* even if Plaintiffs were typical or adequate—and even if they had standing to assert claims premised on CBL's Notes (which they do not)—Plaintiffs' proposed class definition must be narrowed to exclude the Notes. For a securities fraud class action to proceed, Plaintiffs must establish that reliance can be proven on a classwide basis using common evidence. Here, Plaintiffs seek to invoke the fraud-on-the-market presumption of reliance recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). But before the *Basic* presumption applies, Plaintiffs must prove that the Notes traded in an efficient market. Plaintiffs have failed to meet their burden of proving market efficiency for the Notes, which were not traded on a national exchange but rather infrequently in an over-the-counter market, lacked analyst coverage, and have not been shown to react to new, value-relevant information throughout the entirety of the putative class period.

*Finally,* class certification should be denied because Plaintiffs have failed to demonstrate that damages can be calculated on a classwide basis and in a manner that is consistent with

2

Plaintiffs' theory of liability, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

## LEGAL STANDARD

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). "[T]o justify a departure from that rule" and obtain class certification, Plaintiffs bear the burden of satisfying all the requirements of Rule 23(a) and at least one requirement of Rule 23(b). *Id.* That is, Plaintiffs must actually "*prove* the Rule 23 certification requirements" are met with evidence. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012) (emphasis added). In determining whether Plaintiffs have met their burden, the Court must conduct a "rigorous analysis" of the evidence. *Food Lion, LLC v. Dean Foods Co*., 312 F.R.D. 472, 482 (E.D. Tenn. 2016). "A district judge may not duck hard questions" in considering whether certification is warranted, *In re BancorpSouth, Inc.*, 2016 WL 5714755, at *1 (6th Cir. Sept. 6, 2016) (citation omitted), even if those questions also relate to the merits, *see Wal-Mart,* 564 U.S. at 351 (the Rule 23 analysis will "frequently . . . entail some overlap with the merits of the . . . underlying claim").

## ARGUMENT

### I.     PLAINTIFFS LACK STANDING TO PURSUE CLAIMS BASED ON THE NOTES.

Plaintiffs seek to represent a class of individuals who purchased CBL's Notes during the putative class period. But none of the Court-appointed Lead Plaintiffs purchased any Notes. *See* Dkt. 14-2; Case No. 1:19-cv-00149, Dkt. 25-3. For that reason, Plaintiffs lack standing to assert claims on behalf of a putative class of Noteholders, as explained *infra* at Section I.C. *See Rosen v. Tenn. Com'r of Finance and Admin.*, 288 F.3d 918, 928 (6th Cir. 2002) ("It is black-letter law that standing is a claim-by-claim issue" and "representatives without personal standing cannot predicate standing on injuries suffered by [other] members of the class."); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 532 (S.D.N.Y. 2008) (holding that "plaintiffs lack standing [to press Section

3

10(b)] claims relating to funds in which they did not personally invest").

Recognizing this deficiency, Plaintiffs belatedly sought to add Mr. Amsterdam to the case. But Mr. Amsterdam cannot serve as a representative party for two independent reasons. First, as explained in Defendants' Motion to Strike (Dkt. 172 *et seq.*), Mr. Amsterdam is not a proper party to this case. For that reason alone, he cannot serve as a class representative. Second, even if Plaintiffs had followed the proper procedure to add him, Mr. Amsterdam is unfit to serve as a class representative due to his criminal history—which involved a sexual offense against a minor—his dishonest deposition testimony, and his failure to participate in discovery. Without Mr. Amsterdam, Plaintiffs are left without anyone to represent the putative Noteholder class members.

### A. Mr. Amsterdam Is Not a Proper Party.

Plaintiffs' belated addition of Mr. Amsterdam was improper because it occurred after the deadline to amend the pleadings and add new parties had passed (*see* Dkt. 153 at 4) and was otherwise improper under the Federal Rules of Civil Procedure (*see generally* Dkts. 172, 175).

Plaintiffs sandbagged the Court and Defendants by waiting nearly *two years* after Mr. Amsterdam consulted with counsel to suddenly add him as a representative party in their class certification papers, which were filed on August 18, 2022. Discovery has revealed that Mr. Amsterdam first approached the law firm Bronstein Gewirtz & Grossman about this litigation in ***January 2021***. *See* Ex. 1, Amsterdam Dep. 35:15-18; *see also id.* 47:5-11 ("I initially spoke with Mr. Kimelman in January of 2021 and thereafter spoke with Mr. Wernke."). Plaintiffs' counsel may have hesitated when they learned of Mr. Amsterdam's criminal history. [3] *See infra* Section I.B. Whatever the reason, Plaintiffs' delay in proposing Mr. Amsterdam as a party to this litigation

---

[3] Although Plaintiffs' counsel was aware of Mr. Amsterdam since January 2021, he did not sign an engagement letter with Pomerantz LLP until August 18, 2022. *See* Ex. 2, CBL_Amsterdam_00000001 (engagement letter).

4

precludes his appointment as class representative. *See Walters v. Gill Indus., Inc.*, 2021 WL 5830018, at \*1, \*6 (E.D. Ky. Dec. 8, 2021) (finding that "[u]ndue delay" and "lack of notice" in seeking leave to add new plaintiffs and class representatives would prejudice defendants).

### B.      Mr. Amsterdam Is Unfit to Serve as Class Representative.

Setting aside Mr. Amsterdam's status as an improper party, he is wholly unfit to serve as a class representative. When he was 29 years old, Mr. Amsterdam was charged with committing sexual battery on a person under 12 years of age in Broward County, Florida on January 31, 1983, under Fla. Stat. Ann. § 794.011(2)(a), which criminalizes "commit[ting] sexual battery upon . . . a person less than 12 years of age." *See* Ex. 3 at 1 (criminal background report showing January 31, 1983 charge); Ex. 4 at 2 (Florida Dept. of Corr. record of sentencing). The charge against Mr. Amsterdam was resolved via an "adjudication withheld" disposition (Ex. 3 at 1), which is a special type of sentence available to certain criminal defendants in Florida. Under Florida law, a court may place a defendant on probation "with or without an adjudication of guilt" if the "defendant . . . has ***been found guilty [by a] jury, has entered a plea of guilty or a plea of nolo contendere, or has been found guilty by the court***." Fla. Stat. Ann. § 948.01(1) (emphasis added). Here, Mr. Amsterdam was sentenced to five years of "Community Supervision." Ex. 4 at 2.

Although this criminal offense occurred some time ago, its particularly egregious nature should convince the Court not to appoint Mr. Amsterdam as class representative. Class representatives are "fiduciar[ies] for the class," and must "adhere to the highest standards of honesty and integrity." *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 316–17 (E.D. Va. 2007). Mr. Amsterdam's criminal history raises serious questions that will impair his ability to serve as a fiduciary. *See Porath v. Logitech, Inc.*, 2019 WL 6134936, at \*5 (N.D. Cal. Nov. 18, 2019) (noting that such a "plaintiff could be clobbered on the stand with his convictions, all to the detriment of

5

the class."); *Xianglin Shi v. Sina Corp.*, 2005 WL 1561438, at *4 (S.D.N.Y. July 1, 2005) ("[N]umerous courts have rejected the appointment of convicted felons as class representatives.").

Even if the Court were willing to overlook Mr. Amsterdam's criminal history, it should *not* overlook the fact that Mr. Amsterdam lied and evaded questions on this topic when he was deposed *in this litigation*. During his deposition, Mr. Amsterdam refused to testify truthfully or candidly about the nature of his criminal background. At times, Mr. Amsterdam refused entirely to answer questions about his criminal background:

> Q. Have you ever been charged with a crime?
> A. I defer to Michael [Wernke, his counsel].
> Q. You can answer the question.
> A. I'd rather not.
> Q. You won't answer the question have you been charged with a crime?
> A. No, I will not.
> Q. Have you ever stood trial for a crime?
> A. I would defer that question to Mr. Wernke.

Ex. 1, Amsterdam Dep. 14:10-22; *see also id.* 86:25-87:18 ("defer[ring]" questions regarding his criminal history and stating "I won't answer that question" when asked if he was "charged with a sex offense in 1983 in Florida").[4] At other times, he flatly *denied* that he was ever arrested, charged with a crime, or entered a guilty plea. *Id.* 23:14-24:05 (testifying that "I have not been arrested" and "I have not been charged with a crime"); *id.* 15:02-04 ("Q. Have you ever entered into a criminal plea deal? A. No."); *see also id.* 124:14-25 (similar).

The record confirms that Mr. Amsterdam was charged with a sex offense against a minor.

---

[4] Mr. Amsterdam's refusal to testify also renders him an inadequate class representative. *See, e.g.*, *Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (finding that "refusal to answer relevant questions" at a deposition "indicate[d] that [plaintiff] is not suitable to fulfill the fiduciary obligations of a class representative"). Mr. Amsterdam similarly refused to say when he first spoke with his counsel at Pomertanz LLP, which is troubling given Plaintiffs' sandbagging with respect to Mr. Amsterdam's addition to the case. *See* Ex. 1, Amsterdam Dep. 36:4-37:15 (Amsterdam refusing to testify when he first had contact with Pomerantz).

