# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## CHATTANOOGA DIVISION

| | | |
|---|---|---|
| | ) | |
| IN RE CBL & ASSOCIATES PROPERTIES, | ) | Consolidated Case No. |
| INC. SECURITIES LITIGATION | ) | 1:19-CV-181-JRG-CHS |
| | ) | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

ARGUMENT...............................................................................................................1

    I.    THE CLAIMS OF CBL STOCK PURCHASERS SHOULD BE CERTIFIED TO PROCEED AS A CLASS ACTION.............................................................2

        A.    Plaintiffs Satisfy All the Requirements of Rule 23(a)...............................2

            1.    Defendants' Attacks on Movants as a Group Are Meritless ..........2

            2.    Plaintiffs Satisfy the Typicality and Adequacy Requirements of Rule 23 .................................................................................................5

                a.    Plaintiffs Not Submitting a Claim in the Bankruptcy Court Proceeding is Typical of Other Class Members........5

                b.    Plaintiff Hoffman's Post-Class Purchases Do Not Make His Claims Atypical.................................................6

                c.    Defendants' Contention That HoffInvestCo Is Atypical Based Upon Hoffman's Actions Lacks Merit ......................................................................................8

                d.    Mr. Scolnick Is Typical and Adequate ...........................10

                    i.    Mr. Scolnick's Claims Are Typical .....................10

                    ii.    Mr. Scolnick Is Adequate....................................11

                e.    Mr. Shaner is Typical and Adequate ...............................13

                f.    Mr. Amsterdam is Typical and Adequate.........................16

         B.    A PRESUMPTION OF RELIANCE SATISFYING THE PREDOMINANCE REQUIREMENT OF RULE 23(b)(3) APPLIES TO THIS ACTION.................................................................................20

            1.    The *Affiliated Ute* Presumption Applies to This Action Because Plaintiffs' Core Theory Centers on Omissions of Material Fact ...20

            2.    Defendants Do Not Dispute That the *Basic* Presumption Applies to Claims Asserted by Common and Preferred Stock Purchasers] ........................................................................................................22

    II.    THE CLAIMS OF CBL NOTE PURCHASERS SHOULD ALSO BE CERTIFIED TO PROCEED AS A CLASS ACTION ......................................22

A.  Mr. Amsterdam or, Alternatively, the Other Plaintiffs Have Standing to Represent of the Interests of the Note Purchasers ....................................23

B.  A Presumption of Reliance Properly Applies to the Note Purchaser Claims ...............................................................................................25

III.  DAMAGES CAN BE MEASURED ON A CLASSWIDE BASIS ......................34

CONCLUSION...............................................................................................................35

Case 1:19-cv-00181-JRG-CHS     Document 203     Filed 12/16/22     Page 3 of 52
PageID #: 3947

# TABLE OF AUTHORITIES

**Cases**

*Affiliated Ute Citizens of Utah v. U.S.*,
406 U.S. 128 (1972) ...........................................................................................20, 21

*Ambac Assurance Corp. v. EMC Mortgage Corp.*,
2010 WL 11595698 (S.D.N.Y. Dec. 16, 2010)...........................................................23

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ......................................................................................................2

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013) ..................................................................................................1, 5

*Aviva Partners, LLC v. Navarre Corp.*,
2005 WL 3782255 (D. Minn. Dec. 13, 2005)..............................................................14

*Badger Cap., LLC v. Chambers Bank of N. Arkansas*,
2009 WL 10672546 (W.D. Ark. July 8, 2009) ..............................................................6

*Beach v. Healthways, Inc.*,
2010 WL 1408791 (M.D. Tenn. Apr. 2, 2010)..............................................................7

*Benedict v. Altria Grp., Inc.*,
241 F.R.D. 668 (D. Kan. 2007).....................................................................................18

*Blake v. Canoo Inc.*,
2022 WL 599504 (C.D. Cal. Feb. 18, 2022).................................................................13

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989)....................................................................27, 28, 31

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004)..........................................................................................2

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015)....................................................................................31

*Cassell v. Vanderbilt Univ.*,
2018 WL 5264640 (M.D. Tenn. Oct. 23, 2018).............................................................4

*Cavalier Carpets, Inc. v. Caylor*,
746 F.2d 749 (11th Cir. 1984).......................................................................................21

*CE Design Ltd. v. King Architectural Metals, Inc.*,
637 F.3d 721 (7th Cir. 2011).........................................................................................18

Case 1:19-cv-00181-JRG-CHS   Document 203   Filed 12/16/22   Page 4 of 52
PageID #: 3948

*Cervantes v. Sugar Creek Packing Co.*,
210 F.R.D. 611 (S.D. Ohio 2002) ...................................................................................18

*Chauhan v. Intercept Pharms.*,
2021 WL 235890 (S.D.N.Y. Jan. 25, 2021) ......................................................................3

*Chupa v. Armstrong Flooring, Inc.*,
2020 WL 1032420 (C.D. Cal. Mar. 2, 2020) ...................................................................18

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Trust v. RH, Inc.*,
2018 WL 4931543 (N.D. Cal. Oct. 11 2018)...................................................................35

*Clark v. Duke Univ*,
2017 WL 1801946 (M.D.N.C. Apr. 13, 2018)...................................................................4

*Comcast v. Behrend*,
569 U.S. 27 (2013) ..........................................................................................................34

*Cook v. Allergn PLC*,
2019 WL 1510894 (S.D.N.Y. Mar. 21, 2019) .................................................................15

*Cooper v. Noble Casing, Inc.*,
2016 WL 6525740 (D. Colo. Nov. 3, 2016) ....................................................................20

*Cosby v. KPMG, LLP*,
2020 WL 3548379 (E.D. Tenn. June 29, 2020) .................................................................8

*Cosby v. KPMG, LLP*,
2021 WL 1828114 (E.D. Tenn. May 7, 2021) .........................................................*passim*

*Darvin v. Int'l Harvester Co.*,
610 F. Supp. 255 (S.D.N.Y. 1985) ..................................................................................19

*Davidson v. Citizens Gas & Coke Utility*,
238 F.R.D. 225 (S.D. Ind. 2006)......................................................................................20

*Delgado v. New Albertson's, Inc.*,
2010 WL 11507599 (C.D. Cal. Mar. 15, 2010) ..............................................................18

*Di Scala v. ProShares Ultra Bloomberg Crude Oil*,
2020 WL 7698321 (S.D.N.Y. Dec. 28, 2020) .................................................................15

*Dougherty v. Esperion Therapeutics, Inc.*,
2020 WL 3481322 (E.D. Mich. June 19, 2020)...............................................................31

*Dover v. British Airways*, PLC (UK),
321 F.R.D. 49 (E.D.N.Y. 2017) ......................................................................................12

Case 1:19-cv-00181-JRG-CHS   Document 203   Filed 12/16/22   Page 5 of 52
PageID #: 3949

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................16

*Ehrlich v. Kovack*,
    710 F. App'x 646 (6th Cir. 2017)........................................................20

*Eichenholtz v. Brennan*,
    52 F.3d 478 (3d Cir. 1995)....................................................................6

*Farach v. Rivero*,
    305 So. 3d 54 (Fla. Dist. Ct. App. 3d 2019) .....................................19

*Feder v. Elec. Data Sys. Corp.*,
    429 F.3d 125 (5th Cir. 2005)..................................................................7

*Fialkov v. Celladon Corp.*,
    2015 WL 11658717 (S.D. Cal. Dec. 9, 2015)......................................15

*FindWhat Inv'r Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011)...........................................................34

*Freeman v. Blue Ridge Paper Prod., Inc*,
    2011 WL 13098808 (E.D. Tenn. Sept. 30, 2011) ................................5

*GAMCO Investors v. Vivendi*,
    927 F. Supp. 2d 88 (S.D.N.Y. 2013) ..................................................11

*George v. China Auto. Sys., Inc.*,
    2013 WL 3357170 (S.D.N.Y. July 3, 2013) ...................................7, 14

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015)...............................................................10

*Grae v. Corr. Corp. of Am.*,
    329 F.R.D. 570 (M.D. Tenn. 2019), *vacated on other grounds*, 330 F.R.D. 481 (M.D. Tenn. 2019) ........................................................................................22

*Grissom v. Antero Res. Corp.*,
    2022 WL 3139378 (S.D. Ohio Aug. 6, 2022)......................................4

*Gunnells v. Healthplan Servs., Inc.*,
    348 F.3d 417 (4th Cir. 2003)..................................................................4

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ................................................................ 10, 22, 25, 26

*Hatamian v. Advanced Micro Devices, Inc.*,
    2016 WL 1042502 (N.D. Cal. Mar. 16, 2016).....................................35

*Hoffman v. UBS-AG*,
591 F. Supp. 2d 522 (S.D.N.Y. 2008) ...................................................................................23

*Holland v. Florida Real Estate Comm'n*,
352 So. 2d 914 (Fla. 2d DCA 1977)..................................................................................17

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ..................................................................14

*In re AEP ERISA Litig.*,
2008 WL 4210352 (S.D. Ohio Sept. 8, 2008).....................................................................4

*In re AIG Advisor Grp.*,
2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007) ...................................................................23

*In re Allergan PLC Sec. Litig.*,
2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021)....................................................................35

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008)......................................................................................16

*In re AM Int'l, Inc. Sec. Litig.*,
108 F.R.D. 190 (S.D.N.Y. 1985)......................................................................................12

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010)......................................................................................16

*In re Am. Int'l. Grp., Inc.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010) ..............................................................................25

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012) ..............................................................................25

*In re CBL & Assocs. Properties, Inc. Sec. Litig.*,
2022 WL 1405415 (E.D. Tenn. May 3, 2022) .................................................................21

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001)................................................................................................3

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
337 F.R.D. 193 (D. Minn. 2020)......................................................................................31

*In re Citigroup Auction Rate Sec. Litig.*,
700 F. Supp. 2d 294 (S.D.N.Y. 2009) ..............................................................................23

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
2017 WL 2608243 (S.D. Tex. June 15, 2017) ..................................................................26

Case 1:19-cv-00181-JRG-CHS    Document 203    Filed 12/16/22    Page 7 of 52
PageID #: 3951

In re Connetics Corp. Sec. Litig.,
257 F.R.D. 572 (N.D. Cal. 2009) ...................................................................................7

*In re Countrywide Financial Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Ca. 2009) ............................................................................30, 32

*In re Diagnostic Ventures, Inc. Sec. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008) ............................................................................12, 28

*In re Diamond Foods, Inc.*,
295 F.R.D. 240 (N.D. Cal. 2013) (collecting cases) ...............................................10, 11

*In re Dynex Capital Sec. Litig.*,
2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ...................................................................28

*In re Electrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017) ............................................................................24

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
281 F.R.D. 174 (S.D.N.Y. 2012)....................................................................................31

*In re Gaming Lottery Sec. Litig.*,
58 F. Supp. 2d 62 (S.D.N.Y. 1999) ................................................................................12

*In re Glob. Brokerage, Inc. f/k/a FXCM Inc. Sec. Litig.*,
2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021) ...............................................................11

*In re Glob. Brokerage, Inc.*,
2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021) .........................................................11, 28

*In re HealthSouth Corp. Sec. Litig.*,
257 F.R.D. 260 (N.D. Ala. 2009)............................................................................28, 30

*In re Initial Pub. Offering Sec. Litig.*,
2008 WL 2050781 (S.D.N.Y. May 13, 2008)................................................................23

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006).............................................................................................13

*In re Juniper Networks, Inc. Secs. Litig.*,
542 F. Supp. 2d 1037 (N.D. Cal. 2008)........................................................................24

*In re Kenoyer*,
489 B.R. 103 (Bankr. N.D. Cal. 2013) .............................................................................6

*In re Lehman Bros. Sec. & ERISA Litig.*,
684 F. Supp. 2d 485 (S.D.N.Y. 2010) ...........................................................................23

Case 1:19-cv-00181-JRG-CHS   Document 203   Filed 12/16/22   Page 8 of 52
PageID #: 3952

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ...............................................................16

*In re Manown*,
    213 B.R. 411 (Bankr. N.D. Ga. 1997) ...............................................................6

*In re Miller*,
    262 B.R. 499 (B.A.P. 9th Cir. 2001) ...............................................................6

*In re Monster Worldwide, Inc. Sec. Litig.*,
    251 F.R.D. 132 (S.D.N.Y. 2008).......................................................................7

*In re Nortel Networks Corp. ERISA Litig.*,
    2009 WL 3294827 (M.D. Tenn. Sept. 2, 2009) ...............................................4