In his deposition, Mr. Amsterdam confirmed that his date of birth, residence, and the first three digits of his Social Security Number matched the criminal background report. *Compare id.* 86:14-87:17 *with* Ex. 3 at 1. But during that same line of questioning, Mr. Amsterdam refused to say whether he was ever subject to "an adjudication withheld court proceeding involving a criminal offense." *See* Ex. 1, Amsterdam Dep. 86:14-87:17. Given the matching personal information—and Mr. Amsterdam's evasiveness under oath—it is obvious this is his criminal history. Because he was sentenced to community supervision (Ex. 4 at 2), Mr. Amsterdam *must have* been charged, and either found guilty or pleaded guilty or nolo contendere. Thus, Mr. Amsterdam perjured himself when he testified that he had never been charged with a crime.

Mr. Amsterdam's criminal history, dishonesty, and evasiveness under oath render him inadequate. A class representative's "[p]ersonal characteristics," including his perceived "credibility and integrity," have "a direct bearing on [his] ability to adequately represent members of the class." *Davidson v. Citizens Gas & Coke Utility*, 238 F.R.D. 225, 229 (S.D. Ind. 2006). And where a plaintiff with a criminal history fails to "answer numerous, material questions," he is likely "not an adequate class representative." *Morgan v. Crush City Constr., LLC*, 2022 WL 2752614, at *9 (W.D. Wisc. July 14, 2022); *see also Porath*, 2019 WL 6134936, at *5; *Davidson*, F.R.D. at 229 (felony convictions and lies regarding criminal record demonstrated a lack of credibility precluding a finding of adequacy); *Darvin*, 610 F. Supp. at 257 (rejecting class representative because "inconsistent testimony could create serious problems with respect to plaintiff's credibility and could become the focus of cross examination and unique defenses at trial"). In addition to his troubling testimony, Mr. Amsterdam has produced only two documents in this litigation—for a total of four pages—further highlighting his inadequate discovery efforts. The Court should decline to appoint Mr. Amsterdam as class representative.

## C. Without a Noteholder Plaintiff, a Class of Noteholders Cannot Be Certified.

Because Mr. Amsterdam cannot serve as a class representative, Plaintiffs lack Article III standing to assert claims on behalf of purchasers of CBL's Notes.[5] The requirements of Article III are "no less true with respect to class actions than with respect to other suits." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). To the contrary, in a putative class action, "named plaintiffs who [purport to] represent a class must allege and show that they *personally* have been injured"; it is not sufficient to show that "injury has been suffered by other, unidentified members of the class." *Id.*[6] Before engaging in a substantive Rule 23 analysis, the Court must determine, as a "threshold matter," "whether the named Plaintiffs have standing to bring suit." *In re Nortel Networks Corp. ERISA Litig.*, 2009 WL 3294827, at *4 (M.D. Tenn. Sept. 2, 2009). "Finding that a named plaintiff lacks standing is sufficient to deny class certification." *Id.* Accordingly, Plaintiffs are required to (but cannot) demonstrate the elements of Article III standing with respect to the Notes. *See Roane Cnty., Tennessee v. Jacobs Eng'g Grp., Inc.*, 429 F. Supp. 3d 494, 496 (E.D. Tenn. 2019) ("[T]hreshold individual standing is a prerequisite for all actions, including class actions.").

A plaintiff who did not purchase or sell the securities at issue lacks standing to assert claims premised on such securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 732-35 (1975). Here, it is undisputed that none of Court-appointed Plaintiffs purchased any CBL Notes during the class period. *See supra* at 1. The Court should therefore decline to certify a Noteholder class. *See In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *3 (S.D.N.Y. Aug. 21, 2008) (finding named plaintiffs who only purchased "ordinary shares . . . lack[ed] standing to bring claims on

---

[5] Plaintiffs' inability to identify a single legitimate representative for the Noteholders raises serious doubts as to whether the putative Noteholder class even wishes to participate in this case.

[6] *Accord Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("[C]omplaining party must . . . show that he is within the class of persons who will be concretely affected."); *Mitchell v. Ky. Dep't of Corrs.*, 234 F.3d 1269 (Table), 2000 WL 1562842, at *3 (6th Cir. 2000) ("[M]ere fact that a case has been brought as a class action does not alleviate the named plaintiffs' burden of showing standing.").

behal of those class members who purchased Parmalat debt" and "modif[ying] the class to include only . . . investors who purchased . . . Parmalat ordinary shares"); *LBS Petroleum, LLC v. Demir*, 2015 WL 12469064, at *4 & n.2 (S.D. Fla. Oct. 28, 2015) (finding that plaintiff lacked standing to represent purchasers of other securities and "would be unable to satisfy Rule 23"); *In re Initial Pub. Offering Sec. Litig.*, 2008 WL 2050781, at *3 (S.D.N.Y. May 13, 2008) (striking allegations relating to purchases of aftermarket shares that no class representative purchased); *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 308 (S.D.N.Y. 2009) ("Lead Plaintiffs have a responsibility to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiff[s] who . . . have distinct interests or claims.")

Under the circumstances present here, courts routinely find that plaintiffs lack standing to press class claims arising out of securities they did not purchase. *See, e.g.*, *Hoffman*, 591 F. Supp. 2d at 530-32 (plaintiffs lacked standing "for claims relating to funds in which they ha[d] not purchased shares because they cannot claim to be personally injured by the violations relating to those funds"); *Ambac Assurance Corp. v. EMC Mortgage Corp.*, 2010 WL 11595698, at *10 (S.D.N.Y. Dec. 16, 2010) (plaintiff lacked standing because it "did not purchase (or sell) any of the debt securities at issue"); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 490 (S.D.N.Y. 2010) (similar); *N.J. Carpenters Health Fund v. Residential Cap., LLC*, 2010 WL 1257528, at *3–4 (S.D.N.Y. Mar. 31, 2010) (similar); *In re AIG Advisor Grp.*, 2007 WL 1213395, at *4–6 (E.D.N.Y. Apr. 25, 2007) (plaintiffs lacked standing for claims "relate[d] to funds other than the ones in which . . . they actually invested"); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1163 (C.D. Cal. 2010) (similar). For these reasons, the Court should decline to certify a class including purchasers of CBL's Notes.

9

## II. PLAINTIFFS ARE NEITHER TYPICAL NOR ADEQUATE CLASS REPRESENTATIVES.

Independently, Plaintiffs' Motion should be denied in its entirety because Plaintiffs cannot meet Rule 23's typicality and adequacy requirements. Under Rule 23(a)(3)-(4), Plaintiffs must demonstrate that their claims "are typical of the claims . . . of the class" and that they will "fairly and adequately protect the interests of the class." Fed. R. Civ. P 23(a)(3)-(4). Here, the elements of typicality and adequacy are not met because (i) Plaintiffs' claims are barred by CBL's bankruptcy, (ii) Plaintiffs are an assortment of unrelated individuals who have ceded control of this litigation to their lawyers, and (iii) each Plaintiff is subject to unique defenses or other individual failings that render them unable to represent absent class members.

### A. Plaintiffs' Claims Are Barred Because They Failed to Submit a Claim in CBL's Bankruptcy.

Rule 23's typicality requirement mandates, at a minimum, that a "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997). If a proposed class representative does not even *possess* the claim he seeks to assert on behalf of a class, then clearly, his claim is not "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). Likewise, it is well established that the "presence of even an arguable defense peculiar to [a] named plaintiff may destroy the required typicality" and "bring into question the adequacy of the named plaintiff's representation." *Beach v. Healthways, Inc.*, 2009 WL 3245393, at *4 (M.D. Tenn. Oct. 5, 2009). Here, Plaintiffs' claims are barred by CBL's Bankruptcy Plan and its discharge injunction because they failed to preserve them in CBL's bankruptcy by choosing not to file proofs of claim.[7] Accordingly, these

---

[7] CBL and its affiliates filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of Texas on November 1, 2020 (the "Bankruptcy Case"). CBL emerged from bankruptcy on November 1, 2021, after the court confirmed CBL's Third Amended Bankruptcy Plan (the "Plan"). *See* Ex. 5, "Confirmation Order," Dkt. 1397, Case No. 20-35266 (Bankr. S.D. Tex.).

Plaintiffs may not represent absent class members who *did* file claims in the Bankruptcy Case and are therefore not subject to this defense.[8] *See Beach,* 2009 WL 3245393, at *4 (unique defenses can "distract the named plaintiff" such that the "rest of the class will suffer").

Three elements of the Bankruptcy Case combine to preclude Plaintiffs' claims here: (i) Section 510(b) of the Bankruptcy Code, (ii) the Confirmation Order, and (iii) the Plan Injunction.