*In re Parmalat Sec. Litig.*,
    2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) .................................................23

*In re Petrobras Sec. Litig.*,
    312 F.R.D. 354 (S.D.N.Y. 2016)........................................................... 7, 28, 31

*In re Puda Coal Sec. Inc. Litig.*,
    2013 WL 5493007 (S.D.N.Y. Oct. 1, 2013) ....................................................14

*In re Regions Morgan Keegan Closed-End Fund Litig. (Willis v. Morgan Keegan & Co.)*,
    2010 WL 5173851 (W.D. Tenn. Dec. 15, 2010)...............................................3

*In re Safeguard Scientifics*,
    216 F.R.D. 577 (E.D. Pa. 2003) ......................................................................7

*In re Select Comfort Corp. Sec. Litig.*,
    202 F.R.D. 598 (D. Minn. 2001)....................................................................7, 8

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2019 WL 3001084 (S.D.N.Y. July 10, 2019) ...........................................34, 35

*In re Silver Wheaton Corp. Sec. Litig.*,
    2017 WL 2039171 (C.D. Cal. May 11, 2017) ................................................13

*In re SLM Corp. Sec. Litig.*,
    2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) ..................................................13

*In re SolarCity Corp. Sec. Litig.*,
    2017 WL 363274 (N.D. Cal. Jan. 25, 2017) ..................................................13

*In re Storage Tech. Corp. Sec. Litig.*,
    113 F.R.D. 113 (D. Colo. 1986).....................................................................13

*In re Telxon Corp. Sec. Litig.*,
    67 F. Supp. 2d 803 (N.D. Ohio 1999) ..................................................................3

*In re Teva Sec. Litig.*,
    2021 WL 872156 (D. Conn. Mar. 9, 2021) ..................................................... 25, 29, 33

*In re Tivity Health, Inc.*,
    2020 WL 4218743 (6th Cir. July 23, 2020) ..........................................................7, 8

*In re Vale S.A. Sec. Litig.*,
    2022 WL 969724 (E.D.N.Y. Mar. 31, 2022) ...........................................................26

*In re Valence Technology Sec. Litig.*,
    1996 WL 119468 (N.D. Cal. Mar. 14, 1996) ...........................................................7

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    2017 WL 2062985 (S.D.N.Y. May 15, 2017) ..........................................................15

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012) ............................................................................4

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) .................................................................................34

*In re Winstar Communications Secs. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) ..................................................... 24, 25, 29, 30

*Kaspar v. AAC Holdings, Inc.*,
    2017 WL 3008510 (M.D. Tenn. July 14, 2017) .......................................................8

*Kline v. Wolf,*
    88 F.R.D. 696 (S.D.N.Y. 1981) .............................................................................13

*Koss v. Wackenhut Corp.*,
    2009 WL 928087 (S.D.N.Y. Mar. 30, 2009) ...........................................................12

*Langbecker v. Elec. Data Sys. Corp.*,
    476 F.3d 299 (5th Cir. 2007) ..................................................................................7

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) ...........................................................................18

*Laventhol, Krekstein, Horwath & Horwath v. Horwitch*,
    637 F.2d 672 (9th Cir. 1980) ...................................................................................6

*LBS Petroleum, Ltd. Liab. Co. v. Demir*,
    2015 WL 12469064 (S.D. Fla. Oct. 27, 2015) ........................................................23

Local 703, I.B. of T. Grocery & Food Emp. Welfare Fund v. Regions Fin. Corp.,
762 F.3d 1248 (11th Cir. 2014)..................................................................7

*Loritz v. Exide Techs.*,
2015 WL 6790247 (C.D. Cal. July 21, 2015)...............................................29

*Matter of Highland Cap. Mgmt., L.P.*,
48 F.4th 419 (5th Cir. 2022) .......................................................................5

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
722 F. Supp. 2d 1157 (C.D. Cal. 2010) ......................................................23

*Morgan v. Crush City Constr., LLC*,
2022 WL 2752614 (W.D. Wis. July 13, 2022) .............................................20

*N.J. Carpenters Health Fund v. Residential Cap., LLC*,
2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ..............................................23

*NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012), cert. denied 133 S. Ct. 1624 (2013)................24

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
709 F. 3d 109 (2d Cir. 2013).......................................................................25

*Newman v. Eagle Bldg. Techs.*,
209 F.R.D. 499 (S.D. Fla. 2002) ...................................................................3

*Paddock Enterprises, LLC*,
2022 WL 4396358 (Bankr. D. Del. Sept. 22, 2022)........................................6

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
327 F.R.D. 38 (S.D.N.Y. 2018)....................................................................35

*Plumbers & Pipefitters Nat'l Pension Fund v. Burns*,
967 F. Supp. 2d 1143 (N.D. Ohio 2013) ...............................................*passim*

*Porath v. Logitech, Inc.*,
2019 WL 6134936 (N.D. Cal. Nov. 18, 2019)..............................................19

*Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*,
2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ...................................................7

*Robb v. Fitbit Inc.*,
2016 WL 2654351 (N.D. Cal. May 10, 2016) ..............................................14

*Rocco v. Nam Ti Elecs., Inc.*,
245 F.R.D. 131 (S.D.N.Y. 2007)....................................................................7

x

*Rodriguez v. DraftKings Inc.*,
2021 WL 5282006 (S.D.N.Y. Nov. 12, 2021) ...............................................................15

*Rogers v. Baxter Int'l, Inc.*,
2006 WL 794734 (N.D. Ill. Mar. 22, 2006).................................................................16

*Rolex Emps. Ret. Trust v. Mentor Graphics Corp.*,
136 F.R.D. 658 (D. Or. 1991) .......................................................................................7

*Ross v. Abercrombie & Fitch Co.*,
257 F.R.D. 435 (S.D. Ohio 2009) .................................................................................8

*Scuderi v. Mammoth Energy Servs.*,
2019 WL 4397340 (W.D. Okla. Sep. 13, 2019)...........................................................17

*SEC v. Murphy*,
50 F.4th 832 (9th Cir. 2022) .........................................................................................9

*Shiring v. Tier Techs., Inc.*,
244 F.R.D. 307 (E.D. Va. 2007) ...................................................................................4

*Sklar v. Amarin Corp. PLC*,
2014 WL 3748248 (D.N.J. July 29, 2014)...................................................................14

*Smilovits v. First Solar, Inc.*,
295 F.R.D. 423 (D. Ariz. 2013) ..................................................................................32

*Smith v. Frac Tech Servs., LLC*,
2011 WL 96868 (E.D. Ark. Jan. 11, 2011)..................................................................19

*Stanich v. Travelers Indemnity Co.*,
259 F.R.D. 294 (N.D. Ohio 2009)...............................................................................17

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
552 U.S. 148 (2008) ....................................................................................................20

*Tate v. Hartsville/Trousdale Cnty.*,
2009 WL 4060480 (M.D. Tenn. Nov. 20, 2009) ...........................................................2

*Thomas v. State*,
356 So. 2d 846 (Fla. 4th D.C.A. 1978), cert. denied, 361 So. 2d 835 (Fla. 1978)............17

*U.S. v. Schlussel*,
2009 WL 536066 (S.D.N.Y. Feb. 27, 2009).................................................................19

*Utesch v. Lannett Co., Inc.*,
2021 WL 3560949 (E.D. Pa. Aug. 12, 2021)................................................................10

Case 1:19-cv-00181-JRG-CHS   Document 203   Filed 12/16/22   Page 12 of 52
PageID #: 3956

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ................................................................15

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)...........................................................................................34

*Weiner v. Tivity Health, Inc.*,
334 F.R.D. 123 (M.D. Tenn. 2020) ................................................................................7

*Wentworth v. Metrodata Servs.*,
2020 WL 13527954 (W.D.N.Y. Nov. 9, 2020)............................................................17

*White v. E-Loan, Inc.*,
2006 WL 2411420 (N.D. Cal. Aug. 18, 2006)..............................................................18

*Willis v. Big Lots, Inc.*,
242 F. Supp. 3d 634 (S.D. Ohio 2017) .........................................................................11

*Woodall v. Wayne Cnty., Michigan*,
2021 WL 5298537 (6th Cir. Nov. 15, 2021)...................................................................2

*Xianglin Shi v. SINA Corp.*,
2005 WL 1561438 (S.D.N.Y. July 1, 2005) .................................................................19

*Zelaya v. Hammer,*
2022 WL 16757087 (E.D. Tenn. Aug. 9, 2022).............................................................5

*Zwick Partners, LP v. Quorum Health Corp.*,
2019 WL 1450546 (M.D. Tenn. Mar. 29, 2019).............................................................3

**Statutes, Rules & Regulations**

17 C.F.R. § 229.303 ...........................................................................................................21

17 C.F.R. §240.10b-5(b) .....................................................................................................21

31 U.S.C. §5318(l) ................................................................................................................9

F.S. § 943.059(6)(b)............................................................................................................19

N.Y. P'ship Law §40.............................................................................................................9

**Other Authorities**

1 Newberg and Rubenstein on Class Actions § 3:56 (6th ed.).............................................3

15A N.Y. Jur. 2d Business Relationships § 1496 ................................................................9

*Newberg on Class Actions* § 3.68 (5th ed. 2015)........................................................................17

Case 1:19-cv-00181-JRG-CHS    Document 203    Filed 12/16/22    Page 14 of 52
PageID #: 3958

## INTRODUCTION

This case is ideally suited for class treatment because of a classwide presumption of reliance and common issues relating to the other elements of a claim arising under Section 10(b) of the Exchange Act, including proof of falsity, scienter and damages. Forced to concede that the market for CBL's common and preferred stock was efficient during the Class Period, Defendants are left with only absurd arguments that are inconsistent with the overwhelming body of case law.[1] Defendants primarily attack Plaintiffs' typicality and adequacy in a manner which must fail because it is inconsistent with both the record facts and the overwhelming body of caselaw addressing those issues.

Defendants' assertion that the market for CBL's Notes was not sufficiently efficient fares no better. In response to Plaintiffs' expert's opinion that the market for Notes was efficient, Defendants' expert was unwilling or unable to opine that the market for the Notes was not efficient, leaving the Court with an uncontested opinion of market efficiency and supporting the inclusion of Noteholders in the Class. Therefore, as discussed below in greater detail, this Court should certify a plaintiff class.

## ARGUMENT

Each branch of the federal government has "recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 478 (2013) (citations omitted). Allowing securities fraud claims to proceed as on a class basis supports this policy because "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Id.* (citations omitted). As Judge Posner observed, "[t]he *realistic*

---

[1] Capitalized terms undefined herein are defined in Plaintiffs' opening brief (ECF No. 165) or Defendants' opposition to Plaintiffs' motion for class certification, ECF No. 199 (the "Opp.").

alternative to a class action" is zero liability for defendants in light of the relatively small losses of class members and large costs of litigating cases for fraud under the federal securities laws. *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (emphasis in original).

## I. THE CLAIMS OF CBL STOCK PURCHASERS SHOULD BE CERTIFIED TO PROCEED AS A CLASS ACTION

### A. Plaintiffs Satisfy All the Requirements of Rule 23(a)

Defendants do not dispute that Plaintiffs have satisfied the numerosity requirement of Rule 23(a)(1) or the commonality requirement of Rule 23(a)(2). Instead, Defendants limit their arguments to the typicality and adequacy requirements which, as discussed below, lack merit.

#### 1. Defendants' Attacks on Movants as a Group Are Meritless

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "In order to show adequacy, the class representative must be part of the class and possess the same interest and suffer the same injury as the class members. The named plaintiffs must have common interests with unnamed members of the class and must be able to rigorously prosecute the interests of the class through qualified counsel." *Woodall v. Wayne Cnty., Michigan*, 2021 WL 5298537, at *4 (6th Cir. Nov. 15, 2021) (citations omitted).

Defendants do not, and cannot, dispute that Plaintiffs have vigorously prosecuted this action. The rigor of that prosecution goes far beyond defeating Defendants' effort to dismiss the claims asserted and extends to appearing in CBL's bankruptcy proceeding to prevent a proposed release of the claims asserted in this action as well as moving to intervene in attempting to unseal the record in the *Wave* Litigation. Wernke Decl. ¶2. *See, e.g.*, *Tate v. Hartsville/Trousdale Cnty.*, 2009 WL 4060480, at *3 (M.D. Tenn. Nov. 20, 2009). That these actions were taken by counsel does not diminish the Movants' adequacy because it has long been recognized that a class

2

representative's adequacy depends upon the selection of capable counsel. *See, e.g.*, *Zwick Partners, LP v. Quorum Health Corp.*, 2019 WL 1450546, at \*16 (M.D. Tenn. Mar. 29, 2019); 1 Newberg and Rubenstein on Class Actions § 3:56 (6th ed.); *see also* Fed. R. Civ. P. 23(g)(1)(A)(iv).