*Section 510(b).* A claim that "aris[es] from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor [or] for damages arising from the purchase or sale of such a security" must be filed in a bankruptcy case under Section 510(b) of the Bankruptcy Code. 11 U.S.C. § 510(b). The "statute sweeps broadly" and encompasses "securities fraud claims" and "breach of contract claims." *In re Tristar Esperanza Properties, LLC*, 782 F.3d 492, 495 (9th Cir. 2015); *see also Murphy v. Madden,* 532 B.R. 286, 290 (E.D. Mich. 2015) (Section 510(b) "broadly applie[s]" to "claims based on acts or omissions that occurred well after the claimant purchased his stock."). In short, Section 510(b) applies to any claim based upon the purchase or sale of a security—precisely what Plaintiffs allege in this action.

*Confirmation Order.* As detailed in the Confirmation Order, all creditors were directed to file proofs of claim, including for Section 510(b) claims. *See* Ex. 5, Confirmation Order, at F. Plaintiffs did not. And any shareholder who failed to submit a claim is now barred from recovery by operation of the Confirmation Order and the Bankruptcy Code. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 383 (1993) (citing 11 U.S.C. § 1111(a); Fed. R. Bankr. P. 3003(c)(2)).

---

[8] Putative class members who filed Section 510(b) claims received recoveries on account of those claims under the Plan (*see* Ex. 5, Confirmation Order, at Plan § 4.14), which also makes the Plaintiffs different from other putative class members.

***Plan Injunction.*** Finally, shareholders (like Plaintiffs) who failed to preserve their claims against the Debtors are barred from recovering in this lawsuit by the court-approved Plan Injunction, which states:

> **Plan Injunction**: [A]ll Persons who have held, hold, or may hold Claims against or Interests in any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, . . . , and affiliates, are ***permanently enjoined after the entry of the Confirmation Order*** from (i) commencing, conducting, or ***continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind*** . . . against or affecting, ***directly or indirectly***, a Debtor [or] a Reorganized Debtor.

Ex. 5, Confirmation Order, at Plan § 10.6[9] (emphasis added). The Plan Injunction does not merely prohibit proceedings against the Debtors—it precludes "all Persons" from "continuing . . . any suit [or] action" that "directly or indirectly" affects a Reorganized Debtor, like CBL. *Id.*

Plaintiffs' lawsuit against the Defendants affects reorganized CBL "directly or indirectly." First, reorganized CBL assumed the indemnification obligations that Debtor CBL owed the Directors and Officers of the company, including the Defendants. *See* Ex. 5, Confirmation Order, at Plan § 8.4; Ex. 6, CBL Bylaws, at § 6.7. This means CBL is required to pay the costs and fees associated with defense of this matter, which "directly or indirectly" affects reorganized CBL. *See Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 140 (2009) (finding Confirmation Order injunction barred a proceeding against an insurer); *In re marchFIRST, Inc.*, 288 B.R. 526, 532 (Bankr. N.D. Ill. 2002) (holding that shareholder suit against directors/officers could "affect the administration of the estate" due to debtors' indemnification obligations), *aff'd*, 293 B.R. 443 (N.D. Ill. 2003)). Plaintiffs have also served discovery demands on CBL that are identical to those served on

---

[9] The Plan is attached to the Confirmation Order as Exhibit A, and the relevant provision, § 10.6, appears on page 62 of the Plan. The Confirmation Order further provides, at Section HH, that the "Plan Documents are incorporated by reference, are approved in all respects, and constitute an integral part of this Confirmation Order." Ex. 5, Confirmation Order, at HH.

Defendants, causing CBL to incur additional costs and business disruptions. Accordingly, Plaintiffs' pursuit of their claims conflicts with the Plan Injunction. *See In re Manown*, 213 B.R. 411, 412 (Bankr. N.D. Ga. 1997) ("Such post-bankruptcy lawsuits on claims which arose prepetition are precisely the types of actions which bankruptcy's 'fresh start' policy are intended to prevent."); *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (Bankruptcy provides a debtor with "a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.").

In light of the foregoing, Plaintiffs are barred from asserting their claims, which arose from the purchase or sale of CBL securities. *See In re CJ Holding Co.*, 27 F.4th 1105, 1118 (5th Cir. 2022) (noting claimant has "duty . . . to file timely proofs of claim."). But absent class members who filed claims in the Bankruptcy Case are not subject to the same defenses. Accordingly, Plaintiffs' claims are atypical. *See Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) ("The premise of the typicality requirement is . . . as goes the claim of the named plaintiff, so go the claims of the class. That premise is not valid here.").

**B.      Plaintiffs Are an Incohesive Group of Individuals Who Exercise No Control Over This Litigation.**

Even if Plaintiffs' claims were not atypical for the bankruptcy-related reasons above, they fail under a traditional Rule 23 analysis as well. A court may deny certification if the named plaintiffs do not "possess a sufficient level of knowledge" to ensure that they, "rather than [their] lawyers, direct" the litigation. *Berger v. Compaq Comp. Corp.*, 257 F.3d 475, 482-84 (5th Cir. 2001). Similarly, an "aggregation of unrelated plaintiffs" are inadequate because such a group would "encourage lawyers to direct the litigation." *Beckman v. Ener1, Inc.*, 2012 WL 512651, at *3-4 (S.D.N.Y. Feb. 15, 2012). Discovery has revealed Plaintiffs to be mere figureheads who lend their names to counsel and sign off on pleadings. This case is entirely lawyer-driven, which neither

Rule 23 nor the PSLRA permits. *See Shiring*, 244 F.R.D. at 315 ("[T]he adequacy inquiry must be particularly searching" in "the securities fraud context" because "the PSLRA was intended to empower investors so that they, not their lawyers, control securities litigation.") (citation omitted).

*First*, it is clear that Plaintiffs (and Mr. Amsterdam) are "a mélange of unrelated persons," *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 813 (N.D. Ohio 1999), whose membership has changed significantly since the Complaint was filed. *See Clarke v. Baptist Mem'l Healthcare Corp.*, 264 F.R.D. 375, 381 (W.D. Tenn. 2009) (criticizing counsel for using different representatives to "present new arguments attached to different litigants' faces"), *aff'd*, 427 F. App'x 431 (6th Cir. 2011). When appointed as Co-Lead Plaintiffs, the "Hoffman Group" consisted of Charles Hoffman, Lydia Hoffman, and HoffInvestCo. *See* Dkt. 69. Ms. Hoffman has now been dismissed. *See* Dkt. 178. Plaintiffs have attempted to add Mr. Amsterdam. And HoffInvestCo turned out to be nothing more than a joint investment account Mr. Hoffman set up for his family. *See* Ex. 7, Hoffman Dep. 27:15-21 (HoffInvestCo "was never legally formed. It was just a . . . separate account."). Because HoffInvestCo is not a duly constituted legal entity, it lacks capacity to sue and should never have been presented to the Court as a Plaintiff in the first place. *See, e.g.*, *Direct Mktg. Servs., LLC v. Bluegreen Corp.*, 2005 WL 1594543, at *1, *3-4 (E.D. Tenn. July 6, 2005) (only real "legal entit[ies]" have the capacity to sue or be sued under Rule 17).[10] The "Hoffman Group" that began this litigation has been reduced to just one Plaintiff, Mr. Hoffman.

---

[10] Mr. Hoffman testified that HoffInvestCo was a "separate account . . . with Fidelity" (Ex. 7, Hoffman Dep. 28:2-10) and that it was "never registered" with "New York State" (*id.* 46:13-17). To the extent HoffInvestCo was a separate legal entity at all (which there is no evidence of), it was a "sham" partnership or alter ego of Mr. Hoffman. *See Taylor Novelty & Toy, Inc. v. City of Taylor*, 884 F.2d 1393 (Table), 1989 WL 108112, at *2-*3 (6th Cir. 1989) (noting that "sham" entity, which observed no corporate formalities and was controlled by one principal, had "no capacity to sue"). When asked how HoffInvestCo made corporate decisions, Mr. Hoffman testified, "I would make the decision." Ex. 7, Hoffman Dep. 46:18-24. Mr. Hoffman also said that he "appointed [him]self" as the "managing member" of HoffInvestCo (*id.* 42:25-43:6) and

14

*Second,* not only has the group of Plaintiffs changed, but discovery has revealed an utter lack of coordination between them. Neither of the two Plaintiff groups—i.e., the "Hoffman Group" and the "Scolnick Group"—has *ever* communicated with the other. *See* Ex. 8, Scolnick Dep. 238:3-9; Ex. 9, Shaner Dep. 119:25-120:3; Ex. 7, Hoffman Dep. 188:4-18. Mr. Hoffman testified that he does not "know who or what [Jay Scolnick] is," nor did he know "who Mark Shaner is." Ex. 7, Hoffman Dep. 187:24-188:18. Plaintiffs likewise had never communicated with Mr. Amsterdam (and Mr. Hoffman did not even recognize Mr. Amsterdam's name). *Id.* 59:17-22; Ex. 8, Scolnick Dep. 234:13-19; Ex. 9, Shaner Dep. 106:21-22.