Instead, Defendants initially contend that Plaintiffs are not adequate class representatives because they are an unrelated group of persons who are not cohesive and are controlled by their counsel. *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 813 (N.D. Ohio 1999), upon which Defendants rely, however, only addressed whether a group of unrelated persons could serve as a **lead plaintiff** within the meaning of the PSLRA, an issue that has already been decided by this Court. *See* ECF No. 69. Moreover, *Telxon* has not been widely followed in Tennessee federal courts because the relevant provision of the PSLRA – which does not purport to govern class certification – "contains no requirement mandating that the members of a proper group be 'related' in some manner." *In re Regions Morgan Keegan Closed-End Fund Litig. (Willis v. Morgan Keegan & Co.)*, 2010 WL 5173851, at \*13 (W.D. Tenn. Dec. 15, 2010) (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 266 (3d Cir. 2001) (explaining how *Telxon* was wrongly decided).[2] Defendants misleadingly assert that the Proposed Class Representatives have never communicated with each other while, in fact, they communicate through their attorneys. *See* Ex. 1 (Shaner Tr.) at 126:15-17. In any event, no requirement exists that Hoffman and the Scolnick Groups communicate directly and on a regular basis.

---

[2] S*ee also Newman v. Eagle Bldg. Techs.*, 209 F.R.D. 499, 503 (S.D. Fla. 2002) (same); *Chauhan v. Intercept Pharms.*, 2021 WL 235890, at \*3 (S.D.N.Y. Jan. 25, 2021) (recognizing the majority of courts allow groups). *Telxon* is also distinguishable because, here, Movants are not "[a]ggregating claims simply for the purpose of creating the largest financial loss" to become lead plaintiffs. 67 F. Supp. 2d at 816. Instead, the record demonstrates that, after full briefing, two small groups of movants with lead plaintiffs agreed to work together to prosecute their claims (ECF No. 67) and they have in fact done so across three jurisdictions for several years. *See* Wernke Decl. ¶2.

Equally unavailing is Defendants' effort to manufacture an issue based upon the extent to which Plaintiffs have been deferring to their counsel in litigating this action. It is well-settled that "[i]n a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative." *Cassell v. Vanderbilt Univ.*, 2018 WL 5264640, at *5 (M.D. Tenn. Oct. 23, 2018) (citing *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417,430 (4th Cir. 2003) (cited in *Clark v. Duke Univ*, 2017 WL 1801946, at *9 (M.D.N.C. Apr. 13, 2018); and *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 106-07 (E.D.N.Y. 2012)).[3] Instead, all the Movants need show is that they each are not a "pawn of the class lawyers[.]" *Nortel Networks, supra* (citing cases). Here, each of the Movants easily satisfies that standard.[4]

Here, each of the Proposed Class Representatives reached out to their counsel about potential claims. *See* Ex. 2 (Hoffman Tr.) at 179:9-181:12; Ex. 3 (Scolnick Tr.) at 35:10-15; Ex. 1 (Shaner Tr.), at 116:10-11; Ex. 4 (Amsterdam Tr.), at 33:17-34:23. Each has reviewed all major filings in the case, Ex. 2 at 70:2-6; Ex. 3 at 30:10-32:18, 245:4-246:17; Ex. 2 at 20:21-22:7; Ex. 4 at 29:12-33-8, are in regular contact with their attorneys, Ex. 2 at 189:8-16; ECF No. 166-4 ¶¶4,

---

[3] *See also In re Nortel Networks Corp. ERISA Litig.*, 2009 WL 3294827, at *12 (M.D. Tenn. Sept. 2, 2009) ("The Supreme Court has held that a plaintiff need not demonstrate extensive knowledge about the legal or factual details of their cause of action.") (citation omitted).

[4] In *In re AEP ERISA Litig.*, upon which Defendants rely, the proposed class representative testified to "almost no involvement with his case whatsoever" and "had not spoken with his lawyers since he initially contacted them three years earlier" demonstrating "almost complete lack of involvement in the prosecution of his case" and a lack of understanding of a class representative's duties. 2008 WL 4210352, at *3-4 (S.D. Ohio Sept. 8, 2008). Similarly, in *Shiring v. Tier Techs., Inc.*, the plaintiff "took no significant steps to supervise th[e] action" resulting in his "demonstrat[ing] a lack of knowledge regarding the allegations contained in the Complaint." 244 F.R.D. 307, 316 (E.D. Va. 2007). Those were both cases "in which a representative lacked fundamental knowledge of the facts or allegations, or had no involvement in the case other than a deposition." *Grissom v. Antero Res. Corp.*, 2022 WL 3139378, at *5 (S.D. Ohio Aug. 6, 2022).

7-8; Ex. 3 at 30:10-32:18; Ex. 1 at 125:5-19; Ex. 4 at 53:11-58:5, and participate in major decisions such as settlement discussions. Ex. 2 at 189:5-25; Ex. 3 at 245:4-246:17; Ex. 1, at 125:5-19. Each also demonstrated a deep understanding of the allegations and procedural posture of the case and their responsibility to make sure this Action is vigorously prosecuted on behalf of all class members. Ex. 2 at 59:24-63:25; ECF No. 166-4 ¶6; Ex. 3 at 47:22-59:15; 63:8-64:18, 245:4-246:17; Ex. 1 at 28:9-45:4, 125:5-19; Ex. 4 at 18:9-24:14, 29:23-31:22, 53:11-58:5.

### 2. Plaintiffs Satisfy the Typicality and Adequacy Requirements of Rule 23

#### a. Plaintiffs Not Submitting a Claim in the Bankruptcy Court Proceeding is Typical of Other Class Members

The Bankruptcy Court filings reveal that only *five* 510(b) claims were submitted. *See* Exs. 5 and 6. Two of those claims were submitted by Charles and Steven Lebovitz, who are excluded from the Class by definition, and the other three claims were disallowed and expunged (*see* Exs. 7, 8 & 9). Plaintiffs tried to confirm this by serving an interrogatory addressed to this issue on November 2, 2022 (*see* Ex. 10) but Defendants failed to respond. Accordingly, because no evidence exists that *any* Class member recovered any funds through filing a Section 510(b) claim, no *unique* defense can cause any distraction *here*. *See Freeman v. Blue Ridge Paper Prod., Inc*, 2011 WL 13098808, at \*7 (E.D. Tenn. Sept. 30, 2011) (Greer, J.) ("any conflict must be more than 'hypothetical or speculative' to defeat certification").[5]

---

[5] Defendants' arguments about indemnification and violations of CBL's bankruptcy plan are unrelated to a Rule 23 analysis of the claims asserted, and thus not properly before the Court on the instant motion. *See, e.g., Zelaya v. Hammer,* 2022 WL 16757087, at \*3 (E.D. Tenn. Aug. 9, 2022) (quoting *Amgen*, 568 U.S. at 466 ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.")).

Defendants' arguments with respect to the any Bankruptcy Court release are, in any event, meritless. *See, e.g., Matter of Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 437 (5th Cir. 2022) (the very limited sources of authority for a bankruptcy court to exculpate non-debtors do not include exculpation based upon "costs [a party] might incur defending against suits alleging such

### b. Plaintiff Hoffman's Post-Class Purchases Do Not Make His Claims Atypical

Defendants contend that Hoffman's post-Class Period purchases render him atypical because those purchases subject him to a unique defense that the alleged misrepresentations were not a factor in his decision to purchase CBL stock. Opp. at 17. This does not make any sense because Hoffman testified that he did not know of the relevant omitted facts relating to the *Wave* Litigation (Ex. 2 at 61:17-63:6) and he made his purchases of CBL stock relying on the integrity of the market (*e.g.*, Complaint (ECF No. 80) ¶¶195-96, 204) with Defendants not disputing that the market for CBL's equity was efficient during the Class Period. *See* Opp. at 26 n.18 (not challenging that the market for CBL's equity securities was efficient). Accordingly, purchases after corrective disclosures do not give rise to a unique defense because such transactions have "no

negligence are likely to swamp either [it] or the consummated reorganization"); *In re Miller*, 262 B.R. 499, 504-07 (B.A.P. 9th Cir. 2001) (the Bankruptcy Code's automatic stay does not "protect a debtor from complying with discovery requests … pertaining only to the claims against the other non-debtor defendants"); *Paddock Enterprises, LLC*, 2022 WL 4396358, at *3-5 (Bankr. D. Del. Sept. 22, 2022) (refusing to quash "subpoenas [that] affect the implementation and administration of [a] recently-confirmed Plan which [wa]s in its nascent stages" because "responding to third-party discovery is a cost of doing business in the United States"). *In re Manown*, 213 B.R. 411 (Bankr. N.D. Ga. 1997), upon which Defendants rely, is not on point because it "is a decision with little factual discussion that appears to have dealt with the situation where a plaintiff was seeking relief from the automatic stay to prosecute an action against the debtor, and thus the discovery sought was aimed at building a case against the debtor and not against a non-debtor co-defendant." *In re Kenoyer*, 489 B.R. 103, 118 (Bankr. N.D. Cal. 2013); *see also Badger Cap., LLC v. Chambers Bank of N. Arkansas*, 2009 WL 10672546, at *3 (W.D. Ark. July 8, 2009) ("The only case the Court found that cited *Manown* essentially disowned it"). In addition, any agreement to indemnify a securities fraud defendant, *i.e.*, Defendants, against loss is void as against public policy. *See* Ex. 11 at 9 (SEC brief explaining that "federal courts frequently disallow claims for indemnification for securities laws violations because they run counter to the policies underlying the federal securities laws. And the Commission frequently takes the position that it is against public policy to permit indemnification for such violations." (citing *Eichenholtz v. Brennan*, 52 F.3d 478, 484 (3d Cir. 1995); *Laventhol, Krekstein, Horwath & Horwath v. Horwitch*, 637 F.2d 672, 676 (9th Cir. 1980)).).

bearing on whether or not [the class representative] relied on the integrity of the market during the class period." *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008).[6]

As a result, Defendants' contention that Hoffman is atypical because of his post-class period purchases "is against "the weight of authority," a "deviat[ion] from th[e] general rule," and "not generally accepted." *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 128 (M.D. Tenn. 2020), *leave to appeal denied sub nom. In re Tivity Health, Inc.*, 2020 WL 4218743 (6th Cir. July 23, 2020).[7] Instead, "courts routinely certify a class with representatives who purchased stock during and after a class period." *Cosby v. KPMG, LLP*, 2021 WL 1828114, at *9 (E.D. Tenn. May 7, 2021) (Varlan, J.) (quoting *Tivity Health, supra*).[8]

Indeed, Defendants acknowledge that post-Class Period purchases would not defeat typicality if they were made to average down the cost of an investment. Opp. at 18. *Cosby v. KPMG, LLP*, upon which Defendants rely, however, does not limit the ability of a class

---

[6] *See also In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 360 (S.D.N.Y. 2016) (same); *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 314 (5th Cir. 2007) ("Such trading becomes harmless where, after the company has made adverse disclosures, the stock price reverts to valuation based on an efficient market.").

[7] Quoting *Local 703, I.B. of T. Grocery & Food Emp. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1260 (11th Cir. 2014); *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 577 (N.D. Cal. 2009).

[8] *See also Beach v. Healthways, Inc.*, 2010 WL 1408791, at *4 (M.D. Tenn. Apr. 2, 2010) ("Numerous cases have held that a proposed class representative's purchases of stock after adverse disclosure do not destroy typicality" or create a unique defense); *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 607 n.12 (D. Minn. 2001) (collecting cases). By contrast, Defendants' authorities – including *Rocco v. Nam Ti Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007); *George v. China Auto. Sys., Inc.*, 2013 WL 3357170 (S.D.N.Y. July 3, 2013); *In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003); *Rolex Emps. Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991), and *In re Valence Technology Sec. Litig.*, 1996 WL 119468, *5 (N.D. Cal. Mar. 14, 1996) (*see* Opp. at 17-18) – are widely repudiated. For example, the Fifth Circuit observed that the typicality holding in *Rolex* is "not generally accepted." *Feder*, 429 F.3d at 137 & n.9 (also rejecting the holdings of other similar cases including *Safeguard*); *see also Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *5 (N.D. Ill. Feb. 26, 2020) ("post-disclosure purchases defeated typicality and adequacy [only] when combined with a trading strategy that disclaimed reliance on the market price.").