*Third,* Plaintiffs (and Mr. Amsterdam) admitted that they defer entirely to their counsel. Mr. Hoffman testified he does *not* "provide direction" to counsel but instead "defer[s] to [his] counsel's judgment." Ex. 7, Hoffman Dep. 190:2-7. Mr. Amsterdam said he would "absolutely" "defer to [his] attorneys to prosecute the case." Ex. 1, Amsterdam Dep. 31:2-3. And only one Plaintiff, Mr. Shaner, was aware any settlement discussions had taken place. *See* Ex. 7, Hoffman Dep. 190:8-11 (testifying he did not know there had been settlement discussions); Ex. 8, Scolnick Dep. 248:8-11 (same). While class representatives need not be experts, they "are still required to be more than window dressing or puppets for class counsel." *In re AEP ERISA Litig.*, 2008 WL 4210352, at *2 (S.D. Ohio Sept. 8, 2008). Plaintiffs fail to clear that minimal bar. *See Shiring*, 244 F.R.D. at 316 (named plaintiff inadequate where he "took no steps to supervise this action").

### C.   Plaintiffs Suffer From Individual Issues Including a Lack of Actual Reliance.

Beyond the flaws associated with Plaintiffs collectively, each proposed class representative is atypical and inadequate for individual reasons—ranging from unique defenses to discovery violations. As noted, even "an arguable defense" unique to a named plaintiff may defeat adequacy

---

that any "emails sent to . . . HoffInvestCo would have been to Mr. Hoffman, not HoffInvestCo" (*id.* 220:16-221:12).

15

and typicality. *Beach,* 2009 WL 3245393, at *4. A defendant need not prove that a defense will ultimately prevail—it is "only necessary that the defense be unique, arguable and likely to usurp a significant portion of the litigant's time and energy." *Id.*

Each Plaintiff is subject to unique reliance defenses. This is relevant because Plaintiffs seek to establish the element of reliance by invoking *Basic*'s "fraud-on-the-market theory," which presumes that an investor "who buys or sells [a] stock at the market price" relies on public misstatements if the "stock traded in an efficient market." *Halliburton Co. v. Erica P. John Fund, Inc.* 573 U.S. 258, 263 (2014) (citation omitted)). But the *Basic* presumption can be rebutted, including by showing that a plaintiff purchased the stock "without relying on the integrity of the market," *Basic*, 485 U.S. at 249, or that he "would have bought . . . the stock even had he been aware that the stock's price was tainted by fraud," *Halliburton*, 573 U.S. at 269. *See also Basic*, 485 U.S. at 248 ("*Any showing* that severs the link between the alleged misrepresentation and [the plaintiff's] decision to trade at a fair market price . . . [is] sufficient to rebut the presumption of reliance.") (emphasis added). These defenses apply to rebut the *Basic* presumption here.

### 1.    Charles Hoffman Is Atypical and Inadequate.[11]

Mr. Hoffman is subject to a unique reliance defense because his testimony and trading patterns show that any alleged "fraud" was irrelevant to his decision to purchase CBL securities. Mr. Hoffman testified that he "[a]bsolutely" would invest in a company whose management "had committed fraud" if the "other facts of the company outweigh it." Ex. 7, Hoffman Dep. 102:4-22. He testified that he purchased mortgage bonds in the Trump Taj Casino, even though "some crook was running it." *Id.* 102:21-104:14. More critically here, Mr. Hoffman continued to purchase

---

[11] Because Lydia Hoffman has withdrawn from the case and HoffInvestCo is not a legal entity (*see supra* § II.B), the following section focuses solely on Charles Hoffman. Moreover, even if HoffInvestCo were considered a valid proposed class representative, any defenses against Mr. Hoffman also apply to HoffInvestCo, which was controlled entirely by Mr. Hoffman.

CBL stock *after* the alleged corrective disclosures in March 2019 (which Plaintiffs alleged "revealed" the fraud).  And he did so in significant amounts:

- In May 2019, Hoffman purchased an additional 3,870 shares of CBL common stock (*id.* 191:9-194:20).

- In June 2019, he purchased an additional 7,455 shares of CBL Series D Preferred Stock (worth $59,640) along with 10,500 shares of CBL common stock (worth nearly $11,000) and 370 shares of CBL Series E preferred stock (worth $3,096.57) (*id.* 195:9-197:14; *see also* Ex. 10, CBL_HOFFMAN_00549, at -559, -573).

- In September 2019, Mr. Hoffman made *twelve* separate purchases of CBL Series D Preferred stock and purchased an additional 1,050 shares of CBL common stock (*see* Ex. 7, Hoffman Dep. 198:3-200:10).

Numerous courts have found that a plaintiff who purchases securities "after revelation of an alleged fraud" is subject to a unique defense "that precludes him from serving as a class representative."  *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (denying certification where plaintiff made post-disclosure stock purchases) (citation omitted); *see also George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013) (same); *In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (same); *Rolex Emps. Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991) (same).  The rationale underlying these opinions is that a "named plaintiff who [makes] a post-disclosure purchase is subject to the defense that the alleged [misrepresentations] were really not a factor in the purchasing decision but rather that other investment considerations drove the decision."  *George,* 2013 WL 3357170, at *6.

Indeed, Mr. Hoffman *continued* purchasing CBL securities *after* he commenced this securities fraud suit.  In November 2019, Mr. Hoffman purchased 35,000 shares of CBL common stock valued at over $53,000.  *See* Ex. 7, Hoffman Dep. 201:5-203:25; Ex. 11, CBL_HOFFMAN_00709, at -720.  And in December 2019, he purchased 23,345 shares of Series D Preferred stock worth over $115,000.  *See* Ex. 7, Hoffman Dep. 204:16-206:13; Ex. 12, CBL_HOFFMAN_00743, at -753.  These purchases, which occurred after Mr. Hoffman was suing

Defendants for fraud, further confirm that he is an atypical class representative. *See Rocco*, 245 F.R.D. at 134, 135-36 (representative was "clearly atypical" where he made "post-class purchases" after filing a lead plaintiff motion and a complaint); *George,* 2013 WL 3357170 at *3 (plaintiff who purchased "after the original complaint" and "amended complaint" were filed was atypical); *In re Valence Tech. Sec. Litig.*, 1996 WL 119468, at *5 (N.D. Cal. Mar. 14, 1996) (similar).

While some courts have concluded that "post-disclosure purchases" do not "automatically . . . defeat a proposed class representative's typicality," *Kasper v. AAC Holdings, Inc.*, 2017 WL 3008510, at *10 (M.D. Tenn. July 14, 2017); *see also Cosby v. KPMG, LLP*, 2020 WL 3548379, at *8 (E.D. Tenn. June 29, 2020), the *Kasper* decision relied on the fact that investors may purchase at lower prices after a corrective disclosure to "average[e] down," which is a "common technique used to decrease the average cost of an investment." 2017 WL 3008510 at *10. That is not what happened here. Mr. Hoffman testified that he knew the company "had suffered a massive hit" but nonetheless thought the "stock still was viable." Ex. 7, Hoffman Dep. 200:11-25; 207:10-11.

### 2. Jay Scolnick Is Atypical and Inadequate.

Mr. Scolnick is atypical and inadequate for different, though no less compelling, reasons.

### a. Scolnick Relied on His Own Assessment of CBL's Intrinsic Value.

First, Mr. Scolnick is subject to a unique reliance defense because he did not rely on the market price of CBL securities but instead conducted his own, idiosyncratic analyses of CBL's "intrinsic value," which drove his trading decisions. A unique reliance defense may arise if a plaintiff was "relying not on the market, but on his own assessment of the value of the stock." *Rocco*, 245 F.R.D. at 135; *see also In re Vivendi Univ., S.A. Sec. Litig.*, 183 F. Supp. 3d 458, 466–67 (S.D.N.Y. 2016) (*Basic* presumption did not apply where investor "pursued an investment strategy that relied on [its] own, carefully researched evaluation of [the issuer's] assets and liquidity"); *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc*., 546 F.3d 196, 200

18

n.4 (2d Cir. 2008) (the *Basic* theory of reliance depends on the assumption that "investors rely on the market price of securities as an accurate measure of their intrinsic value"). Here, the *Basic* presumption of reliance as to Mr. Scolnick is rebutted because he performed his own, individual analyses to arrive at CBL's "intrinsic value" and based all of his trading decisions on those analyses. *See GAMCO Investors v. Vivendi*, 927 F. Supp. 2d 88, 100 (S.D.N.Y. 2013) ("The *Basic* presumption is rebutted if the plaintiff did not rely on the market price as an accurate measure of its intrinsic value."), *aff'd,* 838 F.3d 214 (2d Cir. 2016).