7

representative to make post-Class Period purchases to "average down" with that phrase going unused in the decision which, instead, focuses on the fact that "a party may believe a stock to be a bargain after such deflation, and may believe that it is now trading at a price with defendants' fraud removed from it." 2020 WL 3548379, at \*8 (E.D. Tenn. June 29, 2020), *report and recommendation adopted*, 2021 WL 1828114 (E.D. Tenn. May 7, 2021).[9]

Here, Hoffman's post-Class purchases are also entirely consistent with a strategy of averaging down based on his stated belief that the CBL stock which he purchased was a bargain based on his perception that CBL was still a viable company offering him an opportunity for substantial profits on those purchases. *See* Ex. 2 at 206:25-207:11.[10] Thus, the "drop in the stock" price created a situation where Hoffman "pretty much couldn't get out of it at the price he got into it" and he kept purchasing because he "felt that [he] want[ed] to hold out until it went back up." Ex. 2 at 145:20-146. *See, e.g., In re Select Comfort*, 202 F.R.D. at 607 n.12 (describing averaging down as "a common technique used to decrease the average cost of an investment").[11]

### c. Defendants' Contention That HoffInvestCo Is Atypical Based Upon Hoffman's Actions Lacks Merit

HoffInvestCo is a partnership and, as a result, a separate person as a matter of law. *See, e.g.*, Limited N.Y. Liability Company Law § 102(w) (defining "Person" to include any "general

---

[9] Quoting *Tivity Health, supra; Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 446 (S.D. Ohio 2009).

[10] For example, Hoffman purchased 7,455 shares of Series D Preferred Stock in June 2019 for an average price of $9.01 per share (ECF No. 184-10 at CBL_HOFFMAN_00559), compared to the stock's annual dividend of $1.84375 per share, representing a 20.5% yield.

[11] *Kaspar v. AAC Holdings, Inc.*, 2017 WL 3008510 (M.D. Tenn. July 14, 2017), upon which Defendants rely, indeed, refers to such post-disclosure purchases potentially being part of a strategy of averaging down the cost of purchases. However, there is no meaningful difference between purchasing stock because a person believes that stock represents a bargain and averaging down as both strategies are driven by a desire to profit on the relevant stock purchases, making Hoffman's post-Class purchases consistent with an averaging down strategy.

8

partnership"). Nonetheless, Defendants contend that "any defenses against Mr. Hoffman also apply to HoffInvestCo, which was controlled entirely by Mr. Hoffman." Opp. at 16 n.11.

To avoid this conclusion, Defendants contend that HoffInvestCo was not a properly formed partnership. Opp. at 14 & n.10. That fails because HoffInvestCo is a general partnership which filed all necessary tax returns with the IRS and gave other partners a Form K-1 reflecting their distributions. Ex. 2 at 51:6-52:3. *See, e.g., SEC v. Murphy*, 50 F.4th 832, 845 (9th Cir. 2022) (a "Schedule K-1 reporting partnership income … prove[s] the existence of a partnership"). No requirement exists under New York law to file a general partnership with the Secretary of State. *See* 15A N.Y. Jur. 2d Business Relationships § 1496.[12]

Nor is there any merit to Defendants' contention that HoffInvestCo is a sham entity because Plaintiff Hoffman made the relevant investment decisions for HoffInvestCo. Opp. at 14 n.10. There is nothing unusual about Plaintiff Hoffman doing so since he owned a majority interest in HoffInvestCo. *See* Ex. 2 at 44:11-45:11. Indeed, New York law explicitly recognizes that partners have equal rights in the conduct of a partnership and may take action not in contravention of a partnership agreement. *See, e.g.*, N.Y. P'ship Law §40(5), (8).

Similarly lacking in merit is Defendants' suggestion that HoffInvestCo cannot sue because it has since been dissolved (Opp. at 14 n.10) which is incorrect. *See* Ex. 2 at 34:8-17.

---

[12] Indeed, Fidelity – one of the largest brokerage firms in the United States – also opened a brokerage account for HoffInvestCo after receiving an executed partnership agreement from HoffInvestCo. Ex. 2 at 28:23-29:15. Fidelity does not allow sham entities to maintain accounts because doing so would violate the know your customer requirements of the PATRIOT Act. *See* 31 U.S.C. §5318(l) (requiring the identification and verification of accountholders).

### d. Mr. Scolnick Is Typical and Adequate

### i. Mr. Scolnick's Claims Are Typical

Defendants assert that Mr. Scolnick's claims are not typical of those of the class because he is subject to the unique defense for not relying on the integrity of the market price of CBL stock when making his purchases. Opp. at 18-21. However, the presumption of reliance on market integrity, *i.e.*, the *Basic* presumption, may only be rebutted by direct evidence that "an individual plaintiff ... did not rely on the integrity of the market price in trading stock," and would have paid the same price had he known of the fraud. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 273-74 (2014) ("*Halliburton II*").[13] Here, Mr. Scolnick testified unequivocally that he never would have purchased CBL stock had he known that its price was tainted by the failure to disclose the facts at issue in this litigation. Ex. 3 at 254:10-24. Mr. Scolnick is thus typical.

Defendants' assertion that Mr. Scolnick must not have relied on the integrity of the market price because he conducted his own thorough "intrinsic value" analysis of CBL based on the publicly reported financial results (Opp. at 18-21) was rejected by the Supreme Court:

> [T]here is no reason to suppose that even [defendant's] main counterexample—the value investor—is as indifferent to the integrity of market prices as [defendant] suggests. Such an investor implicitly relies on the fact that a stock's market price will eventually reflect material information.… The value investor also presumably tries to estimate how undervalued or overvalued a particular stock is, and such estimates can be skewed by a market price tainted by fraud.

*Halliburton II*, 573 U.S. at 273-74. Indeed, even before *Halliburton II,* "[c]ourts … routinely rejected the argument defendant[s] now advance[]. *In re Diamond Foods, Inc.*, 295 F.R.D. 240, 252 (N.D. Cal. 2013) (collecting cases).[14]

---

[13] *See also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 432 (7th Cir. 2015) ("*Basic* was very clear that the way to rebut the presumption is to show that the investor would have paid the same price.") (emphasis removed).

[14] *See also Utesch v. Lannett Co., Inc.*, 2021 WL 3560949, at *8 (E.D. Pa. Aug. 12, 2021) ("that some members of the class were focused on undervalued stock and others were not does not defeat

*GAMCO Investors v. Vivendi*, 927 F. Supp. 2d 88, 100 (S.D.N.Y. 2013), and *In re Vivendi Universal, S.A. Sec. Litig.*, 183 F. Supp. 3d 458, 466-67 (S.D.N.Y. 2016), upon which Defendants rely, are inapposite because those plaintiffs knew of the fraud when they purchased which made it a *more* attractive investment to the plaintiff.[15] Indeed, the *GAMCO* court itself emphasized that its holding "should not be taken to suggest that sophisticated institutional investors or value-based investors are not entitled to the [*Basic*] presumption." 927 F. Supp. 2d at 102.[16]

### ii.     Mr. Scolnick Is Adequate

Defendants assert that Mr. Scolnick is inadequate because he: (i) he produced certain newly discovered documents after his deposition, (ii) he amended his PSLRA certification after learning that it contained certain errors, and (iii) did not obtain a proper assignment of certain claims. Opp. at 21-22. Each of these arguments is meritless.

Two days before his deposition, Mr. Scolnick realized he had additional hardcopy documents concerning CBL, mostly Forms 10-K and 10-Q that may not be 100% duplicative of the hundreds of pages of electronic documents already produced. Ex. 3. at 248:12-250:13 He

---

*Basic*'s presumption of reliance which extends to 'value investors,' who 'believe[ ] that certain stocks are undervalued or overvalued and attempt[ ] to "beat the market" by buying the undervalued stocks and selling the overvalued ones.'") (citations omitted); *In re Glob. Brokerage, Inc.*, 2021 WL 1160056, at *10 (S.D.N.Y. Mar. 18, 2021), *report and recommendation adopted sub nom. In re Glob. Brokerage, Inc. f/k/a FXCM Inc. Sec. Litig.*, 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021) ("The Supreme Court has expressly rejected the argument that an investor who looks for undervalued securities has waived reliance on the integrity of the market.… Thus, the value investor is entitled to the *Basic* presumption of reliance").

[15] *See, e.g.*, *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 648 (S.D. Ohio 2017) ("None testified that they were not misled by fraud or that they would have purchased Big Lots' stock even if they had known of the fraud. Accordingly, this case is distinguishable from *GAMCO* and *In re Vivendi Universal*"); *In re Diamond Foods, Inc.,* 295 F.R.D. at 253 ("*GAMCO* is inapplicable here, where defendant has adduced no evidence that, 'but for the material misstatements, that investor would not have transacted in the securities at issue'").

[16] Moreover, Mr. Scolnick testified that a key component to his intrinsic value analysis was CBL's net income, which Plaintiffs allege was inflated by Defendants' fraudulent statements. Ex.3 at 253:21-23.

promptly sent the documents overnight to Plaintiffs' Counsel. *Id*. Defendants' counsel were immediately informed and the parties agreed that Defendants would proceed with the deposition of Mr. Scolnick as scheduled and "Defendants may continue Mr. Scolnick's deposition on a mutually agreeable date and time following Defendants' receipt of his additional documents for up to an additional 3.5 hours." Ex. 12. After receiving the documents, Defendants chose not to continue Mr. Scolnick's deposition. Courts universally agree that these minor issues are not "the type of 'glaring violations of the discovery rules,' that have led to the disqualification of class representatives in cases." *In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 76 (S.D.N.Y. 1999) (representative not inadequate because of "fail[ure] to comply with discovery requests" and "fil[ing] certifications without carefully reviewing their contents") (citation omitted).[17]

Defendants also take issue with Mr. Scolnick correcting his PSLRA certification, containing over 100 separate transactions pertaining to approximately 200,000 shares, after learning at his deposition that it contained a handful of immaterial transcription errors. ECF No. 180. "Multiple district courts have held that minor or inadvertent mistakes made in a sworn certification do not strike at the heart of Rule 23's adequacy requirement." *In re SolarCity Corp.*

---

[17] *See also In re Glob. Brokerage*, 2021 WL 1160056, at *7 (holding that "fail[ure] to produce certain documents in discovery until after their depositions … was minor and does not come close to the level required to bar a class representative"); *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 197 (S.D.N.Y. 1985) ("that a plaintiff produced most requested documents at his deposition and the rest, discovered later, within a week of that deposition, clearly does not render the plaintiff an inadequate representative"); *Koss v. Wackenhut Corp.*, 2009 WL 928087, at *8 (S.D.N.Y. Mar. 30, 2009) (providing late responses to discovery requests, "some by many months," "do not rise to the level necessary to support a finding of inadequacy"); *Dover v. British Airways*, PLC (UK), 321 F.R.D. 49, 56 (E.D.N.Y. 2017) (finding plaintiffs adequate where although their "initial document productions were lacking, Plaintiffs complied with their discovery obligations by supplementing those initial productions with fulsome responses"); *In re Diagnostic Ventures, Inc. Sec. Litig.*, 249 F.R.D. 196, 206 (E.D. Pa. 2008) ("*In re DVI*") (failure to timely produce documents did not render the plaintiff inadequate where "Defendants do not allege that the materials were withheld in bad faith or that they were significantly prejudiced by the delayed production").