Mr. Scolnick performed extensive analyses of CBL every quarter to calculate its "intrinsic value." *See* Ex. 8, Scolnick Dep. 72:1-22 (testifying that he "did a quarterly analysis every quarter," even creating a spreadsheet with "up to about 14 [different] tabs"). And he was clear that "95 percent of [his trading] decision[s] w[ere] based on the intrinsic value" that he calculated for CBL. *Id.* 115:10-23; *see also id.* 71:8-72:3 ("I only rely on my final analysis," which is "really where I get all my decision-making process from."); *id.* 84:1-8 (testifying that his calculation of intrinsic value was "the primary" or "sole factor" he used "to make investment decisions about CBL"). To arrive at CBL's "intrinsic" or "net asset value"[12]—which was not something CBL reported to investors—Mr. Scolnick would "capitalize [CBL's] income" by assigning "different capitalization rates for the different grades of malls" in CBL's portfolio. *Id.* 72:13-73:12; 82:23-25. Critically, Mr. Scolnick would "adjust" the rates he assigned to the properties based on his own views. *See id.* 74:13-75:13 (testifying "I have adjusted my cap rate" based "on the market" and the "10-year [Treasury]-bill," among other things). His calculations of CBL's intrinsic value thus "differ[ed] from the conclusions reached by other analysts." *Id.* 83:11-17.

---

[12] Mr. Scolnick uses the term "intrinsic value" synonymously with "net asset value" or "NAV." *Id.* 82:18-22.

19

An example of Mr. Scolnick's "intrinsic valuation" analysis of CBL is attached as Exhibit 13 (CBL_Scolnick_00001641), showing his calculation of CBL's "Intrinsic Value Per Share" at September 30, 2017 as being $16.13—whereas the *actual* share price of CBL's common stock on that date was only $5.92. *See id.* Mr. Scolnick testified that this calculation meant CBL's share price was trading at "37 percent of what the true net asset value was," which is why "I went all in because I thought, you know, it was extremely cheap." Ex. 8, Scolnick Dep. 116:1-23.

As shown in a summary document he prepared, for the seven quarters between January 2016 and September 2017, Mr. Scolnick calculated that CBL's stock price swung between 36.7% to 53.4% of what he considered to be CBL's net asset value. *See* Ex. 14, CBL_Shaner_00000031. And Mr. Scolnick relied "[a] hundred percent" on his "calculation[s] of net asset value to determine whether to buy, sell or hold CBL stock." Ex. 8, Scolnick Dep. 84:1-8. He even eschewed the recommendations of other market analysts because, in his words, "you could see how much analysis I did . . . . "[N]o one [else] did any real in-depth analysis." *Id.* 150:1-23; *see also id.* 228:10-23 (Scolnick referring to himself as an "expert witness" about CBL's finances).[13]

In light of the foregoing, it cannot be said that Mr. Scolnick "rel[ied] on the integrity of the market" price when purchasing CBL stock. *Basic*, 485 U.S. at 249. Instead, he based his decisions "on his own assessment of the value of the stock." *Rocco*, 245 F.R.D. at 135. Even if Mr. Scolnick "relied on the price of [CBL] stock in determining that the stock was undervalued, he was also

---

[13] Mr. Scolnick's calculation of CBL's intrinsic value was not the only unique analysis he performed. He also analyzed, among other things, CBL's "annual property return efficiency," its "weighted average cap rate," its "funds from operations," its "debt obligations and maturities," its "dividend and interest coverage ratios," and he tracked the amount of short interest in CBL. *See* Ex. 8, Scolnick Dep. 84:9-85:22, 88:4-25, 91:5-92:15, 94:9-95:8, 105:17-108:18, 136:18-137:2; *see also* Ex. 15, CBL_Scolnick_00001013; Ex. 16, CBL_Scolnick_00001016, Ex. 17, CBL_Scolnick_00001013; Ex. 18, CBL_Shaner_00000020; Ex. 19, CBL_Shaner_00000027; Ex. 20, CBL_Scolnick_00000710.

relying on his own assessment of the [stock's] value . . . [which] subjects him to possibly unique defenses and renders him atypical." *Blank v. Jacobs*, 2009 WL 3233037, at *6 (E.D.N.Y. 2009). At any trial, Mr. Scolnick's unique investment decisions and lack of actual reliance would be key defenses. He cannot be adequate under these circumstances. *See Cahoo v. Fast Enters. LLC*, 508 F. Supp. 3d 138, 158 (E.D. Mich. 2020) ("[U]nique defenses will destroy typicality . . . and absent class members will suffer if their representative is preoccupied with defenses unique to it.").

### b. Scolnick's Discovery Violations and Misleading Representations.

Second, Mr. Scolnick's adequacy is also undermined by his failure to comply with discovery obligations and his misrepresentations regarding the nature of his claimed losses. *See In re Storage Tech. Corp. Sec. Litig.*, 113 F.R.D. 113, 118 (D. Colo. 1986) (noting that a "failure to comply with proper discovery is a sufficient basis for [a] court to conclude that these plaintiffs would not adequately represent the class"); *Kline v. Wolf*, 88 F.R.D. 696, 700 (S.D.N.Y. 1981) (finding proposed representatives inadequate based on discovery violations).

First, Mr. Scolnick waited until a week *after* his deposition to produce over 7,000 pages of documents—his largest production to date. Second, even with that late, supplemental production, Mr. Scolnick failed to produce documents substantiating all of the trades he claimed to have made in his PSLRA Certification (Case no. 1:19-cv-00149, Dkt. 25-3). *See, e.g.*, Ex. 8, Scolnick Dep. 211:8-25 (Scolnick confirming that transactions reflected on his PSLRA Certification were not listed in any corresponding account statement and stating he was "not sure why" and did not know which document was correct); *id.* 215:19-216:3 (same); *id.* 221:2-222:8 (same). When pressed about these discrepancies, Mr. Scolnick stated he would "have to defer" to his attorney" because

he "didn't prepare" the Certification. *Id.* 173:20-174:14.[14] Third, Mr. Scolnick misled the Court regarding his authority to pursue claims based on the transactions of a third-party corporate entity. Mr. Scolnick included in his PSLRA Certification (and his calculation of claimed losses) transactions relating to "Doreen Development Corporation" ("Doreen"). *See* Case No. 1:19-cv-00149, Dkts. 25-3 at 7, 25-4 at 4. He also filed with the Court a document in which he claimed to be the "Vice President" of "Doreen" and assigned its claims to himself. *See id.* Dkt. 25-1. At his deposition, however, Mr. Scolnick testified that Doreen is merely an investment vehicle owned by his mother, which has "no employees" and in which he has no ownership interest. Ex. 8, Scolnick Dep. 18:9-19:2, 46:6-15. This testimony calls into question his purported "assignment" of Doreen's claims to himself and further undermines his credibility. *See Weinberg v. Insituform Techs., Inc.*, 1995 WL 368002, at \*6 (W.D. Tenn. Apr. 7, 1995) ("A plaintiff refusing to act candidly and honestly during the course of a lawsuit is normally an inadequate class representative.").

### 3. Mark Shaner Is Atypical and Inadequate.

Likewise, Mr. Shaner testified that he relied on Mr. Scolnick's "intrinsic value" analyses and advice to make investment decisions relating to CBL. *See* Ex. 9, Shaner Dep. 121:1-13 (testifying that Mr. Scolnick's analyses "inform[ed his] decision-making" with respect to CBL "because we thought the stock was worth more than its stock price"); *see also id.* 65:7-25 (similar); Ex. 22, CBL_Shaner_00000017 (showing Mr. Scolnick sent Mr. Shaner his analyses and advised him that CBL had an intrinsic value of "\$16 per share").[15] For that reason, the unique reliance

---

[14] Several of the documents Mr. Scolnick produced to support his claimed trades did not come from a financial institution but were merely lists of transactions, prepared in Excel, with no underlying account records. *See id.* 183:20-186:9; Ex. 21, CBL_Scolnick_00000516.

[15] Mr. Shaner also testified that CBL's stock was consistently undervalued and that the market did not react appropriately to news concerning CBL. Ex. 9, Shaner Dep. at 136:08-17, 131:19-132:13.

defense applicable to Mr. Scolnick also applies to Mr. Shaner, and he fails typicality and adequacy.

Mr. Shaner is subject to an additional unique defense based on his "in-and-out" trading. "In-and-out" trading refers to the practice of "buying and selling into and out of the securities at issue during the class period." *See IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *19 (S.D.N.Y. Oct. 29, 2013). Courts have found that "[i]n-and-out traders subject themselves to unique inquiries regarding their trading patterns," "whether the fraud was in fact irrelevant to their purchasing . . . decisions, and whether they profited on individual trades," which can "threaten to become the focus of the litigation." *In re Puda Coal Sec. Inc. Litig.*, 2013 WL 5493007, at *18 (S.D.N.Y. Oct. 1, 2013). These issues have led courts to decline to appoint class representatives who engaged in such trading. *See, e.g.*, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40-41 (2d Cir. 2009) (finding named plaintiff who traded "in and out" to be atypical); *George,* 2013 WL 3357170, at *7 (denying certification where "the three named plaintiffs also engaged in significant 'in-and-out' trading activity"); *IBEW Loc. 90*, 2013 WL 5815472, at *19 (fact that named plaintiffs were in-and-out traders "alone defeats certification"); *In re Puda Coal*, 2013 WL 5493007, at *18 (similar).