*Sec. Litig.*, 2017 WL 363274, at *6 (N.D. Cal. Jan. 25, 2017) (quotation marks omitted) (collecting cases); *see also Blake v. Canoo Inc.*, 2022 WL 599504, at *5-7 (C.D. Cal. Feb. 18, 2022) (collecting cases). As a result, "[c]ourts routinely reject criticisms based on errors in certifications, particularly where there is no evidence of bad faith or intent to deceive the court or the parties." *In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *8 (S.D.N.Y. Jan. 24, 2012). *See also In re Silver Wheaton Corp. Sec. Litig.*, 2017 WL 2039171, at *10 (C.D. Cal. May 11, 2017) (inadvertent errors in PSLRA certifications, which were later corrected, "are not the types of errors that would normally preclude a finding of adequacy to represent the Class").[18]

Finally, Defendants' assertion that Mr. Scolnick misled the Court with respect to an assignment of claims is baseless. They identify no discrepancies between the assignments Mr. Scolnick filed with the Court and his testimony. "Doreen Development Corporation" ("Doreen") is an investment vehicle owned by his mother and Mr. Scolnick is the Vice President who executed the trades. He had authority to assign the claims of Doreen.[19]

### e. Mr. Shaner is Typical and Adequate

Defendants assert that Mr. Shaner should not be a class representative because (i) he sold some of his shares during the Class Period, (ii) his loss chart submitted at the lead plaintiff stage

---

[18] The decades-old cases cited by Defendants are distinguishable because the discovery violations went to the core of the case. *See In re Storage Tech. Corp. Sec. Litig.*, 113 F.R.D. 113, 118 (D. Colo. 1986) (finding plaintiffs inadequate because they "failed to appear for their depositions"); *Kline v. Wolf,* 88 F.R.D. 696, 699-700 (S.D.N.Y. 1981) (finding plaintiff inadequate because she did not purchase the shares, never relied on the relevant statements, and refused to answer whether she would have purchased the shares had she known the information).

[19] Defendants complain that Mr. Scolnick did not produce documents from a financial institution. Opp. at 22 n.14. Mr. Scolnick is only required to produce documents in his possession, which he has done. Moreover, Mr. Scolnick testified that the documents in question, which had "END OF FILE" under the spreadsheet must have been "a statement that I was able to get [from my broker] and then … type on top of it. Ex. 3 at 189:24-190:11. Mr. Scolnick has confirmed that the documents did come from his online brokerage account. Ex. 13 ¶2. Defendants could have subpoenaed Mr. Scolnick's broker but chose not to.

calculated "market losses" rather than *Dura* losses, and (iii) he speculated at his deposition that it

is possible that CBL's stock began to decline during the Class Period as the truth leaked out. Each

assertion is without merit and no basis for finding Mr. Shaner atypical or inadequate.[20] "As to

[Defendants'] position that 'in-and-out' traders may not represent a class because of atypicality,

this argument has been frequently rejected by the courts." *Aviva Partners, LLC v. Navarre Corp.*,

2005 WL 3782255, at *3 (D. Minn. Dec. 13, 2005).[21]

Mr. Shaner is not an "in-and-out" investor in the sense that courts find atypical. Unlike the

cases upon which Defendants rely, he retained Class Period purchases through the end of Class

Period and he did not engage in a pattern of purchasing shares only to immediately sell them (a

"day trader").[22] To the contrary, Mr. Shaner purchased approximately 103,000 shares of CBL

stock starting on September 9, 2016 and did not sell a single share until November 9, 2017.

Although he sold all of his shares by September 21, 2018, he purchased an additional 3,700 shares

by the end of 2018. ECF No. 180-2. Defendants do not dispute that Mr. Shaner retained these

shares through the end of the Class Period and was damaged when the truth was revealed on March

1 and March 26, 2019. Therefore, he is not subject to a unique defense of a lack of loss causation

---

[20] As discussed above, the fact that Mr. Shaner relied on Mr. Scolnick's intrinsic value analysis does not render him atypical.

[21] *See also Robb v. Fitbit Inc.*, 2016 WL 2654351, at *6 (N.D. Cal. May 10, 2016) ("other courts have certified classes and appointed in-and-out traders as class representatives in securities actions") (finding in-and-out plaintiff typical where he sought to be lead plaintiff "as part of a group whose other members' investing activities have not been challenged").

[22] *IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *19 n.33 (S.D.N.Y. Oct. 29, 2013) (plaintiffs retained no shares at the end of the class period); *In re Puda Coal Sec. Inc. Litig.*, 2013 WL 5493007, at *18 (S.D.N.Y. Oct. 1, 2013) (same); *George*, 2013 WL 3357170, at *3 (plaintiffs engaged in as many as 15 "in-and-out," some for a profit and "conceded that sometimes he would purchase shares of [the] stock on one day and sell it the next"). "[A]lthough a few courts have held that the presumption of 'most adequate plaintiff' is rebutted as to a plaintiff who could be characterized as a day trader, most other courts have found this not to be true" *Sklar v. Amarin Corp. PLC*, 2014 WL 3748248, at *9 (D.N.J. July 29, 2014).

and meets the typicality standard. *See Rodriguez v. DraftKings Inc.*, 2021 WL 5282006, at \*7 (S.D.N.Y. Nov. 12, 2021) (an "in-and-out" investor that retains shares at the end of the class period "is unlike the situation in [cases] in which removal of 'in-and-out' trading has resulted in movants' complete inability to show loss causation").[23]

Defendants' assertion that Mr. Shaner misled the Court about his financial losses is baseless. As is common practice at the lead plaintiff stage, Mr. Shaner's losses (as well as those of all competing lead plaintiffs) were calculated based on LIFO/FIFO "market losses" rather than "*Dura*" losses. *See Cook v. Allergn PLC*, 2019 WL 1510894, at \*3 (S.D.N.Y. Mar. 21, 2019) (finding it "unwise to embrace [*Dura*] methodology at the expense of ... straightforward [LIFO] calculations" at lead plaintiff appointment stage); *Di Scala*, 2020 WL 7698321, at \*3 ("where, as here, the 'complaint alleges multiple partial disclosures over the course of the Class Period,' this Court has been 'reluctant' to apply *Dura* at the lead plaintiff stage"); *Fialkov v. Celladon Corp.*, 2015 WL 11658717, at \*5 (S.D. Cal. Dec. 9, 2015) (rejecting *Dura* analysis where there were partial corrective disclosures). Defendants do not assert that Mr. Shaner's market losses were incorrectly calculated. Moreover, each of Mr. Shaner's purchases and sales were detailed so anyone could calculate his *Dura* losses if they so wished.

Finally, Defendants assert that Mr. Shaner has a conflict with the class because at his deposition he speculated that it may be possible CBL's stock price was declining prior to the corrective disclosures because certain insiders knew about the fraud. Opp. at 25. This argument

---

[23] *See also Di Scala v. ProShares Ultra Bloomberg Crude Oil*, 2020 WL 7698321, at \*4 (S.D.N.Y. Dec. 28, 2020) (despite selling a large portion of his shares prior to corrective disclosures, the plaintiff met the typicality requirement by holding shares through the end of the class period); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at \*9 (E.D. Pa. Aug. 4, 2016) (same); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at \*3 (S.D.N.Y. May 15, 2017) (same).

fails because the Supreme Court has recognized that the truth can "leak" out. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005). In addition, the issue of loss causation is a subject of future expert testimony and even if Mr. Shaner's speculation conflicted with the theory in the Complaint, "courts often find plaintiffs to be adequate representatives despite such conflicts ['with the complaint's allegations']." *Rogers v. Baxter Int'l, Inc.*, 2006 WL 794734, at *5 n.5 (N.D. Ill. Mar. 22, 2006) (collecting cases). Similarly, assuming the truth did leak out disclosures during the Class Period, class certification is appropriate because plaintiffs and class members will have purchased and sold at different levels of inflation. *See In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 169 (S.D.N.Y. 2010) (rejecting argument that purchases between corrective disclosures and at different inflation levels do not create conflicts defeating typicality); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 277 (S.D.N.Y. 2008) (same).[24]

### f. Mr. Amsterdam is Typical and Adequate

In a shameless attempt to force Mr. Amsterdam out of the case, Defendants assert that he is an inadequate class representative because, they allege, he was charged with a crime in Florida over forty years ago. Opp. at 5-7. Defendants have not produced any record from the Florida Department of Law Enforcement or any court substantiating their assertion. Indeed, in response to a request for any documents pertaining to Mr. Amsterdam the FDLE responded, "***FDLE found NO Florida criminal history***." Ex. 14 (Feuer Decl.) at ¶2 and Ex. A. Defendants' allegations of a charge (but no conviction) is based entirely on a single erroneous data entry line from the Florida

---

[24] The lone case upon which Defendants rely is inapposite as it was not a securities case and involved plaintiffs and class members with opposite trading positions such that there would be direct conflicts between them on each day. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 539 (S.D.N.Y. 2018) (denying certification in a "trader-based" manipulation case where "the named plaintiffs with opposite net trading positions will have directly conflicting incentives to establish not only the existence but also the magnitude of any manipulation that occurred on those dates").

Department of Corrections ("FDOC") from forty years ago (likely entered decades after the fact). The document does not identify Mr. Amsterdam by birth date, social security number or any other unique identifier.[25] And the information makes no sense on its face. The charge is dated September 12, 1983, and states that the charge was against a *juvenile*. However, in 1983, Mr. Amsterdam was 29 years old.

Even if Defendants had demonstrated that the vague FDOC document pertained to Mr. Amsterdam, it is undisputed that there was no conviction. The document states that the resolution was "adjudication withheld," which is not a conviction under Florida law.[26] Defendants cite no case holding that a mere charge of a crime defeats adequacy. Even assuming *arguendo* Defendants had proven that Mr. Amsterdam had been convicted, it is hornbook law that the 40-year-old conviction would not render Mr. Amsterdam inadequate to represent a class of investors in a securities action. *See Newberg on Class Actions* § 3.68 (5th ed. 2015) ("[m]ost courts have rejected the contention that a proposed representative is inadequate because of prior unrelated unsavory, unethical, or even illegal conduct").[27]

---

[25] Defendants also submit a background check they conducted through Westlaw, which appears to reference the same document from the FDOC. Westlaw itself expressly disclaims the accuracy of the information stating that it has done nothing to validate the information in the report. Ex. 15.

[26] *See Thomas v. State*, 356 So. 2d 846, 847 (Fla. 4th D.C.A. 1978), cert. denied, 361 So. 2d 835 (Fla. 1978) ("If the defendant successfully completes his probation he is not a convicted person"); *Holland v. Florida Real Estate Comm'n*, 352 So. 2d 914, 916 (Fla. 2d DCA 1977) ("a person is not deemed to have committed a crime until an adjudication of guilt has been entered").

[27] *See, e.g., Stanich v. Travelers Indemnity Co.*, 259 F.R.D. 294, 315 (N.D. Ohio 2009) ("the general rule … is that unrelated unethical or even criminal conduct is not sufficient to support a finding of inadequacy"); *Wentworth v. Metrodata Servs.*, 2020 WL 13527954, at *6 (W.D.N.Y. Nov. 9, 2020) ("many courts have concluded that minor, unrelated allegations of wrongdoing are insufficient to render a proposed class representative inadequate") (collecting cases); *Scuderi v. Mammoth Energy Servs.*, 2019 WL 4397340, at *5 (W.D. Okla. Sep. 13, 2019) ("it is well established that a criminal history alone does not defeat an individual's adequacy as a class representative").

Instead, there exists a high threshold for finding class representatives inadequate. *See, e.g., CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 728 (7th Cir. 2011) (there must "exist[] *admissible evidence* so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims." (citation omitted) (emphasis supplied)). "[I]n general, Courts *only* disqualify a proposed lead plaintiff because of his prior criminal history if his prior convictions are related to the claims they seek to prosecute on behalf of the proposed class." *Chupa v. Armstrong Flooring, Inc.*, 2020 WL 1032420, at *3 (C.D. Cal. Mar. 2, 2020) (collecting cases).[28] Here, the alleged 40-year-old charge does not speak to Mr. Amsterdam's honesty and there is no connection between the charge and the securities fraud claims asserted here. *See Cervantes v. Sugar Creek Packing Co.*, 210 F.R.D. 611, 626 (S.D. Ohio 2002) (finding inconsistencies in deposition testimony and criminal record insufficient to find representative inadequate).[29] This is particularly true because the matter would be inadmissible under Fed. R. Evid. 609. *See, e.g., U.S. v. Schlussel*, 2009 WL 536066, at *2

---

[28] *See also Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177 (S.D.N.Y. 2008) ("[O]nly when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate." (citation omitted) (internal quotation marks omitted)).