In one of his accounts, Mr. Shaner initially held 78,000 shares of CBL stock, but then sold *all* of those shares as of April 2018—nearly a year before the alleged corrective disclosures in March 2019. *See* Ex. 23, CBL_Shaner_00000143, at -148; Ex. 9, Shaner Dep. 84:13-91:14 ("In this account, I had no CBL [stock]."). In his other account, Mr. Shaner also completely exited his CBL investment in September 2018, but later purchased an additional 3,700 shares of CBL stock, which he retained at the time of the corrective disclosures. *See* Ex. 24, CBL_Shaner_00000139; Ex. 9, Shaner Dep. 100:07-22 (confirming that he held only 3,700 shares in this account as of March 2019). This trading history confirms that Mr. Shaner was an in-and-out trader with respect

to CBL securities, which undermines typicality. *See IBEW Loc. 90*, 2013 WL 5815472, at *19. And his divestment of 78,000 shares of CBL stock as of April 2018—the vast majority of his holdings—raises additional questions about the nature of Mr. Shaner's investment decisions.

Equally important, Mr. Shaner's trading history reveals that he may have misled this Court about the magnitude of his financial losses. In connection with his request to be appointed Lead Plaintiff, Mr. Shaner submitted a "loss chart," which set out the amount he claimed to have lost "in connection with the fraud alleged" in this case. *See* Case No. 1:19-cv-00149, Dkt. 25-4 at 4-5; Dkt. 52 at 1.[16] The section of the loss chart associated with Mr. Shaner claims a total estimated loss of $515,917. *See* Case No. 1:19-cv-00149, Dkt. 25-4 at 5. But it's mathematically impossible for that to be true, since (i) Mr. Shaner owned only 3,700 shares of CBL common stock as of the March 2019 alleged corrective disclosures (*see id.* (showing only 3,700 "shares retained"); Ex. 9, Shaner Dep. 100:07-22), and (ii) Mr. Shaner's trading records show that he spent less than $11,000 to acquire those 3,700 shares of CBL stock (*see* Ex. 24, CBL_Shaner_00000139 at 1, 2-3 (showing cost basis and purchase price); Ex. 9, Shaner Dep. 110:21-112:21 (Shaner confirming he spent only "$10,000 or $11,000" on the shares)). Because Plaintiffs' Complaint "specifically alleges that the purported 'truth' became known for the first time [in March 2019]" (*see* Dkt. 80, Complaint ¶¶ 177-185), "any losses on sales prior to [March 2019] necessarily would be attributable to something other than the alleged misstatements." *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 59–60 (S.D.N.Y. 2013). Accordingly, Mr. Shaner's representations to the Court were

---

[16] Under the PSLRA, there is a presumption that the "most adequate plaintiff" for purposes of lead plaintiff appointment is the person who "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii). And indeed, Mr. Scolnick and Mr. Shaner argued before the Court that they had "incurred an aggregate loss of over *$2 million* in connection with the fraud alleged in the Consolidated Action." *See* Dkt. 52 at 1.

misleading.  *See Shiring*, 244 F.R.D. at 317 (named plaintiff violated the "requisite standards of honesty and integrity" by making false statements in certifications filed with the court).

Mr. Shaner also has a significant and disqualifying conflict with the class.  When questioned about his claimed losses, Mr. Shaner surprisingly asserted that CBL's stock price "was declining *during* the class period"—i.e., *before* the corrective disclosures—"due to th[e] alleged fraud" because "[p]eople had knowledge . . . of [the] fraudulent scheme."  Ex. 9, Shaner Dep. 101:10-102:2 (emphasis added); *see also id.* 104:18-106:7 ("Some people knew about the fraud" before the "corrective disclosure[s]" which "was a factor" in the price declines).  Mr. Shaner's belief that the "truth" was leaking out *before* the alleged corrective disclosures presents a conflict with the putative class because, in his view, class members who purchased later in the class period would be entitled to less in damages—i.e., they would not be entitled to any fraud-related diminution in the value of CBL stock that occurred at earlier points in the putative class period. *See Amchem*, 521 U.S. at 625 ("The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 539 (S.D.N.Y. 2018) (finding that Rule 23(a)(4)'s adequacy requirement was not met where theories of liability advanced by named plaintiffs created conflicts with the class).  Mr. Shaner is inadequate for this reason, too.[17]

---

[17] Days before Defendants filed this Opposition (and long after their depositions), Mr. Shaner and Mr. Scolnick filed "amended" PSLRA certification papers to correct certain "errors" and "inaccuracies.  *See* Dkts. 180, 180-1, 180-2, 180-3.  These amended certifications, which come over three years into this litigation, do nothing to alleviate their shortcoming as class representatives.  Despite being informed by Defendants' counsel that his claimed losses were false and exaggerated by nearly $500,000, Mr. Shaner surprisingly amended his PSLRA certification to claim even *more* losses—namely, $584,059.  *See* Dkt. 180-3 at 5.  His claimed losses therefore remain inaccurate.  Mr. Scolnick merely removed several trades listed in his certification and rearranged trades originally misclassified in incorrect accounts.  *See* Dkt. 180-1.

25

Case 1:19-cv-00181-JRG-CHS   Document 199   Filed 11/21/22   Page 34 of 46
PageID #: 3872

### III. PLAINTIFFS CANNOT INVOKE A PRESUMPTION OF RELIANCE FOR THE NOTES AND THEREFORE CANNOT SATISFY PREDOMINANCE.

Even if Plaintiffs could overcome their standing, typicality, and adequacy hurdles, the proposed class must be substantially narrowed because no class of Noteholders can be certified.

Fraud claims are generally not susceptible to class adjudication because individual questions of class members' reliance on the alleged misrepresentations would predominate over any common questions, in violation of Rule 23(b)(3). *See Krieger v. Gast*, 197 F.R.D. 310, 320 (W.D. Mich. 2000) ("[T]he Sixth Circuit has held that class certification is inappropriate in cases where proof of individual reliance by class members is required."). Plaintiffs seek to avoid these individualized questions by invoking two separate presumptions of reliance: (1) the fraud-on-the-market presumption of reliance recognized in *Basic* and (2) the rarely invoked presumption for omission-based claims recognized in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). However, neither presumption applies to the Noteholder claims in this case.[18] Thus, no class of Noteholders may be certified under Rule 23(b)(3). *See Halliburton*, 573 U.S. at 281 ("[W]ithout [a] presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action.").

#### A. The *Basic* Presumption Does Not Apply to the Notes.

To satisfy Rule 23(b)(3)'s predominance requirement, Plaintiffs rely primarily on the *Basic* presumption, which, as noted, applies if a plaintiff can prove that the relevant security traded in an efficient market. *Id.* at 263. This presumption "rests on the premise that certain well developed markets are efficient processors of public information." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 461 (2013). As with every other element of Rule 23, Plaintiffs bear the burden of proving market efficiency, and they must do so by a preponderance of the evidence. *See IBEW Loc. 90*, 2013 WL 5815472, at *21-22. Because Plaintiffs bear the burden on the question

---

[18] Defendants do not now contest that the market for CBL's equity securities was efficient.

of efficiency, Defendants need only "demonstrate that plaintiffs' proffered proof of market efficiency falls short of the mark" to defeat the *Basic* presumption. *Id.* at *20. Plaintiffs seek to demonstrate market efficiency with respect to the Notes through the expert report of Matthew Cain (Dkt. 166-1, the "Cain Report"). However, as Defendants' expert, Dr. Terrence Hendershott, explains (in the "Hendershott Report," attached as Ex. 25), Dr. Cain falls short. Plaintiffs have not proven that the Notes traded in an efficient market throughout the class period.

### 1. Plaintiffs Impermissibly Rely on Analyses of CBL's Common Stock in Attempting to Prove Market Efficiency for the Notes.

Dr. Cain's conclusion with respect to the efficiency of the Notes is improperly dependent on his analysis of CBL's common stock. *See, e.g.*, Cain Rpt. ¶ 112 ("[T]he market efficiency of CBL's Common Stock . . . will enhance the market efficiency of CBL's Senior Notes."). At times, Dr. Cain even allows his findings about the efficiency of CBL's common stock to stand in for the Notes. *See, e.g.*, Cain Rpt. ¶ 116 (assessing "analyst coverage" of the Notes by relying on analyst reports that focused on CBL's common stock). This is error. The market for debt securities differs in significant respects from equity markets. *See* Hendershott Rpt. § IV.B. For instance, debt securities, such as the Notes here, typically trade in decentralized, over-the-counter markets as opposed to national exchanges; they react far differently to information than equity securities; and they are less liquid than equity securities. *Id.* Dr. Cain's failure to address the distinctions between markets for debt and equity securities shows that his methodology is flawed. *See In re Global Brokerage, Inc.*, 2021 WL 1160056, at *12 (S.D.N.Y. Mar. 18, 2021) (holding that an efficient common stock market does not inherently equate to an efficient market for debt securities).