[29] *See, e.g., Delgado v. New Albertson's, Inc.*, 2010 WL 11507599, at *4 (C.D. Cal. Mar. 15, 2010) (plaintiff's unrelated "past felony criminal conviction," standing alone, is "irrelevant to [a] plaintiff's ability to represent the class vigorously and responsibly"); *Chupa*, 2020 WL 1032420, at *4 (conviction 20 years prior of armed bank robbery did not preclude the plaintiff from representing the class because it was unrelated to the securities fraud alleged in the case and it did not demonstrate "dishonesty" under Fed. R. Evid. 609(a)(2)); *White v. E-Loan, Inc.*, 2006 WL 2411420, at *3 (N.D. Cal. Aug. 18, 2006) (plaintiff convicted for four separate robberies not inadequate because they occurred 30 years prior and were not "related to his role as class representative[]"); *Scuderi*, 2019 WL 4397340, at *5 (criminal convictions from 10 years prior "are insufficient to attack his credibility to such a degree as to render him inadequate as a class representative"); *Benedict v. Altria Grp., Inc.*, 241 F.R.D. 668, 674 (D. Kan. 2007) (plaintiff with several felony convictions not inadequate because there was "no evidence [her] criminal history presents a conflict of interest with other class members or would affect her ability to prosecute the action vigorously on behalf of the class").

(S.D.N.Y. Feb. 27, 2009) (holding that "[two] prior convictions for sexual abuse are inappropriate grounds for impeachment under Rule 609(b). The convictions are over twenty years old and, even if they were more recent, have very little bearing on [the witness's] character for truthfulness"); *Smith v. Frac Tech Servs., LLC*, 2011 WL 96868, at *37 (E.D. Ark. Jan. 11, 2011) (holding that conviction for "first degree sexual assault" was inadmissible under Fed. R. Evid. 609 for purposes of "attacking the truthfulness of a witness").[30]

Defendants also incorrectly assert that Mr. Amsterdam was dishonest when he denied being charged and convicted of a crime in Florida. Pursuant to a motion made through Mr. Amsterdam's attorney in the 1980's, the State of Florida ordered Mr. Amsterdam's record to be sealed. Ex. 16 (Amsterdam Decl.), at ¶¶1-2. The clerk of the court has recently confirmed that the record is sealed and that they will send Mr. Amsterdam a copy of the order upon written request. *Id.* at ¶4; Ex. 14 (Feuer Decl.), at ¶4. As explained to Mr. Amsterdam by his attorney at the time of sealing, Ex. 16 at ¶2, under Florida statutory law, "[t]he subject of the criminal history record sealed under this section..., may lawfully deny or fail to acknowledge the arrests covered by the sealed record." F.S. § 943.059(6)(b); *see also Farach v. Rivero*, 305 So. 3d 54, 57 (Fla. Dist. Ct. App. 3d 2019)

---

[30] The case upon which Defendants rely are extreme situations and wholly inapposite. *See Porath v. Logitech, Inc.*, 2019 WL 6134936, at *5-6 (N.D. Cal. Nov. 18, 2019) (adequacy not demonstrated where the proposed class representative had "seven criminal convictions" (including for burglary, theft willful cruelty to a child and assault with a deadly weapon), "has a history of substance abuse, and of not reporting to his probation officer, and of depression" because, *inter alia*, his felony convictions would be admissible under Rule 609); *Xianglin Shi v. SINA Corp.*, 2005 WL 1561438, at *4 (S.D.N.Y. July 1, 2005) (finding plaintiff inadequate to represent the class because he was "a convicted felon who pled guilty in 1995 to providing false information to a financial institution … [C]onvictions of fraud or other forms of dishonesty undermine the qualifications of a potential class representative"); *Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (adequacy not satisfied where proposed representative repeatedly changed his testimony regarding key aspects of the case, refused to answer relevant questions, his knowledge of the pleadings was "extremely limited or nonexistent….[and] was also unsure of who he purported to represent should the suit be certified as a class action").

(a person who has had their criminal record sealed "is permitted to deny he was arrested, without penalty"). Indeed, it is improper for a witness to be questioned regarding his sealed criminal record. *Ehrlich v. Kovack*, 710 F. App'x 646, 652 (6th Cir. 2017).[31]

Finally, that Mr. Amsterdam only had two documents responsive to Defendants' subpoena is unremarkable given that the key issue for a securities plaintiff is demonstrating they purchased the security at issue during the class period. *See, e.g., Cooper v. Noble Casing, Inc.*, 2016 WL 6525740, at *3 (D. Colo. Nov. 3, 2016) (plaintiff adequate where the defendant asserted that he Cooper "has failed to produce a single document in this case in response to Defendant's discovery requests").

### B. A PRESUMPTION OF RELIANCE SATISFYING THE PREDOMINANCE REQUIREMENT OF RULE 23(b)(3) APPLIES TO THIS ACTION

Reliance is presumed, and therefore predominates as a classwide issue where either: (a) the case is based primarily upon material omissions of fact; or (b) the securities traded in an efficient market. *See, e.g.*, Opp. at 26. Here, both presumptions properly apply.

#### 1. The *Affiliated Ute* Presumption Applies to This Action Because Plaintiffs' Core Theory Centers on Omissions of Material Fact

It is well-settled that "if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008) (citing *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153-54 (1972)). Defendants contend that Plaintiffs are not

---

[31] The cases upon which Defendants rely are distinguishable because each involved an employment class action in which the class representative's lies about being convicted went to the validity and typicality of their claims. *Davidson v. Citizens Gas & Coke Utility*, 238 F.R.D. 225, 229 (S.D. Ind. 2006) (rejecting proposed class representative in an employment discrimination case where he lied on his employment application which would have barred him from employment in the first place); *Morgan v. Crush City Constr., LLC*, 2022 WL 2752614, at *9 (W.D. Wis. July 13, 2022) (rejecting proposed class representative in a Fair Labor Standards Act case where he could not answer questions "on central issues such as when he would start his workday or when he would be required to pick up materials from the shop" and admitted to working "under the influence of methamphetamine").

entitled to invoke *Affiliated Ute*'s presumption which is reserved for a case of "pure omissions." Opp. at 33 (quoting *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 755 (11th Cir. 1984)).

Defendants are in error as *Affiliated Ute* plainly applies to cases "involving **primarily** a failure to disclose[.]" 406 U.S. at 153 (emphasis added); *see also Cavalier Carpets, supra* (the *Affiliated Ute* presumption applies "in **primarily** omission cases in which a duty to disclose existed") (emphasis added). Here, Defendants have previously conceded – albeit in seeking dismissal of this case – that Plaintiffs' "core theory of fraud revolves around CBL's **failure to disclose** (or reserve for) the *Wave* litigation." ECF 93-1 at 6 (emphasis added) (citing ¶¶ 1, 5-8, 41-52, 56-64, 105-185).

Defendants, ignoring their past arguments before this Court, now seek to refashion this case as one involving misrepresentations by contending that Plaintiffs' claims are, in fact, based upon nearly 100 affirmative statements over a five-year period. *See* Opp. at 33 (citing ¶¶70-182). This argument is entirely lacking merit because, as an initial matter, it ignores Plaintiffs' allegations that Defendants failed to disclose information required by SEC rules. *See, e.g.,* ¶¶63, 109, 112, 120, 126, 134, 181.[32] An omission relating to a statement does not mean that the claim is premised on an untrue statement rather than an omission as Rule 10b-5 recognizes that an "untrue statement" represents a separate category of misrepresentation from "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. §240.10b-5(b). Such an omission exists

---

[32] *See also In re CBL & Assocs. Properties, Inc. Sec. Litig.*, 2022 WL 1405415, at *2 (E.D. Tenn. May 3, 2022) ("Plaintiffs assert that CBL had an affirmative duty, under generally accepted accounting principles … and … 17 C.F.R. § 229.303[] to disclose to investors the alleged fraudulent scheme and the *Wave* litigation, but failed to do so"); *id.* at *10 (explaining how "CBL allegedly withheld from its financial statements … that it was artificially inflating its revenue with proceeds from an unlawful scheme").

where, as here, "the truth is not simply correcting a lie but highlighting new categories of information [*i.e.*, the *Wave* litigation] that were previously unknown and filling in gaps." *Cosby*, 2021 WL 1828114, at *7 (Varlan, J.).[33]

### 2. Defendants Do Not Dispute That the *Basic* Presumption Applies to Claims Asserted by Common and Preferred Stock Purchasers]

Defendants do not challenge Dr. Cain's analysis conclusions that the trading market in CBL's common and preferred stock was efficient throughout the Class Period and thereby concede the issue. Therefore, a presumption of reliance unquestionably applies to the claims of the common and preferred stock purchasers. *See, e.g.*, *Halliburton II*, 573 U.S. at 279 ("if a plaintiff shows that the defendant's misrepresentation was public and material and that the stock traded in a generally efficient market, he is entitled to a presumption that the misrepresentation affected the stock price"). The purported individual issues of reliance created by post-Class Period purchases and in-and-out trading lack merit (*see* Points I.A.2.b and I.A.2.e, *supra*) but even assuming *arguendo* they had any merit, it is well-settled that part of the *Basic* presumption is that "if the plaintiff [] shows that he purchased the stock at the market price during the relevant period, he is entitled to a … presumption that he purchased the stock in reliance on the defendant's misrepresentation." *Halliburton II*, 573 U.S. at 279.

## II. THE CLAIMS OF CBL NOTE PURCHASERS SHOULD ALSO BE CERTIFIED TO PROCEED AS A CLASS ACTION

Defendants contend that the claims of Note purchasers should not be certified to proceed as a class action because: (a) Mr. Amsterdam has not properly appeared in this case and is otherwise not an adequate class representative; and (b) the claims fail to satisfy the predominance

---

[33] *Grae v. Corr. Corp. of Am.*, 329 F.R.D. 570, 583 (M.D. Tenn. 2019), *vacated on other grounds*, 330 F.R.D. 481 (M.D. Tenn. 2019), upon which Defendants rely, is not on point because "the [purported] omissions were direct corollaries to affirmative misstatements" rather than previously unknown facts. *Cosby, supra.*

requirement of Rule 23(b)(3) because Plaintiffs will be unable to rely on a presumption of reliance for those claims. Defendants are in error with respect to both of their arguments.

### A. Mr. Amsterdam or, Alternatively, the Other Plaintiffs Have Standing to Represent of the Interests of the Note Purchasers

It is undisputed that Mr. Amsterdam purchased CBL Notes and has standing to assert claims based on those purchases. Defendants' attacks on Mr. Amsterdam are meritless. As previously explained, Plaintiffs followed the proper procedure for proffering Mr. Amsterdam as a class representative and Defendants are unable to identify any prejudice warranting the Class being deprived of a representative. *See* ECF No. 173.

Defendants' assertion that if Mr. Amsterdam is not appointed a class representative then the Note purchaser class cannot be certified (Opp. at 8-9) ignores that they made this exact same argument in their motion to dismiss (ECF No. 93-1 at 28 n.24) which this Court denied, sustaining all claims. ECF No. 145. Instead, Defendants' argument relies almost exclusively on district court decisions from the Second Circuit from 2010 or before.[34] However, in 2013, "[t]he Second Circuit … clarified the ability of purchasers of one type of security to represent purchasers of other types

---

[34] Defendants cited the following eight cases from Second Circuit district courts: *In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *3 (S.D.N.Y. Aug. 21, 2008); *In re IPO Sec. Litig.*, 2008 WL 2050781, at *3 (S.D.N.Y. May 13, 2008); *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 308 (S.D.N.Y. 2009); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 530 (S.D.N.Y. 2008); *Ambac Assurance Corp. v. EMC Mortgage Corp.*, 2010 WL 11595698, at *10 (S.D.N.Y. Dec. 16, 2010); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 490 (S.D.N.Y. 2010); *N.J. Carpenters Health Fund v. Residential Cap., LLC*, 2010 WL 1257528, at *3-4 (S.D.N.Y. Mar. 31, 2010); *In re AIG Advisor Grp.*, 2007 WL 1213395, at *4-6 (E.D.N.Y. Apr. 25, 2007). These cases do not address the distinction between stocks and bonds in a fraud-on-the-market case and, in any event, missed the subsequent controlling and binding precedent that made these decisions bad law in cases such as here. Defendants two other cases are easily distinguishable. *See Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1164 (C.D. Cal. 2010) (finding lack of standing in an MBS case and specifically distinguishing it from a shareholder suit); *LBS Petroleum, Ltd. Liab. Co. v. Demir*, 2015 WL 12469064, at *4 (S.D. Fla. Oct. 27, 2015) (finding lack of standing to assert claims on behalf of investors in separate limited liability companies).

of securities that no named plaintiff purchased." *In re Winstar Communications Secs. Litig.*, 290 F.R.D. 437, 450 (S.D.N.Y. 2013) (citing *NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), cert. denied 133 S. Ct. 1624 (2013)). A plaintiff has standing to represent purchasers of other securities, where he plausibly alleges:

> (1) that he personally has suffered some actual ... injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants.