### 2. Plaintiffs Fail to Demonstrate the Market for the Notes was Efficient.

In addition to that broad deficiency, Dr. Cain's analyses of the factors courts use to assess market efficiency are fatally flawed for independent reasons. The Sixth Circuit has endorsed the

factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), for purposes of assessing market efficiency. *See Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990).[19] For debt securities like the Notes, "the *Cammer* factors are frequently applied 'in modified form . . . [in] recognition of the differences between the manner in which debt bonds and equity securities trade.'" *In re Global*, 2021 WL 1160056, at *12. Close examination of these factors here shows that Plaintiffs fail to meet their burden of proving market efficiency for the Notes.

### a. *Cammer* Factor 5: Cause-and-Effect Relationship

The fifth *Cammer* factor, which is the "most important" for testing market efficiency, asks whether a plaintiff has shown a cause-and-effect relationship between new, unexpected information and a stock's price. *Teamsters*, 546 F.3d at 207. This factor is critical—unless it is satisfied, a court should not find the market to be efficient. In fact, courts in this Circuit have held that the first four "*Cammer* factors **are not enough, alone, to establish market efficiency**." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp*., 2018 WL 3861840, at *17 (N.D. Ohio Aug. 14, 2018) (emphasis added) (collecting cases). And another court has called *Cammer* factor five the "*sine qua non* of efficiency." *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig*., 281 F.R.D. 174, 182 (S.D.N.Y. 2012).

Dr. Cain performed an event study to test whether the Notes demonstrated the requisite cause-and-effect relationship between new information and price. But as Dr. Hendershott explains, Dr. Cain's analysis is deficient and does not satisfy *Cammer* factor five. *See* Hendershott Rpt. § IV.C.1. First and foremost, Dr. Cain *did not even attempt* to test for a cause-and-effect

---

[19] These factors include: "(1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases." *Freeman*, 915 F.2d at 199 (citing *Cammer*, 711 F. Supp. at 1286–87).

28

relationship before November 3, 2017. Hendershott Rpt. ¶¶ 35, 40-41. This means Plaintiffs have only assessed *Cammer* factor five for **less than one-third of the putative class period, which spans over 4.5 years.** Because Plaintiffs lack *any* analysis of the period before November 3, 2017—i.e., the first three years and three months of the putative class period—Plaintiffs have no reliable, direct evidence showing market efficiency for that period. *Id.* An event study examining the Notes' price reactions only after November 3, 2017 "cannot reliably demonstrate market efficiency for any point before that or, indeed, throughout the full Putative Class Period." *Id*. ¶ 40. Thus, at a minimum, the Court cannot certify a Noteholder class for a period beginning before November 3, 2017. *See In re Global*, 2021 WL 1160056, at *13 (plaintiff must show efficiency "throughout the entire Notes Period, not just for the first half of it" to invoke *Basic*); *Ohio Pub. Emps.*, 2018 WL 3861840, at *17 (noting that a single-date event study does not show market efficiency).

Beyond that fatal shortcoming, Dr. Cain's analysis is flawed in numerous other respects. In assessing *Cammer* factor five, Dr. Cain asks whether the Notes reacted in response to credit rating changes. Cain Rpt. ¶ 126. However, showing a price reaction to one type of information (that was highly relevant to the Notes) does not mean the market was efficient as to all information, especially the allegedly misrepresented information here. *See* Hendershott Rpt. ¶ 42. Dr. Cain's event study also shows that days with statistically significant price reactions were often followed by continued price reactions in the following days, which is indicative of an *inefficient* market— since an efficient market would quickly and fully incorporate new information into its prices. *Id.* ¶ 43. Due to these flaws, and Dr. Cain's failure to even test periods prior to November 3, 2017, Plaintiffs have not demonstrated that *Cammer* factor five is satisfied. *See Ohio Pub. Emps.*, 2018 WL 3861840, at *16-18 (flawed expert analysis "failed to establish market efficiency").

### b. Additional *Cammer* Factors: Indirect Indicia of Market Efficiency

The remaining *Cammer* factors also weigh against a finding of market efficiency for the Notes. Unlike *Cammer* factor five, the first four *Cammer* factors do not "directly address the question of efficiency," but rather, provide only indirect evidence of efficiency. *In re Freddie Mac*, 281 F.R.D. at 182.

*Average Weekly Trading Volume.* The first *Cammer* factor looks at a security's average weekly trading volume. Dr. Cain's analysis of trading volume for the Notes is unsound. First, Dr. Cain greatly overstates the number of trades in the Notes by double-counting redundant trade reports (e.g., counting each transaction in an "agency chain transaction" where only one actual trade between counterparties took place). *See* Hendershott Rpt. ¶ 55. Second, Dr. Cain fails to acknowledge that periods of high and low trading volume were not evenly distributed throughout the class period. *Id.* ¶¶ 53-54. This has the effect of skewing average trading volume higher and weighs against a finding of efficiency. *See In re Global*, 2021 WL 1160056, at *13. In fact, when these "large spikes" in trading are controlled for (by using median trading volume rather than average), there were *hundreds* of weeks during the putative class period in which the Notes traded at less than the 2% and 1% thresholds recognized as indicative of efficiency by the *Cammer* court. *See id.* ¶¶ 50-52; *Cammer*, 711 F. Supp. at 1286 (average weekly trading volume of 2% or more establishes a strong presumption of efficiency). Third, Dr. Cain fails to address the fact that during the first year and a half of the putative class period—i.e., from July 29, 2014 to March 16, 2016— the 5.25% Notes and the 4.6% Notes had no trading activity *at all* on over half of the possible trading days. Hendershott Rpt. ¶ 54.

*Analyst Coverage.* The second *Cammer* factor examines the amount of analyst coverage focused on a particular security. Dr. Cain concedes that he relies on analyst reports covering CBL's common stock rather than the Notes. Cain Rpt. ¶ 116. In fact, in his deposition, Dr. Cain

could not identify *any* examples of analyst reports specifically covering the Notes. Ex. 26, Cain Dep. at 164:3-165:20. Plaintiffs' lack of proof that there were any analyst reports focusing on CBL's Notes means that this factor weighs against a finding of efficiency. *See In re Global*, 2021 WL 1160056, at \*14 ("[I]f there are no analysts specifically following a given debt security, *Cammer* Factor 2 provides little support for market efficiency."); *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc*., 2006 WL 2161887, at \*10 (S.D.N.Y. Aug. 1, 2006), (finding a lack of coverage where plaintiffs "presented no evidence that analysts specifically followed the [debt securities]"); *In re Am. Int'l Grp., Inc. Sec. Litig*., 265 F.R.D. 157, 177 (S.D.N.Y. 2010) (similar), *vacated in part on other grounds*, 689 F.3d 229 (2d Cir. 2012).[20]

Dr. Cain's assessment is also flawed because he overestimates the amount of analyst coverage. Dr. Cain opines that "CBL was covered by 1,959 analyst reports which were issued by 26 different firms over the Class Period." Cain Rpt. ¶ 116. In a footnote, he curiously admits that the "number of reports was reduced from 1,959 to 1,453 reports when removing duplicates." *Id.* ¶ 34 n.25. It is unclear why Dr. Cain continues to refer to the 1,959 number throughout his report. Beyond this clear error, Dr. Hendershott explains that Plaintiffs' tally of analyst reports is further misleading because Dr. Cain includes "industry reports" in his measure of analyst coverage—these are reports that do not relate specifically to CBL but instead provide broad market updates about the industry generally. Hendershott Rpt. ¶ 60. When removing these duplicate reports and industry reports, there are *only 377 unique* analyst reports—none of which focus on the Notes—which amounts to *less than 20%* of the supposed 1,959 reports cited by Dr. Cain. *Id.* ¶¶ 59-60.

---

[20] Dr. Cain contends that "[w]hile many of these reports focus on CBL's Common Stock, they also contain information that directly relates to the valuation of CBL's debt securities." Cain Rpt. ¶ 116. However, this is insufficient because courts "look at the number of analysts following a given security (as opposed to the company as a whole)." *In re Global*, 2021 WL 1160056, at \*14.