*Id*. at 162 (internal quotations and citations omitted).

Here, Lead Plaintiffs meet both prongs of the Second Circuit's test. As purchasers of CBL common and preferred shares during the Class Period, Lead Plaintiffs have plausibly pleaded that they suffered some actual injury as a result of the allegedly material misrepresentations in CBL's annual reports, press releases, and public statements in a way that "was broadcast at the same time to all members of the public, prospective shareholders and prospective bondholders alike." *In re Winstar Commc'ns*, 290 F.R.D. at 452 (concluding that an alleged misstatement in a Form 10-K "implicate[d] the same set of concerns for all investors in [the defendant's] securities, including stocks and bonds, because of their common concern for the company's financial health"). Thus, "[w]hether Defendant's participation in issuing th[e] alleged misstatement[s] injured purchasers of [CBL] securities is a question that implicates the same set of concerns for all investors in [CBL]'s securities, including stocks and bonds, because of their common concern for the company's financial health." *In re Winstar*, 290 F.R.D. at 452.[35] Relying on the reasoning by the

---

[35] *See also In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 461 (S.D.N.Y. 2017) (holding that a plaintiff purchasing securities akin to common stock, could bring claims on behalf of bondholders); *In re Juniper Networks, Inc. Secs. Litig.*, 542 F. Supp. 2d 1037, 1052 (N.D. Cal. 2008) (holding that the lead plaintiffs had standing to assert claims on behalf of noteholders, even though they did not allege they purchased those notes).

Second Circuit in *NECA*, a court in this Circuit similarly held that "[stockholder] plaintiffs have 'class standing' to assert the bondholders' claims." *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1164 (N.D. Ohio 2013) ("*Plumbers*").[36]

### B. A Presumption of Reliance Properly Applies to the Note Purchaser Claims

The *Affiliated Ute* presumption applies to the Note purchasers' claims because Plaintiffs' core theory of liability centers on Defendants' omission of material facts. *See* Section I.B.1, *supra*. Moreover, the Supreme Court has rejected Defendants' absolutist view of market efficiency by making clear that "market efficiency is a matter of degree" and that "*Basic*'s presumption of reliance ... does not rest on a 'binary' view of market efficiency." *Halliburton II*, 573 U.S. at 272.

The *Cammer* and *Krogman* factors are not exclusive, a plaintiff need not demonstrate each factor to show market efficiency, and the factors do not fit the bond market well. ECF No. 165 at 11-12; *see also Cosby*, 2021 WL 1828114, at *2 (*Cammer* lists factors not elements which "are intended to be an analytical tool, not a checklist"). "Because the *Cammer* factors were created in the context of the stock markets, courts adjust them for the realities of the over the counter bond market." *In re Winstar*, 290 F.R.D. at 446; *see also In re Teva Sec. Litig.*, 2021 WL 872156, at *19 (D. Conn. Mar. 9, 2021) ("courts still apply the *Cammer* factors … for debt securities but [in] … a more holistic way]." Defendants' approach ignores that debt securities "do[] not behave the

---

[36] Court also routinely allow purchasers of one security to bring claims of holders of other securities in much more attenuated circumstances. *See New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F. 3d 109, 162-64 (2d Cir. 2013) (holding that a plaintiff who had invested in only some securities could bring class claims based for securities it had not invested in so long as all of the relevant claims implicated the same set of concerns); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 778 (S.D.N.Y. 2012) (a plaintiff need not further establish tranche standing to represent a class whose members invested in traches in which the lead plaintiff did not invest); *In re Am. Int'l. Grp., Inc.*, 741 F. Supp. 2d 511, 538 (S.D.N.Y. 2010) (holding plaintiff can represent purchasers from the offerings the named plaintiff did not purchase in when the plaintiffs rely on "the alleged material misstatements and omissions located in the common elements of the ... different registration statements.").

way equity securities behave" and is akin to "throwing out oranges because they are not apples." *In re Vale S.A. Sec. Litig.*, 2022 WL 969724, at \*5 (E.D.N.Y. Mar. 31, 2022) (citations omitted).

"[M]ost, courts have held that bond markets are sufficiently efficient to support the fraud-on-the-market presumption of reliance." *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at \*5 (S.D. Tex. June 15, 2017). Here, Dr. Cain conducted a market efficiency analysis concluding that the market for the Senior Notes was efficient. Cain Report, at ¶12. In contrast, Dr. Hendershott, did "not reach a final conclusion about whether or not the market is or is not efficient." Ex. 17 (Hendershott Tr.) at 50:19-21. Plaintiffs, therefore, have carried their burden because "Defendants' own expert was unwilling or unable to state that the market for Cobalt Notes was not efficient." *In re Cobalt,* 2017 WL 2608243, at \*5.

Despite some academic disagreements with Dr. Cain's analysis, when asked whether as "a general matter … analysts, institutional investors, and other market professionals consider publicly announced material statements about CBL when trading CBL Senior Notes?" Ex. 17 at 65:13-17, Dr. Hendershott ultimately agreed, stating, "as a general matter, you would expect that the more sophisticated investors are paying attention to value-relevant information." *Id.* at 68:9-12. The Supreme Court has stated that this is sufficient to invoke the fraud-on-the-market presumption of reliance. *Halliburton II*, 573 U.S. at 272 (*Basic* is "based the presumption on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'") (citations omitted).

Dr. Hendershott's hodgepodge of criticisms of Dr. Cain's analysis also should be given little weight because Dr. Hendershott admitted that ***he has never once conducted a market efficiency analysis for any security and concluded that the market was either efficient or not***

*efficient*. He has never done the analysis in any litigation, Ex. 17, at 38:13-24, or in his academic work. *Id.* at 40:20-41:19. As a result, he is hardly qualified to criticize Dr. Cain's fulsome analysis.

Turning to the market efficiency factors, Dr. Hendershott does not dispute that several of the *Cammer* and *Krogman* factors support market efficiency for the Senior Notes.

- **S-3 Eligibility:** Dr. Hendershott does not dispute that this factor weights in favor of market efficiency. Defendants likewise concede that this factor was met but suggest this factor is not very probative. Opp. at 32 n.21. Their characterization stands in stark contrast with caselaw of this Circuit. *See Plumbers*, 967 F. Supp. 2d at 1163 ("Given the likelihood that firms filing S–3 forms are actively traded and widely followed, courts consider this factor 'extremely important in market efficiency determinations.'" (citation omitted).

- **Market Capitalization:** Neither Dr. Hendershott nor Defendants challenge that the Notes each had market capitalizations exceeding that of many bonds that Courts have found traded in an efficient market. Nor do they challenge Dr. Cain's opinion that this factor weighs in favor of efficiency.

- **Public Float:** Neither Dr. Hendershott nor Defendants challenge that the public float for CBL's notes is the same as their notional outstanding number. Nor do they challenge Dr. Cain's opinion that this weighs in favor of efficiency.

Defendants' remaining arguments regarding Dr. Cain's analysis are also without merit.

**Weekly Trading Volume:** Defendants, without citing any case, challenge Dr. Cain's treatment of the Notes' average trading volume as unsound (Opp. at 30) despite Dr. Hendershott testifying that low weekly trading volume alone cannot demonstrate inefficiency, Ex. 17, at 115:11-16. Defendants' observation that limited periods of the Class Period experienced volume below the 2% threshold is unremarkable and also runs contrary to *Cammer*, which applied the threshold to the entire class period. 711 F. Supp. at 1286 (assessing "average weekly trading volume during the class period"). Similarly, he concedes that "the median corporate bond does not trade on a majority of trading days." Hendershott Report ¶29. As a result, bonds trading on 20-21% of trading days support a finding of active trading and an efficient market. *Plumbers*, 967 F. Supp. 2d at 1161 (certifying bond class); *cf.* Hendershott Report ¶54 ("the 5.25% Senior Note and the 4.60% Senior Note did not trade at all on 51.4% and 66.3% of trading days").

Indeed, the very purpose of averages is to normalize irregular activities and the "lower trading frequency in the bond market" supports the fact that a "low absolute trading volume … may be[] sufficient to support [a finding of efficiency] for corporate bonds." *Plumbers*, 967 F. Supp. 2d at 1161 (citing *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 634 (N.D. Ala. 2009); *In re DVI*, 249 F.R.D. at 215). Defendants, instead, "refus[e] to recognize that the bond market's structural characteristics are relevant to whether that market is efficient[.]" *Plumbers*, 967 F. Supp. 2d at 1161; *see also In re: Petrobras Sec. Litig.,* 312 F.R.D. at 366 (using modified *Cammer* factors for bonds because "the *Cammer* thresholds are designed for common stock, which trades more frequently than bonds").[37] Even under Dr. Hendershott's flawed analysis, Ex. 18 (Cain Reply) at ¶¶42-47, the average weekly turnover for the Notes is above 1%, which still supports a "substantial presumption" of market efficiency. *Cammer v. Bloom*, 711 F. Supp. 1264, 1293 (D.N.J. 1989).[38]

**Analyst Coverage:** Defendants ignore that when analyst reports discuss a company's stock, "the information [contained therein also] help[s] investors evaluate the riskiness of [that company's] debt securities." *Plumbers*, 967 F. Supp. 2d at 1162 (citing *In re DVI*, 249 F.R.D. at

---

[37] For example, their reliance upon *In re Global Brokerage, Inc.*, 2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021), for the obvious proposition that periods of high and low trading factor into the average trading volume fails because, there, "isolated outlier events," including "abnormal spikes in trading activity" in 2015 affected volume averages and those outliers skewed the results of the analysis. *Id.* at *13. Here, by contrast, there is no indicia that the fluctuations in volume were caused by anything other than a well-functioning market or that they materially skew the analysis. Indeed, as Dr. Cain explains, "virtually every security will experience sizeable fluctuations in trading volume from day to day," "fluctuations in trading intensity are consistent with efficient markets," and "[t]hese spikes do not distort the measurement of trading volume; they are a key component of it." Cain Reply, at ¶43.

[38] *See also In re DVI*, 249 F.R.D. at 214-15 (finding that trading volume favored efficiency where the senior notes had an average weekly trading volume of 1.25%, even where "trading volume would not likely support a finding of an efficient market for equities," it may be "sufficient to support such a finding for corporate bonds"); *In re Dynex Capital Sec. Litig.*, 2011 WL 781215, at *4 (S.D.N.Y. Mar. 7, 2011) ("a turnover rate below the 1% threshold established in *Cammer* for the stock market does not, without more, defeat a finding of an efficient bond market").

215); *see also In re Winstar,* 290 F.R.D. at 446. "[N]umerous courts recognize that substantial analyst coverage of a company's equity (and of the company more generally) is also somewhat probative of whether the market for that company's debt securities was efficient." *In re Teva*, 2021 WL 872156, at *19. Indeed, the contention that no analysts specifically followed the Notes (Opp. at 31 & n.20) ignores the multiple credit ratings agencies that did so. *See Plumbers*, 967 F. Supp. 2d at 1162 (finding it important that "two credit ratings agencies monitored the Dana bonds throughout the class period, while a third agency monitored all but one of the bonds" in determining those bonds traded on an efficient market); *Loritz v. Exide Techs.*, 2015 WL 6790247, at *16 (C.D. Cal. July 21, 2015) (the lack of analyst debt coverage "is mitigated by Exide's coverage by two ratings agencies and by Exide Stock's analyst coverage," which "favors efficiency"); Cain Exhibits 6D, 6E, 6F (demonstrating that Fitch, Moody's and S&P monitored each of the Notes). Dr. Cain explains that the equity analyst reports contained significant amount of information that would be relevant to Note investors. Cain Reply, at ¶¶29-31. Indeed, even if *only* 377 unique analyst reports were issued during the Class Period as Defendants contend, that is one unique report every four and a half days of the Class Period, which is more than sufficient to find an efficient market for CBL's equities, as Defendants concede.