***Market Makers.*** The third *Cammer* factor examines the number of market makers and arbitrageurs who traded in a security. While Dr. Cain defines a market maker as a "firm that stands ready to buy or sell a stock at publicly quoted prices" (Cain Rpt. ¶ 37 n.30), he then considers each unique market participant ID reporting a trade to be a "market maker" (*id.* ¶ 120). Dr. Cain ignores that the vast majority of these market participants very rarely traded in the Notes—and certainly do not qualify as "market makers." *See* Hendershott Rpt. ¶ 63-66. In fact, only 10% of the market makers identified by Dr. Cain traded in more than half of the weeks during the putative class period, showing that his calculation is grossly inflated. *Id.* The lack of actual market makers weighs against a finding of efficiency. *Teamsters*, 2006 WL 2161887, at *10-11.[21]

***Additional Factors: Bid-Ask Spread and Autocorrelation.*** Although not a *Cammer* factor, some courts also consider a security's bid-ask spread, which was recognized as probative in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). Dr. Cain's analysis of bid-ask spread is flawed because it uses a 15-minute window that is inconsistent with the typical academic approach. Hendershott Rpt. ¶¶ 67-72. Auto-correlation is another factor that can be used to test market efficiency.[22] In this case, Dr. Cain did not test for the existence of auto-correlation with respect to the Notes; however, he did perform that analysis for CBL's equity securities. Hendershott Rpt. ¶¶ 73-76. Perhaps unsurprisingly, when Dr. Hendershott tested the Notes for autocorrelation, he found it was present at statistically significant levels. *See id.* ¶¶ 74-76. This is a hallmark of *inefficiency* and further confirms that Dr. Cain's analysis is methodologically flawed.

---

[21] Defendants need not address *Cammer* factor 4, which concerns a company's eligibility to file a shortened form with the SEC to issue securities (*see* Cain Rpt. ¶ 42); this factor is not very probative and cannot establish efficiency. *See In re Global*, 2021 WL 1160056, at *16 (finding factor four only weighed "slightly[] in favor of efficiency").

[22] Autocorrelation "refers to an anomaly by which stock returns over a given time period are able to predict future returns," and thus, the existence of autocorrelation "would imply market inefficiency." Cain Rpt. ¶ 69.

In sum, because Plaintiffs fail to carry their burden of proving market efficiency for the Notes, the "rationale supporting the fraud on the market presumption of reliance does not apply," and certification must be denied as to the Notes. *Freeman*, 915 F. 2d at 198.

B.      The *Affiliated Ute* Presumption Does Not Apply to Any Securities.

Plaintiffs half-heartedly argue, in one paragraph of their brief, that they are entitled to a presumption of reliance under *Affiliated Ute*. *See* Dkt. 165 at 21-22. They are wrong. The *Affiliated Ute* presumption applies only in a narrow category of cases asserting claims based on pure omissions, where the defendant "stood mute, giving plaintiffs nothing upon which to rely." *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 755 (11th Cir. 1984). As courts in this Circuit have recognized, securities plaintiffs may attempt to artificially repackage their allegations "through word games" to invoke the *Affiliated Ute* presumption "without any change in the substance." *Grae v. Corr. Corp. of Am.*, 329 F.R.D. 570, 583 (M.D. Tenn. 2019), *vacated on other grounds*, 330 F.R.D. 481 (M.D. Tenn. 2019). For that reason, courts construe the presumption narrowly. *See Cox v. Collins*, 7 F.3d 394, 395– 96 (4th Cir. 1993) ("The *Affiliated Ute* presumption of reliance is not warranted in a Rule 10b-5 case when the plaintiff alleges both nondisclosure and positive misrepresentation instead of only nondisclosure."). Here, Plaintiffs allege that nearly 100 affirmative statements over a five-year period were false. *See generally* Compl. ¶¶ 70-182. Plainly, the *Affiliated Ute* presumption does not apply.

IV.     **PLAINTIFFS HAVE NOT ESTABLISHED THAT DAMAGES CAN BE MEASURED ON A CLASSWIDE BASIS.**

Plaintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement because they have not shown that their proposed methodology for calculating classwide damages will "measure only those damages attributable to that theory," as required by *Comcast*, 569 U.S. at 35. *See also In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *1 (S.D. Tex. May 20, 2014) (under *Comcast*, a court

33

must determine "whether Plaintiffs' proposed damages methodologies (1) quantify the injury caused by Defendants' alleged wrongful conduct, and (2) can be deployed on a classwide basis"), *aff'd*, 800 F.3d 674 (5th Cir. 2015). Here, Plaintiffs' damages model is deficient for two reasons.

*First*, as explained above (*see supra*, Section II.A), putative class members who submitted Section 510(b) claims in the Bankruptcy Case have already received a recovery on account of their securities claims under CBL's Bankruptcy Plan. *See* Ex. 5, Confirmation Order, at Plan § 4.14 ("[E]ach holder of an Allowed Section 510(b) Claim shall receive on account of such holder's Allowed Section 510(b) Claim its Pro Rata share of New Common Stock."). Because such class members received recoveries on their Section 510(b) claims in the Bankruptcy Case, allowing them to recover in this case would result in an impermissible double recovery. *See Hickson Corp. v. Norfolk S. Ry. Co.*, 260 F.3d 559, 567 (6th Cir. 2001) (where a party "suffer[s] only one injury," it "cannot collect a double recovery"); *Medina v. D.C.*, 643 F.3d 323, 326 (D.C. Cir. 2011) ("The doctrine of double recovery dictates that . . . a plaintiff can recover no more than the loss actually suffered.") (citation omitted).

Critically, Dr. Cain did not tailor his damages model to consider the fact that some putative class members had already recovered on account of their Section 510(b) claims. *See generally* Cain Rpt. ¶¶ 144-50. In fact, during his deposition, Dr. Cain testified that the section of his report proposing a damages methodology is "very similar, if not identical to" reports he has submitted in other cases. Ex. 26, Cain Dep. 242:5-10. Because Dr. Cain's damages methodology does not account for the very real risk of double recovery, it fails to satisfy *Comcast* and Rule 23(b)(3). *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253–54 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification.").

*Second*, as explained by Dr. Hendershott, Plaintiffs' damages model independently violates *Comcast* because it assumes the alleged corrective disclosures—which disclosed the existence and settlement of the *Wave* Litigation—can be used to estimate the amount of "inflation" in CBL's stock price at earlier points in the class period. *See* Hendershott Rpt. ¶ 77. Dr. Cain testified that he could "quantify" damages by "measuring the price impact at the back end when the truth is revealed" and "then back cast that to the beginning of a class period." Ex. 26, Cain Dep. 213:6-15.

Dr. Cain's "back cast[ing]" approach disregards the facts of this case. It should be obvious that Defendants could not have disclosed the *Wave* Litigation (or the amount for which it settled) at earlier points in the putative class period. In fact, the putative class period starts *before* the *Wave* Litigation was even filed. Dr. Cain has not explained how alleged corrective disclosures relating solely to that lawsuit could conceivably be used to measure the inflation in CBL's stock price in periods before the lawsuit was even filed. Although Dr. Cain asserts that he could calculate varying artificial inflation by using "valuation techniques, event studies, [and] published academic research studies" (Cain Rpt. ¶ 148), *his say-so* is insufficient to satisfy *Comcast*. *See Ohio Pub. Emps.*, 2018 WL 3861840, at *19 ("When a class plaintiff … simply asserts … that there are unspecified 'tools' available to measure damages, the model amounts to no damages model at all and the class cannot be certified."). For this reason, too, class certification should be denied.[23]

## CONCLUSION

The Court should deny Plaintiffs' Motion for Class Certification in its entirety. Alternatively, the putative class must be narrowed to exclude purchasers of CBL's Notes, and the putative class period must be shortened to March 16, 2016 through March 26, 2019.

---

[23] At a minimum, the putative class period should be shortened to begin after the *Wave* Litigation was filed on March 16, 2016. Plaintiffs have failed to prove that damages for the pre-*Wave* portion of the putative class period can be calculated on a class-wide basis. *See In re BP*, 2014 WL 2112823, at *8 (narrowing class definition due to lack of viable damages model).

35

Respectfully submitted this 28th day of October, 2022.

By: */s/ Warren Pope*
B. Warren Pope* (Georgia Bar No. 583723)
Peter M. Starr*
Matthew B. Rosenthal*
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309-3521
Telephone: (404) 572-4600
Fax: (404) 572-5100
wpope@kslaw.com
pstarr@kslaw.com
mrosenthal@kslaw.com

Scott M. Shaw (TN BPR # 019171)
**EVANS HARRISON HACKETT PLLC**
835 Georgia Avenue, Suite, 800
Chattanooga, TN 37402
Telephone: (423) 693-2179
Facsimile: (423) 648-7897
Email: sshaw@ehhlaw.com

Gregory C. Cook*
L. Conrad Anderson, IV*
**BALCH & BINGHAM LLP**
1901 Sixth Avenue, N., Suite 1500
Birmingham, Alabama 35203
Telephone: (205) 226-3426
gcook@balch.com
canderson@balch.com

*admitted pro hac vice

*Counsel for Defendants*

36

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 28, 2022, a true and exact copy of the foregoing has been electronically transmitted to the Clerk of Court using the ECF System for filing, which will provide electronic notice of filing to all counsel of record.

By: */s/ Warren Pope*
    Warren Pope (Admitted Pro Hac Vice)
    Georgia Bar No. 583723