**Market Makers:** Defendants, like those in *Plumbers*, attempt to question the number of market makers and suggest Plaintiffs are conflating market makers and market participants. *See Plumbers*, 967 F. Supp. 2d at 1162. However, "the FINRA data on which [Dr. Cain] relied defines the 'market maker side' of each transaction as the participant that executed the trade and has the reporting responsibilities. Thus, [Dr. Cain] properly tallied the number of market makers" and Defendants' argument that this factor weighs in their favor should be rejected. *Id.*

Dr. Hendershott artificially reduces the number of market makers by arbitrarily placing limits on the number and frequency of trades that an entity must engage in to be a market maker. Cain Reply, at ¶34. This analysis contradicts the definition of a "market maker" identified in his report, which is "a dealer who both sells to and also buys from customers or other dealers." Hendershott Rpt. n.89. He also ignores "the presence of over 100 institutional different institutional investors in each of the Senior Notes during the Class Period." Cain Reply, at ¶33.[39] In any event, Dr. Hendershott does not opine in his report that his analysis supports a finding of inefficiency. This may be because even under his arbitrary analysis there were 7 market makers for the 5.25% Notes and 22 market makers for the 5.95% notes. "Courts have held that there need only be 'some market makers' that existed to satisfy this factor." *In re Winstar*, 290 F.R.D. at, 447 (finding six market makers sufficient).

**Bid-Ask Spread:** Defendants criticize Dr. Cain's analysis of the Notes' bid-ask spread because it uses a 15-minute window that their expert posits is inconsistent with the typical academic approach (without stating why that period is inappropriate). Hendershott Rpt. ¶¶ 67-72. Corporate bond markets, however, are "a different animal" than stock markets and "lack widely reported bid-ask spreads." *HealthSouth*, 261 F.R.D. at 637. Dr. Cain's approach to calculating such spreads is consistent with *In re CenturyLink Sales Pracs. & Sec. Litig.*, recently certifying a class including noteholders after the plaintiffs' expert conducted an identical analysis using the same "+/-15-minute window" (*see* Ex. 19 at ¶140). In addition, the plaintiffs' expert calculated a bid-ask spread based on an identical 15-minute window methodology as 2.48% (337 F.R.D. 193 (D.

---

[39] *See also In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009) ("the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs") (citations omitted).

Minn. 2020)) which, as an apples-to-apples comparison, is significantly higher than the bid-ask spreads Dr. Cain calculated. Cain Report ¶137.

**Cause and Effect Relationship of Unexpected Material News and Price:** Defendants' laser-focus on *Cammer* Factor 5 (Opp. at 28-29) fails because as Judge Varlan recently reiterated "[n]umerous Courts within the Sixth Circuit have held that market efficiency can be established without regard to the fifth *Cammer* factor." *Cosby*, 2021 WL 1828114, at *2.[40] Indeed, "[a] plaintiff's shortfall on the fifth *Cammer* factor alone [even assuming such a shortfall happened here] does not outweigh, as here, showings on many other relevant factors." *Cosby*, 2021 WL 1828114, at *3 & n.3 (further explaining that *Freddie Mac* is an outlier that has been since questioned); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 82-83 (S.D.N.Y. 2015) (similar).

Critically, unlike the cases Defendants rely upon, Dr. Cain ***has*** demonstrated a cause-and-effect relationship through analyzing numerous "News Days." *See also In re Petrobras*, 312 F.R.D. at 371 ("where the indirect *Cammer* factors lay a strong foundation for a finding of efficiency, a statistically significant showing that statistically significant price returns are more likely to occur on event dates is sufficient as direct evidence of market efficiency and thereby to invoke Basic's presumption of reliance at the class certification stage").

Defendants' factual contentions are also overstated. Contrary to Defendants' assertion, Dr. Cain's analysis did evaluate the period prior to November 9, 2017. Cain Reply, at ¶¶11-12, 21. Defendants do not criticize Dr. Cain's use of rating downgrades and earnings announcements as objective criteria for "News Days" and Dr. Hendershott did not identify any news days prior to

---

[40] Citing *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 210 (S.D.N.Y. 2012); *Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 3481322, at *7 (E.D. Mich. June 19, 2020); *Cammer*, 711 F. Supp. at 1287.

November 9, 2017 that Dr. Cain should have included. Ex. 17 at 91:8-23. Moreover, it is unsurprising that there were no additional news days earlier in the Class Period. *See In re Countrywide*, 273 F.R.D. at 615 (explaining that debt prices are unlikely to be affected by negative news "[u]ntil the financial situation becomes severe enough that the issuer is likely to default," and are unlikely to be affected much by positive news because, although "equity takes [] additional profit, [] debt's upside is limited by the debt's terms"). Every market efficiency analysis in every securities case necessarily involves a period prior to the first "news day" demonstrating a cause-and-effect relationship. Taken to its "logical" extension, Dr. Hendershott's demand for more data would suggest that *every* trading day must be analyzed; however, that assertion is inconsistent with the principles of statistical sampling and thus, courts have rejected it. *See Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 435 (D. Ariz. 2013) ("*Cammer* does not require empirical facts as to every trading day."); *Plumbers*, 967 F. Supp. 2d at 1159 (rejecting argument that price reactions late in the class period cannot establish market efficiency throughout the class period where "defendants have not identified any other event that [the expert] should have studied.… Nor have defendants provided a countervailing event study").[41] In any event, Dr. Cain opined that had the News Days occurred earlier in the Class Period, the Notes would have reacted in the same way. Cain Reply, at ¶21.

The remainder of Defendants' single sentence criticisms also lack merit. First, their speculation that market efficiency does not necessarily mean that the market was efficient as to the

---

[41] Dr. Hendershott's speculation that the Notes may not have reacted to value relevant news earlier in the Class Period when they were investment grade is disproved by Dr. Cain's analysis the Notes reacted on November 3, 2017 when they *were* still investment grade. Cain Reply, at ¶21. It is undisputed that each of the Notes experienced a statistically significant price reaction at the 99% confidence level. Thus, investors were not "asleep at the switch" as to value-relevant information simply because the Notes were investment grade as Dr. Hendershott speculates.

information misrepresented is a "price impact" argument for which Defendants bear the burden of proof rather than the speculation offered here. *E.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 815 (2011) ("*Halliburton I*"). Notably, the Notes each plummeted by over 6% following the corrective disclosure on March 26, 2019. ECF No. 80, at ¶185. Second, Dr. Hendershott's observation that the Notes experienced statistically significant increases or decreases during the week following certain of the News Days identified by Dr. Cain is unremarkable because as Dr. Hendershott admitted these movements could be explained by additional value relevant news. Ex. 17, at 101:20-24. However, he ignored that such news was disclosed during these periods, explaining the price movements. *Id.* at 102:14-103:16 (Dr. Hendershott admitting that he did not examine whether the price movements could be explained by news); Cain Reply, at ¶¶27-28 (Dr. Cain analyzing the news disclosed during these periods).

**Autocorrelation:** Dr. Hendershott's autocorrelation analysis is flawed because it does not consider important differences between equity and bond markets and that the appearance of autocorrelation in the bond market is not inconsistent with market efficiency because of a "bid-ask bounce" known as "autocovariance" because bond purchases and sales occur at different times (known as non-synchronous trading). Cain Reply, at ¶¶49-50. *See Plumbers*, 967 F. Supp. 2d at 1160 ("[expert's] reports do not adequately account for the possibility that the autocorrelation he observed resulted from non-synchronous trading among [] bonds"). Moreover, he "did not attempt to learn whether any investors had, in fact, used the autocorrelation he identified to profit on the [CBL] bonds." *Id.* Even if Defendants' argument is correct, it "does not detract much (if at all) from a finding of market efficiency because the bond market in general exhibited autocorrelation [from February 6, 2014 through May 10, 2019.]" *In re Teva*, 2021 WL 872156, at *20 (corresponding closely to the Class Period of July 29, 2014 through March 26, 2019).

## III.   DAMAGES CAN BE MEASURED ON A CLASSWIDE BASIS

*Comcast v. Behrend*, 569 U.S. 27 (2013), only requires "plaintiffs to 'be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *In re Signet Jewelers Ltd. Sec. Litig.,* 2019 WL 3001084, at \*19 (S.D.N.Y. July 10, 2019). Here, Plaintiffs propose an event study to measure damages (*e.g.*, Cain Report at §7), which is "the generally accepted method for measuring damages in a securities fraud class action." *Signet*, 2019 WL 3001084, at \*20. The damages methodology proposed here thus "pose[s] no obstacle to class certification." *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017).

*Comcast* was a unique case, where the plaintiffs originally had four theories of antitrust violations, three of which were dismissed. At class certification, however, the plaintiffs' expert presented a damages analysis based on all four theories, the impacts of which he admitted could not be disentangled to match the single theory upheld by the court. *See* 569 U.S. at 36-38. Thus, the expert's damages analysis did not match the plaintiffs' remaining liability claim, and he could not calculate damages for class members based on the only viable claim. *See id*.

Here, in contrast, Plaintiffs allege a single theory of liability: Defendants issued false and misleading statements that artificially inflated the price of CBL securities and caused investors losses when the relevant truth was revealed. The Court upheld all aspects of Plaintiffs' theory. The use of an event study, like that proposed by Dr. Cain, "to determine whether, and the extent to which, [a defendant's] stock price was artificially high (*i.e.*, inflated) during the Class Period due to the market's misapprehension of … risk," is "standard operating procedure in federal securities litigation." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016); *see also FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 n.31 (11th Cir. 2011) ("The methodology of event studies has been sustained by many circuits.").

Nevertheless, Defendants assert that the event study methodology proposed by Dr. Cain is inadequate because, they assert, Dr. Cain has not explained (i) how the damages model would account for possible double recovery from the bankruptcy, or (ii) what the precise level of inflation will be on each day of the Class Period. Opp. at 34-35. Assuming there were any recoveries from the bankruptcy (*see* Point I.A.2.a, *supra*) those recoveries are separate from how damages should be calculated in this case. In any event, any such recoveries can be offset during the claims administration process if appropriate. However, Defendants have not shown that this applies to any Class member, let alone that it represents a material portion of the class.

Defendants' remaining criticisms relate to issues of loss causation and the accuracy of any inflation figures calculated by the methodology, not whether the methodology aligns with Plaintiffs' theory of liability or will interject individual issues that will predominate over common questions. Court decisions rejecting these same arguments at this stage are legion. *See, e.g., Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at \*9 (N.D. Cal. Mar. 16, 2016).[42]

## CONCLUSION

Plaintiffs, therefore, respectfully request that the Court issue an order: (i) certifying this case as a class action pursuant to Rule 23(b)(3); and (ii) appointing the Proposed Class Representatives as Class Representatives.

---

[42] *See also Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 47-48 (S.D.N.Y. 2018); *City of Miami Gen. Employees' & Sanitation Employees' Ret. Trust v. RH, Inc.*, 2018 WL 4931543, \*3 & n.3 (N.D. Cal. Oct. 11 2018); *Signet*, 2019 WL 3001084, at \*20; *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at \*15 (S.D.N.Y. Sept. 8, 2021)).

Dated: December 16, 2022                    Respectfully Submitted,

/s/ *Sarah R. Johnson*
Al Holifield (BPR# 015494)
Sarah R. Johnson (BPR# 030781)
**HOLIFIELD & JANICH, PLLC**
11907 Kingston Pike Suite 201
Knoxville, Tennessee 37934
Tel: (865) 566-0115
Fax: (865) 566-0119
aholifield@holifieldlaw.com
sjohnson@holifieldlaw.com

John W. Chandler, Jr.
**THE HAMILTON FIRM**
2401 Broad Street, Suite 102
Chattanooga, TN 37408
Tel: (423) 634-0871
Fax: (423) 634-0874
jwc@thehamiltonfirm.com

**Co-Liaison Counsel for Plaintiffs**

Jeffrey S. Abraham (admitted *pro hac vice*)
Michael J. Klein (admitted *pro hac vice*)
**ABRAHAM, FRUCHTER &
     TWERSKY, LLP**
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655
jabraham@aftlaw.com
mklein@aftlaw.com

Jeremy A. Lieberman (admitted *pro hac vice*)
Michael J. Wernke (admitted *pro hac vice*)
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
jalieberman@pomlaw.com
mjwernke@pomlaw.com

**Proposed Class Counsel**

**BRONSTEIN, GEWIRTZ &**
    **GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
peretz@bgandg.com

**Additional Counsel for Jay Scolnick**

**KASKELA LAW LLC**
D. Seamus Kaskela
18 Campus Boulevard, Suite 100
Newtown Square, PA 19073
Tel: (484) 258-1585
skaskela@kaskelalaw.com

**Additional Counsel for Mark Shaner**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2022 I caused the foregoing to be electronically filed with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

<u>*By: Sarah R. Johnson*</u>
**HOLIFIELD & JANICH, PLLC**
11907 Kingston Pike Suite 201
Knoxville, Tennessee 37934
Tel: (865) 566-0115
Fax: (865) 566-0119
sjohnson@holifieldlaw.com

*Co-Liaison Counsel for Plaintiffs*